**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In re:<br><br>**MIDNIGHT MADNESS DISTILLING LLC,**<br><br>Debtor. | **CHAPTER 7**<br>**Case No. 21-11750-MDC** |
| **BONNIE B. FINKEL, in her capacity as Chapter 7 Trustee for Midnight Madness Distilling LLC,**<br><br>Plaintiff,<br><br>v.<br><br>**CASEY PARZYCH; SHAWN SHEEHAN; ANGUS RITTENBURG; KELLY FESTA; ASHLEIGH BALDWIN; MICHAEL BOYER; R.F. CULBERTSON; GARY PARZYCH; RYAN USZENSKI; POLEBRIDGE, LLC; GOOD DESIGN, INC.; AGTECH PA LLC; AGTECH VI, LLC; XO ENERGY WORLDWIDE, LLLP; XO EW, LLC; CAN MAN LLC; BEST BEV, LLC; ETOH WORLDWIDE, LLC; CANVAS 340, LLC; FINLAND LEASING CO., INC.; and EUGENE T. PARZYCH, INC.,**<br><br>Defendants. | **Adv. No. _____**<br><br><br>**<u>JURY TRIAL DEMANDED</u>** |

**<u>COMPLAINT</u>**

## I.    INTRODUCTION

1.      Plaintiff, Bonnie B. Finkel (the "Trustee"), in her capacity as Chapter 7 Trustee for

Midnight Madness Distilling LLC f/k/a Theobald and Oppenheimer, LLC d/b/a Faber Distilling

(the "Debtor"), by and through her undersigned counsel, brings this action to recover, *inter alia*,

more than $10 million for damages inflicted upon the Debtor—a successful distillery that was

looted and destroyed by the Debtor's former insiders (the "Insider Defendants") and their profiteering enablers—all Defendants herein.

2.      In a brazen scheme to loot the Debtor, Defendants formed shadow entities—a number of which were "offshore"—to which Debtor opportunities, property and profits were diverted (the "Pilfering Entities") with the purpose, intent, and effect of enriching Defendants at the expense of the Debtor and its non-insider creditors.

3.      To cover their tracks, the Insider Defendants intentionally deleted, wiped, and stole the Debtor's electronic data and cloud computing drives after the Debtor filed for bankruptcy. Debtor emails, internal documents, sales records, customer lists, invoices, and marketing strategies (but for a few which remained in system files and metadata uncovered by the Trustee) were purposefully destroyed or transferred to the Pilfering Entities.

## II.     JURISDICTION AND VENUE

4.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1334, since the litigation arises under Title 11 of the United States Code (the "Bankruptcy Code"), or in or related to cases under the Bankruptcy Code.

5.      The Trustee demands a jury trial before an Article III judge in connection with all claims asserted herein that are triable to a jury under the Constitution and applicable law, and the Trustee does not consent to the entry of final judgment or adjudication by a bankruptcy judge.

6.      Venue is appropriate in this District pursuant to 28 U.S.C. § 1409(a).

## III.    PARTIES

### A.     The Plaintiff

7.      On June 21, 2021 (the "Petition Date"), Midnight Madness Distilling LLC, a Pennsylvania limited liability company, filed a voluntary petition for relief under Chapter 11 of

the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Pennsylvania under the caption *In re Midnight Madness LLC*, Bankr. E.D. Pa., Case No. 21-11750-MDC.

8.      On October 13, 2021, this Court entered an order converting the Debtor's Chapter 11 bankruptcy case (the "Chapter 11 Case") to a case under Chapter 7 of the Bankruptcy Code (the "Chapter 7 Case").

9.      On October 14, 2021, Plaintiff Bonnie B. Finkel was appointed as Chapter 7 Trustee of Debtor's bankruptcy estate—a position which she currently holds.

### B.      The Defendants

### The Insider Defendants

10.      Defendant Casey Parzych is an individual with a place of business at 2512 Quakertown Road, Pennsburg, PA 18073.  At times material hereto, Casey Parzych was: (a) the Manager and majority member of the Debtor; (b) the Debtor's President and Treasurer from 2012 until 2020 (when he was replaced as Treasurer by Defendant Rittenburg); (c) a Member and President of Defendant AgTech PA LLC (hereinafter identified), one of the Defendant Wynk Entities (hereinafter defined); and (d) an agent for the Pilfering Entities (hereinafter defined).

11.      Defendant Angus Rittenburg is an individual with a place of business at 2512 Quakertown Road, Pennsburg, PA 18073.  At times material hereto, Defendant Rittenburg was: (a) an officer and member of the Debtor; (b) an officer and member/shareholder of Defendants Polebridge, LLC and Good Design, Inc.; and (c) Chief Operations/Technology Officer of Defendant Best Bev Entities (hereinafter identified) and Defendant Wynk Entities (of which he is a co-founder).

12.      Defendant Kelly Festa is an individual with a place of business at 2512 Quakertown

Road, Pennsburg, PA 18073.  At times material hereto, Defendant Festa was: (a) the Chief Financial Officer of the Debtor; (b) the Director of Sales and Operations of the Best Bev Entities; and (c) an agent of the Polebridge Entities (hereinafter defined) and the Wynk Entities.

13.    Defendant Ashleigh Baldwin—Defendant Casey Parzych's wife—is an individual with a place of business at 2512 Quakertown Road, Pennsburg, PA 18073. At times material hereto, Defendant Baldwin was: (a) Debtor spokesperson and agent; (b) an officer and member/shareholder of Polebridge, LLC and Good Design, Inc.; and (c) an agent of the Wynk Entities and the Best Bev Entities.

14.    Defendant Michael Boyer is an individual residing at 4406 Lowell Road, Wilmington, DE 19802 and with a place of business at 2512 Quakertown Road, Pennsburg, PA 18073.  At times material hereto, Defendant Boyer was an attorney serving in the dual and conflicting roles of general counsel to the Debtor and counsel to the Polebridge Entities and the Wynk Entities.

15.    Defendant R.F. Culbertson is an individual residing at 17 Churchill Road, Pittsburgh, PA 15235 and with a place of business at 2512 Quakertown Road, Pennsburg, PA 18073.  At times material hereto, Defendant Culbertson was: (a) Chief Operating Officer and member of the Debtor; and (b) an agent of the Polebridge Entities, the Wynk Entities, and the Best Bev Entities.

16.    Defendants Casey Parzych, Rittenburg, Festa, Baldwin, Boyer, and Culbertson are referred to collectively in this Complaint as the "Insider Defendants."

**The Polebridge Entities**

17.    Defendant Polebridge, LLC ("Polebridge") is a Pennsylvania limited liability company with its registered office at 118 North Main Street, Trumbauersville, PA 18970.

18.     Defendant Good Design, Inc. ("Good Design") is a British Columbia corporation with a registered office at Suite 1400, 777 Densmuir Street, Vancouver, British Columbia, Canada, V7Y 1K4.  Good Design is owned by Defendant Baldwin, Defendant Rittenburg, and Thomas Rittenburg, who, upon information and belief, has a familial relationship with Defendant Rittenburg.

19.     Defendants Polebridge and Good Design operated as alter egos, and are referred to collectively in this Complaint as the "Polebridge Entities."

20.     As described in detail herein, the Polebridge Entities, with the substantial assistance of the Insider Defendants, misappropriated Debtor resources, property, and personnel to generate sales and profits from CBDelight and Faber Hand Sanitizer products, which rightfully belonged to the Debtor but were misappropriated by and diverted to the Polebridge Entities.

## **The Wynk Entities**

21.      Defendant AgTech PA LLC f/k/a American Cannabis LLC ("AgTech PA") is a Pennsylvania limited liability company with its principal business office at 2512 Quakertown Road, Pennsburg, PA 18073.

22.     Defendant Shawn Sheehan is an individual with a place of business at 6501 Red Hook Plaza, Suite 201, Charlotte Amalie, United States Virgin Islands, 00802.  Defendant Sheehan is sole manager and member of XO EW, LLC and Canvas 340, LLC, and Director and President of XO Energy MA, Inc.

23.     Defendant AgTech VI, LLC ("AgTech VI") is a United States Virgin Islands limited liability company with operations at 2512 Quakertown Road, Pennsburg, PA 18073.

24.     Defendant AgTech VI is formally owned and operated by a complex web of entities which are ultimately owned and controlled by Defendant Sheehan, as follows:

a.      Defendant XO Energy Worldwide, LLLP is a United States Virgin Islands limited liability limited partnership with its principal office at East End Plaza, Suite 120, 6115 Smith Bay, Charlotte Amalie, United States Virgin Islands, 00802.  Defendant XO Energy Worldwide, LLLP is the sole member and manager of Defendant AgTech VI;

b.      Defendant XO EW, LLC is a United States Virgin Islands limited liability company with its principal office at 5093 Dronningens Gade, Ste. 1, Charlotte Amalie, United States Virgin Islands, 00802.  Defendant XO EW, LLC is the general partner of Defendant XO Energy Worldwide, LLLP; and

c.      Defendant Sheehan is the sole member and manager of Defendant XO EW, LLC.  He is also its Chief Executive Officer.

25.      Defendant Canvas 340, LLC is a United States Virgin Islands limited liability company with its principal office at East End Plaza, Suite 120, 6115 Smith Bay, Charlotte Amalie, United States Virgin Islands, 00802.  The members of Canvas 340, LLC are Defendant Sheehan and the Shawn P. Sheehan Revocable Trust.

26.      Upon information and belief, Defendants AgTech PA, AgTech VI, XO Energy Worldwide, LLLP, XO EW, LLC, and Canvas 340, LLC – along with the now-dissolved Sheehan-controlled entities AgTech VI, LLLP and AgTVI, LLC – operated under the control of Defendants Sheehan and Casey Parzych as if they were a unified entity, or alter egos, and are referred to collectively in this Complaint as the "Wynk Entities."

27.      As described in detail herein, Defendants caused the Wynk Entities to, *inter alia*, utilize the resources, property, and personnel of the Debtor to produce, market and sell the Wynk Seltzer product, for which the profits flowed not to the Debtor, but instead to the Wynk Entities.

**The Best Bev Entities**

28.     Defendant Ryan Uszenski is an individual residing at 8-40 Estate Nazareth, Charlotte Amalie, United States Virgin Islands, 00802, with a place of business at 2512 Quakertown Road, Pennsburg, PA 18073.  Defendant Uszenski is a Manager of Defendants Can Man, LLC and Best Bev, LLC.

29.     Defendant Can Man LLC d/b/a Best Bev ("Can Man") is a Pennsylvania limited liability company with its registered office at 2512 Quakertown Road, Pennsburg, PA 18073.

30.     Defendant Best Bev, LLC is a United States Virgin Islands limited liability company with operations at 2512 Quakertown Road, Pennsburg, PA 18073.

31.     Defendant Best Bev, LLC is owned and operated by a complex web of entities which are owned and controlled by Defendant Sheehan, as follows:

a.      Defendant EtOH Worldwide, LLC is a United States Virgin Islands limited liability company with its principal office at East End Plaza, Suite 120, 6115 Smith Bay, Charlotte Amalie, United States Virgin Islands, 00802.  Defendant EtOH Worldwide, LLC is the sole member and a co-Manager of Defendant Best Bev, LLC;

b.      Defendant XO Energy Worldwide, LLLP is the sole member and manager of Defendant EtOH Worldwide, LLC;

c.      Defendant XO EW, LLC is the general partner of Defendant XO Energy Worldwide, LLLP; and

d.      Defendant Sheehan is the sole member and manager of Defendant XO EW, LLC.

32.     Upon information and belief, Defendants Can Man, Best Bev, LLC, EtOH Worldwide, LLC, XO Energy Worldwide, LLLP, and XO EW, LLC operated as if they were a

unified entity, or alter egos, and will hereinafter be collectively referred to as the "Best Bev Entities."

33.     As described in detail herein, the Defendants caused the Best Bev Entities to, *inter alia*, utilize resources, property, and personnel of the Debtor to generate beverage sales and beverage packaging sales for which the profits flowed not to the Debtor, but instead to the Best Bev Entities.

### The Gary Parzych Entities

34.     Defendant Gary Parzych is an individual residing at 138 N. Main Street, Trumbauersville, PA, with a place of business at 2300 Trumbauersville Road, Trumbauersville, PA 18970.  Gary Parzych is the father of Defendant Casey Parzych and the President and Owner of Defendants Finland Leasing Co., Inc. and Eugene T. Parzych, Inc.

35.     Defendant Finland Leasing Co., Inc. ("Finland Leasing") is a Pennsylvania corporation with its registered office at 2300 Trumbauersville Road, Trumbauersville, PA 18970. Finland Leasing is Debtor's former landlord.

36.     Defendant Eugene T. Parzych, Inc. ("ETP") is a Pennsylvania corporation with its registered office at 2300 Trumbauersville Road, Trumbauersville, PA 18970.

37.     At all times material hereto, the individual Defendants acted in their own right, and as agents for and on behalf of the entity Defendants.

38.     The Polebridge Entities, the Wynk Entities, and the Best Bev Entities will be referred to collectively herein as the "Pilfering Entities."

## IV.     FACTS

39.     The Debtor, also known as Theobald & Oppenheimer and Faber Distilling Co., was co-founded by Defendant Casey Parzych and Anthony Lorubbio in or around 2012 while the two

were enrolled in Defendant Culbertson's Intro to Entrepreneurship class at Carnegie Mellon University.

40.    In the years leading up to its bankruptcy filing, the Debtor experienced rapid growth—from almost nothing to $10 million in annual sales—developing, manufacturing, marketing and selling thirty+ distilled spirit products, with its most prominent products bearing the Faber brand.

41.    A February 21, 2018 Philadelphia Business Journal article reported on the Debtor's expansion:

> The Bucks County spirits company that produces the Faber line of liquors has rebranded and moved to a larger headquarters facility. The moves signal changes at the company, pivoting to become a 'curator of a collection of brands' – setting it up for more expansion. Theobald & Oppenheimer began as an entrepreneurship class project at Carnegie Mellon University in Pittsburgh, forming in 2012 under the name Midnight Madness Distilling.
>
> The company purchased, renovated and this year moved into the historic and once-dormant Theobald & Oppenheimer Co. cigar building at 118 N. Main St., Trumbauersville in Bucks County.
>
> Theobald & Oppenheimer moved from 500 square feet in its old facility to about 12,000 square feet in its new headquarters just down the road, which has office space, storage and a bottling system on four floors. . . .
>
> "We rebranded not as a craft distillery but as a curator of a collection of brands," co-founder Anthony Lorubbio told the Philadelphia Business Journal. . . . "Faber is our consumer-facing line, but if we wanted to get into another one, then we need this umbrella-branded entity that houses those brands . . . . Aside from products we have now, we have a few things under the hood we look to launch soon[.]"

**The Insider Defendants Form Good Design, Polebridge, and the Wynk Entities**
**To Funnel Money Out of the Debtor in Collusion with Defendant Sheehan**

42.    On April 19, 2019, the Debtor entered into a Loan Agreement and a Security Agreement with PNC pursuant to which it ultimately borrowed approximately $2.5 million.  To

9

secure the loan, PNC received a first lien on all personal property of the Debtor and a second mortgage on the Debtor's headquarters at 118 North Main St., Trumbauersville in Bucks County ("118 North Main").

43.    To circumvent PNC's security interest, the Insider Defendants conspired with themselves and the other Defendants to form shadow entities—in the same lines of business as the Debtor—which were then used to misappropriate Debtor resources and loot the Debtor for the benefit of the Defendants.

44.    The unlawful scheme involved sham profit sharing arrangements and sham loan agreements between the Debtor and Sheehan's collection of wholly-owned Virgin Islands based entities – namely, Defendant AgTech VI, LLC, Defendant XO Energy Worldwide, LLLP, Defendant XO EW, LLC, Defendant EtOH Worldwide, LLC, AgTech VI LLLP, and AGTVI LLC (collectively, the "Sheehan Entities") – through which Debtor resources were misappropriated and Debtor profits were siphoned out, and the ill-gotten gains were shared among the Defendants.

45.    The profit sharing agreements themselves have not been provided and are unavailable to the Trustee due to Defendants' destruction/theft of Debtor records and Defendants' failure to cooperate with the Trustee's Rule 2004 requests (discussed *infra*).

**The Polebridge Entities**

46.    Effective April 19, 2019 – the same date that the Debtor executed the PNC Loan Agreement – Defendant Baldwin formed Defendant Polebridge as a Pennsylvania limited liability company, listing its registered office as the Debtor's headquarters at 118 North Main.  Using Debtor computers, Defendant Festa provided administrative support for the filing of Polebridge's registration documents.

47.    On May 23, 2019, Defendants Baldwin and Rittenburg formed Defendant Good

Design as a British Columbia corporation, listing the Debtor's headquarters as the incorporators' address. Using Debtor computers, Defendant Festa provided administrative support for the filing of Good Design's registration documents.

48.     On February 4, 2020, Defendant Baldwin caused Polebridge to register "Good Design" as a fictitious name with the Pennsylvania Department of State, listing "canning" as the "nature of the business or other activity to be carried on under or through the fictitious name."

**CBDelight Seltzer**

49.     The Polebridge Entities' first project was CBDelight seltzer, a carbonated beverage containing cannabis derivatives.

50.     CBDelight was manufactured, packaged, and marketed using Debtor resources, labor, and material, including but not limited to: office and warehouse space for operations, the purchase of additional canning/bottling equipment utilized for the purposes of Good Design/Polebridge, sales services and incentives, marketing services, graphic design services, digital marketing and advertising services, legal services, intellectual property, and bottling services. The following facts establish the point.

51.     While described to the public as a Good Design product, "C B Delight" was in fact a trademark filed by the Debtor on April 17, 2019.

52.     On August 1, 2019, Defendants issued a press release stating that "Cbdelight (a division of Good Design Inc.) announced that it has partnered with Pennsylvania-based distributor Nittany Beverage to expand the brand's footprint in Pennsylvania. . . . Ashleigh Baldwin, CEO of Good Design Inc., remarked: 'With Chad Merriweather and Kelli Scozzaro working with Nittany's seasoned team, we're going to hit it out of the park.'" At the time of the press release, Kelli Scozzaro and Chad Merriweather were full time employees of the Debtor.

11

53.     Defendant Culbertson's LinkedIn page states that he has been employed in sales and marketing for Good Design since January 2019 and further states that "[o]ur cbDelight product is one of the top selling products in the tri-state area. . . . Our new Siphon device allows anyone to carbonate any drink with CBD – anywhere – at a far reduced price point."  The "Siphon device" referenced by Defendant Culbertson constituted or utilized the Debtor's intellectual property.

54.     The Debtor utilized Defendant Culbertson's Polebridge Entities' email address (rf@gooddesigninc.com) on its application for a Paycheck Protection Program loan.

55.     While employed full-time as the Debtor's CFO, Defendant Festa utilized a Polebridge Entities email address (kellyfesta@gooddesigninc.com), which she accessed using the Debtor's computer equipment.

56.     On numerous occasions, Defendant Casey Parzych conducted Debtor business, including communications with Debtor's outside counsel, using his Polebridge Entities email address (casey@gooddesigninc.com).

57.     Many other full-time Debtor employees utilized the Polebridge Entities' email addresses, accessed through Debtor computers, to further the business interests of the Polebridge Entities, including Defendant Rittenburg (angus@gooddesigninc.com), Debtor customer service representative Casey Coughlin (ccoughlin@gooddesigninc.com), and Debtor production manager John Pitts (john@gooddesigninc.com).

58.     CBDelight's Facebook page lists its telephone number as (215) 268-6071, a telephone number owned, paid for, and utilized by the Debtor, and staffed by Debtor employees.

59.     The LinkedIn page of John Aguilar—a Debtor account manager from November 2019 through November 2020—emphasizes that, while employed full-time by the Debtor, he "[d]eveloped, maintained and grew a target account list within Philadelphia market that drove

volume & brand recognition for . . . CBDelight," and which resulted in a 40% increase in brand

growth for CBDelight.

60.    An August 23, 2019 presentation approved by Defendant Parzych to train Debtor

sales representatives announced new Debtor product CBDelight as Debtor's top "mission critical"

priority:



61.     A Debtor marketing presentation entitled "Theobald & Oppenheimer Leadership Brands Presentation" features numerous CBDelight slides emphasizing that the Debtor makes, cans, and delivers the CBDelight product:



**Faber Hand Sanitizer**

62.     In March 2020, after the WHO declared COVID-19 a global pandemic and bars throughout the United States shut down due to government orders, the Insider Defendants caused the Debtor to manufacture, bottle, and sell hand sanitizer under the Faber brand ("Faber Hand Sanitizer"), which had been trademarked by the Debtor in 2016.

63.     As they did with CBDelight, Defendants diverted the proceeds and profits from

14

the massively lucrative Faber Hand Sanitizer out of the hands of the Debtor where they rightfully belonged and into the pockets of Defendants—funneled through the Polebridge Entities.

64.    Faber Hand Sanitizer was manufactured, packaged, and marketed with Debtor resources, including labor, material, office and warehouse space for operations, the purchase of additional canning/bottling equipment, sales services and incentives, marketing services, graphic design services, digital marketing and advertising services, legal services, intellectual property, and bottling services.  The following facts establish the point.

65.    Good Design's LinkedIn profile describes its business as "[m]anufacturing," specifically "[m]aking beverages and FDA-approved hand sanitizer for hospitals, grocery stores, employees and everyday Americans."

66.    Defendant Baldwin's LinkedIn profile lists her former employment as CEO of Good Design, which she states "makes consumer goods including spirits, sodas and hand sanitizer. We are registered with the FDA and are currently supplying hand sanitizer to several of the largest healthcare systems in the U.S."  Defendant Baldwin's profile further states that Good Design "is a good kind of consumer goods company.  We invent and make delightful spirits, sodas and other consumer products in our own factory in rural Pennsylvania."

67.    These descriptions are false—the Polebridge Entities had no manufacturing capability, facilities, or personnel whatsoever, except for that pilfered from the Debtor.

68.    Good Design's LinkedIn profile depicts bottles of Faber Distilling Co. hand sanitizer in its background:



69.    Beginning on March 26, 2020, the Debtor's Faber Liquors Instagram page was dominated by posts advertising Faber Hand Sanitizer.

70.    A Philadelphia Inquirer article dated April 6, 2020 highlights the Debtor, with no mention of Polebridge or Good Design:

> Bucks County's Theobald & Oppenheimer[, i.e., the Debtor,] is on the opposite end of the spectrum [from a smaller distillery]: The second-largest distillery in the state, it made $2 million worth of alcohol last year between its two brands, Faber Liquors and Singe Prop Rum.  Like its smaller peers, Theobald has pivoted to hand sanitizer – also using its own bottles – but it can churn it out by the pallet.
>
> "We bought ethanol at 200 [proof] and we get a tanker in a day," said T&O chief financial officer Kelly Festa.  "We mix it with hydrogen peroxide and glycerin, and then we run it through the bottling lines."

16

The Trumbauersville company has increased the number of production shifts and employees. "We're running three shifts a day, seven days a week, trying to get as much out the door as possible," Festa said. "We're getting orders left and right, from hospitals, the U.S. Postal Service, huge supermarket chains, you name it."

By the end of March, T&O had filled 167,300 one-liter glass bottles with hand sanitizer branded with the Faber Liquors label. . . . At the moment, hand sanitizer is all T&O is making.

71.    Confirming the theft of payments due the Debtors from sales of Faber Hand Sanitizer, by email dated April 9, 2020, Defendant Baldwin instructed the Debtor's sales team to divert payments from Debtor's Square point of sale system to Polebridge's Square account:



72.    As the Debtor's April 17, 2020 press release made clear:

> [The Debtor] has shifted production of its high-quality vodkas, gin, and rum to the manufacture of hand sanitizer (Faber Hand Sanitizer). While many distillers have made similar adjustments, Faber has scaled the production of its hand sanitizer to supply consumers as well as medical professionals and first responders. . .
>
> So many people are having trouble securing sanitizer right now. We knew we could help by producing an abundant supply, despite disruptions in the supply chain," said Ashleigh Baldwin, Faber's spokesperson. "When people get their sanitizer from us, they are protecting themselves and supporting efforts to help those heroes on the frontlines of the COVID-19 pandemic. . . .
>
> Faber Hand Sanitizer is available in the same one-liter bottles that the company has traditionally used to store the spirits that it has produced for more than 8 years. The hand sanitizer has less viscosity, allowing it to be utilized in spray bottles or with towels to help disinfect surfaces.

73.    Similarly, Faber Hand Sanitizer's Facebook page stated: "we – the team at FABER Liquors – have shifted our usual operations to produce much-needed hand sanitizer" and lists the telephone number of Faber Hand Sanitizer as (215) 268-6071, a telephone number owned by, paid for, utilized, and staffed by the Debtor.

74.    On April 17, 2020, Defendant Sheehan made a post to his LinkedIn page advertising Faber Hand Sanitizer.   Upon information and belief, Defendant Sheehan and the Sheehan Entities had an agreement with the Insider Defendants to share in the ill-gotten profits from the sale of CBDelight and Faber Hand Sanitizer.

75.    An April 21, 2020 email from Defendant Festa's Polebridge Entities email account (kellyfesta@gooddesigninc.com) to the Debtor's sales managers—via their Debtor email accounts (@theoandopp.com)—instructed the Debtor's sales managers to ensure that the Debtor's customers made payments by electronic transfer, i.e., ACH or wire, into Polebridge's

bank account, and not the account of the Debtor, for sales of Faber Hand Sanitizer:

> **From: Kelly Festa**
> <kellyfesta@gooddesigninc.com>
> Date: Tue, Apr 21, 2020 at 3:55 PM
> Subject: New bank account wiring
> instructions
> To: Ian Kobos <ian@theoandopp.com>,
> Kelli Scozzaro
> <kscozzaro@theoandopp.com>
>
> Hello,
>
> Can you please send this along to your
> sales team? We have a new bank account
> for wires and ACH's to go into. ACH info
> below and wire instructions attached.
>
> Thank you!
>
> Account name: Polebridge LLC
>
> Account type: Checking
>
> Bank name: Raymond James- UMB Bank
>
> Account: ▮▮▮▮▮▮▮▮
> Routing: ▮▮▮▮▮▮

76.    An April 29, 2020 press release issued by the Debtor, reports that the Debtor:

is increasing its production of hand sanitizer (Faber Hand Sanitizer) to meet growing demand . . . .

The Faber team has been supplying hospitals, truck drivers, and first responders since it first made the switch from producing its high-quality vodkas, gin, and rum.  The company has also made its 80 percent alcohol antiseptic hand sanitizer available directly to consumers too.

"It is no secret that essential businesses and services need hand sanitizer to maintain operations. However, as more businesses make plans to re-open, many are experiencing difficulties and frustrations sourcing much-needed hand sanitizer," said Faber spokesperson Ashleigh Baldwin. "We are producing abundant supplies of high-quality sanitizer to relieve the anxieties of businesses preparing to safely conduct business again.

77.     A May 12, 2020 email from the Debtor's outside counsel to a representative of the
United States Alcohol & Tobacco Tax & Trade Bureau confirms that the Debtor "has converted
to hand sanitizer production and [is] supplying large hospital centers."

78.     The Debtor's sales representatives also accepted tens of thousands, if not
hundreds of thousands, of dollars in cash payments for Faber Hand Sanitizer, which were
diverted from the Debtor for the benefit of the Polebridge Entities.

79.     A June 11, 2020 presentation approved by Defendant Parzych to train the Debtor's
sales representatives lists four "Mission Critical" products for emphasis to the Debtor's customers.
Faber Hand Sanitizer shared the top spot with Faber liquor (with CBDelight demoted to third
place):



80.     Another Debtor marketing presentation—entitled "Theobald & Oppenheimer Leadership Brands Presentation"—featured numerous slides touting Faber Hand Sanitizer and the massive success of this Debtor product:






81.     Numerous individuals utilized email addresses associated with Faber Hand Sanitizer, which they accessed using Debtor computer equipment, to further the business interests of the Polebridge Entities, including: Defendant Baldwin (ashleigh@fabersanitizer.com), Defendant Culbertson (rf@fabersanitizer.com), and Debtor customer service representative Casey Coughlin (ccoughlin@fabersanitizer.com).

82.    Faber Hand Sanitizer exploited the Debtor's marketing staff and resources, and utilized advertising mirroring that for Debtor's liquor products:



83.    Kelli Sheehan (who, upon information and belief, has a familial relationship with Defendant Sheehan), while a full-time employee and agent of the Sheehan Entities, utilized the Debtor's computers to conduct business relating to the Faber Hand Sanitizer product (kelli@fabersanitizer.com).

84.     Despite being manufactured, marketed, and sold using the Debtor's resources and personnel, profits from Faber Hand Sanitizer were diverted to the Polebridge Entities, and ultimately to the Defendants.

85.     The Trustee's preliminary analysis confirms that a minimum of $8.8 million of profits attributable to the sale of Faber Hand Sanitizer and CBDelight were stolen from the Debtor and diverted to Defendants.  The actual amount diverted is likely much higher, as there was no proper accounting for cash transactions.

**Wynk Seltzer**

86.     In the fall of 2020, Defendants Casey Parzych, Rittenburg and Sheehan used Debtor resources and personnel to create a cannabis infused beverage known as Wynk seltzer ("Wynk Seltzer").

87.     On September 1, 2020, Defendant Sheehan caused Defendant AgTech VI to file Articles of Organization as a United States Virgin Islands ("USVI") limited liability company for the purposes of diverting the profits from the sale of Wynk Seltzer away from the Debtor.

88.     On November 25, 2020, Defendant Casey Parzych, as organizer, registered American Cannabis LLC as a Pennsylvania limited liability company for the purposes of diverting the profits from Wynk Seltzer away from the Debtor.

89.     On April 26, 2021, American Cannabis LLC filed a document with the Pennsylvania Department of State to change its name to AgTech PA LLC.  The document was signed by Defendant Casey Parzych as President and indicates that it should be returned to Defendant Festa via the email address kellyfesta@drinkwynk.com.

90.     The Wynk Seltzer business was facilitated using Debtor resources, including labor, material, office and warehouse space for operations, the purchase of additional canning/bottling

equipment utilized for the purposes of Wynk Seltzer, sales services and incentives, marketing services, graphic design services, digital marketing and advertising services, legal services, intellectual property, and canning services. The following facts establish the point.

91.     While Defendants conspired to delete or steal all data on the Debtor's physical computers and cloud storage services (as described in greater detail below), forensic analysis of system files on a Debtor hard drive reveals that, as with CBDelight and Faber Hand Sanitizer, substantial Debtor resources were diverted for the ultimate benefit of the Wynk Entities.

92.     Debtor computers were used to access email addresses associated with Wynk Seltzer, including those belonging to Defendant Casey Parzych (casey@drinkwynk.com and casey@drinkcannabisusa.com), Defendant Rittenburg (angus@drinkwynk.com), Defendant Festa (kellyfesta@drinkwynk.com), Defendant Culbertson (rf@drinkwynk.com and rf@drinkcannabisusa.com), Sheehan Entities' employee Kelli Sheehan (kellisheehan@drinkwynk.com), and Debtor customer service representative Casey Coughlin (ccoughlin@drinkwynk.com).

93.     The Wynk Entities regularly used a copier and scanner belonging to the Debtor.

94.     On April 19, 2022[1], current Wynk Seltzer Brand Manager Casey Coughlin posted the following to her LinkedIn page, indicating that, on April 19, 2021 (while still a full-time

---

[1]     Historical LinkedIn posts do not publicly display the exact date on which a post was made, instead giving an approximation based off the date the post was viewed (in the case of this post, approximately "1 yr" from the June 6, 2023 date on which the screenshot was taken). The exact posting date, however, is available within computer code used to display the LinkedIn website and a publicly available internet tool (https://ollie-boyd.github.io/Linkedin-post-timestamp-extractor/) can use the URL of a given LinkedIn post to display the exact date the post was made. Utilizing this tool, the Trustee's special counsel determined that the LinkedIn post was made on April 19, 2022.

employee of the Debtor), she was "[w]rapping up Wynk's 1st mobile production run in Ohio":



95.     Debtor credit card records establish that the Debtor—not the Wynk Entities—paid

for Ms. Coughlin's travel to Ohio, including:

       a.     On April 18, 2021, a $200.45 charge at the Hampton Inn in Gallipolis, Ohio;

       b.     On April 18, 2021, an $18.46 charge to the United Dairy Farmers

convenience store in Columbus, Ohio;

       c.     On April 18, 2021, a $15.78 charge to a Bob Evans restaurant in Jackson,

Ohio;

       d.     On April 18, 2021, a $30.52 charge to a Target in Columbus, Ohio;

  e.  On April 19, 2021, a \$2.95 charge to a Starbucks in Columbus, Ohio;

  f.  On April 20, 2021, a \$23.00 charge to Jolly Pirate Donuts in Newark, Ohio;

  g.  On April 20, 2021, a \$96.80 charge to Destination Donuts in Columbus, Ohio;

  h.  On April 23, 2021, a total of \$41.43 in charges to a BP gas station in Columbus, Ohio;

  i.  On April 23, 2021, a \$973.01 charge to Budget Rent-A-Car in Columbus Ohio for a vehicle which was rented from 4/19/21 until 4/23/21;

  j.  On April 23, 2021, a \$719.10 charge to the Canopy by Hilton hotel in Columbus, Ohio;

  k.  On April 23, 2021, a \$26.44 charge to Duck Donuts in Mason, Ohio; and

  l.  On April 23, 2021, a \$313.40 charge to American Airlines for travel from Columbus, Ohio to Philadelphia.

96. Upon information and belief, the Debtor paid for many other purchases for the sole benefit of the Wynk Entities and the Wynk Seltzer product.

97. On May 11, 2021, the Wynk Entities arranged for the shipment of industrial equipment to 2600 Milford Square Pike, Quakertown PA 18591 ("2600 Milford"), a location which was paid for by the Debtor but which, upon information and belief, was used solely by the Pilfering Entities.

98. In the Summer of 2021, numerous other invoices were billed to the Debtor yet either explicitly stated that they were for purposes related to Wynk Seltzer or called for deliveries to 2512 Quakertown Road, Pennsburg, Pennsylvania ("2512 Quakertown Road"), an address never disclosed by the Debtor as part of its operations and which was used solely for the purposes of the

Polebridge Entities, the Wynk Entities, and the Best Bev Entities.

99.     The website of the Cannabis Beverage Association features a member page for "WYNK ;)", listing its address as 2512 Quakertown Road and its telephone number as (215) 565-5845, a phone number which is listed as belonging to the Debtor on vendor invoices.

100.    The Wynk Entities regularly ordered supplies for Wynk Seltzer using the Debtor's computers, telephone lines, and vendor accounts.

101.    Numerous individuals used their Wynk Entities email accounts in communications concerning the Debtor and its bankruptcy, many of which would have been otherwise privileged communications with the Debtor's attorneys, including: Defendant Casey Parzych (casey@drinkwynk.com and casey@drinkcannabisusa.com), Defendant Rittenburg (angus@drinkwynk.com), Defendant Festa (kellyfesta@drinkwynk.com), Defendant Culbertson (rf@drinkwynk.com and rf@drinkcannabisusa.com), and Defendant Sheehan (shawn@drinkwynk.com).

102.    In an email dated June 15, 2021, a representative of Classic Staffing Services, Inc. – a temp agency paid for by the Debtor – stated that she "was instructed to reach out for all matters related to Faber to Jack Blobe from Drink Wynk.  I was told he would be the contact going forward and that Drink Wynk, Theo and Opp, and Faber were one and the same."  Mr. Blobe's LinkedIn profile states that he was a full-time employee of the Debtor from May 2020 through September 2021, a full-time employee of the Wynk Entities from May 2021 through February 2022, and a full-time employee of the Best Bev Entities from May 2022 through May 2023.

103.    Despite being manufactured, marketed, and sold using the Debtor's resources and personnel, all revenues from Wynk Seltzer flowed to the Wynk Entities, and ultimately the

27

Defendants.

**Defendants Conspire to Utilize the Bankruptcy Process to Defraud the Debtor's Creditors**

104.    Defendants attempted to mask their wrongdoing by creating invoices, tax forms, and other documents to feign an arm's length relationship between Debtor, the Polebridge Entities, and the Wynk Entities.  The documents were phony and a sham—as they failed to fully and accurately describe and account for Debtor resources being devoted to the sole benefit of the Polebridge Entities, the Wynk Entities, and, ultimately, the individual Defendants.

105.    Defendants' scheme was designed to hide the fact that they were extracting millions of dollars of value out of the Debtor, to place it beyond the reach of Debtor's creditors.

106.    Due to Defendants' diversion of Debtor resources and profits to the Polebridge Entities, the Wynk Entities, and their principals and affiliates, the Debtor was unable to pay its debts and, on February 28, 2021, defaulted on the PNC loan.

107.    Under scrutiny but not wanting to abandon their profitable scheme, Defendants conspired to have Defendant Sheehan utilize his complex network of wholly-owned USVI entities to further defraud the Debtor and its creditors.

108.    Kelli Sheehan and Sheehan Entities CFO John Charette, despite being full-time employees of the Sheehan Entities, maintained accounts on the Debtor's computer system and had full access to the books, records, and online accounts belonging to the Debtor.

109.    Defendants first attempted to have certain of the Sheehan Entities either purchase PNC's debt or purchase the Debtor's business assets outside of bankruptcy.

110.    The contemplated transactions were not arm's length and were closely coordinated among the Defendants, with Defendants Casey Parzych and Sheehan leading the scheme.

111.    The coordination between the Debtor and the Sheehan Entities was so egregious

that the Debtor's outside counsel admonished Defendants Casey Parzych, Culbertson, Boyer, and

Festa in a January 18, 2021 email:

> [I]t's very unusual and inadvisable to be including [Sheehan
> Entities' attorney] Carey Drangula and [the Sheehan Entities
> referred to as] X/O on all of these emails [concerning the Sheehan
> Entities acquiring the Debtor or its assets]. There is no privilege.
> She and X/O are an adverse party in these negotiations, particularly
> now that another party . . . is in the mix. You again must treat this
> as an arm's length transaction for the ultimate maximum benefit of
> the Company between two equal suitors or you are going to get
> yourselves in trouble. I would not advise continuing to seek her
> legal counsel or X/O's approval on anything. I would also keep
> confidential communications within this team unless or until a deal
> is made. Any indication that you have favored X/O or have been
> providing them access or information that you have not provided to
> [the other potential purchaser] or other suitors has the potential to
> become fodder for litigation. X/O and [the other potential
> purchaser] are competitors and we must treat them as such.

112.    Defendants Casey Parzych, Culbertson, Boyer, and Festa did not follow counsel's

advice. They continued to present the Debtor to other potential purchasers as unfavorable in the

hope of steering the business to the Sheehan Entities at less than fair value.

113.    That plan failed and Defendants pivoted to a bankruptcy alternative, which included

an effort to sell the business cheap to the Sheehan Entities through a Section 363 sale or, if that

failed – via a web of entities doing business as "Best Bev" and/or "Can Man" and referred to herein

as the "Best Bev Entities" – through outright theft of the Debtor's property and resources.

114.    Attorney time entries filed with this Court in support of certain of the Sheehan

Entities' attorneys' application for allowance of a purported "expense reimbursement" establish

the essential role of the Sheehan Entities in the scheme, indicating that, as of at least April 8, 2021,

the Sheehan Entities were conspiring with the Debtor Defendants to formulate the Debtor's

bankruptcy strategy.

115.    Indeed, Defendant Sheehan (using his Sheehan Entities email address,

ssheehan@xo-energy.com, and his Wynk Entities email address, shawn@drinkwynk.com) and Sheehan Entities CFO John Charette (using his Wynk Entities email address, johncharette@drinkwynk.com) were copied on otherwise privileged emails between the Debtor, its bankruptcy counsel, and/or its accountants concerning the Debtor's bankruptcy strategy.

116.    Defendants Sheehan and Casey Parzych jointly retained Washington D.C.-based public relations firm kglobal to direct marketing strategies in light of Debtor's bankruptcy and Sheehan's anticipated takeover of Debtor's assets.

### The Debtor Diverted Assets to the Best Bev Entities

117.    On May 3, 2021, Can Man, LLC ("Can Man") was formed as a Pennsylvania limited liability company with Debtor's outside counsel acting as organizer.  Can Man's registered office was originally listed as 2600 Milford, but changed on September 30, 2021 to 2512 Quakertown Road, the same address used by the Wynk Entities.

118.    Upon information and belief, all activity taking place at 2600 Milford, 2512 Quakertown Road, and 300 Commerce Drive, Quakertown, PA ("300 Commerce") was for the benefit of Can Man, the other Best Bev Entities, and the other Pilfering Entities.

119.    Upon information and belief, in May 2021, Defendants caused the Debtor to transfer a Hamrick Recaser machine with an estimated value of $145,000 to 2512 Quakertown Road for use by the Pilfering Entities.

120.    On May 6, 2021, Casey Coughlin – who identifies herself on her LinkedIn page as an employee of the Debtor and Wynk – posted the following to her facebook page: "Hiring spree! Beverage production in Quakertown (don't sleep on it) at Faber Distilling. . . . Signing bonus, referral bonus, bonus for breathing.  Name your bonus."

121.    Upon information and belief, Ms. Coughlin's hiring efforts – while ostensibly made

on behalf of the Debtor – were intended to benefit the Pilfering Entities, as a company on the verge of a bankruptcy filing would likely not make such extraordinary hiring expenditures.

122.    On June 1, 2021, despite knowing that the Debtor's bankruptcy filing was imminent, Defendant Casey Parzych, acting on behalf of the Debtor, executed a Consulting Services Agreement with DPG Management, LLC ("DPG") under which DPG was to provide human resources consulting services more fully described in a proposal dated May 20, 2021.

123.    The May 20, 2021 DPG proposal, while addressed to the Debtor, is entitled "Wynk – Proposal," and provides for comprehensive human resources programs and assessments which would be of no use to a company about to file for bankruptcy.  Upon information and belief, the services provided by DPG, although contracted and paid for by the Debtor, were used by Defendants to benefit the Pilfering Entities.

124.    On June 14, 2021, Defendants Festa and Uszenski utilized the Debtor's computer equipment and email system to create and edit a Word document titled "Can Man Shadow Structure," which depicted a corporate structure under which Can Man would own Faber and all the Debtor's other brands and operate out of a headquarters located 2512 Quakertown Road.

125.    On June 13, 2022, Best Bev, LLC was formed as a United States Virgin Islands limited liability company.  Upon information and belief, Best Bev LLC is either the successor in interest to Can Man or was created by Defendants to avoid liability for misconduct on the part of Can Man, which at all times relevant hereto operated using the name "Best Bev."

126.    On June 24, 2022, Maho, LLC filed papers with the Pennsylvania Department of State to utilize "Best Bev" as a fictitious name.  The document was signed by John Pitts, the Best Bev Entities' Processing & Compliance Manager (and the Debtor's former production manager) and indicates that it should be returned to Defendant Festa at 2512 Quakertown Road.

**<u>Defendants Interfered with the Debtor's Section 363 Sale</u>**

127. On June 3, 2021, Defendants Casey Parzych and Rittenburg signed a Joint Resolution of the Managers and Majority In Interest of Members of the Debtor declaring that the Debtor was insolvent and unable to pay its debts as they mature and authorizing the filing of a voluntary petition under chapter 11 of the Bankruptcy Code.

128. On June 1, 2021, immediately before execution of the joint resolution, the Debtor, on the one hand, and EtOH Worldwide, LLC and AgTech VI, LLC, on the other, executed Equipment Lease Agreements.

129. The Equipment Lease Agreements were sham documents designed to create false administrative claims that would accrue during the Chapter 11 Case but would never be paid. Indeed, based on the lease payments that were accruing, the Debtor over a two-year term would pay well more than double the original cost of the equipment.

130. In a letter dated June 10, 2021, Defendant Sheehan, writing as President of Defendant EtOH Worldwide, LLC, sent a letter (the "Sheehan Letter") to coerce PNC into cooperating with a Section 363 sale of the Debtor's assets to the Best Bev Entities at a low-ball price. While signed only by Defendant Sheehan, the letter was drafted by Sheehan, counsel for Sheehan and the Best Bev Entities, and the Debtor's bankruptcy counsel. It states in pertinent part:

> EtOH has evaluated MMD, [i.e., the Debtor,] including the collateral pledged to PNC, and concluded that the remaining value of its business, however slight, is as an ongoing concern. As soon as MMD is reduced to its assets, the value of the business will plummet. The equipment that was pledged to PNC has significantly diminished in value and is almost inextricably integrated into the building in which it has housed. . . . EtOH's acquisition of MMD's assets will be the only viable path forward, and this path will require PNC to reset its expectations for several reasons.

\* \* \*

Without EtOH as a counterparty, MMD will shutter its operations in Trumbauersville, leaving 80 employees jobless in a small rural town in Pennsylvania. PNC will be left with virtually unsaleable equipment, and, in the face of Casey Parzych's personal bankruptcy, a meaningless guaranty. EtOH is aware of certain additional complicating factors that will only frustrate PNC's attempts to recoup value from MMD's assets . . . .

\* \* \*

The landlord of the leased premises[, i.e., 2300 Trumbauersville Road, which was leased by Defendant Finland Leasing to the Debtor,] is the father of MMD's majority Unit Holder; it is solely because of this relationship that the landlord has not pursued a default claim for nonpayment of rent under the lease. . . . [T]he landlord is unwilling to relet the premises to an unknown third party (including PNC or its eventual assignee) and nothing could compel him to do so. Without a lease at these premises, the distilled spirits production permits . . . will be immediately revoked.

131.    On the Petition Date, the Debtor filed a motion seeking approval of a sale under Section 363 of the Bankruptcy Code (the "Sale Motion"). The Sale Motion proposed to sell the Debtor's assets to Sheehan Entity EtOH Worldwide, LLC, and failed to disclose the extent of the relationship between the Sheehan Entities and Debtor insiders.

132.    In the run up to the Section 363 sale, Defendant Gary Parzych advised potential buyers that he would not allow anyone other than the Sheehan Entities to lease the 2300 Trumbauersville Road property, nor would he permit a transition period for a buyer to find a new location for the operations in that building. Gary Parzych further stated that he was only willing to allow the Sheehan Entities to occupy the building because his son, Defendant Casey Parzych, was part of their organization.

133.    On July 22, 2021, the Debtor caused a document to be posted to the Section 363 sale data room which stated that the 2300 Trumbauersville Road "lease is expired. All batching and bottling equipment that is currently stored in this building needs to be immediately removed

33

from the premises upon completion of the sale.  New distilled spirits plant license [sic] will then

have to be obtained as all current licenses are tied to 2300 Trumbauersville Road."

134.    The chilling impact of this sudden revelation was well-summarized in a July 22,

2021 email from PNC's counsel to the Debtor's bankruptcy counsel:

> This lease is identified in the Stalking Horse APA for assumption
> and assignment, so the sudden revelation that it is not available to
> other bidders is problematic.  The landlord – Finland Leasing – is
> owned by Casey's father.
>
> If the Stalking Horse is getting favored (undisclosed) treatment for
> this lease by virtue of this property being owned by Casey's father
> – and other potential bidders will not be afforded similar treatment
> or even told they can negotiate with Finland – this is highly
> inappropriate.  None of this has been disclosed but for a random
> paragraph uploaded for the first time today (that seems well
> designed to scare off potential bidders).  This document should be
> removed from the data room immediately since it is highly
> prejudicial.
>
> It's looking more and more like MMD is designing this sale to
> overwhelmingly favor ETOH (in a sale that no doubt will benefit
> Casey personally) – a clear violation of MMD's fiduciary
> obligations.

135.    On the same day, counsel for PNC expressed further concerns to counsel for the

United States Trustee, and highlighted how Defendants were depressing the value of the

Debtor's assets at the anticipated Section 363 sale:

> I am very concerned about the due diligence materials being
> presented to potential bidders and management's favoritism to
> ETOH (that an affiliate holds Casey and his wife's personal
> guaranty over their heads is a major red flag – I don't care what was
> proffered yesterday).  PNC got access to the data room yesterday
> and discovered that only 2020/2021 financials were uploaded (only
> COVID operations, nothing historic).  PNC requested that historical
> financials for the past 3 years be updated (and was told by [the
> Debtor's auctioneer] that they would be).  It just seems like
> management is doing everything it can to make this business look
> unattractive to third parties.  BET Investments has already dropped
> out – Kurtzman told me today.

136.    Other bidders informed PNC's counsel that they were dropping out because it was obvious that the Insider Defendants were attempting to rig the sale in favor of the Sheehan Entities.

137.    A July 23, 2021 email from PNC's counsel further describes the impact of the Debtor's failure to provide full disclosure as to the relationship between the Debtor, its principals, Finland Leasing, and the Sheehan Entities:

> What information was provided to PNC pre-petition has little bearing on the information being provided to third party bidders by MMD/Comly – nor is posturing by ETOH in connection with pre-petition sale negotiations pertinent to whether or not MMD is meeting its fiduciary obligations now that it is in bankruptcy.  At best the information provided to third party bidders regarding this lease has been misleading and contradictory (with this lease reported as unexpired in the Schedules and disclosure schedules to the APA when allegedly it is not).  At worst, the bidders are being given late information that is both inaccurate and designed to discourage participation.  It's fair to alert bidders that the lease is expired and cannot be assumed or assigned under Section 365 (if that is the case).  But it's another thing entirely for MMD to pre-emptively tell bidders that they will have no access to that building post-closing under any circumstances (which is the message sent by the document uploaded yesterday).

> Casey's father and his company, Finland Leasing, are statutory insiders of the Debtor.  *See* Section 101(31)(B)(vi) and (E).  If there is a side-agreement or any sort of understanding (even informal) between Finland Leasing and ETOH, it should have been disclosed at Wednesday's hearing (where it was reported that there are no agreements/understandings at all between ETOH and its affiliates/insiders and MMD and its affiliates/insiders other than the vague reference in the APA to possible retention of employees).  The fact that the APA provides for assumption and assignment of this expired lease strongly suggests there is such a side-agreement.  This should be disclosed in the notice you are preparing to interested parties.

> Most importantly, however, Casey and his father (both insiders of MMD) cannot collude with each other and ETOH to favor ETOH over other bidders.  That is what this is if Finland would only agree to enter into a new lease with ETOH and no other potential buyers.  It's deliberately and purposefully putting the other bidders at a

disadvantage to throw the auction to ETOH.  That ETOH was aware of this advantage and previewed it for PNC is all the more troubling and suggestive of the collusion.  But ETOH's posturing does not excuse MMD and Casey from meeting their fiduciary obligations to conduct a fair sale process designed to maximize the value of the assets.  A fix in favor of ETOH hardly does that.

This can be corrected by MMD/Comly advising potential bidders that they too are free to reach out to Finland Leasing to negotiate terms of a new lease (or a short-term accommodation if they don't want to use that building).  But any attempt by Finland Leasing (a debtor insider) to pre-emptively foreclose those discussions is a significant problem and clear violation of MMD's fiduciary obligations.  All bidders need to be on equal footing with respect to potential negotiations with Finland (except for normal market issues such as ability to perform, etc.) – and that should be communicated clearly to the interested bidders.

138.    On July 26, 2021, counsel to the United States Trustee held a Section 341 meeting at which Defendant Casey Parzych testified under penalty of perjury, *inter alia*, that the Debtor had no relationship with Wynk Seltzer.  This testimony was willfully false.

139.    That same day, a creditor which participated in the meeting emailed counsel for the United States Trustee.  The creditor forwarded an email from a representative of Classic Staffing Services, Inc. (stating that a Debtor representative told her that "Drink Wynk, Theo and Opp, and Faber were one and the same"), and pointed out that it establishes the "opposite of what [Defendant Casey Parzych] testified [to] on today's call re: DrinkWynk's relationship to Midnight Madness."

140.    PNC's counsel confirmed that numerous Debtor employees were simultaneously working for the Wynk Entities:

A little shocking that MMD internally isn't even trying to hide it[, i.e., the fact that Debtor employees, vendors, and customers were being told that the Debtor and the Wynk Entities were one and the same].

I wonder if they would give you ownership/governance information for Wynk, ETOH, AgTech and XO Energy?  [Millstone Spirits Group, LLC ("Millstone") principal] Robert Cassell thought Casey

had an ownership interest in one of the XO affiliates, but I was not able to find any governance information (these are Virgin Island entities). Even if Casey doesn't have an ownership interest in Wynk, I bet Angus Rittenburg does – and he's also a director of MMD. I would think at some point Harry/Bill would be a little concerned with how honest their client contact is being with them. My litany of e-mails to them is not just me crying wolf at this point. There are serious issues here.

I'm told by Cassell that Faber is a $10 million brand, so there's real value here (and that's just one of the several brands). The failed transaction with XO Energy that the other shareholder blew up pre-petition was for a purchase price of more than $2.5 million. Creditors are now at risk of ETOH taking the company for $1.5 million ($1,025,000 cash plus assumption of $450,000 in secured debt) and Casey getting the benefit of whatever side deals he's negotiated and this co-venture with Wynk. If you assume $2.5 million is the floor, fulsome marketing and a fair auction (overseen by a true fiduciary) could get unsecured creditors paid.

At one point pre-petition, PNC floated to Casey the idea of PNC funding a small DIP loan to allow for fulsome marketing and to neutralize the stalking horse bid. He wouldn't even discuss it with us. Not sure if PNC would be interested in that in connection with a trustee, but let me know if you want to discuss.

141.    On August 6, 2021, in response to questioning from counsel from the United

States Trustee, the Debtor represented that:

The debtor does not now and never has provided services to any companies for the purpose of unlawfully manufacturing, storing, distribution, or using a controlled substance as defined under federal law.

The debtor has no knowledge of a company called DrinkWynk. Wynk seltzer is a product.

Casey Parzych is the sole member of AgTech PA LLC ("AgTech"). Agtech contracts with different cannabis processors to produce Wynk seltzer. None of the debtor's assets (including but not limited to the collateral of the PNC Loans) are currently used by or in the business operations of AgTech nor have they ever been used by or in the business operations [sic] AgTech. AgTech lawfully provides services to cannabis companies using assets that are not and never were owned by the debtor.

37

142.    This statement, like Defendant Casey Parzych's testimony at the Section 341

meeting, is demonstrably false given the numerous instances described in this Complaint of the

Wynk Entities using the Debtor's equipment, facilities, and employees.

143.    In an email string dated August 16 & 17, 2021, counsel for PNC complained to the

Debtor's bankruptcy counsel that:

> Counsel for New Liberty[, a division of Millstone,] reached out to
> advise that she spoke with Casey's father (principal of the landlord
> for 2300 Trumbauersville Road) and was told in no uncertain terms
> that he will not accommodate anyone other than ETOH with respect
> to either a new lease or even transition time for a new buyer to find
> a new location for the operations in that building.  He told her that
> he is only willing to allow ETOH occupy the building because his
> son is going to be involved with them going forward.  All he will
> offer a new buyer is 30 days, which New Liberty's counsel tells me
> is not enough time to transition; they need at least 90 days.  At the
> same time, he is offering ETOH (as the stalking horse) much more
> than that – because he knows that Casey will be involved with that
> enterprise.
>
> Needless to say, this is concerning and contrary to representations
> made by Casey and ETOH (including representations made by
> Casey under oath).  Casey's recent declaration said that his father
> was willing to discuss arrangements with other bidders and that
> there is no formal or informal agreement between ETOH and
> Finland regarding the premises.  Casey has also sworn (and your
> firm has represented) that there is no agreement – informal or
> otherwise – between Casey and ETOH regarding his ongoing
> involvement with the business.  It's very obvious to anyone paying
> attention that that simply isn't true.  Casey's father pretty much
> confirmed it today with New Liberty's counsel.
>
> This also reeks of continuing collusion among Casey, ETOH and his
> father.  As estate fiduciaries, both Casey and your firm should
> welcome the participation of New Liberty.  We therefore implore
> you and Harry to address this immediately with Casey and his father.
> Casey's father – as a debtor insider – cannot favor ETOH over other
> potential bidders because of his son's business relationship with
> ETOH (current or future).  That is the very reason why relatives of
> debtor insiders are themselves considered debtor insiders.

* * *

> Casey has been less than forthcoming with everyone (including your firm) about the extent of his and his family's relationships with the stalking horse – disclosing things only when they're called out by others. Given these prior issues, questions need to be asked and information verified – and it is not my practice to blindside opposing counsel by simply raising issues at a hearing.
>
> All PNC wants is a fair auction process that puts bidders on somewhat equal footing and does not give ETOH an inside advantage because of Shaun Sheehan's other business relationships with Casey.

144.    On or about August 25, 2021, Millstone placed a winning bid at the Section 363 auction for an approximate price of $1.4 million and agreements to assume certain contracts, and pay certain administrative expenses.

145.    Due to the Defendants' misconduct as alleged herein, the price paid by Millstone for the Debtor's assets was less than it would have been had the Section 363 sale been conducted on a level playing field.

146.    On September 17, 2021, this Court approved the sale of substantially all of the Debtor's assets to Millstone.

147.    Documents filed with this Court by Millstone for the purposes of objecting to the Sheehan Entities' requests for allowance of expense reimbursement aptly summarize the chilling effect of the Defendants' misconduct on the bidding at the Section 363 auction and the inextricable intertwinement of the Debtor, the Sheehan Entities, and the Wynk Entities:

> [t]he Stalking Horse bid[, i.e., the Sheehan Entities' collusive initial bid for the Debtor's assets,] did not serve as a catalyst for additional bids. The mere fact that the Stalking Horse bidder was an insider of the Debtor with intimate and preexisting knowledge of the assets to be sold, and that Finland Leasing (the Debtor's landlord for 2300 Trumbauersville Road and Casey Parzych's father) made clear he would only lease to [Sheehan Entity] ETOH, certainly dissuaded true third party purchasers. Millstone was the only bidder at the

auction other than ETOH and PNC, and even then, the Debtor attempted to prevent Millstone from bidding by announcing, at the auction with no advance warning, that the Debtor would not consider the bids apples-to-apples unless Millstone agreed to pay ETOH's administrative expense claim.  If ETOH's insider status wasn't . . . enough to chill bidding, the Debtor's overwhelming support of the Stalking Horse surely did. . . . ETOH had unfettered access to information regarding the valuation of the Debtor's assets and its business operations for months, if not longer, before the bankruptcy was filed.

\* \* \*

The [Sheehan Entities'] and the Debtor's businesses and management have been inextricably [i]ntertwined since well before this bankruptcy case was filed[.] . . . The [Sheehan Entities] are insiders of the Debtor, . . . [and] the transactions resulting in the [Sheehan Entities'] request for an administrative claim were not arms-length[.] . . . Millstone submits that the invoices for many of the parts associated with [equipment which is the subject of the aforementioned sham lease agreements between the Sheehan Entities and the Debtor] demonstrates the [Sheehan Entities'] insider relationship.  For example, several of the invoices that appear to be for pieces of the Leased Equipment were billed to "Kelly Festa, Etoh Worldwide." . . . Ms. Festa was, at all relevant times, the Debtor's chief operating officer.  Other invoices reflect equipment that was billed and shipped to a company called "American Cannabis" located at the Debtor's business address and "ordered by Kelly Festa." . . . While the Debtor was never in the business of cannabis production, the venture formed by Debtor's members, Casey Parzych and Angus Rittenburg, with the indirect owner of the [Sheehan Entities], Shawn Sheehan, were in that business, through their "Wynk" business.  Yet other invoices [pertaining to equipment used by the Wynk Entities] were billed directly to "Theobald & Oppenheimer," the dba used by the Debtor.

**Defendants Operated the Debtor in Possession As An Extension of
the Pilfering Entities, And Continued to Do So After the Section 363 Sale**

148.    While operating the Debtor in Possession (the "DIP"), Defendants caused the DIP to make numerous transfers and incur debts from which the Debtor derived no benefit and which went to the sole benefit of the Best Bev Entities and the other Pilfering Entities.

149.    Upon information and belief, Defendant Casey Parzych made the Debtor's bankruptcy counsel aware of his plan to steal Debtor assets and divert business to the Best Bev Entities, prompting counsel to send him the following email on August 31, 2021:

> Casey, as a follow up to our conversation, I want to reiterate that our strong advice is for you and MMD to at all times act in good faith to take all actions to preserve and protect the assets, business, customers, contracts, relationships, etc of MMD and to deliver to the winning bidder at the auction--- Millstone--- the assets that they contracted to purchase so that their expectations for the transaction that they bargained for will be consummated at the closing.  Doing anything less, would contradict our advice could subject you (and maybe others) to significant legal issues and concerns.   One particular issue of note is that you could be found personally liable for failure to uphold your fiduciary duty to MMD and its creditors and such personal liability could be deemed non-dischargeable (even if you filed a Chapter 7) see, for example Section 523(a)(4) of the Bankruptcy Code.

150.    While the Trustee's effort to construct a full accounting of transfers made by the Debtor for the benefit of Best Bev has been hampered by Defendants' intentional destruction of Debtor records, such transfers include the following (the "Post Petition Best Bev Transfers"):

a.    On or about July 6, 2021, Defendants caused an industrial shrink wrapper machine (PMI Shrink Wrapper with Heat Tunnel, SI-TW30, Serial No. 02498) belonging to the Debtor to be delivered to 2512 Quakertown Road for use by Best Bev.  Defendant Festa later falsely informed Millstone that the machine was broken and scrapped before closing;

b.    On or about July 14, 2021, Defendants used the Debtor's account to order $700.40 worth of carbon dioxide from Roberts Oxygen Company, Inc., with the carbon dioxide delivered to Best Bev at 2512 Quakertown Road;

c.    On or about July 14, 2021, Defendants used the Debtor's account to order 25,872 750 ML glass bottles and 2,688 1.75 L glass bottles from O-I Packaging Solutions LLC at

a cost of $22,198.03, which were delivered to Best Bev at 2512 Quakertown Road, and which were paid for by check drawn on the Debtor's DIP account and signed by Defendant Festa;

       d.     On or about July 19, 2021, Defendants used the Debtor's account to order 25,872 750 ML glass bottles, 1,344 1.75L glass bottles, and 3,072 750 ML tequila bottles from O-I Packaging Solutions LLC at a cost of $22,919.06, which were delivered to Best Bev at 2512 Quakertown Road, and which were paid for by check drawn on the Debtor's DIP account and signed by Defendant Festa;

       e.     On or about August 5, 2021, a $400.00 check to Milford Township (in which 2512 Quakertown Road sits) for a "Fire Inspection" was drawn on the Debtor's DIP bank account and signed by Defendant Festa;

       f.     On or about August 10, 2021, Defendants used the Debtor's account to arrange for SunTeck Transport Co., LLC to deliver a 2,000 LB shipment from Eastgate Graphics in Lebanon, OH to Best Bev at 2512 Quakertown Road at a cost of $2,795.00;

       g.     On or about August 11, 2021, Defendants used the Debtor's account to order $1,244.30 worth of packaging material from Century Packing, Inc., for shipment to Best Bev at 2512 Quakertown Road;

       h.     On or about August 12, 2021, Defendants used the Debtor's account to order 24,024 1L glass bottles from O-I Packaging Solutions LLC at a cost of $17,125.14, which were delivered to Best Bev at 2512 Quakertown Road;

       i.     On or about August 18 and 19, 2021, Defendants used the Debtor's account to order a total of $1,236.64 worth of carbon dioxide from Roberts Oxygen Company, Inc., which was delivered to Best Bev at 2512 Quakertown Road;

j.      On or about August 31, 2021, Defendants used the Debtor's account to order and ship 181,984 aluminum cans from Zuckerman Honickman at a total cost of $41,037.12, which were delivered to Best Bev at 2512 Quakertown Road;

k.      On or about September 13, 2021, Defendants used the Debtor's account to order 722,000 aluminum can ends from Zuckerman Honickman at a cost of $23,465.00, which were delivered to Best Bev at 2512 Quakertown Road; and

l.      A September 29, 2021 email from Millstone's counsel to Debtor's bankruptcy counsel reported that Defendants removed the following items from Debtor's facility (upon information and belief, for the benefit of the Best Bev Entities): a case shrink sealer, a nitrogen doser, and a bulk carbon dioxide system.

151.    Upon information and belief, the above represents a small fraction of the goods and services which were paid for by the Debtor, but which were used for the sole benefit of Best Bev or the other Pilfering Entities.

152.    Defendants have intentionally sabotaged the Trustee's efforts to determine the full extent of goods and services paid for by the Debtor but used for the sole benefit of Best Bev or the other Pilfering Entities.  For example, Defendant Festa instructed vendors to falsely state that Debtor orders were being delivered to the Debtor's facilities when they were actually being delivered to Best Bev at 2512 Quakertown Road.

153.    Shortly before the Millstone acquisition was set to close, the Insider Defendants falsely informed Debtor employees that they would be meeting with Millstone representatives, but instead arranged a meeting with agents of the Best Bev entities, who requested that Debtor employees sign a document stating their intention to work for Best Bev.  The employees were then told to take the week off, which allowed Defendants to remove several pieces of large equipment

from the Debtor for the benefit of the Best Bev entities.

154.    On or about September 21, 2021, prior to the Millstone deal closing, the Insider Defendants intentionally deleted, wiped, or stole all the Debtor's electronic data and cloud computing drives, both to hinder Millstone from competing with Defendants' Best Bev enterprise and to hinder any investigation into Defendants' misconduct.

155.    While Defendant Festa testified at a Section 341 meeting that she inadvertently deleted the Debtor's data while trying to transfer it to Millstone, this testimony is contradicted by numerous facts, including: a) due to standardized safeguards and warnings issued by the Debtor's cloud provider prior to mass deletion of data, and a thirty day hold period during which deleted data can be recovered, it is highly improbable that all of the Debtor's email and electronic data could be inadvertently destroyed; b) in addition to data stored on cloud services, the Debtor's computers were wiped of meaningful data prior to their transfer to Millstone; c) a forensic analysis conducted by Millstone indicated that the data was not destroyed, but instead transferred; and d) in discussions which occurred after the supposed deletion of data, Defendant Festa was able to retrieve specifically requested electronic documents belonging to the Debtor, but only after reporting that she had to ask for permission to do so.  Upon information and belief, Defendant Festa sought "permission" from Defendants Casey Parzych and Sheehan, who ordered the deletion/transfer of the Debtor's data in the first instance.

156.    On September 27, 2021, Millstone's counsel reported to the Debtor's counsel that Defendant Parzych told Debtor employees not to come to work, that the Debtor had not been fulfilling customer orders, that "Faber products are out of stock in basically every store," and that there was no backlog of inventory or glass bottles at the Debtor's premises.  Upon information and belief, this was because Defendants: a) encouraged the Debtor's former employees to work for the

Best Bev Entities instead of Millstone; b) were fulfilling the Debtor's customer orders for the benefit of the Best Bev Entities instead of the Debtor; and c) were using the Debtor's inventory and equipment to produce large amounts of product for use by Best Bev.

157.    The Debtor's large raw materials purchases and hiring spree in the months preceding the Millstone closing also support the inference that millions of dollars' worth of DIP property was improperly diverted to the Best Bev Entities.

158.    Defendants lied about the true nature of their supposedly new enterprise, informing customers that Best Bev was simply a continuation of the Debtor.

159.    For example an October 7, 2021 text message from Defendant Culbertson to a former customer of the Debtor stated that the Defendants had "re-formed" the Debtor "and quickly started [manufacturing] & co-packing 500,000 cans/bottles per day."

160.    Culbertson's text message further offered to "save you at least 14% OFF your current prices," with the "current prices" being a reference to the Debtor's prices, and with the discount made possible only because Defendants had been stealing the Debtor's personnel, equipment, and inventory for use by Best Bev.

161.    Upon information and belief, Defendants sent similar text messages to hundreds of the Debtor's former customers, using customer lists which Defendants stole from the Debtor.

162.    An October 11, 2021 email from counsel to Millstone to Debtor's bankruptcy attorneys reports:

> [b]ased on . . . conversations our sales guys are having with [former Debtor] customers, [Defendant] Casey [Parzych] and [Defendant] RF [Culbertson] are holding themselves out to customers as "Faber" and saying the[y] "re-formed" the business.
>
> I am also getting invoices from other [Debtor] vendors who say they haven't been paid in months, and that [Defendant] Kelly [Festa] recently asked them to make edits to invoices before they sent them

45

> to us to make it look like the goods were shipping to [the Debtor] at
> 118 N. main Street (when the original invoice says they were
> shipping to CanMan at 2512 Quakertown Road).

163.    On October 12, 2021, Defendants made their first post to the wellrebellion Instagram account.  Well Rebellion was the new name for the liquor product Defendants manufactured and bottled using Debtor resources and employees.

164.    Defendants subsequently began manufacturing, marketing, and selling the Well Rebellion product using stolen Debtor equipment as well as the Debtor's supposedly deleted internal data.

165.    Certain of the Defendants, including Defendants Festa and Culbertson, utilized custom Well Rebellion flyers which included their cell phone numbers to market the product for the benefit of Best Bev.  Upon information and belief, the flyers were created using the Debtor's marketing files, but with the Faber brand name replaced with the Well Rebellion name.

166.    Prior to and after the closing of the sale of the Debtor's assets to Millstone, the Defendants utilized the Debtor's phone.com account for the benefit of Best Bev, returning calls to Debtor customers who placed orders for Faber products, and instead selling them the corresponding Best Bev products.

167.    On October 18, 2021, Drifter Spirits emailed Millstone concerning a meeting that Drifter Spirits had that day with "Midnight Madness," the Debtor; in reality, the Defendants had set up a meeting between Drifter Spirits and Best Bev under the guise that Best Bev was a mere continuation of the Debtor.

168.    In an October 20, 2021 report, a Millstone sales manager complained that Defendants were using the Faber brand name in communications with the Debtor's former customers and were causing the customers to think that Best Bev was simply a continuation of the

Debtor:

> All of our customers are still very confused and getting daily
> constant texts/calls/emails from BestBev claiming to be us and
> asking for their 'Faber well order'. . . . They hired a team of reps +
> call center with 5 people non stop calling our customers working
> phones + email off our old customer lists.  Many of our customer
> are telling me they call them, text them, and email them multiple
> times a day after they told them to please please stop.

169.    On November 1, 2021, a Millstone sales manager reported that the Best Bev

Entities "are continuing to spam all of our customers direct cell phones with texts and calls" and

that the customers were confused as to whether the Debtor and Best Bev were separate entities.

170.    In the fall of 2022, Defendants caused Best Bev to join the Upper Perkiomen Valley

Chamber of Commerce, stating that, "[a]fter years of dreaming up, canning and distributing our

own beverages, we have expanded our universe . . . [and] have the space to do it all at our new

100,000+ sf facility centrally located just outside Philadelphia," i.e., 2512 Quakertown Road.  The

reference to "years of dreaming up, canning and distributing our own beverages" is an obvious

reference to the Debtor, and yet another indication that Defendants treated the Debtor and Best

Bev as one and the same.

171.    To this day, Defendants and the Best Bev Entities benefit from their theft of Debtor

resources.  Accordingly, all profits and assets of the Best Bev Entities should be returned to the

Debtor's estate for the benefit of those creditors whose debts Defendants sought to avoid.

### The Insider Defendants' Utter Failure To Maintain Internal Controls

172.    At all times material hereto, the Insider Defendants caused the Debtor to fail to

comply with the most basic principles of corporate governance and internal controls.

173.    This failure was intentional, particularly with respect to the Debtor's accounting,

as it allowed Defendants to freely pilfer the Debtor for the benefit of the Pilfering Entities, with

substantial ill-gotten gains flowing to the individual Defendants.

174.    A May 10, 2021 letter from the Debtor's outside accounting firm addressed to the

Debtor's Board of Directors and Members of the Debtor and its related entities reported the

complete failure of the Debtor's accounting function:

> In planning and performing our review of the consolidated
> financial statements of [the Debtor] and related entities . . .
> as of and for the year ended December 2020 in accordance
> with Statements on Standards for Accounting and Review
> Services promulgated by the Accounting and Review
> Services Committee of the American Institute of Certified
> Public Accountants (AICPA) we considered the Company's
> internal control over financial reporting together with certain
> administrative and procedural aspects which the Company
> employs.
>
> During the course of the review engagement we encountered
> numerous issues that we believe need to be addressed.  These
> matters lead to a prior period adjustment, numerous
> adjusting journal entries, and a significant amount of
> additional time to complete the review because of the need
> to perform additional review procedures. . . .
>
> Moreover, the issues noted cause for substantial concern
> because management cannot rely entirely on the accuracy of
> internally prepared financial statements.

175.    The Insider Defendants, with the active involvement and under the instruction of

Defendant Sheehan, grossly mismanaged the Debtor's Chapter 11 Case by, among other things,

providing false and inaccurate testimony and declarations, allowing the Debtor to produce and file

inaccurate documents, pilfering funds belonging to the DIP for the benefit of their affiliated

entities, providing the Sheehan Defendants full access and control of the Debtor's books and

records, allowing the Sheehan Defendants to assist in the preparation of the Debtor's filings with

this Court, intentionally attempting to rig the Section 363 sale for the benefit of the Sheehan

Defendants (resulting in an artificially low price for the Debtor's assets at auction) and causing the

Debtor to incur substantial unnecessary and avoidable fees, costs, and expenses.

176.    The Insider Defendants retained and utilized Defendant Boyer as the Debtor's non-bankruptcy General Counsel while knowing that Defendant Boyer was breaching fiduciary duties owed to the Debtor by simultaneously acting as counsel to the Polebridge Entities and the Wynk Entities to the considerable prejudice and detriment of the Debtor and its creditors.

177.    Defendant Boyer breached his fiduciary duties to the Debtor by simultaneously representing the Debtor, the Polebridge Entities, and the Wynk Entities, which, as set forth herein, existed for the purpose of defrauding the Debtor and its creditors.  Moreover, Defendant Boyer as general counsel to the Debtor knew or should have known of management's wrongdoing and failure to follow proper standards of corporate governance as set forth herein, had a duty to take corrective measures, and actively assisted Defendants' scheme instead of fulfilling his duty to correct the wrongdoing.

178.    Defendants Parzych and Rittenburg treated the Debtor as their piggy bank, making a number of personal purchases using the Debtor's funds, including the following (the "Parzych/Rittenburg Purchases"):

    a.    On May 22, 2020, Defendant Casey Parzych used the Debtor's credit card to make a $287.60 purchase at Heartwood Aviation LLC, a private flight school in Quakertown, PA;

    b.    On May 22, 2020, Defendant Angus Rittenburg used the Debtor's credit card to make a $114.42 purchase at Rich Air, a private aircraft services provider in Queensbury, NY;

    c.    On June 1, 2020, Defendant Casey Parzych used the Debtor's credit card to make a $1,029.42 purchase at Elliott Aviation, a private aircraft service provider;

d.     On June 2, 2020, Defendant Casey Parzych used the Debtor's credit card to make a $698.75 purchase at AVFlight, a private aviation service provider in North Canton, OH;

e.     On June 2, 2020, Defendant Angus Rittenburg used the Debtor's credit card to make a $438.76 purchase at Rich Air, a private aircraft services provider in Queensbury, NY;

f.     On June 3, 2020, Defendant Casey Parzych used the Debtor's credit card to make an $81.76 purchase at Heartwood Aviation LLC, a private flight school in Quakertown, PA;

g.     On June 8, 2020, Defendant Casey Parzych used the Debtor's credit card to make a $247.34 purchase at Heartwood Aviation LLC, a private flight school in Quakertown, PA;

h.     On June 12, 2020, Defendant Casey Parzych used the Debtor's credit card to make a total of $2,072.10 in purchases at Elite Flight Experience, a private flight school in Princeton, NJ;

i.     On June 13, 2020, Defendant Casey Parzych used the Debtor's credit card to make a $948.30 purchase at Elite Flight Experience, a private flight school in Princeton, NJ;

j.     On June 13, 2020, Defendant Casey Parzych used the Debtor's credit card to make a $173.97 purchase at Heartwood Aviation LLC, a private flight school in Quakertown, PA;

k.     On June 13, 2020, Defendant Rittenburg used the Debtor's credit card to make a $285.64 purchase at Heartwood Aviation LLC, a private flight school in Quakertown, PA;

l.     On June 14, 2020, Defendant Casey Parzych used the Debtor's credit card to make a $1,657.10 purchase at Elite Flight Experience, a private flight school in Princeton, NJ;

m.     On June 22, 2020, Defendant Rittenburg used the Debtor's credit card to make a $2,398.00 purchase at General Aviation Modifications, Inc., a supplier of private aircraft

engine parts in Ada, OK;

n.      On August 23, 2020, Defendant Casey Parzych used the Debtor's credit card to make a $14,362.24 purchase at the Pink Sands Club, a luxury resort located on the Caribbean island of Canouan in St. Vincent and the Grenadines;

o.      On October 2, 2020, Defendant Casey Parzych used the Debtor's credit card to make a $329.22 purchase at Heartwood Aviation LLC, a private flight school in Quakertown, PA;

p.      On January 7, 2021, Defendant Casey Parzych used the Debtor's credit card to make a $620.40 purchase with American Airlines for purposes of buying an airline ticket for his father, Defendant Gary Parzych;

q.      On February 13, 2021, Defendant Casey Parzych used the Debtor's credit card to make a $205.14 purchase at the Margaritaville Beach hotel in Hollywood, Florida;

r.      On February 16, 2021, Defendant Casey Parzych used the Debtor's credit card to make a total of $274.89 in purchases from American Airlines for travel to St. Thomas;

s.      On March 2, 2021, Defendant Casey Parzych used the Debtor's credit card to make a $4,551.93 purchase at Elite Flight Experience, a private flight school in Princeton, NJ;

t.      On March 29, 2021, Defendant Casey Parzych used the Debtor's credit card to make a $940.00 purchase at Fare Share Ltd., a private flight school in Pottstown, PA; and

u.      On April 21, 2021, Defendant Casey Parzych used the Debtor's credit card to make a $15,000.00 payment to his personal attorney at Rogers Counsel in Ardmore, PA.

### The Insider Defendants Funneled Money To Defendant Gary Parzych's Entities

179.    The Debtor was party to a lease with Defendant Finland Leasing dated January 1, 2016 for warehouse space at 2300 Trumbauersville Road, Quakertown, PA (the "2300

Trumbauersville Lease").

180.    Defendant Finland Leasing is owned and controlled by Defendant Gary Parzych,

Casey Parzych's father.

181.    The 2300 Trumbauersville Lease provides for a monthly rent payment of

$2,050.00.

182.    The 2300 Trumbauersville Lease provides that it "may be modified only by a

further writing that is duly executed by both parties."

183.    Despite only being obligated to pay Finland Leasing $2,050.00 per month in rent,

the Insider Defendants, for the purpose of funneling money out of the reach of the Debtor's

creditors, caused the Debtor to pay Finland Leasing well more than $2,050.00 per month in rent

as follows:

| Month | Payments Total | Excess Payment |
|-------|----------------|----------------|
| August 2017 | $7,700.00 | $5,650.00 |
| October 2017 | $2,293.36 | $243.36 |
| January 2018 | $8,760.86 | $6,710.86 |
| February 2018 | $6,500.00 | $4,450.00 |
| April 2018 | $6,500.00 | $4,450.00 |
| May 2018 | $6,500.00 | $4,450.00 |
| June 2018 | $6,500.00 | $4,450.00 |
| July 2018 (payment made 6/29/18) | $6,500.00 | $4,450.00 |
| August 2018 | $14,994.40 | $12,944.40 |
| September 2018 | $9,000.00 | $6,950.00 |
| October 2018 | $6,500.00 | $4,450.00 |
| November 2018 | $9,700.00 | $7,650.00 |
| December 2018 | $12,800.00 | $10,750.00 |
| January 2019 (payment made 12/27/18) | $6,500.00 | $4,450.00 |
| February 2019 | $13,000.00 | $10,950.00 |
| March 2019 | $6,500.00 | $4,450.00 |
| April 2019 | $6,500.00 | $4,450.00 |
| May 2019 | $6,500.00 | $4,450.00 |
| June 2019 (payment made 7/3/2019) | $6,500.00 | $4,450.00 |
| July 2019 | $7,375.00 | $5,325.00 |

| | | |
|---|---|---|
| August 2019 | $7,375.00 | $5,325.00 |
| September 2019 | $7,375.00 | $5,325.00 |
| October 2019 | $7,443.00 | $5,393.00 |
| November 2019 | $7,375.00 | $5,325.00 |
| December 2019 | $7,375.00 | $5,325.00 |
| January 2020 | $7,448.00 | $5,398.00 |
| February 2020 | $7,375.00 | $5,325.00 |
| May 2020 | $6,500.00 | $4,450.00 |
| June 2020 (payment made 7/1/20) | $6,500.00 | $4,450.00 |
| July 2020 | $6,500.00 | $4,450.00 |
| August 2020 (payment made 9/4/2020) | $6,500.00 | $4,450.00 |
| September 2020 | $15,000.00 | $12,950.00 |
| October 2020 (payment made 9/29/2020) | $6,500.00 | $4,450.00 |
| November 2020 | $6,500.00 | $4,450.00 |
| December 2020 | $6,500.00 | $4,450.00 |
| January 2021 | $6,500.00 | $4,450.00 |
| February 2021 (payment made 1/28/2021) | $6,500.00 | $4,450.00 |
| March 2021 | $6,500.00 | $4,450.00 |
| April 2021 | $6,500.00 | $4,450.00 |
| May 2021 | $6,500.00 | $4,450.00 |
| June 2021 | $6,500.00 | $4,450.00 |
| **TOTAL** | **$308,389.62** | **$224,339.62** |

184.    As computed above, the Debtor made at least $308,389.62 in payments to Finland

Leasing from August 2017 through June 2021 (the "Total Finland Leasing Payments"), thereby

overpaying its rent obligations by at least $224,339.62 (the "Finland Lease Overpayments").

185.    The 2300 Trumbauersville Lease provides that "[i]n the event that any utility or

service provided to the Leased Premises is not separately metered, Landlord shall pay the amount

due and separately invoice Tenant for Tenant's pro rata share of the charges."

186.    Despite this unambiguous language, the Debtor made various payments for utilities

and services ostensibly provided to the leased premises not to Finland Leasing, but instead to

Defendant ETP.

187.    The unjustified and extracontractual payments made by the Debtor to ETP were ostensibly for not only utilities, but also a variety of clearly frivolous and non-Debtor charges, including dental insurance for Defendant Casey Parzych's uncle Larry Parzych and satellite radio for Defendant Casey Parzych.

188.    The Debtor made at least $355,778.05 in unjustified and extracontractual payments to ETP (the "ETP Payments") as follows:

| Date | Payment Total |
|---|---|
| May 2016 | $36,374.15 |
| December 2016 | $10,678.08 |
| January 2017 | $6,183.78 |
| March 2017 | $1,477.51 |
| May 2017 | $6,670.48 |
| June 2017 | $2,458.54 |
| July 2017 | $4,773.87 |
| August 2017 | $8,656.02 |
| September 2017 | $8,755.82 |
| November 2017 | $19,082.53 |
| January 2018 | $11,963.53 |
| March 2018 | $12,934.44 |
| April 2018 | $8,723.14 |
| June 2018 | $4,830.00 |
| August 2018 | $3,196.08 |
| September 2018 | $3,372.50 |
| October 2018 | $20,837.51 |
| December 2018 | $1,553.89 |
| February 2019 | $5,853.24 |
| May 2019 | $13,819.34 |
| July 2019 | $7,129.61 |
| August 2019 | $4,423.87 |
| September 2019 | $7,525.59 |
| October 2019 | $1,381.90 |
| December 2019 | $3,996.04 |
| May 2020 | $37,163.97 |
| July 2020 | $16,298.72 |
| August 2020 | $7,809.00 |
| September 2020 | $8,026.80 |
| October 2020 | $6,098.95 |
| November 2020 | $926.24 |
| December 2020 | $3,922.76 |

| January 2021 | $4,211.33 |
|---|---|
| February 2021 | $4,630.77 |
| March 2021 | $4,478.25 |
| May 2021 | $21,562.40 |
| June 2021 | $5,998.62 |
| August 2021 | $10,191.00 |
| September 2021 | $7,807.78 |
| **TOTAL** | **$355,778.05** |

## The Chapter 7 Case

189.    On August 25, 2021, the United States Trustee filed a Motion Pursuant to 11 U.S.C.

§ 1112 to Dismiss the Case or Convert to Chapter 7 (the "Conversion Motion").  In support of the

Conversion Motion, the United States Trustee averred, *inter alia*:

        a.      "[P]rior to the petition date the Debtor caused to be made transfers of

substantial value";

        b.      "The Debtor has failed to timely file its financial operating reports since the

petition date.  The UST, creditors, and parties in interest are unable to examine the Debtor's post-

petition operations and determine whether the Debtor has otherwise complied with its fiduciary

obligations.  Further, the failure to comply with this duty makes it impossible to determine the

administrative expenses of the estate since this case was filed."; and

        c.      "The Debtor has failed to file the Notice of Officer Compensation as

required by LBR 4002-1 disclosing any payments made since the filing date or contemplated being

made to the Debtor's officers."

190.    On October 13, 2021 (the "Conversion Date"), the Bankruptcy Court entered an

Order converting the Debtor's Chapter 11 case to a case under Chapter 7 of the Bankruptcy Code

and, on October 14, 2021, the Trustee was appointed as the permanent Chapter 7 Trustee of the

Estate.

191.    Since her appointment, the Trustee has undertaken an investigation of the Debtor's affairs.

192.    The Defendants have actively obstructed the Trustee's investigation.

193.    As discussed herein, Defendants intentionally destroyed or stole the Debtor's emails and electronic files.

194.    The night before Millstone was set to take over the Debtor, documents stored in a safe located at 118 North Main were removed.  A forensic analysis of the Debtor's Wi-Fi system disclosed that a device named "Casey's Phone" logged into the Debtor's network at a time contemporaneous with the removal.

195.    Defendants Casey Parzych, Rittenburg, Baldwin, Festa, Culbertson, Uszenski, Best Bev, LLC, Can Man, EtOH Worldwide, LLC and AgTech VI have failed to cooperate with requests for information issued pursuant to Bankr. E.D.Pa. Local Rule 2004-1.

196.    Defendants instructed former debtor employees to sign non-disclosure agreements to conceal information relating to the operation of the Debtor's business.

197.    Former Debtor employees who did not cooperate with Defendants were harassed and intimidated.  By way of example, a chocolate phallus was sent to the family home of a former Debtor employee who chose to work for Millstone rather than join Defendants at the Best Bev Entities.

198.    On March 7, 2022, Millstone filed a proof of claim which confirms many of the foregoing allegations and establishes that the Defendants' wrongdoing caused substantial harm to the Estate by incurring debts and making expenditures on behalf of the Pilfering Entities, transferring the Debtor's equipment to the Pilfering Entities, and ultimately diminishing the value of the Debtor in the eyes of potential Rule 363 purchasers.

## V.    CLAIMS

### FIRST CLAIM – BREACH OF FIDCUIARY DUTY
#### (Against the Insider Defendants)

199.    The allegations set forth above are incorporated herein by reference as if set forth at length.

200.    The Insider Defendants, as officers (Defendants Casey Parzych, Rittenburg, Festa, and Culbertson), members (Defendants Parzych, Rittenburg, and Culbertson), employees/agents (all Insider Defendants), and/or legal counsel (Defendant Boyer) to the Debtor, owed fiduciary duties of care, loyalty, and good faith to the Debtor.

201.    The duty of loyalty obligated the Insider Defendants to commit themselves to the business of the Debtor for the purpose of promoting the interests of the Debtor and not themselves or their other affiliated entities.

202.    The duty of loyalty is breached, *inter alia*: (a) when a fiduciary fails to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities; (b) when a fiduciary "abdicates" their fiduciary responsibilities; (c) when a fiduciary acts in bad faith; and/or (d) when a fiduciary engages in self-dealing.

203.    The duty of care is breached, *inter alia*: (a) when a fiduciary engages in an irrational decision-making process; and (b) when the conduct of a fiduciary rises to the level of gross negligence.

204.    The Insider Defendants breached their fiduciary duties to the Debtor by, among other things:

a.    Making, or allowing to be made, significant unauthorized or improper transfers;

b.    Causing the Debtor to enter into transactions with affiliates and family

57

members of its managers and members without proper authorization;

      c.     Engaging in numerous acts of self-dealing and theft for the benefit of the Pilfering Entities;

      d.     Causing or allowing the Debtor's funds to be commingled with the funds of other persons or entities;

      e.     Using or allowing to be used the Debtor's funds for the use of the Pilfering Entities or the personal use of Defendants Casey Parzych and Rittenburg;

      f.     Failing to maintain and preserve the Debtor's assets and records, including, among other things, intentionally destroying or stealing Debtor emails and electronic records;

      g.     Failing to ensure that adequate internal controls and reporting systems were in place and property utilized to mitigate against the misappropriation of Debtor funds and resources;

      h.     Failing to maintain an adequate accounting system;

      i.     Failing to hold regular meetings of the Board of Managers;

      j.     Failing to conduct or maintain written records of meetings, votes, resolutions, or written consents;

      k.     Failing to keep, or cause to be kept, accurate, complete, and proper books, records, and accounts pertaining to Debtor's affairs;

      l.     Conspiring to attempt to sell Debtor or its assets to the Sheehan Entities at a fraction of its true value, and in so doing sabotaging offers from other interested purchasers;

      m.     Grossly mismanaging Debtor's Chapter 11 Case, including allowing representatives of the Sheehan Entities to manage the bankruptcy process to the detriment of the Debtor and its estate;

n.      Destroying Debtor's attorney-client privilege by including the Wynk Entities and Sheehan Entities in numerous communications;

o.      Causing the Debtor to operate in an illegal fashion in violation of tax laws and other regulatory obligations;

p.      Conspiring with the Sheehan Entities, Finland Leasing, and Gary Parzych to chill bidding at the Debtor's Section 363 sale; and

q.      Engaging in other acts of fraud, gross negligence, or other material breaches of their fiduciary duties as set forth herein.

205.    At all times relevant hereto, the Insider Defendants engaged in self-dealing, prioritizing their own interests and the interests of their affiliates over the interests of the Debtor.

206.    The Insider Defendants and their affiliates received millions of dollars for their roles in facilitating and implementing the breaches of fiduciary duty, and they should be required to disgorge and repay those ill-gotten gains.

207.    The conduct of the Insider Defendants, as aforesaid, was intentional, reckless, and sufficiently outrageous as to justify the imposition of punitive damages.

208.    As a result of the many breaches of fiduciary duties by the Insider Defendants as set forth herein, the Debtor has suffered damages in an amount to be determined at trial, but which exceeds the sum of $10 million.

## SECOND CLAIM – AIDING & ABETTING BREACH OF FIDCUIARY DUTY
### (Against All Defendants)

209.    The allegations set forth above are incorporated herein by reference as if set forth at length.

210.    As set forth in detail in this Complaint, at all times relevant hereto, the Insider Defendants owed the Debtor fiduciary duties of care, loyalty, and good faith and repeatedly

breached these duties.

211.   Each of the Defendants aided and abetted these breaches of fiduciary duty.

212.   Each of the Defendants had knowledge that the Insider Defendants' conduct was a breach of their fiduciary duties owed to the Debtor.

213.   Each of the Defendants substantially assisted and/or encouraged the Insider Defendants to breach their fiduciary duties owed to the Debtor.

214.   To the extent that any Insider Defendant might be found not to have had a fiduciary duty to the Debtor at the time of the misconduct complained of herein, each such Insider Defendant is nevertheless liable for having aided and abetted the breach of fiduciary duties by one or more of the other Insider Defendants possessing such duties at the relevant times.

215.   The entity Defendants' substantial assistance and/or encouragement is demonstrated by, *inter alia*, their role as the entities through which the individual Defendants siphoned money away from the Debtor, and the improper benefits they received because of that misconduct.

216.   Defendants received millions of dollars for their roles in aiding and abetting the breaches of fiduciary duty, and they should be required to disgorge and repay those ill-gotten gains.

217.   The conduct of the Defendants, as aforesaid, was intentional, reckless, in bad faith, and sufficiently outrageous as to justify the imposition of punitive damages.

218.   As a result of each Defendant's aiding and abetting of the breaches of fiduciary duty by the Fiduciary Defendants as set forth herein, the Debtor has suffered damages in an amount to be determined at trial, but which exceeds the sum of $10 million.

### THIRD CLAIM – CORPORATE WASTE
**(Against the Insider Defendants)**

219.   The allegations set forth above are incorporated herein by reference as if set forth

at length.

220.    The funds generated by the Pilfering Entities' use of the Debtor's assets constituted

valuable assets of the Debtor which, if properly handled and collected by the Debtor, would have

generated significant revenue and profits for the Debtor.

221.    By using the Pilfering Entities to funnel revenues and profits away from the Debtor

and its creditors and to the Defendants, the Insider Defendants deprived the Debtor of millions of

dollars.

222.    The Insider Defendants' waste of the Debtor's assets was commercially

unreasonable and served no rational business purpose.

223.    As a result of the waste of Debtor's assets, the Insider Defendants are liable for the

damages associated with their misconduct.

### FOURTH CLAIM – DECLARATORY RELIEF
### (ALTER EGO, PIERCING THE CORPORATE VEIL
### AND/OR SUCCESSOR LIABILITY)
### (Against All Defendants)

224.    The allegations set forth above are incorporated herein by reference as if set forth

at length.

225.    As set forth in detail in this Complaint, the corporate form should be disregarded

as between the Pilfering Entities and the individual Defendants, on the one hand, and the Debtor,

on the other, because Defendants ignored the corporate boundaries of the Debtor in favor of their

own interests and over the interests of the Debtor and its creditors, as part of a scheme to enrich

themselves at the expense of the Debtor and its creditors.

226.    Defendants exercised control over the Debtor to such a degree that the Debtor

operated as nothing more than their alter ego, tool, and business conduit.

227.    Defendants dominated the Debtor inequitably and to the detriment of the Debtor

and its creditors by, among other actions, preventing the Debtor from paying its legitimate debts while siphoning company funds for the benefit of the Pilfering Entities and their principals, the individual Defendants.

228.    Defendants operated the Pilfering Entities as if they were the alter ego and mere continuation of the Debtor, with Debtor management and employees making all decisions for and conducting the daily operation of the Pilfering Entities utilizing the physical plant and equipment of the Debtor.

229.    The Pilfering Entities utilized the same employees, telephone number and address as the Debtor.

230.    Any intercompany transactions between the Debtor and the Pilfering Entities were not at arm's length, were not properly documented, and operated to the severe disadvantage of the Debtor.

231.    Defendants intentionally failed to keep adequate books and records rendering it impossible to disentangle the affairs of the Debtor from those of the Pilfering Entities.

232.    Due to Defendant's blatant disregard of corporate formalities and Defendants' explicit statements as set forth herein, Debtor's employees, vendors, and customers understood Debtor and the Pilfering Entities to be one and the same, and injustice would result if the assets of the Pilfering Entities and the other Defendants were not available to satisfy the claims of Debtor's non-insider creditors.

233.    The Pilfering Entities were simply a façade for the individual Defendants and utilized for the sole purpose of siphoning funds and resources from the Debtor.

234.    The Pilfering Entities constitute a mere continuation of the Debtor and are thus liable for the Debtor's debts as the Debtor's successor.

235.    Accordingly, the interests of justice demand the entry of a judgment piercing the corporate veils, declaring that the Pilfering Entities and the individual Defendants are each the alter egos of the Debtor and holding them jointly and severally liable for all liabilities of the Debtor's Estate.

### FIFTH CLAIM – UNJUST ENRICHMENT
**(Against All Defendants)**

236.    The allegations set forth above are incorporated herein by reference as if set forth at length.

237.    As set forth in detail in this Complaint, each of the Defendants was enriched and received economic and other benefits from the Debtor without justification, including, but not limited to, the following:

a.    The Pilfering Entities use of the Debtor's facilities, equipment, personnel, inventory, and intellectual property without payment of fair compensation therefor;

b.    The Pilfering Entities receipt of revenue from the sale of CBDelight, Faber Hand Sanitizer, Wynk Seltzer, and other products manufactured by the Debtor or with the use of the Debtor resources;

c.    Finland Leasing and ETP's receipt of extracontractual and unjustified payments from the Debtor (i.e., the Finland Lease Overpayments and the ETP Payments);

d.    Defendant Casey Parzych's and Rittenburg's receipt of the Parzych/Rittenburg Purchases; and

e.    Upon information and belief, each of the Defendants have received monetary payments from the Pilfering Entities which were derived with the benefit of the Debtor's resources.

238.    Defendants have unjustly retained benefits to the detriment of the Debtor's Estate

and its creditors.

239.    The Debtor was impoverished because of Defendants' misconduct, which resulted in a massive share of Debtor's assets and profits being siphoned off for the benefit of the Defendants and the Pilfering Entities, with the Estate being left with millions of dollars in unpaid debts.

240.    There is no justification for the Defendants' abuse of the Debtor for the purpose of self-dealing and other misconduct.

241.    Accordingly, the Trustee is entitled to a judgment against each of the Defendants compelling them to disgorge and return the amounts by which they were unjustly enriched.

### SIXTH CLAIM – AN ACCOUNTING
**(Against All Defendants)**

242.    The allegations set forth above are incorporated herein by reference as if set forth at length.

243.    An accounting is an equitable remedy that consists of the adjustment of accounts between parties and a rendering of a judgment for the amount ascertained to be due to as a result.

244.    As set forth in detail in this Complaint, the Insider Defendants failed to maintain complete and accurate books and records of the benefits conferred by the Debtor on the Pilfering Entities.

245.    Moreover, except for files inadvertently left on a Debtor hard drive, the Insider Defendants either destroyed or stole those Debtor books and records which do exist.

246.    Defendants took extraordinary and illegal steps to cover their tracks, including, for example, Defendant Festa's forgery of vendor invoices to conceal the shipment of goods to the Best Bev Entities and Defendant Casey Parzych's false testimony at a Section 341 meeting.

247.    Upon information and belief, Defendants possess certain books, records, and other

electronic data of the Debtor.

248.    The Trustee is entitled to an accounting setting forth the Debtor's transfers to and transactions with the Defendants.

249.    Accordingly, the Trustee seeks the entry of a judgment directing the Defendants to perform a full and accurate accounting of all Debtor resources which were diverted to or for the benefit of the Defendants, as well as revenues received using Debtor resources, and to remit to the Trustee all funds owed to the Estate as a result.

## SEVENTH CLAIM – CONSTRUCTIVE TRUST
### (Against All Defendants)

250.    The allegations set forth above are incorporated herein by reference as if set forth at length.

251.    A constructive trust is an equitable remedy to redress a wrong.  When one party has obtained the property of another that in equity and good conscience it ought not to possess, a constructive trust will be imposed.

252.    As set forth in detail herein, the Pilfering Entities were formed, managed, and financed using the resources of the Debtor, with full knowledge of the Debtor's obligations to its creditors, and with the active participation of the Debtor's fiduciaries.

253.    The Pilfering Entities were directly and materially enriched by virtue of such unfair and unconscionable conduct, at the expense of the Debtor and its creditors.

254.    Accordingly, a constructive trust should be imposed on the assets of the Pilfering Entities for the benefit of the Debtor's bankruptcy estate.

**EIGHTH CLAIM – BREACH OF CONTRACT**
**(Against Defendants Casey Parzych and Rittenburg, for Monetary Damages)**
**(Against the Pilfering Entities, for a Declaratory Judgment)**

255.    The allegations set forth above are incorporated herein by reference as if set forth

at length.

256.    Section 9.17 of Debtor's Amended and Restated Operating Agreement As

Amended and Restated as of April 16, 2019 and Debtor's Amended and Restated Operating

Agreement As Amended and Restated as of March 26, 2021 state as follows (the "Assignment"

provision):

9.17    Assignment.

(a) The term "Work Product" means all patents
and patent applications, all inventions, innovations, improvements,
packaging improvements, alcohol/spirit/liqueur formulations,
packaging inventions and/or improvements, packaging
developments, technologies, similar technologies, developments,
methods, designs, analyses, drawings, reports, creative works,
discoveries, software, computer programs, modifications,
enhancements, know-how, product, formula or formulations,
marketing and sales information, concepts and ideas, and all similar
or related information (in each case whether or not patentable), all
copyrights and copyrightable works, all trade secrets, Information,
and all other intellectual property and intellectual property rights
that (in any case above) are conceived, reduced to practice, created,
developed or made by a Member either alone or with others, in the
course of providing the services to the Company.

(b) Each Member hereby agrees that (and hereby
assigns) all Work Product will be the exclusive property of the
Company, and in consideration of this Agreement, without further
compensation, hereby assigns, and (as necessary) agrees to assign,
to the Company all right, title, and interest to all Work Product that:
(i) relates to any and all current and future aspects of the Company's
Business (defined as the selling, making, marketing, distributing or
otherwise engaging in the liqueur, spirits, carbonated beverage,
seltzer, general beverage, or alcoholic beverage business) or (ii) is
conceived, created, reduced to practice, developed, or made entirely
or in any part: (a) during the time any Member performs (or
performed) services for the Company; or (b) using any equipment,

66

supplies, facilities, assets, materials, information (including, without limitation, Information) or resources of the Company (including, without limitation, any intellectual property rights of the Company);

(c) If for any reason the foregoing assignment is determined to be unenforceable, each Member grants to the Company a perpetual irrevocable, worldwide, royalty-free, exclusive, sub-licensable right and license to exploit and exercise all such Work Product; and

(d) Each Member shall promptly disclose Work Product to the CEO of the Company and perform all actions reasonably requested by the Company (whether during or after the service with the Company) to establish and confirm the ownership and proprietary interest of the Company in any Work Product (including, without limitation, the execution of assignments, consents, powers of attorney, applications and other instruments). Each Member agrees to assist the Company in obtaining any patent for, copyright on or other intellectual-property protection for the Work Product, and to execute and deliver or otherwise provide such documentation and provide such other assistance as is necessary to or reasonably requested by the Company or its agents or counsel to obtain such patent, copyright, or other protection. Each Member shall maintain adequate written records of the Work Product, in such format as may be specified by the Company, and make such records available to, as the sole property of, the Company at all times. Each Member shall not file any patent or copyright applications related to any Work Product except with the written consent of the Company's CEO.

257.    Defendants Casey Parzych and Rittenburg are "Members" of the Debtor as that term is defined in each pertinent document, and were bound by Debtor's operating agreement which contains the Assignment Provision.

258.    As set forth in detail above, Defendants Casey Parzych and Rittenburg generated Work Product for the benefit of the Pilfering Entities that: 1) related to the Debtor's Business (i.e., selling, making, marketing, distributing or otherwise engaging in the liqueur, spirits, carbonated beverage, seltzer, general beverage, or alcoholic beverage business); 2) was conceived, created, reduced to practice, developed, or made entirely or in any part during the time Parzych and

Rittenburg were performing services for the Debtor; and 3) was conceived, created, reduced to practice, developed, or made entirely or in any part using the equipment, supplies, facilities, assets, materials, information and resources of the Debtor.

259.    Defendants Casey Parzych and Rittenburg have not disclosed or assigned Work Product to the Debtor, in breach of the Assignment Provision.

260.    The Pilfering Entities, with knowledge of the Assignment Provision, possess Work Product which was generated entirely or partially by Defendants Casey Parzych and Rittenburg, including, but not limited to, the Work Product associated with the following:

   a.   The Wynk Seltzer and CBDelight products;

   b.   The Best Bev Entities' branding and brands;

   c.   United States Design Patent Nos. US D918,708 S, US D931,672 S;

   d.   United States Patent Application Publication No. US 2022/0264947 and Patent Cooperation Treaty Application No. PCT/US2020/043055;

   e.    United States Patent Application Publication No. US 2022/0232859 and Patent Cooperation Treaty Application No. PCT/US2020/043034;

   f.   Unites States Patent Application No. 63/174,233 and Patent Cooperation Treaty Application No. PCT/US2022/024394;

   g.   United States Patent Application No. 62/979,200 and Patent Cooperation Treaty Application No. PCT/US2021/018509;

   h.   United States Patent Application No. 62/903,260 and Patent Cooperation Treaty Application No. PCT/US2020/051783;

   i.   United States Patent Application No. 62/847,019 and Patent Cooperation Treaty Application No. PCT/US2020/032590;

   j.   United States Patent Application No. 62/979,233 and Patent Cooperation Treaty Application No. PCT/US2021/018532;

   k.   United States Patent Application No. 62/847,023 and Patent

Cooperation Treaty Application No. PCT/US2020/032593;

l.   United States Patent Application No. 62/903,293 and Patent Cooperation Treaty Application No. PCT/US2020/051803; and

m.   United States Trademark Serial Nos. 97263015, 90889744, 90674624, 97883067, 97174708, 97184527, 97184492, 97600495, 97600483, 88639939, 88840793, 88389825, 88421795, 88389949.

261.   Defendants Casey Parzych's and Rittenburg's failure to comply with the terms of the Assignment Provision have caused damages to the Debtor.

262.   Accordingly, the Trustee seeks entry of a judgment against Defendants Casey Parzych and Rittenburg for damages caused to the Debtor arising out of the breach of the Assignment Provision, or Defendants' wrongful use of Debtor property.

263.   The Trustee also seeks entry of a declaratory judgment against the Pilfering Entities assigning back to the Debtor all Work Product in the possession or control of the Pilfering Entities.

## NINTH CLAIM – BREACH OF CONTRACT
### (Against Defendant Finland Leasing)

264.   The allegations set forth above are incorporated herein by reference as if set forth at length.

265.   As set forth in detail *supra*, the Finland Lease Overpayments and ETP Payments were made in violation of the terms of the Finland Lease.

266.   Accordingly, judgment should be entered in favor of the Trustee and against Finland Leasing for the full amount of the Finland Lease Overpayments and ETP Payments.

## TENTH CLAIM – EQUITABLE SUBORDINATION
### (Against All Defendants)

267.    The allegations above are incorporated herein by reference as if set forth at length.

268.   Defendants have engaged in inequitable conduct which has resulted in injury to Debtor's creditors and conferred unfair advantages on Defendants and, as such, equitable

subordination of any/all claims of the Defendants would not be inconsistent with the provisions of the bankruptcy code.

269.    As a result of the wrongdoing of the Defendants, as aforesaid, any/all claims of the Defendants – including claims heretofore or hereinafter filed – against the Debtor should be equitably subordinated below the rights of all other creditors and innocent members of the Debtor, pursuant to 11 U.S.C. § 510(c).

## ELEVENTH CLAIM – TURNOVER
### Pursuant to 11 U.S.C. § 542
### (Against all Defendants)

270.    The allegations set forth above are incorporated herein by reference as if set forth at length.

271.    The following items in the possession of the Defendants are property of the Debtor's estate which the Trustee may use in her administration of this bankruptcy case, and have significant informational and/or monetary value to the estate:

a.    Debtor's electronic records, email, and other records which relate to the Debtor's property and financial affairs which, as discussed in detail above, were ostensibly deleted by Defendant Festa but which, upon information and belief, were instead transferred to and remain in the possession of Defendants;

b.    All Debtor emails and other documents which are being stored on or are otherwise in the possession of the Defendants;

c.    The extracontractual Finland Lease Overpayments and ETP Payments;

d.    The intellectual property and Work Product discussed in Claim Eight, *supra*; and

e.    All property otherwise set forth above which belonged to the Debtor but

was improperly transferred to the Pilfering Entities.

272.     Pursuant to 11 U.S.C. § 542, the above listed items should be immediately turned

over to the estate.

## TWELFTH  CLAIM – AVOIDANCE AND RECOVERY OF POSTPETITION TRANSFERS
### Pursuant to 11 U.S.C. §§ 549 and 550
### (Against the Best Bev Defendants)

273.     The allegations set forth above are incorporated herein by reference as if set forth

at length.

274.     Defendants caused the Debtor to make the Post Petition Best Bev Transfers after

commencement of the Debtor's bankruptcy case and without authorization by the Court or under

the Bankruptcy Code.

275.     The Post Petition Best Bev Transfers are thus avoidable by the Trustee pursuant to

11 U.S.C. § 549 and their value recoverable by the Trustee pursuant to 11 U.S.C. § 550.

## THIRTEENTH CLAIM – AVOIDANCE AND RECOVERY OF PREFERENTIAL TRANSFERS
### Pursuant to 11 U.S.C. §§ 547(b) and 550
### (Against Defendants Finland Leasing, ETP, and Boyer)

276.     The allegations set forth above are incorporated herein by reference as if set forth

at length.

277.     As further set forth herein, Defendants Finland Leasing, ETP, and Boyer are

insiders of the Debtor by virtue of their close relationships with the Debtor and the fact that their

dealings with the Debtor were not at arm's length.

278.     The Total Finland Leasing Payments and the ETP Payments were transfers of

property, or of an interest in property, of the Debtor to and/or for the benefit of Finland Leasing

and ETP.

279.     Some of the Total Finland Leasing Payments and the ETP Payments were made within one year of the Petition Date, as previously set forth.

280.     The Total Finland Leasing Payments and the ETP Payments made within the one-year preference period were made at a time while the Debtor was insolvent.

281.     The Total Finland Leasing Payments and the ETP Payments allowed Finland Leasing and ETP to receive more than they would have received if the payments had not been made and they received payment of those debts to the extent provided by filing a claim in this proceeding.

282.     As discussed in detail *supra*, the Debtor was contractually obligated to pay Finland Leasing $2,050.00 per month in rent.  Accordingly, $2,050.00 of each month's Total Finland Leasing Payments within the year preceding the Petition Date were made on account of antecedent debt owed by the Debtor to Finland Leasing pursuant to the Finland Lease and constitute avoidable preferential transfers pursuant to Section 547 of the Bankruptcy Code.

283.     While the Trustee alleges that there is no contractual basis for any payment in excess of $2,050.00 per month to Finland Leasing (and thus that those amounts must be returned to the Debtor as damages for a breach of contract or unjust enrichment, or as a matter of statutory turnover), to the extent that the Court finds that any of the Finland Lease Overpayments made during the one year preference period were valid antecedent debts, then those payments were preferential as well.

284.     While the Trustee alleges that there is no valid contractual basis for any of the ETP Payments (and thus that those amounts must be returned to the Debtor as a matter of damages for unjust enrichment, or as a matter of statutory turnover), to the extent that the Court finds that any of the ETP Payments made during the one-year preference period were valid antecedent debts,

then those payments were preferential as well.

285.    On March 19, 2021, Defendant Boyer received a $75,000.00 wire transfer from the Debtor (the "Boyer Payment").  Upon information and belief, the Boyer Payment was on account of an antecedent debt for legal services ostensibly provided for the Debtor.

286.    The Trustee and her professionals have conducted reasonable due diligence into potential affirmative defenses and have concluded that those defenses are without merit given the nature of and circumstances surrounding the portion of the Total Finland Leasing Payments, the ETP Payments, and the Boyer Payment discussed in this Claim, including, but not limited to, the fact that the Debtor received no contemporaneous value in exchange for the payments and the payments were not made according to ordinary business terms, but instead to enrich insiders of the Debtor.

287.    Accordingly, the Boyer Payment as well as that portion of the Total Finland Leasing Payments and the ETP Payments subject to the aforementioned conditions are avoidable by the Trustee pursuant to 11 U.S.C. § 547 and their value recoverable by the Trustee pursuant to 11 U.S.C. § 550.

**FOURTHEENTH CLAIM – AVOIDANCE AND
<u>RECOVERY OF FRAUDULENT TRANSFERS</u>
Pursuant to 11 U.S.C. §§ 548 and 550
(Against Defendants Finland Leasing and ETP)**

288.    The allegations set forth above are incorporated herein by reference as if set forth at length.

289.    The Finland Lease Overpayments and ETP Payments were transfers of property, or of an interest in property, of the Debtor to and/or for the benefit of Defendants Finland Leasing and ETP.

290.    The Debtor made the contractually unjustified Finland Lease Overpayments and ETP Payments with the actual intent to hinder, delay and/or defraud the Debtor's creditors.

291.    Accordingly, to the extent they were made within two years of the Petition Date, the Finland Lease Overpayments and ETP Payments constitute avoidable fraudulent transfers pursuant to 11 U.S.C. § 548(a)(1)(A).

292.    Due to the Defendants' misconduct as detailed herein, the Debtor was insolvent in the two years prior to the Petition Date.

293.    The Debtor did not receive reasonably equivalent value for the Finland Lease Overpayments and the ETP Payments.

294.    Accordingly, to the extent they were made within two years of the Petition Date, the Finland Lease Overpayments and ETP Payments constitute avoidable fraudulent transfers pursuant to 11 U.S.C. § 548(a)(1)(B).

## VI.    RELIEF REQUESTED

WHEREFORE, Plaintiff Bonnie Finkel, Chapter 7 Trustee for the estate of Midnight Madness Distilling LLC, demands judgment in her favor and against Defendants, jointly and severally, for:

(a)  Compensatory damages in excess of $10 million;

(b)  Punitive damages in an amount to be determined by the jury;

(c)  Avoidance and recovery of fraudulent, preferential, and unauthorized post-petition transfers as set forth herein;

(d)  the return of estate property as set forth herein;

(e)  Equitable subordination of any and all claims of any Defendant against the Debtor below the rights of all other creditors of the Debtor;

(f) A constructive trust on the assets of the Pilfering Entities for the benefit of the Debtor's bankruptcy estate;

(g) The entry of declaratory judgments as set forth above;

(h)  Pre-Judgment and Post-Judgment Interest, reasonable attorneys' fees, and costs; and

(i)  Such additional relief as this Court deems just.

## VII.    **JURY DEMAND**

The Trustee demands a jury trial before an Article III Judge on all claims asserted in this Complaint that are triable to a jury under the Constitution and applicable law.

Dated: June 15, 2023                                    /s/ Steven M. Coren
                                                  STEVEN M. COREN
    ANDREW J. BELLI
    **COREN & RESS, P.C.**
    Two Commerce Square, Suite 3900
    2001 Market Street
    Philadelphia, PA 19103
    Tel: (215) 735-8700
    Fax: (215) 735-5170
    scoren@kcr-law.com

    *Counsel for Plaintiff*
    *Bonnie Finkel, Chapter 7 Trustee*