# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re:<br>**MIDNIGHT MADNESS DISTILLING LLC,**<br><br>        **Debtor.** | **CHAPTER 7**<br>**Case No. 21-11750-MDC** |
| **BONNIE B. FINKEL, in her capacity as Chapter 7 Trustee for Midnight Madness Distilling LLC,**<br><br>        **Plaintiff,**<br>    v.<br><br>**CASEY PARZYCH, et al.,**<br><br>        **Defendants.** | **Adv. No. 23-00047-MDC**<br>Re: Adv. Docket No. 17 |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO MOVING DEFENDANTS' MOTION TO DISMISS

**COREN & RESS, P.C.**
STEVEN M. COREN
JANICE D. FELIX
ANDREW J. BELLI
Two Commerce Square, Suite 3900
2001 Market Street
Philadelphia, PA 19103
Tel: (215) 735-8700
Fax: (215) 735-5170

*Counsel for Plaintiff*
*Bonnie Finkel, Chapter 7 Trustee*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................ iv

I.   INTRODUCTION ............................................................................................1

II.  FACTUAL ALLEGATIONS .........................................................................5

    A.   The Debtor's Formation and Operations ...................................................5

    B.   The Insider Defendants Form Good Design, Polebridge, and the Wynk Entities
        To Funnel Money Out of the Debtor in Collusion with Defendant Sheehan ..............5

        1.   The Polebridge Entities.............................................................6

            a.   CBDelight Seltzer ...........................................................7

            b.   Faber Hand Sanitizer...........................................................9

        2.   Wynk Seltzer.......................................................................14

    C.   Defendants Conspire to Utilize the Bankruptcy Process to Defraud the Debtor's
        Creditors ....................................................................................16

        1.   The Debtor Diverts Assets to the Best Bev Entities Pre-Bankruptcy............18

        2.   Defendants Interfere with the Debtor's Section 363 Sale.............................20

        3.   Defendants Operated the Debtor in Possession As An Extension of the
            Pilfering Entities, And Continued to Do So After the Section 363 Sale.........27

    D.   The Insider Defendants' Utter Failure To Maintain Internal Controls ....................31

    E.   The Chapter 7 Case ....................................................................33

    F.   The Adversary Proceeding ...........................................................35

III. MOTION TO DISMISS STANDARD...............................................................35

IV.  ARGUMENT......................................................................................35

    A.   The Allegations of the Complaint Are Sufficiently Specific As To Each
        Defendant....................................................................................35

    B.   The Complaint States Claims for Breach of Fiduciary Duty, Aiding and Abetting
        Breach of Fiduciary Duty, and Corporate Waste ......................................38

        1.   The Complaint States Claims for Breach of Fiduciary Duty Against All
            Insider Defendants .....................................................................38

        a.   Defendants Festa, Baldwin, Boyer, and Culbertson Owed Fiduciary
Duties To The Debtor..........................................................................38

        b.   Defendants Casey Parzych and Rittenburg Owed Fiduciary Duties
to the Debtor ....................................................................................42

        c.   The Insider Defendants Breached Their Fiduciary Duties.................46

    2.   The Complaint States Claims For Aiding and Abetting Breach of Fiduciary
Duty Against All Moving Defendants ...........................................................53

    3.   The Complaint States Claims For Corporate Waste Against The Insider
Defendants ....................................................................................................58

    4.   Moving Defendants' Arguments Concerning A So-Called "Exculpation"
Clause Are Without Merit ..............................................................................59

        a.   Exculpation Is An Affirmative Defense And Cannot Be Considered At
The Motion to Dismiss Stage ............................................................59

        b.   The Operating Agreement Does Not Contain An Exculpation
Provision ..........................................................................................60

        c.   Moving Defendants' Fictional Exculpation Clause Would Not Protect
Them From Liability For Their Misconduct As A Matter of Law......61

            i.   The Clause Is Void As Against Pennsylvania Public Policy ...........62

            ii.   The Clause Is Void As Contrary To A Matter of Public Interest
And Because It Would Impair The Rights Of Nonparties To
The Operating Agreement................................................................62

            iii.   The Clause Is Void Under Principles of Strict Construction ........63

C.   The Complaint Establishes A Plausible Entitlement to Veil Piercing and Successor
Liability..................................................................................................................64

    1.   Legal Standards..............................................................................................64

    2.   The Complaint States Plausible Claims For Relief Under All Of The
Foregoing Doctrines ......................................................................................67

D.   The Complaint States Claims For Unjust Enrichment...............................................72

E.   The Complaint States Claims for an Accounting ......................................................73

F.   The Trustee Is Entitled to the Imposition of a Constructive Trust.............................74

G.    The Complaint States A Claim For Breach of the Operating Agreement's
Assignment Provision .................................................................................................76

H.    The Complaint States A Claim For Equitable Subordination ...................................79

I.    The Complaint States A Claim For Turnover .............................................................80

J.    The Trustee States A Claim Under 11 U.S.C. § 549...................................................81

K.    The Complaint States A Preferential Transfer Claim Against Defendant Boyer ......82

V.   CONCLUSION .....................................................................................................................87

# TABLE OF AUTHORITIES

**Cases**

*Act II Jewelry, LLC v. Wooten*, 301 F. Supp. 3d 905 (N.D. Ill. 2018)........................................... 40

*Advanced Fluid Sys., Inc. v. Huber*, 2017 WL 2445303 (M.D. Pa. June 6, 2017),
    aff'd, 958 F.3d 168 (3d Cir. 2020)............................................................................................ 53

*Alturnamats, Inc. v. Harry*, 2008 WL 4279814 (W.D. Pa. Sept. 16, 2008) ................................ 39

*AmQuip Crane Rental, LLC v. Crane & Rig Servs., LLC*, 199 A.3d 904 (Pa. Super. 2018) ....... 40

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................................................................ 35

*B.D.W. Associates v. Busy Beaver Bldg. Ctrs.*, 865 F.2d 65 (3d Cir. 1989)................................ 81

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................................................ 35

*Boyd & Mahoney v. Chevron U.S.A.*, 614 A.2d 1191 (Pa. Super. 1992)...................................... 73

*Buchanan v. Brentwood F.S. &L. Assoc.*, 320 A.2d 117 (Pa. 1974) ............................................ 74

*Buck v. Hampton Tp. School Dist.*, 452 F.3d 256 (3d Cir. 2006) ................................................ 84

*Buckley v. O'Hanlon*, 2007 WL 956947 (D. Del. Mar. 28, 2007)................................................ 36

*Burris v. Main Line Health Sys.*, 2017 WL 2506446 (E.D. Pa. June 9, 2017) ............................ 54

*Cantor v. Perelman*, 414 F.3d 430 (3d Cir. 2005)....................................................................... 75

*Castle Cheese, Inc. v. MS Produce, Inc.*, 2008 WL 4372856 (W.D. Pa. Sept. 19, 2008) ........... 39

*Chaleplis v. Karloutsos*, 579 F. Supp. 3d 685 (E.D. Pa. 2022) .................................................. 74

*ChemLogix LLC v. Bulk Tainer Logistics N. Am., Inc.,* 2023 WL 5751404
    (E.D. Pa. Sept. 6, 2023) ........................................................................................................... 35

*Citron v. Steego Corp.*, 1988 WL 94738 (Del. Ch. 1988) ........................................................... 75

*City of Wilkes-Barre v. Kaminski Bros.*, 804 A.2d 89 (Pa. Commw. 2002)................................ 61

*DeMary v. Latrobe Printing & Pub. Co.*, 762 A.2d 758 (Pa. Super. 2000) ................................ 60

*E. Mins. & Chemicals Co. v. Mahan*, 225 F.3d 330 (3d Cir. 2000) ............................................ 65

*Employers Liability Assur. Corp. v. Greenville Bus. Men's Ass'n*, 224 A.2d 620 (Pa. 1966) ..... 61

*Feleccia v. Lackawanna Coll.*, 215 A.3d 3 (Pa. 2019) ................................................................ 61

*Fizzano Bros. Concrete Prod. v. XLN, Inc.*, 42 A.3d 951 (Pa. 2012)..................................... 66, 71

*Fletcher-Harlee Corp. v. Szymanski*, 936 A.2d 87 (Pa. Super. 2007)......................................... 68

*Harrison v. Harrison*, 2021 WL 3022416 (E.D. Pa. July 15, 2021)........................................... 54

*Hawk Mt. LLC v. Mirra*, 2016 WL 4541032 (D. Del. Aug. 31, 2016)........................................ 37

*Higgins v. Shenango Pottery Co.*, 279 F.2d 46 (3d Cir. 1960)..................................................... 75

*In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267 (3d Cir. 2004).................................................. 35

*In re BC Funding, LLC*, 519 B.R. 394 (Bankr. E.D.N.Y. 2014) .................................................... 86

*In re Calabrese*, 689 F.3d 312 (3d Cir. 2012) .............................................................................. 62

*In re Caremerica, Inc.*, 409 B.R. 737 (Bankr. E.D.N.C. 2009) .................................................... 83

*In re Cont'l Cap. Inv. Servs., Inc.*, 2006 WL 6179374 (Bankr. N.D. Ohio June 12, 2006) ......... 85

*In re Daddy's Money of Clearwater, Inc.*, 155 B.R. 788 (Bankr. M.D. Fla. 1993)...................... 86

*In re DBSI, Inc.*, 445 B.R. 344 (Bankr. D. Del. 2011).................................................................. 84

*In re DVI, Inc.*, 2008 WL 4239120 (Bankr. D. Del. Sept. 16, 2008)............................................ 35

*In re FAH Liquidating Corp.*, 572 B.R. 117 (Bankr. D. Del. 2017)........................................ 72, 83

*In re Furniture Factory Ultimate Holding, L.P.*, 2023 WL 5662747
   (Bankr. D. Del. Aug. 31, 2023) ................................................................................................ 59

*In re Genesis Health Ventures, Inc.*, 355 B.R. 438 (Bankr. D. Del. Dec. 13, 2006) ................... 36

*In re Jevic Holding Corp.*, 2021 WL 1812665 (Bankr. D. Del. May 5, 2021)............................. 52

*In re Joey's Steakhouse, LLC*, 474 B.R. 167 (Bankr. E.D. Pa. 2012) ......................................... 81

*In re Lemington Home for Aged*, 659 F.3d 282 (3d Cir. 2011) ................................................... 62

*In re LMI Legacy Holdings, Inc.*, 2017 WL 3432366 (Bankr. D. Del. Aug. 10, 2017) ............... 60

*In re Main, Inc.*, 239 B.R. 281 (Bankr. E.D. Pa.) ....................................................................... 51

*In re Meadowbrook Ests.*, 246 B.R. 898 (Bankr. E.D. Cal. 2000) .............................................. 79

*In re OPP Liquidating Co., Inc.*, 2022 WL 774063 (Bankr. D. Del. Mar. 14, 2022).................. 59

*In re Our Alchemy, LLC*, 2019 WL 4447541 (Bankr. D. Del. Sept. 16, 2019) ...................... 41, 73

*In re Rose*, 2019 WL 4752084 (Bankr. E.D. Tex. Sept. 27, 2019)............................................... 79

*In re Spitko*, 2007 WL 1720242 (Bankr. E.D. Pa. June 11, 2007)............................................... 85

*In re Student Fin. Corp.*, 335 B.R. 539 (D. Del. 2005) ......................................................... 35, 84

*In re Winstar Commc'ns, Inc.*, 554 F.3d 382 (3d Cir. 2009) ...................................................... 84

*In re Zambrano Corp.*, 478 B.R. 670 (Bankr. W.D. Pa. 2012)................................................... 62

*Indep. Enterprises Inc. v. Pittsburgh Water & Sewer Auth.*, 103 F.3d 1165 (3d Cir. 1997)........ 74

*Infantino v. W. Wyoming Borough*, 2013 WL 3972770 (M.D. Pa. July 31, 2013)............... *passim*

*Koken v. Steinberg*, 825 A.2d 723 (Pa. Cmwlth. 2003)................................................................ 53

*Langensiepen v. Unemployment Comp. Bd. Of Review*, 451 A.2d 814 (Pa. Cmwlth. 1982) ....... 39

*Loc. No. 163, Int'l Union of United Brewery, Flour, Cereal, Soft Drink & Distillery
   Workers of Am. v. Watkins*, 207 A.2d 776 (Pa. 1965) ............................................................. 73

*M.B. v. Schuylkill Cty.*, 375 F.Supp.3d 574 (E.D. Pa. 2019) ...................................................... 37

*M.H. Eby, Inc. v. Timpte Indus., Inc.*, 2019 WL 6910153 (E.D. Pa. Dec. 19, 2019) .................. 63

*Manti Holdings, LLC v. Carlyle Grp. Inc.*, 2022 WL 444272 (Del. Ch. Feb. 14, 2022)............. 45

*Marion v. Bryn Mawr Tr. Co.*, 288 A.3d 76 (Pa. 2023) ................................................................ 53

*Maritrans v. Pepper Hamilton & Sheetz*, 602 A.2d 1277 (Pa. 1992) ................................... 39, 46

*Meier v. Maleski*, 648 A.2d 595 (Pa. Cmwlth. 1994) ................................................................. 73

*Milo, LLC v. Procaccino*, 2020 WL 1853499 (E.D. Pa. Apr. 13, 2020) .................................... 37

*Mitchell v. Moore*, 729 A.2d 1200 (Pa. Super. 1999)................................................................. 72

*Monroe v. CBH20, LP*, 286 A.3d 785 (Pa. Super. 2022)............................................................ 60

*Mortimer v. McCool*, 255 A.3d 261 (Pa. 2021) ................................................................... 64, 66

*Neopart Transit, LLC v. CBM N.A. Inc.*, 314 F. Supp. 3d 628 (E.D. Pa. 2018)......................... 40

*Official Comm. of Unsecured Creditors of Allegheny Health Educ. & Research Found. v. PriceWaterhouseCoopers, LLP*, 989 A.2d 313 (Pa. 2010)........................................................ 53

*Paige Capital Management, LLC v. Lerner Master Fund, LLC*, 2011 WL 3505355 (Del. Ch. Aug. 8, 2011) ............................................................................................................. 44

*Partners Coffee Co., LLC v. Oceana Servs. & Prod. Co.*, 700 F. Supp. 2d 720 (W.D. Pa. 2010) ................................................................................................................... 65

*Patient Acct. Serv. Ctr., LLC v. Ebling*, 2022 WL 4073341 (M.D. Pa. Sept. 2, 2022) ............... 40

*Philadelphia Electric Co. v. Hercules, Inc.*, 762 F.2d 303 (3d Cir. 1985) ................................. 66

*Phillips v. County of Allegheny*, 515 F.3d 224 (3d Cir. 2008)............................................. *passim*

*Pittsburgh's Airport Motel, Inc. v. Airport Asphalt & Excavating Co.*, 469 A.2d 226 (Pa. Super. 1983) ................................................................................................................... 73

*Power Restoration Int'l, Inc. v. PepsiCo, Inc.*, 2014 WL 1725041 (E.D. Pa. Apr. 30, 2014)...... 55

*Reivia Ashley, LLC v. Paselo Logistics, LLC*, 2017 WL 6001640 (E.D. Pa. Dec. 1, 2017)......... 64

*Rock v. Pyle*, 720 A.2d 137 (Pa. Super. 1998)............................................................................ 74

*Rodwell v. City of Newark*, 2023 WL 5703176 (D.N.J. Sept. 5, 2023) ...................................... 37

*Rosenberry v. Evans*, 48 A.3d 1255 (Pa. Super. 2012)................................................................ 55

*Santoro v. Morse*, 781 A.2d 1220 (Pa. Super. 2001) ................................................................. 75

*Schemberg v. Smicherko*, 85 A.3d 1071 (Pa. Super. 2014) ........................................................ 44

*Schmidt v. Skolas*, 770 F.3d 241 (3d Cir. 2014) ........................................................................ 35

*Seven Springs Mountain Resort, Inc. on behalf of Sikirica v. Hess*, No. 2022 WL 1004178 (W.D. Pa. Apr. 4, 2022)......................................................................................... *passim*

*SHV Coal, Inc. v. Continental Grain Co.*, 545 A.2d 91 (Pa. Super. 1988), rev'd on other grounds, 587 A.2d 702 (1991) ............................................................... 39

*Smith v. A.O. Smith Corp.*, 270 A.3d 1185 (Pa. Super. 2022) .................................................... 71

*Smith v. Morrison*, 47 A.3d 131 (Pa. Super. 2012) ........................................................ 38

*Smith v. Unemployment Comp. Bd. Of Review*, 367 A.2d 811 (Pa. Cmwlth. 1977) ................... 39

*Snitow v. Snitow*, 2017 WL 6557479 (Pa. Super. Dec. 22, 2017) ................................................ 38

*Solid Wood Cabinet Co. v. Partners Home Supply*, 2015 WL 1208182
   (E.D. Pa. Mar. 13, 2015) ........................................................................................................ 39

*Tayar v. Camelback Ski Corp.*, 47 A.3d 1190 (Pa. 2012) ........................................................... 63

*Teva Pharms. USA, Inc. v. Sandhu*, 291 F. Supp. 3d 659 (E.D. Pa. 2018) ................................... 46

*Today's Child Learning Ctr. Inc. v. United States*, 40 F. Supp. 2d 268 (E.D. Pa. 1998) ............. 66

*Topp Copy Prod., Inc. v. Singletary*, 626 A.2d 98 (Pa. 1993) ..................................................... 62

*UD Dissolution Liquidating Trust v. Sphere 3D Corp. (In re UD Dissolution Corp.)*,
   629 B.R. 11 (Bankr. D. Del. 2021) ........................................................................................ 37

*Valhal Corp. v. Sullivan Assocs., Inc.*, 44 F.3d 195 (3d Cir. 1995) ....................................... 61, 62

*Voest-Alpine v. Vantage Steel Corp.*, 919 F.2d 206 (3d Cir. 1990) ............................................. 75

*Weissman v. A. Weissman, Inc.*, 97 A.2d 870 (Pa. 1953) ........................................................... 75

*White v. George*, 66 Pa. D. & C.4th 129 (Pa. Com. Pl. 2004) ..................................................... 58

*Winner v. Etkin & Co.*, 2007 WL 2616084 (W.D. Pa. Sept. 6, 2007) .......................................... 67

Plaintiff Bonnie B. Finkel, in her capacity as Chapter 7 Trustee (the "Trustee" or "Plaintiff") for the bankruptcy estate of Debtor Midnight Madness Distilling, LLC f/k/a Theobald and Oppenheimer, LLC d/b/a Faber Distilling (the "Debtor"), submits this Memorandum of Law in opposition to the motion to dismiss (the "Motion") filed by Defendants Casey Parzych; Shawn Sheehan; Angus Rittenburg; Kelly Festa; Ashleigh Baldwin; Michael Boyer; R.F. Culbertson; Polebridge, LLC; Good Design, Inc.; AgTech PA LLC; AgTech VI, LLC; XO Energy Worldwide, LLLP; XO EW, LLC; Best Bev, LLC; EtOH Worldwide, LLC; and Canvas 340, LLC (collectively, the "Moving Defendants").

## I.    INTRODUCTION

The Trustee filed a Complaint detailing a brazen scheme to loot the Debtor through a number of shadow entities to which Debtor opportunities, property and profits were diverted with the purpose, intent, and effect of enriching the Moving Defendants at the expense of the Debtor and its creditors.  The Complaint alleges in detail how Debtor resources, employees, and equipment were used for the benefit of three groups of these shadow entities – the "Polebridge Entities," the "Wynk Entities," and the "Best Bev Entities" – to avoid paying the legitimate creditors of the Debtor.  The Polebridge Entities used Debtor resources to manufacture and sell CBDelight cannabis seltzer and Faber Hand Sanitizer, with all profits flowing not to the Debtor, but instead to the Moving Defendants.  The Wynk Entities, which a Debtor representative described as "one and the same" as the Debtor, similarly used Debtor resources to manufacture and sell Wynk cannabis seltzer, with all profits flowing not to the Debtor, but instead to the Moving Defendants.  And the Best Bev Entities were formed by outright theft from the Debtor and held out as the mere continuation of the Debtor.

1

Contrary to the Moving Defendants' argument that the Complaint is a "shotgun pleading," the Complaint does not rely on unadorned descriptions of the various causes of action it asserts. To the contrary, it alleges in scrupulous detail the role of each individual and entity defendant along with specific actions implicating all of the Moving Defendants. Those detailed allegations establish, among many other things, that: the Insider Defendants (hereinafter defined) explicitly instructed the Debtor's staff to use Debtor resources for the benefit of the Polebridge Entities, including the instruction to deposit revenue which rightfully belonged to the Debtor into bank accounts belonging to Polebridge, LLC; that Defendants Casey Parzych and Rittenburg conspired with Defendant Sheehan and the other individual Defendants to use Debtor resources to create, develop, produce and sell Wynk seltzer (which is formally owned by a network of Wynk Entities the role and function of which is described in detail in the Complaint), including detailed allegations establishing beyond all doubt the use of the Debtor's credit card to fund production of Wynk seltzer; and that the Insider Defendants and Defendant Sheehan conspired to create a complex web of Best Bev Entities (the identity and function of which is described in detail in the Complaint), which were part of a "shadow structure" that Defendants explicitly contemplated would own the Debtor's business and which stole various property from the Debtor (including numerous vendor orders made by the Debtor yet delivered to the Best Bev Entities) to further an enterprise which held itself out as a mere continuation of the Debtor. Defendant Sheehan's individual role in the scheme is outlined in detail in the Complaint, as is the identity and function of his wholly owned group of Sheehan Entities.

Given the Complaint's detailed allegations that, to cover their tracks, the Insider Defendants intentionally deleted, wiped, or stole the Debtor's electronic data and cloud computing drives after the Debtor filed for bankruptcy, the level of detail pleaded by the Trustee is more than

sufficient to move all its claims past the minimal standard of plausibility applicable at the motion to dismiss stage.  Tellingly, Moving Defendants are forced to support their arguments for dismissal by substituting fictional facts for the well-pleaded facts against which the Trustee's claims must be tested.  For example, Moving Defendants argue that the Debtor could not have been involved with the CBDelight or Wynk products due to the requirements of its lender, insurance company, and Pennsylvania liquor law, yet the Complaint alleges in exacting detail how the Moving Defendants exploited the Debtor and used it to manufacture and sell the very products which Moving Defendants now argue were prohibited.

The Complaint alleges numerous detailed facts supporting each of its claims against the Moving Defendants, and their Motion should be dismissed because:

1. The Complaint contains specific detail regarding each Moving Defendant's role at or concerning the Debtor, includes specific detail regarding the conduct of individual Moving Defendants throughout, and undoubtedly gives the defendants adequate notice of the claims against them and the grounds upon which each claim rests.  To the extent that certain paragraphs are alleged in terms of conduct that all or specific subsets of the Defendants as a group engaged in or allowed to happen, the Complaint is pleaded in that fashion because all such Defendants collectively engaged in that behavior, and there is nothing improper with allegations of this type.  Moving Defendants' "shotgun pleading" argument should thus be rejected, *see infra* at pp. 35-38;

2. Insider Defendants Festa, Baldwin, Boyer, and Culbertson all owed common law fiduciary duties to the Debtor, and those duties are not impacted (much less waived) by any provision of Pennsylvania law or the Debtor's Operating Agreement, *see infra* at pp. 38-41;

3. All Insider Defendants breached their fiduciary duties to the Debtor via egregious violations of the duties of care and loyalty for the benefit of the Polebridge Entities, the Wynk Entities, and the Best Bev Entities, which breaches are described in detail *infra* at pp. 46-52;

4. All Moving Defendants are liable for aiding and abetting breach of fiduciary duty given well-established principles of imputation and the active participation of all individual defendants in the overarching scheme to use Debtor resources to the detriment of the Debtor and the benefit of the Polebridge Entities, the Wynk Entities, and the Best Bev Entities, *see infra* at pp. 53-58;

5. The claims for corporate waste against the Insider Defendants are established by the same facts which support the claims for breach of fiduciary duty, *see infra* at pp. 58-59;

6. Moving Defendants' arguments concerning a so-called "exculpation" clause cannot be raised at the motion to dismiss stage and, in any event, are without merit because: a) no such clause exists, and Moving Defendants' argument hinges on an undisclosed alteration to the Operating Agreement, and b) even if the fictional language crafted by the Moving Defendants for the purposes of their Motion did exist, it cannot protect them from liability for their misconduct as a matter of law, *see infra* at pp. 59-64;

7. The Complaint pleads facts demonstrating that the Debtor did not maintain corporate formalities, kept books and records which were inadequate or destroyed, had a fundamentally deficient accounting function, and was operated as if it were one and the same as the Polebridge Entities, the Wynk Entities, and the Best Bev Entities, supporting claims for liability under the alter ego and enterprise theories of veil piercing, and the doctrine of successor liability, *see infra* at pp. 64-71;

8. The Complaint pleads facts demonstrating all the elements of unjust enrichment, and the possibility that the Trustee's other claims might provide relief does not justify dismissal at this early stage of the litigation, *see infra* at pp. 72-73;

9. The Complaint pleads facts establishing significant breaches of fiduciary duty via a complex scheme to deplete the resources of the Debtor for the benefit of a wide range of Defendant entities and individuals, those breaches of fiduciary duty occurred with the full knowledge and participation of all Defendants, and Defendants took extraordinary steps to conceal their misconduct, making it impossible for the Trustee to account for the rightful property of the Debtor's estate, thus supporting a claim for an accounting, *see infra* at pp. 73-74;

10. A constructive trust is appropriate in cases such as this involving egregious breaches of fiduciary duty and usurpation of Debtor property and resources, *see infra* at pp. 74-75;

11. Defendants Casey Parzych and Rittenburg breached the Operating Agreement's assignment provision by using their roles with the Debtor and the Debtor's resources to create intellectual property pertaining to, *inter alia*, CBDelight and Wynk Seltzer for the benefit of entities and individuals other than the Debtor, *see infra* at pp. 76-79;

12. Numerous Moving Defendants are identified in the Debtor's bankruptcy schedules as holding undisputed, liquidated, and non-contingent claims, thus supporting the Complaint's claim for equitable subordination, *see infra* at pp. 79-80;

13. The Complaint alleges that Defendants are in possession of both valuable property belonging to the Debtor, recoverable under Section 542(a), and of the Debtor's electronic information, recoverable under Section 542(e), thus stating a claim for turnover, *see infra* at pp. 80-81;

4

14. The Complaint and inferences derivable therefrom make it clear that the Trustee's Section 549 claim is brought against the Best Bev Entities, and the Complaint provides Moving Defendants with ample notice of the defendants against whom such claim is brought, *see infra* at pp. 81-82; and

15. Defendant Boyer is properly alleged to be an insider and creditor of the Debtor and it is clear from review of the docket in the Debtor's bankruptcy case that the transfer to him within the one-year insider preference period and while the Debtor was insolvent enabled him to receive more than he could otherwise receive in the claims administration process, thus establishing the elements of a preferential transfer claim against him, *see infra* at pp. 82-86.

## II.    FACTUAL ALLEGATIONS

The following factual allegations from the Trustee's Complaint (Adv. D.I. 1, the "Complaint") must be accepted as true and viewed in the light most favorable to the Trustee, with all factual inferences taken in the Trustee's favor. *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008).

### A.    The Debtor's Formation and Operations

The Debtor, also known as Theobald & Oppenheimer and Faber Distilling Co., was co-founded by Defendant Casey Parzych and Anthony Lorubbio in or around 2012 while the two were enrolled in Defendant Culbertson's Intro to Entrepreneurship class at Carnegie Mellon University.  Complaint at ¶ 39.  In the years leading up to its June 21, 2021 bankruptcy filing, the Debtor experienced rapid growth—from almost nothing to $10 million in annual sales in 2020—developing, manufacturing, marketing and selling thirty+ distilled spirit products, with its most prominent products bearing the Faber brand. *Id.* at ¶¶ 7, 41.

### B.    The Insider Defendants Form Good Design, Polebridge, and the Wynk Entities To Funnel Money Out of the Debtor in Collusion with Defendant Sheehan

On April 19, 2019, the Debtor entered into a Loan Agreement and a Security Agreement with PNC pursuant to which it ultimately borrowed approximately $2.5 million.  Complaint at ¶

42.   To secure the loan, PNC received a first lien on all personal property of the Debtor and a second mortgage on the Debtor's headquarters at 118 North Main St., Trumbauersville in Bucks County ("118 North Main"). *Id.*  As set forth in detail in the Complaint, to circumvent PNC's security interest, Defendants and Debtor insiders Casey Parzych, Rittenburg, Festa, Baldwin, Boyer, and Culbertson (collectively, the "Insider Defendants") conspired among themselves and with the other Defendants in this action to form shadow entities in the same lines of business as the Debtor which they then used to misappropriate Debtor resources and loot the Debtor. *Id.* at ¶¶ 10-16, 43.   The unlawful scheme involved sham profit sharing arrangements and sham loan agreements between the Debtor and Defendant Sheehan's collection of wholly-owned Virgin Islands based entities – namely, Defendant AgTech VI, LLC, Defendant XO Energy Worldwide, LLLP, Defendant XO EW, LLC, Defendant EtOH Worldwide, LLC, AgTech VI LLLP, and AGTVI LLC (collectively, the "Sheehan Entities") – through which Debtor resources were misappropriated and Debtor profits were siphoned out, and the ill-gotten gains were shared among the Defendants. *Id.* at ¶ 44.

### 1.     The Polebridge Entities

Effective April 19, 2019 – the same date that the Debtor executed the PNC Loan Agreement – Defendant Baldwin formed Defendant Polebridge, LLC ("Polebridge") as a Pennsylvania limited liability company, listing its registered office as the Debtor's headquarters at 118 North Main. *Id.* at ¶ 46.  On May 23, 2019, Defendants Baldwin and Rittenburg formed Defendant Good Design, Inc. ("Good Design") as a British Columbia corporation, listing the Debtor's headquarters as the incorporators' address. *Id.* at ¶ 47.  Using Debtor computers while she was the Debtor's CFO, Defendant Festa provided administrative support for the filing of Polebridge's and Good Design's registration documents. *Id.* at ¶¶ 12, 46, 47.  On February 4, 2020, Defendant Baldwin caused

6

Polebridge to register "Good Design" as a fictitious name with the Pennsylvania Department of State, listing "canning" – a key line of business of the Debtor – as the "nature of the business or other activity to be carried on under or through the fictitious name." *Id.* at ¶ 48.

While they were Debtor fiduciaries,[1] each of the Insider Defendants participated in the management and operation of Defendants Polebridge and Good Design (collectively, the "Polebridge Entities") to the Debtor's detriment. *Id.* at ¶¶ 19-20. Defendants Baldwin (Casey Parzych's spouse) and Rittenburg are officers and members/shareholders of the Polebridge Entities. *Id.* at ¶¶ 11, 13. Defendant Culbertson states on his public LinkedIn page that he has been employed in sales and marketing for Good Design since January 2019. *Id.* at ¶ 53. Defendant Boyer simultaneously served as general counsel to the Debtor and counsel to the Polebridge Entities. *Id.* at ¶ 14. Defendant Festa used the Debtor's computers to provide administrative support for the filing of the Polebridge Entities' registration documents, used the Debtor's computers to further the business of the Polebridge Entities with her Polebridge Entities email address, and instructed the Debtor's sales managers to ensure that monies which should have been paid to the Debtor were instead paid to Polebridge. *Id.* at ¶¶ 46, 47, 55, 75. And Defendant Casey Parzych instructed Debtor sales representatives to make a Polebridge Entities product their top "mission critical priority." *Id.* at ¶ 60.

### a. CBDelight Seltzer

The Polebridge Entities' first project was CBDelight seltzer ("CBDelight"), a carbonated beverage containing cannabis derivatives. *Id.* at ¶ 49. As established by the following facts, CBDelight was manufactured, packaged, and marketed using Debtor resources, labor, and material, including but not limited to: office and warehouse space for operations, the purchase of

---

[1]   *See infra* at pp. 38-46.

additional canning/bottling equipment utilized for the purposes of Good Design/Polebridge, sales services and incentives, marketing services, graphic design services, digital marketing and advertising services, legal services, intellectual property, and bottling services.  *Id.* at ¶ 50.

While described to the public as a Good Design product, "C B Delight" was in fact a trademark filed by the Debtor on April 17, 2019.  *Id.* at ¶ 51.  CBDelight's Facebook page lists its telephone number as (215) 268-6071, a telephone number owned, paid for, and utilized by the Debtor, and staffed by Debtor employees.  *Id.* at ¶ 58.  Defendant Culbertson's LinkedIn page states the Polebridge Entities' "cbDelight product is one of the top selling products in the tri-state area. . . . Our new Siphon device allows anyone to carbonate any drink with CBD – anywhere – at a far reduced price point."  *Id.* at ¶ 53.  The "Siphon device" referenced by Defendant Culbertson constituted or utilized the Debtor's intellectual property.  *Id.*

An August 1, 2019 press release states that "Cbdelight (a division of Good Design Inc.) announced that it has partnered with Pennsylvania-based distributor Nittany Beverage to expand the brand's footprint in Pennsylvania. . . . Ashleigh Baldwin, CEO of Good Design Inc., remarked: 'With Chad Merriweather and Kelli Scozzaro working with Nittany's seasoned team, we're going to hit it out of the park.'"  *Id.* at ¶ 52.  At the time of the press release, Ms. Scozzaro and Mr. Merriweather were full-time employees of the Debtor.  *Id.*  An August 23, 2019 presentation approved by Defendant Casey Parzych to train Debtor sales representatives announced CBDelight as the Debtor's top "mission critical" priority.  *Id.* at ¶ 60.  A Debtor marketing presentation featured numerous CBDelight slides emphasizing that the Debtor manufactured, canned, and delivered the CBDelight product.  *Id.* at ¶ 61.

The LinkedIn page of John Aguilar—a Debtor account manager from November 2019 through November 2020—emphasizes that, while employed full-time by the Debtor, he

"[d]eveloped, maintained and grew a target account list within Philadelphia market that drove volume & brand recognition for . . . CBDelight," and which resulted in a 40% increase in brand growth for CBDelight. *Id.* at ¶ 59.

The Insider Defendants and numerous other individuals (acting at the behest of the Insider Defendants) regularly used the Debtor's electronic devices to further the business interests of the Polebridge Entities via their Polebridge Entities' email addresses, including: Defendant Casey Parzych, who also used his Polebridge Entities email address (casey@gooddesigninc.com) to conduct Debtor business, including otherwise privileged communications with Debtor's outside counsel; Defendant Festa (kellyfesta@gooddesigninc.com); Defendant Culbertson, whose Polebridge Entities' email address (rf@gooddesigninc.com) was also listed on the Debtor's application for a Paycheck Protection Program loan; Defendant Rittenburg (angus@gooddesigninc.com); Debtor customer service representative Casey Coughlin (ccoughlin@gooddesigninc.com); and Debtor production manager John Pitts (john@gooddesigninc.com). *Id.* at ¶¶ 20, 54-57.

**b.    Faber Hand Sanitizer**

In March 2020, after the WHO declared COVID-19 a global pandemic and bars throughout the United States shut down due to government orders, the Insider Defendants caused the Debtor to manufacture, bottle, and sell hand sanitizer under the Faber brand ("Faber Hand Sanitizer"), which had been trademarked by the Debtor in 2016. *Id.* at ¶ 62. As with CBDelight, Faber Hand Sanitizer was manufactured, packaged, and marketed with Debtor resources, including labor, material, office and warehouse space for operations, the purchase of additional canning/bottling equipment, sales services and incentives, marketing services, graphic design services, digital marketing and advertising services, legal services, intellectual property, and bottling services, with

the profits diverted out of the hands of the Debtor and funneled through the Polebridge Entities. *Id.* at ¶¶ 63-64.  Numerous agents of the Debtor utilized email addresses associated with Faber Hand Sanitizer – which they accessed using Debtor computer equipment – to further the business interests of the Polebridge Entities, including Defendant Baldwin (ashleigh@fabersanitizer.com), Defendant Culbertson (rf@fabersanitizer.com), and Debtor customer service representative Casey Coughlin (ccoughlin@fabersanitizer.com).  *Id.* at ¶ 81.  Additionally, Kelli Sheehan (who, upon information and belief, has a familial relationship with Defendant Sheehan), while a full-time employee and agent of the Sheehan Entities, utilized the Debtor's computers to conduct business relating to the Faber Hand Sanitizer product (kelli@fabersanitizer.com).  *Id.* at 83.

Defendant Baldwin's LinkedIn profile lists her former employment as CEO of Good Design, which she states "makes consumer goods including spirits, sodas and hand sanitizer.  We are registered with the FDA and are currently supplying hand sanitizer to several of the largest healthcare systems in the U.S."  *Id.* at ¶ 66.  Defendant Baldwin's profile further states that Good Design "is a good kind of consumer goods company.  We invent and make delightful spirits, sodas and other consumer products in our own factory in rural Pennsylvania."  *Id.*  Consistent with Defendant Baldwin's profile, Good Design's LinkedIn profile, which prominently depicts bottles of hand sanitizer bearing the Debtor's Faber Distilling Co. mark, describes its business as "[m]anufacturing," specifically "[m]aking beverages and FDA-approved hand sanitizer for hospitals, grocery stores, employees and everyday Americans."  *Id.* at ¶¶ 65, 68.  These descriptions are false—the Polebridge Entities had no manufacturing capability, facilities, or personnel whatsoever, except for that which they pilfered from the Debtor.  *Id.* at ¶ 67.

Despite the Insider Defendants' attempts to portray it as a Polebridge Entities product, beginning on March 26, 2020, the Debtor's Faber Liquors Instagram page was dominated by posts

10

advertising Faber Hand Sanitizer. *Id.* at ¶ 69. A Philadelphia Inquirer article dated April 6, 2020

highlights the Debtor, with no mention of Polebridge or Good Design:

> Bucks County's Theobald & Oppenheimer[, i.e., the Debtor,] is on
> the opposite end of the spectrum [from a smaller distillery]: The
> second-largest distillery in the state, it made $2 million worth of
> alcohol last year between its two brands, Faber Liquors and Singe
> Prop Rum. Like its smaller peers, Theobald has pivoted to hand
> sanitizer – also using its own bottles – but it can churn it out by the
> pallet.
>
> "We bought ethanol at 200 [proof] and we get a tanker in a day,"
> said T&O chief financial officer Kelly Festa. "We mix it with
> hydrogen peroxide and glycerin, and then we run it through the
> bottling lines."
>
> The Trumbauersville company has increased the number of
> production shifts and employees. "We're running three shifts a day,
> seven days a week, trying to get as much out the door as possible,"
> Festa said. "We're getting orders left and right, from hospitals, the
> U.S. Postal Service, huge supermarket chains, you name it."
>
> By the end of March, T&O had filled 167,300 one-liter glass bottles
> with hand sanitizer branded with the Faber Liquors label. . . . At the
> moment, hand sanitizer is all T&O is making.

*Id.* at ¶ 70.

On April 9, 2020, immediately following publication of the article in which Defendant

Festa confirmed that Faber Hand Sanitizer was manufactured, packaged, marketed, and distributed

entirely by the Debtor, Defendant Baldwin instructed the Debtor's sales team to divert the proceeds

from all sales of Faber Hand Sanitizer from the Debtor's Square point of sale system to

Polebridge's Square account. *Id.* at ¶ 71. On April 17, 2020, in the wake of Defendant Baldwin's

email – which provides irrefutable proof of the Insider Defendants' conspiracy to steal all payment

due the Debtor for Faber Hand Sanitizer by diverting it to Polebridge, and that, despite the lack of

a formal title or agreement, Defendant Baldwin (who is married to Defendant Casey Parzych)

exercised high level managerial control over the Debtor's employees – the Debtor issued a press

release again making it clear that Faber Hand Sanitizer was manufactured, packaged, marketed, and distributed entirely by the Debtor:

> [The Debtor] has shifted production of its high-quality vodkas, gin, and rum to the manufacture of hand sanitizer (Faber Hand Sanitizer). While many distillers have made similar adjustments, Faber has scaled the production of its hand sanitizer to supply consumers as well as medical professionals and first responders. . .
>
> So many people are having trouble securing sanitizer right now. We knew we could help by producing an abundant supply, despite disruptions in the supply chain," said Ashleigh Baldwin, Faber's spokesperson. "When people get their sanitizer from us, they are protecting themselves and supporting efforts to help those heroes on the frontlines of the COVID-19 pandemic. . . .
>
> Faber Hand Sanitizer is available in the same one-liter bottles that the company has traditionally used to store the spirits that it has produced for more than 8 years. The hand sanitizer has less viscosity, allowing it to be utilized in spray bottles or with towels to help disinfect surfaces.

*Id.* at ¶ 72; *see also id.* at ¶ 76 (describing an April 29, 2020 Debtor press release in which Defendant Baldwin identified herself as a Debtor "spokesperson" and stated that the Debtor was ramping up its production and distribution of Faber Hand Sanitizer to meet growing demand).

Similarly, Faber Hand Sanitizer's Facebook page stated: "we – the team at FABER Liquors – have shifted our usual operations to produce much-needed hand sanitizer" and lists the telephone number of Faber Hand Sanitizer as (215) 268-6071, a telephone number owned by, paid for, utilized, and staffed by the Debtor. *Id.* at ¶ 73. Faber Hand Sanitizer also utilized the Debtor's marketing staff and resources, including the use of advertising mirroring that for Debtor's liquor products. *Id.* at ¶ 82.

An April 21, 2020 email from Defendant Festa's Polebridge Entities email account (kellyfesta@gooddesigninc.com) to the Debtor's sales managers – via their Debtor email accounts (@theoandopp.com) – instructed the Debtor's sales managers yet again to ensure that the Debtor's

customers made payments by electronic transfer, i.e., ACH or wire, into Polebridge's bank account, and not the account of the Debtor, for sales of Faber Hand Sanitizer. *Id.* at ¶ 75. The Debtor's sales representatives also accepted tens of thousands, if not hundreds of thousands, of dollars in cash payments for Faber Hand Sanitizer, which were diverted from the Debtor for the benefit of the Polebridge Entities. *Id.* at ¶ 78.

A May 12, 2020 email from the Debtor's outside counsel to a representative of the United States Alcohol & Tobacco Tax & Trade Bureau confirms that the Debtor "has converted to hand sanitizer production and [is] supplying large hospital centers." *Id.* at ¶ 78. A June 11, 2020 presentation approved by Defendant Parzych to train the Debtor's sales representatives lists four "Mission Critical" products for emphasis to the Debtor's customers, with Faber Hand Sanitizer sharing the top spot with Faber liquor (and CBDelight demoted to third place). *Id.* at ¶ 79. Another Debtor marketing presentation—entitled "Theobald & Oppenheimer Leadership Brands Presentation"—featured numerous slides touting Faber Hand Sanitizer and the massive success of this Debtor product. *Id.* at ¶ 80.

Despite being manufactured, marketed, and sold using the Debtor's resources and personnel, profits from Faber Hand Sanitizer were diverted to the Polebridge Entities, and ultimately to the Defendants, with a minimum of $8.8 million of profits attributable to the sale of Faber Hand Sanitizer and CBDelight stolen from the Debtor and diverted to Defendants. *Id.* at ¶¶ 84-85. On April 17, 2020, Defendant Sheehan made a post to his LinkedIn page advertising Faber Hand Sanitizer in furtherance of his personal and the Sheehan Entities' agreement with the Insider Defendants to share in the ill-gotten profits from the sale of CBDelight and Faber Hand Sanitizer. *Id.* at ¶ 74.

### 2.    Wynk Seltzer

In the fall of 2020, Defendants Casey Parzych, Rittenburg and Sheehan used Debtor resources and personnel to create a cannabis infused beverage known as Wynk seltzer ("Wynk Seltzer"). *Id.* at ¶ 86. On September 1, 2020, Defendant Sheehan caused Defendant AgTech VI, LLC ("AgTech VI") to file Articles of Organization as a United States Virgin Islands ("USVI") limited liability company for the purposes of diverting the profits from the sale of Wynk Seltzer away from the Debtor. *Id.* at ¶ 87. On November 25, 2020, Defendant Casey Parzych, as organizer, registered American Cannabis LLC as a Pennsylvania limited liability company for the purposes of diverting the profits from Wynk Seltzer away from the Debtor. *Id.* at ¶ 88. On April 26, 2021, American Cannabis LLC filed a document with the Pennsylvania Department of State to change its name to AgTech PA LLC ("AgTech PA"). *Id.* at ¶ 89. The document was signed by Defendant Casey Parzych as President of AgTech PA and indicates that it should be returned to Defendant Festa via the email address kellyfesta@drinkwynk.com. *Id.*

As with CBDelight and Faber Hand Sanitizer, the Wynk Seltzer business was facilitated using Debtor resources, including labor, material, office and warehouse space for operations, the purchase of additional canning/bottling equipment utilized for the purposes of Wynk Seltzer, sales services and incentives, marketing services, graphic design services, digital marketing and advertising services, legal services, intellectual property, and canning services. *Id.* at ¶ 90. Despite being manufactured, marketed, and sold using the Debtor's resources and personnel, all revenues from Wynk Seltzer flowed to the Wynk Entities[2], and ultimately the Defendants. *Id.* at ¶ 103.

While Defendants conspired to delete or steal all data on the Debtor's physical computers

---

[2]    The "Wynk Entities" are defined in the Complaint as including Defendants AgTech PA and AgTech VI, along with the entities that own and control AgTech VI, i.e., XO Energy Worldwide, LLLP, XO EW, LLC, and Canvas 340, LLC. *See id.* at ¶¶ 21-27.

and cloud storage services (as described in greater detail below), forensic analysis of system files on a Debtor hard drive reveals that, as with CBDelight and Faber Hand Sanitizer, substantial Debtor resources were diverted for the ultimate benefit of the Wynk Entities.  *Id.* at ¶ 91.  Debtor computers, copiers, and scanners were used to further the business of Wynk Seltzer, including to access Wynk email addresses belonging to Defendant Casey Parzych (casey@drinkwynk.com and casey@drinkcannabisusa.com), Defendant Rittenburg (angus@drinkwynk.com), Defendant Festa (kellyfesta@drinkwynk.com), Defendant Culbertson (rf@drinkwynk.com and rf@drinkcannabisusa.com), Sheehan Entities' employee Kelli Sheehan (kellisheehan@drinkwynk.com), and Debtor customer service representative Casey Coughlin (ccoughlin@drinkwynk.com).  *Id.* at ¶¶ 92-93.  The Wynk Entities regularly ordered supplies for Wynk Seltzer using the Debtor's computers, telephone lines, and vendor accounts.  *Id.* at ¶ 100. The website of the Cannabis Beverage Association features a member page for "WYNK ;)", listing its telephone number as (215) 565-5845, a phone number which is listed as belonging to the Debtor on vendor invoices.  *Id.* at ¶ 99.

On April 19, 2022, current Wynk Seltzer Brand Manager Casey Coughlin posted the following to her LinkedIn page, indicating that, on April 19, 2021 (while still a full-time employee of the Debtor), she was "[w]rapping up Wynk's 1st mobile production run in Ohio."  *Id.* at ¶¶ 94. Debtor credit card records establish that the Debtor—not the Wynk Entities—paid for the expenses associated with Ms. Coughlin's travel to Ohio, along with many other purchases for the sole benefit of the Wynk Entities and the Wynk Seltzer product.  *Id.* at ¶¶ 95-96.  Indeed, in the Summer of 2021, numerous invoices were billed to the Debtor yet either explicitly stated that they were for purposes related to Wynk Seltzer or called for deliveries to 2512 Quakertown Road, Pennsburg, Pennsylvania ("2512 Quakertown Road"), an address which was never disclosed by the Debtor as

part of its operations, and which is listed as Wynk's address on the website of the Cannabis Beverage Association.  *Id.* at ¶¶ 98-99.

In an email dated June 15, 2021, a representative of Classic Staffing Services, Inc. – a temp agency paid for by the Debtor – stated that she "was instructed to reach out for all matters related to Faber to Jack Blobe from Drink Wynk.  I was told he would be the contact going forward and that Drink Wynk, Theo and Opp, and Faber were one and the same."  *Id.* at ¶ 101.  Mr. Blobe's LinkedIn profile states that he was a full-time employee of the Debtor from May 2020 through September 2021 and a full-time employee of the Wynk Entities from May 2021 through February 2022.  *Id.*

### C.    Defendants Conspire to Utilize the Bankruptcy Process to Defraud the Debtor's Creditors

Defendants attempted to mask their wrongdoing by creating invoices, tax forms, and other documents to feign an arm's length relationship between Debtor, the Polebridge Entities, and the Wynk Entities.  *Id.* at ¶ 104.  The documents were phony and a sham—as they failed to fully and accurately describe and account for Debtor resources being devoted to the sole benefit of the Polebridge Entities, the Wynk Entities, and, ultimately, the individual Defendants.  *Id.* Defendants' scheme was designed to hide the fact that they were extracting millions of dollars of value out of the Debtor, to place it beyond the reach of Debtor's creditors.  *Id.* at ¶ 105.

Due to Defendants' diversion of Debtor resources and profits to the Polebridge Entities, the Wynk Entities, and their principals and affiliates, the Debtor was unable to pay its debts and, on February 28, 2021, defaulted on the PNC loan.  *Id.* at ¶ 106.  Under scrutiny but not wanting to abandon their profitable scheme, Defendants conspired to have Defendant Sheehan utilize his complex network of wholly-owned USVI entities – i.e., the Sheehan Entities – to further defraud the Debtor and its creditors.  *Id.* at ¶¶ 44, 107.  To this end, Sheehan Entities employee (and

16

Defendant Sheehan relative) Kelli Sheehan and Sheehan Entities CFO John Charette, despite being full-time employees of the Sheehan Entities, maintained accounts on the Debtor's computer system and had full access to the books, records, and online accounts belonging to the Debtor. *Id.* at ¶ 108.

Defendants first attempted to have certain of the Sheehan Entities either purchase PNC's debt or purchase the Debtor's business assets outside of bankruptcy. *Id.* at ¶ 109. The contemplated transactions were not arm's length and were closely coordinated among the Defendants, with Defendants Casey Parzych and Sheehan leading the scheme. *Id.* at ¶ 110. The coordination between the Debtor and the Sheehan Entities was so egregious that the Debtor's outside counsel admonished Defendants Casey Parzych, Culbertson, Boyer, and Festa in a January 18, 2021 email:

> [I]t's very unusual and inadvisable to be including [Sheehan Entities' attorney] Carey Drangula and [the Sheehan Entities referred to as] X/O on all of these emails [concerning the Sheehan Entities acquiring the Debtor or its assets]. There is no privilege. She and X/O are an adverse party in these negotiations, particularly now that another party . . . is in the mix. You again must treat this as an arm's length transaction for the ultimate maximum benefit of the Company between two equal suitors or you are going to get yourselves in trouble. I would not advise continuing to seek her legal counsel or X/O's approval on anything. I would also keep confidential communications within this team unless or until a deal is made. Any indication that you have favored X/O or have been providing them access or information that you have not provided to [the other potential purchaser] or other suitors has the potential to become fodder for litigation. X/O and [the other potential purchaser] are competitors and we must treat them as such.

*Id.* at ¶ 111. Defendants Casey Parzych, Culbertson, Boyer, and Festa did not follow counsel's advice and continued to present the Debtor to other potential purchasers as unfavorable in the hope of steering the business to the Sheehan Entities at less than fair value. *Id.* at ¶ 112.

That plan failed and Defendants pivoted to a bankruptcy alternative, which included an

effort to sell the business on the cheap to the Sheehan Entities through a Section 363 sale or, if that

failed – via a web of entities doing business as "Best Bev" and/or "Can Man" and referred to in

the Complaint as the "Best Bev Entities"[3] – through outright theft of the Debtor's property and

resources.  *Id.* at ¶ 113.   Attorney time entries filed with this Court in support of certain of the

Sheehan Entities' attorneys' application for allowance of a purported "expense reimbursement"

establish the essential role of the Sheehan Entities in the scheme, indicating that, as of at least April

8, 2021, the Sheehan Entities were conspiring with the Debtor Defendants to formulate the

Debtor's bankruptcy strategy.  *Id.* at ¶ 114.   Defendant Sheehan (using his Sheehan Entities email

address,       ssheehan@xo-energy.com,       and       his       Wynk       Entities       email       address,

shawn@drinkwynk.com) and Sheehan Entities CFO John Charette (using his Wynk Entities email

address, johncharette@drinkwynk.com) were copied on otherwise privileged emails between the

Debtor, its bankruptcy counsel, and/or its accountants concerning the Debtor's bankruptcy

strategy.  *Id.* at ¶ 115.   Defendants Sheehan and Casey Parzych jointly retained Washington D.C.-

based  public relations firm kglobal to direct marketing strategies in light of Debtor's bankruptcy

and Sheehan's anticipated takeover of Debtor's assets.  *Id.* at ¶ 116.

   **1.**  **The Debtor Diverts Assets to the Best Bev Entities Pre-Bankruptcy**

  On May 3, 2021, just over a month before the Debtor's bankruptcy filing, Can Man, LLC

("Can Man") was formed as a Pennsylvania limited liability company with Debtor's outside

counsel acting as organizer.  *Id.* at ¶ 117.  Can Man's registered office was originally listed as 2600

Milford Square Pike, Quakertown PA 18591 ("2600 Milford"), but changed on September 30,

---

[3]  The "Best Bev Entities" are defined in the Complaint as including Defendants Can Man
LLC and Best Bev, LLC, both of which do business as "Best Bev" and operate out of a location
at 2512 Quakertown Road, as well as EtOH Worldwide LLC, XO Energy Worldwide, LLLP,
and XO EW, LLC, entities which ultimately own and control Best Bev, LLC.  *Id.* at ¶¶ 28-33,
117, 125.

2021 to 2512 Quakertown Road, the same address used by the Wynk Entities. *Id.* All activity

taking place at 2600 Milford, 2512 Quakertown Road, and 300 Commerce Drive, Quakertown,

PA ("300 Commerce") was for the benefit of Can Man, the other Best Bev Entities, and the other

Pilfering Entities.[4] *Id.* at ¶ 118.

In May 2021, Defendants caused the Debtor to transfer a Hamrick Recaser machine with

an estimated value of $145,000 to 2512 Quakertown Road for use by the Pilfering Entities. *Id.* at

¶ 119. On May 6, 2021, Casey Coughlin – who identified herself on her LinkedIn page as an

employee of the Debtor and Wynk – posted the following to her facebook page: "Hiring spree!

Beverage production in Quakertown (don't sleep on it) at Faber Distilling. . . . Signing bonus,

referral bonus, bonus for breathing. Name your bonus." *Id.* at ¶ 120. Upon information and belief,

Ms. Coughlin's hiring efforts – while ostensibly made on behalf of the Debtor – were intended to

benefit the Pilfering Entities, as a company on the verge of a bankruptcy filing would likely not

make such extraordinary hiring expenditures. *Id.* at ¶ 121.

On June 1, 2021, despite knowing that the Debtor's bankruptcy filing was imminent,

Defendant Casey Parzych, acting on behalf of the Debtor, executed a Consulting Services

Agreement with DPG Management, LLC ("DPG") under which DPG was to provide human

resources consulting services more fully described in a proposal dated May 20, 2021. *Id.* at ¶ 122.

The May 20, 2021 DPG proposal, while addressed to the Debtor, is entitled "Wynk – Proposal,"

and provides for comprehensive human resources programs and assessments which would be of

no use to a company about to file for bankruptcy. *Id.* at ¶ 123. The services provided by DPG,

although contracted and paid for by the Debtor, were used by Defendants to benefit the Pilfering

---

[4]    The Complaint defines the "Pilfering Entities" as the combination of the Polebridge
Entities, the Wynk Entities, and the Best Bev Entities. *Id.* at ¶ 38.

Entities.  *Id.*

On June 14, 2021, Defendants Festa and Uszenski utilized the Debtor's computer equipment and email system to create and edit a Word document titled "Can Man Shadow Structure," which depicted a corporate structure under which Can Man would own Faber and all the Debtor's other brands and operate out of a headquarters located 2512 Quakertown Road.  *Id.* at ¶ 124.  On June 13, 2022, Best Bev, LLC was formed as a United States Virgin Islands limited liability company.  *Id.* at ¶ 125.  Best Bev, LLC is either the successor in interest to Can Man or was created by Defendants to avoid liability for misconduct on the part of Can Man, which at all times relevant hereto operated using the name "Best Bev."  *Id.*

### 2. Defendants Interfere with the Debtor's Section 363 Sale

On June 3, 2021, Defendants Casey Parzych and Rittenburg signed a Joint Resolution of the Managers and Majority In Interest of Members of the Debtor declaring that the Debtor was insolvent and unable to pay its debts as they mature and authorizing the filing of a voluntary petition under chapter 11 of the Bankruptcy Code.  *Id.* at ¶ 127.  On June 1, 2021, immediately before execution of the joint resolution, the Debtor, on the one hand, and Defendants EtOH Worldwide, LLC and AgTech VI, LLC, on the other, executed Equipment Lease Agreements.  *Id.* at ¶ 128.  The Equipment Lease Agreements were sham documents designed to create false administrative claims that would accrue during the Chapter 11 Case but would never be paid.  *Id.* at ¶ 129.  Indeed, based on the lease payments that were accruing, the Debtor over a two-year term would pay well more than double the original cost of the equipment.  *Id.*

In a letter dated June 10, 2021, Defendant Sheehan, writing as President of Defendant EtOH Worldwide, LLC, sent a letter (the "Sheehan Letter") to coerce PNC into cooperating with a Section 363 sale of the Debtor's assets to the Best Bev Entities at a low-ball price.  *Id.* at ¶ 130.

While signed only by Defendant Sheehan, the letter was drafted by Sheehan, counsel for Sheehan and the Best Bev Entities, and the Debtor's bankruptcy counsel.  *Id.*  It states in pertinent part:

> EtOH has evaluated MMD, [i.e., the Debtor,] including the collateral pledged to PNC, and concluded that the remaining value of its business, however slight, is as an ongoing concern.  As soon as MMD is reduced to its assets, the value of the business will plummet.  The equipment that was pledged to PNC has significantly diminished in value and is almost inextricably integrated into the building in which it has housed. . . . EtOH's acquisition of MMD's assets will be the only viable path forward, and this path will require PNC to reset its expectations for several reasons.
>
> * * *
>
> Without EtOH as a counterparty, MMD will shutter its operations in Trumbauersville, leaving 80 employees jobless in a small rural town in Pennsylvania.  PNC will be left with virtually unsaleable equipment, and, in the face of Casey Parzych's personal bankruptcy, a meaningless guaranty.  EtOH is aware of certain additional complicating factors that will only frustrate PNC's attempts to recoup value from MMD's assets . . . .
>
> * * *
>
> The landlord of the leased premises[, i.e., 2300 Trumbauersville Road, which was leased by Defendant Finland Leasing to the Debtor,] is the father of MMD's majority Unit Holder; it is solely because of this relationship that the landlord has not pursued a default claim for nonpayment of rent under the lease. . . . [T]he landlord is unwilling to relet the premises to an unknown third party (including PNC or its eventual assignee) and nothing could compel him to do so.  Without a lease at these premises, the distilled spirits production permits . . . will be immediately revoked.

*Id.*

Consistent with Defendant Sheehan's letter, on the Petition Date, the Debtor filed a motion seeking approval of a sale under Section 363 of the Bankruptcy Code (the "Sale Motion").  *Id.* at ¶ 131.  The Sale Motion proposed to sell the Debtor's assets to Defendant EtOH Worldwide, LLC, and failed to disclose the extent of the relationship between the Sheehan Entities and Debtor insiders.  *Id.*

In the run up to the Section 363 sale, Defendant Gary Parzych (Defendant Casey Parzych's father) advised potential buyers that he would not allow anyone other than the Sheehan Entities to lease the 2300 Trumbauersville Road property, nor would he permit a transition period for a buyer to find a new location for the operations in that building. *Id.* at ¶ 132. Gary Parzych further stated that he was only willing to allow the Sheehan Entities to occupy the building because his son, Defendant Casey Parzych, was part of their organization. *Id.* On July 22, 2021, the Debtor caused a document to be posted to the Section 363 sale data room which stated that the 2300 Trumbauersville Road "lease is expired. All batching and bottling equipment that is currently stored in this building needs to be immediately removed from the premises upon completion of the sale. New distilled spirits plant license [sic] will then have to be obtained as all current licenses are tied to 2300 Trumbauersville Road." *Id.* at ¶ 133. The chilling impact of this sudden revelation was well-summarized in a July 22, 2021 email from PNC's counsel to the Debtor's bankruptcy counsel: "If the Stalking Horse is getting favored (undisclosed) treatment for this lease by virtue of this property being owned by Casey's father – and other potential bidders will not be afforded similar treatment or even told they can negotiate with Finland – this is highly inappropriate. . . . It's looking more and more like [Debtor] MMD is designing this sale to overwhelmingly favor ETOH (in a sale that no doubt will benefit Casey personally) – a clear violation of MMD's fiduciary obligations." *Id.* at ¶ 134; *see also id.* at ¶ 135 (PNC's counsel again expresses concern about "management's favoritism to ETOH," stating that it "seems like management is doing everything it can to make this business look unattractive to third parties"). *Id.* at ¶ 135. Other potential bidders informed PNC's counsel that they were dropping out because the Insider Defendants were attempting to rig the sale in favor of the Sheehan Entities. *Id.* at ¶ 136.

22

On July 26, 2021, counsel to the United States Trustee held a Section 341 meeting at which Defendant Casey Parzych testified under penalty of perjury, *inter alia*, that the Debtor had no relationship with Wynk Seltzer.  *Id.* at ¶ 138.  This testimony was willfully false.  *Id.*  That same day, a creditor which participated in the meeting emailed counsel for the United States Trustee, forwarding an email from a representative of Classic Staffing Services, Inc. (stating that a Debtor representative told her that "Drink Wynk, Theo and Opp, and Faber were one and the same"), and pointing out that it establishes the "opposite of what [Defendant Casey Parzych] testified [to] on today's call re: DrinkWynk's relationship to Midnight Madness."  *Id.* at ¶ 139.  PNC's counsel confirmed that numerous Debtor employees were simultaneously working for the Wynk Entities. *Id.* at ¶ 140.

On August 6, 2021, in response to questioning from counsel from the United States Trustee, the Debtor represented that:

> The debtor does not now and never has provided services to any companies for the purpose of unlawfully manufacturing, storing, distribution, or using a controlled substance as defined under federal law.
>
> The debtor has no knowledge of a company called DrinkWynk. Wynk seltzer is a product.
>
> Casey Parzych is the sole member of AgTech PA LLC ("AgTech"). Agtech contracts with different cannabis processors to produce Wynk seltzer.  None of the debtor's assets (including but not limited to the collateral of the PNC Loans) are currently used by or in the business operations of AgTech nor have they ever been used by or in the business operations [sic] AgTech.  AgTech lawfully provides services to cannabis companies using assets that are not and never were owned by the debtor.

*Id.* at ¶ 142.  This statement, like Defendant Casey Parzych's testimony at the Section 341 meeting, is demonstrably false given the numerous instances described in the Complaint of the Wynk

Entities using the Debtor's equipment, facilities, and employees. *Id.* at ¶ 142; *see also, e.g., id.* at ¶ 86 (Wynk cannabis seltzer created by Defendants Parzych, Rittenburg, and Sheehan using Debtor resources and personnel), ¶ 90 (Wynk Seltzer business operated using Debtor resources), ¶¶ 94-95 (Debtor employee conducts activities for Wynk Seltzer out of state with all expenses paid for by the Debtor), 102 (Debtor informs its temp agency that it is "one and the same" as Wynk).

In an email string dated August 16 & 17, 2021, counsel for PNC complained to the Debtor's bankruptcy counsel that:

> Counsel for New Liberty[, a division of Millstone Spirits Group, LLC ("Millstone"),] reached out to advise that she spoke with Casey's father [Defendant Gary Parzych] (principal of the landlord for 2300 Trumbauersville Road) and was told in no uncertain terms that he will not accommodate anyone other than [Defendant] ETOH with respect to either a new lease or even transition time for a new buyer to find a new location for the operations in that building. He told her that he is only willing to allow ETOH [to] occupy the building because his son is going to be involved with them going forward. All he will offer a new buyer is 30 days, which New Liberty's counsel tells me is not enough time to transition; they need at least 90 days. At the same time, he is offering ETOH (as the stalking horse) much more than that – because he knows that [Defendant] Casey [Parzych] will be involved with that enterprise.
>
> Needless to say, this is concerning and contrary to representations made by Casey and ETOH (including representations made by Casey under oath). Casey's recent declaration said that his father was willing to discuss arrangements with other bidders and that there is no formal or informal agreement between ETOH and Finland regarding the premises. Casey has also sworn (and your firm has represented) that there is no agreement – informal or otherwise – between Casey and ETOH regarding his ongoing involvement with the business. It's very obvious to anyone paying attention that that simply isn't true. Casey's father pretty much confirmed it today with New Liberty's counsel.

24

This also reeks of continuing collusion among Casey, ETOH and his father. As estate fiduciaries, both Casey and your firm should welcome the participation of New Liberty. We therefore implore you and [Debtor attorney] Harry to address this immediately with Casey and his father. Casey's father – as a debtor insider – cannot favor ETOH over other potential bidders because of his son's business relationship with ETOH (current or future). That is the very reason why relatives of debtor insiders are themselves considered debtor insiders.

\* \* \*

Casey has been less than forthcoming with everyone (including your firm) about the extent of his and his family's relationships with the stalking horse – disclosing things only when they're called out by others. Given these prior issues, questions need to be asked and information verified – and it is not my practice to blindside opposing counsel by simply raising issues at a hearing.

All PNC wants is a fair auction process that puts bidders on somewhat equal footing and does not give ETOH an inside advantage because of [Defendant] Shaun Sheehan's other business relationships with Casey.

*Id.* at ¶ 143.

On or about August 25, 2021, Millstone placed a winning bid at the Section 363 auction for an approximate price of $1.4 million and agreements to assume certain contracts and pay certain administrative expenses. *Id.* at ¶ 144. Due to the Defendants' misconduct as alleged herein, the price paid by Millstone for the Debtor's assets was less than it would have been had the Section 363 sale been conducted on a level playing field. *Id.* at ¶ 145. On September 17, 2021, this Court approved the sale of substantially all of the Debtor's assets to Millstone. *Id.* at ¶ 146. Documents filed with this Court by Millstone for the purposes of objecting to the Sheehan Entities' requests for allowance of expense reimbursement aptly summarize the chilling effect of the Defendants' misconduct on the bidding at the Section 363 auction and the inextricable intertwinement of the Debtor, the Sheehan Entities, and the Wynk Entities:

[t]he Stalking Horse bid[, i.e., the Sheehan Entities' collusive initial bid for the Debtor's assets,] did not serve as a catalyst for additional bids.  The mere fact that the Stalking Horse bidder was an insider of the Debtor with intimate and preexisting knowledge of the assets to be sold, and that Finland Leasing (the Debtor's landlord for 2300 Trumbauersville Road and Casey Parzych's father) made clear he would only lease to [Sheehan Entity] ETOH, certainly dissuaded true third party purchasers.  Millstone was the only bidder at the auction other than ETOH and PNC, and even then, the Debtor attempted to prevent Millstone from bidding by announcing, at the auction with no advance warning, that the Debtor would not consider the bids apples-to-apples unless Millstone agreed to pay ETOH's administrative expense claim.  If ETOH's insider status wasn't . . . enough to chill bidding, the Debtor's overwhelming support of the Stalking Horse surely did. . . . ETOH had unfettered access to information regarding the valuation of the Debtor's assets and its business operations for months, if not longer, before the bankruptcy was filed.

* * *

The [Sheehan Entities'] and the Debtor's businesses and management have been inextricably [i]ntertwined since well before this bankruptcy case was filed[.] . . . The [Sheehan Entities] are insiders of the Debtor, . . . [and] the transactions resulting in the [Sheehan Entities'] request for an administrative claim were not arms-length[.] . . . Millstone submits that the invoices for many of the parts associated with [equipment which is the subject of the aforementioned sham lease agreements between the Sheehan Entities and the Debtor] demonstrates the [Sheehan Entities'] insider relationship.  For example, several of the invoices that appear to be for pieces of the Leased Equipment were billed to "Kelly Festa, Etoh Worldwide." . . . Ms. Festa was, at all relevant times, the Debtor's chief operating officer.  Other invoices reflect equipment that was billed and shipped to a company called "American Cannabis" located at the Debtor's business address and "ordered by Kelly Festa." . . . While the Debtor was never in the business of cannabis production, the venture formed by Debtor's members, Casey Parzych and Angus Rittenburg, with the indirect owner of the [Sheehan Entities], Shawn Sheehan, were in that business, through their "Wynk" business.  Yet other invoices [pertaining to equipment used by the Wynk Entities] were billed directly to "Theobald & Oppenheimer," the dba used by the Debtor.

26

*Id.* at ¶ 147.

**3.      Defendants Operated the Debtor in Possession As An Extension of the Pilfering Entities, And Continued to Do So After the Section 363 Sale**

While operating the Debtor in Possession (the "DIP"), Defendants caused the DIP to make numerous transfers and incur debts from which the Debtor derived no benefit, and which went to the sole benefit of the Best Bev Entities and the other Pilfering Entities.  *Id.* at ¶ 148.  Defendant Casey Parzych made the Debtor's bankruptcy counsel aware of his plan to steal Debtor assets and divert business to the Best Bev Entities, prompting counsel to send him the following email on August 31, 2021:

> Casey, as a follow up to our conversation, I want to reiterate that our strong advice is for you and MMD to at all times act in good faith to take all actions to preserve and protect the assets, business, customers, contracts, relationships, etc of MMD and to deliver to the winning bidder at the auction--- Millstone--- the assets that they contracted to purchase so that their expectations for the transaction that they bargained for will be consummated at the closing.  Doing anything less, would contradict our advice could subject you (and maybe others) to significant legal issues and concerns.   One particular issue of note is that you could be found personally liable for failure to uphold your fiduciary duty to MMD and its creditors and such personal liability could be deemed non-dischargeable (even if you filed a Chapter 7) see, for example Section 523(a)(4) of the Bankruptcy Code.

*Id.* at ¶ 149.

While the Trustee's effort to fully account for transfers made by the Debtor for the benefit of the Best Bev Entities has been hampered by Defendants' intentional destruction of Debtor records, the Trustee lists a number of specific such transfers in the Complaint (the "Post Petition Best Bev Transfers").  *See id.* at ¶ 151.  Defendants intentionally sabotaged the Trustee's efforts to determine the full extent of goods and services paid for by the Debtor but used for the sole

benefit of Best Bev or the other Pilfering Entities. *Id.* at ¶ 152. For example, Defendant Festa instructed vendors to falsely state that Debtor orders were being delivered to the Debtor's facilities when they were actually delivered to Best Bev at 2512 Quakertown Road. *Id.*

Shortly before the Millstone acquisition was set to close, the Insider Defendants falsely informed Debtor employees that they would be meeting with Millstone representatives, but instead arranged a meeting with agents of the Best Bev Entities, who requested that Debtor employees sign a document stating their intention to work for Best Bev. *Id.* at ¶ 153. The employees were then told to take the week off, which allowed Defendants to remove several pieces of large equipment from the Debtor for the benefit of the Best Bev Entities. *Id.*

On or about September 21, 2021, prior to the Millstone sale closing, the Insider Defendants intentionally deleted, wiped, or stole all the Debtor's electronic data and cloud computing drives, both to hinder Millstone from competing with Defendants' Best Bev enterprise and to hinder any investigation into Defendants' misconduct. *Id.* at ¶ 154. While Defendant Festa testified at a Section 341 meeting that she inadvertently deleted the Debtor's data while trying to transfer it to Millstone, this testimony is contradicted by numerous facts, including: a) due to standardized safeguards and warnings issued by the Debtor's cloud provider prior to mass deletion of data, and a thirty day hold period during which deleted data can be recovered, it is highly improbable that all of the Debtor's email and electronic data could be inadvertently destroyed; b) in addition to data stored on cloud services, the Debtor's computers were wiped of meaningful data prior to their transfer to Millstone; c) a forensic analysis conducted by Millstone indicated that the data was not destroyed, but instead transferred; and d) in discussions which occurred after the supposed deletion of data, Defendant Festa was able to retrieve specifically requested electronic documents belonging to the Debtor, but only after reporting that she had to ask for permission to do so. *Id.* at

¶ 155.  Defendant Festa sought "permission" from Defendants Casey Parzych and Sheehan, who ordered the deletion/transfer of the Debtor's data in the first instance.  *Id.*

On September 27, 2021, Millstone's counsel reported to the Debtor's counsel that Defendant Parzych told Debtor employees not to come to work, that the Debtor had not been fulfilling customer orders, that "Faber products are out of stock in basically every store," and that there was no backlog of inventory or glass bottles at the Debtor's premises.  *Id.* at ¶ 156.  This was because Defendants: a) encouraged the Debtor's former employees to work for the Best Bev Entities instead of Millstone; b) were fulfilling the Debtor's customer orders for the benefit of the Best Bev Entities instead of the Debtor; and c) were using the Debtor's inventory and equipment to produce large amounts of product for use by Best Bev.  *Id.*  The Debtor's large raw materials purchases and hiring spree in the months preceding the Millstone closing also support the inference that millions of dollars' worth of DIP property was improperly diverted to the Best Bev Entities.  *Id.* at ¶ 157.

Defendants lied about the true nature of their supposedly new enterprise, informing customers that Best Bev was simply a continuation of the Debtor.  *Id.* at ¶ 158.  For example, an October 7, 2021 text message from Defendant Culbertson to a former customer of the Debtor stated that the Defendants had "re-formed" the Debtor "and quickly started [manufacturing] & co-packing 500,000 cans/bottles per day."  *Id.* at ¶ 159.  Culbertson's text message further offered to "save you at least 14% OFF your current prices," with the "current prices" being a reference to the Debtor's prices, and with the discount made possible only because Defendants had been stealing the Debtor's personnel, equipment, and inventory for use by Best Bev.  *Id.* at ¶ 160.  Defendants sent similar text messages to hundreds of the Debtor's former customers, using customer lists which they stole from the Debtor.  *Id.* at ¶ 161.

An October 11, 2021 email from counsel to Millstone to Debtor's bankruptcy attorneys reports:

> [b]ased on . . . conversations our sales guys are having with [former Debtor] customers, [Defendant] Casey [Parzych] and [Defendant] RF [Culbertson] are holding themselves out to customers as "Faber" and saying the[y] "re-formed" the business.
>
> I am also getting invoices from other [Debtor] vendors who say they haven't been paid in months, and that [Defendant] Kelly [Festa] recently asked them to make edits to invoices before they sent them to us to make it look like the goods were shipping to [the Debtor] at 118 N. main Street (when the original invoice says they were shipping to CanMan at 2512 Quakertown Road).

*Id.* at ¶ 162.

On October 12, 2021, Defendants made their first post to the wellrebellion Instagram account. *Id.* at ¶ 163. Well Rebellion was the new name for the liquor product Defendants manufactured and bottled using Debtor resources and employees. *Id.* Defendants subsequently began manufacturing, marketing, and selling the Well Rebellion product using stolen Debtor equipment as well as the Debtor's supposedly deleted internal data. *Id.* at ¶ 164. Certain of the Defendants, including Defendants Festa and Culbertson, utilized custom Well Rebellion flyers which included their cell phone numbers to market the product for the benefit of Best Bev. *Id.* at ¶ 165. The flyers were created using the Debtor's marketing files, but with the Faber brand name replaced with the Well Rebellion name. *Id.*

Prior to and after the closing of the sale of the Debtor's assets to Millstone, the Defendants utilized the Debtor's phone.com account for the benefit of Best Bev, returning calls to Debtor customers who placed orders for Faber products, and instead selling them the corresponding Best Bev products. *Id.* at ¶ 166. On October 18, 2021, Drifter Spirits emailed Millstone concerning a meeting that Drifter Spirits had that day with "Midnight Madness," the Debtor; in reality, the

Defendants had set up a meeting between Drifter Spirits and Best Bev under the guise that Best Bev was a mere continuation of the Debtor.  *Id.* at ¶ 167.

In an October 20, 2021 report, a Millstone sales manager complained that Defendants were using the Faber brand name in communications with the Debtor's former customers and were causing the customers to think that Best Bev was simply a continuation of the Debtor:

> All of our customers are still very confused and getting daily constant texts/calls/emails from BestBev claiming to be us and asking for their 'Faber well order'. . . . They hired a team of reps + call center with 5 people non stop calling our customers working phones + email off our old customer lists.  Many of our customer are telling me they call them, text them, and email them multiple times a day after they told them to please please stop.

*Id.* at ¶ 168.  On November 1, 2021, a Millstone sales manager reported that the Best Bev Entities "are continuing to spam all of our customers direct cell phones with texts and calls" and that the customers were confused as to whether the Debtor and Best Bev were separate entities.

In the fall of 2022, Defendants caused Best Bev to join the Upper Perkiomen Valley Chamber of Commerce, stating that, "[a]fter years of dreaming up, canning and distributing our own beverages, we have expanded our universe . . . [and] have the space to do it all at our new 100,000+ sf facility centrally located just outside Philadelphia," i.e., 2512 Quakertown Road.  *Id.* at ¶ 170.  The reference to "years of dreaming up, canning and distributing our own beverages" is an obvious reference to the Debtor, and yet another indication that Defendants treated the Debtor and Best Bev as one and the same.  *Id.*  To this day, Defendants and the Best Bev Entities benefit from their theft of Debtor resources.  *Id.* at ¶ 171.

### D.     The Insider Defendants' Utter Failure To Maintain Internal Controls

At all times material hereto, the Insider Defendants caused the Debtor to fail to comply with the most basic principles of corporate governance and internal controls.  *Id.* at ¶ 172.  This

failure was intentional, particularly with respect to the Debtor's accounting, as it allowed Defendants to freely pilfer the Debtor for the benefit of the Pilfering Entities, with substantial ill-gotten gains flowing to the individual Defendants.  *Id.* at ¶ 173.  A May 10, 2021 letter from the Debtor's outside accounting firm addressed to the Debtor's Board of Directors and Members of the Debtor and its related entities reported the complete failure of the Debtor's accounting function as "cause for substantial concern because management cannot rely entirely on the accuracy of internally prepared financial statements."  *Id.* at ¶ 174.

The Insider Defendants, with the active involvement and under the instruction of Defendant Sheehan, grossly mismanaged the Debtor's Chapter 11 Case by, among other things, providing false and inaccurate testimony and declarations, allowing the Debtor to produce and file inaccurate documents, pilfering funds belonging to the DIP for the benefit of their affiliated entities, providing the Sheehan Defendants full access and control of the Debtor's books and records, allowing the Sheehan Defendants to assist in the preparation of the Debtor's filings with this Court, intentionally attempting to rig the Section 363 sale for the benefit of the Sheehan Defendants (resulting in an artificially low price for the Debtor's assets at auction) and causing the Debtor to incur substantial unnecessary and avoidable fees, costs, and expenses.  *Id.* at ¶¶ 175, 104-116, 128-147, 189.

The Insider Defendants retained and utilized Defendant Boyer as the Debtor's non-bankruptcy General Counsel while knowing that Defendant Boyer was breaching fiduciary duties owed to the Debtor by simultaneously acting as counsel to the Polebridge Entities and the Wynk Entities to the considerable prejudice and detriment of the Debtor and its creditors.  *Id.* at ¶ 176. Defendant Boyer breached his fiduciary duties to the Debtor by simultaneously representing the Debtor, the Polebridge Entities, and the Wynk Entities, which, as set forth herein, existed for the purpose of defrauding the Debtor and its creditors.  *Id.* at ¶ 177.  Moreover, Defendant Boyer as

general counsel to the Debtor knew or should have known of management's wrongdoing and failure to follow proper standards of corporate governance as set forth herein, had a duty to take corrective measures, and actively assisted Defendants' scheme instead of fulfilling his duty to correct the wrongdoing. *Id.*

Defendants Parzych and Rittenburg treated the Debtor as their piggy bank, making a number of personal purchases using the Debtor's funds, as set forth in detail in the Complaint. *Id.* at ¶ 178. Additionally, as set forth in detail in the Complaint, the Insider Defendants caused the Debtor to wrongfully funnel large sums of money into entities owned by Defendant Casey Parzych's father, Defendant Gary Parzych. *Id.* at ¶¶ 179-188.

### E.      The Chapter 7 Case

On August 25, 2021, the United States Trustee filed a Motion Pursuant to 11 U.S.C. § 1112 to Dismiss the Case or Convert to Chapter 7 (the "Conversion Motion"). In support of the Conversion Motion, the United States Trustee averred, *inter alia*:

a.      "[P]rior to the petition date the Debtor caused to be made transfers of substantial value";

b.      "The Debtor has failed to timely file its financial operating reports since the petition date. The UST, creditors, and parties in interest are unable to examine the Debtor's post-petition operations and determine whether the Debtor has otherwise complied with its fiduciary obligations. Further, the failure to comply with this duty makes it impossible to determine the administrative expenses of the estate since this case was filed."; and

c.      "The Debtor has failed to file the Notice of Officer Compensation as required by LBR 4002-1 disclosing any payments made since the filing date or contemplated being made to the Debtor's officers," *id.* at ¶ 189. On October 13, 2021 (the "Conversion Date"), the Bankruptcy

Court entered an Order converting the Debtor's Chapter 11 case to a case under Chapter 7 of the Bankruptcy Code and, on October 14, 2021, the Trustee was appointed as the permanent Chapter 7 Trustee of the Estate. *Id.* at ¶ 190.

Since her appointment, the Trustee has undertaken an investigation of the Debtor's affairs. *Id.* at ¶ 191. The Defendants have actively obstructed the Trustee's investigation. *Id.* at ¶ 192. As discussed herein, Defendants intentionally destroyed or stole the Debtor's emails and electronic files. *Id.* at ¶ 193. The night before Millstone was set to take over the Debtor, documents stored in a safe located at 118 North Main were removed. *Id.* at ¶ 194. A forensic analysis of the Debtor's Wi-Fi system disclosed that a device named "Casey's Phone" logged into the Debtor's network at a time contemporaneous with the removal. *Id.* Defendants Casey Parzych, Rittenburg, Baldwin, Festa, Culbertson, Uszenski, Best Bev, LLC, Can Man, EtOH Worldwide, LLC and AgTech VI have failed to cooperate with requests for information issued pursuant to Bankr. E.D.Pa. Local Rule 2004-1. *Id.* at ¶ 195. Defendants instructed former debtor employees to sign non-disclosure agreements to conceal information relating to the operation of the Debtor's business. *Id.* at ¶ 196.

Additionally, former Debtor employees who did not cooperate with Defendants were harassed and intimidated. *Id.* at ¶ 197. By way of example, a chocolate phallus was sent to the family home of a former Debtor employee who chose to work for Millstone rather than join Defendants at the Best Bev Entities. *Id.*

On March 7, 2022, Millstone filed a proof of claim which confirms many of the foregoing allegations and establishes that the Defendants' wrongdoing caused substantial harm to the Estate by incurring debts and making expenditures on behalf of the Pilfering Entities, transferring the Debtor's equipment to the Pilfering Entities, and ultimately diminishing the value of the Debtor in the eyes of potential Rule 363 purchasers. *Id.* at ¶ 198.

34

### F.    The Adversary Proceeding

The Trustee instituted the instant adversary proceeding by filing the Complaint on June 15, 2023.  Moving Defendants filed their Motion to Dismiss on September 15, 2023 (Adv. D.I. 17), attaching the Debtor's Amended and Restated Operating Agreement as Amended and Restated as of March 26, 2021 (the "Operating Agreement," Adv. D.I. 17-2).

## III.    MOTION TO DISMISS STANDARD

In ruling on a motion to dismiss pursuant to Rule 12(b)(6), the court must accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief. *ChemLogix LLC v. Bulk Tainer Logistics N. Am., Inc.,* 2023 WL 5751404, at *4 (E.D. Pa. Sept. 6, 2023).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "The purpose of a motion to dismiss is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case."  *In re Student Fin. Corp.*, 335 B.R. 539, 546 (D. Del. 2005).  The plaintiff is not required to anticipate, overcome, or plead around affirmative defenses in the complaint.  *Schmidt v. Skolas*, 770 F.3d 241, 248 (3d Cir. 2014)); *see also In re DVI, Inc.*, 2008 WL 4239120, at *11 (Bankr. D. Del. Sept. 16, 2008) ("An affirmative defense with disputed facts is not a proper basis to dismiss a complaint.").

## IV.    ARGUMENT

### A.    The Allegations of the Complaint Are Sufficiently Specific As To Each Defendant

The allegations in the Complaint are specific enough to set forth claims against each Moving Defendant.  All that is required under Federal Rule of Civil Procedure 8(a)(2) is "a short

and plain statement of the claim showing that the pleader is entitled to relief."  The Rule "do[es] not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570.  To make a claim "plausible," the facts alleged must simply "raise a right to relief beyond the speculative level."  *Id.* at 555.  "This requirement 'calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of' necessary elements of the plaintiff's cause of action."  *Infantino v. W. Wyoming Borough*, 2013 WL 3972770, at *2 (M.D. Pa. July 31, 2013) (quoting *Twombly*, 550 U.S. at 556).

Moving Defendants ignore these standards in accusing the Trustee of simply engaging in so-called "shotgun pleading," which, they argue, makes the Complaint insufficient.  *See* Moving Defendants' Brief, Adv. D.I. 17-1 ("MD Br.") at pp. 16-19.  The Complaint is not a shotgun pleading because it contains specific detail regarding each Moving Defendant's role at or concerning the Debtor, *see* Complaint at ¶¶ 10-33, and includes specific allegations regarding the conduct of individual Moving Defendants throughout.  *See, e.g., infra* at pp. 47-50, 53-58 (detailing the Complaint's allegations of individualized misconduct against each of the Moving Defendants).  To the extent that certain paragraphs are alleged in terms of conduct that all or specific subsets of the Defendants as a group engaged in or allowed to happen, the Complaint is pleaded in that fashion because all such Defendants collectively engaged in that behavior, and there is nothing improper with allegations of this type.  *See, Buckley v. O'Hanlon*, 2007 WL 956947, at *5 (D. Del. Mar. 28, 2007) (stating a claim does not require a plaintiff to "associate specific parties to particularized conduct" when "much of the alleged conduct involved collective action and decision making"); *In re Genesis Health Ventures, Inc.*, 355 B.R. 438, 457 (Bankr. D. Del. Dec. 13, 2006) (collective references to certain groups of defendants did not render the pleadings defective, and made sense because the allegations arose out of group action); *UD*

*Dissolution Liquidating Trust v. Sphere 3D Corp. (In re UD Dissolution Corp.)*, 629 B.R. 11, 36-37 (Bankr. D. Del. 2021) (rejecting "group pleading" argument and finding Amended Complaint contained sufficient detail of actions taken by the Defendants, collectively and individually, in furtherance of the alleged breaches of fiduciary duty); *Hawk Mt. LLC v. Mirra*, 2016 WL 4541032, at *2 (D. Del. Aug. 31, 2016) ("'Group Pleading' is permissible where—as here—information that would permit greater particularity is exclusively within the possession of a defendant, and defendants are alleged to have acted together to facilitate a general scheme.").

Moving Defendants' argument loses sight of the fact that "whether a complaint is an impermissible shotgun pleading is not wholly dependent on whether it incorporates all preceding paragraphs or names multiple defendants, but on whether the complaint 'give[s] the defendants adequate notice of the claims against them and the grounds upon which each claim rests.'" *Milo, LLC v. Procaccino*, 2020 WL 1853499, at *10 (E.D. Pa. Apr. 13, 2020) (quoting *M.B. v. Schuylkill Cty.*, 375 F.Supp.3d 574, 587 (E.D. Pa. 2019) (denying motion to dismiss when each count in complaint adopted all preceding counts and when some claims "[did] not identify the 'role of each particular defendant in the claim'" because complaint otherwise put defendants on notice and "describes, in significant detail, specific allegations against the respective defendants")). Here, "[t]here is no great mystery . . . as to which counts are asserted against which defendants [because,] [i]mmediately after the subheading for each count in the . . . complaint, Plaintiff[] name[s] the specific defendant or defendants whose actions form the basis of their claim for relief." *Rodwell v. City of Newark*, 2023 WL 5703176, at *5 (D.N.J. Sept. 5, 2023) (rejecting defendants' "shotgun pleading" argument). The Complaint in the instant case, which pleads numerous details concerning each Moving Defendant's participation in an overall scheme to benefit themselves and entities under their control at the expense of the Debtor, meets the minimal standard of giving

Moving Defendants adequate notice of the Trustee's claims and the grounds on which they rest. Moving Defendants' "shotgun pleading" argument is accordingly without merit, and their Motion should be denied.

### B. The Complaint States Claims for Breach of Fiduciary Duty, Aiding and Abetting Breach of Fiduciary Duty, and Corporate Waste

#### 1. The Complaint States Claims for Breach of Fiduciary Duty Against All Insider Defendants

Under Pennsylvania law, the plaintiff generally must plead and prove the following elements to prevail on a breach of fiduciary duty claim: 1) the defendant owed a fiduciary duty to the plaintiff; 2) the defendant either negligently or intentionally failed to act in good faith and solely for the benefit of plaintiff, or failed to use reasonable care in carrying out the fiduciary duties owed to the plaintiff; 3) the plaintiff suffered an injury; and 4) the defendant's failure to act solely for the plaintiff's benefit or use the skill and knowledge demanded of the defendant by law was a real factor in bringing about the plaintiff's injuries. *See, e.g., Smith v. Morrison*, 47 A.3d 131, 136 (Pa. Super. 2012); *Snitow v. Snitow*, 2017 WL 6557479, at *7 (Pa. Super. Dec. 22, 2017). Here the Complaint amply details numerous acts of brazen misconduct by the Insider Defendants, as aided and abetted by all of the Moving Defendants, designed to usurp the resources of the Debtor for the benefit of themselves and Defendant entities under their control. Accordingly, Moving Defendants' Motion should be denied.

##### a. Defendants Festa, Baldwin, Boyer, and Culbertson Owed Fiduciary Duties To The Debtor

With respect to Defendants Festa, Baldwin, Boyer, and Culbertson, Moving Defendants incorrectly argue that, because "[t]he Debtor is a manager-managed LLC[,] . . . only the Managers of the Debtor owe fiduciary duties." MD Br. at p. 21. To the contrary, it is black-letter law in

38

Pennsylvania that during the term of employment and within the scope of agency, an employer/principal is entitled to its employees' and agents' undivided loyalty:

> Under Pennsylvania law, the duty of loyalty is implied in every employer-employee relationship, *Smith v. Unemployment Comp. Bd. Of Review*, 367 A.2d 811, 813 (Pa. Cmwlth. 1977), and an employee "owes his employer loyalty, diligence, fidelity, obedience, and above all, honesty." *Langensiepen v. Unemployment Comp. Bd. Of Review*, 451 A.2d 814, 816 (Pa. Cmwlth. 1982). In order to uphold his duty of loyalty, "[a]n employee must provide his employer with undivided loyalty and avoid conflicts of interest." *See Maritrans v. Pepper Hamilton & Sheetz*, 602 A.2d 1277, 1283 (Pa. 1992). Stated differently, "[n]o man can serve two masters." *SHV Coal, Inc. v. Continental Grain Co.*, 545 A.2d 91 (Pa. Super. 1988), rev'd on other grounds, 587 A.2d 702 (1991). Every agent "is subject to a duty not to act or to agree to act during the period of his agency for persons whose interests conflict with those of the principal in matters in which the agent is employed." *SHV Coal, Inc.* (citing Restatement (Second) of Agency § 394).

*Alturnamats, Inc. v. Harry*, 2008 WL 4279814, at *13 (W.D. Pa. Sept. 16, 2008) (internal citations reformatted), order amended on reconsideration on other grounds, 2009 WL 185952 (W.D. Pa. Jan. 23, 2009); *see also, e.g., Solid Wood Cabinet Co. v. Partners Home Supply*, 2015 WL 1208182, at *6 (E.D. Pa. Mar. 13, 2015) ("Pennsylvania law dictates that employees owe their employers a duty of loyalty."); *Castle Cheese, Inc. v. MS Produce, Inc.*, 2008 WL 4372856, at *9 (W.D. Pa. Sept. 19, 2008) ("All agents are bound by the fiduciary duties of loyalty and obedience to the principal"). Additionally, Pennsylvania's Supreme Court has made it abundantly clear that the same principles of agency law mandate that the relationship between an attorney, such as Defendant Boyer, and their client is a fiduciary one. *See Maritrans*, 602 A.2d at 1287.

Defendants fail to cite any provision of the Pennsylvania Uniform Limited Liability Company Act of 2016 (the "LLC Act," codified at 15 Pa.C.S. § 8811, *et seq.*) which undermines

these well-established and long-standing principles of law, and there is no such provision.[5]  Indeed,

Pennsylvania's Associations Code (of which the LLC Act is a part, *see* 15 Pa.C.S. § 101) explicitly

provides that, "[u]nless displaced by the particular provisions of this title, the principles of law and

equity, including, but not limited to, the law relating to principal and agent, estoppel, waiver, fraud,

misrepresentation, duress, coercion, mistake, bankruptcy or other validating or invalidating cause,

shall supplement its provisions."  15 Pa.C.S. § 110.

Numerous cases decided under Pennsylvania law establish the point by holding that

employees or agents of a limited liability company owe that company common law fiduciary

duties.  *See AmQuip Crane Rental, LLC v. Crane & Rig Servs., LLC*, 199 A.3d 904, 915 (Pa. Super.

2018) (holding that a salesperson employed by an LLC breached his common law duty of loyalty

to the LLC by helping co-workers breach their noncompetition agreements); *Patient Acct. Serv.

Ctr., LLC v. Ebling*, 2022 WL 4073341, at *12 (M.D. Pa. Sept. 2, 2022) (recognizing in a case

brought by an LLC against a former employee that "Pennsylvania law dictates that an employee,

as the agent of his employer, owes his employer a duty of loyalty" (quoted reference omitted));

*Neopart Transit, LLC v. CBM N.A. Inc.*, 314 F. Supp. 3d 628, 636 (E.D. Pa. 2018) (denying motion

to dismiss plaintiff LLC's breach of fiduciary duty claims against the employee of an LLC which

was the plaintiff's predecessor in interest); *cf. also Act II Jewelry, LLC v. Wooten*, 301 F. Supp. 3d

905, 915-916 (N.D. Ill. 2018) (collecting cases from other jurisdictions establishing that

"Employees are not governed by an LLC's operating agreement, but rather by employment

---

[5]      Moving Defendants cite Section 8849.1 and 8849.2 of the LLC Act in support of the
proposition that "only the Managers of the Debtor owe fiduciary duties." MD Br. at p. 21.  There
is absolutely no language in those sections supporting this conclusion.  Those sections simply set
forth general standards of conduct for members and managers, and do not speak to the duties owed
by other categories of individuals, such as employees, agents, and attorneys.

contracts and traditional rules of agency. . . . [C]ertainly the ability to modify fiduciary duties owed

by members and managers does not eradicate all duties owed by agents.").

Nor does the "Operating Agreement provide that only managers owe fiduciary duties to the

Debtor," as Moving Defendants argue.  MD Br. at p. 26 (citing Operating Agreement at §§ 5.1,

5.7, and 5.8).  There is no language of any sort in the Operating Agreement which references

fiduciary duties in the employee context, states that only Managers have fiduciary duties, or states

that the company intended to displace the common law of agency.  With respect to the specific

sections cited by the Moving Defendants, Sections 5.1 and 5.7 pertain only to Managers and are

thus entirely inapplicable to Defendants Festa, Baldwin, Boyer, and Culbertson.  While certain

aspects of Section 5.8 pertain to officers and agents of the Debtor, that section makes no mention

of the waiver of any fiduciary duties and explicitly states that Members, Managers, officers and

agents of the Company are prohibited from using their "position with the Company, and the

information received as a result of said position, in a manner that will harm the business of the

Company in any way," which is exactly the misconduct alleged in the Complaint.

Simply stated, the Complaint definitively pleads that Defendants Festa, Baldwin, Boyer,

and Culbertson were employees and/or agents of the Debtor,[6] the foregoing discussion establishes

that employees and agents of a limited liability company owe it fiduciary duties, and Moving

Defendants' argument to the contrary is entirely without merit.[7]

---

[6]      *See* Complaint at ¶¶ 10-15.

[7]      Moving Defendants argue that, by pleading in the alternative that the Insider Defendants
can be held liable for aiding and abetting breaches of fiduciary duty even if they are not personally
deemed to owe such a duty, the Trustee "recognizes" that no fiduciary duties are owed.  MD Br.
at p. 27 n. 12.  The argument is specious, as it is well-established that alternative pleading of this
type is permissible.  *See In re Our Alchemy, LLC*, 2019 WL 4447541, at *16 (Bankr. D. Del. Sept.
16, 2019) ("At the pleading stage, the Trustee is entitled to plead in the alternative and to assert
claims of aiding and abetting to the extent that some defendants did not themselves have any

### b.      Defendants Casey Parzych and Rittenburg Owed Fiduciary Duties to the Debtor

Moving Defendants concede that Defendants Casey Parzych and Rittenburg owed fiduciary duties to the Debtor, MD Br. at p. 19, but argue that the Operating Agreement limits liability for those duties to breaches based in "fraud, deceit, gross negligence, or willful misconduct."  MD Br. at p. 27 (citing Operating Agreement at § 5.7).  While the allegations of the Complaint meet even this enhanced standard, *see infra* at pp. 47-50, the Operating Agreement cannot be construed to limit fiduciary duties in such a manner given that, as a matter of law, any displacement of fiduciary duties is effective only to the extent that the displacement is stated clearly and with particularity, with any ambiguities resolved against the party seeking to limit the scope of the duty.

The LLC Act establishes that managers of a manager-managed LLC owe the company the duties of loyalty, care, and good faith and fair dealing:

> (b) Duty of loyalty.--The fiduciary duty of loyalty of a manager in a manager-managed limited liability company includes the duties:
>
>> (1) to account to the company and to hold as trustee for it any property, profit or benefit derived by the manager:
>>
>>> (i) in the conduct or winding up of the company's activities and affairs;
>>>
>>> (ii) from a use by the manager of the company's property; or
>>>
>>> (iii) from the appropriation of a company opportunity;
>>
>> (2) to refrain from dealing with the company in the conduct or winding up of the company's activities and affairs as or on

---

fiduciary duties or were shielded from breach of fiduciary duty claims by exculpatory provisions of debtor's operating agreement.").

behalf of a person having an interest adverse to the company; and

> (3) to refrain from competing with the company in the conduct of the company's activities and affairs until completion of the winding up of the company.

(c) Duty of care.--The duty of care of a manager of a manager-managed limited liability company in the conduct or winding up of the company's activities and affairs is to refrain from engaging in gross negligence, recklessness, willful misconduct or knowing violation of law.

(d) Good faith and fair dealing.--A manager of a manager-managed limited liability company shall discharge the duties and obligations under this title or under the operating agreement and exercise any rights consistently with the contractual obligation of good faith and fair dealing.

\* \* \*

(h) Exoneration.--The operating agreement may provide that a manager in a manager-managed limited liability company shall not be personally liable for monetary damages to the company or the members for a breach of subsection (c), except that a manager may not be exonerated for an act that constitutes recklessness, willful misconduct or a knowing violation of law.

15 Pa.C.S. § 8849.2; *see also id.* at 2016 Committee Comment ("This section states some of the core aspects of the fiduciary duty of loyalty, provides a duty of care, and incorporates the contractual obligation of good faith and fair dealing.").

While these duties may be modified by some extent by an LLC's operating agreement, "15 Pa.C.S. § 8815(c) and (d) contain important limitations on the power of the operating agreement to affect fiduciary duties and the obligation of good faith and fair dealing." *Id.* To that end, Section 8815(c) states that an operating agreement "may not" "[e]liminate the duty of loyalty provided for in section 8849.2(b)(1)(i) or (ii) or (2) or the duty of care of a manager, except as provided in subsection (d)[,]" which permits the alteration, but not the elimination, of, the duty of care and certain aspects of the duty of loyalty. 15 Pa.C.S. §§ 8815(c)(12), (d)(3). Moreover, it is

43

"fundamental in the jurisprudence of fiduciary duty" that any "displacement of fiduciary duties is effective only to the extent that the displacement is stated clearly and with particularity."  *See* 2016 Committee Comment to 15 Pa.C.S. § 8815 (citing *Paige Capital Management, LLC v. Lerner Master Fund, LLC*, 2011 WL 3505355 at *31 (Del.Ch. Aug. 8, 2011)).

Here, Moving Defendants' argument that Section 5.7 limits the managers' fiduciary duties, MD Br. at p. 27, is without merit because the section is ambiguous and must be construed against Defendants.  Section 5.7 states in full as follows:

> 5.7 <u>Liability for Certain Acts</u>. Each Manager shall perform his duties as a Manager in good faith, in a manner he reasonably believes to be in the best interests of the Company, and with such care as an ordinarily prudent person in a like position would use under similar circumstances. No Manager shall be liable to the Company or to any Member for any loss or damage sustained by the Company or any Member, unless the loss or damage shall have been the result of fraud, deceit, gross negligence or willful misconduct by such Manager.

The first sentence of the section addresses the duty of care and establishes that the Debtor's managers are held to an ordinary (and not gross) negligence standard of care.  *See, e.g., Schemberg v. Smicherko*, 85 A.3d 1071, 1075 (Pa. Super. 2014) (describing the duty of care owed pursuant to an ordinary negligence claim as the "absence of ordinary care that a reasonably prudent person would exercise in the same or similar circumstances.").  Accordingly, the Operating Agreement imposes on Managers a ***higher*** standard of care than the gross negligence standard imposed by the LLC Act's default rule.  *See* 15 Pa.C.S. § 8849.2(c) ("The duty of care of a manager . . . is to refrain from engaging in gross negligence, recklessness, willful misconduct or knowing violation of law.").

The ordinary negligence standard established in the first sentence of Section 5.7 is in inherent conflict with the section's second sentence, which purports to restore the default standard

by eliminating liability for loss or damage caused with less than gross negligence, which would render the ordinary negligence standard established in the first sentence meaningless.  This creates an ambiguity which must, as a matter of Pennsylvania law, be resolved against Defendants, with the ordinary negligence standard preserved.  *See* 2016 Committee Comment to 15 Pa.C.S. § 8815 ("displacement of fiduciary duties is effective only to the extent that the displacement is stated clearly and with particularity"); *see also Manti Holdings, LLC v. Carlyle Grp. Inc.*, 2022 WL 444272, at *2 (Del. Ch. Feb. 14, 2022) (holding under Delaware law that "drafters of [an] entity's documents must make their intent to eliminate fiduciary duties plain and unambiguous in order for such waivers to be effective" and thus that "the interpretive scales tip in favor of preserving fiduciary duties" (quotation and alteration marks omitted)).

The Moving Defendants' arguments fare no better with the duty of loyalty.  While they imply that Section 5.8 of the Operating Agreement somehow limits that duty, MD Br. at p. 24, the section does not contain any language which would limit or materially modify the statutory default set forth in LLC Act § 8849.2(b).  Section 5.8 states as follows:

> 5.8 <u>Conflicts of Interest</u>.  The Managers shall devote such time as they, in their discretion, deem necessary to manage the Company's affairs in an efficient manner.  Subject to the other express provisions of this Agreement, each Manager, Member, officer and agent of the Company at any time and from time to time may engage in and possess interests in other business ventures of any and every type and description, independently or with others, with no obligation to offer to the Company or any other Member, Manager or agent the right to participate therein. Except as otherwise provided in this Agreement, the Company may transact business with any Manager, Member, agent or Affiliate thereof provided the terms of those transactions are disclosed to the Managers and no Manager has any objection thereto. The foregoing notwithstanding, no Manager, Member, officer or agent may use his/her/its position with the Company, and the information received as a result of said position, in a manner that will harm the business of the Company in any way.

45

While the section expressly allows the Managers to participate in other business ventures and to transact business with the Debtor, it does not allow them to compete with the Debtor and does not impact or limit the statutory duty of loyalty in any fashion beyond simply expanding on that duty by stating that none of the enumerated individuals "may use his/her/its position with the Company, and the information received as a result of said position, in a manner that will harm the business of the Company in any way."

### c.    The Insider Defendants Breached Their Fiduciary Duties

As detailed above, all of the Insider Defendants owed fiduciary duties to the Debtor.  For Defendants Casey Parzych and Rittenburg as managers, those duties included the duty of care to act "in a manner [they] reasonably believe[d] to be in the best interests of the Company, and with such care as an ordinarily prudent person in a like position would use under similar circumstances,"[8] Operating Agreement at § 5.7, and the duty of loyalty to, *inter alia*, safeguard the Debtor's property and refrain from adverse dealing and competition with the Debtor.  15 Pa.C.S. § 8849.2(b).  For the remaining Insider Defendants, those duties included providing the Debtor with undivided loyalty and avoiding conflicts of interest, *Maritrans*, 602 A.2d at 1283, "refrain[ing] from competing with the [Debtor] and from taking action on behalf of, or otherwise assisting, the [Debtor's] competitors throughout the duration of the agency relationship, as well as a duty not to use property or confidential information of the principal for the agent's own purpose or those of a third party."  *Teva Pharms. USA, Inc. v. Sandhu*, 291 F. Supp. 3d 659, 678 (E.D. Pa. 2018) (quotation marks and citation omitted).

---

[8]    Even if the Court accepts the argument that the managers' duty of care is limited to a gross negligence or higher standard, the misconduct of Defendants Casey Parzych and Rittenburg as hereinafter described clearly rises to this level, as it was intentionally designed to benefit the Insider Defendants and entities under their control to the detriment of the Debtor.

The Complaint contains extensive allegations detailing behavior on the part of each of the individual Insider Defendants that was in breach of all of the fiduciary duties enumerated above. Among other things, the Complaint makes the following individualized allegations[9] against the Insider Defendants, which are in and of themselves enough to state a claim for breach of fiduciary duty against them:

| Defendant | Individualized Misconduct Alleged | Complaint ¶¶ |
|---|---|---|
| Casey Parzych<br><br>(majority member and Manager of the Debtor, member and president of AgTech PA, and agent of the Polebridge Entities, the Wynk Entities, and the Best Bev Entities) | Instructed Debtor sales representatives to make sales of CBDelight and Faber Hand Sanitizer their "mission critical" priorities even though all proceeds from these products went not to the Debtor but instead to the Polebridge Defendants. | 10, 60, 63, 79 |
| | Used Debtor resources and personnel to create Wynk seltzer and formed AgTech PA, of which he is President, for the purposes of diverting the profits from Wynk Seltzer away from the Debtor. | 86, 88, 89 |
| | Used Debtor computers and a personal Wynk Seltzer email address to further the business of the Wynk Entities. | 92 |
| | Waived the Debtor's attorney client privilege by using his personal Wynk Entities email address in communications with the Debtor's outside counsel. | 101 |
| | Led, along with Defendant Sheehan, the scheme to funnel the Debtor's business to the Sheehan Entities at a fire sale price. | 110-112, 116, 143 |
| | Caused the Debtor to retain and pay for an HR consulting firm on the eve of bankruptcy for the purposes of benefitting entities other than the Debtor. | 122-124 |
| | Falsely testified under oath during a Section 341 meeting that the Debtor was not involved with the production of Wynk Seltzer. | 138-139 |
| | Made the Debtor's bankruptcy counsel aware of his plan to steal Debtor assets and divert business to other entities, leading bankruptcy counsel to admonish him via email. | 149 |
| | Ordered the deletion/transfer of the Debtor's electronic data. | 155 |

---

[9]     While the Complaint's allegations of misconduct undertaken by the Insider Defendants as a group are entirely proper due to their acting together in furtherance of a common scheme, *see supra* at pp. 35-38, the following chart includes only allegations of misconduct attributed to individual defendants. The extensive nature of these allegations further demonstrates why Moving Defendants' "shotgun pleading" argument is without merit.

| | | |
|---|---|---|
| | Sabotaged the Debtor's business prior to the transfer of its assets to Millstone. | 156 |
| | Held himself out to the Debtor's former customers as a continuation of the Debtor for the benefit of the Best Bev Entities. | 162 |
| | Treated the Debtor as his personal piggy bank by making a number of personal purchases using the Debtor's funds. | 178 |
| | Generated Work Product using the resources of the Debtor for the benefit of entities other than the Debtor. | 258 |
| Angus Rittenburg<br><br>*(member and officer of the Debtor, officer and member/shareholder of the Polebridge Entities, and officer of the Best Bev Entities and the Wynk Entities)* | Formed Good Design and Polebridge, the sole purpose of which was to usurp resources and monies properly belonging to the Debtor. | 11, 46-47, 20, 63 |
| | Waived the Debtor's attorney client privilege by using his personal Wynk Seltzer email address in communications with the Debtor's outside counsel. | 101 |
| | Used Debtor resources and personnel to create Wynk Seltzer. | 86 |
| | Used Debtor computers and personal Wynk Entities and Polebridge Entities email addresses to further the business of the Wynk Entities and the Polebridge Entities. | 57, 92 |
| | Waived the Debtor's attorney client privilege by using his personal Wynk Entities email address in communications with the Debtor's outside counsel. | 101 |
| | Treated the Debtor as his personal piggy bank by making a number of personal purchases using the Debtor's funds. | 178 |
| | Generated Work Product using the resources of the Debtor for the benefit of entities other than the Debtor. | 258 |
| Kelly Festa<br><br>*(Debtor CFO, Director of Sales and Operations of the Best Bev Entities, and agent of the Polebridge Entities and the Wynk Entities)* | Used the Debtor's computers to file the corporate registration documents for Good Design and Polebridge, entities the sole purpose of which was to wrongfully divert the resources of the Debtor. | 46-47, 20, 63 |
| | Used Debtor computers and a personal Polebridge email address to further the business of the Wynk Entities. | 55 |
| | Used her personal Polebridge Entities email address to instruct the Debtor's sales managers to divert revenue from sales of Faber Hand Sanitizer away from the Debtor, despite her knowledge, as she represented to the public, that Faber Hand Sanitizer was produced and sold by the Debtor. | 70, 75 |
| | Used Debtor computers and personal Wynk Entities and Polebridge Entities email addresses to further the business of the Wynk Entities and the Polebridge Entities. | 87, 89 |
| | Waived the Debtor's attorney client privilege by using her personal Wynk Entities email address in communications with the Debtor's outside counsel. | |

| | | |
|---|---|---|
| | Presented the Debtor as unfavorable to potential purchasers in the hope of steering the Debtor's business to the Sheehan Entities at less than fair value, leading to an admonishment from outside counsel. | 111-112 |
| | Utilized the Debtor's computer equipment and email system to plan the "Can Man Shadow Structure," which depicted a corporate structure which would hold assets which were to be pilfered from the Debtor. | 124 |
| | Falsely informed Millstone that the Debtor's industrial shrink wrapper, which was transferred to another entity, was broken and scrapped before closing. | 150.a |
| | Signed checks from the Debtor's DIP account to pay for supplies and services for the benefit of the Best Bev Entities. | 150.c-150.e |
| | Instructed vendors to falsely state that Debtor orders were being delivered to the Debtor's facilities when they were actually being delivered to a non-Debtor location in which the Polebridge Entities, the Wynk Entities, and the Best Bev Entities operate. | 152 |
| | Falsely testified that she inadvertently deleted the Debtor's electronic data and cloud computing drives when that data was actually intentionally deleted, wiped, or stolen. | 154-155 |
| | Utilized the Debtor's marketing files for the purposes of marketing products for the benefit of the Best Bev Entities. | 165 |
| Ashleigh Baldwin *(Casey Parzych's spouse, spokesperson for the Debtor, officer and member/shareholder of the Polebridge Entities, agent of the Wynk Entities and the Best Bev Entities)* | Formed Good Design and Polebridge, entities which the Complaint alleges the sole purpose of which was to usurp resources and monies properly belonging to the Debtor. | 46-48, 20, 63 |
| | Utilized the Debtor's employees for the purpose of selling CBDelight for the benefit of the Polebridge Entities | 52 |
| | Instructed the Debtor's sales team to divert payments for the sale of Faber Hand Sanitizer from the Debtor's Square point of sale system to Polebridge's Square account, despite knowing – as confirmed by her public statements as the Debtor's spokesperson – that Faber Hand Sanitizer was produced and sold by the Debtor. | 71, 72, 76 |
| | Utilized the Debtor's computer to access an email address associated with the Polebridge Entities to further the business interests of the Polebridge Entities. | 81 |
| Michael Boyer *(general counsel to the Debtor and counsel to the* | Attorney who improperly served in the dual and conflicting roles of general counsel to the Debtor and counsel to the Polebridge Entities and the Wynk Entities, which existed for the purpose of defrauding the Debtor and its creditors. | 14, 176-177 |

| | | |
|---|---|---|
| *Polebridge Entities and the Wynk Entities)* | Presented the Debtor as unfavorable to potential purchasers in the hope of steering the Debtor's business to the Sheehan Entities at less than fair value, leading to an admonishment from outside counsel. | 111-112 |
| R.F. Culbertson<br><br>*(COO and member of the Debtor and agent of the Polebridge Entities, the Wynk Entities, and the Best Bev Entities)* | Provided sales and marketing services for Good Design, which the Complaint alleges the sole purpose of which was to usurp resources and monies properly belonging to the Debtor. | 53, 20, 63 |
| | Used his Polebridge Entities email address on the Debtor's application for a Paycheck Protection Program loan. | 54 |
| | Presented the Debtor as unfavorable to potential purchasers in the hope of steering the Debtor's business to the Sheehan Entities at less than fair value, leading to an admonishment from outside counsel. | 111-112 |
| | Held himself out to the Debtor's former customers as a continuation of the Debtor for the benefit of the Best Bev Entities. | 159-160, 162 |
| | Utilized the Debtor's marketing files for the purposes of marketing products for the benefit of the Best Bev Entities. | 165 |

Moving Defendants' arguments that the foregoing allegations are insufficient to state a claim for breach of fiduciary duty are based on purported facts which do not appear in the Complaint – and many of which directly contradict the allegations made in the Complaint – and accordingly cannot be considered at the motion to dismiss stage. *See, e.g., Phillips*, 515 F.3d at 233. Moving Defendants argue that "[t]here is nothing improper about engaging in other business ventures," MD Br. at p. 28, ignoring the Complaint's unequivocal allegations that the other business ventures were formed for the purpose of circumventing PNC's security interest in the Debtor and "misappropriat[ing] Debtor resources and loot[ing] the Debtor for the benefit of the Defendants." *See, e.g.,* Complaint at ¶¶ 20, 27, 43. Had the Insider Defendants used non-Debtor resources to form and operate a company entirely unrelated to the Debtor – as opposed to starting companies using Debtor resources, running those companies with Debtor personnel, and using those companies to funnel money away from the Debtor – this lawsuit would not have been filed.

Moving Defendants' claim that the fiduciary duty claims should be dismissed because it was illegal for "the Debtor [to] engage in CBD- or cannabis-related activities," MD Br. at p. 28, only reinforces the conclusion that the Insider Defendants breached their fiduciary duties given the Complaint's many detailed allegations establishing that the Insider Defendants did in fact cause the Debtor to engage in CBD- and cannabis-related activities. *See, e.g.,* Complaint at ¶¶ 51 ("'C B Delight' was . . . a trademark filed by the Debtor"), 52 (Defendant Baldwin uses Debtor employees to market CBDelight), 53 (Defendant Culbertson's LinkedIn page touts CBDelight and an associated "siphon device," which belonged to the Debtor), 58 (the Debtor owned and staffed the telephone number associated with CBDelight), 60 (Defendant Parzych instructs Debtor sales representatives that CBDelight should be their top "mission critical" priority), 86 (Wynk cannabis seltzer created by Defendants Parzych, Rittenburg, and Sheehan using Debtor resources and personnel), 90 (Wynk Seltzer business operated using Debtor resources), 94-95 (Debtor employee conducts activities for Wynk Seltzer out of state with all expenses paid for by the Debtor), 102 (Debtor informs its temp agency that it is "one and the same" as Wynk). Moving Defendants' admission that such conduct was illegal is in and of itself reason to deny their Motion. *See, e.g., In re Main, Inc.*, 239 B.R. 281, 292 (Bankr. E.D. Pa.) (holding under Pennsylvania law that a fiduciary's "[f]ailure to take positive steps to correct an illegal corporate action is the equivalent of active participation in the illegal scheme.").

Moving Defendants' remaining arguments are similarly baseless. They improperly contradict the allegations of the Complaint by arguing that unauthorized transfers were in fact "legitimate business expenses." *Compare* MD Br. at p. 28, *with* Complaint at ¶ 178 ("Defendants Parzych and Rittenburg treated the Debtor as their piggy bank, making a number of personal purchases using the Debtor's funds"). The argument is not only improper at the motion to dismiss

stage, but also implausible given the clearly frivolous nature of the purchases detailed in the Complaint. *See* Complaint at ¶ 178 (listing purchases made with the Debtor's credit card for, *inter alia*, lavish resort vacations and private flight instruction). The argument that the Complaint "mischaracterizes the nature of the electronic data that was allegedly lost," MD Br. at p. 29, a reference to the Complaint's allegation that "the Insider Defendants intentionally deleted, wiped, or stole all the Debtor's electronic data and cloud computing drives[,]" Complaint at ¶ 154, is similarly improper. While Defendants can argue at trial that the Trustee's allegation is factually incorrect, the allegation must be accepted as true for purposes of a motion to dismiss.

Moving Defendants again mischaracterize the Complaint by arguing that it claims merely that "the Individual Defendants mismanaged the Chapter 11 Case and the sale process." MD Br. at 29. The actual allegations of the Complaint are far more inculpatory. *See* Complaint at ¶¶ 104-147, 189 (detailed allegations supporting the contention that the Insider Defendants conspired with Defendant Sheehan to utilize the bankruptcy process to intentionally defraud creditors); *id.* at ¶ 175 (describing how the Insider Defendants and Defendant Sheehan "***grossly*** mismanaged the Debtor's Chapter 11 Case" (emphasis added)). And Moving Defendants' argument that the Trustee is somehow attempting to collaterally attack the auction and sale process whereby the Debtor's assets were sold to Millstone is entirely without merit – the Trustee is not attempting to challenge or unwind the sale process in any way, shape, or form, but is simply exercising her right to bring claims for breach of fiduciary duty due to the Insider Defendants' misconduct during the course of the sale process. Moving Defendants' stated concern that the Trustee's claims could somehow "discourage third parties from dealing with the debtor in possession," *see* MD Br. at p. 30 (quoting *In re Jevic Holding Corp.*, 2021 WL 1812665, at *4 (Bankr. D. Del. May 5, 2021)), is nonsensical, as the Trustee is seeking relief solely from the wrongdoers themselves, not innocent third parties.

### 2.     The Complaint States Claims For Aiding and Abetting Breach of Fiduciary Duty Against All Moving Defendants

Pennsylvania's appellate courts have explicitly recognized the tort of aiding and abetting breach of fiduciary duty as a valid cause of action.  *See, e.g., Official Comm. of Unsecured Creditors of Allegheny Health Educ. & Research Found. v. PriceWaterhouseCoopers, LLP*, 989 A.2d 313, 327 n.14 (Pa. 2010) ("Under present Pennsylvania law as established by the Commonwealth Court as the highest appellate court which has reached the issue, aiding and abetting a breach of fiduciary duty is a recognized cause of action." (citing *Koken v. Steinberg*, 825 A.2d 723, 732 (Pa. Cmwlth. 2003)); *Koken*, 825 A.2d at 732 ("[Plaintiff] has clearly identified the wrong, a breach of fiduciary duty, the wrongdoer, . . . and the party that acted in concert with the wrongdoer . . . . Accordingly, . . . [plaintiff] has stated a cause of action . . . for aiding and abetting a breach of fiduciary duty[.]"); *cf. also Marion v. Bryn Mawr Tr. Co.*, 288 A.3d 76, 85 (Pa. 2023) (noting that that "a claim of aiding and abetting breach of a fiduciary duty is distinct from but analogous to a claim of aiding and abetting fraud" and citing *Koken* in support of its holding that Pennsylvania recognizes a claim for aiding and abetting fraud).  Indeed, "[f]ederal courts applying Pennsylvania law regularly allow plaintiffs to pursue" claims for aiding and abetting breach of fiduciary duty.  *Advanced Fluid Sys., Inc. v. Huber*, 2017 WL 2445303, at *18 (M.D. Pa. June 6, 2017), aff'd, 958 F.3d 168 (3d Cir. 2020) (citing *Koken* and numerous federal court cases in support of its "conclu[sion] that Pennsylvania law recognizes an independent cause of action for aiding and abetting breach of a fiduciary duty").

To state a claim for aiding and abetting a breach of fiduciary duty under Pennsylvania law, a Plaintiff must allege the following elements: 1) a breach of a fiduciary duty owed to another; 2) knowledge of the breach by the aider and abettor; and 3) substantial assistance or encouragement by the aider and abettor in effecting that breach.  *Koken*, 825 A.2d at 732.  With respect to the

second element, "[e]ither the defendant's direct knowledge of, or willful ignorance to, the breach of fiduciary duty may satisfy the knowledge requirement for aiding and abetting." *Harrison v. Harrison*, 2021 WL 3022416, at *10 (E.D. Pa. July 15, 2021). As established in detail above, the Insider Defendants have breached fiduciary duties which they owed to the Debtor, thus satisfying the first element, *see* pp. 38-52, *supra*, and the Complaint explicitly pleads that all Defendants knew that the Insider Defendants' conduct was a breach of fiduciary duty and that all Defendants substantially assisted in and/or encouraged such breaches. Complaint at ¶¶ 212-216. But the Complaint does not stop there – it contains significant factual detail which, when viewed in the light most favorable to the Trustee, amply supports the elements of the aiding and abetting cause of action as to all Moving Defendants.

With respect to the second and third elements, the Complaint establishes that all of the Insider Defendants were high level employees or agents of the Debtor and thus would necessarily have known about their breaches of fiduciary duty (or, if any of them are deemed not to have breached such duties, about the other Insider Defendants' breaches of their duties), and that all of the Insider Defendants either directly breached their own fiduciary duties or, via the conduct alleged in detail above, substantially assisted with the breach of fiduciary duties. *See* pp. 47-50, *supra*; *see also Marion*, 288 A.3d at 91 (holding that "actual knowledge [for purposes of aiding and abetting a tort] does not require the aider and abettor to 'underst[and] the full legal significance of the facts, or all the details of the primary wrongdoing.' Rather, '[i]t is sufficient if the defendant was aware of facts that made the primary conduct wrongful.'" (quotation marks, alteration marks, and citations omitted)); *Burris v. Main Line Health Sys.*, 2017 WL 2506446, at *12 n.16 (E.D. Pa. June 9, 2017) (holding at the summary judgment stage that the knowledge element was satisfied when the defendant knew that the fiduciary and the entity to which the duty was owed were

54

"operating as partners"); *Power Restoration Int'l, Inc. v. PepsiCo, Inc.*, 2014 WL 1725041, at \*5 (E.D. Pa. Apr. 30, 2014) (holding that, at the motion to dismiss stage, the knowledge element of an aiding and abetting fiduciary duty claim under Pennsylvania law did not have to be explicitly pleaded and could be inferred from facts demonstrating active involvement and participation).

Because it is well-settled that the knowledge of an agent is imputed to its principal, Defendants Polebridge (for which Defendants Rittenburg and Baldwin are officers), Good Design (for which Defendants Rittenburg and Baldwin are officers), and Wynk Entity AgTech PA (for which Defendant Parzych is an officer), are properly deemed as also having knowledge of the breach for purposes of an aiding and abetting claim. *See, e.g., Rosenberry v. Evans*, 48 A.3d 1255, 1262 (Pa. Super. 2012) ("It is well settled in the law of this jurisdiction that knowledge of an agent, acting within the scope of his authority, real or apparent, may be imputed to the principal, and, therefore, knowledge of the agent is knowledge of the principal." (quotation marks and citation omitted)). And the Complaint contains numerous allegations establishing these entities' active assistance in the underlying breaches of duty. *See, e.g.,* Complaint at ¶ 20 ("the Polebridge Entities, with the substantial assistance of the Insider Defendants, misappropriated Debtor resources, property, and personnel to generate sales and profits from CBDelight and Faber Hand Sanitizer products, which rightfully belonged to the Debtor but were misappropriated by and diverted to the Polebridge Entities"), ¶¶ 49-85 (Polebridge Entities used Debtor resources to produce and sell CBDelight and Faber Hand Sanitizer products), ¶¶ 88-89 (AgTech PA formed for purposes of diverting the profits of Wynk Seltzer away from the Debtor).

That leaves Defendant Sheehan and remaining Moving Defendants AgTech VI, LLC, XO Energy Worldwide, LLLP, XO EW, LLC, Best Bev, LLC, EtOH Worldwide, LLC, and Canvas 340, LLC. The Complaint pleads ample facts from which this Court can infer that Defendant

Sheehan knew about and substantially assisted with the Insider Defendants' breaches of fiduciary duties, including the following:

- On April 17, 2020, Defendant Sheehan posted an advertisement for Faber Hand Sanitizer in furtherance of an agreement with the Insider Defendants to share in the ill-gotten profits from the sale of CBDelight and Faber Hand Sanitizer, which were stolen from the Debtor, Complaint at ¶¶ 74, 63;

- In the fall of 2020, Defendant Sheehan was part of the team using Debtor resources to create Wynk Seltzer, *id.* at ¶ 86;

- On September 1, 2020, Defendant Sheehan organized AgTech VI, LLC for the purposes of diverting the profits from the sale of Wynk Seltzer away from the Debtor, *id.* at ¶ 87;

- Defendant Sheehan used his Wynk Seltzer email account (shawn@drinkwynk.com) in communications concerning the Debtor and its bankruptcy, *id.* at ¶ 101;

- Defendant Sheehan conspired with the other defendants to utilize his network of wholly-owned Virgin Islands entities to defraud the Debtor and its creditors, *id.* at ¶ 107;

- Full time employees of the Sheehan Entities, which were wholly owned and controlled by Defendant Sheehan, maintained accounts on the Debtor's computer system and had full access to the books, records, and online accounts belonging to the Debtor, *id.* at ¶¶ 44, 108;

- Defendant Sheehan, along with Defendant Casey Parzych, led the scheme to sell the Debtor's assets to the Sheehan Entities at a fire-sale price, *id.* at ¶¶ 109-114, was copied on otherwise privileged communications between the Debtor and its bankruptcy counsel concerning the Debtor's bankruptcy strategy, *id.* at ¶ 115, and, along with Defendant Casey Parzych, jointly retained a public relations firm to direct marketing strategies in light of Debtor's bankruptcy and Sheehan's anticipated takeover of the Debtor's assets, *id.* at ¶ 116;

- Defendant Sheehan signed a letter dated June 10, 2021 to coerce PNC into cooperating with a Section 363 sale of the Debtor's assets to entities he owns and controls at a low-ball price. *Id.* at ¶ 130.  The letter was drafted in coordination with the Debtor and its counsel and demonstrates Sheehan's access to insider information concerning the Debtor and which was used to the detriment of the Debtor, *id.*;

- Defendant Sheehan, along with Defendant Casey Parzych, ordered the deletion/transfer of the Debtor's electronic data for purposes of hindering Millstone from competing with his Best Bev enterprise and to hinder any investigation into his misconduct, *id.* at ¶¶ 154-155; and

- Defendant Sheehan was actively involved in and coordinated the gross mismanagement of the Debtor's Chapter 11 Case for improper purposes, *id.* at ¶¶ 104-116, 128-147, 175, 189.

By the same principles of imputation applied to the Insider Defendants, Defendant Sheehan's knowledge and actions can be imputed to Defendants AgTech VI, LLC, XO Energy Worldwide, LLLP, XO EW, LLC, Best Bev, LLC, EtOH Worldwide, LLC, and Canvas 340, LLC,

as Defendant Sheehan is: 1) an officer and sole member and manager of Defendant XO EW, LLC, which is in turn the general partner of Defendant XO Energy Worldwide, LLLP, which is in turn the sole member and manager of Defendant AgTech VI, LLC, *see* Complaint at ¶ 24 (alleging that Defendant AgTech VI, LLC "is formally owned and operated by a complex web of entities which are ultimately owned and controlled by Defendant Sheehan," and describing in detail the structure of those entities); 2) an officer and sole member and manager of Defendant XO EW, LLC, which is in turn the general partner of Defendant XO Energy Worldwide, LLLP, which is in turn the sole member and manager of Defendant EtOH Worldwide, LLC, which in turn is the sole member and co-manager of Defendant Best Bev, LLC, *id.* at ¶ 31; and 3) a member of Defendant Canvas 340, LLC, *id.* at ¶¶ 22, 25.

Moreover, the Complaint alleges that these entities – either directly, or by virtue of their control of subsidiaries – participated in and enabled the Defendants' scheme to defraud the Debtor. *See id.* at ¶ 87 (AgTech VI formed for the purposes of diverting the profits from Wynk Seltzer away from the Debtor), ¶¶ 128-129 (EtOH Worldwide, LLC and AgTech VI, LLC executed sham lease agreements with the Debtor designed to create false administrative claims, and which would require the Debtor to pay more than double the cost of the leased equipment over a two-year term), ¶ 195 (Best Bev, LLC, Can Man, EtOH Worldwide, LLC, and AgTech VI fail to cooperate with requests for information issued pursuant to Bankr. E.D.Pa. Local Rule 2004-1), ¶ 115 (individuals with an "@xo-energy.com" email address – including Defendant Sheehan and Sheehan Entities' CFO John Charette, copied on otherwise privileged emails concerning the Debtor's bankruptcy strategy), ¶¶ 140, 147 (PNC's counsel describes how "XO" and "EtOH" entities were improperly manipulating the bankruptcy process), ¶¶ 125, 150 (describing post-petition transfers illegally made to "Best Bev," implicating Defendant Can Man, LLC, which at all times did business as

"Best Bev," and Moving Defendant Best Bev, Inc., which was formed either as the successor in interest to Can Man, LLC or created to avoid liability for Can Man, LLC's misconduct), ¶ 130 (EtOH Worldwide, LLC cities inside information of the Debtor in a letter designed to coerce PNC into cooperating with a sale of the Debtor's assets to the Best Bev Entities at a low-ball price).

Given the foregoing, the Complaint alleges facts which "raise a reasonable expectation that discovery will reveal evidence" establishing the elements of aiding and abetting breach of fiduciary duty as to all Moving Defendants, *Infantino*, 2013 WL 3972770, at *2, and the Motion should be denied.

### 3. The Complaint States Claims For Corporate Waste Against The Insider Defendants

Moving Defendants' primary argument concerning the Trustee's corporate waste claims is that these claims should be dismissed when breach of fiduciary duty claims are dismissed. MD Br. at pp. 36-37. As discussed in detail above, the Complaint lays out the Insider Defendants' breaches of fiduciary duty in exacting detail, and Moving Defendants' challenge to the Trustee's corporate waste claims is accordingly without merit.

Indeed, the Complaint sets forth ample facts supporting the Trustee's waste claims. In *White v. George*, 66 Pa. D. & C.4th 129, 149–50 (Pa. Com. Pl. 2004), the court held that allegations that defendant "damaged, converted and gave away [company] equipment to . . . third parties without corporate authorization or regard to the financial impact upon [the company]" were "sufficient to support a claim for waste" because the actions occurred "without consideration or a rational business purpose" and "appear to be a squandering of assets to the detriment of [the company]." The allegations against the Insider Defendants – who utilized Debtor resources and gave away property rightfully belonging to the Debtor for the sole benefit of non-Debtor entities, *see, e.g.,* pp. 47-50, *supra*, and placed the Debtor in bankruptcy with its equity rendered worthless

– overlap with (and in fact go far beyond) those held to be sufficient to state a claim for corporate waste in *White*.

### 4.    Moving Defendants' Arguments Concerning A So-Called "Exculpation" Clause Are Without Merit

Moving Defendants argue that that Section 5.21 of the Operating Agreement "provides exculpation for each of the Debtor's members, officers, employees, and agents,"  MD Br. at p. 34, and thus warrants dismissal of the Trustee's claims for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and waste.  MD Br. at pp. 27, 32, 26.  The argument must be rejected for the following reasons.

### a.    Exculpation Is An Affirmative Defense And Cannot Be Considered At The Motion to Dismiss Stage

Application of an exculpation provision is an affirmative defense which cannot be considered at the motion to dismiss stage and Moving Defendants' exculpation arguments are accordingly not a basis for dismissal of any of the Trustee's claims.  *See, e.g., In re Furniture Factory Ultimate Holding, L.P.*, 2023 WL 5662747, at *11 (Bankr. D. Del. Aug. 31, 2023) ("The Court agrees that it need not address the D&Os' arguments concerning the exculpation clause because affirmative defenses, such as exculpation, may not be considered at the motion to dismiss stage."); *In re OPP Liquidating Co., Inc.*, 2022 WL 774063, at *11 n.95 (Bankr. D. Del. Mar. 14, 2022) ("The Defendants also argue that they have an exculpation clause which relieves them of any responsibility. The Court need not consider this argument because it is an affirmative defense which should not be considered at the motion to dismiss stage.").[10]

---

[10]     While some cases within the Third Circuit have considered exculpatory clauses at the motion to dismiss stage, they have done so acknowledging that the line separating substantive law (as to which state law applies) from procedural law (as to which federal law applies) is sometimes blurred, and accordingly "federal courts sitting in diversity are permitted to grant motions to dismiss breach of fiduciary duty claims based upon the existence of an exculpatory clause where

b.      **The Operating Agreement Does Not Contain An Exculpation Provision**

Even should the Court decide to address it at this early juncture, Moving Defendants'

exculpation argument hinges on an undisclosed alteration of the contract they attach to their

Motion, the relevant section of which reads in full as follows:

> 5.21 <u>Exculpation</u>. No Member as such or any Manager, officer,
> employee or agent of any Member or the Company **shall be able** to
> the Company or any Member for losses or liabilities arising from the
> conduct of the affairs of the Company or from the conduct of any
> employee or agent of the Company.

Adv. D.I. 17-2, Operating Agreement at § 5.21 (emphasis added).  The actual language as written

in the Operating Agreement – as opposed to the fictional version Defendants have presented to this

Court, which substitutes "shall be able" with "shall be liable," MD Br. at 24 – cannot on its face

be construed as providing for exculpation of any sort.  The only explicit or implicit reference to

the concept of exculpation in Section 5.21 comes in the section heading, which the agreement has

explicitly deemed irrelevant.  *See* Operating Agreement at § 9.6 ("The headings herein are inserted

only as a matter of convenience only, and do not define, limit or describe the scope of this

Agreement or the intent of the provisions hereof.").  Accordingly, the plain language of the

Operating Agreement does not provide for exculpation of any sort, and Moving Defendants'

attempt to surreptitiously alter the document should be rejected.

---

the law of the state of incorporation permitted such a dismissal."  *In re LMI Legacy Holdings, Inc.*,
2017 WL 3432366, at *2 (Bankr. D. Del. Aug. 10, 2017) (quotation marks and citation omitted).
This line of caselaw is inapplicable here because exculpatory provisions are considered affirmative
defenses under Pennsylvania law.  *See Monroe v. CBH20, LP*, 286 A.3d 785, 825 (Pa. Super. 2022)
(holding that invocation of an exculpatory provision "constituted an affirmative defense");
*DeMary v. Latrobe Printing & Pub. Co.*, 762 A.2d 758, 761 (Pa. Super. 2000) (holding that a
defendant's affirmative defenses may not be decided on preliminary objections, the Pennsylvania
analogue of a motion to dismiss, unless the plaintiff fails to object to the court considering them at
that stage).

   **c.**  **Moving Defendants' Fictional Exculpation Clause Would Not Protect Them From Liability For Their Misconduct As A Matter of Law**

Even if this Court addresses the affirmative defense at the motion to dismiss stage and applies Moving Defendants' rewritten contractual language (the "Fictional Exculpation Clause") instead of the actual language set forth in Section 5.21, Moving Defendants cannot as a matter of law escape liability for the misconduct set forth in detail in the Trustee's Complaint.  It is well-established under Pennsylvania law that "exculpatory contracts are generally disfavored, and subject to close scrutiny."  *Feleccia v. Lackawanna Coll.*, 215 A.3d 3, 17 (Pa. 2019) (citing *Employers Liability Assur. Corp. v. Greenville Bus. Men's Ass'n*, 224 A.2d 620, 623 (Pa. 1966)).  Such clauses, whether providing for exculpation or indemnification,[11] are evaluated using the same test:

> First, the clause must not contravene public policy.  Second, the contract must relate solely to the private affairs of the contracting parties and not include a matter of public interest.  Third, each party must be a free bargaining agent.  In addition, an exculpatory or indemnity clause will still not be enforced unless it is clear that the beneficiary of the clause is being relieved of liability only for his/her own acts of negligence.  The clause must be construed strictly and the contract must state the intention of the parties with the greatest particularity.  Furthermore, any ambiguity must be construed against the party seeking immunity, and that party also has the burden of proving each of the prerequisites to enforcement.

---

[11] Moving Defendants make offhand reference to a purported indemnification clause in the Operating Agreement.  *See* MD Br. at pp. 24-25, 27.  As with exculpation, indemnification is an affirmative defense which cannot be raised at the motion to dismiss stage.  *See, e.g., City of Wilkes-Barre v. Kaminski Bros.*, 804 A.2d 89, 94 n.9 (Pa. Commw. 2002).  Moreover, any argument that indemnification is warranted would be without merit for the same reasons Moving Defendants' exculpation argument is without merit.  *See, e.g., Valhal Corp. v. Sullivan Assocs., Inc.*, 44 F.3d 195, 202 (3d Cir. 1995) (holding that, under Pennsylvania law, "the test used to determine the enforceability of exculpatory and indemnity provisions is the same").

*Valhal Corp. v. Sullivan Assocs., Inc.*, 44 F.3d 195, 202 (3d Cir. 1995) (citing *Topp Copy Prod.,*

*Inc. v. Singletary*, 626 A.2d 98, 99 (Pa. 1993)).

### i.      The Clause Is Void As Against Pennsylvania Public Policy

As Moving Defendants affirmatively argue, the Fictional Exculpation Clause would

exculpate Moving Defendants from any liability whatsoever.  However, clauses that exculpate

liability for gross negligence and higher levels of fault are void and against Pennsylvania public

policy.  *Feleccia*, 215 A.3d at 20.  Moreover, as described in detail at pages 47-50 and 53-58,

*supra*, the allegations of the Complaint establish that Moving Defendants engaged in intentional

misconduct, which cannot be the subject of an exculpation clause as a matter of law.

### ii.      The Clause Is Void As Contrary To A Matter of Public Interest And Because It Would Impair The Rights Of Nonparties To The Operating Agreement

The Fictional Exculpation Clause should also be deemed unenforceable because it would

impair a matter of public interest and the rights of nonparties to the Debtor's Operating Agreement,

namely the Debtor's creditors.  Under Pennsylvania law, when an entity becomes insolvent,

fiduciary duties enlarge and extend to the creditors of the entity as well as its shareholders.  *In re*

*Lemington Home for Aged*, 659 F.3d 282, 290 (3d Cir. 2011) (applying Pennsylvania law).  Thus,

when a company is insolvent, a fiduciary must "[protect] the entire community of interests in the

corporation, which includes creditors as well as stockholders."  *In re Zambrano Corp.*, 478 B.R.

670, 685 (Bankr. W.D. Pa. 2012); *see also* Complaint at ¶¶ 106, 127 (allegations establishing

Debtor's insolvency).  Moreover, one of the twin policy goals of federal bankruptcy law is to

provide for "a maximum and equitable distribution for creditors," *In re Calabrese*, 689 F.3d 312,

321 (3d Cir. 2012), a public interest which would be impaired by allowing insiders of a debtor to

eliminate liability for all forms of misconduct.  Because the creditors are owed fiduciary duties

and never consented to the elimination of such duties via an exculpation clause, and protection of

creditors' right to a maximum and equitable distribution is a primary public interest protected by

the Bankruptcy Code, the Fictional Exculpation Clause is unenforceable as a matter of law.

### iii.    The Clause Is Void Under Principles of Strict Construction

For an exculpatory clause to be enforceable under Pennsylvania law,

> 1) the contract language must be construed strictly, since exculpatory language is not favored by the law; 2) the contract must state the intention of the parties with the greatest particularity, beyond doubt by express stipulation, and no inference from words of general import can establish the intent of the parties; 3) the language of the contract must be construed, in cases of ambiguity, against the party seeking immunity from liability; and 4) the burden of establishing immunity is upon the party invoking protection under the clause.

*Tayar v. Camelback Ski Corp.*, 47 A.3d 1190, 1196 (Pa. 2012) (quoted reference omitted); *see also*

*M.H. Eby, Inc. v. Timpte Indus., Inc.*, 2019 WL 6910153, at *4 (E.D. Pa. Dec. 19, 2019) ("[F]or an

exculpatory clause to be enforceable, the clause must be construed strictly and the contract must

state the intention of the parties with the greatest particularity.  Ambiguities are construed against

the party seeking immunity." (citations, quotation marks, and alteration marks omitted)).

Under these standards, Moving Defendants' argument that the Fictional Exculpation

Clause means that there are no circumstances in which a member, manager, officer, employee, or

agent of the Debtor may be liable for their misconduct must be rejected.  To be enforceable, an

exculpation clause must specifically establish which conduct and what levels of fault are being

disclaimed from liability.  The Fictional Exculpation Clause, in contrast, fails to specify which

levels of fault and what kinds of behavior are being disclaimed.   The text of the language lacks

any semblance of "greatest particularity," puts nothing "beyond doubt by express stipulation," and

contains absolutely nothing but "words of general import."   As such, the clause fails to meet the

test for enforceability under Pennsylvania law.  *See, e.g., M.H. Eby, Inc.*, 2019 WL 6910153, at *4

("A limitation of liability provision that limits damages entirely would almost completely take

away the incentive to perform, and therefore such a provision would not be enforceable.").

### C.  The Complaint Establishes A Plausible Entitlement to Veil Piercing and Successor Liability

#### 1.  Legal Standards

Pennsylvania recognizes two types of veil piercing doctrines – "alter ego," under which

the owners of a company may be held liable for the company's debts, and the "enterprise" theory,

under which companies with some level of common ownership or control may be held liable for

each other's debts.  *See Seven Springs Mountain Resort, Inc. on behalf of Sikirica v. Hess*, No.

2022 WL 1004178, at *3-*5 (W.D. Pa. Apr. 4, 2022).  Both forms of veil piercing are based on the

fundamental tenet that the corporate form "may be disregarded whenever justice or public policy

demand, such as when [it] has been used to defeat public convenience, justify wrong, protect fraud,

or defend crime.  Fraud in its narrow sense need not be shown; Pennsylvania courts will disregard

the corporate form whenever it is necessary to avoid injustice, and so long as the rights of innocent

parties are not prejudiced nor the theory of corporate entity rendered useless."  *Mortimer v.

McCool*, 255 A.3d 261, 277 (Pa. 2021) (quotation marks and citation omitted); *accord Reivia

Ashley, LLC v. Paselo Logistics, LLC*, 2017 WL 6001640, at *14 (E.D. Pa. Dec. 1, 2017).

The alter ego doctrine is an exception to the "general rule [that] members of a Pennsylvania

limited liability company are not personally liable for the debts, obligations or other liability of the

LLC."  *Reivia Ashley, LLC*, 2017 WL 6001640, at *13.  "[I]n appropriate circumstances, the

general rule is inapplicable, and a court may pierce the corporate veil as an equitable remedy that

disregards the existence of a corporation[12] to make the corporation's individual principals and their personal assets liable for the debts of the corporation." *Id.* (internal quotation marks, alteration marks, and citations omitted).  While "[n]o clear test exists for determining when the piercing of the corporate veil is appropriate . . ., courts may consider a number of [nonexclusive] factors in making this determination, including, undercapitalization, failure to adhere to corporate formalities, the insolvency of the entity, substantial intermingling of corporate and personal affairs, use of the corporate form to perpetrate a fraud, and circumstances that present an element of injustice or unfairness." *Id.*; *see also, e.g., E. Mins. & Chemicals Co. v. Mahan*, 225 F.3d 330, 333 n.7 (3d Cir. 2000) ("Factors considered under Pennsylvania law, . . . with respect to the alter ego theory include, but are not limited to, the following: [T]he failure to observe corporate formalities; non-payment of dividends; insolvency of debtor corporation; siphoning the funds from corporation by dominant shareholders; non-functioning of other officers and directors; absence of corporate records; whether the corporation is a mere facade for the operations of a common shareholder or shareholders; and gross undercapitalization." (quotation marks and citation omitted)).

Similarly, "[u]nder the enterprise or single-entity theory, two or more business entities under some level of common ownership or control are treated as a single entity—or common enterprise—for the purpose of liability." *Seven Springs*, 2022 WL 1004178, at *4.  "[T]here is no clear test or settled rule in Pennsylvania as to exactly when the corporate veil can be pierced and when it may not be pierced" under the enterprise theory, and courts must conduct "holistic, case-by-case analyses" to determine whether the doctrine is applicable. *Id.* at *4-*5 (citing *Mortimer*,

---

[12]      A limited liability company is subject to the same veil piercing principles application to corporations. *See, e.g., Partners Coffee Co., LLC v. Oceana Servs. & Prod. Co.*, 700 F. Supp. 2d 720, 736 (W.D. Pa. 2010) ("Pennsylvania courts have found that the veil of an LLC may be pierced to the same degree as that of a corporation.").

255 A.3d 261 (unanimously recognizing the viability of the enterprise theory of liability under Pennsylvania law)).  After analysis of several other jurisdictions' approach to enterprise liability, and the various factors the jurisdictions considered, *Mortimer* set forth two factors which should guide courts in evaluating enterprise liability: first, there must be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist, and second, adherence to the corporate fiction under the circumstances would sanction fraud or promote injustice. *Mortimer*, 255 A.3d at 286-287; *see also Seven Springs*, 2022 WL 1004178, at *7 (holding under Pennsylvania law that the same factors which support application of the alter ego theory also support application of the enterprise theory)

In addition to the two veil-piercing doctrines discussed above, it is well-settled that a successor corporation may be held liable for the debts and liabilities of its predecessors "where . . . the transaction amounts to a consolidation or *de facto* merger[,] . . . the purchasing corporation is merely a continuation of the transferor corporation[,] or . . . the transaction is fraudulently entered into to escape liability[.]" *Philadelphia Electric Co. v. Hercules, Inc.*, 762 F.2d 303, 308 (3d Cir. 1985) (applying Pennsylvania law).  Indeed, "[e]ven where the relationship between the predecessor and successor corporations does not fit neatly into the traditional continuation or de facto model, courts will apply the continuity of enterprise theory to impose corporate successor liability." *Today's Child Learning Ctr. Inc. v. United States*, 40 F. Supp. 2d 268, 273 (E.D. Pa. 1998).  Pennsylvania's Supreme Court holds that successor liability can apply even where there are no common shareholders or officers between the original corporation and the alleged successor corporation.  See *Fizzano Bros. Concrete Prod. v. XLN, Inc.*, 42 A.3d 951, 970 (Pa. 2012) (rejecting a narrow, mechanical application of continuity of ownership in holding that "the manner by which

[continuity of ownership] may be shown is more extensive and attuned to . . . transactional realities").

All of these doctrines are fact-specific and require a holistic analysis, and are accordingly typically inappropriate for disposition at the motion to dismiss stage. *Seven Springs*, 2022 WL 1004178, at *6; *Winner v. Etkin & Co.*, 2007 WL 2616084, *2 (W.D. Pa. Sept. 6, 2007) (denying motion to dismiss because "[t]he veil-piercing doctrine requires a multi-factor, factually-intensive inquiry").

> **2.     The Complaint States Plausible Claims For Relief Under All Of The Foregoing Doctrines**

The Complaint pleads numerous facts which, when viewed in the light most favorable to the Trustee and bearing in mind that application of veil piercing/successor liability are inherently fact specific, support the conclusion that discovery will reveal evidence supporting each of the above-described theories of veil piercing and successor liability.  The following facts support holding Defendants Casey Parzych, Rittenberg, and Culbertson liable for the debts of the Debtor (of which they are all members) under the alter ego veil piercing theory:

- the Debtor was undercapitalized and insolvent, as established by the Debtor being unable to pay its debts and defaulting on the PNC loan as early as February 28, 2021, and its Managers declaring it insolvent on June 3, 2021, Complaint at ¶¶ 106, 127;

- the Debtor failed to adhere to corporate formalities and failed to maintain adequate books and records, making it impossible to disentangle the affairs of the Debtor from those of the Polebridge Entities, the Wynk Entities, and the Best Bev Entities, *id.* at ¶¶ 204.f-k,231;

- the Debtor's outside accounting firm reported the complete failure of the Debtor's accounting function and stated that internally prepared financial statements could not be relied upon, *id.* at ¶ 174;

- Defendants Parzych and Rittenburg treated the Debtor as their personal piggy bank, making a number of personal purchases using the Debtor's funds, *id.* at ¶ 178;

- Defendants Parzych, Rittenburg, and Culbertson, along with the other Moving Defendants, undertook numerous acts which, while made using the Debtor's resources and

personnel, were for the benefit of the Polebridge Entities, the Wynk Entities, and the Best Bev Entities, demonstrating an intermingling of affairs and supporting the conclusion that these entities were mere instrumentalities of the individual defendants, *see supra* at pp. 47-50; *see also id.* at pp. 53-58 (describing numerous other points of entanglement between the affairs of the Debtor and the affairs of the Polebridge Entities, the Wynk Entities, and the Best Bev Entities).

These facts amply establish a plausible claim for relief under the alter ego theory against Defendants Casey Parzych, Rittenburg, and Culbertson at the motion to dismiss stage. *See, e.g., Seven Springs*, 2022 WL 1004178, at *7 (the court carefully scrutinized the pleadings and denied defendant's Rule 12(b)(6) motion where "[t]he [a]mended [c]omplaint provides considerable detail as to the [shareholder's] personal use of funds from [the corporate entity]," "pleaded facts showing [the corporate entity] was undercapitalized," and "there was a lack of adherence to corporate formalities," including that "that [corporate entity] kept only meager records from 1991 to 2018"); *Fletcher-Harlee Corp. v. Szymanski*, 936 A.2d 87 (Pa. Super. 2007) (shareholder held personally liable under alter ego theory where the debtor company filed for bankruptcy after which the shareholder began to perform identical work through another entity, the debtor was not appropriately capitalized as evidence by its bankruptcy filing, failed to adhere to corporate formalities, and the new entities used the debtor's resources to operate their business).

Similarly, under the enterprise veil piercing theory, the Complaint pleads substantial facts indicating that the Defendants exploited ownership and control over the Debtor to commit a fraud or injustice on the Debtor and its creditors via the Polebridge Entities, the Wynk Entities and the Best Bev Entities. *See supra* at pp. 47-50, 53-58 (describing Moving Defendants' actions designed to benefit the Polebridge Entities, the Wynk Entities, and the Best Bev Entities at the expense of the Debtor); *see also* Complaint at ¶¶ 46-85 (detailed allegations describing how Defendants exploited their ownership and control over the Debtor to use the Debtor's resources to manufacture, package, and market CBDelight and Faber Hand Sanitizer, with all profits flowing

not to the Debtor, but instead to the Polebridge Entities); *id.* at ¶¶ 86-103 (equivalent detailed allegations for the Wynk Entities); *id.* at ¶¶ 117-126, 148-151, 156-171 (equivalent detailed allegations for the Best Bev Entities).

The Complaint also pleads facts supporting the inference that discovery will reveal evidence of common ownership and control between the Debtor, on the one hand, and the Polebridge Entities, the Wynk Entities and the Best Bev Entities, on the other:

- Defendant Rittenburg formally owns equity in the Debtor and the Polebridge Entities, and is a manager/officer of the Debtor, the Polebridge Entities, the Wynk Entities, and the Best Bev Entities.  Complaint at ¶ 11;

- Defendant Parzych formally owns equity in the Debtor and Wynk Entity AgTech PA LLC, is a manager/officer of the Debtor and Wynk Entity AgTech PA LLC, and exploited his control over the Debtor to take numerous actions on behalf of the Best Bev Entities.  *Id.* at ¶ 10, s*ee also supra* at pp. 47-48;

- Defendant Baldwin formally owned equity in and was an officer of Good Design and Polebridge, exercised de facto high level managerial control over the Debtor and its employees, and is an agent of the Wynk Entities and the Best Bev Entities.  Complaint at ¶¶ 13, 71;

- Defendant Festa was CFO of the Debtor and is Director of Sales and Operations of the Best Bev Entities, and exploited her control over the Debtor to take numerous actions on behalf of the Polebridge Entities, the Wynk Entities, and the Best Bev Entities.  *Id.* at ¶ 12, *see also supra* at pp. 48-49;  and

- Defendant Sheehan is the ultimate formal owner of and exercises control over Wynk Entity AgTech VI via control of Wynk Entities XO Energy Worldwide, LLLP and XO EW, LLC, Complaint at ¶ 24, is the ultimate formal owner of and exercises control over Best Bev Entity Best Bev, LLC via control of the Best Bev Entities XO EW, LLC, XO Energy Worldwide, LLLP, and EtOH Worldwide, LLC, *id.* at ¶ 31, has an agreement with the Insider Defendants to share in the ill-gotten profits diverted from the Debtor to the Polebridge Entities, *id.* at ¶ 74, had full access to the Debtor's books, records, and online accounts, *id.* at ¶ 108, improperly influenced the Debtor's bankruptcy strategy, and utilized his influence over the Debtor to benefit the Wynk Entities, and the Best Bev Entities, *id.* at ¶¶ 175, 104-116, 128-147, 189.

Moreover, a spreadsheet created by the Defendant Festa (the Debtor's CFO) and Defendant Ryan Uszenski – a non-Moving Defendant who is the formal manager of Defendants Can Man, LLC and Best Bev, LLC – depicted a corporate structure under which Can Man, LLC would own

69

Faber and all the Debtor's other brands, and Best Bev, LLC is either the successor in interest to

Can Man, LLC or was created by Defendants in an attempt to avoid liability for Can Man's

misconduct, an allegation supported by the fact that, *inter alia*, Can Man, LLC at all times did

business under the name Best Bev and had the same address and personnel as Best Bev, LLC. *Id.*

at ¶ 29-30, 125

The foregoing facts amply establish a plausible claim for relief under the enterprise theory

against the Polebridge Entities, the Wynk Entities, and the Best Bev Entities. *See Seven Springs*,

2022 WL 1004178, at *7 (holding under Pennsylvania law that the same factors which support

application of the alter ego theory also support application of the enterprise theory).

Finally, with respect to successor liability, the Complaint pleads numerous facts which

support the inference that the Polebridge Entities, the Best Bev Entities and the Wynk Entities are

simply the continuation of the business of the Debtor via the continuity of management, personnel,

assets, and general business operations, including the following:

- Immediately before filing bankruptcy, a Debtor employee operating under the name of the Debtor solicited employment applications for the benefit of the Polebridge Entities, the Best Bev Entities and the Wynk Entities, Complaint at ¶ 120-121;

- Defendant Parzych caused the Debtor to execute and pay for an HR Consulting Services Agreement with a third party for the benefit of the Polebridge Entities, the Best Bev Entities and the Wynk Entities, *id.* at ¶¶ 122-123;

- On the eve of the Debtor's bankruptcy filing, Defendants Festa and Uszenski used the Debtor's computers to create and edit a document titled "Can Man Shadow Structure," which depicted a corporate structure under which Can Man would own Faber and all the Debtor's other brands, *id.* at ¶ 124;

- An October 7, 2021 text message sent by Defendant Culbertson to a former customer of the Debtor stated that Defendants had "re-formed" the Debtor "and quickly started [manufacturing] & co-packing 500,000 cans/bottles per day," with similar text messages sent to hundreds of the Debtor's former customers using customer lists stolen from the Debtor, *id.* at ¶¶ 159-161;

- Counsel to Millstone reported to the Debtor's bankruptcy counsel that Defendants Casey Parzych and Culbertson were "holding themselves out to customers as 'Faber' and saying they[y] 're-formed' the [Debtor's] business," *id.* at ¶¶ 162, 168;

- Defendant Festa was asking Debtor vendors to edit invoices for goods delivered to Defendants' new enterprise to falsely make it appear that the goods were being delivered to the Debtor, *id.*;

- Defendants used the Debtor's marketing files to create ostensibly new brands for use by the Best Bev Entities, *id.* at ¶ 165;

- Defendants used the Debtor's phone.com account for the benefit of the Best Bev Entities, returning calls to Debtor customers who placed orders for Faber products, and instead selling them the corresponding Best Bev products, *id.* at ¶ 166;

- Defendants, under the guise that the Best Bev Entities were a mere continuation of the Debtor, set up business meetings with Debtor customers, *id.* at ¶ 167;

- Prior customers of the Debtor were confused as to whether the Debtor and Best Bev were separate entities, *id.* at ¶ 169; and

- Best Bev traded on the goodwill of the Debtor by representing to the public that it had "years of dreaming up, canning and distributing our own beverages," an obvious reference to the continuation of the Debtor's operations, *id.* at ¶ 170.

Accordingly, the Complaint raise a reasonable expectation that discovery will reveal evidence of necessary elements of the successor liability theory, and Moving Defendants' Motion should be denied. *See, e.g., Fizzano Brothers*, 42 A.3d at 962, 969-971 ("[T]he elements of the de facto merger are not a mechanically-applied checklist, but a map to guide a reviewing court" and include "(1) continuity of ownership; (2) a cessation of ordinary business and dissolution of the predecessor as soon as practically and legally possible; (3) assumption by the successor of the liabilities ordinarily necessary for the uninterrupted continuation of the business of the predecessor, and (4) a continuity of management, personnel, physical location, aspects, and general business operation."); *Smith v. A.O. Smith Corp.*, 270 A.3d 1185, 1193 (Pa. Super. 2022) ("The 'mere continuation' exception to the general rule against successor liability is often treated 'identically' to and is 'difficult to distinguish' from the de facto merger exception.").

**D.      The Complaint States Claims For Unjust Enrichment**

Under Pennsylvania law, unjust enrichment requires "(1) benefits conferred on defendant by plaintiff; (2) appreciation of such benefits by defendant; and (3) acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value." *Mitchell v. Moore*, 729 A.2d 1200, 1203-04 (Pa. Super. 1999) (citation omitted).  The Complaint pleads these elements.  The Trustee's unjust enrichment claim is based on the Moving Defendants' receipt of benefits at the expense of the Debtor and its creditors.  *See* Complaint at, e.g., ¶¶ 2, 20, 27, 33, 44, 63, 74, 84-85, 87, 88, 106.  The benefits were conferred without justification, given the Moving Defendants active participation in the wrongdoing detailed at length in the Complaint.  *See* pp. 47-50, 53-58, *supra* (detailing specific allegations of each Moving Defendant's misconduct).   Given these allegations, there is a reasonable expectation that discovery will reveal evidence of the elements of unjust enrichment, *Infantino*, 2013 WL 3972770, at *2, and Moving Defendants' Motion should be denied.

Moving Defendants' primary arguments in opposition to the Trustee's unjust enrichment claim are the supposed existence of contracts governing the relationship between the Debtor and the Moving Defendants and the purported availability of a remedy at law.  MD Br. at pp. 40-41.  The arguments are without merit because it is "entirely acceptable" to pursue alternative theories at the pleading stage, and it is also "well established" that a plaintiff may plead an alternative unjust enrichment theory even where the pleading also contains a contract-based claim.  *In re FAH Liquidating Corp.*, 572 B.R. 117, 131 (Bankr. D. Del. 2017).  The Court may ultimately determine that unjust enrichment does not apply, either because a remedy is otherwise available, because certain writings govern the applicable relationship among the parties, or for some other reason.  But this is no cause to dismiss the unjust enrichment claims at this stage of the proceedings.  As

numerous courts in the Third Circuit have held, a claim for unjust enrichment should survive a motion to dismiss where it is plausible that the plaintiff could otherwise be left without a remedy at law.  *See id.* (*citing Halperin v. Moreno*, 2015 WL 5146161, at *10 (Bankr. D. Del. Aug. 31, 2015)); *In re Our Alchemy, LLC*, 2019 WL 4447545, at *11 (denying motion to dismiss unjust enrichment claim because, *inter alia*, it was plausible the trustee would be left without an adequate remedy at law if his fraudulent transfer claims ultimately failed).

### E.    The Complaint States Claims for an Accounting

"Case law in Pennsylvania has long recognized equitable accounting as an appropriate remedy for wrongful possession of property." *Boyd & Mahoney v. Chevron U.S.A.*, 614 A.2d 1191, 1196–97 (Pa. Super. 1992).  Here an accounting is appropriate because: significant breaches of fiduciary duty have been established via a complex scheme to deplete the resources of the Debtor for the benefit of a wide range of Defendant entities and individuals, *see* pp. 47-50, *supra*; those breaches of fiduciary duty occurred with the full knowledge and participation of all Defendants, *id.* at 47-50, 53-58; and the Defendants took extraordinary steps to conceal their misconduct, making it impossible for the Trustee to account for the rightful property of the Debtor's estate, *see, e.g.,* Complaint at ¶¶ 154-155, 192-197.  Such allegations are at this early stage sufficient to state a claim for an equitable accounting under Pennsylvania law.  *See Loc. No. 163, Int'l Union of United Brewery, Flour, Cereal, Soft Drink & Distillery Workers of Am. v. Watkins*, 207 A.2d 776, 780 (Pa. 1965) (holding that "[a] sufficient allegation of a breach of a fiduciary relationship will support a request for" an accounting); *accord Meier v. Maleski*, 648 A.2d 595, 607 (Pa. Cmwlth. 1994); *see also Pittsburgh's Airport Motel, Inc. v. Airport Asphalt & Excavating Co.*, 469 A.2d 226, 229 (Pa. Super. 1983) (holding that an accounting is appropriate where "accounts are mutual or complicated" (quotation marks and citation omitted)); *Rock v. Pyle*, 720 A.2d 137, 142 (Pa.

Super. 1998) ("An equitable accounting is improper where no fiduciary relationship exists between the parties, no fraud or misrepresentation is alleged, the accounts are not mutual or complicated, *or* the plaintiff possesses an adequate remedy at law." (emphasis in original)).

While the Moving Defendants argue that Plaintiff possesses an adequate remedy at law via her other claims, Federal Rule of Civil Procedure 8 allows pleading claims in the alternative despite inconsistencies "in both legal and factual allegations." *Indep. Enterprises Inc. v. Pittsburgh Water & Sewer Auth.*, 103 F.3d 1165, 1175 (3d Cir. 1997). At this early stage of the proceedings, it is not clear that the Trustee's other claims will provide the estate with adequate remedies at law, and Moving Defendants' argument that the claim should be dismissed on this ground is accordingly without merit. *See Chaleplis v. Karloutsos*, 579 F. Supp. 3d 685, 705 (E.D. Pa. 2022) (holding that "whether Plaintiffs possess an adequate remedy at law is not ripe for resolution at [the motion to dismiss] stage" – "because Plaintiffs are entitled to plead in the alternative, the fact that they have asserted other claims for damages in other counts of the Complaint does not bar [an accounting] claim" (citing Fed. R. Civ. P. 8(d)(2))).

### F.     The Trustee Is Entitled to the Imposition of a Constructive Trust

"A constructive trust, it has often been said, is not really a trust at all but rather an equitable remedy. Like all remedies in equity, it is flexible and adaptable. . . . An equity has never been reluctant to right injustices or to correct societal ills." B*uchanan v. Brentwood F.S. &L. Assoc.*, 320 A.2d 117, 126 (Pa. 1974) (citations omitted). "A constructive trust arises when a person holding title to property is subject to an equitable duty to convey it to another on the ground he would be unjustly enriched if he were permitted to retain it. The necessity for such a trust may arise from circumstances evidencing fraud, duress, undue influence or mistake. The controlling factor in determining whether a constructive trust should be imposed is whether it is necessary to

prevent unjust enrichment." *Santoro v. Morse*, 781 A.2d 1220, 1231 (Pa. Super. 2001) (citations omitted).

Where a fiduciary profits personally from a breach of fiduciary duty or disloyalty, that profit is the "fruit of a breach of fiduciary duty," and, as such, it may be imposed with a constructive trust. *Cantor v. Perelman*, 414 F.3d 430, 436, n. 4 (3d Cir. 2005) (quoting *Citron v. Steego Corp.*, 1988 WL 94738 (Del. Ch. 1988)); *Higgins v. Shenango Pottery Co.*, 279 F.2d 46, 53 (3d Cir. 1960) ("Where a fiduciary in violation of his duty to the beneficiary transfers property or causes property to be transferred to a third person, the third person, . . . if he had notice of the violation of duty, holds the property upon a constructive trust for the beneficiary." (quotation marks and citation omitted)); *Weissman v. A. Weissman, Inc.*, 97 A.2d 870, 871-72 (Pa. 1953) ("An officer of a corporation does not have the right to make acquisitions for his own account which are essential or would be advantageous to the corporation. And, when such acquisitions are made, even with the officer's own money, they are subject to a constructive trust for the benefit of the corporation"). Additionally, breach of the duty of loyalty and unjust enrichment are grounds to impose a constructive trust. *See Voest-Alpine v. Vantage Steel Corp.*, 919 F.2d 206, 218 (3d Cir. 1990) (affirming imposition of a constructive trust on the shares of a company that had received a transfer from another company controlled by the same members for the benefit of an unsecured creditor); *Weissman*, 97 A.2d at 871-72.

As set forth in detail above, the Insider Defendants breached their fiduciary duties to the Debtor and all Moving Defendants aided and abetted in the breach of such duties. Accordingly, any proceeds realized by such breaches are "fruits" of the breach which are properly subject to a constructive trust, and Moving Defendants' Motion should be denied.

**G.     The Complaint States A Claim For Breach of the Operating Agreement's Assignment Provision**

The Complaint alleges in scrupulous detail that – by using their roles with the Debtor and the Debtor's resources to create intellectual property pertaining to, *inter alia*, CBDelight and Wynk Seltzer for the benefit of entities and individuals other than the Debtor – Defendants Casey Parzych and Rittenburg breached the Operating Agreement's assignment provision.  *See* Complaint at*, e.g.,* ¶¶ 256-263.  That provision states as follows:

> 9.17    Assignment.
>
> (a)     The term "Work Product" means all patents and patent applications, all inventions, innovations, improvements, packaging improvements, alcohol/spirit/liqueur formulations, packaging inventions and/or improvements, packaging developments, technologies, similar technologies, developments, methods, designs, analyses, drawings, reports, creative works, discoveries, software, computer programs, modifications, enhancements, know-how, product, formula or formulations, marketing and sales information, concepts and ideas, and all similar or related information (in each case whether or not patentable), all copyrights and copyrightable works, all trade secrets, Information, and all other intellectual property and intellectual property rights that (in any case above) are conceived, reduced to practice, created, developed or made by a Member either alone or with others, in the course of providing the services to the Company.
>
> (b)     Each Member hereby agrees that (and hereby assigns) all Work Product will be the exclusive property of the Company, and in consideration of this Agreement, without further compensation, hereby assigns, and (as necessary) agrees to assign, to the Company all right, title, and interest to all Work Product that: (i) relates to any and all current and future aspects of the Company's Business (defined as the selling, making, marketing, distributing or otherwise engaging in the liqueur, spirits, carbonated beverage, seltzer, general beverage, or alcoholic beverage business) or (ii) is conceived, created, reduced to practice, developed, or made entirely or in any part: (a) during the time any Member performs (or performed) services for the Company; or (b) using any equipment, supplies, facilities, assets, materials, information (including, without limitation, Information) or resources of the Company (including, without limitation, any intellectual property rights of the Company);

(c)    If for any reason the foregoing assignment is determined to be unenforceable, each Member grants to the Company a perpetual irrevocable, worldwide, royalty-free, exclusive, sub-licensable right and license to exploit and exercise all such Work Product; and

(d) Each Member shall promptly disclose Work Product to the CEO of the Company and perform all actions reasonably requested by the Company (whether during or after the service with the Company) to establish and confirm the ownership and proprietary interest of the Company in any Work Product (including, without limitation, the execution of assignments, consents, powers of attorney, applications and other instruments). Each Member agrees to assist the Company in obtaining any patent for, copyright on or other intellectual-property protection for the Work Product, and to execute and deliver or otherwise provide such documentation and provide such other assistance as is necessary to or reasonably requested by the Company or its agents or counsel to obtain such patent, copyright, or other protection. Each Member shall maintain adequate written records of the Work Product, in such format as may be specified by the Company, and make such records available to, as the sole property of, the Company at all times. Each Member shall not file any patent or copyright applications related to any Work Product except with the written consent of the Company's CEO.

By explicitly pleading that "Defendants Casey Parzych and Rittenburg generated Work Product for the benefit of the Pilfering Entities that: 1) related to the Debtor's Business (i.e., selling, making, marketing, distributing or otherwise engaging in the liqueur, spirits, carbonated beverage, seltzer, general beverage, or alcoholic beverage business); 2) was conceived, created, reduced to practice, developed, or made entirely or in any part during the time Parzych and Rittenburg were performing services for the Debtor; and 3) was conceived, created, reduced to practice, developed, or made entirely or in any part using the equipment, supplies, facilities, assets, materials, information and resources of the Debtor," and failed to disclose or assign such Work Product to the Debtor, the Complaint undoubtedly sets forth facts establishing a breach of this provision. Complaint at ¶¶ 258-259.

Moving Defendants argue that the Complaint fails to allege that any of the pilfered intellectual property qualifies as "Work Product" for purposes of the agreement because "Work Product" must be produced "in the course of providing services to the [Debtor]" and it is impossible for the Trustee to plead facts satisfying this condition because "the Debtor was prohibited by lending, regulatory, and insurance considerations from engaging in any business involving CBD or cannabis-related products." MD Br. at p. 46. As discussed *supra* at p. 51, the argument is specious and requires willful blindness to the detailed allegations set forth in the Complaint, which establish that the Debtor was engaging in a myriad of CBD- and cannabis-related activities at the behest of Defendants Casey Parzych and Rittenburg.

Next, Moving Defendants argue that, because the Operating Agreement permits them to "'engage in and possess interests in other business ventures of any and every type and description, independently and with others, with no obligation to offer to the [Debtor] . . . the right to participate therein[,]'" MD Br. at p. 46 (quoting Operating Agreement at § 5.8), the breach of contract claim must fail. This argument likewise ignores both the allegations of the Complaint and the plain language of the Operating Agreement. The misconduct challenged by the Trustee is not the mere operation and ownership of other business ventures, but instead the operation of other business ventures in which the Debtor has no formal ownership interest via outright theft of the Debtor's property and resources. Indeed, Moving Defendants fail to highlight the second sentence of Section 5.8, which states that, notwithstanding the first sentence, "no Manager, Member, officer or agent may use his/her/its position with the [Debtor], and the information received as a result of said position, in a manner that will harm the business of the [Debtor] in any way." The misconduct alleged in the Complaint is in clear violation of this provision.

78

Finally, Moving Defendants argue that one form of the Trustee's requested relief, i.e., a judgment ordering the holders of pilfered Debtor intellectual property to assign such property back to the Debtor, is somehow "moot." MD Br. at p. 47. That would be the case had Defendants returned the stolen property back to the Debtor, but they have failed to do so. Regardless of whether the relief is considered a declaratory judgment pursuant to the Declaratory Judgment Act or its Pennsylvania analogue, or specific performance damages for breach of the Operating Agreement, there can be little doubt that the breach of contract claim is properly pleaded and should proceed. *See* Fed. R. Civ. P. 57 ("The existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate.").

### H.    The Complaint States A Claim For Equitable Subordination

Moving Defendants argue that the Trustee's equitable subordination claim should be dismissed because "none of the Moving Defendants hold a claim that could be subject to subordination." MD Br. at p. 48. Moving Defendants are plainly incorrect, as the Debtor's bankruptcy schedules identify the following Moving Defendants as holding undisputed, liquidated, and non-contingent claims: Defendant Boyer, in the amount of $525,000.00; Defendant AgTech VI, LLC, in the amount of $106,922.00; and Defendant EtOH Worldwide LLC, in the amount of $37,896.00. *See* Bankr. D.I. 60 at ECF pp. 8, 11, 13. These scheduled claims have "the same effect as if [each Defendant] had filed a claim for [it]self in the [Debtor's] bankruptcy case." *In re Rose*, 2019 WL 4752084, at *2 (Bankr. E.D. Tex. Sept. 27, 2019); *In re Meadowbrook Ests.*, 246 B.R. 898, 905 (Bankr. E.D. Cal. 2000) ("To have an allowed claim [for purposes of equitable subordination], the defendant's claim must have been scheduled as undisputed, liquidated, and non-contingent by the debtor or a proof of claim must have been filed by or on behalf of the creditor." (citing 11 U.S.C. §§ 501(a) & 1111(a)); 11 U.S.C. § 1111(a) ("A proof of claim or interest

is deemed filed under section 501 of this title for any claim or interest that appears in the schedules

filed under section 521(a)(1) or 1106(a)(2) of this title, except a claim or interest that is scheduled

as disputed, contingent, or unliquidated.").

## I.    The Complaint States A Claim For Turnover

The Complaint states a claim under 11 U.S.C. § 542, which is titled "Turnover of property

to the estate" and states in relevant part as follows:

> (a) . . . an entity . . . in possession, custody, or control, during the
> case, of property that the trustee may use, sell, or lease under section
> 363 of this title, or that the debtor may exempt under section 522 of
> this title, shall deliver to the trustee, and account for, such property
> or the value of such property, unless such property is of
> inconsequential value or benefit to the estate.
>
> * * *
>
> (e) Subject to any applicable privilege, after notice and a hearing,
> the court may order an attorney, accountant, or other person that
> holds recorded information, including books, documents, records,
> and papers, relating to the debtor's property or financial affairs, to
> turn over or disclose such recorded information to the trustee.

11 U.S.C. §§ 542(a), (e).

The Complaint alleges that Defendants are in possession of both valuable property

belonging to the Debtor,[13] recoverable under Section 542(a), and of the Debtor's electronic

information,[14] recoverable under Section 542(e).  While Moving Defendants argue that a dispute

exists as to proper title to the property, any such dispute is not bona fide because the allegations of

the Complaint must be accepted as true for purposes of a motion to dismiss.  "The Third Circuit

has explained that a 'bona fide dispute' exists only when there is 'a genuine issue of material fact

that bears upon the debtor's liability, or a meritorious contention as to the application of law to

---

[13]    *See* Complaint at, *e.g.,* ¶¶ 150.a-l, 156, 162.
[14]    *See* Complaint at, *e.g.,* ¶¶ 91, 154, 164, 165.

undisputed facts.'"  *In re Joey's Steakhouse, LLC*, 474 B.R. 167, 188 (Bankr. E.D. Pa. 2012)

(quoting *B.D.W. Associates v. Busy Beaver Bldg. Ctrs.*, 865 F.2d 65, 66 (3d Cir. 1989)).  The

undisputed facts alleged in the Complaint establish that a turnover claim is proper, Moving

Defendants cannot dispute those facts via a motion to dismiss, and the Motion should thus be

denied with respect to the turnover claims.

> **J.       The Trustee States A Claim Under 11 U.S.C. § 549**

Moving Defendants' primary challenge to the Trustee's Section 549 claims is that, because

it is "only pled against the 'Best Bev Defendants[,]' and because "[t]he term 'Best Bev Defendants'

is <u>not</u> defined anywhere in the Complaint," the claim must be dismissed as it fails to name an

adverse party.  MD Br. at 51.  This attempt to exploit a nonexistent ambiguity in the Complaint

should be rejected.  While Moving Defendants are correct that the term "Best Bev Defendants" is

not defined in the Complaint, they fail to mention that the Complaint defines the term "Best Bev

Entities" in scrupulous detail as specifically named individual entities "operating as if they were a

unified entity, or alter egos[]."  *See* Complaint at ¶¶ 28-33.  Moving Defendants also ignore the

Complaint's detailed explanation of the history of the "Best Bev Entities," and the allegation that

Defendants intentionally made the structure of and lines between the Best Bev Entities opaque in

an attempt to avoid liability for their misconduct.  To that end, the Complaint establishes that:

- Best Bev Entity Can Man, LLC ("Can Man") was formed on May 3, 2021, *id.* at ¶ 117, less than two months before the Debtor filed for bankruptcy, *id.* at ¶ 7, and at all times operated under the name "Best Bev," *id.* at ¶ 125;

- on June 14, 2021, Defendants Festa and Uszenski used the Debtor's computer equipment and email system to create and edit a document entitled "Can Man Shadow Structure," which depicted a corporate structure under which Can Man would own all of the Debtor's brands and operate out of a headquarters at 2512 Quakertown Road, *id.* at ¶ 124;

- on June 13, 2022, Best Bev Entity Best Bev, LLC was formed as a United States Virgin Islands limited liability company and "is either the successor in interest to Can Man or was created

by Defendants to avoid liability for misconduct on the part of Can Man, which at all times relevant hereto operated using the name "Best Bev," *id.* at ¶ 125; and

- 2512 Quakertown Road is the current address of Best Bev Entities Can Man LLC and Best Bev, LLC, *id.* at ¶¶ 29-30, an address never disclosed as part of the Debtor's operations, *id.* at ¶ 98.

In this context, and construing the Complaint and the allegations thereof in the light most favorable to the Trustee, it is abundantly clear that the Trustee intended to plead her Section 549 claims against the specifically defined Best Bev Entities.  While Moving Defendants also take issue with the Trustee's pleading that transfers subject to Section 549 were made to "Best Bev," on the grounds that such an allegation does not identify the immediate or mediate transferee of the transfers, their argument ignores the allegation that the Best Bev entities "operat[ed] as if they were a unified entity, or alter egos[]," an allegation which is supported and made abundantly plausible via pleading the abundant links between and overlap among the specifically enumerated Best Bev Entities.  Accordingly, the Moving Defendants' Motion is without merit and the Section 549 claim is properly pleaded.  *See, e.g.,* Complaint at ¶ 150.a-l (pleading a number of specific post-petition transfers to the Best Bev enterprise).

### K.    The Complaint States A Preferential Transfer Claim Against Defendant Boyer

Section 547(b) of the Bankruptcy Code provides that a transfer is avoidable as a preference when the transfer was (i) to or for the benefit of a creditor, (ii) for or on account of an antecedent debt, (iii) made when the Debtor was insolvent, (iv) made within 90 days before the petition or within one year if the creditor was an insider, and (v) enabled the creditor to receive more than he would have in a Chapter 7 liquidation had the payment not been made.  11 U.S.C. § 547(b).  Moving Defendants argue that the Trustee has "failed to allege that (i) [Defendant Boyer] was a creditor, (ii) the Debtor was insolvent at the time the alleged transfer was made, which was more

82

than 90 days prior to the Petition Date, or (iii) the alleged transfer enabled [Defendant Boyer] to

receive more that [sic] he would receive if the alleged transfer had not been made and [Defendant

Boyer] had received payment to the extent provided by the Bankruptcy Code."  MD Br. at p. 54

(footnote omitted).

Moving Defendants' arguments are without merit.  The Complaint expressly alleges that

the preference payment was made on account of an antecedent debt owed to Defendant Boyer and

thus that he was a creditor.  Complaint at ¶ 285.  The Complaint also alleges that the Debtor was

unable to pay its debts (i.e., insolvent) as early as February 2021 and that the preferential transfer

occurred after this point, in March 2021.  *Id.* at ¶¶ 106, 285; *see also In re FAH Liquidating Corp.*,

572 B.R. at 128 (recognizing insolvency as "a factual inquiry that often evades determination at

the motion to dismiss stage" and holding that as long as a complaint provides enough information

"to raise a reasonable expectation that discovery will reveal evidence of" insolvency, a motion to

dismiss on such grounds should be denied (quotation marks and citation omitted)).

As to whether the transfer would enable Defendant Boyer to receive more than he would

receive in a Chapter 7 liquidation absent the payment, the fact can be established by the Court's

consideration of the broader bankruptcy case as a whole, including: (i) the Debtor's bankruptcy

petitions and schedules and (ii) the proofs of claim that have been filed against the Debtor's estate.

*See e.g., In re Caremerica, Inc.*, 409 B.R. 737, 753–54 (Bankr. E.D.N.C. 2009) ("Generally, as

long as the distribution to general unsecured creditors would be less than 100%, any payment to

such a creditor during the preference period would enable the creditor to receive more than it would

in a liquidation had the payment not been made. . . . The court finds that the debtors' summary of

schedules, reflecting liabilities far greater than assets, is sufficient to satisfy the trustee's pleading

requirement."); *see also Buck v. Hampton Tp. School Dist.*, 452 F.3d 256, 260 (3d Cir. 2006)

(holding that, in evaluating a motion to dismiss, the court "may consider . . . items appearing in the record of the case" (quotation marks and citation omitted)).  The Summary of Assets and Liabilities filed by the Debtor lists assets of only $2.7 million versus scheduled liabilities of $10.1 million.  Bankr. D.I. 63.  The current claims register lists over $4.4 million in filed liquidated claims, and the sale of the Debtor's assets to Millstone yielded only $1.4 million.  Complaint at ¶ 144.  When comparing the Debtor's high level of indebtedness to the meager proceeds from the sale of the Debtor's assets, it is reasonable to infer that an unsecured creditor like Defendant Boyer would receive less in a Chapter 7 distribution than the cash he was paid by the Debtor pre-bankruptcy.

Finally, Moving Defendants argue that the preference claim against Defendant Boyer should be dismissed because the challenged transfer occurred more than 90 days prior to the petition date and Defendant Boyer is not an insider.  MD Br. at 55.  The Bankruptcy Code sets forth a non-exhaustive list of the types of individuals or entities which may be considered "insiders" of a debtor, including, *inter alia*, directors, officers, and persons in control of the debtor. *See* 11 U.S.C. § 101(31).  Because these definitions are non-exhaustive, creditors may be considered "non-statutory insiders" if, despite not falling within one of the enumerated categories, "there is a close relationship between debtor and creditor and anything other than closeness to suggest that any transactions were not conducted at arm's length."  *In re Winstar Commc'ns, Inc.*, 554 F.3d 382, 396-97 (3d Cir. 2009) (internal citations, quotation marks, and alteration marks omitted).  Because the inquiry into insider status is "fact-intensive" and must be made on a "case-by-case basis," it is generally inappropriate for resolution on a motion to dismiss.  *Student Fin. Corp.*, 335 B.R. at 547; *see also In re DBSI, Inc.*, 445 B.R. 344, 348 (Bankr. D. Del. 2011).

Moving Defendants cite *In re Spitko*, 2007 WL 1720242, at \*10 (Bankr. E.D. Pa. June 11, 2007), for the proposition that "[a]ttorneys have not generally been considered insiders of their debtor-clients."  MD Br. at p. 55.  However, *Spitko* also establishes a key exception to this general rule: "[w]herever an attorney has been found to be an extra-statutory insider, that status has been imposed because of a relationship with the debtor that transcended the normal attorney-client boundaries."  *Spitko*, 2007 WL 1720242, at \*10.

Here the Complaint alleges that the relationship between Defendant Boyer went far beyond the "normal attorney-client boundaries" by pleading that Defendant Boyer: was general counsel for the Debtor (not simply an outside attorney with a limited scope of engagement),[15] Complaint at ¶ 14; was improperly serving in the dual and conflicting roles of general counsel to the Debtor and counsel to the Polebridge Entities and the Wynk Entities, which existed for the purpose of defrauding the Debtor and its creditors, *id.* at ¶¶ 14, 176-177; and was admonished by the Debtor's outside counsel for presenting the Debtor as unfavorable to potential purchasers in the hope of steering the Debtor's business to the Sheehan Entities at less than fair value, yet continued to do so, *id.* at ¶ 111-112.

These facts establish a "relationship with the debtor that transcend[s] the normal attorney-client boundaries," *Spitko*, 2007 WL 1720242, at \*10, and, especially in light of the fact-specific nature of the non-statutory insider analysis, require denial of Moving Defendant's Motion.  *See In re Cont'l Cap. Inv. Servs., Inc.*, 2006 WL 6179374, at \*4 (Bankr. N.D. Ohio June 12, 2006)

---

[15]    As with many other aspects of their Motion, Moving Defendants resort to mischaracterizing the allegations of the Complaint by stating, with no basis, that Boyer "was outside counsel who was engaged on an as-needed basis by the Debtor."  MD Br. at p. 55.  The Complaint actually alleges the opposite, i.e., that Boyer was "serving in the dual and conflicting roles of **general counsel** to the Debtor and counsel to the Polebridge Entities and the Wynk Entities."  Complaint at ¶ 14 (emphasis added).

(holding that denial of a motion to dismiss as to insider status was warranted as to a debtor's corporate counsel who "knew of, and aided and/or participated in the various fraudulent schemes" alleged in the complaint); *In re Daddy's Money of Clearwater, Inc.*, 155 B.R. 788, 791 (Bankr. M.D. Fla. 1993) (material issues of fact regarding insider status of attorney precluded summary judgment on issue of whether transfer to attorney more than 90 days prepetition was a voidable preference); *In re BC Funding, LLC*, 519 B.R. 394, 433 (Bankr. E.D.N.Y. 2014) (allegations that an individual attorney was general counsel of a debtor and manager of a company holding the debtor's equity sufficed for purposes of pleading insider status).

## V.    CONCLUSION

In light of the foregoing facts and authorities, the Trustee respectfully submits that Moving

Defendants' motion to dismiss should be denied.[16]


Dated: October 27, 2023

<div style="margin-left: 40%;">

**COREN & RESS, P.C.**

/s/ Andrew J. Belli_____
STEVEN M. COREN
ANDREW J. BELLI
JANICE D. FELIX
Two Commerce Square, Suite 3900
2001 Market Street
Philadelphia, PA 19103
Tel: (215) 735-8700
Fax: (215) 735-5170
scoren@kcr-law.com
abelli@kcr-law.com
jfelix@kcr-law.com

*Counsel for Plaintiff*
*Bonnie Finkel, Chapter 7 Trustee*

</div>

---

[16]    In the alternative, if the Court determines that dismissal of any claims is warranted, Plaintiff respectfully requests that the dismissal be without prejudice so that the Trustee may amend the Complaint with respect to any claim deemed insufficient. *See, e.g., Phillips*, 515 F.3d at 245 ("even when plaintiff does not seek leave to amend his complaint after a defendant [successfully] moves to dismiss it, unless the district court finds that amendment would be inequitable or futile, the court must inform the plaintiff that he or she has leave to amend the complaint within a set period of time").