# Exhibit A

# AMENDED AND RESTATED OPERATING AGREEMENT

## OF

## MIDNIGHT MADNESS DISTILLING, LLC

### As Amended and Restated as of

### March 26, 2021

THE UNITS OF THE COMPANY HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE " SECURITIES ACT") OR ANY STATE SECURITIES LAWS OR THE LAWS OF ANY OTHER NATION OR JURISDICTION AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS THEREOF. NEITHER THE UNITS NOR ANY INTEREST THEREIN MAY BE OFFERED, SOLD, TRANSFERRED, ASSIGNED, PLEDGED, HYPOTHECATED OR OTHERWISE TRANSFERRED OR DISPOSED OF UNLESS THE SAME HAVE BEEN INCLUDED IN AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE SECURITIES LAWS OR AN OPINION OF COUNSEL SATISFACTORY TO THE BOARD OF MANAGERS OF THE COMPANY HAS BEEN RENDERED TO THE COMPANY THAT AN EXEMPTION FROM REGISTRATION UNDER APPLICABLE SECURITIES LAWS IS AVAILABLE.  IN ADDITION, TRANSFER OR OTHER DISPOSITION OF THE UNITS ARE RESTRICTED AS PROVIDED IN ARTICLE VII OF THIS OPERATING AGREEMENT AND THE RESTRICTED UNITS PLAN.

## SECTION 1
## DEFINED TERMS

The following capitalized terms shall have the meanings specified in this <u>Section 1</u>. Other terms are defined in the text of this Agreement; and, throughout this Agreement, those terms shall have the meanings respectively ascribed to them

"<u>Act</u>" means the Pennsylvania Limited Liability Company Law of 1994, as amended from time to time.

"<u>Active Founders</u>" means Casey Parzych and Angus Rittenburg, collectively.

"<u>Adjusted Capital Account Deficit</u>" means, with respect to any Member, the deficit balance, if any, in the Member's Capital Account as of the end of the relevant taxable year, after giving effect to the following adjustments:

(a)    the deficit shall be decreased by the amounts which the Member is obligated to restore, if any, pursuant to <u>Section 4.4.2</u>, or is deemed to be obligated to restore pursuant to Treas. Reg. § 1.7041(b)(2)(ii)(c); and

(b)    the deficit shall be increased by the items described in Treas. Reg. § 1.7041(b)(2)(ii)(d)(4), (5) and (6).

"<u>Adjusted Capital Balance</u>" means, as of any day, a Member's total Capital Contributions less all amounts actually distributed to the Member pursuant to <u>Section 4.5</u> hereof If any Unit is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Adjusted Capital Balance of the transferor to the extent the Adjusted Capital Balance relates to the Unit transferred.

"<u>Affiliate</u>" means, with respect to any Person, any other Person directly or indirectly Controlling, Controlled by or under direct or indirect common Control with such Person.

"<u>Agreement</u>" means this Agreement, as amended, restated or supplemented from time to time.

"<u>Bankruptcy</u>" means (i) the entry of a decree or order for relief by a court having jurisdiction in respect of a Person in an involuntary proceeding under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator (or similar official) of a Person or for any substantial part of such Person's property or the entry of an order for the winding up or liquidation of its affairs, which decree or order remains unstayed and in effect for a period of ninety (90) consecutive days; (ii) the commencement by a Person of a voluntary proceeding under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or consent to the entry of an order for relief in an involuntary case under any such law, or consent to the appointment or taking possession by a receiver, liquidator, assignee, custodian, trustee, sequestrator (or similar official) of a Person or for any substantial part of its property, or any general assignment by a Person for the benefit of creditors; or (iii) the attachment by a creditor of a Person's interest in the

2

Company, which attachment is not discharged or vacated within ninety (90) days from the date it becomes effective.

"Board" means the Board of Managers of the Company as provided in Article 5 of this Agreement.

"Capital Account" has the meaning set forth in Section 4.1.

"Capital Contribution" means the total amount of cash and the fair market value of any other assets contributed (or deemed contributed under Treas. Reg. § 1.7041(b)(2)(iv)(d)) to the Company by a Member, net of liabilities assumed or to which the assets are subject.

"Cash Flow" for a given period (or portion thereof) means all gross revenues or business receipts for such period (or portion thereof), from any source whatsoever of the Company (determined on a cash basis), less Permitted Expenses for such period (or portion thereof).

"Certificate of Organization" means the Certificate of Organization of the Company and any and all amendments thereto and restatements thereof filed on behalf of the Company with the Office of the Secretary of State of the Commonwealth of Pennsylvania pursuant to the Act.

"Class A Member" means any Member holding a Class A Membership Unit.

"Class B Member" means any Member holding a Class B Membership Unit.

"Class C Member" means any Member holding a Class C Membership Unit.

*Class D deleted; formerly reserved for "collegiate" investors.*

"Class E Member" means any Member holding a Class E Membership Unit,

"Class F Member" means any Member holding a Class F Membership Unit.

"Class G Member" means any Member holding a Class G Membership Unit,

"Class H Member" means any Member holding a Class H Membership Unit.

"Code" means the Internal Revenue Code of 1986, as amended, or any corresponding provision of any succeeding law.

"Collegiate Investors" means Carnegie Mellon University and those investors who have matched the funds the Company may potentially win in any Carnegie Mellon University competition.

"Company" means Midnight Madness Distilling, LLC, the Pennsylvania limited liability company formed in accordance with this Agreement and the Act.

"Company Minimum Gain" has the meaning set forth in Treas. Reg. §§ 1.7042(b)(2) and 1.7042(d) for company minimum gain.

3

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities or general Partner or managing member interests, by contract or otherwise. "Controlling" and "Controlled" shall have correlative meanings. Without limiting the generality of the foregoing, a Person shall be deemed to Control any other Person in which it owns, directly or indirectly, a majority of the ownership interests.

"Depreciation" means, for each fiscal year or other period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable with respect to an asset for such year or other period, except that if the Gross Asset Value of an asset differs from its adjusted basis for Federal income tax purposes at the beginning of such year or other period, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the Federal income tax depreciation, amortization, or other cost recovery deduction for such year or other period bears to such beginning adjusted tax basis; provided, however, that if the Federal income tax depreciation, amortization, or other cost recovery deduction for such year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Board.

"Disability" shall be deemed to have occurred if on account of any physical or mental disability; (1) a Member is considered to be totally or permanently disabled as such terms are defined in the applicable disability buy-out insurance policy or policies owned by the Company (and the Disability shall be deemed to occur on the date as defined in such insurance policy or policies); or (2) the Member is unable to perform the responsibilities and duties of his position with the Company for a period of one hundred eighty (180) consecutive days, or two hundred fifty (250) total days in any twelve month period (and the disability shall be deemed to occur on the last day of such period).

"Divorce" means the occurrence of a divorce or separation decree, marital property settlement agreement or any other form of judicially approved marital arrangement respecting a Member, but only if pursuant to such decree, agreement or arrangement, the affected Member would not retain ownership of the Units issued to him, or any portion thereof in which event the date of Divorce is the date of the divorce or separation decree, marital property settlement agreement or marital arrangement. In the event that the spouse of a Member would be awarded the ownership of any of the Units by a divorce or separation decree, marital property settlement agreement or any other form of judicially approved marital arrangement, the Company shall have the option to purchase all of the Units that would be so awarded prior to the actual transfer of such Units to such spouse pursuant to Section 7.9 of this Agreement.

"Excess Loss" means any Losses that would cause or increase a deficit balance in a Member's Capital Account to an amount in excess of the sum of (i) the amount such Member is obligated to restore pursuant to any provision of this Agreement and (ii) the amount such Member is deemed obligated to restore pursuant to the Treasury Regulations Section 1.704-2(g)(1) and 1.704-2(i)(5).

"Fair Market Value" means the fair market value of the Units as reasonably determined by all of the parties involved. If the parties are unable to agree on the fair market value, each party shall have the right to appoint an appraiser who shall appoint a third appraiser who shall determine

the value of the Units.  The value of the Units as determined by the third appraiser shall be the Fair Market Value.

"Fiscal Year" means the period beginning on January 1 of any calendar year and ending on December 31, of such calendar year, except that the first fiscal year of the Company shall begin at the date of organization and end on December 31 of such calendar year.

"Friends and Family Members" means friends and family who are purchasing Class C Units.

"Gross Asset Value" with respect to any asset means the asset's adjusted basis for Federal income tax purposes, except as follows:

(a)    The initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross lair market value of such asset, as determined by the contributing Member and the Board;

(b)    The Gross Asset Values of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Board, as of the following times:

(i)    the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a de minimis Capital Contribution;

(ii)    the distribution by the Company to a Member of more than a de minimis amount of Company property other than money as consideration for an interest in the Company; and

(iii)    the liquidation of the Company for Federal income tax purposes within the meaning of Treasury Regulation Section 1.7041(b)(2)(ii)(9): provided, however, that the adjustments pursuant to clauses (i) and (ii) above shall be made only if the Board reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company;

(c)    The Gross Asset Value of any Company asset distributed to any Member shall be the gross fair market value of such asset on the date of distribution;

(d)    The Gross Asset Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Regulation Section 1.704-1(b)(2)(iv)(m) and Section 4.3.5 hereof provided, however, that Gross Asset Values shall not be adjusted pursuant to this clause (a) to the extent the Board determines that an adjustment pursuant to clause (b) hereof is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this clause (d); and

(e)    If the Gross Asset Value of an asset has been determined pursuant to subparagraphs (a), (b) or (d) hereof such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

5

"Incentive Class Members" means employees, independent contractors, vendors, business associates and other partners of the Company issued Class E Units of the Company, each of whom is a Member.

"Information" has the meaning set forth in Section 9.15.

"Investor Members" means those investors who are "accredited investors" as said term is defined in the Securities Act.

"Involuntary Withdrawal" means, with respect to any Member, the occurrence of any of the following events:

(a)     the Member makes an assignment for the benefit of creditors;

(b)     the Member files a voluntary petition of bankruptcy;

(c)     the Member is adjudged bankrupt or insolvent or there is entered against the Member an order for relief in any bankruptcy or insolvency proceeding;

(d)     the Member files a petition or answer seeking for the Member any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation;

(e)     the Member seeks, consents to, or acquiesces in the appointment of a trustee for, receiver for, or liquidation of the Member or of all or any substantial part of the Member's properties;

(f)     the Member files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Member in any proceeding described in subsections (a) through (e) above;

(g)     any proceeding against the Member seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law or regulation, continues for sixty (60) days after the commencement thereof or the appointment of a trustee, receiver, or liquidator for the Member or all or any substantial part of the Member's properties without the Member's agreement or acquiescence, which appointment is not vacated or stayed for sixty (60) days or, if the appointment is stayed, for sixty (60) days after the expiration of the stay during which period the appointment is not vacated;

(h)     if the Member is an individual, the Member's death, divorce (whereby the Member would not retain sole ownership of his or her Units) or Disability;

(j)     if the Member is acting as a Member by virtue of being a trustee of a trust, the termination of the trust;

(k)     if the Member is a partnership or a limited partnership, the dissolution and commencement of winding up of the partnership or a limited partnership;

6

(l)    if the Member is a corporation, the dissolution of the corporation or the revocation of its charter; or

(m)    if the Member is an estate, the distribution by the fiduciary of the estate's entire interest in the Company,

"Majority in Interest" means one or more Members who in aggregate hold more than 50% of all the issued and outstanding Class A Units of the Company.

"Manager" means any person elected as a Manager in accordance with this Agreement and the Act.

"Member" means each Person signing this Agreement as of the date hereof and any Person who subsequently is admitted as an additional member of the Company pursuant to the provisions of this Agreement.

"Member Nonrecourse Debt" has the meaning set forth in Treas. Reg. § 1.704-2(b)(4) for Company nonrecourse debt.

"Member Nonrecourse Debt Minimum Gain" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Treas. Reg. § 1.70420(3).

"Member Nonrecourse Deductions" has the meaning set forth in Treas. Reg. §§ 1.70420(1) and 1.70420(2).

"Negative Capital Account" means a Capital Account calculated for tax purposes with a balance of less than zero.

"Nonrecourse Deductions" has the meaning set forth in Treas. Reg. § 1.7042(b)(1). The amount of Nonrecourse Deductions for a taxable year of the Company equals the net increase, if any, in the amount of Minimum Gain during that taxable year, determined according to the provisions of Treas. Reg. § 1.7042(c).

"Nonrecourse Liability" has the meaning set forth in Treas. Reg. § 1.7042(b)(3).

"Percentage Interest" means, with respect to any Member, a percentage equal to a fraction, the numerator of which is the number of Units held by such Member and the denominator of which is the total number of Units of the Company outstanding.

"Permitted Expenses" means all costs (capital, operating, and otherwise) of the Company during any period or portion thereof determined on the basis of sound accounting practices applied on a consistent basis (including, but not limited to, salaries to be paid to the officers of the Company, principal and interest payments on Company debt and amounts spent on improving property owned or leased by the Company and reasonable reserves as determined by the Board, in its sole discretion, but specifically excluding depreciation, amortization and any other non-cash deductions of the Company for income tax purposes.)

"Permitted Transferee" means (i) the Company, (ii) any Active Founder, (iii) any entity wholly owned by any Active Founder and (iv) lineal descendants, or trusts, family limited partnership or other entities established for the benefit of such persons (provided that the right to vote those Units Transferred under (iv) shall be retained by the Member who has the right to vote or direct the voting of such Units).

"Person" means any individual, corporation, partnership, association, limited liability company, trust, estate or other entity

"Positive Capital Account" means a Capital Account calculated for tax purposes with a balance greater than zero.

"Profit" and "Loss" means, for each taxable year of the Company (or other period for which Profit or Loss must be computed), the Company's taxable income or loss determined in accordance with Code Section 703(a), with the following adjustments:

(a)    all items of income, gain, loss, deduction, or credit required to be stated separately pursuant to Code Section 703(a)(1) shall be included in computing taxable income or loss; and

(b)    any tax exempt income of the Company, not otherwise taken into account in computing Profit or Loss, shall be included in computing taxable income or loss; and

(c)    any expenditures of the Company described in Code Section 705(a)(2)(b) (or treated as such pursuant to Treas. Reg. § 1,7041 (b)(2)(iv)(i)) and not otherwise taken into account in computing Profit or Loss, shall be subtracted from taxable income or loss; and

(d)    gain or loss resulting from any taxable disposition of Company property shall be computed by reference to the adjusted book value of the property disposed of, notwithstanding the feet that the adjusted book value differs from the adjusted basis of such property for federal income tax purposes; and

(e)    in lieu of the depreciation, amortization or cost recovery deductions allowable in computing taxable income or loss, there shall be taken into account the depreciation computed based upon the adjusted book value of the asset; and

(f)    notwithstanding any other provision of this definition, any items which are specialty allocated pursuant to Section 4.3. hereof shall not be taken into account in computing Profit or Loss.

"Regulation" means the income tax regulations, including any temporary regulations, from time to time promulgated under the Code.

"Securities Act" means the Securities Act of 1933, as amended.

"Series" means each separate offering of a Class of Units.  Each Series shall be named sequentially in alphabetical order.

8

"Supermajority" means one or more Members who in aggregate control the voting of more than 65% of all the issued and outstanding Vested Units of the Company.

"Transfer" or 'Transferred" means, when used as a noun, any sale, hypothecation, pledge, assignment, attachment or other transfer, and, when used as a verb, means voluntarily to sell, hypothecate, pledge, assign or otherwise transfer.

"Units" has the meaning set forth in Section 3.3.

"Unit Holder" means any Person who holds a Unit, whether as a Member or an unadmitted assignee of a Member.

"Vested" as to any Units subject to a Restricted Units Plan and any other document setting forth the terms and timeline for the vesting of such Units, means that a Units Option has been exercised pursuant to the terms and conditions of the applicable option grant and that such Units are issued and entered on the books of the Company subject to the terms of this Agreement and any other document setting forth the terms and timeline for the vesting of such Units.

## SECTION 2
## FORMATION AND NAME; OFFICE; PURPOSE; TERM; REPRESENTATIONS

2.1     Formation.  The Members hereby agree that the Company shall be conducted as a limited liability company pursuant to the provisions of the Act.  The rights and obligations of the Members shall be as stated in the Act, except as this Agreement otherwise provides.

2.2     Name of the Company.  The name of the Company shall be "Midnight Madness Distilling, LLC".

2.3     Purpose; Powers.  The object and propose of and the nature of the business to be conducted and promoted by the Company is (i) to own, operate, and manage a distillery to distill, manufacture, distribute and import and sell alcoholic and/or other distilled beverages, (ii) to engage in any and all lawful activities necessary, convenient, desirable, or incidental to the foregoing, and (iii) otherwise to engage in any other lawful act or activity for which limited liability companies may be organized under the Act.

2.4     Term.  The term of the Company, which commenced on the date of filing of the Certificate of Organization shall be indefinite unless earlier terminated or dissolved pursuant to applicable law or to any other provision of this Agreement.

2.5     Registered Office.  The Company's registered office in the Commonwealth of Pennsylvania shall be 2300 Trumbauersville Round, Milford Twp., PA 18951, or at such other location as the Managers may designate from time to time in the manner provided by law.  The principal place of business of the Company shall be at such place as the Managers may designate from time to time, which need not be in the Commonwealth of Pennsylvania, and the Company may maintain such other offices as the Managers determine to be necessary or desirable for the conduct of the Company's business.  The mailing address of the Company shall be P.O. Box 116, Quakertown, PA 18951.

2.6    Members.  The name and present mailing address of each Member are set forth on Schedule A.  Upon execution of this Agreement, the Persons listed on Schedule A shall be deemed admitted or shall have been previously admitted as Members of the Company.

2.7    Fiscal Year.  The fiscal year of the Company shall end on the last day of December in each year unless the Board determines that another fiscal year end is advantageous to the Company.

2.8    Amendments.  Subject to Section 5.3, this Agreement and the Certificate of Organization may be modified, altered, supplemented or amended pursuant to a written agreement executed by a Majority in Interest.

2.9    Representations and Warranties.  Each Member hereby represents and warrants to the Company and each other Member (a) if that Member is a corporation, it is duly organized, validly existing, and in good standing under the law of the state of its incorporation and is duly qualified and in good standing as a foreign corporation in all jurisdictions in which it is required to be qualified to do business; (b) if that Member is a limited liability company, it is duly organized, validly existing, and (if applicable) in good standing under the law of the state of its organization and is duly qualified and (if applicable) in good standing as a foreign limited liability company in all jurisdictions in which it is required to be qualified to do business; (c) if that Member is a partnership, trust, or other entity, it is duty formed, validly existing, and (if applicable) in good standing under the law of the state of its formation, and if required by law is duly qualified to do business and (if applicable) in good standing in all jurisdictions in which it is required to be qualified to do business, and the representations and warranties in clause (a), (b), or (c), as applicable, are true and correct with respect to each partner (other than limited partners), trustee, or other member thereof (d) that Member has full corporate, limited liability company, partnership, trust, or other applicable power and authority to execute and agree to this Operating Agreement and to perform its obligations hereunder and all necessary actions by the board of directors, shareholders, managers, members, partners, trustees, beneficiaries, or other persons necessary for the due authorization, execution, delivery, and performance of this Operating Agreement by that Member have been duty taken; (e) that Member has duly executed and delivered this Operating Agreement; and (f) that Member's authorization, execution, delivery, and performance of this Operating Agreement do not conflict with any other agreement or arrangement to which that Member is a party or by which it is bound.

## SECTION 3
## MEMBERS; CAPITAL; CAPITAL ACCOUNTS

3.1    Initial Capital Contributions of the Member.  Upon or prior to execution of this Agreement, each Member shall contribute cash, tangible or intangible property, services rendered, or a promissory note or other obligation to contribute cash or property or to perform services to the Company as shown on Schedule A attached hereto.

3.2    Capital Contributions.  In return for their Capital Contributions, the Members will receive the number and class of Units reflected on Schedule A.

10

3.3    <u>Units</u>. The Members are entitled to one vote for each Unit held of record on all matters submitted to a vote of the Company, except for those Units which are not Vested or as otherwise specifically provided herein. Units shall not be certificated. Holders of Units, except Units that are not Vested, will be entitled to share pro rata in all distributions as maybe declared from time to time by the Company from funds legally available therefore as provided under Section 4.5. Upon liquidation or dissolution of the Company, holders of Units, except Units that are not Vested, will be entitled to share proportionately in all assets available for distribution to such holders. The aggregate membership interests in the Company shall consist of such number of Units as may be issued, Vested and outstanding at the time. Other than the Units described in this Section 3.3., the Company may not create a new class of Units or issue additional Units without the approval of the Active Founders. All classes of Units shall be subject to dilution upon the issuance of additional Units. The classes of Units created shall be, and shall have such additional restrictions as follows:

3.3.1    <u>Class A Units</u>. Class A Units will be issued solely to members entitled to vote. Class A units shall be the only Units entitled to vote.

3.3.2    <u>Class B Units</u>. Class B Units will be issued solely to Investor Members as a result of one or more financing "events," including but not limited to the sale of securities at an established price per share, conversion of Convertible Promissory Notes from one or multiple rounds of financing, or other means of Membership Units gained through financial consideration. Class B Units will be issued in one or more different Series, with each Series having its own set of rights, Unit Prices, terms of Units or Convertible Promissory Notes, or powers and duties as may from time to time be established by the Company, Class B Units shall have no voting rights.

3.3.3    <u>Class C Units</u>. Class C Units will be issued solely to Friends and Family Members as a result of one or more financing "events," including but not limited to the sale of securities at an established price per share, conversion of Convertible Promissory Notes from one or multiple rounds of financing, or other means of Membership Units gained through financial consideration. Class C Units will be issued in one or more different Series, with each Series having its own set of rights, Unit Prices, terms of Units or Convertible Promissory Notes, or powers and duties as may from time to time be established by the Company. Class C Units shall have no voting rights.

3.3.4    *Class D deleted; formerly reserved for "collegiate" investors.*

3.3.5    <u>Class E Units</u>. Class E Units will be issued solely to the Incentive Class Members pursuant to the terms of the Restricted Units Plan. Class E Units shall have no voting rights.

3.3.6    <u>Class F Units</u>. Class F Units will be issued solely to the Managers pursuant to a resolution of a Majority in Interest. Class F Units shall have no voting rights.

3.3.7    <u>Class G Units</u>. Class G Units will be issued solely to the members of the Advisory Council pursuant to a resolution of the Board. Class G Units shall have no voting rights.

3.3.8    <u>Class H Units</u>. Class H Units will be issued solely to Mr. Doug Heckmann. Class H Units shall have no voting rights.

158397.00101/125544886v.1

3.4    <u>No Additional Capital Contributions</u>.  No Member shall be required to make any additional capital contribution to the Company except as otherwise agreed to in a writing signed by all of the Members.

3.5    <u>No Interest on Capital Contributions</u>.  Members shall not be paid interest on their Capital Contributions or amounts in their capital accounts except as otherwise provided herein.

3.6    <u>Repayment of Capital Contributions</u>.  Except as otherwise provided in this Agreement, no Member may withdraw or receive the return of any Capital Contribution.

3.7    <u>Form of Return of Capital</u>.  If a Member is entitled to receive a return of a Capital Contribution, the Company may distribute cash, notes, property or a combination thereof to the Member in return of the Capital Contribution,

3.8    <u>Loans by Members</u>.  Loans by Members to the Company shall not constitute a Capital Contribution to the Company or be credited to the Capital Account of the lending Member or entitle such lending Member to any increase in his share of Company profits or distributions or subject him to any greater proportion of the losses which the Company may sustain.  Loans in accordance with the foregoing sentence shall be a debt due from the Company to such lending Member.

3.9    <u>Restricted Units Plan</u>.  Class E Units of the Company may, in the discretion of the Board and pursuant to and in accordance with a Restricted Units Agreement, be issued pursuant to the terms and provisions of a certain Restricted Units Plan, a copy of which is attached to this Agreement as <u>Exhibit A</u>.  Said Class E Units will vest in such manner and over such period of time as shall be determined by the Board.  The Restricted Units Plan outlines the rights, limitations, privileges and obligations relating to each class of Class E Units issued thereunder, including, without limitation, the right of the Company to redeem such Class E Units upon the occurrence of certain events.  Class E Units that are not Vested under the Restricted Units Plan may not be sold, pledged or otherwise encumbered or transferred.  The Restricted Units Plan may be amended from time to time by the Board.

<h1 style="text-align:center">SECTION 4<br>PROFIT, LOSS AND DISTRIBUTIONS</h1>

4.1    <u>Capital Accounts</u>.

The Company shall maintain a "Capital Account" for each applicable Member in accordance with the following provisions:

4.1.1    <u>Credit</u>.  A Member's Capital Account shall be credited with the Member's Capital Contributions and the Member's distributive share of Profit and any item in the nature of income or gain specially allocated to such Member pursuant to the provisions of <u>Section 4</u> (other than <u>Section 4.3.3</u>.).

12

4.1.2    <u>Debit</u>.  A Member's Capital Account shall be debited with the amount of money and the fair market value of any Company property distributed to the Member and the Member's distributive share of Loss and any item in the nature of expenses or losses specially allocated to the Member pursuant to the provisions of <u>Section 4</u> (other than <u>Section 4.3.3</u>).

4.1.3    <u>Transfer</u>.  If any Unit is transferred pursuant to the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent the Capital Account is attributable to the transferred Units.  If the book value of Company property is adjusted pursuant to <u>Section 4.3.3.</u>, the Capital Account of each Member shall be adjusted to reflect the aggregate adjustment in the same manner as if the Company had recognized gain or loss equal to the amount of such aggregate adjustment.  It is intended that the Capital Accounts of all Members shall be maintained in compliance with the provisions of Treas. Reg. § 1.7041(b), and all provisions of this Agreement relating to the maintenance of Capital Accounts shall be interpreted and applied in a manner consistent with that Regulation.

4.2    <u>Allocations of Profit or Loss</u>.

4.2.1    <u>Allocation of Profits</u>.  After giving effect to the special allocations set forth in Section 4.3 hereof Profits for any Fiscal Year shall be allocated to the Members in the following manner:

(i)    first, to the Members, up to the aggregate of in proportion to, and in reverse order of and in the ratio of any Excess Loss previously allocated to each Member in accordance with Section 4.2.2 and not previously offset by Profits allocated pursuant to this Section 4.2.10; and

(ii)    next, to the Members in proportion to and in accordance with their respective Percentage.

4.2.2    <u>Allocation of Losses</u>.  After giving effect to the special allocations set forth in Sections 4.3. hereof Losses for any taxable year shall be allocated in the following manner:

(i)    first, to the Members up to the aggregate of in proportion to, and in reverse order of and in the ratio of any Profits previously allocated to such Members in accordance with Sections 4.2.1(ii) and not previously offset by Losses allocated pursuant to this Section 4.2.20;

(ii)    next, to the Members in proportion to their and in accordance with their respective Adjusted Capital Balance until each Member's Adjusted Capital Account balance has been reduced to zero; and

(iii)    next, to the Members in proportion to and in accordance with their respective Percentage.

The Losses allocated pursuant to this Section 4.2.2 shall not exceed the maximum amount of Losses that can be allocated without causing any Member to be allocated an Excess Loss.  If some but not all Members would be allocated an Excess Loss as a result of an allocation of Losses under Section 4.2.2, the limitation contained in the preceding sentence shall be applied on a Member by Member basis so as to allocate the maximum permissible Losses to each Member under Treasury

13

Regulations Section 1.704-1(b)(2)(ii)(d). All Losses in excess of the limitation contained herein shall be allocated to Members in accordance with their respective Capital Contributions.

4.3     Regulatory Allocations.

        4.3.1    Qualified Income Offset.    No Member shall be allocated Losses or deductions if the allocation causes a Member to have an Adjusted Capital Account Deficit. If a Member receives (1) an allocation of Loss or deduction (or item thereof) or (2) any distribution which causes the Member to have an Adjusted Capital Account Deficit at the end of any taxable year, then all items of income and gain of the Company (consisting of a pro rata portion of each item of Company gross income) for that taxable year shall be allocated to that Member before any other allocation is made of Company items for that taxable year, in the amount and in proportions required to eliminate the Adjusted Capital Account Deficit as quickly as possible. This Section 4.3.1. is intended to comply with, and shall be interpreted consistently with, the "qualified income offset" provisions of the Regulations promulgated under Code Section 704(b).

        4.3.2    Company Minimum Gain.    Except as set forth in Treas. Reg. § 1.7042(f)(2), notwithstanding any other provision of this Agreement, if during any taxable year, there is a net decrease in Company Minimum Gain, each Member, prior to any other allocation pursuant to this Section 4, shall be specially allocated items of gross income and gain for such taxable year (and, if necessary, subsequent taxable years) in an amount equal to that Member's share of the net decrease in Company Minimum Gain, computed in accordance with Treas. Reg. § 1.7042(g). Allocations of gross income and gain pursuant to this Section 4.3.2. shall be made first from gain recognized from the disposition of Company assets subject to nonrecourse liabilities (within the meaning of the Regulations promulgated under Code Section 752), to the extent of the Company Minimum Gain attributable to those assets, and thereafter, from a pro rata portion of the Company's other items of income and gain for the taxable year. The items to be so allocated shall be determined in accordance with Treas. Reg. §§ 1.7042(f)(6) and 1.7042(j)(2). It is the intent of the parties hereto that any allocation pursuant to this Section 4.3.2. shall constitute a "minimum gain chargeback" under Treas. Reg. § 1.7042(f) and shall be interpreted consistently therewith.

        4.3.3    Member Minimum Gain.    Except as otherwise provided in Treas. Reg. § 1.7042(i)(4), notwithstanding any other provision of this Agreement, if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any taxable year, each Member who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Treas. Reg. § 1.7042(f)(5), shall be specially allocated items of income and gain for such taxable year (and, if necessary, subsequent taxable years) in an amount equal to such Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Treas. Reg, § 1.7042(f)(4). Allocations pursuant to the previous sentence shall be determined in accordance with Treas. Reg. §§ 1.7042(f)(4) and 1.7042(i)(2). This Section 4.3.3. is intended to comply with the minimum gain chargeback requirement in Treas. Reg. § 1.7042(f)(4) and shall be interpreted consistently therewith.

        4.3.4    Contributed Property and Bookups.    In accordance with Code Section 704(c) and the Regulations thereunder, as well as Treas. Reg. § 1.7041(b)(2)(iv)(d)(3), income, gain, loss, and deduction with respect to any property contributed (or deemed contributed) to the Company

14

shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of the property to the Company for federal income tax purposes and its lair market value at the date of contribution (or deemed contribution). If the adjusted book value of any Company asset is adjusted as provided herein, subsequent allocations of income, gain, loss, and deduction with respect to the asset shall take account of any variation between the adjusted basis of the asset for federal income tax purposes and its adjusted book value in the manner required under Code Section 704(c) and the Regulations thereunder.

4.3.5    Code Section 754 Adjustment. To the extent an adjustment to the tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Treas. Reg. § 1.7041(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of the adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases basis) and the gain or loss shall be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to that Section of the Regulations.

4.3.6    Nonrecourse Deductions. Any Member Nonrecourse Deductions for any taxable year shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Treas. Reg. § 1.7042(i)(l).

4.3.7    Member Loan Nonrecourse Deductions. Any Member Loan Nonrecourse Deduction for any taxable year or other period shall be specialty allocated to the Member who bears the risk of loss with respect to the loan to which the Member Loan Nonrecourse Deduction is attributable in accordance with Treas. Reg. § 1.7042(b).

4.3.8    Unrealized Receivables. If a Member's Unit holding is reduced (provided the reduction does not result in a complete termination of the Member's interest in the Company), the Member's share of the Company's "unrealized receivables" and "substantially appreciated inventory" (within the meaning of Code Section 751) shall not be reduced, so that, notwithstanding any other provision of this Agreement to the contrary, that portion of the Profit otherwise allocable upon a liquidation or dissolution of the Company pursuant to Section 4.4. hereof which is taxable as ordinary income (recaptured) for federal income tax purposes shall, to the extent possible without increasing the total gain to the Company or to any Member, be specialty allocated among the Members in proportion to the deductions (or basis reductions treated as deductions) giving rise to such recapture. Any questions as to the aforesaid allocation of ordinary income (recapture), to the extent such questions cannot be resolved in the manner specified above, shall be resolved by the Member.

4.3.9    Withholding. All amounts required to be withheld pursuant to Code Section 1446 or any other provision of federal, state or local tax law shall be treated as amounts actuality distributed to the affected Members for all purposes under this Agreement or as a deduction to the income of the Company as permitted by federal, state or local tax laws in the Member's discretion.

4.4     Liquidation and Dissolution.

4.4.1    If the Company is dissolved, the assets of the Company shall be distributed, subject to the procedures set forth in Section 8.2, to the Members in accordance with the balances in their respective Capital Accounts, after taking into account the allocations of Profit or Loss pursuant to Sections 4.2. and 4.6.2., if any.

4.4.2    No Member shall be obligated to restore a Negative Capital Account except as required by the Act.

4.4.3    Notwithstanding anything to the contrary, in the event the Company is "liquidated" within the meaning of Treas. Reg, § 1.704-1(b)(2)(ii)(g), liquidating distributions shall be made pursuant to this Section 4.4. by the end of the taxable year in which the Company is liquidated, or, if later, within ninety (90) days after the date of such liquidation Distributions pursuant to the preceding sentence may be made to a trust for the purpose of an orderly liquidation of the Company by the trust in accordance with the Act.

4.5     Distribution of Cash Flow.

4.5.1    Cash Flow, if any, shall be distributed to the Members in accordance with this section. Distributions of Cash Flow, if any, for any Fiscal Year, shall be made to the Members, subject to Sec. 4.6.5., no later than ninety (90) days after the end of such Fiscal Year. After taking account all distributions to the Members pursuant to Section 4.5.2 hereof all distributions of remaining Cash Flow shall be paid to the Members in proportion to and in accordance with their respective Percentage Interest.

4.5.2    The Company shall use its best efforts to cause distributions to be made to the Members to cover any cumulative tax liability incurred by the Members as a result of the allocations of Profits made to the Members. Subject to the preceding sentence, in the event that the Company tax return for any given year shows that the Members have been credited with income for income tax purposes or it is finally determined that the Members owe additional tax with respect to a given year pursuant to claims of the Internal Revenue Service related to the Members, the Board shall, to the extent that the Company has, in the sole discretion of the Board, sufficient cash available for distribution, promptly declare and pay a cash distribution to each Member in an amount equal to no less than the highest marginal tax rate applicable to such Member under the Code, as then in effect for such tax year, plus applicable state income taxes (unless provisions have been made for the payment of state income taxes at the Company level) multiplied by the amount of the income that such Members have been credited with for the applicable year.

4.6     General

4.6.1    Except as otherwise provided in this Agreement, Cash Flow shall be distributed to the Members pro rata in accordance with their Percentage Interests.

4.6.2    If any assets of the Company are distributed in kind to the Members, such assets shall be valued on the basis of their fair market value, and any Member entitled to any interest in such assets shall receive that interest as a tenant in common with all other Members so entitled. Unless the Board otherwise determines, the lair market value of such assets shall be

16

determined by an independent appraiser selected by the Board.  The Profit or Loss for each unsold asset shall be determined as if the asset had been sold at its fair market value, and the Profit or Loss shall be allocated as provided in <u>Section 4.3</u>, and shall be property credited or charged to the Capital Accounts of the Members prior to the distribution of the assets in liquidation pursuant to <u>Section 4.4</u>.

4.6.3   All Profit and Loss shall be allocated, and all distributions shall be made, to the Persons shown on the records of the Company to have been Members as of the last day of the taxable year for which the allocation or distribution is to be made.  Notwithstanding the foregoing, unless the Company's taxable year is separated into segments, if there is a Transfer or an Involuntary Withdrawal during the taxable year, the Profit and Loss shall be allocated between the original Member and the successor on the basis of the number of days each was a Member during the taxable year; <u>provided</u>, <u>however</u>, the Company's taxable year shall be segregated into two or more segments in order to account for Profit, Loss or proceeds attributable to any extraordinary nonrecurring items of the Company.

4.6.4   The Board is hereby authorized, upon the advice of the Company's tax counsel, to amend this <u>Article 4</u> to comply with the Code and the Regulations promulgated under Code Section 704(b).

4.6.5   <u>Restricted Distributions</u>.  Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not be required to make a distribution to any Member on account of its Units if such distribution would have the effect of rendering the Company insolvent or violate the Act or other applicable law.

## SECTION 5
## MANAGEMENT; RIGHTS, POWERS, AND DUTIES

5.1   <u>Management</u>.  The business and affairs of the Company will be managed by a Board of Managers (the "Board"), who may, but need not, be Members of the Company.  The Board is authorized and directed to manage and control the business of the Company.  Except for situations in which the approval of the Members is expressly required by this Agreement or by nonwaivable provisions of the Act, the Board has full and complete authority, power and discretion to manage and control the business, affairs and properties of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business.

5.2   <u>Board of Managers</u>.

(a)   <u>Size; Election</u>.  There shall be not less than two (2) and not more than seven (7) Managers on the Board.  A Majority in Interest shall elect the Managers.  Each Manager shall hold office for the term for which such Manager is elected or until such Manager's successor shall have been duty elected and qualified by a Majority in Interest.  A Manager need not be a resident of the Commonwealth of Pennsylvania.

(b)   <u>Removal and Vacancy</u>.  A Majority in Interest shall have the right to remove a Manager from the Board (for any reason and for no reason at all) by notice to the other Members.  If any Manager ceases to serve in such capacity prior to the end of his term for any

17

reason, the resulting vacancy on the Board shall be filled by the Active Founders and said Manager shall serve until his successor shall have been duty elected and qualified.

(c)     Authority. The Board shall be vested with the frill power, authority and responsibility to manage the Company, which shall include, but not be limited to, consideration of and action upon strategic issues, budgeting, a review of operational results, Company financing, strategic alliances, banking relationships, mergers and acquisitions, selection, hiring and termination of employees, management compensation, the protection of intellectual property, and other general corporate matters.

(d)     Voting. Each Manager shall have one vote on any Company matter. The Board shall act by majority vote except as otherwise provided by this Agreement. No Manager may act individually to bind the Company, except as otherwise provided by this Agreement or pursuant to resolutions or orders of the Board.

(e)     Committee. The Board, by resolution, may create one or more committees, to assist the Board in discharging its duties and responsibilities. The Board shall designate (with power of removal) the chairman and the members of each Committee. Each committee shall exercise all of the power and authority granted to it by its creating resolution, shall report to the full Board, its actions, and shall keep minutes of its proceedings.

(f)     Advisory Council.  The Board, by resolution, may create an Advisory Council to provide advice and counsel to the Company as necessary.  The Advisory Council shall have no voting rights and shall have no right to bind the Company in any manner. The Board, by resolution, may authorize the issuance of Class G Units to a member of the Advisory Council

5.3    Specific Rights and Powers of Board. Without limiting the generality of Section 5.1, the Board shall have the power and authority on behalf of the Company to do the following;

(a)     Execute any and all documents or instruments of any kind which the Board deem necessary or appropriate to achieve the purposes of the Company, including, without limitation, contracts, agreements, leases, subleases, easements, deeds, notes, mortgages and other documents or instruments of any kind or character or amendments of any such documents or instruments;

(b)     Borrow money from individuals, banks and other lending institutions on the general credit of the Company for use in the Company business, all upon such terms and containing such features as the Board shall reasonably determine to be necessary or desirable in their absolute discretion;

(c)     Incur, secure, renew, replace, refinance, modify, extend, repay or otherwise discharge any indebtedness of the Company;

(d)     Sell, exchange, lease, mortgage, pledge, assign, or otherwise transfer, dispose of or encumber all or a portion of the company's properties or any interest therein;

18

(e)     Procure and maintain, at the expense of the Company and with responsible companies, such insurance as may be available in such amounts and covering such risks as are appropriate in the reasonable judgment of the Board, including insurance policies insuring the Board against liability arising as a result of any action they may take or fail to take in their capacity as Board of the Company;

(f)     Establish, maintain, and cause the Company to make distributions to, an employee benefit plan or bonus plan upon such terms, in such amounts and covering such employees as the Board shall reasonably determine in their sole discretion;

(g)     Supervise the preparation and filing of all Company tax returns;

(h)     Open, maintain and close bank and investment accounts and arrangements, draw checks and other orders for the payment of money, and designate individuals with authority to sign or give instructions with respect to those accounts and arrangements;

(i)     Bring, defend or settle actions at law or equity; and

(j)     Retain and compensate on behalf of the Company such accountants, attorneys, realtors, tax specialists, management companies, consultants or other professionals as the Board shall deem necessary or desirable in the Board' absolute discretion in order to carry out the purposes and business of the Company.

Unless authorized to do so by this Agreement or by the Board, no attorney-in-feet, employee or other agent of the Company shall have any power or authority to bind the Company in any way, to pledge its credit, or to render it liable for any purpose.  No Member shall have any power or authority to bind the Company unless the Member has been authorized by the Board to act as an agent of the Company in accordance with the preceding sentence.  Any Member who takes any action or binds the Company in violation of this Section 5.3 shall be solely responsible for any loss and expense incurred by the Company as a result of the unauthorized action and shall indemnify and hold the Company harmless with respect to such loss or expense.

5.4     <u>Books of Account and Records</u>.  At the expense of the Company, the Board shall maintain (or shall cause to be maintained) proper and complete records and books of account and the operations and expenditures of the Company, in which shall be entered fully and accurately all transactions relating to the Company's business in such detail and completeness as is customary and usual for businesses of the type engaged in by the Company.  The books and records shall at all times be maintained at the principal place of business of the Company or such other place as the Board may designate.  At a minimum, the Company will maintain the following records:

(a)     A current list of the full name and last known address of each Member setting forth the amount of cash each Member has contributed, a description and statement of the agreed value of the other properly or services each Member has contributed or has agreed to contribute in the future, and the date on which each became a Member;

(b)     A copy of the Certificate of Organization of the Company and all amendments thereto, together with executed copies of any powers of attorney pursuant to which any amendment has been executed;

19

(c)    Copies of the Company's federal, state and local income tax returns and reports, if any, for the three (3) most recent years and of any financial statements of the Company for the three (3) most recent years;

(d)    Copies of the Company's currently effective written Operating Agreement and all amendments thereto; and

(e)    Originals or copies of all certificates representing the Units issued to the Members.

Such books of account, together with all correspondence, papers and other documents, shall be, at all reasonable times, open to the examination of any of the Active Founders or their duly authorized representatives. Upon request, the Board, at its sole and exclusive discretion, may allow other Members to review the Company's financial records. Except as otherwise provided herein, all financial books and records of the Company and of each entity which it controls shall be kept, and all financial statements shall be prepared, in accordance with generally accepted accounting principles consistently applied as modified by tax basis accounting or such other basis as the Board may determine.

5.5    Returns and Other Elections. The Board shall cause the preparation and timely filing of all tax returns required to be filed by the Company pursuant to the Code and all other tax returns deemed necessary and required in each jurisdiction in which the Company does business. Copies of such returns, or pertinent information therefrom, will be furnished to the Active Founders within a reasonable time after the end of the Company's Fiscal Year as required by law or upon such Active Founders' written request. All elections permitted to be made by the Company under federal or state laws will be made by the Board in their sole discretion.

5.6    Tax Matters Partner. The Board shall designate a "Tax Matters Partner" (as defined in Code Section 6231) who shall be authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including, without limitation, administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith The Members agree to cooperate with each other and to do, or refrain from doing, any and all things reasonably required to conduct such proceedings. The initial Tax Matters Partner shall be Casey Parzych.

5.7    Liability for Certain Acts. Each Manager shall perform his duties as a Manager in good faith, in a manner he reasonably believes to be in the best interests of the Company, and with such care as an ordinarily prudent person in a like position would use under similar circumstances. No Manager shall be liable to the Company or to any Member for any loss or damage sustained by the Company or any Member, unless the loss or damage shall have been the result of fraud, deceit, gross negligence or willful misconduct by such Manager.

5.8    Conflicts of Interest. The Managers shall devote such time as they, in their discretion, deem necessary to manage the Company's affairs in an efficient manner. Subject to the other express provisions of this Agreement, each Manager, Member, officer and agent of the Company at any time and from time to time may engage in and possess interests in other business ventures of any and every type and description, independently or with others, with no obligation

20

to offer to the Company or any other Member, Manager or agent the right to participate therein. Except as otherwise provided in this Agreement, the Company may transact business with any Manager, Member, agent or Affiliate thereof provided the terms of those transactions are disclosed to the Managers and no Manager has any objection thereto. The foregoing notwithstanding, no Manager, Member, officer or agent may use his/her/its position with the Company, and the information received as a result of said position, in a manner that will harm the business of the Company in any way.

5.9    Regular Meetings. Regular meetings of the Board shall be held at such times and places as shall be designated from time to time by resolution of the Board. Members who are Active Founders shall have the right to attend, observe and, if permitted by the Chairman, ask questions at all regular and special meetings of the Board; provided, that they shall not have any right to vote at such meetings unless they are also Managers.

5.10    Special Meetings. Special meetings of the Board maybe called by or at the request of any Manager. The person or persons authorized to call the special meeting of the Board may fix any place as the place for holding the special meeting of the Board.

5.11    Notice. Notice of any special meeting of the Board shall be given no fewer than ten (10) days and no more than sixty (60) days prior to the date of the meeting. The attendance of a Manager at any meeting shall constitute a waiver of notice of such meeting, except where a Manager attends a meeting for the express purpose of objecting to the transaction of any business because the meeting is not lawfully called or convened. Unless otherwise provided in this Agreement, neither the business to be transacted at, nor the purpose of any regular or special meeting of the Board need be specified in the notice or waiver of notice of such meeting.

5.12    Quorum. A majority of the members of the Board shall constitute a quorum for transaction of business at any meeting of the Board, provided that if less than a majority of such members of the Board are present at said meeting, a majority of the members of the Board present may adjourn the meeting at any time without further notice.

5.13    Manner of Acting. The act of the majority of the Managers at a duly held meeting shall be the act of the Board, unless the act of a greater number is required by this Agreement, the Certificate of Organization, or the Act.

5.14    Vacancies. Any vacancy occurring among the Board, and any Manager position to be filled by reason of an increase in the number of Managers, shall be filled by the Active Founders with notice to the other Members.

5.15    Action Without Meeting. Unless specifically prohibited by the Certificate of Organization, any action required to be taken at a meeting of the Board, or any other action which may be taken at a meeting of the Board, or of any committee thereof may be taken without a meeting if a consent in writing, setting forth the action so taken, shall be signed by not less than a majority of the Managers entitled to vote with respect to the subject matter thereof. Any such consent signed by the Managers or the members of a committee shall have the same effect as a vote, and may be stated as such in any document filed with the Secretary of State or with any other Person.

5.16    Resignation and Removal of Managers.  A Manager may resign at any time upon written notice to the other Managers (or, if none, to the Class A Members), and shall take effect at the time specified therein, or if no time be specified, at the time of its receipt by the other Managers (or the Members, as the case may be).  The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation One or more of the Managers may be removed for any reason or for no reason at all by the action, resolution, or consent of A Majority in Interest as to the remaining Managers.  A Person shall cease to be a Manager upon such Manager's resignation or removal or such Manager's death or Disability.

5.17    Telephonic Meetings.  The Board or any committee of the Board may participate in and act at any meeting of Board through the use of a conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other.  Participation in such meeting shall constitute attendance and presence in person at the meeting of the person or persons so participating.

5.18    Compensation; Expenses.

(a)    A Majority in Interest may authorize a Manager to receive Class F Units.

(b)    Managers shall be entitled to receive compensation, if any, for their services as may be designated from time to time upon an affirmative vote by a Majority in Interest. Except as otherwise provided in this Agreement or as the Members may agree unanimously, no Member shall receive any salary, fee or draw for services rendered to or on behalf of the Company or otherwise in its capacity as a Manager or a Member.

(c)    Managers may be entitled to be reimbursed for reasonable out-of-pocket costs and expenses incurred in the course of rendering the Board's services hereunder upon an affirmative vote of a Majority in Interest.

5.19    Officers.  The Managers may from time to time elect one or more officers of the Company, and such officers shall have such titles, powers, duties and tenure as the Managers shall from time to time determine.  Vacancies may be filled or new offices created and filled by resolution of the Managers.  Any officer or agent elected or appointed by the Managers may be removed by the Managers whenever in their judgment the best interests of the Company would be served; provided, however, such removal shall be without prejudice to the contract rights, if any, of the person so removed.  Further, officers may be entitled to receive compensation, if any, for their services as may be designated from time to time by the unanimous resolution of all of the Managers.  Until such time as their successors are duly elected, the following individuals shall serve in the following roles:

|                   |   |                                      |
|-------------------|---|--------------------------------------|
| Casey Parzych     | - | President and Chief Executive Officer |
| Angus Rittenburg  | - | Secretary and Treasurer              |

5.20    Additional Members.  The Board may cause additional Members to be admitted to the Company upon approval of a Majority in Interest.  Upon the admission of an additional Member, Schedule A to this Agreement will be amended to reflect the addition of such Member. The terms of admission may provide for the creation of different classes or groups of Members, having different rights, powers, and duties, and the issuance of units to such additional Members.

5.21    Exculpation.  No Member as such or any Manager, officer, employee or agent of any Member or the Company shall be able to the Company or any Member for losses or liabilities arising from the conduct of the affairs of the Company or from the conduct of any employee or agent of the Company.

5.22    Indemnification of the Members and Managers.

(a)    Except as limited herein or otherwise provided by the Act, the Company shall indemnify and hold harmless the Members and/or Managers against all damages, losses, fines, costs and expenses (including attorneys' fees and disbursements) resulting from or relating in any way to any claim or demand made or threatened, or any action, proceeding or investigation commenced or threatened, omitted to have been taken (or alleged to have been taken or omitted to have been taken) by such person in connection with the organization, business or other affairs of the Company (including any amounts paid or property transferred, and all costs and expenses, including attorneys' fees and disbursements, incurred in connection with any settlement of any such claim, action, proceeding, or investigation), provided that such indemnification shall be made only if such action or omission of such person was made in good faith and in a manner that such person reasonably believed to be in, and not opposed to, the best interest of the Company, and with respect to any criminal action or proceeding, such person had no reason to believe their conduct was unlawful.

(b)    For the purposes of Section 5.22(a) hereof the determination that the action or omission of any person satisfies Section 5.22(a) or the Act shall be made by a court of competent jurisdiction or other body before which the relevant action, proceeding or investigation is pending. In the absence of a determination by such court or other body, such determination may be made by legal counsel to the Company in a written legal opinion to the Company.

## SECTION 6
## MEETINGS OF MEMBERS

6.1    Meetings.  Meetings of Members may be called by or at the request of (i) any Manager, or (ii) by Members holding not less than thirty percent (30%) of the outstanding Class A Units.  The meeting shall be held at the principal place of business of the Company or as designated in the notice or waiver of notice of the meeting.

6.2    Notice.  Notice of any meeting of the Members shall be given to all Class A Members no fewer than ten (10) days and no more than sixty (60) days prior to the date of the meeting.  Notices shall specify the purpose or purposes for which the meeting is called.  The attendance of a Member at any meeting shall constitute a waiver of notice of such meeting, except where a Member attends a meeting for the express purpose of objecting to the transaction of any business because the meeting is not lawfully called or convened.

6.3     Quorum.  The Class A Members representing a Majority in Interest, present in person or represented by proxy, shall constitute a quorum for transaction of business at any meeting of the Members, provided that if less than a Majority in Interest is present at said meeting, the Members present may adjourn the meeting at any time without further notice.

6.4     Manner of Acting.  All questions or matters that require the vote, consent or approval of the Members shall require the affirmative vote, consent or approval of a Majority in Interest, unless the question or matter is one upon which, by express provision of applicable law or of the Certificate of Organization or this Agreement, a different vote is required in which case such express provision shall govern and control the decision of such question or matter.

6.5     Action Without Meeting.  Unless specifically prohibited by the Certificate of Organization, any action required to be taken at a meeting of the Members or any other action which may be taken at a meeting of the Members, may be taken without a meeting if a consent in writing, setting forth the action so taken, shall be signed by the holder or holders of not less than the minimum Units that would be necessary to take such action at a meeting at which the holders of all Units entitled to vote on the action were present and voted.

6.6     Telephonic Meetings.  The Members may participate in and act at any meeting of Members through the use of a conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other.  Participation in such meeting shall constitute attendance and presence in person at the meeting of the person or persons so participating.

6.7     Proxies.  Each Member entitled to vote at a meeting of Members or to express consent or dissent to action in writing without a meeting may authorize another Person or Persons to act for him by written proxy.  Such proxy shall be delivered to the principal office of the Company not less than 48 hours before a meeting is held or action is taken, but no proxy shall be valid after eleven months from the date of its execution, unless otherwise provided in the proxy. A telegram, telex, cablegram or similar transmission by the Member, or a photographic, photostatic, facsimile or similar reproduction of a writing executed by the Member shall be treated as a written proxy for purposes of this Section A proxy shall be revocable unless the proxy form conspicuously states that the proxy is irrevocable.

6.8     Voting Rights.  Notwithstanding any other provision in this Agreement, each Class A Member, in the capacity as a Class A Member, shall have the number of votes equal to the number of Units held by such Class A Member.

**SECTION 7**
**TRANSFER OF UNITS**

7.1     Restrictions on Transfers.  The Units may be Transferred, as defined below, in whole or in part only in accordance with other specific provisions of this Agreement and the following provisions:

7.1.1   No Member shall Transfer any Units, except to a Permitted Transferee, without the approval of the Board.

24

7.1.2    Any Transfer not in accord with this Section 7.1 shall be void ab initio.

When any Person is admitted as a Member or ceases to be a Member, the Board of Managers shall prepare a revised version of Schedule A and attach it to this Agreement.

7.2    Right of First Refusal.  In the event that a Member (the "Selling Member") desires to transfer to any third person all or a portion of his Units, the Selling Member may do so only subject to the restrictions on transfer contained in Section 7.1 and in full and complete compliance with the procedures set forth in Section 7.1.3 and the procedures set forth below for each instance or transfer.

7.2.1    The Selling Member shall give written notice (the 'Notice") to the Company setting forth, in substance, the following:

(a)    That the Selling Member has received from a third party (the "Offeror") a good faith written offer (the "Offer") to transfer all or a part of his Units (the "Offered Units"); and

(b)    That the Selling Member thereby offers to transfer the Offered Unit to the Company, at a price and upon such terms and conditions as are set forth in the Offer, a true copy of which shall be attached to the Notice.

7.2.2    Within thirty (30) days after receipt of the Notice (the "Company Offering Period"), the Company may, at its option, elect to purchase all or a portion of the Offered Units by giving written notice of its intention to do so to the Selling Member.  Closing of the purchase of the Offered Units shall occur within sixty (60) days after the expiration of the Company Offering Period as set forth in Section 7.3.

7.2.3    In the event that the Company does not elect to purchase all of the Offered Units in accordance with Section 7.2.2, the Selling Member shall provide Notice of such event to the Active Founders.  Each Active Founder shall then have thirty (30) days after such Notice (the "Active Founders Offering Period") to determine whether he shall elect to purchase any of the Offered Units not purchased by the Company, by giving written notice to the Selling Member and to the Company stating the quantity of Units which such Active Founder desires to purchase.  If the total number of Units specified in such Active Founders' notices exceeds the number of Offered Units not purchased by the Company, each Active Founder shall have the right, up to the number of Units specified in his notice, to purchase such portion of the Units on a pro rata basis determined by the number of Units owned by each of them relative to the other Active Founders. The Units not so purchased shall be allocated on a pro rata basis determined by the number of Units owned by each Active Founder relative to the other Active Founders electing to purchase more than their initial pro rata portions up to the number of Units specified in each Active Founder's notice to the Selling Member, or as otherwise agreed among the Active Founders. Closing of the purchase of the Offered Units shall occur within sixty (60) days after the expiration of the Active Founders Offering Period.  Failure of the Active Founder to notify the Selling Member of his acceptance within the relevant Active Founders Offering Period shall be deemed to be his refusal to acquire the Offered Units.

25

7.2.4    If all of the Units offered by the Selling Member are not purchased pursuant to Section 7.2.1., 7.2.2., or 7.2.3, and the Selling Member has complied with the requirements of Section 7.1 and Section 7.2, the Selling Member shall be permitted to Transfer the unpurchased Offered Units to the Offeror upon the terms and conditions as stated in the Offer; provided, however. that such Transfer may not be effected until the Offeror has executed and adopted this Agreement or a counterpart thereof Transfer pursuant to the Offer must be made within sixty (60) days following the expiration of the Active Founders Offering Period and, if the Transfer is not made within such time period, the Offered Units shall again become subject to the restrictions of this Agreement.

7.3    Closing of a Transfer.  At the closing for the Transfer of Units pursuant to Section 7.2.2 and 7.2.3, the Selling Member must transfer and deliver the Units to the buyer and the buyer shall pay the agreed consideration to the Selling Member.  The Selling Member shall also deliver to the buyer an instrument executed by the Selling Member, warranting that the Units are free and clear of all liens, claims, and encumbrances of every kind.  The Selling Member shall also agree therein to indemnify the buyer against and to hold it harmless from any loss, cost or damage which it may incur by reason of the breach of such warranty.  Further, in the event that the Selling Member shall fell to appear at the closing, or shall otherwise fail to comply with his obligations under this Agreement, the buyer may thereupon place the agreed consideration in escrow for the Selling Member, whereupon the Company shall be privileged to cancel the Selling Member's Units and to treat the Units as having been purchased by the buyer.  Such purchase price shall be released from escrow only upon the written acknowledgement and authorization of Selling Member.

7.4    Effective Date of Sale.  Any valid assignment of a Member's Unit and/or Units in the Company, or part thereof pursuant to the provisions of Section 7.2.2. or Section 7.2.3, hereof shall be effective as of the close of business on the last day of the calendar month in which the closing occurred or the conditions to Transfer shall have been satisfied, whichever is later.  The Company shall, from the effective date of such assignment, thereafter pay all further distributions on account of the Units so assigned, to the assignee of such Units.  As between any Member and his assignee, Profits and Losses for the fiscal year of the Company in which such assignment occurs shall be apportioned for federal income tax purposes in accordance with any convention permitted under §706(d) of the Code and selected by the Members.  Any dispute regarding apportionment shall be resolved by the Board.

7.5    Drag-Along Rights.  Notwithstanding anything to the contrary in this Agreement, if a Member or Members who hold a collective majority of the voting power of the issued and outstanding Units held by all Members (collectively, the 'Initiating Members") should desire to sell all of the Units owned by them to a third party (a "Drag-Along Sale"), the Initiating Members may require the other Members, including those Members who did not vote their shares in favor of the Drag-Along Sale, if any (collectively, the "Drag-Along Sellers"), to participate in the Drag-Along Sale on the same price, terms and conditions; provided, that prior to such sale such Initiating Members have complied with Sections 7.1 and 7.2, and is free of the restrictions set forth in this Agreement with respect to the sale and provided, further, that the Active Founders have approved of such Drag-Along Sale in writing.  Without limiting the generality of the foregoing, at the request of the Initiating Members, the Drag-Along Sellers agree to vote any shares of Units held by them in favor of such Drag-Along Sale.  If the Initiating Members elect to require a Drag-Along Sale, the Initiating Members will provide written notice (a "Drag-Along Notice") of such Drag-Along

26

Sale to each of the Drag-Along Sellers. The Drag-Along Notice will identify the purchaser; the number of Units subject to the Drag-Along Sale (the 'Number of Units"); the consideration for each Percentage for which a sale is proposed to be made (the "Drag-Along Sale Price"); a representative of the Initiating Members to whom certificates may be delivered (the 'Designated Representative"); and all other material terms and conditions of the Drag-Along Sale. Each Drag-Along Seller will be required to tender all such Units owned by them in the manner described below. At least ten (10) days before the date proposed for consummation of the Drag-Along Sale, each Drag-Along Seller will deliver to the Designated Representative certificates representing the Units he or she holds, duly endorsed, together with all other documents reasonably required to be executed in connection with the Drag-Along Sale. If the Drag-Along Seller fails to deliver his or her certificates to the Designated Representative, the Company will cause its books and records to show those shares are bound by the provisions of this <u>Section 7.5</u> and that such Units will be transferred to the third party immediately upon surrender of the Units. The sale of all the Units subject to the Drag-Along Sale must be completed within ninety (90) days after the Initiating Members give the Drag-Along Notice. If not, the representative of the Initiating Members will return to the Drag-Along Sellers all certificates representing the Units that the Drag-Along Sellers delivered for sale pursuant to this Agreement, and all the restrictions on sale or other disposition contained in this Agreement with respect to the Units owned by the Drag-Along Sellers will again be in effect. Promptly after the consummation of the sale of Units in the Drag-Along Sale, the Designated Representative will notify all other sellers, will remit to each Drag-Along Seller who has surrendered his or her certificates the total consideration for his or her Units sold, and will furnish other evidence of the completion time and terms of the sale or other disposition as may be reasonably requested by the other sellers.

7.6    <u>Transfers to Permitted Transferees</u>. Subject to the restrictions on transfer contained in <u>Section 7.1</u>, any Member may, at any time and from time to time, upon satisfaction of the conditions set forth in this <u>Section 7.6</u>, Transfer to a Permitted Transferee, all, or any portion of, or any interest or rights in, the Units owned by the Member. Any such assignee shall not become a Member without having first executed an instrument reasonably satisfactory to the other Members accepting and agreeing to the terms and conditions of this Agreement, including a counterpart of this Agreement, and without having paid to the Company a fee sufficient to cover all reasonable expenses of the Company in connection with such assignee's admission as a Member. If a Member assigns all of his Units to a Permitted Transferee, and the assignee of such Units is entitled to become a Member pursuant to this <u>Section 7.6</u>, such assignee shall be admitted to the Company effective immediately prior to the effective date of the assignment, and, immediately following such admission, the assigning Member shall cease to be a Member of the Company. In such event, the Company shall not dissolve if the business of the Company is continued without dissolution in accordance with <u>Section 8.3</u> hereof.

7.7    <u>Voluntary Withdrawal</u>. No Member shall have the right or power to withdraw from the Company as a Member, other than through Involuntary Withdrawal

7.8    <u>Involuntary Withdrawal</u>. Immediately upon the occurrence of an Involuntary Withdrawal, the successor of the withdrawn Member, if any, shall thereupon become a Unit Holder but shall not become a Member without the approval of the Board. If the Company is continued as provided in Section 8.3, the successor Unit Holder, if any, shall have all of the rights of the same type and class of a Unit Holder as the withdrawn Member.

7.9    Divorce.  In the event of a Member's Divorce, the Company shall have the option, but not the obligation, to repurchase the Units awarded to the Member's spouse, if any, at Fair Market Value determined as of the date of the Divorce.  The Fair Market Value may be paid, at the discretion of the Company either (i) in cash, or (ii) issuance by the Company of a promissory note with repayment terms which are commercially reasonable given the financial condition of the Company at time of issuance after taking into account its revenue and its bona fide expenses (including any obligations currently in place obligating payments to the spouse of any other Member) it being the goal of this provision to provide for repayment terms which do not unreasonably burden the Company If the Company chooses not to repurchase the Units awarded to the Member's spouse, such Units will be owned of record by the Member's spouse with all rights, limitations, privileges and obligations as set forth in this Agreement; provided, however, that such Units will not have any right to vote on any matter submitted to a vote of the Members.

## SECTION 8
## DISSOLUTION, LIQUIDATION, CONSOLIDATION, MERGER AND SALE OF ASSETS

8.1    Events of Dissolution.  The Company shall be dissolved and its affairs wound up:

(a)    upon the unanimous written agreement of the Class A Members; or

(b)    upon the entry of a decree of judicial dissolution under the Act; or

(c)    upon the sale or other disposition of all or substantially all of the assets of the Company.

8.2    Procedure for Winding Up and Dissolution.  In the event that the Company shall be dissolved, the Company shall be wound up and liquidated in accordance with the law and the following provisions:

(a)    The Board shall have authority to wind up the Company affairs and to supervise its liquidation.

(b)    Upon dissolution, the Board shall ensure that an accounting of all property, assets and liabilities of the Company shall be taken as soon as practicable.

(c)    Each Member shall pay to the Company all amounts owing to the Company pursuant to any note which may have been executed by the Member in favor of the Company, together with any other sums required by law to be paid.

(d)    The assets and property of the Company or the proceeds of any sale thereof together with contributions received pursuant to the preceding paragraph shall be applied in the following order:

(i)    To discharge the debts and liabilities of the Company, other than to the Members, and the expenses of liquidation and to establish satisfactory reserves to meet all reasonably anticipated liabilities; and

28

(ii)     To pay to each Member amounts accrued and owing to it for loans or other extensions of credit to the Company or upon contracts with the Company or upon open account; and

(iii)     After all allocations have been made pursuant to Section 4.1 hereof (it being the intent not to restore negative capital accounts), to distribute the balance in accordance with each Member's Capital Account.

Upon the final distribution of assets to the Members, each of the Members shall be furnished with a statement which sets forth the assets and liabilities of the Company as of the date of the complete liquidation. Upon compliance with the foregoing distribution plan, the Board shall execute and cause to be filed a certificate of cancellation of the Company and any and all other documents necessary with respect to termination and cancellation.

Notwithstanding anything to the contrary, in the event the Company is "liquidated" within the meaning of Treas. Reg. § 1.704-1(b)(2)(ii)(g), liquidating distributions shall be made pursuant to this Section 8.2 by the end of the taxable year in which the Company is liquidated, or, if later, within 90 days after the date of such liquidation. Distributions pursuant to the preceding sentence may be made to a trust for the purpose of an orderly liquidation of the Company by the trust in accordance with the Act.

8.3     Continuation of Business.  Except as provided in Section 8.1, and to the fullest extent permitted by law, the Company shall not be dissolved and its affairs shall not be wound up upon the occurrence of an event that causes a Member to cease to be a Member of the Company, and upon the occurrence of such an event, the business of the Company shall be continued without dissolution.

## SECTION 9
## GENERAL PROVISIONS

9.1     Assurances.  Each Member shall execute all such certificates and other documents and shall do all such filing, recording, publishing and other acts as appropriate to comply with the requirements of law for the formation and operation of the Company and to comply with any laws, rules and regulations relating to the acquisition, operation or holding of the properly of the Company.

9.2     Notifications.  Any notice, demand, consent, election, offer, approval, request or other communication (collectively a "notice") required or permitted under this Agreement must be in writing and either delivered personally or sent by certified or registered mail, postage prepaid, return receipt requested. Any notice to be given hereunder by the Company may be given by the Board. A notice must be addressed to a Member at the Member's last known address on the records of the Company. A notice to the Company must be addressed to the Company's principal office. A notice delivered personally or by facsimile will be deemed given when delivered with confirmation of delivery in case of facsimile. A notice that is sent by mail will be deemed given three (3) business days after it is mailed. Any party may designate, by notice to all of the others, substitute addresses or addressees for notices; and, thereafter, notices are to be directed to those substitute addresses or addressees.

29

9.3     Specific Performance. The parties recognize that irreparable injury will result from a breach of any provision of this Agreement, and money damages will be inadequate to fully remedy the injury. Accordingly, in the event of a breach or threatened breach of one or more of the provisions of this Agreement, any party who may be injured (in addition to any other remedies which may be available to that party) shall be entitled to one or more preliminary or permanent orders (i) restraining and enjoining any act which would constitute a breach or (ii) compelling the performance of any obligation which, if not performed, would constitute a breach.

9.4     Complete Agreement. This Agreement constitutes the complete and exclusive statement of the agreement among the Members. It supersedes all prior written and oral statements, including any prior representation, statement, condition or warranty.

9.5     Applicable Law. All questions concerning the construction, validity and interpretation of this Agreement and the performance of the obligations imposed by this Agreement shall be governed by the internal law, not the law of conflicts, of the Commonwealth of Pennsylvania, all rights and remedies being governed by said law.

9.6     Section Titles. The headings herein are inserted only as a matter of convenience only, and do not define, limit or describe the scope of this Agreement or the intent of the provisions hereof.

9.7     Binding Provisions. This Agreement is binding upon, and inures to the benefit of the parties hereto and their respective heirs, executors, administrators, personal and legal representatives, successors and permitted assigns.

9.8     Terms. Common nouns and pronouns shall be deemed to refer to the masculine, feminine, neuter, singular and plural, as the identity of the Person may in the context require.

9.9     Separability of Provisions. Each provision of this Agreement shall be considered separable; and if for any reason, any provision or provisions herein are determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or affect those portions of this Agreement which are valid.

9.10    Counterparts. This Agreement may be executed simultaneously in two or more counterparts each of which shall be deemed an original, and all of which, when taken together, constitute one and the same document. The signature of any party to any counterpart shall be deemed a signature to, and may be appended to, any other counterpart.

9.11    Estoppel Certificate. Each Member shall, within ten (10) days after written request by the Board, deliver to the Board a certificate stating, to the Member's knowledge; (a) that this Agreement is in full force and effect; (b) that this Agreement has not been modified except by any instrument or instruments identified in the certificate; and (c) there is no default hereunder by the requesting Person, or if there is a default, the nature and extent thereof.

9.12    Indemnity. Each Member (the "**Indemnitor**") agrees to indemnify and hold harmless the Company, the Managers, the other Members and their Affiliates from and against; (a) any and all liabilities, losses, damages, costs and expenses (including reasonable attorneys' fees and expenses), suits, claims or judgments (collectively, "**Liabilities**") arising out of any act or

30

omission of the Indemnitor with respect to the Company property or any breach by the Indemnitor of any representation, warranty, covenant or agreement contained herein and (b) any and all Liabilities not generally indemnified against in clause (a) of this Section 9.12 relating to the Company property or any lease, mortgage, assignment or other document entered into with respect thereto imposed upon any Member and their Affiliates in excess of any amount equal to such Member's Percentage of such Liabilities; provided, however, that the indemnity obligations of the Member pursuant to this Section 9.12 shall be null, void and unenforceable if its enforcement would cause Member to be adjudged bankrupt or insolvent or would cause there to be entered against the Member an order for relief in any bankruptcy or insolvency proceeding.

9.13   Effective Date of Agreement.   This Agreement shall be effective as of the date hereof.

9.14   Conflict.   In the event of any inconsistencies or conflict between the terms of this Agreement and the terms of the Certificate of Organization of the Company, the terms of the Certificate of Organization shall govern and control.

9.15   Confidentiality.   A Member, Manager, officer and/or member of the Advisory Council (each an "Informed Party", collectively, the "Informed Parties") will obtain information regarding the Company and its business (collectively, including information obtained by the Informed Parties from the Company or its Affiliates in connection with their consideration of becoming an Informed Party, the "Information"). The Informed Parties acknowledge that all such Information is proprietary, confidential and/or trade secret data, which properly belongs to the Company. During the term of the Company and at all times after termination of the Company, unless authorized in writing by the Board, the Informed Parties will not: (i) use the Information for their benefit or advantage; or (ii) use the Information for the benefit of any third party; or (in) disclose or cause to be disclosed the Information or authorize or permit such disclosure of the Information to any third party. The Informed Parties will not be liable for the disclosure of Information which: (i) was known lawfully prior to the date of execution of this Agreement (other than Information obtained from the Company or its Affiliates in connection with their consideration of becoming an Informed Party); (ii) is in the public domain generally and as such becomes known to the Informed Party through no wrongful act or breach of this Agreement; (iii) is received rightfully by the Informed Party from a third party having a lawful right to possess and to release the Information possessed by the third party and within the meaning of Information under this Agreement; or (iv) is subject to applicable laws requiring the Informed Parties to disclose any part of the Information. The Informed Party will surrender to the Company at any time upon request, and upon termination of the Company or the withdrawal of the Informed Party for any reason, all written or otherwise tangible documentation representing or embodying the Information, in whatever form, whether or not copyrighted, patented or protected as a mask work, and any copies or imitations of the Information.

9.16   Grant of Power of Attorney.   Each Member hereby irrevocably constitutes and appoints the Board or its designee as such Member's true and lawful attorney and agent, in such Member's name, place and stead and for his use and benefit, to make, execute, acknowledge, deliver, swear to, file and record in all necessary or appropriate places such documents as maybe necessary or appropriate to carry out this Agreement, including but not limited to:

31

(a)     any certificates or other instruments or amendments thereof that the Company may be required to file under the Act or any other laws of the Commonwealth of Pennsylvania or pursuant to the requirements of any governmental authority having jurisdiction over the Company or which the Board shall deem it advisable to hie, including, without limitation, this Agreement, any amended Agreement and a certificate of termination as applicable;

(b)     any certificates or other instruments (including counterparts of this Agreement with such changes as may be required by the law of other jurisdictions) and all amendments thereto that the Board deems appropriate or necessary to qualify, or continue the qualification of; the Company as a limited Company and to preserve the status of the Company in the jurisdictions in which the Company may conduct business;

(c)     any certificates or other instruments which may be required in order to effectuate any change in the membership of the Company or to effectuate the dissolution and termination of the Company pursuant to <u>Section 7</u>; and

(d)     any amendments to any certificate or to this Agreement necessary to reflect any other changes made pursuant to the exercise of the powers of attorney contained in this Section or pursuant to this Agreement.

The powers of attorney granted hereunder shall be deemed irrevocable and to be coupled with an interest, and shall survive the bankruptcy, death, adjudication of incompetence or insanity, or dissolution of any of the Members and the Transfer of any Units held by such Member.

9.17    <u>Assignment</u>.

(a)     The term "Work Product" means all patents and patent applications, all inventions, innovations, improvements, packaging improvements, alcohol/spirit/liqueur formulations, packaging inventions and/or improvements, packaging developments, technologies, similar technologies, developments, methods, designs, analyses, drawings, reports, creative works, discoveries, software, computer programs, modifications, enhancements, know-how, product, formula or formulations, marketing and sales information, concepts and ideas, and all similar or related information (in each case whether or not patentable), all copyrights and copyrightable works, all trade secrets, Information, and all other intellectual property and intellectual property rights that (in any case above) are conceived, reduced to practice, created, developed or made by a Member either alone or with others, in the course of providing the services to the Company.

(b)     Each Member hereby agrees that (and hereby assigns) all Work Product will be the exclusive property of the Company, and in consideration of this Agreement, without further compensation, hereby assigns, and (as necessary) agrees to assign, to the Company all right, title, and interest to all Work Product that: (j) relates to any and all current and future aspects of the Company's Business (defined as the selling, making, marketing, distributing or otherwise engaging in the liqueur, spirits, carbonated beverage, seltzer, general beverage, or alcoholic beverage business) or (ii) is conceived, created, reduced to practice, developed, or made entirety or in any part: (a) during the time any Member performs (or performed) services for the Company; or (b) using any equipment, supplies, facilities, assets, materials, information (including,

32

without limitation, Information) or resources of the Company (including, without limitation, any intellectual property rights of the Company);

    (c) If for any reason the foregoing assignment is determined to be unenforceable, each Member grants to the Company a perpetual, irrevocable, worldwide, royalty-free, exclusive, sub-licensable right and license to exploit and exercise all such Work Product; and

    (d) Each Member shall promptly disclose Work Product to the CEO of the Company and perform all actions reasonably requested by the Company (whether during or after the service with the Company) to establish and confirm the ownership and proprietary interest of the Company in any Work Product (including, without limitation, the execution of assignments, consents, powers of attorney, applications and other instruments). Each Member agrees to assist the Company in obtaining any patent for, copyright on or other intellectual-property protection for the Work Product, and to execute and deliver or otherwise provide such documentation and provide such other assistance as is necessary to or reasonably requested by the Company or its agents or counsel to obtain such patent, copyright, or other protection. Each Member shall maintain adequate written records of the Work Product, in such format as may be specified by the Company, and make such records available to, as the sole property of the Company at all times. Each Member shall not file any patent or copyright applications related to any Work Product except with the written consent of the Company's CEO.

**[THE REMAINDER OF THIS PAGE INTENTIONALLY MADE BLANK]**

158397.00101/125544886v.1

IN WITNESS WHEREOF, the parties have executed, or caused this Agreement to be executed, under seal, as of the date set forth hereinabove.

**COMPANY**:

MIDNIGHT MADNESS DISTILLING, LLC

By:_____
Casey Parzych, President & CEO

**MEMBERS**:

MAJORITY IN INTEREST OF CLASS A MEMBERS:

_____
Casey Parzych

_____
Angus Rittenburg

34

## SCHEDULE A
## MEMBERS

### CLASS A MEMBERS

| Name, Address | Initial Capital Contribution | Class A Units | Total Percentage Interest in Company |
|---|---|---|---|
| Casey Parzych<br>P.O. Box 576<br>Trumbauersville, PA 18970 | $4,709.72 | 4,550 | 47.1845% |
| Anthony Lorubbio<br>P.O. Box 116<br>Quakertown, PA | $8,143.83 | 3,798 | 39.3861% |
| Angus Rittenburg<br>P.O. Box 171<br>Trumbauersville PA 18970 | $0 | 330 | 3.4222% |

### CLASS B MEMBERS

| Name, Address | Initial Capital Contribution | Class B Units | Total Percentage Interest in Company |
|---|---|---|---|
| Andrew Schlosser 325 Highland Ave Souderton, PA 18964 | $40,000 | 109 | 1.1304.% |
| Daniel Owen Parker<br>437 W 44th St. Apt FR4<br>New York NY 10036 | $75,000 | 127 | 1.3170% |
| David Schwartz 11317 Southwestern Ave Suite 100B Oklahoma City, OK 73170 | $15,000 | 42 | 0.4355% |
| Tom Frost<br>144 West Manilla Ave Pittsburgh PA 15220 | $15,000 | 42 | 0.4355% |

| John Greer 383 Cobblestone Circle McKees Rocks, PA 15136 | $7,500 | 20 | 0.2074% |
| Vince Silvaggio 31 Club Road Rosslyn Farms PA 15106 | $10,000 | 27 | 0.2800% |
| Joe Silvaggio 7067 Bennington Woods Dr Pittsburgh PA 15237 | $10,000 | 27 | 0.2800% |
| Steve & Gina Super 1135 Greenlawn Dr Pittsburgh PA 15220 | $20,000 | 53 | 0.5496% |

## CLASS C MEMBERS

| Name, Address | Initial Capital Contribution | Class C Units | Total Percentage Interest in Company |
| --- | --- | --- | --- |
| Carl Lorubbio 7670 Brixton Crest Canfield OH 44406 | $20,000 | 56 | 0.5807% |
| Marie Lorubbio 375 Edison St Struthers OH 44471 | $5,000 | 15 | 0.1556% |
| Carmen Lorubbio 204 Como St Struthers OH 44471 | $3,000 | 9 | 0.0933% |
| Bruce and Dianne Howell 511 McEntee Dr Wadsworth OH 44281 | $1,000 | 3 | 0.0311% |
| Tom and Tracy Penrose P.O. Box 515 Westfield Center OH 44251 | $3,000 | 8 | 0.0830% |

36

| Roberta Richards<br>963 Devonwood Dr<br>Wadsworth OH 44281 | $1,000 | 3 | 0.0311% |
| Angus Rittenburg<br>P.O. Box 171<br>Trumbauersville PA 18970 | $3,000 | 8 | 0.0830 |
| Stephen Browning<br>1538 Bonnett Dr<br>Pittsburgh PA 15237 | $5,000 | 14 | 0.1452% |
| Daniel and Julie Heckmann<br>2014 Highpoint Ct<br>Murrysville PA 15668 | $25,000 | 71 | 0.7363% |
| Stephen and Joyce Heckmann<br>10595 LANDAU DRIVE<br>WEXFORD, PA 15090 | $12,000 | 35 | 0.3630% |

*Class D formerly reserved for "collegiate" investors.*

### CLASS E MEMBERS

| Name, Address | Initial Capital Contribution | Class E Units | Total Percentage Interest in Company |
|---|---|---|---|
|  |  |  |  |

### CLASS F MEMBERS

| Name, Address | Initial Capital Contribution | Class F Units | Total Percentage Interest in Company |
|---|---|---|---|
|  |  |  |  |

158397.00101/125544886v.1

## CLASS G MEMBERS

| Name, Address | Initial Capital Contribution | Class G Units | Total Percentage Interest in Company |
|---|---|---|---|
| R.F. Culbertson 17 Churchill Road Pittsburgh, PA 15235 | $0.00 | 100 | 1.0370% |
| Kenneth Justin Brown 1742 Old Bethlehem Rd. Quakertown Pa. 18951 | $0.00 | 50 | 0.5185% |
| Shawn Brown 3376 Bingen Rd. Bethlehem Pa. 18015 | $0.00 | 50 | 0.5185% |

## CLASS H MEMBERS

| Name, Address | Initial Capital Contribution | Class H Units | Total Percentage Interest in Company |
|---|---|---|---|
| Doug Heckmann 295 S Hudson Ave Unit 12 Pasadena CA 91101 | $5,314.83 | 96 | 0.9955% |

| Members | Percentage Interests |
|---|---|
| Class A Members | 89.9927% |
| Class B Members | 4.6355% |
| Class C Members | 2.3022% |
| *Class D Members* | *N/A* |
| Class E Members | 0% |
| Class F Members | 0% |
| Class G Members | 2.0740% |
| Class H Members | 0.9955% |

158397.00101/125544886v.1