**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In re:<br>**MIDNIGHT MADNESS DISTILLING LLC,**<br><br>Debtor. | **CHAPTER 7**<br>**Case No. 21-11750-PMM** |
| **BONNIE B. FINKEL, in her capacity as Chapter 7 Trustee for Midnight Madness Distilling LLC,**<br><br>**Plaintiff,**<br>v.<br><br>**CASEY PARZYCH, et al.,**<br><br>**Defendants.** | **Adv. No. 23-00047-PMM**<br>Re: Adv. Docket No. 50 |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION**
**TO MOVING DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT**

**COREN & RESS, P.C.**
STEVEN M. COREN
JANICE D. FELIX
ANDREW J. BELLI
Two Commerce Square, Suite 3900
2001 Market Street
Philadelphia, PA 19103
Tel: (215) 735-8700
Fax: (215) 735-5170

*Counsel for Plaintiff*
*Bonnie Finkel, Chapter 7 Trustee*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................ iv

I.    INTRODUCTION ...............................................................................................1

II.   FACTUAL ALLEGATIONS ..............................................................................3

    A.    The Debtor's Formation and Operations ..................................................3

    B.    The Insider Defendants Form Good Design, Polebridge, and the Wynk Entities
       To Funnel Money Out of the Debtor in Collusion with Defendant Sheehan .........3

        1.    The Polebridge Entities.............................................................4

            a.    CBDelight Seltzer ...............................................5

            b.    Faber Hand Sanitizer.............................................7

        2.    Wynk Seltzer...........................................................................11

    C.    Defendants Conspire to Utilize the Bankruptcy Process to Defraud the Debtor's
       Creditors....................................................................................................14

        1.    The Debtor Diverts Assets to the Best Bev Entities Pre-Bankruptcy........16

        2.    Defendants Interfere with the Debtor's Section 363 Sale...........................18

        3.    The Section 363 Sale Did Not Include the Trustee's Claims ...................24

        4.    Defendants Operated the Debtor in Possession As An Extension of the
            Pilfering Entities, And Continued to Do So After the Section
            363 Sale............................................................................................27

    D.    The Insider Defendants' Utter Failure To Maintain Internal Controls.................32

    E.    The Chapter 7 Case ...................................................................................33

    F.    The Adversary Proceeding.........................................................................35

III.  MOTION TO DISMISS STANDARD..............................................................37

IV.   ARGUMENT ....................................................................................................38

    A.    The Trustee Has Standing To Pursue Her Claims, Which Were Not Among the
       Debtor's Business Assets Transferred to Millstone...............................38

        1.    The Plain Language of the APA Establishes That the Trustee's
            Causes of Action Were Not Among The Business Assets Transferred

i

|  |  | to Millstone ...............................................................................38 |

| | 2. | The Parties' Representations to this Court in Support of the Debtor's Sale of Business Assets Establish That the Trustee's Causes of Action Were Not Transferred to Millstone ...............................................44 |
| | 3. | The Parties' Course of Performance Establishes That The Trustee's Claims Were Not Transferred to Millstone .................................46 |
| | 4. | Moving Defendants AgTech VI, LLC and ETOH Worldwide, LLC Were Not "Holders" of Assumed Liabilities ...............................49 |
| | 5. | Moving Defendants' Argument Is Inapplicable to Count 8 .....................51 |
| | 6. | Even If This Court Accepts Moving Defendants' Standing Argument, Millstone Has Executed A Conditional Assignment of Claims Back to the Trustee.............................................................................52 |

| B. | | Moving Defendants' Remaining Arguments, the Majority of Which Have Already Been Considered and Rejected by this Court, Are Without Merit..........53 |
| | 1. | The Bulk of Moving Defendants' Arguments Have Already Been Rejected by this Court, And the Law of the Case Doctrine Denies Them A Second Bite at the Apple ...............................................53 |
| | 2. | As this Court Has Already Held, the Allegations of the Amended Complaint Are Sufficiently Specific As to Each Defendant, And The Term "Pilfering Entities" Is Clearly Defined...............................54 |
| | 3. | As This Court Has Already Held, the Amended Complaint Establishes That Defendant Baldwin, As An Agent of the Debtor, Owed Fiduciary Duties to the Debtor ...................................................................57 |
| | 4. | As this Court Has Already Held, The Trustee States A Claim For Aiding and Abetting Breach of Fiduciary Duty........................................60 |
| | 5. | As this Court Has Already Held, The Trustee Establishes A Plausible Entitlement to Veil Piercing and Alter Ego Liability, and the Amended Complaint States Claims for Veil Piercing, Alter Ego Liability, and Successor Liability...................................................................70 |
| | | a. | Legal Standards...............................................................70 |
| | | b. | The Amended Complaint States Plausible Claims For Relief Under All Of The Foregoing Doctrines .........................73 |
| | | c. | It Is Well Established That A Trustee Can Bring Veil Piercing Claims ...............................................................78 |

6.    As this Court Has Already Held, The Trustee States A Claim For
      Unjust Enrichment .................................................................................. 79

7.    The Amended Complaint States A Claim For Equitable
      Subordination ........................................................................................... 81

8.    The Amended Complaint States a Claim for Turnover ........................... 83

V.    CONCLUSION ................................................................................................. 84

## **TABLE OF AUTHORITIES**

**Cases**

*ACLU v. Mukasey*, 534 F.3d 181 (3d Cir. 2008) .......................................................... 53

*Act II Jewelry, LLC v. Wooten*, 301 F. Supp. 3d 905 (N.D. Ill. 2018)......................... 59

*Alturnamats, Inc. v. Harry*, 2008 WL 4279814 (W.D. Pa. Sept. 16, 2008) 2009 WL 185952
(W.D. Pa. Jan. 23, 2009) .................................................................................... 57

*AmQuip Crane Rental, LLC v. Crane & Rig Servs., LLC*, 199 A.3d 904 (Pa. Super. 2018) ....... 58

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ....................................................................... 37

*Atl. Richfield Co. v. Razumic*, 390 A.2d 736 (Pa. 1978)......................................... 43, 46

*B.D.W. Associates v. Busy Beaver Bldg. Ctrs.*, 865 F.2d 65 (3d Cir. 1989)................................. 84

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .................................................. 37, 54

*Bowers v. City of Philadelphia*, 2008 WL 5234357 (E.D. Pa. Dec. 12, 2008)........................... 53

*Burris v. Main Line Health Sys.*, 2017 WL 2506446 (E.D. Pa. June 9, 2017) ............................ 66

*Castle Cheese, Inc. v. MS Produce, Inc.*, 2008 WL 4372856 (W.D. Pa. Sept. 19, 2008) ........... 57

*ChemLogix LLC v. Bulk Tainer Logistics N. Am., Inc.,* 2023 WL 5751404
(E.D. Pa. Sept. 6, 2023) .................................................................................. 37

*Dep't of Transp. v. Manor Mines, Inc.*, 565 A.2d 428 (Pa. 1989).......................................... 43

*E. Mins. & Chemicals Co. v. Mahan*, 225 F.3d 330 (3d Cir. 2000) ............................................. 72

*Fizzano Bros. Concrete Prod. v. XLN, Inc.*, 42 A.3d 951 (Pa. 2012)..................................... 73, 78

*Fletcher-Harlee Corp. v. Szymanski*, 936 A.2d 87 (Pa. Super. 2007) ......................................... 74

*Gen. Refractories Co. v. First State Ins. Co.*, 94 F. Supp. 3d 649 (E.D. Pa. 2015)..................... 46

*Hamilton v. Leavy*, 322 F.3d 776 (3d Cir. 2003) ........................................................ 53

*Harrison v. Harrison*, 2021 WL 3022416 (E.D. Pa. July 15, 2021)........................................... 61

*Hartig Drug Co. Inc. v. Senju Pharm. Co.*, 836 F.3d 261 (3d Cir. 2016) .................................... 37

*Hawk Mt. LLC v. Mirra*, 2016 WL 4541032 (D. Del. Aug. 31, 2016)........................................ 55

*Hill v. Akamai Tech, Inc.*, 477 F.3d 1131 (10th Cir. 2007) ............................................... 43

*In re Am. Metrocomm Corp.*, 274 B.R. 641 (Bankr. D. Del. 2002).............................................. 83

*In re Carbone*, 615 B.R. 76 (Bankr. E.D. Pa. 2020).................................................. 53

*In re Charles Edwards Enterprises, Inc.*, 344 B.R. 788 (Bankr. N.D.W. Va. 2006) .................. 79

*In re Emoral, Inc.*, 740 F.3d 875 (3d Cir. 2014)........................................................ 79

*In re FAH Liquidating Corp.*, 572 B.R. 117 (Bankr. D. Del. 2017)........................................... 80

*In re Genesis Health Ventures, Inc.*, 355 B.R. 438 (Bankr. D. Del. Dec. 13, 2006) ................... 55

*In re Jamuna Real Est. LLC*, 365 B.R. 540 (Bankr. E.D. Pa. 2007)................................ 78

*In re Joey's Steakhouse, LLC*, 474 B.R. 167 (Bankr. E.D. Pa. 2012) .......................... 84

*In re Our Alchemy, LLC*, 2019 WL 4447541 (Bankr. D. Del. Sept. 16, 2019) ..................... 66, 81

*In re Silicon Electro-Physics, Inc.*, 116 B.R. 44 (Bankr. W.D. Pa. 1990)..................... 42

*In re Student Fin. Corp.*, 335 B.R. 539 (D. Del. 2005) ......................................... 38

*In re Twp. of Blythe*, 2020 WL 710003 (Pa. Cmwlth. Feb. 12, 2020)........................... 48

*Infantino v. W. Wyoming Borough*, 2013 WL 3972770 (M.D. Pa. July 31, 2013)............... *passim*

*Koken v. Steinberg*, 825 A.2d 723 (Pa. Cmwlth. 2003)........................................ 61

*Linens of Europe, Inc. v. Best Mfg., Inc.*, 2004 WL 2071689 (S.D.N.Y. Sept. 16, 2004)........... 42

*Lorubbio v. Parzych, et al.*, Bucks Cty. CCP No. 2021-01816 ..................................... 47

*M.B. v. Schuylkill Cty.*, 375 F.Supp.3d 574 (E.D. Pa. 2019) ................................ 56

*Marion v. Bryn Mawr Trust Co.*, 288 A.3d 76 (Pa. 2023)....................................... 66

*Milo, LLC v. Procaccino*, 2020 WL 1853499 (E.D. Pa. Apr. 13, 2020) ......................... 56

*Mitchell v. Moore*, 729 A.2d 1200 (Pa. Super. 1999) ......................................... 80

*Mortimer v. McCool*, 255 A.3d 261 (Pa. 2021) ............................................... 71

*Neopart Transit, LLC v. CBM N.A. Inc.*, 314 F. Supp. 3d 628 (E.D. Pa. 2018)................. 59

*New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*,
    514 U.S. 645 (1995)................................................................. 42

*Occidental Chem. Corp. v. 21st Century Fox Am., Inc.*, 2022 WL 6737217
    (D.N.J. Oct. 11, 2022)............................................................. 79

*Official Comm. of Unsecured Creditors of Allegheny Health Educ. & Research Found. v.
    PriceWaterhouseCoopers, LLP*, 989 A.2d 313 (Pa. 2010)................................ 61

*Partners Coffee Co., LLC v. Oceana Servs. & Prod. Co.*, 700 F. Supp. 2d 720
    (W.D. Pa. 2010) ................................................................... 71

*Patient Acct. Serv. Ctr., LLC v. Ebling*, 2022 WL 4073341 (M.D. Pa. Sept. 2, 2022) ............... 58

*Philadelphia Electric Co. v. Hercules, Inc.*, 762 F.2d 303 (3d Cir. 1985) ................. 73

*Phillips v. Cty. of Allegheny*, 515 F.3d 224 (3d Cir. 2008)...................................... 3, 85

*Power Restoration Int'l, Inc. v. PepsiCo, Inc.*, 2014 WL 1725041 (E.D. Pa. Apr. 30, 2014)...... 66

*Reivia Ashley, LLC v. Paselo Logistics, LLC*, 2017 WL 6001640 (E.D. Pa. Dec. 1, 2017)......... 71

*Rodwell v. City of Newark*, 2023 WL 5703176 (D.N.J. Sept. 5, 2023) ....................... 56

*Rosenberry v. Evans*, 48 A.3d 1255 (Pa. Super. 2012)........................................ 67

*See M. Barry Schultz & Co. v. APM Horsham, Inc.*, 835 F. Supp. 820 (E.D. Pa. 1993)............. 43

*Seven Springs Mountain Resort, Inc. on behalf of Sikirica v. Hess*, No. 2022 WL 1004178
    (W.D. Pa. Apr. 4, 2022) .................................................... *passim*

*Smith v. A.O. Smith Corp.*, 270 A.3d 1185 (Pa. Super. 2022) ....................................... 78

*Tl Administration Corp. v. Ideasphere, Inc.*, 337 B.R. 827 (Bankr. S.D.N.Y. 2006)................... 41

*Today's Child Learning Ctr. Inc. v. United States*, 40 F. Supp. 2d 268 (E.D. Pa. 1998) ............. 73

*UD Dissolution Liquidating Trust v. Sphere 3D Corp. (In re UD Dissolution Corp.)*
    629 B.R. 11 (Bankr. D. Del. 2021) ......................................................................... 55

*Winner v. Etkin & Co.*, 2007 WL 2616084 (W.D. Pa. Sept. 6, 2007) ........................................ 73

**Statutes and Rules**

11 U.S.C. § 105 ..................................................................................................... 52

11 U.S.C. § 1112 ................................................................................................... 33

11 U.S.C. § 542 ..................................................................................................... 83

15 Pa.C.S. § 101 ................................................................................................... 58

15 Pa.C.S. § 110 ................................................................................................... 58

15 Pa.C.S. § 8811 ................................................................................................. 58

Federal Rule of Civil Procedure 12 ....................................................................... 37

Federal Rule of Civil Procedure 8 ......................................................................... 54

Plaintiff Bonnie B. Finkel, in her capacity as Chapter 7 Trustee (the "Trustee" or "Plaintiff") for the bankruptcy estate of Debtor Midnight Madness Distilling, LLC f/k/a Theobald and Oppenheimer, LLC d/b/a Faber Distilling (the "Debtor"), submits this Memorandum of Law in opposition to the motion to dismiss (the "Motion") filed by Defendants Casey Parzych; Shawn Sheehan; Angus Rittenburg; Kelly Festa; Ashleigh Baldwin; Michael Boyer; R.F. Culbertson; Polebridge, LLC; Good Design, Inc.; AgTech PA LLC; AgTech VI, LLC; XO Energy Worldwide, LLLP; XO EW, LLC; Best Bev, LLC; EtOH Worldwide, LLC; and Canvas 340, LLC (collectively, the "Moving Defendants") with respect to the Trustee's Amended Complaint (Adv. D.I. 44).

## I.      INTRODUCTION

The Trustee filed an Amended Complaint detailing a brazen scheme to loot the Debtor through a number of entities to which Debtor opportunities, property, and profits were diverted with the purpose, intent, and effect of enriching the Moving Defendants at the expense of the Debtor and its creditors.  The Amended Complaint alleges in detail how Debtor resources, employees, and equipment were used for the benefit of three groups of these shadow entities – the "Polebridge Entities," the "Wynk Entities," and the "Best Bev Entities" – to avoid paying the legitimate creditors of the Debtor.  The Polebridge Entities used Debtor resources to manufacture and sell CBDelight cannabis seltzer and Faber Hand Sanitizer, with all profits flowing not to the Debtor, but instead to the Moving Defendants.  The Wynk Entities, which a Debtor representative described as "one and the same" as the Debtor, similarly used Debtor resources to manufacture and sell Wynk cannabis seltzer, with all profits flowing not to the Debtor, but instead to the Moving Defendants.  And the Best Bev Entities were formed by outright theft from the Debtor and held out as the mere continuation of the Debtor.

1

With the majority of the Trustee's claims surviving the Moving Defendants' first motion to dismiss, Moving Defendants belatedly – over fifteen months after this adversary proceeding was filed – argue that the Trustee lacks standing because her claims were transferred by the Debtor-in-possession to Millstone prior to appointment of the Trustee.  Moving Defendants' argument is baseless and is contradicted by the plain language of the applicable Asset Purchase Agreement, which transferred only those assets used in or related to the Debtor's liquor business.  As set forth in detail in the Amended Complaint, the Trustee's claims relate not to the Debtor's operation of its liquor business, but instead the Moving Defendants' brazen theft from that business for the benefit of competing entities, several of which operated businesses it would have been illegal for the Debtor to participate in.  The Trustee's interpretation of the APA is supported by statements made in open court by counsel for the Debtor-in-possession and Millstone.  It is further supported by judicial admissions made on behalf of Defendant Casey Parzych – who controlled the Debtor-in-possession prior to appointment of the Trustee – stating that the Debtor's estate retains claims akin to those now being asserted by the Trustee.  Finally, Millstone interprets the APA as not having transferred the causes of action now being asserted by the Trustee.

The Moving Defendants' remaining arguments are by and large identical to those which were raised in their first motion to dismiss and which have already been rejected by this Court.  This Court's decision is law of the case and Moving Defendants' attempt at a second bite at the apple should be denied.  Moreover, as set forth in detail herein, Moving Defendants' arguments are no more persuasive the second time around.  The Amended Complaint alleges numerous detailed facts supporting each of its claims against the Moving Defendants, and Moving Defendants' motion should be denied.

## II.    FACTUAL ALLEGATIONS

The following factual allegations from the Trustee's Amended Complaint (Adv. D.I. 44, the "Amended Complaint") must be accepted as true and viewed in the light most favorable to the Trustee, with all factual inferences taken in the Trustee's favor. *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008).

### A.    The Debtor's Formation and Operations

The Debtor, also known as Theobald & Oppenheimer and Faber Distilling Co., was co-founded by Defendant Casey Parzych and Anthony Lorubbio in or around 2012 while the two were enrolled in Defendant Culbertson's Intro to Entrepreneurship class at Carnegie Mellon University. Amended Complaint at ¶ 39. In the years leading up to its June 21, 2021 bankruptcy filing, the Debtor experienced rapid growth—from almost nothing to $10 million in annual sales in 2020—developing, manufacturing, marketing and selling thirty+ distilled spirit products, with its most prominent products bearing the Faber brand. *Id.* at ¶¶ 7, 41.

### B.    The Insider Defendants Form Good Design, Polebridge, and the Wynk Entities To Funnel Money Out of the Debtor in Collusion with Defendant Sheehan

On April 19, 2019, the Debtor entered into a Loan Agreement and a Security Agreement with PNC pursuant to which it ultimately borrowed approximately $2.5 million. Amended Complaint at ¶ 42. To secure the loan, PNC received a first lien on all personal property of the Debtor and a second mortgage on the Debtor's headquarters at 118 North Main St., Trumbauersville in Bucks County ("118 North Main"). *Id.* As set forth in detail in the Amended Complaint, to circumvent PNC's security interest, Defendants and Debtor insiders Casey Parzych, Rittenburg, Festa, Baldwin, Boyer, and Culbertson (collectively, the "Insider Defendants") conspired among themselves and with the other Defendants in this action to form shadow entities

3

in the same lines of business as the Debtor which they then used to misappropriate Debtor resources and loot the Debtor. *Id.* at ¶¶ 10-16, 43. The unlawful scheme involved sham profit sharing arrangements and sham loan agreements between the Debtor and Defendant Sheehan's collection of wholly-owned Virgin Islands based entities – namely, Defendant AgTech VI, LLC, Defendant XO Energy Worldwide, LLLP, Defendant XO EW, LLC, Defendant EtOH Worldwide, LLC, AgTech VI LLLP, and AGTVI LLC (collectively, the "Sheehan Entities") – through which Debtor resources were misappropriated and Debtor profits were siphoned out, and the ill-gotten gains were shared among the Defendants. *Id.* at ¶ 44.

### 1.    The Polebridge Entities

Effective April 19, 2019 – the same date that the Debtor executed the PNC Loan Agreement – Defendant Baldwin formed Defendant Polebridge, LLC ("Polebridge") as a Pennsylvania limited liability company, listing its registered office as the Debtor's headquarters at 118 North Main. *Id.* at ¶ 46. On May 23, 2019, Defendants Baldwin and Rittenburg formed Defendant Good Design, Inc. ("Good Design") as a British Columbia corporation, listing the Debtor's headquarters as the incorporators' address. *Id.* at ¶ 47. Using Debtor computers while she was the Debtor's CFO, Defendant Festa provided administrative support for the filing of Polebridge's and Good Design's registration documents. *Id.* at ¶¶ 12, 46, 47. On February 4, 2020, Defendant Baldwin caused Polebridge to register "Good Design" as a fictitious name with the Pennsylvania Department of State, listing "canning" – a key line of business of the Debtor – as the "nature of the business or other activity to be carried on under or through the fictitious name." *Id.* at ¶ 48.

While they were Debtor fiduciaries, each of the Insider Defendants participated in the management and operation of Defendants Polebridge and Good Design (collectively, the "Polebridge Entities") to the Debtor's detriment. *Id.* at ¶¶ 19-20. Defendants Baldwin (Casey

Parzych's spouse) and Rittenburg are officers and members/shareholders of the Polebridge Entities. *Id.* at ¶¶ 11, 13. Defendant Culbertson states on his public LinkedIn page that he has been employed in sales and marketing for Good Design since January 2019. *Id.* at ¶ 53. Defendant Boyer simultaneously served as general counsel to the Debtor and counsel to the Polebridge Entities. *Id.* at ¶ 14. Defendant Festa used the Debtor's computers to provide administrative support for the filing of the Polebridge Entities' registration documents, used the Debtor's computers to further the business of the Polebridge Entities with her Polebridge Entities email address, and instructed the Debtor's sales managers to ensure that monies which should have been paid to the Debtor were instead paid to Polebridge. *Id.* at ¶¶ 46, 47, 55, 75. And Defendant Casey Parzych instructed Debtor sales representatives to make a Polebridge Entities product their top "mission critical priority." *Id.* at ¶ 60.

### a.  CBDelight Seltzer

The Polebridge Entities' first project was CBDelight seltzer ("CBDelight"), a carbonated beverage containing cannabis derivatives. *Id.* at ¶ 49. As established by the following facts, CBDelight was manufactured, packaged, and marketed using Debtor resources, labor, and material, including but not limited to: office and warehouse space for operations, the purchase of additional canning/bottling equipment utilized for the purposes of Good Design/Polebridge, sales services and incentives, marketing services, graphic design services, digital marketing and advertising services, legal services, intellectual property, and bottling services. *Id.* at ¶ 50.

While described to the public as a Good Design product, "C B Delight" was in fact a trademark filed by the Debtor on April 17, 2019. *Id.* at ¶ 51. CBDelight's Facebook page lists its telephone number as (215) 268-6071, a telephone number owned, paid for, and utilized by the Debtor, and staffed by Debtor employees. *Id.* at ¶ 58. Defendant Culbertson's LinkedIn page

states the Polebridge Entities' "cbDelight product is one of the top selling products in the tri-state area. . . . Our new Siphon device allows anyone to carbonate any drink with CBD – anywhere – at a far reduced price point." *Id.* at ¶ 53. The "Siphon device" referenced by Defendant Culbertson constituted or utilized the Debtor's intellectual property. *Id.*

An August 1, 2019 press release states that "Cbdelight (a division of Good Design Inc.) announced that it has partnered with Pennsylvania-based distributor Nittany Beverage to expand the brand's footprint in Pennsylvania. . . . Ashleigh Baldwin, CEO of Good Design Inc., remarked: 'With Chad Merriweather and Kelli Scozzaro working with Nittany's seasoned team, we're going to hit it out of the park.'" *Id.* at ¶ 52. At the time of the press release, Ms. Scozzaro and Mr. Merriweather were full-time employees of the Debtor. *Id.* An August 23, 2019 presentation approved by Defendant Casey Parzych to train Debtor sales representatives announced CBDelight as the Debtor's top "mission critical" priority. *Id.* at ¶ 60. A Debtor marketing presentation featured numerous CBDelight slides emphasizing that the Debtor manufactured, canned, and delivered the CBDelight product. *Id.* at ¶ 61.

The LinkedIn page of John Aguilar—a Debtor account manager from November 2019 through November 2020—emphasizes that, while employed full-time by the Debtor, he "[d]eveloped, maintained and grew a target account list within Philadelphia market that drove volume & brand recognition for . . . CBDelight," and which resulted in a 40% increase in brand growth for CBDelight. *Id.* at ¶ 59.

The Insider Defendants and numerous other individuals (acting at the behest of the Insider Defendants) regularly used the Debtor's electronic devices to further the business interests of the Polebridge Entities via their Polebridge Entities' email addresses, including: Defendant Casey Parzych, who also used his Polebridge Entities email address (casey@gooddesigninc.com) to

conduct Debtor business, including otherwise privileged communications with Debtor's outside counsel; Defendant Festa (kellyfesta@gooddesigninc.com); Defendant Culbertson, whose Polebridge Entities' email address (rf@gooddesigninc.com) was also listed on the Debtor's application for a Paycheck Protection Program loan; Defendant Rittenburg (angus@gooddesigninc.com); Debtor customer service representative Casey Coughlin (ccoughlin@gooddesigninc.com); and Debtor production manager John Pitts (john@gooddesigninc.com). *Id.* at ¶¶ 20, 54-57.

### b.   Faber Hand Sanitizer

In March 2020, after the WHO declared COVID-19 a global pandemic and bars throughout the United States shut down due to government orders, the Insider Defendants caused the Debtor to manufacture, bottle, and sell hand sanitizer under the Faber brand ("Faber Hand Sanitizer"), which had been trademarked by the Debtor in 2016. *Id.* at ¶ 62. As with CBDelight, Faber Hand Sanitizer was manufactured, packaged, and marketed with Debtor resources, including labor, material, office and warehouse space for operations, the purchase of additional canning/bottling equipment, sales services and incentives, marketing services, graphic design services, digital marketing and advertising services, legal services, intellectual property, and bottling services, with the profits diverted out of the hands of the Debtor and funneled through the Polebridge Entities. *Id.* at ¶¶ 63-64. Numerous agents of the Debtor utilized email addresses associated with Faber Hand Sanitizer – which they accessed using Debtor computer equipment – to further the business interests of the Polebridge Entities, including Defendant Baldwin (ashleigh@fabersanitizer.com), Defendant Culbertson (rf@fabersanitizer.com), and Debtor customer service representative Casey Coughlin (ccoughlin@fabersanitizer.com). *Id.* at ¶ 81. Additionally, Kelli Sheehan (who, upon information and belief, has a familial relationship with Defendant Sheehan), while a full-time

7

employee and agent of the Sheehan Entities, utilized the Debtor's computers to conduct business relating to the Faber Hand Sanitizer product (kelli@fabersanitizer.com). *Id.* at 83.

Defendant Baldwin's LinkedIn profile lists her former employment as CEO of Good Design, which she states "makes consumer goods including spirits, sodas and hand sanitizer. We are registered with the FDA and are currently supplying hand sanitizer to several of the largest healthcare systems in the U.S." *Id.* at ¶ 66. Defendant Baldwin's profile further states that Good Design "is a good kind of consumer goods company. We invent and make delightful spirits, sodas and other consumer products in our own factory in rural Pennsylvania." *Id.* Consistent with Defendant Baldwin's profile, Good Design's LinkedIn profile, which prominently depicts bottles of hand sanitizer bearing the Debtor's Faber Distilling Co. mark, describes its business as "[m]anufacturing," specifically "[m]aking beverages and FDA-approved hand sanitizer for hospitals, grocery stores, employees and everyday Americans." *Id.* at ¶¶ 65, 68. These descriptions are false—the Polebridge Entities had no manufacturing capability, facilities, or personnel whatsoever, except for that which they pilfered from the Debtor. *Id.* at ¶ 67.

Despite the Insider Defendants' attempts to portray it as a Polebridge Entities product, beginning on March 26, 2020, the Debtor's Faber Liquors Instagram page was dominated by posts advertising Faber Hand Sanitizer. *Id.* at ¶ 69. A Philadelphia Inquirer article dated April 6, 2020 highlights the Debtor, with no mention of Polebridge or Good Design:

> Bucks County's Theobald & Oppenheimer[, i.e., the Debtor,] is on the opposite end of the spectrum [from a smaller distillery]: The second-largest distillery in the state, it made $2 million worth of alcohol last year between its two brands, Faber Liquors and Singe Prop Rum. Like its smaller peers, Theobald has pivoted to hand sanitizer – also using its own bottles – but it can churn it out by the pallet.
>
> "We bought ethanol at 200 [proof] and we get a tanker in a day," said T&O chief financial officer Kelly Festa. "We mix it with

> hydrogen peroxide and glycerin, and then we run it through the bottling lines."
>
> The Trumbauersville company has increased the number of production shifts and employees. "We're running three shifts a day, seven days a week, trying to get as much out the door as possible," Festa said. "We're getting orders left and right, from hospitals, the U.S. Postal Service, huge supermarket chains, you name it."
>
> By the end of March, T&O had filled 167,300 one-liter glass bottles with hand sanitizer branded with the Faber Liquors label. . . . At the moment, hand sanitizer is all T&O is making.

*Id.* at ¶ 70.

On April 9, 2020, immediately following publication of the article in which Defendant Festa confirmed that Faber Hand Sanitizer was manufactured, packaged, marketed, and distributed entirely by the Debtor, Defendant Baldwin instructed the Debtor's sales team to divert the proceeds from all sales of Faber Hand Sanitizer from the Debtor's Square point of sale system to Polebridge's Square account. *Id.* at ¶ 71. On April 17, 2020, in the wake of Defendant Baldwin's email – which provides irrefutable proof of the Insider Defendants' conspiracy to steal all payment due the Debtor for Faber Hand Sanitizer by diverting it to Polebridge, and that, despite the lack of a formal title or agreement, Defendant Baldwin (who is married to Defendant Casey Parzych) exercised high level managerial control over the Debtor's employees – the Debtor issued a press release again making it clear that Faber Hand Sanitizer was manufactured, packaged, marketed, and distributed entirely by the Debtor:

> [The Debtor] has shifted production of its high-quality vodkas, gin, and rum to the manufacture of hand sanitizer (Faber Hand Sanitizer). While many distillers have made similar adjustments, Faber has scaled the production of its hand sanitizer to supply consumers as well as medical professionals and first responders. . .
>
> So many people are having trouble securing sanitizer right now. We knew we could help by producing an abundant supply, despite disruptions in the supply chain," said Ashleigh Baldwin, Faber's

> spokesperson. "When people get their sanitizer from us, they are
> protecting themselves and supporting efforts to help those heroes on
> the frontlines of the COVID-19 pandemic. . . .
>
> Faber Hand Sanitizer is available in the same one-liter bottles that
> the company has traditionally used to store the spirits that it has
> produced for more than 8 years. The hand sanitizer has less
> viscosity, allowing it to be utilized in spray bottles or with towels to
> help disinfect surfaces.

*Id.* at ¶ 72; *see also id.* at ¶ 76 (describing an April 29, 2020 Debtor press release in which Defendant Baldwin identified herself as a Debtor "spokesperson" and stated that the Debtor was ramping up its production and distribution of Faber Hand Sanitizer to meet growing demand).

Similarly, Faber Hand Sanitizer's Facebook page stated: "we – the team at FABER Liquors – have shifted our usual operations to produce much-needed hand sanitizer" and lists the telephone number of Faber Hand Sanitizer as (215) 268-6071, a telephone number owned by, paid for, utilized, and staffed by the Debtor. *Id.* at ¶ 73. Faber Hand Sanitizer also utilized the Debtor's marketing staff and resources, including the use of advertising mirroring that for Debtor's liquor products. *Id.* at ¶ 82.

An April 21, 2020 email from Defendant Festa's Polebridge Entities email account (kellyfesta@gooddesigninc.com) to the Debtor's sales managers – via their Debtor email accounts (@theoandopp.com) – instructed the Debtor's sales managers yet again to ensure that the Debtor's customers made payments by electronic transfer, i.e., ACH or wire, into Polebridge's bank account, and not the account of the Debtor, for sales of Faber Hand Sanitizer. *Id.* at ¶ 75. The Debtor's sales representatives also accepted tens of thousands, if not hundreds of thousands, of dollars in cash payments for Faber Hand Sanitizer, which were diverted from the Debtor for the benefit of the Polebridge Entities. *Id.* at ¶ 78.

A May 12, 2020 email from the Debtor's outside counsel to a representative of the United

States Alcohol & Tobacco Tax & Trade Bureau confirms that the Debtor "has converted to hand sanitizer production and [is] supplying large hospital centers." *Id.* at ¶ 78. A June 11, 2020 presentation approved by Defendant Parzych to train the Debtor's sales representatives lists four "Mission Critical" products for emphasis to the Debtor's customers, with Faber Hand Sanitizer sharing the top spot with Faber liquor (and CBDelight demoted to third place). *Id.* at ¶ 79. Another Debtor marketing presentation—entitled "Theobald & Oppenheimer Leadership Brands Presentation"—featured numerous slides touting Faber Hand Sanitizer and the massive success of this Debtor product. *Id.* at ¶ 80.

Despite being manufactured, marketed, and sold using the Debtor's resources and personnel, profits from Faber Hand Sanitizer were diverted to the Polebridge Entities, and ultimately to the Defendants, with a minimum of $8.8 million of profits attributable to the sale of Faber Hand Sanitizer and CBDelight stolen from the Debtor and diverted to Defendants. *Id.* at ¶¶ 84-85. On April 17, 2020, Defendant Sheehan made a post to his LinkedIn page advertising Faber Hand Sanitizer in furtherance of his personal and the Sheehan Entities' agreement with the Insider Defendants to share in the ill-gotten profits from the sale of CBDelight and Faber Hand Sanitizer. *Id.* at ¶ 74.

### 2. Wynk Seltzer

In the fall of 2020, Defendants Casey Parzych, Rittenburg and Sheehan used Debtor resources and personnel to create a cannabis infused beverage known as Wynk seltzer ("Wynk Seltzer"). *Id.* at ¶ 86. On September 1, 2020, Defendant Sheehan caused Defendant AgTech VI, LLC ("AgTech VI") to file Articles of Organization as a United States Virgin Islands ("USVI") limited liability company for the purposes of diverting the profits from the sale of Wynk Seltzer away from the Debtor. *Id.* at ¶ 87. On November 25, 2020, Defendant Casey Parzych, as

organizer, registered American Cannabis LLC as a Pennsylvania limited liability company for the purposes of diverting the profits from Wynk Seltzer away from the Debtor. *Id.* at ¶ 88. On April 26, 2021, American Cannabis LLC filed a document with the Pennsylvania Department of State to change its name to AgTech PA LLC ("AgTech PA"). *Id.* at ¶ 89. The document was signed by Defendant Casey Parzych as President of AgTech PA and indicates that it should be returned to Defendant Festa via the email address kellyfesta@drinkwynk.com. *Id.*

As with CBDelight and Faber Hand Sanitizer, the Wynk Seltzer business was facilitated using Debtor resources, including labor, material, office and warehouse space for operations, the purchase of additional canning/bottling equipment utilized for the purposes of Wynk Seltzer, sales services and incentives, marketing services, graphic design services, digital marketing and advertising services, legal services, intellectual property, and canning services. *Id.* at ¶ 90. Despite being manufactured, marketed, and sold using the Debtor's resources and personnel, all revenues from Wynk Seltzer flowed to the Wynk Entities[1], and ultimately the Defendants. *Id.* at ¶ 103.

While Defendants conspired to delete or steal all data on the Debtor's physical computers and cloud storage services (as described in greater detail below), forensic analysis of system files on a Debtor hard drive reveals that, as with CBDelight and Faber Hand Sanitizer, substantial Debtor resources were diverted for the ultimate benefit of the Wynk Entities. *Id.* at ¶ 91. Debtor computers, copiers, and scanners were used to further the business of Wynk Seltzer, including to access Wynk email addresses belonging to Defendant Casey Parzych (casey@drinkwynk.com and casey@drinkcannabisusa.com), Defendant Rittenburg (angus@drinkwynk.com), Defendant Festa (kellyfesta@drinkwynk.com),    Defendant    Culbertson    (rf@drinkwynk.com    and

---

[1]    The "Wynk Entities" are defined in the Complaint as including Defendants AgTech PA and AgTech VI, along with the entities that own and control AgTech VI, i.e., XO Energy Worldwide, LLLP, XO EW, LLC, and Canvas 340, LLC. *See id.* at ¶¶ 21-27.

rf@drinkcannabisusa.com),    Sheehan    Entities'    employee    Kelli    Sheehan
(kellisheehan@drinkwynk.com), and Debtor customer service representative Casey Coughlin
(ccoughlin@drinkwynk.com). *Id.* at ¶¶ 92-93. The Wynk Entities regularly ordered supplies for
Wynk Seltzer using the Debtor's computers, telephone lines, and vendor accounts. *Id.* at ¶ 100.
The website of the Cannabis Beverage Association features a member page for "WYNK ;)", listing
its telephone number as (215) 565-5845, a phone number which is listed as belonging to the Debtor
on vendor invoices. *Id.* at ¶ 99.

On April 19, 2022, current Wynk Seltzer Brand Manager Casey Coughlin made a LinkedIn
post in which she stated that, on April 19, 2021 (while still a full-time employee of the Debtor),
she was "[w]rapping up Wynk's 1st mobile production run in Ohio." *Id.* at ¶ 94. Debtor credit
card records establish that the Debtor—not the Wynk Entities—paid for the expenses associated
with Ms. Coughlin's travel to Ohio, along with many other purchases for the sole benefit of the
Wynk Entities and the Wynk Seltzer product. *Id.* at ¶¶ 95-96. Indeed, in the Summer of 2021,
numerous invoices were billed to the Debtor yet either explicitly stated that they were for purposes
related to Wynk Seltzer or called for deliveries to 2512 Quakertown Road, Pennsburg,
Pennsylvania ("2512 Quakertown Road"), an address which was never disclosed by the Debtor as
part of its operations, and which is listed as Wynk's address on the website of the Cannabis
Beverage Association. *Id.* at ¶¶ 98-99.

In an email dated June 15, 2021, a representative of Classic Staffing Services, Inc. – a temp
agency paid for by the Debtor – stated that she "was instructed to reach out for all matters related
to Faber to Jack Blobe from Drink Wynk. I was told he would be the contact going forward and
that Drink Wynk, Theo and Opp, and Faber were one and the same." *Id.* at ¶ 102. Mr. Blobe's
LinkedIn profile states that he was a full-time employee of the Debtor from May 2020 through

13

September 2021 and a full-time employee of the Wynk Entities from May 2021 through February 2022. *Id.*

C.    **Defendants Conspire to Utilize the Bankruptcy Process to Defraud the Debtor's Creditors**

Defendants attempted to mask their wrongdoing by creating invoices, tax forms, and other documents to feign an arm's length relationship between Debtor, the Polebridge Entities, and the Wynk Entities. *Id.* at ¶ 104. The documents were phony and a sham—as they failed to fully and accurately describe and account for Debtor resources being devoted to the sole benefit of the Polebridge Entities, the Wynk Entities, and, ultimately, the individual Defendants. *Id.* Defendants' scheme was designed to hide the fact that they were extracting millions of dollars of value out of the Debtor, to place it beyond the reach of Debtor's creditors. *Id.* at ¶ 105.

Due to Defendants' diversion of Debtor resources and profits to the Polebridge Entities, the Wynk Entities, and their principals and affiliates, the Debtor was unable to pay its debts and, on February 28, 2021, defaulted on the PNC loan. *Id.* at ¶ 106. Under scrutiny but not wanting to abandon their profitable scheme, Defendants conspired to have Defendant Sheehan utilize his complex network of wholly-owned USVI entities – i.e., the Sheehan Entities – to further defraud the Debtor and its creditors. *Id.* at ¶¶ 44, 107. To this end, Sheehan Entities employee (and Defendant Sheehan relative) Kelli Sheehan and Sheehan Entities CFO John Charette, despite being full-time employees of the Sheehan Entities, maintained accounts on the Debtor's computer system and had full access to the books, records, and online accounts belonging to the Debtor. *Id.* at ¶ 108.

Defendants first attempted to have certain of the Sheehan Entities either purchase PNC's debt or purchase the Debtor's business assets outside of bankruptcy. *Id.* at ¶ 109. The contemplated transactions were not arm's length and were closely coordinated among the

Defendants, with Defendants Casey Parzych and Sheehan leading the scheme. *Id.* at ¶ 110. The

coordination between the Debtor and the Sheehan Entities was so egregious that the Debtor's

outside counsel admonished Defendants Casey Parzych, Culbertson, Boyer, and Festa in a

January 18, 2021 email:

> [I]t's very unusual and inadvisable to be including [Sheehan
> Entities' attorney] Carey Drangula and [the Sheehan Entities
> referred to as] X/O on all of these emails [concerning the Sheehan
> Entities acquiring the Debtor or its assets]. There is no privilege.
> She and X/O are an adverse party in these negotiations, particularly
> now that another party . . . is in the mix. You again must treat this
> as an arm's length transaction for the ultimate maximum benefit of
> the Company between two equal suitors or you are going to get
> yourselves in trouble. I would not advise continuing to seek her
> legal counsel or X/O's approval on anything. I would also keep
> confidential communications within this team unless or until a deal
> is made. Any indication that you have favored X/O or have been
> providing them access or information that you have not provided to
> [the other potential purchaser] or other suitors has the potential to
> become fodder for litigation. X/O and [the other potential
> purchaser] are competitors and we must treat them as such.

*Id.* at ¶ 111. Defendants Casey Parzych, Culbertson, Boyer, and Festa did not follow counsel's

advice and continued to present the Debtor to other potential purchasers as unfavorable in the hope

of steering the business to the Sheehan Entities at less than fair value. *Id.* at ¶ 112.

That plan failed and Defendants pivoted to a bankruptcy alternative, which included an

effort to sell the business on the cheap to the Sheehan Entities through a Section 363 sale or, if that

failed – via a web of entities doing business as "Best Bev" and/or "Can Man" and referred to in

the Amended Complaint as the "Best Bev Entities"[2] – through outright theft of the Debtor's

---

[2]    The "Best Bev Entities" are defined in the Complaint as including Defendants Can Man
LLC and Best Bev, LLC, both of which do business as "Best Bev" and operate out of a location
at 2512 Quakertown Road, as well as EtOH Worldwide LLC, XO Energy Worldwide, LLLP,
and XO EW, LLC, entities which ultimately own and control Best Bev, LLC. *Id.* at ¶¶ 28-33,
117, 125.

property and resources.  *Id.* at ¶ 113.  Attorney time entries filed with this Court in support of certain of the Sheehan Entities' attorneys' application for allowance of a purported "expense reimbursement" establish the essential role of the Sheehan Entities in the scheme, indicating that, as of at least April 8, 2021, the Sheehan Entities were conspiring with the Debtor Defendants to formulate the Debtor's bankruptcy strategy.  *Id.* at ¶ 114.  Defendant Sheehan (using his Sheehan Entities email address, ssheehan@xo-energy.com, and his Wynk Entities email address, shawn@drinkwynk.com) and Sheehan Entities CFO John Charette (using his Wynk Entities email address, johncharette@drinkwynk.com) were copied on otherwise privileged emails between the Debtor, its bankruptcy counsel, and/or its accountants concerning the Debtor's bankruptcy strategy.  *Id.* at ¶ 115.  Defendants Sheehan and Casey Parzych jointly retained Washington D.C.-based  public relations firm kglobal to direct marketing strategies in light of Debtor's bankruptcy and Sheehan's anticipated takeover of Debtor's assets.  *Id.* at ¶ 116.

### 1.      The Debtor Diverts Assets to the Best Bev Entities Pre-Bankruptcy

On May 3, 2021, just over a month before the Debtor's bankruptcy filing, Can Man, LLC ("Can Man") was formed as a Pennsylvania limited liability company with Debtor's outside counsel acting as organizer.  *Id.* at ¶ 117.  Can Man's registered office was originally listed as 2600 Milford Square Pike, Quakertown PA 18591 ("2600 Milford"), but changed on September 30, 2021 to 2512 Quakertown Road, the same address used by the Wynk Entities.  *Id.*  All activity taking place at 2600 Milford, 2512 Quakertown Road, and 300 Commerce Drive, Quakertown, PA ("300 Commerce") was for the benefit of Can Man, the other Best Bev Entities, and the other Pilfering Entities.[3]  *Id.* at ¶ 118.

---

[3]      The Complaint defines the "Pilfering Entities" as the combination of the Polebridge Entities, the Wynk Entities, and the Best Bev Entities.  *Id.* at ¶ 38.

In May 2021, Defendants caused the Debtor to transfer a Hamrick Recaser machine with an estimated value of $145,000 to 2512 Quakertown Road for use by the Pilfering Entities. *Id.* at ¶ 119.  On May 6, 2021, Casey Coughlin – who identified herself on her LinkedIn page as an employee of the Debtor and Wynk – posted the following to her facebook page: "Hiring spree! Beverage production in Quakertown (don't sleep on it) at Faber Distilling. . . . Signing bonus, referral bonus, bonus for breathing.  Name your bonus." *Id.* at ¶ 120.  Upon information and belief, Ms. Coughlin's hiring efforts – while ostensibly made on behalf of the Debtor – were intended to benefit the Pilfering Entities, as a company on the verge of a bankruptcy filing would likely not make such extraordinary hiring expenditures. *Id.* at ¶ 121.

On June 1, 2021, despite knowing that the Debtor's bankruptcy filing was imminent, Defendant Casey Parzych, acting on behalf of the Debtor, executed a Consulting Services Agreement with DPG Management, LLC ("DPG") under which DPG was to provide human resources consulting services more fully described in a proposal dated May 20, 2021. *Id.* at ¶ 122. The May 20, 2021 DPG proposal, while addressed to the Debtor, is entitled "Wynk – Proposal," and provides for comprehensive human resources programs and assessments which would be of no use to a company about to file for bankruptcy. *Id.* at ¶ 123.  The services provided by DPG, although contracted and paid for by the Debtor, were used by Defendants to benefit the Pilfering Entities. *Id.*

On June 14, 2021, Defendants Festa and Uszenski utilized the Debtor's computer equipment and email system to create and edit a Word document titled "Can Man Shadow Structure," which depicted a corporate structure under which Can Man would own Faber and all the Debtor's other brands and operate out of a headquarters located 2512 Quakertown Road. *Id.* at ¶ 124.  On June 13, 2022, Best Bev, LLC was formed as a United States Virgin Islands limited

liability company. *Id.* at ¶ 125. Best Bev, LLC is either the successor in interest to Can Man or

was created by Defendants to avoid liability for misconduct on the part of Can Man, which at all

times relevant hereto operated using the name "Best Bev." *Id.*

### 2.    Defendants Interfere with the Debtor's Section 363 Sale

On June 3, 2021, Defendants Casey Parzych and Rittenburg signed a Joint Resolution of

the Managers and Majority In Interest of Members of the Debtor declaring that the Debtor was

insolvent and unable to pay its debts as they mature and authorizing the filing of a voluntary

petition under chapter 11 of the Bankruptcy Code. *Id.* at ¶ 127. On June 1, 2021, immediately

before execution of the joint resolution, the Debtor, on the one hand, and Defendants EtOH

Worldwide, LLC and AgTech VI, LLC, on the other, executed Equipment Lease Agreements. *Id.*

at ¶ 128. The Equipment Lease Agreements were sham documents designed to create false

administrative claims that would accrue during the Chapter 11 Case but would never be paid. *Id.*

at ¶ 129. Indeed, based on the lease payments that were accruing, the Debtor over a two-year term

would pay well more than double the original cost of the equipment. *Id.*

In a letter dated June 10, 2021, Defendant Sheehan, writing as President of Defendant

EtOH Worldwide, LLC, sent a letter (the "Sheehan Letter") to coerce PNC into cooperating with

a Section 363 sale of the Debtor's assets to the Best Bev Entities at a low-ball price. *Id.* at ¶ 130.

While signed only by Defendant Sheehan, the letter was drafted by Sheehan, counsel for Sheehan

and the Best Bev Entities, and the Debtor's bankruptcy counsel. *Id.* It states in pertinent part:

> EtOH has evaluated MMD, [i.e., the Debtor,] including the collateral
> pledged to PNC, and concluded that the remaining value of its
> business, however slight, is as an ongoing concern. As soon as
> MMD is reduced to its assets, the value of the business will
> plummet. The equipment that was pledged to PNC has significantly
> diminished in value and is almost inextricably integrated into the
> building in which it has housed. . . . EtOH's acquisition of MMD's
> assets will be the only viable path forward, and this path will require

> PNC to reset its expectations for several reasons.
>
> * * *
>
> Without EtOH as a counterparty, MMD will shutter its operations in Trumbauersville, leaving 80 employees jobless in a small rural town in Pennsylvania.  PNC will be left with virtually unsaleable equipment, and, in the face of Casey Parzych's personal bankruptcy, a meaningless guaranty.  EtOH is aware of certain additional complicating factors that will only frustrate PNC's attempts to recoup value from MMD's assets . . . .
>
> * * *
>
> The landlord of the leased premises[, i.e., 2300 Trumbauersville Road, which was leased by Defendant Finland Leasing to the Debtor,] is the father of MMD's majority Unit Holder; it is solely because of this relationship that the landlord has not pursued a default claim for nonpayment of rent under the lease. . . . [T]he landlord is unwilling to relet the premises to an unknown third party (including PNC or its eventual assignee) and nothing could compel him to do so.  Without a lease at these premises, the distilled spirits production permits . . . will be immediately revoked.

*Id.*

Consistent with Defendant Sheehan's letter, on the Petition Date, the Debtor filed a motion seeking approval of a sale under Section 363 of the Bankruptcy Code (the "Sale Motion").  *Id.* at ¶ 131.  The Sale Motion proposed to sell the Debtor's assets to Defendant EtOH Worldwide, LLC, and failed to disclose the extent of the relationship between the Sheehan Entities and Debtor insiders.  *Id.*

In the run up to the Section 363 sale, Defendant Gary Parzych (Defendant Casey Parzych's father) advised potential buyers that he would not allow anyone other than the Sheehan Entities to lease the 2300 Trumbauersville Road property, nor would he permit a transition period for a buyer to find a new location for the operations in that building.  *Id.* at ¶ 132.  Gary Parzych further stated that he was only willing to allow the Sheehan Entities to occupy the building because his son, Defendant Casey Parzych, was part of their organization.  *Id.*  On July 22, 2021, the Debtor caused a document to be posted to the Section 363 sale data room which stated that the 2300

Trumbauersville Road "lease is expired.  All batching and bottling equipment that is currently stored in this building needs to be immediately removed from the premises upon completion of the sale.  New distilled spirits plant license [sic] will then have to be obtained as all current licenses are tied to 2300 Trumbauersville Road."  *Id.* at ¶ 133.  The chilling impact of this sudden revelation was well-summarized in a July 22, 2021 email from PNC's counsel to the Debtor's bankruptcy counsel: "If the Stalking Horse is getting favored (undisclosed) treatment for this lease by virtue of this property being owned by Casey's father – and other potential bidders will not be afforded similar treatment or even told they can negotiate with Finland – this is highly inappropriate. . . . It's looking more and more like [Debtor] MMD is designing this sale to overwhelmingly favor ETOH (in a sale that no doubt will benefit Casey personally) – a clear violation of MMD's fiduciary obligations."  *Id.* at ¶ 134; *see also id.* at ¶ 135 (PNC's counsel again expresses concern about "management's favoritism to ETOH," stating that it "seems like management is doing everything it can to make this business look unattractive to third parties").  Other potential bidders informed PNC's counsel that they were dropping out because the Insider Defendants were attempting to rig the sale in favor of the Sheehan Entities.  *Id.* at ¶ 136.

On July 26, 2021, Kevin Callahan, counsel to the United States Trustee, held a Section 341 meeting at which Defendant Casey Parzych testified under penalty of perjury, *inter alia*, that the Debtor had no relationship with Wynk Seltzer.  *Id.* at ¶ 138.  This testimony was willfully false.  *Id.*  That same day, a creditor which participated in the meeting emailed Attorney Callahan, forwarding an email from a representative of Classic Staffing Services, Inc. (stating that a Debtor representative told her that "Drink Wynk, Theo and Opp, and Faber were one and the same"), and pointing out that it establishes the "opposite of what [Defendant Casey Parzych] testified [to] on today's call re: DrinkWynk's relationship to Midnight Madness."  *Id.* at ¶ 139.  PNC's counsel

confirmed that numerous Debtor employees were simultaneously working for the Wynk Entities.

*Id.* at ¶ 140.

On August 6, 2021, in response to questioning from Attorney Callahan, the

Debtor represented that:

> The debtor does not now and never has provided services to any
> companies for the purpose of unlawfully manufacturing, storing,
> distribution, or using a controlled substance as defined under federal
> law.
>
> The debtor has no knowledge of a company called DrinkWynk.
> Wynk seltzer is a product.
>
> Casey Parzych is the sole member of AgTech PA LLC ("AgTech").
> Agtech contracts with different cannabis processors to produce
> Wynk seltzer.  None of the debtor's assets (including but not limited
> to the collateral of the PNC Loans) are currently used by or in the
> business operations of AgTech nor have they ever been used by or
> in the business operations [sic] AgTech.  AgTech lawfully provides
> services to cannabis companies using assets that are not and never
> were owned by the debtor.

*Id.* at ¶ 141.  This statement, like Defendant Casey Parzych's testimony at the Section 341 meeting,

is demonstrably false given the numerous instances described in the Amended Complaint of the

Wynk Entities using the Debtor's equipment, facilities, and employees.  *Id.* at ¶ 142; *see also, e.g.,*

*id.* at ¶ 86 (Wynk cannabis seltzer created by Defendants Parzych, Rittenburg, and Sheehan

using Debtor resources and personnel), ¶ 90 (Wynk Seltzer business operated using Debtor

resources), ¶¶ 94-95 (Debtor employee conducts activities for Wynk Seltzer out of state with all

expenses paid for by the Debtor), 102 (Debtor informs its temp agency that it is "one and the

same" as Wynk).

In an email string dated August 16 & 17, 2021, counsel for PNC complained to the Debtor's

bankruptcy counsel that:

Counsel for New Liberty[, a division of Millstone Spirits Group, LLC ("Millstone"),] reached out to advise that she spoke with Casey's father [Defendant Gary Parzych] (principal of the landlord for 2300 Trumbauersville Road) and was told in no uncertain terms that he will not accommodate anyone other than [Defendant] ETOH with respect to either a new lease or even transition time for a new buyer to find a new location for the operations in that building. He told her that he is only willing to allow ETOH [to] occupy the building because his son is going to be involved with them going forward. All he will offer a new buyer is 30 days, which New Liberty's counsel tells me is not enough time to transition; they need at least 90 days. At the same time, he is offering ETOH (as the stalking horse) much more than that – because he knows that [Defendant] Casey [Parzych] will be involved with that enterprise.

Needless to say, this is concerning and contrary to representations made by Casey and ETOH (including representations made by Casey under oath). Casey's recent declaration said that his father was willing to discuss arrangements with other bidders and that there is no formal or informal agreement between ETOH and Finland regarding the premises. Casey has also sworn (and your firm has represented) that there is no agreement – informal or otherwise – between Casey and ETOH regarding his ongoing involvement with the business. It's very obvious to anyone paying attention that that simply isn't true. Casey's father pretty much confirmed it today with New Liberty's counsel.

This also reeks of continuing collusion among Casey, ETOH and his father. As estate fiduciaries, both Casey and your firm should welcome the participation of New Liberty. We therefore implore you and [Debtor attorney] Harry to address this immediately with Casey and his father. Casey's father – as a debtor insider – cannot favor ETOH over other potential bidders because of his son's business relationship with ETOH (current or future). That is the very reason why relatives of debtor insiders are themselves considered debtor insiders.

* * *

Casey has been less than forthcoming with everyone (including your firm) about the extent of his and his family's relationships with the stalking horse – disclosing things only when they're called out by others. Given these prior issues, questions need to be asked and

> information verified – and it is not my practice to blindside opposing
> counsel by simply raising issues at a hearing.
>
> All PNC wants is a fair auction process that puts bidders on
> somewhat equal footing and does not give ETOH an inside
> advantage because of [Defendant] Shaun Sheehan's other business
> relationships with Casey.

*Id.* at ¶ 143.

On or about August 25, 2021, Millstone placed a winning bid at the Section 363 auction
for an approximate price of $1.4 million and agreements to assume certain contracts and pay
certain administrative expenses. *Id.* at ¶ 144. Due to the Defendants' misconduct as alleged herein,
the price paid by Millstone for the Debtor's assets was less than it would have been had the Section
363 sale been conducted on a level playing field. *Id.* at ¶ 145.

Documents filed with this Court by Millstone for the purposes of objecting to the Sheehan
Entities' requests for allowance of expense reimbursement aptly summarize the chilling effect of
the Defendants' misconduct on the bidding at the Section 363 auction and the inextricable
intertwinement of the Debtor, the Sheehan Entities, and the Wynk Entities:

> [t]he Stalking Horse bid[, i.e., the Sheehan Entities' collusive initial
> bid for the Debtor's assets,] did not serve as a catalyst for additional
> bids. The mere fact that the Stalking Horse bidder was an insider of
> the Debtor with intimate and preexisting knowledge of the assets to
> be sold, and that Finland Leasing (the Debtor's landlord for 2300
> Trumbauersville Road and Casey Parzych's father) made clear he
> would only lease to [Sheehan Entity] ETOH, certainly dissuaded
> true third party purchasers. Millstone was the only bidder at the
> auction other than ETOH and PNC, and even then, the Debtor
> attempted to prevent Millstone from bidding by announcing, at the
> auction with no advance warning, that the Debtor would not
> consider the bids apples-to-apples unless Millstone agreed to pay
> ETOH's administrative expense claim. If ETOH's insider status
> wasn't . . . enough to chill bidding, the Debtor's overwhelming
> support of the Stalking Horse surely did. . . . ETOH had unfettered
> access to information regarding the valuation of the Debtor's assets
> and its business operations for months, if not longer, before the

23

bankruptcy was filed.

* * *

> The [Sheehan Entities'] and the Debtor's businesses and management have been inextricably [i]ntertwined since well before this bankruptcy case was filed[.] . . . The [Sheehan Entities] are insiders of the Debtor, . . . [and] the transactions resulting in the [Sheehan Entities'] request for an administrative claim were not arms-length[.] . . . Millstone submits that the invoices for many of the parts associated with [equipment which is the subject of the aforementioned sham lease agreements between the Sheehan Entities and the Debtor] demonstrates the [Sheehan Entities'] insider relationship.  For example, several of the invoices that appear to be for pieces of the Leased Equipment were billed to "Kelly Festa, Etoh Worldwide." . . . Ms. Festa was, at all relevant times, the Debtor's chief operating officer.  Other invoices reflect equipment that was billed and shipped to a company called "American Cannabis" located at the Debtor's business address and "ordered by Kelly Festa." . . . While the Debtor was never in the business of cannabis production, the venture formed by Debtor's members, Casey Parzych and Angus Rittenburg, with the indirect owner of the [Sheehan Entities], Shawn Sheehan, were in that business, through their "Wynk" business.  Yet other invoices [pertaining to equipment used by the Wynk Entities] were billed directly to "Theobald & Oppenheimer," the dba used by the Debtor.

*Id.* at ¶ 147.

### 3.     The Section 363 Sale Did Not Include the Trustee's Claims

On September 15, 2021, this Court held a hearing on the Debtor's motion to sell certain of

the Debtor's business assets pursuant to Section 363 (Bankr. D.I. 4).  At the hearing, counsel for

Millstone stated as follows:

> MS. JEFFERSON [counsel for Millstone]:   Your Honor, the final objection is the objection filed by the United States Trustee, at docket 140.  There were a number of issues raised in that objection . . . .
>
> The first being a concern regarding the sale of the Debtors Chapter 5 causes of action. . . .

> Section 1.01k of the Asset Purchase Agreement, and decretal paragraph 10 of the Sale Order, limit the Chapter 5 causes of action being sold to the buyer to those actions against the Buyer, its affiliates, and the holder of any assumed liability. There should not be any cause of action against the Buyer or its affiliates, because they had no prebankruptcy business relationship with the Debtor. The holder of the assumed liabilities is a very limited list. And I think it is entirely normal and appropriate that a buyer requests that the parties it intends to do business with going forward not be potentially rendered insolvent by a cause of action.

*See* Ex. A[4], Bankr. D.I. 189 at 18:19-19:15. Counsel for the Debtor and the United States Trustee

agreed with Ms. Jefferson's statement. *Id.* at 22:2-7, 9-10, 20-24. In describing the marketing of

the assets which were being sold, counsel for the Debtor represented that

> [William F.] Comly [and Son, Inc.] . . . prepared and implemented a marketing program to promote the sale of the assets. And as reference to that there is Exhibit 5, which is the Comly exhibit of the marketing material, which is essentially a list of . . . Comly's expenses, as well as a copy of the ad and the brochure. The prices are not relevant. What is relevant is the different activity and the nice little glossy picture there, with the assets.

*Id.* at 39:20-40:3.

> Counsel's presentation led to the following inquiry from this Court:

> THE COURT:        . . . So, the Debtor is selling this real estate, equipment, and the entire business, correct?

> MR. BURNETT [Debtor's counsel]:        Basically, yes, Your Honor. Obviously, the . . . purchased assets are specifically listed, but essentially that is correct.

> * * *

> THE COURT:        . . . And the Chapter 5 issue that Mr. Callahan raised, related to claims against the purchaser or their affiliates, correct?

---

[4]        References herein to "Ex. __" refer to the exhibits to the Declaration of Andrew J. Belli, being filed contemporaneously herewith.

> MS. JEFFERSON:     That is correct, Your Honor.   And that is
> Section 101k of the Asset Purchase Agreement, and decretal
> paragraph 10 of the Order, that makes very clear that the only
> Chapter 5 causes of action being sold to the Buyer relate to those
> claims that would be against the Buyer, its affiliates, and the holders
> of assumed liabilities.  So, a very limited universe of parties.

> THE COURT:          Are there any other Chapter 5 claims?
> Because I think Mr. Callahan was satisfied there aren't any claims
> under 547, 548, are [sic] any of those things?  And if they are, they
> are not being sold, if they are, correct?

> MS. JEFFERSON:     Correct.  There . . . may be some.  They will
> remain with the estate.

> THE COURT:          Okay.  Okay.

> MR. BURNETT:        Correct.

*Id.* at 44:2-7, 59:2-19.

On September 17, 2021, this Court approved the sale of the Debtor's business assets to

Millstone, entering an order (the "Sale Order") which approved of and attached the Asset Purchase

Agreement ("APA," Bankr. D.I. 178 at ECF pages 19-61) between the Debtor and Millstone.  *See*

Bankr. D.I. 178.  Paragraph 10 of the Sale Order (referenced during the sale approval hearing as

set forth above) makes it clear that the only causes of action being transferred to the Buyer are

those which are against the Buyer, its affiliates, or any holder of an Assumed Liability:

> At the closing of the Sale Transaction, to the extent provided by the
> Asset Purchase Agreement (and not identified as an Excluded
> Asset), all of the rights, claims or causes of action of the Debtor or
> its bankruptcy estate against the Buyer, its affiliates or any holder of
> an Assumed Liability, including any Claims and causes of action
> arising under Chapter 5 of the Bankruptcy Code or any similar Law
> against such older of an Assumed Liability, shall be assigned, sold
> and transferred to Buyer, free and clear of all liens, claims,
> encumbrances and interests, and Buyer shall have standing and
> authority to assert such rights, claims and causes of action.

*Id.* at ¶ 10 (ECF page 10 of 61).  Section 101(k) of the APA, also referenced during the sale

approval hearing, similarly transfers "any claims or causes of action the Seller or its bankruptcy

estate have, had, or may have against Buyer or any of its affiliates, or any holder of an Assumed

Liability, including, without limitation, any claims or causes of action pursuant to Sections 544,

547, 548, 549, or 550 of the Bankruptcy Code[.]" *Id.*, APA at ¶ 1.01(k) (ECF page 25 of 61).

### 4. Defendants Operated the Debtor in Possession As An Extension of the Pilfering Entities, And Continued to Do So After the Section 363 Sale

While operating the Debtor in Possession (the "DIP"), Defendants caused the DIP to make

numerous transfers and incur debts from which the Debtor derived no benefit, and which went to

the sole benefit of the Best Bev Entities and the other Pilfering Entities. Amended Complaint at ¶

148. Defendant Casey Parzych made the Debtor's bankruptcy counsel aware of his plan to steal

Debtor assets and divert business to the Best Bev Entities, prompting counsel to send him the

following email on August 31, 2021:

> Casey, as a follow up to our conversation, I want to reiterate that our
> strong advice is for you and MMD to at all times act in good faith to
> take all actions to preserve and protect the assets, business,
> customers, contracts, relationships, etc of MMD and to deliver to the
> winning bidder at the auction--- Millstone--- the assets that they
> contracted to purchase so that their expectations for the transaction
> that they bargained for will be consummated at the closing. Doing
> anything less, would contradict our advice could subject you (and
> maybe others) to significant legal issues and concerns. One
> particular issue of note is that you could be found personally liable
> for failure to uphold your fiduciary duty to MMD and its creditors
> and such personal liability could be deemed non-dischargeable
> (even if you filed a Chapter 7) see, for example Section 523(a)(4) of
> the Bankruptcy Code.

*Id.* at ¶ 149.

While the Trustee's effort to fully account for transfers made by the Debtor for the benefit

of the Best Bev Entities has been hampered by Defendants' intentional destruction of Debtor

records, the Trustee lists a number of specific such transfers in the Amended Complaint (the "Post

Petition Best Bev Transfers"). *See id.* at ¶ 150.  Defendants intentionally sabotaged the Trustee's efforts to determine the full extent of goods and services paid for by the Debtor but used for the sole benefit of Best Bev or the other Pilfering Entities. *Id.* at ¶ 152.  For example, Defendant Festa instructed vendors to falsely state that Debtor orders were being delivered to the Debtor's facilities when they were actually delivered to Best Bev at 2512 Quakertown Road. *Id.*

Shortly before the Millstone acquisition was set to close, the Insider Defendants falsely informed Debtor employees that they would be meeting with Millstone representatives, but instead arranged a meeting with agents of the Best Bev Entities, who requested that Debtor employees sign a document stating their intention to work for Best Bev. *Id.* at ¶ 153.  The employees were then told to take the week off, which allowed Defendants to remove several pieces of large equipment from the Debtor for the benefit of the Best Bev Entities. *Id.*

On or about September 21, 2021, prior to the Millstone sale closing, the Insider Defendants intentionally deleted, wiped, or stole all the Debtor's electronic data and cloud computing drives, both to hinder Millstone from competing with Defendants' Best Bev enterprise and to hinder any investigation into Defendants' misconduct. *Id.* at ¶ 154.  While Defendant Festa testified at a Section 341 meeting that she inadvertently deleted the Debtor's data while trying to transfer it to Millstone, this testimony is contradicted by numerous facts, including: a) due to standardized safeguards and warnings issued by the Debtor's cloud provider prior to mass deletion of data, and a thirty day hold period during which deleted data can be recovered, it is highly improbable that all of the Debtor's email and electronic data could be inadvertently destroyed; b) in addition to data stored on cloud services, the Debtor's computers were wiped of meaningful data prior to their transfer to Millstone; c) a forensic analysis conducted by Millstone indicated that the data was not destroyed, but instead transferred; and d) in discussions which occurred after the supposed deletion

of data, Defendant Festa was able to retrieve specifically requested electronic documents belonging to the Debtor, but only after reporting that she had to ask for permission to do so. *Id.* at ¶ 155. Defendant Festa sought "permission" from Defendants Casey Parzych and Sheehan, who ordered the deletion/transfer of the Debtor's data in the first instance. *Id.*

On September 27, 2021, Millstone's counsel reported to the Debtor's counsel that Defendant Parzych told Debtor employees not to come to work, that the Debtor had not been fulfilling customer orders, that "Faber products are out of stock in basically every store," and that there was no backlog of inventory or glass bottles at the Debtor's premises. *Id.* at ¶ 156. This was because Defendants: a) encouraged the Debtor's former employees to work for the Best Bev Entities instead of Millstone; b) were fulfilling the Debtor's customer orders for the benefit of the Best Bev Entities instead of the Debtor; and c) were using the Debtor's inventory and equipment to produce large amounts of product for use by Best Bev. *Id.* The Debtor's large raw materials purchases and hiring spree in the months preceding the Millstone closing also support the inference that millions of dollars' worth of DIP property was improperly diverted to the Best Bev Entities. *Id.* at ¶ 157.

Defendants lied about the true nature of their supposedly new enterprise, informing customers that Best Bev was simply a continuation of the Debtor. *Id.* at ¶ 158. For example, an October 7, 2021 text message from Defendant Culbertson to a former customer of the Debtor stated that the Defendants had "re-formed" the Debtor "and quickly started [manufacturing] & co-packing 500,000 cans/bottles per day." *Id.* at ¶ 159. Culbertson's text message further offered to "save you at least 14% OFF your current prices," with the "current prices" being a reference to the Debtor's prices, and with the discount made possible only because Defendants had been stealing the Debtor's personnel, equipment, and inventory for use by Best Bev. *Id.* at ¶ 160. Defendants

sent similar text messages to hundreds of the Debtor's former customers, using customer lists which they stole from the Debtor. *Id.* at ¶ 161.

An October 11, 2021 email from counsel to Millstone to Debtor's bankruptcy attorneys reports:

> [b]ased on . . . conversations our sales guys are having with [former Debtor] customers, [Defendant] Casey [Parzych] and [Defendant] RF [Culbertson] are holding themselves out to customers as "Faber" and saying the[y] "re-formed" the business.
>
> I am also getting invoices from other [Debtor] vendors who say they haven't been paid in months, and that [Defendant] Kelly [Festa] recently asked them to make edits to invoices before they sent them to us to make it look like the goods were shipping to [the Debtor] at 118 N. main Street (when the original invoice says they were shipping to CanMan at 2512 Quakertown Road).

*Id.* at ¶ 162.

On October 12, 2021, Defendants made their first post to the wellrebellion Instagram account. *Id.* at ¶ 163. Well Rebellion was the new name for the liquor product Defendants manufactured and bottled using Debtor resources and employees. *Id.* Defendants subsequently began manufacturing, marketing, and selling the Well Rebellion product using stolen Debtor equipment as well as the Debtor's supposedly deleted internal data. *Id.* at ¶ 164. Certain of the Defendants, including Defendants Festa and Culbertson, utilized custom Well Rebellion flyers which included their cell phone numbers to market the product for the benefit of Best Bev. *Id.* at ¶ 165. The flyers were created using the Debtor's marketing files, but with the Faber brand name replaced with the Well Rebellion name. *Id.*

Prior to and after the closing of the sale of the Debtor's assets to Millstone, the Defendants utilized the Debtor's phone.com account for the benefit of Best Bev, returning calls to Debtor customers who placed orders for Faber products, and instead selling them the corresponding Best

Bev products.  *Id.* at ¶ 166.  On October 18, 2021, Drifter Spirits emailed Millstone concerning a

meeting that Drifter Spirits had that day with "Midnight Madness," the Debtor; in reality, the

Defendants had set up a meeting between Drifter Spirits and Best Bev under the guise that Best

Bev was a mere continuation of the Debtor.  *Id.* at ¶ 167.

In an October 20, 2021 report, a Millstone sales manager complained that Defendants were

using the Faber brand name in communications with the Debtor's former customers and were

causing the customers to think that Best Bev was simply a continuation of the Debtor:

> All of our customers are still very confused and getting daily
> constant texts/calls/emails from BestBev claiming to be us and
> asking for their 'Faber well order'. . . . They hired a team of reps +
> call center with 5 people non stop calling our customers working
> phones + email off our old customer lists.  Many of our customer
> are telling me they call them, text them, and email them multiple
> times a day after they told them to please please stop.

*Id.* at ¶ 168.  On November 1, 2021, a Millstone sales manager reported that the Best Bev Entities

"are continuing to spam all of our customers direct cell phones with texts and calls" and that the

customers were confused as to whether the Debtor and Best Bev were separate entities.  *Id.* at ¶

169.

In the fall of 2022, Defendants caused Best Bev to join the Upper Perkiomen Valley

Chamber of Commerce, stating that, "[a]fter years of dreaming up, canning and distributing our

own beverages, we have expanded our universe . . . [and] have the space to do it all at our new

100,000+ sf facility centrally located just outside Philadelphia," i.e., 2512 Quakertown Road.  *Id.*

at ¶ 170.   The reference to "years of dreaming up, canning and distributing our own beverages" is

an obvious reference to the Debtor, and yet another indication that Defendants treated the Debtor

and Best Bev as one and the same.  *Id.*  To this day, Defendants and the Best Bev Entities benefit

from their theft of Debtor resources.  *Id.* at ¶ 171.

**D.       The Insider Defendants' Utter Failure To Maintain Internal Controls**

At all times material hereto, the Insider Defendants caused the Debtor to fail to comply

with the most basic principles of corporate governance and internal controls.  *Id.* at ¶ 172.  This

failure was intentional, particularly with respect to the Debtor's accounting, as it allowed

Defendants to freely pilfer the Debtor for the benefit of the Pilfering Entities, with substantial ill-

gotten gains flowing to the individual Defendants.  *Id.* at ¶ 173.  A May 10, 2021 letter from the

Debtor's outside accounting firm addressed to the Debtor's Board of Directors and Members of

the Debtor and its related entities reported the complete failure of the Debtor's accounting function

as "cause for substantial concern because management cannot rely entirely on the accuracy of

internally prepared financial statements."  *Id.* at ¶ 174.

The Insider Defendants, with the active involvement and under the instruction of Defendant

Sheehan, grossly mismanaged the Debtor's Chapter 11 Case by, among other things, providing

false and inaccurate testimony and declarations, allowing the Debtor to produce and file inaccurate

documents, pilfering funds belonging to the DIP for the benefit of their affiliated entities, providing

the Sheehan Defendants full access and control of the Debtor's books and records, allowing the

Sheehan Defendants to assist in the preparation of the Debtor's filings with this Court, intentionally

attempting to rig the Section 363 sale for the benefit of the Sheehan Defendants (resulting in an

artificially low price for the Debtor's assets at auction) and causing the Debtor to incur substantial

unnecessary and avoidable fees, costs, and expenses.  *Id.* at ¶¶ 175, 104-116, 128-147, 189.

The Insider Defendants retained and utilized Defendant Boyer as the Debtor's non-

bankruptcy General Counsel while knowing that Defendant Boyer was breaching fiduciary duties

owed to the Debtor by simultaneously acting as counsel to the Polebridge Entities and the Wynk

Entities to the considerable prejudice and detriment of the Debtor and its creditors.  *Id.* at ¶ 176.

32

Defendant Boyer breached his fiduciary duties to the Debtor by simultaneously representing the Debtor, the Polebridge Entities, and the Wynk Entities, which, as set forth herein, existed for the purpose of defrauding the Debtor and its creditors. *Id.* at ¶ 177. Moreover, Defendant Boyer as general counsel to the Debtor knew or should have known of management's wrongdoing and failure to follow proper standards of corporate governance as set forth herein, had a duty to take corrective measures, and actively assisted Defendants' scheme instead of fulfilling his duty to correct the wrongdoing. *Id.*

Defendants Parzych and Rittenburg treated the Debtor as their piggy bank, making a number of personal purchases using the Debtor's funds, as set forth in detail in the Amended Complaint. *Id.* at ¶ 178. Additionally, as set forth in detail in the Amended Complaint, the Insider Defendants caused the Debtor to wrongfully funnel large sums of money into entities owned by Defendant Casey Parzych's father, Defendant Gary Parzych. *Id.* at ¶¶ 179-188.

### E. The Chapter 7 Case

On August 25, 2021, the United States Trustee filed a Motion Pursuant to 11 U.S.C. § 1112 to Dismiss the Case or Convert to Chapter 7 (the "Conversion Motion"). In support of the Conversion Motion, the United States Trustee averred, *inter alia*:

a. "[P]rior to the petition date the Debtor caused to be made transfers of substantial value";

b. "The Debtor has failed to timely file its financial operating reports since the petition date. The UST, creditors, and parties in interest are unable to examine the Debtor's post-petition operations and determine whether the Debtor has otherwise complied with its fiduciary obligations. Further, the failure to comply with this duty makes it impossible to determine the administrative expenses of the estate since this case was filed."; and

c.      "The Debtor has failed to file the Notice of Officer Compensation as required by LBR 4002-1 disclosing any payments made since the filing date or contemplated being made to the Debtor's officers," *id.* at ¶ 189.

On October 13, 2021 (the "Conversion Date"), the Bankruptcy Court entered an order converting the Debtor's Chapter 11 case to a case under Chapter 7 of the Bankruptcy Code and, on October 14, 2021, the Trustee was appointed as the permanent Chapter 7 Trustee of the Estate. *Id.* at ¶ 190.

Since her appointment, the Trustee has undertaken an investigation of the Debtor's affairs. *Id.* at ¶ 191. The Defendants have actively obstructed the Trustee's investigation. *Id.* at ¶ 192. As discussed herein, Defendants intentionally destroyed or stole the Debtor's emails and electronic files. *Id.* at ¶ 193. The night before Millstone was set to take over the Debtor, documents stored in a safe located at 118 North Main were removed. *Id.* at ¶ 194. A forensic analysis of the Debtor's Wi-Fi system disclosed that a device named "Casey's Phone" logged into the Debtor's network at a time contemporaneous with the removal. *Id.* Defendants Casey Parzych, Rittenburg, Baldwin, Festa, Culbertson, Uszenski, Best Bev, LLC, Can Man, EtOH Worldwide, LLC and AgTech VI have failed to cooperate with requests for information issued pursuant to Bankr. E.D.Pa. Local Rule 2004-1. *Id.* at ¶ 195. Defendants instructed former debtor employees to sign non-disclosure agreements to conceal information concerning the operation of the Debtor's business. *Id.* at ¶ 196.

Additionally, former Debtor employees who did not cooperate with Defendants were harassed and intimidated. *Id.* at ¶ 197. By way of example, a chocolate phallus was sent to the family home of a former Debtor employee who chose to work for Millstone rather than join Defendants at the Best Bev Entities. *Id.*

On March 7, 2022, Millstone filed a proof of claim which confirms many of the foregoing

allegations and establishes that the Defendants' wrongdoing caused substantial harm to the Estate

by incurring debts and making expenditures on behalf of the Pilfering Entities, transferring the

Debtor's equipment to the Pilfering Entities, and ultimately diminishing the value of the Debtor in

the eyes of potential Rule 363 purchasers. *Id.* at ¶ 198.

###### F.      The Adversary Proceeding

The Trustee instituted the instant adversary proceeding by filing her original complaint on

June 15, 2023. *See* Adv. D.I. 1. Moving Defendants filed a motion to dismiss the Trustee's

original complaint on September 15, 2023 (Adv. D.I. 17, the "Prior MTD"), along with a

supporting memorandum of law detailing their arguments (Adv. D.I. 17-1, the "Prior MTD Br.").

On July 23, 2024, this Court issued an order (Adv. D.I. 40) and accompanying opinion

(Adv. D.I. 39, the "MTD Opinion") granting in part and denying in part the Prior MTD, and

holding as follows:

- Count 1 of the complaint stated a claim for breach of fiduciary duty against all Insider Defendants, MTD Opinion at pp. 32-37;

- Count 2 of the complaint stated a claim for aiding and abetting breach of fiduciary duty against all Moving Defendants, *id.* at pp. 40-44;

- Count 3 of the complaint stated a claim for corporate waste against all Insider Defendants, *id.* at pp. 45-46;

- Count 4 of the complaint stated an alter ego claim against Moving Defendants Casey Parzych, Rittenburg, and Culbertson, and a claim for veil piercing against the Pilfering Entities, *id.* at pp. 49-52, with the Trustee granted leave to amend its claim for successor liability as a separate count, *id.* at p. 46 n.21;

- Count 5 of the complaint stated a claim for unjust enrichment against all Moving Defendants, *id.* at pp. 55-57;

- Count 6 of the complaint failed to state a claim for an equitable accounting, *id.* at pp. 58-59;

- Count 7 of the complaint failed to state a claim for a constructive trust, *id.* at p. 61;

- Count 8 of the complaint stated a claim for breach of contract against Moving Defendants Casey Parzych and Rittenburg and a claim for declaratory relief against the Pilfering Entities, *id.* at pp. 63-64;

- Count 10 of the complaint stated a claim for equitable subordination against Moving Defendants AgTech VI LLC, ETOH Worldwide LLC, and Boyer, *id.* at pp. 65-67;

- Count 11 of the complaint stated a claim for turnover against all Moving Defendants as to the Debtor's electronic records and emails, *id.* at pp. 68-69;

- Count 12 of the complaint, for avoidance and recovery of post-petition transfers, would be dismissed with leave to amend, *id.* at p. 71; and

- Count 13 of the complaint stated a claim for a preference against Defendant Boyer, *id.* at pp. 73-74.

On August 22, 2024, the Trustee filed her Amended Complaint, making the following limited amendments specifically contemplated in the MTD Opinion:

- With respect to Count 4, the claims for alter ego and veil piercing were limited to Defendants Parzych, Rittenburg, Culbertson, and the Pilfering Entities in Count 4A, and the claim for successor liability against the Pilfering Entities was separated into a separate count, Count 4B, *see* Amended Complaint at ¶¶ 224-238;

- Counts 6 (for an accounting) and 7 (for a constructive trust) were eliminated;

- Count 10 (for equitable subordination) was limited to Defendants AgTech VI LLC, EtOH Worldwide LLC, and Boyer;

- Count 11 (for turnover) was limited to encompass only the Debtor's emails and other records; and

- Count 12 (for avoidance of post-petition transfers) was amended to correct a typographical error, with the undefined term "Best Bev Defendants" changed to the defined term "Best Bev Entities".[5]

On September 30, 2023, the Moving Defendants filed the instant Motion to Dismiss the Trustee's Amended Complaint (Adv. D.I. 50), along with an accompanying memorandum of law

---

[5]      *See* MTD Opinion at 71.

(Adv. D.I. 50-1, the "Renewed MTD Br.").

## III.    MOTION TO DISMISS STANDARD

The Moving Defendants' challenge to the Trustee's standing is subject to Federal Rule of Civil Procedure 12(b)(1).  "A facial 12(b)(1) challenge, which attacks the complaint on its face without contesting its alleged facts, is like a 12(b)(6) motion in requiring the court to consider the allegations of the complaint as true."  *Hartig Drug Co. Inc. v. Senju Pharm. Co.*, 836 F.3d 261, 268 (3d Cir. 2016) (citations and quotation marks omitted).  A factual 12(b)(1) challenge attacks allegations underlying the assertion of jurisdiction in the complaint and, "when reviewing a factual challenge, a court may weigh and consider evidence outside the pleadings."  *Id.* (citations and quotation marks omitted).

Moving Defendants' remaining arguments are subject to Federal Rule of Civil Procedure 12(b)(6), pursuant to which the court must accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.  *ChemLogix LLC v. Bulk Tainer Logistics N. Am., Inc.,* 2023 WL 5751404, at *4 (E.D. Pa. Sept. 6, 2023).  "To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "The purpose of a motion to

dismiss is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits

of the case." *In re Student Fin. Corp.*, 335 B.R. 539, 546 (D. Del. 2005).

## IV.   ARGUMENT

### A.   The Trustee Has Standing To Pursue Her Claims, Which Were Not Among the Debtor's Business Assets Transferred to Millstone

Moving Defendants – after actively litigating this case for over fifteen months, and

despite their contemporaneous knowledge of the September 2021 sale of certain of the Debtor's

assets to Millstone and the terms thereof – belatedly argue that the Trustee lacks standing to

pursue certain of the claims in the adversary proceeding[6] because those claims were purportedly

sold by the Debtor to Millstone.  Renewed MTD Br. at pp. 4-10.  The argument should be

rejected as a last-ditch litigation tactic as it is contradicted by: 1) the plain language of the APA

between the Debtor and Millstone, and the Court's Sale Order approving the same; 2) the

representations of counsel for both the Debtor and Millstone in open court prior to this Court's

approval of the APA; 3) Millstone's own intent and interpretation of the APA as leaving the

Trustee's claims with the Debtor's estate; and 4) the post-sale course of conduct of a significant

subset of the Moving Defendants, including Defendant Casey Parzych, who controlled the

Debtor during the negotiation and approval of the APA prior to appointment of the Trustee.

### 1.   The Plain Language of the APA Establishes That the Trustee's Causes of Action Were Not Among The Business Assets Transferred to Millstone

Section 1.01 of the APA states that Millstone is purchasing "all of [the Debtor's] right,

title, and interest in, to, and under all of the tangible and intangible assets, properties, and rights

---

[6]      Moving Defendants identify Counts 1-5, 8, and 10-12 as common law claims subject to
their standing attack.  Renewed MTD Br. at p. 4.  This is incorrect, as claims ten, eleven, and
twelve arise under the Bankruptcy Code.

of every kind and nature and wherever located (other than the Excluded Assets), which relate to, or are used or held for use in connection with, the Business (collectively, the "Purchased Assets"). . .," with the "Business" contractually defined as the Debtor's "business of distilling and producing spirits." *See* APA § 1.01 and Recitals (Bankr. D.I. 178 at ECF page 23 of 61); *see also* Bankr. D.I. 15, 6/22/21 Declaration of Moving Defendant Casey Parzych in Support of First Day Motions at ¶¶ 9, 13 (representing that the Debtor "operates a distillery and co-co-packaging [sic] plant in Bucks County, Pennsylvania" and "produces a variety of brands [of alcoholic beverages], such as Keystone Rail, Faber, Single Prop and Escape Goat").

This language makes it clear that the intent of the parties was for the Debtor to retain assets above and beyond the explicitly Excluded Assets, as the potential universe of Purchased Assets is limited from the start to those assets which "relate to, or are used or held for use in connection with, the Business." The Trustee's litigation claims do not relate to, nor were they used or held in connection with, the Debtor's operating business of distilling and producing spirits. To the contrary, the Trustee's claims arise out of the Moving Defendants' theft and usurpation of the Debtor's resources to benefit otherwise completely unrelated or competing businesses, namely the CBD, marijuana, and hand sanitizer businesses operated by the Polebridge Entities and the Wynk Entities and the competing canning and liquor business operated by the Best Bev Entities. The Debtor was in the liquor business, not the litigation business, and the Moving Defendants' interpretation of the APA strains credulity.

There can be no dispute that the Trustee's claims relating to use of the Debtor's resources to operate the CBD business of the Polebridge Entities and the marijuana business of the Wynk Entities was not related to the Debtor's business of distilling and producing spirits. Indeed, the Moving Defendants themselves admitted that the businesses are entirely unrelated in their

original motion to dismiss, where they argued that "the Trustee's theory of the case . . . would have resulted in the Debtor operating in an illegal manner. . . . [T]he Debtor could not engage in business activities such as those related to CBDelight and Wynk Seltzer.  At bottom, the Trustee's case is founded on an unsupportable claim that the estate should be entitled to the value of separate business ventures which the Debtor did not, and could not, own."  Prior MTD Br. (Adv. D.I. 17-1) at p. 30.[7]  Accordingly, the Moving Defendants' arguments as to claims relating to CBD or marijuana production must be rejected.

And the Moving Defendants fare no better with the Trustee's claims relating to the Moving Defendants' use of the Debtor's resources to benefit the Polebridge Entities with respect to hand sanitizer and the Best Bev Entities with respect to a competing canning and liquor business, as those claims arise not out of the Debtor's operation of its business, but instead the Moving Defendants' usurpation of the Debtor's business for their own purposes.  In

---

[7]     *See also id.* at p. 2 ("the Debtor did not, and could not, own or operate CBDelight or Wynk Seltzer—CBD or cannabis infused beverage products—due to restrictions imposed upon the Debtor by its lender, insurance, and liquor license"), pp. 3-4 ("The Debtor did not and could not engage in CBD or cannabis sales due to the fact that PNC, the Debtor's prepetition secured lender, is a federally chartered national bank that cannot be the lender to a company selling CBD or cannabis-based or controlled-substance products.  Moreover, licensing and insurance constraints did not allow for the Debtor to be concurrently in the business of manufacturing and selling both alcohol and CBD or cannabis products."), p. 28 ("the Debtor could not engage in CBD- or cannabis-related activities"), p. 50 ("CBDelight, Wynk Seltzer, and other alleged 'Work Product,' are not and were never assets of the Debtor or property of the estate.  In fact, the Debtor could not own or sell those products because of lending, regulatory, and insurance restrictions."); *accord* Amended Complaint at ¶ 141 (alleging that, on August 6, 2021, in response to questioning from counsel for the United States Trustee, the Debtor represented that it "does not now and never has provided services to any companies for the purpose of unlawfully manufacturing, storing, distribution, or using a controlled substance as defined under federal law. . . . None of the debtor's assets . . . are currently used by or in the business operations of AgTech nor have they ever been used by or in the business operations [sic] AgTech.  AgTech lawfully provides services to cannabis companies using assets that are not and never were owned by the debtor.").

circumstances such as this, courts narrowly construe contractual language to make sure only

those assets the parties intended to transfer are included in the asset sale.

     For instance, in *Tl Administration Corp. v. Ideasphere, Inc.*, 337 B.R. 827 (Bankr.

S.D.N.Y. 2006), the parties disputed whether the "intangible" assets mentioned in a pre-

bankruptcy Asset Purchase Agreement (the "TL APA") included the debtors' right to restitution

from two insurance brokers for alleged wrongful activity that predated the TL APA.  The TL

APA called for the transfer of "all the assets . . . used in the Business, . . . whether real or

personal, tangible or intangible, vested or unvested, contingent or otherwise," including

"accounts receivable," "goodwill and other intangible assets associated with the Business," and

"any rights, claims or causes of action of Sellers against third parties relating to the Business or

the Purchased Assets."  *Id.* at 830 (formatting altered).  Despite the broad language, the court

construed the TL APA as covering only those assets actually used in the normal course of the

aluminum "business" that was being sold, and not "*all* of the Sellers' assets" regardless of

whether they directly concerned normal business operations.  *Id.* at 831 (emphasis in original).

Finding the debtors' claims against the brokers to be different in kind and nature from normal

business operations, the court held that those unique assets had not been transferred "because

they were not 'used in the [Sellers'] Business,' unless one reads the definition of 'Business' so

broadly as to encompass not what [the TL] APA § 1.1 says the 'Business' is (the 'manufacturing

and marketing of nutritional products'), but, rather, the ownership of all of the Debtors' assets.

Such an interpretation, however, would render the [TL] APA's emphasis on the Purchased

Assets being used in the 'Business' superfluous."  *Id.* at 832.  The court reached this conclusion

despite the TL APA's language calling for the transfer of "any rights, claims or causes of action .

. . relating to the Business or the Purchased Assets," holding that the rights at issue "are 'related'

41

to the Business only to the extent that they are something of value that may, like any other asset that is convertible into money, be used in the business, a connection that is too tangential to support the[ir] treatment . . . as a Purchased Asset." *Id.* at 830, 835; *accord In re Silicon Electro-Physics, Inc.*, 116 B.R. 44, 46 (Bankr. W.D. Pa. 1990) (a "lien" on corporate "collateral," including "contract rights," did not include life insurance proceeds, as the "record" did not support an intent to do so).

Here, as in *Tl Administration*, the APA makes it clear that the Debtor is not selling all of its assets, but instead only those assets which "relate to, or are used or held for use in connection with" the Debtor's Business.  The only relation of the Trustee's claims to the Debtor's Business – as opposed to the business of other companies – is that the claims arise out of the Moving Defendants' wrongful use of the Debtor's money, property, and employees.  It cannot fairly be said that the Trustee's claims are "related to" the Debtor's Business simply because they implicate the Moving Defendants' usurpation of the Debtor's resources, as such an interpretation would render superfluous the APA's transfer of not all assets, but instead only assets related to the Debtor's business.  *See Tl Administration Corp.*, 337 B.R. 827; *cf. Linens of Europe, Inc. v. Best Mfg., Inc.*, 2004 WL 2071689, at *8 (S.D.N.Y. Sept. 16, 2004) (contractual assumption of "routine commercial liability incurred 'in the ordinary course of business'" did not include "tortious liability arising out of unlawful activity"); *New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995) (Supreme Court, in the context of statutory pre-emption, cautions against an overbroad interpretation of the term "relate to" – "If 'relate to' were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes pre-emption would never run its course, for really, universally, relations stop nowhere[.]" (internal alteration marks, quotation marks and citation omitted)).

42

Further confirmation that the APA did not transfer the Trustee's litigation causes of

action comes from APA Section 1.01(k), which states that the transferred property includes "any

claims or causes of action [Debtor] or its bankruptcy estate have, had, or may have against

[Millstone] or any of its affiliates, or any holder of an Assumed Liability, including, without

limitation, any claims or causes of action pursuant to Sections 544, 547, 548, 549, or 550 of the

Bankruptcy Code[.]"  *See* APA § 1.01(k) (Bankr. D.I. 178, ECF page 25 of 61); *see also* Sale

Order, at ¶ 10 (Bankr. D.I. 178, ECF page 10 of 61).[8]  If other language in the APA effectuated

the transfer to Millstone of all litigation claims, then Section 1.01(k) would be entirely redundant

and of no effect.  Accordingly, the only reasonable interpretation of the APA is that the causes of

action being brought by the Trustee were transferred to Millstone only to the extent they were

against Millstone or its affiliates, or the holder of an Assumed Liability.  *See M. Barry Schultz &

Co. v. APM Horsham, Inc.*, 835 F. Supp. 820, 822 (E.D. Pa. 1993) ("Ultimately, contracts should

be construed to give effect to every provision.) (citing *Dep't of Transp. v. Manor Mines, Inc.*,

565 A.2d 428, 432 (Pa. 1989) ("It is also well established that when interpreting a contract a

court must determine the intent of the parties and effect must be given to all provisions in the

contract."); *Atl. Richfield Co. v. Razumic*, 390 A.2d 736, 739 (Pa. 1978) ("To determine an

agreement, a writing must be interpreted as a whole, giving effect to all its provisions.").[9]

---

[8]    Paragraph 10 of the Sale Order mirrors Section 1.01(k) of the APA and states that, "[a]t
the closing of the Sale Transaction, to the extent provided by the Asset Purchase Agreement (and
not identified as an Excluded Asset), all of the rights, claims or causes of action the Debtor or its
bankruptcy estate against the Buyer, its affiliates or any holder of an Assumed Liability,
including any Claims and causes of action arising under Chapter 5 of the Bankruptcy Code or
any similar Law against such older of an Assumed Liability, shall be assigned, sold and
transferred to Buyer, free and clear of all liens, claims, encumbrances and interests, and Buyer
shall have standing and authority to assert such rights, claims and causes of action."

[9]    Moving Defendants cite *Hill v. Akamai Tech, Inc.*, 477 F.3d 1131 (10th Cir. 2007) in
support of their argument that the Debtor-in-possession waived the Trustee's claims by not
listing them in the APA as causes of action pending or threatened against the Debtor.  Renewed

2.    **The Parties' Representations to this Court in Support of the Debtor's Sale of Business Assets Establish That the Trustee's Causes of Action Were Not Transferred to Millstone**

The interpretation of the APA as not including the Trustee's causes of action was confirmed by the parties to the agreement in open court during the hearing on the Debtor's motion to approve the sale, with counsel for Millstone representing as follows:

> MS. JEFFERSON [counsel for Millstone]:   Your Honor, the final objection is the objection filed by the United States Trustee, at docket 140.  There were a number of issues raised in that objection . . . .
>
> The first being a concern regarding the sale of the Debtors Chapter 5 causes of action. . . .
>
> Section 1.01k of the Asset Purchase Agreement, and decretal paragraph 10 of the Sale Order, limit the Chapter 5 causes of action being sold to the buyer to those actions against the Buyer, its affiliates, and the holder of any assumed liability.  There should not be any cause of action against the Buyer or its affiliates, because they had no prebankruptcy business relationship with the Debtor. The holder of the assumed liabilities is a very limited list.  And I think it is entirely normal and appropriate that a buyer requests that the parties it intends to do business with going forward not be potentially rendered insolvent by a cause of action. . . .

*See* Ex. A, Bankr. D.I. 189 at 18:19-19:15.  Counsel for the Debtor and the United States Trustee agreed with Ms. Jefferson's statement.  *Id.* at 22:2-7, 9-10, 20-24.

In describing the marketing of the assets which were being sold, counsel for the Debtor represented that

> [William F.] Comly [and Son, Inc.] . . . prepared and implemented

---

MTD Br. at p. 9.  The argument is specious, as the Trustee's claims were not "pending" or "threatened" until the Trustee was appointed and investigated the wrongdoing of the Moving Defendants, including wrongdoing committed when the Insider Defendants were in control of the Debtor-in-possession.  *Hill* is entirely inapposite, as that case held that a Chapter 7 trustee was bound by an explicit bar on claims approved by the Bankruptcy Court, 477 F.3d at 1135, not an implied bar on claims arising out of the Insider Defendants' failure to list claims against themselves in a contractual recital.

> a marketing program to promote the sale of the assets.  And as
> reference to that there is Exhibit 5, which is the Comly exhibit of the
> marketing material, which is essentially a list of . . . Comly's
> expenses, as well as a copy of the ad and the brochure.  The prices
> are not relevant.  What is relevant is the different activity and the
> nice little glossy picture there, with the assets.

*Id.* at 39:20-40:3.  Reference to Exhibit 5, attached hereto as Ex. E, demonstrates that the assets

counsel was referring to were "Real Estate, Intellectual Property & Distillery Process Equipment,"

and not litigation claims.

Counsel's presentation led to the following inquiry from this Court:

> THE COURT:        . . . So, the Debtor is selling this real estate,
> equipment, and the entire business, correct?
>
> MR. BURNETT [Debtor's counsel]:        Basically, yes, Your
> Honor.  Obviously, the . . . purchased assets are specifically listed,
> but essentially that is correct.
>
> * * *
>
> THE COURT:        . . . And the Chapter 5 issue that Mr. Callahan
> raised, related to claims against the purchaser or their affiliates,
> correct?
>
> MS. JEFFERSON:    That is correct, Your Honor.  And that is
> Section 101k of the Asset Purchase Agreement, and decretal
> paragraph 10 of the Order, that makes very clear that the only
> Chapter 5 causes of action being sold to the Buyer relate to those
> claims that would be against the Buyer, its affiliates, and the holders
> of assumed liabilities.  So, a very limited universe of parties.
>
> THE COURT:        Are there any other Chapter 5 claims?
> Because I think Mr. Callahan was satisfied there aren't any claims
> under 547, 548, are [sic] any of those things?  And if they are, they
> are not being sold, if they are, correct?
>
> MS. JEFFERSON:    Correct.  There . . . may be some.  They will
> remain with the estate.
>
> THE COURT:        Okay.  Okay.
>
> MR. BURNETT:        Correct.

*Id.* at 44:2-7, 59:2-19.

While counsel's statements pertain to Chapter 5 claims and limit those claims being transferred to only those claims which are against Millstone or the holder of an Assumed Liability, counsel explained that claims against other defendants were not transferred due to operation of Section 1.01(k) of the APA and decretal paragraph 10 of the Sale Order, which are not limited to Chapter 5 claims. Instead, those paragraphs broadly encompass "***any*** claims or causes of action the [Debtor] or its bankruptcy estate have, had, or may have[.]" APA at § 1.01(k) (Bankr. D.I. 178, ECF page 25 of 61, emphasis added); *accord* Sale Order at ¶ 10 (Bankr. D.I. 178, ECF page 10 of 61, referring to "all of the rights, claims or causes of action of the Debtor or its bankruptcy estate"). If, as counsel represented to this Court, Section 1.01(k) limits the transfer of Chapter 5 claims to only those claims against Millstone or the holder of an Assumed Liability, then Section 1.01(k) must also limit the transfer of the Trustee's common law claims to the same extent.

### 3.    The Parties' Course of Performance Establishes That The Trustee's Claims Were Not Transferred to Millstone

"Under Pennsylvania law, the course of performance may always be considered as evidence of the intent of the parties." *Gen. Refractories Co. v. First State Ins. Co.*, 94 F. Supp. 3d 649, 663 (E.D. Pa. 2015). Indeed, "'(t)he parties to an agreement know best what they meant, and their action under it is often the strongest evidence of their meaning.'" *Atl. Richfield Co. v. Razumic*, 390 A.2d 736, 741 n. 6 (Pa. 1978) (alteration in original; quoting Restatement (Second) of Contracts § 228 cmt. g). Here, 1) Millstone interpreted the APA as not including the Trustee's claims and accordingly did not assert any of the causes of action brought in the Adversary Proceeding on its own behalf; and 2) Moving Defendant Casey Parzych (who controlled the

Debtor during the sale to Millstone and who signed the APA on behalf of the Debtor[10]) took action demonstrating his understanding that causes of action like those being brought by the Trustee were not property of Millstone.  These facts operate as powerful confirmation that the parties to the agreement did not intend to transfer the Trustee's claims.

Millstone has confirmed that it did not intend for the APA to transfer the Trustee's causes of action and does not interpret the APA as having transferred those causes of action.  *See* Ex. F at Appendix 1, ¶ 7 (Declaration of Millstone President Robert Cassell).  Accordingly, Millstone has not acted to assert the causes of action brought in the Adversary Proceeding on its own behalf.  *Id.* at ¶ 8.  As the buyer which would have benefitted from the transfer of potentially valuable causes of action, Millstone's interpretation of the APA and subsequent inaction regarding the causes of action asserted by the Trustee is entitled to substantial weight.

And the Debtor-in-possession's intent and interpretation of the APA was no different.  On April 2, 2021, Anthony Lorubbio – one of the Debtor's former principals – brought claims for breach of fiduciary duty against Moving Defendants Casey Parzych, Baldwin, Rittenburg, and Polebridge in the Bucks County Court of Common Pleas.  *See* Ex. B, Docket from *Lorubbio v. Parzych, et al.*, Bucks Cty. CCP No. 2021-01816 (the "State Court Docket").  On July 15, 2023 – nearly two years after this Court's approval of the APA – those Moving Defendants filed a motion for summary judgment which argued that the state court lawsuit should be dismissed because "none of [Lorubbio's] alleged injuries can be separated from . . . MMD's [i.e., the Debtor's] purported injuries" (i.e., Lorubbio's claims are derivative of injury inflicted on the Debtor) and because "Lorubbio failed to join Midnight Madness Distilling, LLC [i.e., the Debtor] . . . as an indispensable party."  *See* Ex. C, State Court MSJ Br. at pp. 1, 5.  While it was

---

[10]     *See* Ex. D (executed version of APA).

ultimately denied, the state court motion is germane to the Moving Defendants' standing

argument because it demonstrates that a significant subset of the Moving Defendants – including

Casey Parzych, who controlled the Debtor during the negotiation, approval, and execution of the

APA, and who executed the APA on behalf of the Debtor – understood that the Debtor retained

ownership of causes of action for breach of fiduciary duty and, had the state court agreed with

those Moving Defendants' arguments, it would be the Debtor, and not Millstone, that would be a

necessary party to Lorubbio's state court action.

As the controlling principal of the Debtor during the Millstone sale, Moving Defendant

Casey Parzych's interpretation of the APA as leaving derivative claims for breach of fiduciary

duty in the possession of the Debtor demonstrates his understanding that claims of that nature

were not transferred to Millstone. *See In Re Twp. of Blythe*, 2020 WL 710003, at *7 (Pa.

Cmwlth. Feb. 12, 2020) ("a party's performance under the terms of a contract is always relevant

in interpreting writing").

The Moving Defendants' course of conduct during the instant lawsuit further

demonstrates their understanding that causes of action like those brought by the Trustee were not

among those distillery business assets transferred to Millstone via the APA.  The Trustee

initiated this adversary proceeding on June 15, 2023 (Adv. D.I. 1), and effectuated service the

next day (Adv. D.I. 2).  Instead of immediately arguing that the Trustee lacked standing to bring

her claims, the Moving Defendants attempted to have this Case withdrawn to the District Court

(Adv. D.I. 5, 9/5/23 Motion for Withdrawal of Reference), and filed their original motion to

dismiss this case (Adv. D.I. 17) raising arguments relating to the merits of the Trustee's claims,

and not any purported lack of standing to bring them.  Despite undoubtedly being aware of the

sale to Millstone and the terms of the APA, the fact that it took Moving Defendants over a year

48

to argue that the Trustee's claims were part of the business assets transferred to Millstone is

further demonstration that the parties to the APA did not interpret it as such and that the Moving

Defendants' current argument is a litigation gambit and an attempt to play things fast and loose

with this Court.

### 4.    Moving Defendants AgTech VI, LLC and ETOH Worldwide, LLC Were Not "Holders" of Assumed Liabilities

Moving Defendants Agtech VI, LLC and ETOH Worldwide LLC make the additional

argument that Section 1.01(k) of the APA transferred the Trustee's claims against them to

Millstone because they were "holder[s] of Assumed Liabilities."  Renewed MTD Br. at 32.

Section 1.03 of the APA governs Assumed Liabilities and states in pertinent part as follows:

> Buyer shall not assume or be responsible for any Liabilities of the Seller, except that Buyer shall only assume the following Liabilities (the "Assumed Liabilities"): . . .
>
> (d)    Buyer shall assume and perform those monetary obligations of the Seller under the Seller's Equipment Leases with Agtech IV, LLC and ETOH Worldwide LLC (the "Rejected Leases") that arise on or after the Petition Date, to the extent that (i) such obligations are administrative claims (the "Agtech/ETOH Admin Claims") allowed pursuant to Section 503 of the Bankruptcy Code by a final, non-appealable order of the Bankruptcy Court; (ii) the Buyer shall be entitled, and have standing to object to any such Motion seeking allowance of the Agtech/ETOH Admin Claims; (iii) the Buyer shall have no obligations with respect to the Rejected Leases or the Agtech/ETOH Admin Claims other than as expressly provided herein.

APA at § 1.03 (Bankr. D.I. 178, ECF pages 25-26).  As an initial matter, Moving Defendants'

argument is entirely inapplicable to Defendant AgTech VI, LLC, as that entity is not mentioned

in APA Section 1.03 – instead the section discusses AgTech IV, LLC, which is not a defendant

in the Trustee's lawsuit.

Even assuming that the APA listed AgTech VI, LLC in Section 1.03(d) (and not non-defendant AgTech IV, LLC), Moving Defendants' argument should be rejected because AgTech IV, LLC and ETOH Worldwide, LLC were not "holder[s] of Assumed Liabilities" for purposes of APA Section 1.01(k) due to their unique treatment in the APA.  Unlike all the other Assumed Liabilities listed in Section 1.03 of the APA – which required Millstone to assume and perform the Debtor's obligations under various Assigned Contracts and assumed claims whole cloth, *see* APA §§ 1.03(a)-(c) (Bankr. D.I. 178, ECF page 25 of 61) – the contracts which purportedly established the liabilities to AgTech IV, LLC and ETOH Worldwide, LLC were not assumed. To the contrary, they were expressly rejected, as demonstrated by their definition as "Rejected Leases" in APA Section 1.03(d) and as specified by decretal paragraph 13 of the Sale Order, which states that "the Debtor shall not reject any Contract designated an Assigned Contract under the [APA], provided however, that the Debtor's Equipment Lease Agreements with Agtech IV, LLC and ETOH Worldwide, LLC shall be deemed rejected as of the date of this Order."  *See* APA § 1.03(d) (Bankr. D.I. 178, ECF page 25 of 61); Sale Order at ¶ 13 (Bankr. D.I. 178, ECF pages 11-12).

As opposed to "holding" – i.e., possessing – an assumed liability which was established by an executory contract and which could have been the subject of claims that Millstone would in fairness have to hold in order to not sit unprotected in an ongoing contractual relationship, all that AgTech IV, LLC and ETOH Worldwide, LLC obtained via Section 1.03(d) was a highly qualified path to payment of specifically designated claims subject to the further approval of this Court.  Accordingly, these entities were not "holders" of Assumed Liabilities for purposes of Section 1.01(k).

This is the only rational interpretation of the APA considering counsel's explanation during the Section 363 hearing that Section 1.01(k) of the APA was justified with respect to assumed liabilities because "[t]he holder of the assumed liabilities is a very limited list. And I think it is entirely normal and appropriate that a buyer requests that the parties it intends to do business with going forward not be potentially rendered insolvent by a cause of action." *See* Ex. A, Bankr. D.I. No. 189 at 19:11-15. Here, because the leases with AgTech IV, LLC and ETOH Worldwide, LLC were expressly being rejected under paragraph 13 of the Sale Order, there was no "business going forward" and no justifiable reason to include claims against AgTech IV, LLC and ETOH Worldwide, LLC among those which were transferred to Millstone.

It is notable that Judge Coleman, who approved the APA language in the first instance, has already rejected the Moving Defendants' arguments that claims against AgTech VI, LLC and ETOH Worldwide, LLC are barred by virtue of their being allowed administrative expenses under the APA, *see* Prior MTD Br. (Adv. D.I. 17-1) at p. 48. The result should be no different the second time around.

### 5.    Moving Defendants' Argument Is Inapplicable to Count 8

Even should the Court accept Moving Defendants' jurisdiction argument as to certain of the Trustee's other claims, the argument is entirely inapplicable to Count 8, for breach of the Debtor's LLC Agreement against Moving Defendants Casey Parzych and Rittenburg and related declaratory relief against the Pilfering Entities. *See* Amended Complaint at ¶¶ 247-255. Section 1.02 of the APA states that the business assets purchased by Millstone "shall not include the assets, properties, and rights specifically set forth on Schedule 1.02 of the Disclosure Schedules." APA § 1.02 (Bankr. D.I. 178 at ECF page 25 of 61). Schedule 1.02 specifically excludes from the purchased assets "All Contracts, and leases of real or personal property except for the

Assigned Contracts." *Id.* at Sched. 1.02 (Bankr. D.I. 178 at ECF page 51 of 61).  The Debtor's

LLC Agreement, which forms the basis for the Trustee's breach of contract claims, is not among

the contracts included in the APA's schedule of assigned contracts.  *See id.* at Schedule 1.01

(Bankr. D.I. 178 at ECF page 49 of 61).  Accordingly, the Debtor's contractual rights under its

LLC Agreement were not transferred to Millstone, and Moving Defendants' challenge as to

Count 8 must be rejected.

> **6.      Even If This Court Accepts Moving Defendants' Standing Argument,
> Millstone Has Executed A Conditional Assignment of Claims Back to
> the Trustee**

As discussed above, Millstone did not intend for the APA to transfer the causes of action

now being asserted by the Trustee, and does not interpret the APA as having transferred those

causes of action.  *See* Ex. F at Appendix 1, ¶ 7.   However, out of an abundance of caution, to the

extent that this Court determines that the APA transferred any of the Trustee's causes of action to

Millstone, Millstone assigns those causes of action to the Trustee retroactive to the date on which

Millstone is deemed to have taken possession of them.  *See* Ex. F (Conditional Assignment of

Claims).  This Court – which approved the APA and which has also already issued an opinion

allowing the bulk of the Trustee's causes of action to continue – appointed the Trustee to

investigate claims such as those asserted in the Amended Complaint, and has broad discretion to

implement its orders and prevent abuses of process.  *See* 11 U.S.C. § 105(a).  The Trustee's

Amended Complaint details significant malfeasance on the part of the Moving Defendants at the

Debtor's expense.  To this day, Moving Defendants continue to operate their Wynk and Best Bev

enterprises, reaping the benefits of their looting of the Debtor while the Debtor's creditors

remain unpaid.  Millstone believes that the causes of action asserted by the Trustee were not

transferred to Millstone, and, even if they are deemed to have been, Millstone is willing to assign

them to the Trustee. The Trustee should accordingly be allowed to pursue her claims for the benefit of the Debtor's estate.

> **B.    Moving Defendants' Remaining Arguments, the Majority of Which Have Already Been Considered and Rejected by this Court, Are Without Merit**

>> **1.    The Bulk of Moving Defendants' Arguments Have Already Been Rejected by this Court, And the Law of the Case Doctrine Denies Them A Second Bite at the Apple**

With the exception of the standing issue addressed *supra*, and as highlighted in the opening paragraph of the pertinent subsections below, Moving Defendants' remaining arguments are by and large identical to those they already raised in the Prior MTD (Adv. D.I. 17) and which were rejected by this Court in its MTD Opinion (Adv. D.I. 39). The law of the case doctrine "limits re-litigation of an issue once it has been decided in an earlier stage of the same litigation." *In re Carbone*, 615 B.R. 76, 85 (Bankr. E.D. Pa. 2020) (quotation marks omitted, citing *Bowers v. City of Philadelphia*, 2008 WL 5234357, at *3 (E.D. Pa. Dec. 12, 2008) and *Hamilton v. Leavy*, 322 F.3d 776, 786-87 (3d Cir. 2003)); *ACLU v. Mukasey*, 534 F.3d 181, 187 (3d Cir. 2008) ("Under the law-of-the-case doctrine, when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." (quotation marks and citation omitted)). This Court's MTD Opinion is the law of the case and Moving Defendants' attempt at a second bite at the apple on the issues briefed below should accordingly be rejected as a matter of course.

**2.      As this Court Has Already Held, the Allegations of the Amended Complaint Are Sufficiently Specific As to Each Defendant, And The Term "Pilfering Entities" Is Clearly Defined**

Moving Defendants repeat their previously asserted[11] argument that various claims in the Amended Complaint are defective under Fed. R. Civ. P. 8 because of the use of purported vague definitions and an improper "shotgun style" of pleading.  Renewed MTD Br. at pp. 12-15.  This Court should deny Moving Defendants a second bite at the apple, and reject the argument for the same reasons it was rejected in the first instance.  *See* MTD Opinion (Adv. D.I. 39) at 21 ("[T]he test is not perfect pleading, but rather whether the Complaint provides adequate notice to the Moving Defendants of the claims that are asserted against them and the factual basis for the claims.  The Court finds that the Complaint sets forth the underlying facts underpinning each claim against the Defendants, and identifies in each count which Defendants it seeks to hold liable, thereby adequately satisfying this test. The Complaint therefore does not constitute a shotgun pleading.").

The allegations in the Amended Complaint are specific enough to set forth claims against each Moving Defendant.  All that is required under Federal Rule of Civil Procedure 8(a)(2) is "a short and plain statement of the claim showing that the pleader is entitled to relief."  The Rule "do[es] not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.  To make a claim "plausible," the facts alleged must simply "raise a right to relief beyond the speculative level." *Id.* at 555.  "This requirement 'calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of' necessary elements of the plaintiff's cause of action." *Infantino v. W. Wyoming Borough*, 2013 WL 3972770, at *2 (M.D. Pa. July 31, 2013) (quoting *Twombly*, 550 U.S. at 556).

---

[11]      *See* Prior MTD Br. (Adv. D.I. 17-1) at pp. 16-19.

Moving Defendants ignore these standards in their Motion. The Amended Complaint is not a shotgun pleading and is entirely compliant with Rule 8 because it contains specific detail regarding each Moving Defendant's role at or concerning the Debtor, *see* Amended Complaint at ¶¶ 10-33, and includes specific allegations regarding the conduct of individual Moving Defendants throughout. *See, e.g., infra* at pp. 62-65, 66-69 (detailing the Amended Complaint's allegations of individualized misconduct against each of the Moving Defendants).

To the extent that certain paragraphs are alleged in terms of conduct that all or specific subsets of the Defendants as a group engaged in or allowed to happen, the Amended Complaint is pleaded in that fashion because all such Defendants collectively engaged in that behavior, and there is nothing improper with allegations of this type. *See Buckley v. O'Hanlon*, 2007 WL 956947, at *5 (D. Del. Mar. 28, 2007) (stating a claim does not require a plaintiff to "associate specific parties to particularized conduct" when "much of the alleged conduct involved collective action and decision making"); *In re Genesis Health Ventures, Inc.*, 355 B.R. 438, 457 (Bankr. D. Del. Dec. 13, 2006) (collective references to certain groups of defendants did not render the pleadings defective, and made sense because the allegations arose out of group action); *UD Dissolution Liquidating Trust v. Sphere 3D Corp. (In re UD Dissolution Corp.)*, 629 B.R. 11, 36-37 (Bankr. D. Del. 2021) (rejecting "group pleading" argument and finding amended complaint contained sufficient detail of actions taken by the Defendants, collectively and individually, in furtherance of the alleged breaches of fiduciary duty); *Hawk Mt. LLC v. Mirra*, 2016 WL 4541032, at *2 (D. Del. Aug. 31, 2016) ("'Group Pleading' is permissible where—as here—information that would permit greater particularity is exclusively within the possession of a defendant, and defendants are alleged to have acted together to facilitate a general scheme.").

The only specific concern raised by the Moving Defendants with respect to the allegations of the Amended Complaint relates to the use of the term "Pilfering Entities," which the Amended Complaint clearly and specifically defines as consisting of the Polebridge Entities, the Wynk Entities, and the Best Bev Entities, Amended Complaint at ¶ 38, which are themselves specifically defined in the Amended Complaint, *id.* at ¶¶ 19, 26, 32. This Court had no difficulty ascertaining the identity of the Pilfering Entities in denying the Moving Defendants' original motion to dismiss, and Moving Defendants' challenge is baseless. *See* MTD Opinion (Adv. D.I. 39) at 3-5 (delineating the defined terms "Pilfering Entities," "Polebridge Entities," "Wynk Entities," and "Best Bev Entities").

And Moving Defendants' argument loses sight of the fact that "whether a complaint is an impermissible shotgun pleading is not wholly dependent on whether it incorporates all preceding paragraphs or names multiple defendants, but on whether the complaint 'give[s] the defendants adequate notice of the claims against them and the grounds upon which each claim rests.'" *Milo, LLC v. Procaccino*, 2020 WL 1853499, at *10 (E.D. Pa. Apr. 13, 2020) (quoting *M.B. v. Schuylkill Cty.*, 375 F.Supp.3d 574, 587 (E.D. Pa. 2019) (denying motion to dismiss when each count in complaint adopted all preceding counts and when some claims "[did] not identify the 'role of each particular defendant in the claim'" because complaint otherwise put defendants on notice and "describes, in significant detail, specific allegations against the respective defendants")). Here, "[t]here is no great mystery . . . as to which counts are asserted against which defendants [because,] [i]mmediately after the subheading for each count in the . . . complaint, Plaintiff[] name[s] the specific defendant or defendants whose actions form the basis of their claim for relief." *Rodwell v. City of Newark*, 2023 WL 5703176, at *5 (D.N.J. Sept. 5, 2023) (rejecting defendants' "shotgun pleading" argument).

56

The Amended Complaint in the instant case, which pleads numerous details concerning each Moving Defendant's participation in an overall scheme to benefit themselves and entities under their control at the expense of the Debtor, meets the minimal standard of giving Moving Defendants adequate notice of the Trustee's claims and the grounds on which they rest. Accordingly, as it was when this Court first rejected it, Moving Defendants' argument as to the sufficiency of the Trustee's pleading is without merit.

> **3.      As This Court Has Already Held, the Amended Complaint Establishes That Defendant Baldwin, As An Agent of the Debtor, Owed Fiduciary Duties to the Debtor**

With respect to Defendant Baldwin only, Moving Defendants argue that "Claim One of the Amended Complaint fails to state a [breach of fiduciary duty] claim against Baldwin because the Trustee fails to plead any facts alleging Baldwin was a manager, director, or officer of Debtor who owed a fiduciary duty."  Renewed MTD Br. at pp. 15-17.  This identical argument has already been raised by the Moving Defendants, *see* Prior MTD Br. (Adv. D.I. 17-1) at pp. 25-27, and rejected by this Court.  *See* MTD Opinion (Adv. D.I. 39) at pp. 32-37 ("The Complaint alleges each of Festa, Baldwin, Boyer, and Culbertson were officers, employees, or agents of the Debtor, and that in those capacities they each breached their duty of loyalty to Debtor as their employer or principal.  That is sufficient to provide notice to the Insider Defendants of the claim against them and the basis for it, which is all that is required to survive dismissal.").

Moving Defendants' renewed argument once again ignores black letter Pennsylvania law establishing that "[a]ll agents are bound by the fiduciary duties of loyalty and obedience to the principal."  *Castle Cheese, Inc. v. MS Produce, Inc.*, 2008 WL 4372856, at *9 (W.D. Pa. Sept. 19, 2008); *Alturnamats, Inc. v. Harry*, 2008 WL 4279814, at *13 (W.D. Pa. Sept. 16, 2008) (internal citations reformatted), order amended on reconsideration on other grounds, 2009 WL

185952 (W.D. Pa. Jan. 23, 2009) ("[N]o man can serve two masters.  Every agent is subject to a

duty not to act or to agree to act during the period of his agency for persons whose interests

conflict with those of the principal in matters in which the agent is employed." (citations and

quotation marks omitted)).

Yet again, Moving Defendants fail to cite any provision of the Pennsylvania Uniform

Limited Liability Company Act of 2016 (the "LLC Act," codified at 15 Pa.C.S. § 8811, *et seq.*)

which undermines these well-established and long-standing principles of law, and there is no

such provision.[12]  Indeed, Pennsylvania's Associations Code (of which the LLC Act is a part, *see*

15 Pa.C.S. § 101) explicitly provides that, "[u]nless displaced by the particular provisions of this

title, the principles of law and equity, including, but not limited to, the law relating to principal

and agent, estoppel, waiver, fraud, misrepresentation, duress, coercion, mistake, bankruptcy or

other validating or invalidating cause, shall supplement its provisions."  15 Pa.C.S. § 110.

Numerous cases decided under Pennsylvania law establish the point by holding that

employees or other agents of a limited liability company owe that company common law

fiduciary duties.  *See AmQuip Crane Rental, LLC v. Crane & Rig Servs., LLC*, 199 A.3d 904,

915 (Pa. Super. 2018) (holding that a salesperson employed by an LLC breached his common

law duty of loyalty to the LLC by helping co-workers breach their noncompetition agreements);

*Patient Acct. Serv. Ctr., LLC v. Ebling*, 2022 WL 4073341, at *12 (M.D. Pa. Sept. 2, 2022)

(recognizing in a case brought by an LLC against a former employee that "Pennsylvania law

---

[12]     Moving Defendants cite Section 8849.2 and 8815(d)(3) of the LLC Act in support of the proposition that "only the Managers of the Debtor owe fiduciary duties."  Renewed MTD Br. at p. 16.  There is absolutely no language in those sections supporting this conclusion.  Those sections simply set forth general standards of conduct for members and managers and provide for limited authority to alter the scope of those individuals' duties, and do not speak to the duties owed by other categories of individuals, such as employees, agents, and attorneys.

dictates that an employee, ***as the agent of his employer***, owes his employer a duty of loyalty"

(quoted reference omitted; emphasis added)); *Neopart Transit, LLC v. CBM N.A. Inc.*, 314 F.

Supp. 3d 628, 636 (E.D. Pa. 2018) (denying motion to dismiss plaintiff LLC's breach of

fiduciary duty claims against the employee of an LLC which was the plaintiff's predecessor in

interest); *cf. also Act II Jewelry, LLC v. Wooten*, 301 F. Supp. 3d 905, 915-916 (N.D. Ill. 2018)

(collecting cases from other jurisdictions establishing that "Employees are not governed by an

LLC's operating agreement, but rather by employment contracts and ***traditional rules of agency***.

. . . [C]ertainly the ability to modify fiduciary duties owed by members and managers does not

eradicate all duties ***owed by agents***." (emphasis added)).

Nor does the "Operating Agreement provide that only managers, directors, or officers owe

fiduciary duties to the Debtor," as Moving Defendants once again argue.  Renewed MTD Br. at

pp. 16-17 (citing Operating Agreement at §§ 5.1, 5.7, and 5.8).  There is no language of any sort

in the Operating Agreement which references fiduciary duties in the agency context, states that

only Managers have fiduciary duties, or states that the company intended to displace the common

law of agency.  With respect to the specific sections cited by the Moving Defendants, Sections 5.1

and 5.7 pertain only to Managers and is thus entirely inapplicable to Defendant Baldwin.  While

certain aspects of Section 5.8 pertain to officers and agents of the Debtor, that section makes no

mention of the waiver of any fiduciary duties and explicitly states that Members, Managers,

officers and agents of the Company are prohibited from using their "position with the Company,

and the information received as a result of said position, in a manner that will harm the business

of the Company in any way," which is exactly the misconduct alleged in the Amended Complaint.

Knowing that their argument that agents cannot owe fiduciary duties is baseless, Moving

Defendants attempt to argue that the Amended Complaint "provides no factual basis to create an

agency relationship." Renewed MTD Br. at p. 16. The argument is likewise without merit, as

the Amended Complaint explicitly alleges that Defendant Baldwin was a spokesperson and agent

of the Debtor, Amended Complaint at ¶ 13, who breached fiduciary duties owed in that capacity

by, *inter alia*:

- Forming Good Design and Polebridge, entities which the Amended Complaint alleges the sole purpose of which was to usurp resources and monies properly belonging to the Debtor, *id.* at ¶¶ 20, 46-48, 63;

- Utilizing the Debtor's employees for the purpose of selling CBDelight for the benefit of the Polebridge Entities, *id.* at ¶ 52;

- Instructing the Debtor's sales team to divert payments for the sale of Faber Hand Sanitizer from the Debtor's Square point of sale system to Polebridge's Square account, despite knowing – as confirmed by her public statements as the Debtor's spokesperson – that Faber Hand Sanitizer was produced and sold by the Debtor, *id.* at 71, 72, 76; and

- Utilizing the Debtor's computer to access an email address associated with the Polebridge Entities to further the business interests of the Polebridge Entities, *id.* at 81.

These allegations amply establish that Baldwin was an agent of the Debtor, as she: exercised

direct control over the Debtor's employees, *id.* at ¶¶ 46-47, 52, and 71; was identified as the

Debtor's spokesperson and issued quotes on the Debtor's behalf in Debtor press releases, *id.* at

¶¶ 72, 76; and had access to the Debtor's computer system, *id.* at ¶ 81.

Simply stated, the Amended Complaint definitively pleads that Defendant Baldwin was

an agent of the Debtor, the foregoing discussion establishes that agents of a limited liability

company owe it fiduciary duties, and Moving Defendants' argument to the contrary is entirely

without merit and should be rejected yet again.

### 4.    As this Court Has Already Held, The Trustee States A Claim For Aiding and Abetting Breach of Fiduciary Duty

Moving Defendants argue that the Amended Complaint is insufficiently specific as to its

claim for aiding and abetting breach of fiduciary duty. Renewed MTD Br. at pp. 17-20. This

argument has already been raised by the Moving Defendants, *see* Prior MTD Br. (Adv. D.I. 17-1) at p. 34, and rejected by this Court.  *See* MTD Opinion (Adv. D.I. 39) at pp. 40-44.

Pennsylvania's appellate courts have explicitly recognized the tort of aiding and abetting breach of fiduciary duty as a valid cause of action.  *See, e.g., Official Comm. of Unsecured Creditors of Allegheny Health Educ. & Research Found. v. PriceWaterhouseCoopers, LLP*, 989 A.2d 313, 327 n.14 (Pa. 2010) ("Under present Pennsylvania law as established by the Commonwealth Court as the highest appellate court which has reached the issue, aiding and abetting a breach of fiduciary duty is a recognized cause of action." (citing *Koken v. Steinberg*, 825 A.2d 723, 732 (Pa. Cmwlth. 2003)); *Koken*, 825 A.2d at 732 ("[Plaintiff] has clearly identified the wrong, a breach of fiduciary duty, the wrongdoer, . . . and the party that acted in concert with the wrongdoer . . . . Accordingly, . . . [plaintiff] has stated a cause of action . . . for aiding and abetting a breach of fiduciary duty[.]").

To state a claim for aiding and abetting a breach of fiduciary duty under Pennsylvania law, a plaintiff must allege the following elements: 1) a breach of a fiduciary duty owed to another; 2) knowledge of the breach by the aider and abettor; and 3) substantial assistance or encouragement by the aider and abettor in effecting that breach.  *Koken*, 825 A.2d at 732.  With respect to the second element, "[e]ither the defendant's direct knowledge of, or willful ignorance to, the breach of fiduciary duty may satisfy the knowledge requirement for aiding and abetting."  *Harrison v. Harrison*, 2021 WL 3022416, at *10 (E.D. Pa. July 15, 2021).

As to the first element, the Amended Complaint makes numerous individualized allegations[13] against the Insider Defendants establishing that they have breached their fiduciary duties to the debtor, including the following:

| Defendant | Individualized Misconduct Alleged | Amended Complaint ¶¶ |
|---|---|---|
| Casey Parzych<br><br>(majority member and Manager of the Debtor, member and president of AgTech PA, and agent of the Polebridge Entities, the Wynk Entities, and the Best Bev Entities) | Instructed Debtor sales representatives to make sales of CBDelight and Faber Hand Sanitizer their "mission critical" priorities even though all proceeds from these products went not to the Debtor but instead to the Polebridge Defendants. | 10, 60, 63, 79 |
| | Used Debtor resources and personnel to create Wynk seltzer and formed AgTech PA, of which he is President, for the purposes of diverting the profits from Wynk Seltzer away from the Debtor. | 86, 88, 89 |
| | Used Debtor computers and a personal Wynk Seltzer email address to further the business of the Wynk Entities. | 92 |
| | Waived the Debtor's attorney client privilege by using his personal Wynk Entities email address in communications with the Debtor's outside counsel. | 101 |
| | Led, along with Defendant Sheehan, the scheme to funnel the Debtor's business to the Sheehan Entities at a fire sale price. | 110-112, 116, 143 |
| | Caused the Debtor to retain and pay for an HR consulting firm on the eve of bankruptcy for the purposes of benefitting entities other than the Debtor. | 122-124 |
| | Falsely testified under oath during a Section 341 meeting that the Debtor was not involved with the production of Wynk Seltzer. | 138-139 |
| | Made the Debtor's bankruptcy counsel aware of his plan to steal Debtor assets and divert business to other entities, leading bankruptcy counsel to admonish him via email. | 149 |
| | Ordered the deletion/transfer of the Debtor's electronic data. | 155 |
| | Sabotaged the Debtor's business prior to the transfer of its assets to Millstone. | 156 |

---

[13]     While the Amended Complaint's allegations of misconduct undertaken by the Insider Defendants as a group are entirely proper due to their acting together in furtherance of a common scheme, *see supra* at pp. 54-57, the following chart includes only allegations of misconduct attributed to individual defendants.  The extensive nature of these allegations further demonstrates why Moving Defendants' "shotgun pleading" argument is without merit.

| | | |
|---|---|---|
| | Held himself out to the Debtor's former customers as a continuation of the Debtor for the benefit of the Best Bev Entities. | 162 |
| | Treated the Debtor as his personal piggy bank by making a number of personal purchases using the Debtor's funds. | 178 |
| | Generated Work Product using the resources of the Debtor for the benefit of entities other than the Debtor. | 250 |
| Angus Rittenburg<br><br>*(member and officer of the Debtor, officer and member/shareholder of the Polebridge Entities, and officer of the Best Bev Entities and the Wynk Entities)* | Formed Good Design and Polebridge, the sole purpose of which was to usurp resources and monies properly belonging to the Debtor. | 11, 46-47, 20, 63 |
| | Waived the Debtor's attorney client privilege by using his personal Wynk Seltzer email address in communications with the Debtor's outside counsel. | 101 |
| | Used Debtor resources and personnel to create Wynk Seltzer. | 86 |
| | Used Debtor computers and personal Wynk Entities and Polebridge Entities email addresses to further the business of the Wynk Entities and the Polebridge Entities. | 57, 92 |
| | Treated the Debtor as his personal piggy bank by making a number of personal purchases using the Debtor's funds. | 178 |
| | Generated Work Product using the resources of the Debtor for the benefit of entities other than the Debtor. | 250 |
| Kelly Festa<br><br>*(Debtor CFO, Director of Sales and Operations of the Best Bev Entities, and agent of the Polebridge Entities and the Wynk Entities)* | Used the Debtor's computers to file the corporate registration documents for Good Design and Polebridge, entities the sole purpose of which was to wrongfully divert the resources of the Debtor. | 46-47, 20, 63 |
| | Used Debtor computers and a personal Polebridge email address to further the business of the Wynk Entities. | 55 |
| | Used her personal Polebridge Entities email address to instruct the Debtor's sales managers to divert revenue from sales of Faber Hand Sanitizer away from the Debtor, despite her knowledge, as she represented to the public, that Faber Hand Sanitizer was produced and sold by the Debtor. | 70, 75 |
| | Used Debtor computers and personal Wynk Entities and Polebridge Entities email addresses to further the business of the Wynk Entities and the Polebridge Entities. | 87, 89 |
| | Waived the Debtor's attorney client privilege by using her personal Wynk Entities email address in communications with the Debtor's outside counsel. | 101 |
| | Presented the Debtor as unfavorable to potential purchasers in the hope of steering the Debtor's business to the Sheehan Entities at less than fair value, leading to an admonishment from outside counsel. | 111-112 |
| | Utilized the Debtor's computer equipment and email system to plan the "Can Man Shadow Structure," which | 124 |

| | depicted a corporate structure which would hold assets which were to be pilfered from the Debtor. | |
|---|---|---|
| | Falsely informed Millstone that the Debtor's industrial shrink wrapper, which was transferred to another entity, was broken and scrapped before closing. | 150.a |
| | Signed checks from the Debtor's DIP account to pay for supplies and services for the benefit of the Best Bev Entities. | 150.c-150.e |
| | Instructed vendors to falsely state that Debtor orders were being delivered to the Debtor's facilities when they were actually being delivered to a non-Debtor location in which the Polebridge Entities, the Wynk Entities, and the Best Bev Entities operate. | 152 |
| | Falsely testified that she inadvertently deleted the Debtor's electronic data and cloud computing drives when that data was actually intentionally deleted, wiped, or stolen. | 154-155 |
| | Utilized the Debtor's marketing files for the purposes of marketing products for the benefit of the Best Bev Entities. | 165 |
| Ashleigh Baldwin<br><br>*(Casey Parzych's spouse, spokesperson for the Debtor, officer and member/shareholder of the Polebridge Entities, agent of the Wynk Entities and the Best Bev Entities)* | Formed Good Design and Polebridge, entities which the Amended Complaint alleges the sole purpose of which was to usurp resources and monies properly belonging to the Debtor. | 46-48, 20, 63 |
| | Utilized the Debtor's employees for the purpose of selling CBDelight for the benefit of the Polebridge Entities | 52 |
| | Instructed the Debtor's sales team to divert payments for the sale of Faber Hand Sanitizer from the Debtor's Square point of sale system to Polebridge's Square account, despite knowing – as confirmed by her public statements as the Debtor's spokesperson – that Faber Hand Sanitizer was produced and sold by the Debtor. | 71, 72, 76 |
| | Utilized the Debtor's computer to access an email address associated with the Polebridge Entities to further the business interests of the Polebridge Entities. | 81 |
| Michael Boyer<br><br>*(general counsel to the Debtor and counsel to the Polebridge Entities and the Wynk Entities)* | Attorney who improperly served in the dual and conflicting roles of general counsel to the Debtor and counsel to the Polebridge Entities and the Wynk Entities, which existed for the purpose of defrauding the Debtor and its creditors. | 14, 176-177 |
| | Presented the Debtor as unfavorable to potential purchasers in the hope of steering the Debtor's business to the Sheehan Entities at less than fair value, leading to an admonishment from outside counsel. | 111-112 |
| R.F. Culbertson | Provided sales and marketing services for Good Design, which the Amended Complaint alleges the sole purpose of | 53, 20, 63 |

| | | |
|---|---|---|
| *(COO and member of the Debtor and agent of the Polebridge Entities, the Wynk Entities, and the Best Bev Entities)* | which was to usurp resources and monies properly belonging to the Debtor. | |
| | Used his Polebridge Entities email address on the Debtor's application for a Paycheck Protection Program loan. | 54 |
| | Presented the Debtor as unfavorable to potential purchasers in the hope of steering the Debtor's business to the Sheehan Entities at less than fair value, leading to an admonishment from outside counsel. | 111-112 |
| | Held himself out to the Debtor's former customers as a continuation of the Debtor for the benefit of the Best Bev Entities. | 159-160, 162 |
| | Utilized the Debtor's marketing files for the purposes of marketing products for the benefit of the Best Bev Entities. | 165 |

Accordingly, the Amended Complaint demonstrates that the Insider Defendants breached fiduciary duties which they owed to the Debtor, thus satisfying the first element of the Trustee's aiding and abetting claim. And the Amended Complaint also explicitly pleads that all Defendants knew that the Insider Defendants' conduct was a breach of fiduciary duty and that all Defendants substantially assisted in and/or encouraged such breaches. Amended Complaint at ¶¶ 212-216. But the Amended Complaint does not stop there – it contains significant factual detail which, when viewed in the light most favorable to the Trustee, amply supports the elements of the aiding and abetting cause of action as to all Moving Defendants.

With respect to the second and third elements, the Amended Complaint establishes that all of the Insider Defendants were high level employees or agents of the Debtor and thus would necessarily have known about their breaches of fiduciary duty (or, if any of them are deemed not to have breached such duties, about the other Insider Defendants' breaches of their duties), and that all of the Insider Defendants either directly breached their own fiduciary duties or, via the conduct alleged in detail above, substantially assisted with the other Insider Defendants' breaches

65

of fiduciary duties.[14]  *See* pp. 62-65, *supra*; *see also Marion v. Bryn Mawr Trust Co.*, 288 A.3d 76,

91 (Pa. 2023) (holding that "actual knowledge [for purposes of aiding and abetting a tort] does not

require the aider and abettor to 'underst[and] the full legal significance of the facts, or all the details

of the primary wrongdoing.'  Rather, '[i]t is sufficient if the defendant was aware of facts that made

the primary conduct wrongful.'" (quotation marks, alteration marks, and citations omitted)); *Burris*

*v. Main Line Health Sys.*, 2017 WL 2506446, at *12 n.16 (E.D. Pa. June 9, 2017) (holding at the

summary judgment stage that the knowledge element was satisfied when the defendant knew that

the fiduciary and the entity to which the duty was owed were "operating as partners"); *Power*

*Restoration Int'l, Inc. v. PepsiCo, Inc.*, 2014 WL 1725041, at *5 (E.D. Pa. Apr. 30, 2014) (holding

that, at the motion to dismiss stage, the knowledge element of an aiding and abetting fiduciary

duty claim under Pennsylvania law did not have to be explicitly pleaded and could be inferred

from facts demonstrating active involvement and participation).

Because it is well-settled that the knowledge of an agent is imputed to its principal,

Defendants Polebridge (for which Defendants Rittenburg and Baldwin are officers), Good Design

(for which Defendants Rittenburg and Baldwin are officers), and Wynk Entity AgTech PA (for

which Defendant Parzych is an officer), are properly deemed as also having knowledge of the

breach for purposes of an aiding and abetting claim.  *See, e.g., Rosenberry v. Evans*, 48 A.3d 1255,

---

[14]     Moving Defendants, without citing a single authority, also repeat their previous argument
that it is improper for the Trustee to plead in the alternative that the Insider Defendants can be
held liable for aiding and abetting breaches of fiduciary duty if they are not personally deemed to
owe such a duty.  Renewed MTD Br. at p. 20.  The argument is specious, as it is well-established
that alternative pleading of this type is permissible.  *See In re Our Alchemy, LLC*, 2019 WL
4447541, at *16 (Bankr. D. Del. Sept. 16, 2019) ("At the pleading stage, the Trustee is entitled to
plead in the alternative and to assert claims of aiding and abetting to the extent that some
defendants did not themselves have any fiduciary duties or were shielded from breach of
fiduciary duty claims by exculpatory provisions of debtor's operating agreement.").

1262 (Pa. Super. 2012) ("It is well settled in the law of this jurisdiction that knowledge of an agent, acting within the scope of his authority, real or apparent, may be imputed to the principal, and, therefore, knowledge of the agent is knowledge of the principal." (quotation marks and citation omitted)). And the Amended Complaint contains numerous allegations establishing these entities' active assistance in the underlying breaches of duty. *See, e.g.,* Amended Complaint at ¶ 20 ("the Polebridge Entities, with the substantial assistance of the Insider Defendants, misappropriated Debtor resources, property, and personnel to generate sales and profits from CBDelight and Faber Hand Sanitizer products, which rightfully belonged to the Debtor but were misappropriated by and diverted to the Polebridge Entities"), ¶¶ 49-85 (Polebridge Entities used Debtor resources to produce and sell CBDelight and Faber Hand Sanitizer products), ¶¶ 88-89 (AgTech PA formed for purposes of diverting the profits of Wynk Seltzer away from the Debtor).

That leaves Defendant Sheehan and remaining Moving Defendants AgTech VI, LLC, XO Energy Worldwide, LLLP, XO EW, LLC, Best Bev, LLC, EtOH Worldwide, LLC, and Canvas 340, LLC. The Amended Complaint pleads ample facts from which this Court can infer that Defendant Sheehan knew about and substantially assisted with the Insider Defendants' breaches of fiduciary duties, including the following:

- On April 17, 2020, Defendant Sheehan posted an advertisement for Faber Hand Sanitizer in furtherance of an agreement with the Insider Defendants to share in the ill-gotten profits from the sale of CBDelight and Faber Hand Sanitizer, which were stolen from the Debtor, Amended Complaint at ¶¶ 74, 63;
- In the fall of 2020, Defendant Sheehan was part of the team using Debtor resources to create Wynk Seltzer, *id.* at ¶ 86;
- On September 1, 2020, Defendant Sheehan organized AgTech VI, LLC for the purposes of diverting the profits from the sale of Wynk Seltzer away from the Debtor, *id.* at ¶ 87;
- Defendant Sheehan used his Wynk Seltzer email account (shawn@drinkwynk.com) in communications concerning the Debtor and its bankruptcy, *id.* at ¶ 101;
- Defendant Sheehan conspired with the other defendants to utilize his network of wholly-owned Virgin Islands entities to defraud the Debtor and its creditors, *id.* at ¶ 107;

- Full time employees of the Sheehan Entities, which were wholly owned and controlled by Defendant Sheehan, maintained accounts on the Debtor's computer system and had full access to the books, records, and online accounts belonging to the Debtor, *id.* at ¶¶ 44, 108;

- Defendant Sheehan, along with Defendant Casey Parzych, led the scheme to sell the Debtor's assets to the Sheehan Entities at a fire-sale price, *id.* at ¶¶ 109-114, was copied on otherwise privileged communications between the Debtor and its bankruptcy counsel concerning the Debtor's bankruptcy strategy, *id.* at ¶ 115, and, along with Defendant Casey Parzych, jointly retained a public relations firm to direct marketing strategies in light of Debtor's bankruptcy and Sheehan's anticipated takeover of the Debtor's assets, *id.* at ¶ 116;

- Defendant Sheehan signed a letter dated June 10, 2021 to coerce PNC into cooperating with a Section 363 sale of the Debtor's assets to entities he owns and controls at a low-ball price. *Id.* at ¶ 130.  The letter was drafted in coordination with the Debtor and its counsel and demonstrates Sheehan's access to insider information concerning the Debtor and which was used to the detriment of the Debtor, *id.*;

- Defendant Sheehan, along with Defendant Casey Parzych, ordered the deletion/transfer of the Debtor's electronic data for purposes of hindering Millstone from competing with his Best Bev enterprise and to hinder any investigation into his misconduct, *id.* at ¶¶ 154-155; and

- Defendant Sheehan was actively involved in and coordinated the gross mismanagement of the Debtor's Chapter 11 Case for improper purposes, *id.* at ¶¶ 104-116, 128-147, 175, 189.

By the same principles of imputation applied to the Insider Defendants, Defendant Sheehan's knowledge and actions can be imputed to Defendants AgTech VI, LLC, XO Energy Worldwide, LLLP, XO EW, LLC, Best Bev, LLC, EtOH Worldwide, LLC, and Canvas 340, LLC, as Defendant Sheehan is: 1) an officer and sole member and manager of Defendant XO EW, LLC, which is in turn the general partner of Defendant XO Energy Worldwide, LLLP, which is in turn the sole member and manager of Defendant AgTech VI, LLC, *see* Amended Complaint at ¶ 24 (alleging that Defendant AgTech VI, LLC "is formally owned and operated by a complex web of entities which are ultimately owned and controlled by Defendant Sheehan," and describing in detail the structure of those entities); 2) an officer and sole member and manager of Defendant XO EW, LLC, which is in turn the general partner of Defendant XO Energy Worldwide, LLLP, which is in turn the sole member and manager of Defendant EtOH Worldwide, LLC, which in turn is the

68

sole member and co-manager of Defendant Best Bev, LLC, *id.* at ¶ 31; and 3) a member of Defendant Canvas 340, LLC, *id.* at ¶¶ 22-25.

Moreover, the Amended Complaint alleges that these entities – either directly, or by virtue of their control of subsidiaries – participated in and enabled the Defendants' scheme to defraud the Debtor. *See id.* at ¶ 87 (AgTech VI formed for the purposes of diverting the profits from Wynk Seltzer away from the Debtor), ¶¶ 128-129 (EtOH Worldwide, LLC and AgTech VI, LLC executed sham lease agreements with the Debtor designed to create false administrative claims, and which would require the Debtor to pay more than double the cost of the leased equipment over a two-year term); ¶ 195 (Best Bev, LLC, Can Man, EtOH Worldwide, LLC, and AgTech VI fail to cooperate with requests for information issued pursuant to Bankr. E.D.Pa. Local Rule 2004-1), ¶ 115 (individuals with an "@xo-energy.com" email address – including Defendant Sheehan and Sheehan Entities' CFO John Charette, copied on otherwise privileged emails concerning the Debtor's bankruptcy strategy), ¶¶ 140, 147 (PNC's counsel describes how "XO" and "EtOH" entities were improperly manipulating the bankruptcy process), ¶¶ 125, 150 (describing post-petition transfers illegally made to "Best Bev," implicating Defendant Can Man, LLC, which at all times did business as "Best Bev," and Moving Defendant Best Bev, Inc., which was formed either as the successor in interest to Can Man, LLC or created to avoid liability for Can Man, LLC's misconduct), ¶ 130 (EtOH Worldwide, LLC cities inside information of the Debtor in a letter designed to coerce PNC into cooperating with a sale of the Debtor's assets to the Best Bev Entities at a low-ball price).

Given the foregoing, the Amended Complaint alleges facts which "raise a reasonable expectation that discovery will reveal evidence" establishing the elements of aiding and abetting breach of fiduciary duty as to all Moving Defendants, *Infantino*, 2013 WL 3972770, at *2, and the

Moving Defendants' renewed argument that the claim is insufficiently pleaded should once again be denied.[15]

> **5.** **As this Court Has Already Held, The Trustee Establishes A Plausible Entitlement to Veil Piercing and Alter Ego Liability, and the Amended Complaint States Claims for Veil Piercing, Alter Ego Liability, and Successor Liability**

Moving Defendants repeat their previously asserted[16] arguments that the Trustee fails to state a claim for alter ego against Moving Defendants Casey Parzych, Rittenburg, and Culbertson, and a claim for piercing the corporate veil against the Pilfering Entities. Renewed MTD Br. at pp. 24-30. This Court should deny Moving Defendants a second bite at the apple, and reject the arguments for the same reasons they were rejected in the first instance. *See* MTD Opinion (Adv. D.I. 39) at pp. 49-53. Moving Defendants' arguments as to successor liability are likewise without merit, and should also be rejected.

### a.    Legal Standards

Pennsylvania recognizes two types of veil piercing doctrines – "alter ego," under which the owners of a company may be held liable for the company's debts, and the "enterprise" theory, under which companies with some level of common ownership or control may be held liable for

---

[15]    Moving Defendants also repeat their argument that certain aspects of the Trustee's claim represents a collateral attack on this Court's order approving the Section 363 sale. *Compare* Renewed MTD Br. at pp. 21-23 ("Any challenge to the operation of the Debtor's estate and/or the character of the Section 363 Sale process is precluded by the Court's contrary findings in the Sale Order and is collaterally estopped."), *with* Prior MTD Br. (Adv. D.I. 17-1) at pp. 30 ("The Trustee's quite clear attempt to challenge the sale process is an impermissible collateral attack on this Court's prior sale order, which is binding on the Trustee."). Judge Coleman – who issued the sale order – considered and rejected this argument, MTD Opinion at pp. 28, 37, and it should fail once again. Indeed, the Trustee is not attempting to challenge or unwind the sale process in any way, shape, or form, but is simply exercising her right to bring claims for breach of fiduciary duty due to the Moving Defendants' misconduct during the course of the sale process.

[16]    *See* Prior MTD Br. (Adv. D.I. 17-1) at pp. 37-40.

each other's debts.  *See Seven Springs Mountain Resort, Inc. on behalf of Sikirica v. Hess*, No. 2022 WL 1004178, at *3-*5 (W.D. Pa. Apr. 4, 2022).  Both forms of veil piercing are based on the fundamental tenet that the corporate form "may be disregarded whenever justice or public policy demand, such as when [it] has been used to defeat public convenience, justify wrong, protect fraud, or defend crime.  Fraud in its narrow sense need not be shown; Pennsylvania courts will disregard the corporate form whenever it is necessary to avoid injustice, and so long as the rights of innocent parties are not prejudiced nor the theory of corporate entity rendered useless."  *Mortimer v. McCool*, 255 A.3d 261, 277 (Pa. 2021) (quotation marks and citation omitted); *accord Reivia Ashley, LLC v. Paselo Logistics, LLC,* 2017 WL 6001640, at *14 (E.D. Pa. Dec. 1, 2017).

The alter ego doctrine is an exception to the "general rule [that] members of a Pennsylvania limited liability company are not personally liable for the debts, obligations or other liability of the LLC."  *Reivia Ashley, LLC*, 2017 WL 6001640, at *13.  "[I]n appropriate circumstances, the general rule is inapplicable, and a court may pierce the corporate veil as an equitable remedy that disregards the existence of a corporation[17] to make the corporation's individual principals and their personal assets liable for the debts of the corporation."  *Id.* (internal quotation marks, alteration marks, and citations omitted).  While "[n]o clear test exists for determining when the piercing of the corporate veil is appropriate . . ., courts may consider a number of [nonexclusive] factors in making this determination, including, undercapitalization, failure to adhere to corporate formalities, the insolvency of the entity, substantial intermingling of corporate and personal affairs, use of the corporate form to perpetrate a fraud, and circumstances that present an element of

---

[17]    A limited liability company is subject to the same veil piercing principles application to corporations. *See, e.g., Partners Coffee Co., LLC v. Oceana Servs. & Prod. Co.*, 700 F. Supp. 2d 720, 736 (W.D. Pa. 2010) ("Pennsylvania courts have found that the veil of an LLC may be pierced to the same degree as that of a corporation.").

injustice or unfairness." *Id.*; *see also, e.g., E. Mins. & Chemicals Co. v. Mahan*, 225 F.3d 330, 333

n.7 (3d Cir. 2000) ("Factors considered under Pennsylvania law, . . . with respect to the alter ego

theory include, but are not limited to, the following: [T]he failure to observe corporate formalities;

non-payment of dividends; insolvency of debtor corporation; siphoning the funds from corporation

by dominant shareholders; non-functioning of other officers and directors; absence of corporate

records; whether the corporation is a mere facade for the operations of a common shareholder or

shareholders; and gross undercapitalization." (quotation marks and citation omitted)).

Similarly, "[u]nder the enterprise or single-entity theory, two or more business entities

under some level of common ownership or control are treated as a single entity—or common

enterprise—for the purpose of liability." *Seven Springs*, 2022 WL 1004178, at *4. "[T]here is no

clear test or settled rule in Pennsylvania as to exactly when the corporate veil can be pierced and

when it may not be pierced" under the enterprise theory, and courts must conduct "holistic, case-

by-case analyses" to determine whether the doctrine is applicable. *Id.* at *4-*5 (citing *Mortimer*,

255 A.3d 261 (unanimously recognizing the viability of the enterprise theory of liability under

Pennsylvania law)). After analysis of several other jurisdictions' approach to enterprise liability,

and the various factors the jurisdictions considered, *Mortimer* set forth two factors which should

guide courts in evaluating enterprise liability: first, there must be such unity of interest and

ownership that the separate personalities of the corporation and the individual no longer exist, and

second, adherence to the corporate fiction under the circumstances would sanction fraud or

promote injustice. *Mortimer*, 255 A.3d at 286-287; *see also Seven Springs*, 2022 WL 1004178, at

*7 (holding under Pennsylvania law that the same factors which support application of the alter

ego theory also support application of the enterprise theory)

In addition to the two veil-piercing doctrines discussed above, it is well-settled that a successor corporation may be held liable for the debts and liabilities of its predecessors "where . . . the transaction amounts to a consolidation or *de facto* merger[,] . . . the purchasing corporation is merely a continuation of the transferor corporation[,] or . . . the transaction is fraudulently entered into to escape liability[.]" *Philadelphia Electric Co. v. Hercules, Inc.*, 762 F.2d 303, 308 (3d Cir. 1985) (applying Pennsylvania law).    Indeed, "[e]ven where the relationship between the predecessor and successor corporations does not fit neatly into the traditional continuation or de facto model, courts will apply the continuity of enterprise theory to impose corporate successor liability." *Today's Child Learning Ctr. Inc. v. United States*, 40 F. Supp. 2d 268, 273 (E.D. Pa. 1998).    Pennsylvania's Supreme Court holds that successor liability can apply even where there are no common shareholders or officers between the original corporation and the alleged successor corporation.    *See Fizzano Bros. Concrete Prod. v. XLN, Inc.*, 42 A.3d 951, 970 (Pa. 2012) (rejecting a narrow, mechanical application of continuity of ownership in holding that "the manner by which [continuity of ownership] may be shown is more extensive and attuned to . . . transactional realities").

All of these doctrines are fact-specific and require a holistic analysis, and are accordingly typically inappropriate for disposition at the motion to dismiss stage.    *Seven Springs*, 2022 WL 1004178, at *6; *Winner v. Etkin & Co.*, 2007 WL 2616084, *2 (W.D. Pa. Sept. 6, 2007) (denying motion to dismiss because "[t]he veil-piercing doctrine requires a multi-factor, factually-intensive inquiry").

<blockquote>

**b.    The Amended Complaint States Plausible Claims For Relief Under All Of The Foregoing Doctrines**

</blockquote>

The Amended Complaint pleads numerous facts which, when viewed in the light most favorable to the Trustee and bearing in mind that application of veil piercing/alter ego liability are

inherently fact specific, support the conclusion that discovery will reveal evidence supporting each

of the above-described theories of veil piercing liability. The following facts support holding

Defendants Casey Parzych, Rittenberg, and Culbertson liable for the debts of the Debtor (of which

they are all members) under the alter ego veil piercing theory:

- the Debtor was undercapitalized and insolvent, as established by the Debtor being unable to pay its debts and defaulting on the PNC loan as early as February 28, 2021, and its Managers declaring it insolvent on June 3, 2021, Amended Complaint at ¶¶ 106, 127;

- the Debtor failed to adhere to corporate formalities and failed to maintain adequate books and records, making it impossible to disentangle the affairs of the Debtor from those of the Polebridge Entities, the Wynk Entities, and the Best Bev Entities, *id.* at ¶¶ 204.f-k, 231;

- the Debtor's outside accounting firm reported the complete failure of the Debtor's accounting function and stated that internally prepared financial statements could not be relied upon, *id.* at ¶ 174;

- Defendants Parzych and Rittenburg treated the Debtor as their personal piggy bank, making a number of personal purchases using the Debtor's funds, *id.* at ¶ 178;

- Defendants Parzych, Rittenburg, and Culbertson, along with the other Moving Defendants, undertook numerous acts which, while made using the Debtor's resources and personnel, were for the benefit of the Polebridge Entities, the Wynk Entities, and the Best Bev Entities, demonstrating an intermingling of affairs and supporting the conclusion that these entities were mere instrumentalities of the individual defendants, *see supra* at pp. 62-65; *see also id.* at pp. 66-69 (describing numerous other points of entanglement between the affairs of the Debtor and the affairs of the Polebridge Entities, the Wynk Entities, and the Best Bev Entities).

These facts amply establish a plausible claim for relief under the alter ego theory against

Defendants Casey Parzych, Rittenburg, and Culbertson at the motion to dismiss stage. *See, e.g.,*

*Seven Springs*, 2022 WL 1004178, at *7 (the court carefully scrutinized the pleadings and denied

defendant's Rule 12(b)(6) motion where "[t]he [a]mended [c]omplaint provides considerable

detail as to the [shareholder's] personal use of funds from [the corporate entity]," "pleaded facts

showing [the corporate entity] was undercapitalized," and "there was a lack of adherence to

corporate formalities," including that "that [corporate entity] kept only meager records from 1991

to 2018"); *Fletcher-Harlee Corp. v. Szymanski*, 936 A.2d 87 (Pa. Super. 2007) (shareholder held

74

personally liable under alter ego theory where the debtor company filed for bankruptcy after which the shareholder began to perform identical work through another entity, the debtor was not appropriately capitalized as evidence by its bankruptcy filing, failed to adhere to corporate formalities, and the new entities used the debtor's resources to operate their business).

Similarly, under the enterprise veil piercing theory, the Amended Complaint pleads substantial facts indicating that the Defendants exploited ownership and control over the Debtor to commit a fraud or injustice on the Debtor and its creditors via the Polebridge Entities, the Wynk Entities and the Best Bev Entities. *See supra* at pp. 62-65, 66-69 (describing Moving Defendants' actions designed to benefit the Polebridge Entities, the Wynk Entities, and the Best Bev Entities at the expense of the Debtor); *see also* Amended Complaint at ¶¶ 46-85 (detailed allegations describing how Defendants exploited their ownership and control over the Debtor to use the Debtor's resources to manufacture, package, and market CBDelight and Faber Hand Sanitizer, with all profits flowing not to the Debtor, but instead to the Polebridge Entities); *id.* at ¶¶ 86-103 (equivalent detailed allegations for the Wynk Entities); *id.* at ¶¶ 117-126, 148-151, 156-171 (equivalent detailed allegations for the Best Bev Entities).

The Amended Complaint also pleads facts supporting the inference that discovery will reveal evidence of common ownership and control between the Debtor, on the one hand, and the Polebridge Entities, the Wynk Entities and the Best Bev Entities, on the other:

- Defendant Rittenburg formally owns equity in the Debtor and the Polebridge Entities, and is a manager/officer of the Debtor, the Polebridge Entities, the Wynk Entities, and the Best Bev Entities. Amended Complaint at ¶ 11;

- Defendant Parzych formally owns equity in the Debtor and Wynk Entity AgTech PA LLC, is a manager/officer of the Debtor and Wynk Entity AgTech PA LLC, and exploited his control over the Debtor to take numerous actions on behalf of the Best Bev Entities. *Id.* at ¶ 10, s*ee also supra* at pp. 62-63;

- Defendant Baldwin formally owned equity in and was an officer of Good Design and Polebridge, exercised de facto high level managerial control over the Debtor and its employees, and is an agent of the Wynk Entities and the Best Bev Entities. Amended Complaint at ¶¶ 13, 71;

- Defendant Festa was CFO of the Debtor and is Director of Sales and Operations of the Best Bev Entities, and exploited her control over the Debtor to take numerous actions on behalf of the Polebridge Entities, the Wynk Entities, and the Best Bev Entities. *Id.* at ¶ 12, *see also supra* at pp. 63-64; and

- Defendant Sheehan is the ultimate formal owner of and exercises control over Wynk Entity AgTech VI via control of Wynk Entities XO Energy Worldwide, LLLP and XO EW, LLC, Amended Complaint at ¶ 24, is the ultimate formal owner of and exercises control over Best Bev Entity Best Bev, LLC via control of the Best Bev Entities XO EW, LLC, XO Energy Worldwide, LLLP, and EtOH Worldwide, LLC, *id.* at ¶ 31, has an agreement with the Insider Defendants to share in the ill-gotten profits diverted from the Debtor to the Polebridge Entities, *id.* at ¶ 74, had full access to the Debtor's books, records, and online accounts, *id.* at ¶ 108, improperly influenced the Debtor's bankruptcy strategy, and utilized his influence over the Debtor to benefit the Wynk Entities, and the Best Bev Entities, *id.* at ¶¶ 175, 104-116, 128-147, 189.

Moreover, a document created by the Defendant Festa (the Debtor's CFO) and Defendant Ryan Uszenski – a non-Moving Defendant who is the formal manager of Defendants Can Man, LLC and Best Bev, LLC – depicted a corporate structure under which Can Man, LLC would own Faber and all the Debtor's other brands, and Best Bev, LLC is either the successor in interest to Can Man, LLC or was created by Defendants in an attempt to avoid liability for Can Man's misconduct, an allegation supported by the fact that, inter alia, Can Man, LLC at all times did business under the name Best Bev and had the same address and personnel as Best Bev, LLC. *Id.* at ¶¶ 29-30, 124-125.

The foregoing facts amply establish a plausible claim for relief under the enterprise theory against the Polebridge Entities, the Wynk Entities, and the Best Bev Entities. *See Seven Springs*, 2022 WL 1004178, at *7 (holding under Pennsylvania law that the same factors which support application of the alter ego theory also support application of the enterprise theory).

Finally, with respect to successor liability, the Amended Complaint pleads numerous facts which support the inference that the Polebridge Entities, the Best Bev Entities and the Wynk Entities are simply the continuation of the business of the Debtor via the continuity of management, personnel, assets, and general business operations, including the following:

- Immediately before filing bankruptcy, a Debtor employee operating under the name of the Debtor solicited employment applications for the benefit of the Polebridge Entities, the Best Bev Entities and the Wynk Entities, Amended Complaint at ¶¶ 120-121;

- Defendant Parzych caused the Debtor to execute and pay for an HR Consulting Services Agreement with a third party for the benefit of the Polebridge Entities, the Best Bev Entities and the Wynk Entities, *id.* at ¶¶ 122-123;

- On the eve of the Debtor's bankruptcy filing, Defendants Festa and Uszenski used the Debtor's computers to create and edit a document titled "Can Man Shadow Structure," which depicted a corporate structure under which Can Man would own Faber and all the Debtor's other brands, *id.* at ¶ 124;

- An October 7, 2021 text message sent by Defendant Culbertson to a former customer of the Debtor stated that Defendants had "re-formed" the Debtor "and quickly started [manufacturing] & co-packing 500,000 cans/bottles per day," with similar text messages sent to hundreds of the Debtor's former customers using customer lists stolen from the Debtor, *id.* at ¶¶ 159-161;

- Counsel to Millstone reported to the Debtor's bankruptcy counsel that Defendants Casey Parzych and Culbertson were "holding themselves out to customers as 'Faber' and saying they[y] 're-formed' the [Debtor's] business," *id.* at ¶¶ 162, 168;

- Defendant Festa was asking Debtor vendors to edit invoices for goods delivered to Defendants' new enterprise to falsely make it appear that the goods were being delivered to the Debtor, *id.*;

- Defendants used the Debtor's marketing files to create ostensibly new brands for use by the Best Bev Entities, *id.* at ¶ 165;

- Defendants used the Debtor's phone.com account for the benefit of the Best Bev Entities, returning calls to Debtor customers who placed orders for Faber products, and instead selling them the corresponding Best Bev products, *id.* at ¶ 166;

- Defendants, under the guise that the Best Bev Entities were a mere continuation of the Debtor, set up business meetings with Debtor customers, *id.* at ¶ 167;

- Prior customers of the Debtor were confused as to whether the Debtor and Best Bev were separate entities, *id.* at ¶ 169; and

- Best Bev traded on the goodwill of the Debtor by representing to the public that it had "years of dreaming up, canning and distributing our own beverages," an obvious reference to the continuation of the Debtor's operations, *id.* at ¶ 170.

Accordingly, the Amended Complaint raise a reasonable expectation that discovery will reveal evidence of necessary elements of the successor liability theory, and Moving Defendants' Motion should be denied.  *See, e.g., Fizzano Brothers*, 42 A.3d at 962, 969-971 ("[T]he elements of the de facto merger are not a mechanically-applied checklist, but a map to guide a reviewing court" and include "(1) continuity of ownership; (2) a cessation of ordinary business and dissolution of the predecessor as soon as practically and legally possible; (3) assumption by the successor of the liabilities ordinarily necessary for the uninterrupted continuation of the business of the predecessor, and (4) a continuity of management, personnel, physical location, aspects, and general business operation."); *Smith v. A.O. Smith Corp.*, 270 A.3d 1185, 1193 (Pa. Super. 2022) ("The 'mere continuation' exception to the general rule against successor liability is often treated 'identically' to and is 'difficult to distinguish' from the de facto merger exception.").

### c. It Is Well Established That A Trustee Can Bring Veil Piercing Claims

Moving Defendants argue that the Trustee's veil piercing and alter ego claims should be dismissed because a trustee is not permitted "to pierce the veil of its own entity in post-petition bankruptcy proceedings."  Renewed MTD Br. at pp. 24-25  The argument is entirely without merit and was squarely rejected by this Court in *In re Jamuna Real Est. LLC*, 365 B.R. 540 (Bankr. E.D. Pa. 2007).  That case considered an identical argument and held that, under Pennsylvania, law, a Chapter 7 trustee is permitted to invoke veil piercing doctrines to prevent abuse of the corporate form – "[a]s this remedy would serve to benefit those alleged to have been

wronged by the individual defendants, Pennsylvania law would allow the Trustee to disregard

the Debtors' corporate structures and impose liability on the individual defendants." *Id.* at 562-

64; *accord In re Charles Edwards Enterprises, Inc.*, 344 B.R. 788, 790 (Bankr. N.D.W. Va.

2006) (collecting cases holding that alter ego and veil piercing theories are property of the estate

which may be pursued by a Chapter 7 trustee); *cf. also Occidental Chem. Corp. v. 21st Century

Fox Am., Inc.*, 2022 WL 6737217, at *6 (D.N.J. Oct. 11, 2022) ("alter ego liability claims are to

be addressed as property of the bankruptcy estate"); *In re Emoral, Inc.*, 740 F.3d 875, 880-81 (3d

Cir. 2014) ("Just as the purpose behind piercing the corporate veil, however, the purpose of

successor liability is to promote equity and avoid unfairness, and it is not incompatible with that

purpose for a trustee, on behalf of a debtor corporation, to pursue that claim.").

### 6.      As this Court Has Already Held, The Trustee States A Claim For Unjust Enrichment

With respect to Defendants Casey Parzych, Rittenburg, Culbertson, AgTech VI and EtOH,

Moving Defendants argue that the Trustee's claims for "unjust enrichment [are] precluded under

Pennsylvania law because of the written contract governing the parties' relationships," Renewed

MTD Br. at pp. 30-32, an argument already raised by the Moving Defendants, *see* Prior MTD Br.

(Adv. D.I. 17-1) at 40-42, and rejected by this Court. *See* MTD Opinion (Adv. D.I. 39) at 56 ("The

Court rejects the Moving Defendants' argument that the claim is precluded by the Amended

Complaint's claims sounding in contract, providing an adequate remedy at law."). Likewise

already raised and rejected was Moving Defendants' argument that the Trustee has failed to plead

the elements of a claim for unjust enrichment. *See* Prior MTD Br. (Adv. D.I. 17-1) at pp. 40-42;

MTD Opinion at 56 ("The Complaint's allegations, taken as a whole and as true, allege that each

Defendant improperly received benefit, if not actual transfers of funds, from the Debtor through

the actions of the Insider Defendants and Sheehan, the appreciation of which was the profit, sales,

and retention of other benefits that belonged to the Debtor, and the inequity of which is evidenced by the Debtor's resulting insolvency. These allegations state a claim for unjust enrichment.").

Under Pennsylvania law, unjust enrichment requires "(1) benefits conferred on defendant by plaintiff; (2) appreciation of such benefits by defendant; and (3) acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value." *Mitchell v. Moore*, 729 A.2d 1200, 1203-04 (Pa. Super. 1999) (citation omitted). The Amended Complaint pleads these elements. The Trustee's unjust enrichment claim is based on the Moving Defendants' receipt of benefits at the expense of the Debtor and its creditors. *See* Amended Complaint at, e.g., ¶¶ 2, 20, 27, 33, 44, 63, 74, 84-85, 87, 88, 106. The benefits were conferred without justification, given the Moving Defendants active participation in the wrongdoing detailed at length in the Amended Complaint. *See* pp. 62-65, 66-69, *supra* (detailing specific allegations of each Moving Defendant's misconduct). Given these allegations, there is a reasonable expectation that discovery will reveal evidence of the elements of unjust enrichment, *Infantino*, 2013 WL 3972770, at *2, and Moving Defendants' Motion should be denied.

Moving Defendants' primary arguments in opposition to the Trustee's unjust enrichment claim are the supposed existence of contracts governing the relationship between the Debtor and certain of the Moving Defendants and the purported availability of a remedy at law. Renewed MTD Br. at pp. 40-41. The arguments are without merit because it is "entirely acceptable" to pursue alternative theories at the pleading stage, and it is also "well established" that a plaintiff may plead an alternative unjust enrichment theory even where the pleading also contains a contract-based claim. *In re FAH Liquidating Corp.*, 572 B.R. 117, 131 (Bankr. D. Del. 2017). The Court may ultimately determine that unjust enrichment does not apply, either because a

remedy is otherwise available, because certain writings govern the applicable relationship among the parties, or for some other reason.  But this is no cause to dismiss the unjust enrichment claims at this stage of the proceedings.  As numerous courts in the Third Circuit have held, a claim for unjust enrichment should survive a motion to dismiss where it is plausible that the plaintiff could otherwise be left without a remedy at law.  *See id.* (*citing Halperin v. Moreno*, 2015 WL 5146161, at *10 (Bankr. D. Del. Aug. 31, 2015)); *In re Our Alchemy, LLC*, 2019 WL 4447545, at *11 (denying motion to dismiss unjust enrichment claim because, *inter alia*, it was plausible the trustee would be left without an adequate remedy at law if his fraudulent transfer claims ultimately failed).

### 7.    The Amended Complaint States A Claim For Equitable Subordination

This Court has previously rejected Moving Defendants' challenges to the Trustee's equitable subordination claims on the grounds that the Trustee failed to allege that they engaged in inequitable conduct and that the claims are barred by collateral estoppel based on this Court's prior orders.  *See* Prior MTD Br. (Adv. D.I. 17-1) at p. 48-49 ("As a threshold matter, the Moving Defendants strongly dispute that they engaged in any inequitable conduct whatsoever. . . . "[A]ny attempt to seek equitable subordination of previously settled claims is an impermissible collateral attack on this Court's prior orders."); MTD Opinion (Adv. D.I. 39) at 64-67 (allowing the Trustee's equitable subordination claims to proceed against Moving Defendants AgTech VI, EtOH, and Boyer).  Here, Moving Defendants renew these same arguments.  Renewed MTD Br. at pp. 32-36. Their renewed effort should be rejected yet again.

With respect to Defendant Boyer, the Amended Complaint pleads that he was an attorney who improperly served in the dual and conflicting roles of general counsel to the Debtor and counsel to the Polebridge Entities and the Wynk Entities, which existed for the purpose of defrauding the Debtor and its creditors.  *See* Amended Complaint at ¶¶ 14, 176-177.  The Amended

Complaint alleges that the relationship between Defendant Boyer went far beyond the normal attorney-client boundaries by pleading that Defendant Boyer: was general counsel for the Debtor (not simply an outside attorney with a limited scope of engagement), Amended Complaint at ¶ 14; was improperly serving in the dual and conflicting roles of general counsel to the Debtor and counsel to the Polebridge Entities and the Wynk Entities, which existed for the purpose of defrauding the Debtor and its creditors, *id.* at ¶¶ 14, 176-177; and was admonished by the Debtor's outside counsel for presenting the Debtor as unfavorable to potential purchasers in the hope of steering the Debtor's business to the Sheehan Entities at less than fair value, yet continued to do so, *id.* at ¶ 111-112.   Accordingly, the Amended Complaint alleges far more than simply the "representation of multiple parties," Renewed MTD Br. at p. 34, and Moving Defendants' argument that the Amended Complaint fails to plead inequitable conduct on the part of Defendant Boyer should be rejected.

The Amended Complaint contains similarly detailed allegations demonstrating inequitable conduct on the part of AgTech VI, LLC and EtOH Worldwide, LLC.  *See* Amended Complaint at ¶ 87 (AgTech VI formed for the purposes of diverting the profits from Wynk Seltzer away from the Debtor), ¶¶ 128-129 (EtOH Worldwide, LLC and AgTech VI, LLC executed sham lease agreements with the Debtor designed to create false administrative claims, and which would require the Debtor to pay more than double the cost of the leased equipment over a two-year term), ¶ 195 (EtOH Worldwide, LLC, and AgTech VI, LLC fail to cooperate with requests for information issued pursuant to Bankr. E.D.Pa. Local Rule 2004-1), ¶¶ 140, 147 (PNC's counsel describes how "XO" and "EtOH" entities were improperly manipulating the bankruptcy process), ¶ 130 (EtOH Worldwide, LLC cites inside information of the Debtor in a letter designed to coerce PNC into

cooperating with a sale of the Debtor's assets to the Best Bev Entities at a low-ball price).  Moving

Defendants' argument is accordingly without merit as to these entities.

### 8.    The Amended Complaint States a Claim for Turnover

The Amended Complaint states a claim under 11 U.S.C. § 542, which is titled "Turnover

of property to the estate" and states in relevant part as follows:

> (a) . . . an entity . . . in possession, custody, or control, during the
> case, of property that the trustee may use, sell, or lease under section
> 363 of this title, or that the debtor may exempt under section 522 of
> this title, shall deliver to the trustee, and account for, such property
> or the value of such property, unless such property is of
> inconsequential value or benefit to the estate.
>
> * * *
>
> (e) Subject to any applicable privilege, after notice and a hearing,
> the court may order an attorney, accountant, or other person that
> holds recorded information, including books, documents, records,
> and papers, relating to the debtor's property or financial affairs, to
> turn over or disclose such recorded information to the trustee.

11 U.S.C. §§ 542(a), (e).

The Amended Complaint alleges that Defendants are in possession of the Debtor's emails

and other electronic information,[18] which relate to the Debtor's property and financial affairs, and

are thus recoverable under Section 542(e).  While Moving Defendants renew their previously

unsuccessful[19] argument that a dispute exists as to proper title to the information and as to when it

was transferred, any such dispute is not bona fide because the allegations of the Amended

Complaint must be accepted as true for purposes of a motion to dismiss, and title to the property

is irrelevant under Section 542(e).  *See In re Am. Metrocomm Corp.*, 274 B.R. 641, 652 (Bankr.

D. Del. 2002) ("Although an action for turnover under § 542(a) requires that the information

---

[18]      *See* Amended Complaint at*, e.g.,* ¶¶ 91, 154, 164, 165.

[19]      *See* Prior MTD Br. (Adv. D.I. 17-1) at 49-51; MTD Opinion (Adv. D.I. 39) at 69.

requested be property of the estate, there is no such requirement in § 542(e)."). "The Third Circuit

has explained that a 'bona fide dispute' exists only when there is 'a genuine issue of material fact

that bears upon the debtor's liability, or a meritorious contention as to the application of law to

undisputed facts.'" *In re Joey's Steakhouse, LLC*, 474 B.R. 167, 188 (Bankr. E.D. Pa. 2012)

(quoting *B.D.W. Associates v. Busy Beaver Bldg. Ctrs.*, 865 F.2d 65, 66 (3d Cir. 1989)). The

undisputed facts alleged in the Amended Complaint establish that a turnover claim is proper,

Moving Defendants cannot dispute those facts via a motion to dismiss, and the Motion should thus

be denied with respect to the turnover claims.

## V.    CONCLUSION

In light of the foregoing facts and authorities, the Trustee respectfully submits that Moving

Defendants' motion to dismiss the Amended Complaint should be denied.[20]

Dated: October 29, 2024

                                        **COREN & RESS, P.C.**

                                        /s/ Andrew J. Belli
                                        STEVEN M. COREN
                                        ANDREW J. BELLI
                                        JANICE D. FELIX
                                        Two Commerce Square, Suite 3900
                                        2001 Market Street
                                        Philadelphia, PA 19103
                                        Tel: (215) 735-8700
                                        Fax: (215) 735-5170
                                        scoren@kcr-law.com
                                        abelli@kcr-law.com

---

[20]    In the alternative, if the Court determines that dismissal of any claims is warranted, Plaintiff respectfully requests that the dismissal be without prejudice so that the Trustee may amend the complaint with respect to any claim deemed insufficient. *See, e.g., Phillips*, 515 F.3d at 245 ("even when plaintiff does not seek leave to amend his complaint after a defendant [successfully] moves to dismiss it, unless the district court finds that amendment would be inequitable or futile, the court must inform the plaintiff that he or she has leave to amend the complaint within a set period of time").

84

jfelix@kcr-law.com

*Counsel for Plaintiff*
*Bonnie Finkel, Chapter 7 Trustee*