# EXHIBIT 1

DTX-3

Anthony Lorubbio

Page 1

IN THE COURT OF COMMON PLEAS
PLEAS OF BUCKS COUNTY,
PENNSYLVANIA
Case No.: 2021-01816-0-JUDGE:34

_____

ANTHONY LORUBBIO
            Plaintiff

        v.

CASEY PARZYCH, POLEBRIDGE LLC, ASHLEIGH BALDWIN, and
ANGUS RITTENBURG
            Defendants

_____

                    - - -

            Friday, March 31, 2022

                    - - -

        Oral sworn deposition of ANTHONY LORUBBIO was taken via Zoom videoconference before Aubrey D. McNally, (30XI00234300), Certified Court Reporter, Registered Professional Reporter and Notary Public of the State of New Jersey, on the above date, commencing at 10:00 a.m., there being present:

A P P E A R A N C E S:

    SIDKOFF, PINCUS & GREEN, P.C.
    BY:  CASEY GREEN, ESQUIRE
    1101 Market Street
    Philadelphia, Pennsylvania  19107
    (215) 547-0600
    cg@sidkoffpincusgreen.com
    Attorneys for the Plaintiff


    ROGERS COUNSEL
    BY:  JOSEPH R. HEFFERN, ESQUIRE
    26 East Athens Avenue
    Ardmore, Pennsylvania  19003
    (610) 649-1880
    joe@rogerscounsel.com
    Attorneys for the Defendants


ALSO PRESENT:
ANGUS RITTENBURG
SHAWN McBREARTY

Anthony Lorubbio

Page 3

I N D E X

Witness                                             Page

ANTHONY LORUBBIO

        BY MR. HEFFERN                                  5

888-893-3767
www.lexitaslegal.com

LEXITAS

LORUBBIO0569008

Anthony Lorubbio

Page 4

E X H I B I T S

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| L-1 | Deposition Notice | 7 |
| L-2 | LinkedIn page | 14 |
| L-3 | Google search of residences | 67 |
| L-5 | Email String | 102 |
| L-6 | Intellectual Property Asset Assignment Agreement | 109 |
| L-7 | Amended Complaint | 115 |
| L-8 | Motion for Leave to Amend Complaint | 145 |
| L-9 | Request for Production of Documents | 169 |

(Exhibits attached.)

. . . .ANTHONY LORUBBIO, after having been duly sworn, was examined and testified as follows:

— — —

MR. HEFFERN:  Just usual standard rules of civil procedure are fine by me.

MR. GREEN:  Okay.  Are we reserving then everything other than as to form?

MR. HEFFERN:  Yes.

MR. GREEN:  Okay.  I would like a copy of the transcript, read and sign.

BY MR. HEFFERN:

Q        Good morning, Mr. Lorubbio.  Could you please state your full name and address for the record.

A        Yes.  My full name is Anthony Lorubbio and you said address?

Q        Yes, please, your home address.

A        Yes, I do not have a permanent home address.  I am -- but my mailing address is PO Box 515 Westfield Center, Ohio 44251.  And the reason I do not have a permanent home address is I -- my current work requires that I travel a lot, so I live permanently on the road at this time.

LORUBBIO0569010

Page 6

Q        Okay.  Do you own a home at 3014 Franklin Boulevard, Cleveland, Ohio?

A        I do not.

Q        Okay.  Did you ever live at that address?

A        At some points in my life I have lived at that address.

Q        Okay.  When did you last live at that address?

A        To the best of my memory the last time I lived at that address was summer 2021 I believe would have been around that -- yeah, it was around that time I think was the last time.

Q        Okay.  And when did you start living at that address?

A        I started living at that address in November 2018 I believe.

Q        Okay.  Do you own a home anywhere?  Do you own any real estate?

A        I've been involved in some real estate in the past, but currently to the best of my knowledge at the moment I do not -- I do not own any real estate right now, no.

Q        Okay.  And is your cell phone number

Anthony Lorubbio

(330) 903-0921?

A       That is correct.

Q       Thank you.  I'm going to try and share my screen with you.  Are you seeing a deposition notice for yourself?

A       If you could scroll -- so this is the top?

Q       Yes.

A       Any chance you could continue to scroll so I could see the entire document?

Q       Yes.

MR. HEFFERN:  Just for the record, I'm going to mark this as L-1 for Lorubbio-1.

- - -

(At this time, Exhibit L-1 was marked for identification.)

- - -

BY MR. HEFFERN:

Q       Have you seen this notice before?

A       I believe I have seen this notice before, yes.

Q       Okay.  And I'll represent that this is your deposition notice for your testimony today in the case of Anthony Lorubbio versus Casey Parzych,

et al, 2021-01816 in which you filed in Bucks County, Pennsylvania.

Have you ever been deposed before?

A    I believe this is my first time being deposed.

Q    Okay.  Well, I will go over some basic ground rules then.  First of all, we're doing this by Zoom which I appreciate your willingness to do it that way.

Your answers must be verbal.  So even though this is being recorded, head nods, inaudible grunts don't really come across well on the transcript, so if you could just make sure all your answers are verbal; is that okay?

A    Yes, that is okay.

Q    Okay.  Great.  You're doing a great job with this already but because this is Zoom there might be a little bit of a delay, so you want to make sure that I fully ask my question before you start to answer.  It also gives your attorney an opportunity to object if he wants to, okay?

A    Yes, I understand.

Q    Great.  If you don't understand something I've asked, just let me know and I will

try and rephrase it so you can understand, okay?

A     Okay.

Q     If you don't say anything, I'll assume you understood the question, okay?

A     Okay.

Q     All right.  I don't want you to guess.  If you don't know, it's fine to say I don't know or I don't recall, okay?

A     Okay.

Q     The only time -- and I generally won't ask you to speculate.  The only time I may ask is for an approximation or if you could ballpark something for me or give me a range.  If you can, great.  Just make it clear on the transcript that you're doing an approximation.  If you can't, that's fine, too, all right?

A     Okay.

Q     All right.  So from time to time your attorney may object, and that's fine.  That's his right to do.  Unless, however, your attorney tells you not to answer, you otherwise should feel free to answer if you can my question, okay?

A     Yep.  Okay.

Q     Great.  If at any time you'd like to

LORUBBIO0569014

take a break, it's absolutely fine.  We can take as many breaks as you'd like whether five minutes for a restroom or if you want something more substantial for lunch or, you know, a snack break, whatever, that's fine.  We could take as long of a break as you'd like, okay?

A          Okay.

Q          You understand your testimony is under oath today, correct?

A          Yes, I understand.

Q          And you understand that you could be subject to criminal penalties for perjury if you don't tell the truth and the whole truth.  You understand that, correct?

A          I do understand that.

Q          I don't anticipate that being a problem, but I just have to make you aware of it, okay?

A          Okay.

Q          All right.  Is there any reason today why you can't provide me complete and truthful answers to my questions?

A          No reason comes to mind for why I cannot, yes.

Q          Great.  Now, I will ask you lots of

questions today but if any question ever involves a conversation with an attorney of yours, you are not to disclose any attorney-client confidential information, okay?

A       Okay.

Q       All right.  Did you do anything to prepare for today's deposition?

A       I meditated this morning.

Q       Okay.  Did you do anything else like looked at documents?

A       I did review a few emails and I went through a couple of -- a few documents.  Basically the Complaint document I went through again and, yeah, that's about it.

Q       Okay.  You said the Complaint document. When you say that, are you speaking of the original Complaint you filed in this case or the amended Complaint?

A       I did review the amended Complaint, yes, and there may have been a few additional documents, but at least that one, that one definitely comes to mind for something I did to prepare.

Q       Okay.  Do you recall any of the emails you reviewed today?

Anthony Larubbio

A     I did not review any emails today.

Q     Do you recall any of the emails you reviewed in anticipation of today's deposition?

A     I did review a few emails that were provided in production from the defense because there were some emails that I believe were in PDF form from that, so I did review some of that. That's what comes to mind at the moment at least for what I reviewed to prepare.

Q     Okay.  You don't recall anything else?

A     I do not.  Yeah, that is what I recall, yeah.

Q     Okay.  Great.  Thank you.

Without asking you any discussions you may have had, did you meet by phone or otherwise with any of your attorneys to prepare for today?

A     Yes, I did meet via phone yesterday to prepare, yes.

Q     Who did you meet with yesterday to prepare?

A     I met with Shawn.  Oh, boy, Shawn, I hope I don't mispronounce your last name, McBrearty, and I met with Casey Green as well.

Q     Okay.  And for how long did you meet

LORUBBIO0569017

with attorneys yesterday?

        A        From what I recall, it was fairly brief. No more than -- yeah, it was fairly brief.

        Q        Okay.  Did you meet with your attorneys at all prior to yesterday to prepare for your deposition?

        A        I have prior to yesterday.  I don't recall that I met with my attorneys to prepare for this deposition.

        Q        Okay.  Did you discuss your upcoming deposition with anyone other than your attorneys?

        A        Some of the people that come to mind that I've discussed that I'm being depositioned today include my mom, my dad, a couple of close friends.  Yeah, that's who comes to mind.

        Q        Okay.  Do you recall when you spoke with those individuals?

        A        Yeah, at the very least one interaction that comes to mind is a text message this morning from a good friend of mine just to check in, ask how I was feeling.

        Q        Okay.

        A        And then I sent a voice message to my dad yesterday as well.

Q        How old are you?

A        I'm 32.

Q        What is your date of birth?

A        5/21/1990.

Q        And where did you go to high school?

A        I went to high school at Wadsworth High School in Ohio.

Q        Where's that in Ohio?  What town?

A        It is in Wadsworth.

Q        What year did you graduate?

A        To clarify the question, in what year did I graduate from what?

Q        High school?

A        I graduated high school in 2009.

         MR. HEFFERN:  Okay.  I'm going to show you what I've marked as Exhibit L-2 for Lorubbio-2.

                       - - -

         (At this time, Exhibit L-2 was marked for identification.)

                       - - -

BY MR. HEFFERN:

Q        This is a copy of your LinkedIn page that I printed out to PDF yesterday at 5:34 p.m. and

LORUBBIO0569019

Anthony Larubbio

Page 15

I'll scroll down so you can see the whole thing.

Do you recognize this as your LinkedIn page?

A       Please do.  If you could go ahead and scroll down so I can --

Q       Okay.  Do you --

A       I can see -- my apologies.  I didn't mean to speak over.  I can see this document through the screen share.  I would just like to see the entire document first.

Q       Yeah, absolutely.  Sorry, you can see the ads in it as well, too.

A       Thanks.

Q       No problem.  Having had a chance to look at that, does that accurately reflect your employment history?

A       Based on what we just reviewed, I do feel that accurately reflects my employment history.

Q       Okay.  And does it accurately reflect your educational background?  Scrolling back up to your educational background.

A       There may be some additional education that I've received or dove into, but certainly I think what's listed here is accurate.

LEXITAS

LORUBBIO0569020

Anthony Larubbio

Page 16

Q        Okay.  When you say "additional education," are you speaking in terms of like a master's degree or something or like a certificate program?

A        I am not specifically referring to a master's program.  I am saying that there may be additional, yes, certification type of programs and things like that.

Q        Okay.  Are they listed under the licenses and certifications or are there others that don't appear on here?

A        So based on what we're reviewing, at the very least the two that are listed there are certifications that I've received, yes.

Q        Okay.  Have you received any other certifications besides the two that are listed on here?

A        One that comes to mind, and there may be more, but one additional one at the very least I know that comes to mind is the Wim Hof Method certification which I don't see that's listed here.

Q        Okay.  I think that might be down further.  Let me just check.  I think I saw that.  Maybe it's up higher.

Anthony Lorubbio

Okay.  It states that you're an instructor as of January 2022; is that correct?

A       I am an instructor as of January '22, yes.  I just don't see mention of the certification.

Q       All right.  Fair enough.  Thank you.

Going down to your education, so you graduated from Carnegie Mellon University in 2013; is that correct?

A       Yes, that is correct.

Q       With a bachelor's degree in information systems and business administration?

A       Yes, that's correct.

Q       You are currently employed at Recal Travel; is that correct?

A       I'm not entirely sure about the technical definition of employed.

Q       Okay.  Fair enough.

A       I spend a majority of my -- I shouldn't say a majority.  I do spend professional time on the company Recal Travel.

Q       Okay.  You're the founder of Recal?

A       I am the founder of Recal.

Q       Okay.  Do you take a salary from Recal?

A       I do not take a salary from Recal.

LORUBBIO0569022

Q        Okay.  Does Recal have any employees?

A        Recal does not have any employees.

Q        Okay.  Is Recal a profit-making enterprise for yourself?

A        I have not -- I'm unsure yet if it has turned a profit just yet, actually.

Q        Okay.  Can you please describe Recal for me a little bit so I can better understand what exactly its business is?

A        Sure.  Recal is short for recalibrate and it specializes in mindful adventure travel a/k/a combining mindfulness practices, things including breath work and meditation and all sorts of different mindfulness with adventure travel to help people that are stressed from life or work or the combination of and they're potentially burnt out and we do various things in this area, but at least one of the things we do is run retreat-style trips to help these people.

Q        So when you say "we," were you speaking in terms of you partnering with others to schedule these trips?

A        I do want to pause for one moment.  If you do, in fact, hear vacuuming noise in the



LORUBBIO0569023

background, I'm happy to ensure that that is no more.

Q     I don't hear anything.  That's fine.

A     Great.  And, my apologies, could you please repeat the question.

Q     Sure.  So you said "we" and I was wondering, do you partner with anyone to put together these trips or --

A     We do partner with people and organizations to put together the trips, yes.

Q     Okay.  What sort of organizations and individuals do you partner with to put together these trips?

A     Some organizations that come to mind are hotels and accommodations partners as well as outfitters, guides.  So at the moment at the very least those are what come to mind.

Q     Okay.  And how do you get paid?  Do you take a percentage of commission?  How does that work?

A     Just to clarify the question, who are you referring to getting paid?

Q     You.  So I guess my question is:  This is a business, correct?

LORUBBIO0569024

Anthony Larubbio

A        This is a business.

Q        Okay.  How do you make money through that business?  You know, you said you haven't necessarily turned a profit yet, but how do you receive revenue from that business?

A        To clarify, I'm not totally sure yet if we have turned a profit, for example, for last year.  Secondly, we -- individuals pay to be a part of our, for example, retreat-style trips and people pay to go on these trips.

Q        Okay.  And you take -- I guess you charge a fee to do that and you take a certain percentage of that as income for yourself?

A        I do not take a certain percentage of that as income for myself.

Q        Okay.  Do you know how much revenue Recal generated in 2022?

A        In 2022 I do not recall how much revenue we've taken in.

Q        Okay.  Do you have like a ballpark figure?  Is it in the order of tens of thousands or hundreds of thousands or --

A        It is less than a million in revenue. I'm not quite sure where exactly we landed, for

example, last year.

Q        Okay.  Do you have a floor -- zero to a million is kind of a big range.  Do you have kind of a lower end of that?

A        Yeah, that's a worthwhile question. Yeah, the floor certainly would be 50,000.  Yeah, it's greater than 50 from what I recall.

Q        Okay.  Do you have any other sources of income right now besides Recal Travel?

A        I do have sources of income.  One that -- other sources of income, one that comes to mind is some of my work through the Wim Hof Method and some of my coaching.

Q        Okay.  Any others besides the Wim Hof Method?

A        I do have a coaching practice for individuals and private clients specifically in the areas of breath work and mindfulness that's not necessarily in one -- under one entity being Recal or being Wim Hof Method.

Q        Okay.  Do you recall what your adjusted gross income was for 2021?

A        I do not recall exactly what that was. I believe I can provide a range.

LORUBBIO0569026

Q       Yeah, that's fine.

A       And that is -- for 2021 specifically, that would have been between 50 and 100,000, but I don't recall exactly.

Q       Okay.  How about for 2020, do you recall that?

A       For 2020 from what I recall my adjusted gross income I believe was just a bit north of 200,000.  However, with taxes, of course there's always nuances where there may be entities that you own equity in that certainly affect your adjusted gross income.

So in terms of both those years, 2021 and 2020, I just want to consider the caveat that I don't recall exactly what adjusted gross income would have landed especially with considerations of losses or gains from equity.

Q       No, understandable.  When you're speaking about equity, what sources of income do you attribute to equity or how much of your income do you attribute to equity?

A       I'm not quite sure actually how much or what it felt -- could you repeat the question just to actually clarify for me so that I can give an

888-893-3767
www.lexitaslegal.com

LEXITAS

LORUBBIO0569027

accurate answer.

Q      Yeah.  So you mentioned in 2020 some of that income may have come from equity in the north of 200,000.  What were your sources of equity that you were referring to in that year?

A      So some sources of -- actually, some equity holdings that certainly come to mind, and I'm not sure that we consider them sources of income or not, but some companies in which I held equity include Midnight Madness Distilling.  Another one that comes to mind is an equity stake in a company called Refrigerated Solutions Group and there may be others as well.  One more that comes to mind is a company called Spectro-UV and there may be some others, but those are at least the ones that clearly come to mind at this moment.

Q      Okay.  Do you still hold equity in any of those companies that you just named?

A      My understanding is I do still hold equity in some of those companies, yes.

Q      Which ones?

A      I'm not a bankruptcy expert, but I'm fairly certain I still have equity in Midnight Madness Distilling, LLC.

LORUBBIO0569028

Anthony Larubbio

Q      Okay.  Any others?

A      One that comes to mind is, and I'm not totally sure on this, but one that comes to mind is Spectro-UV.

Q      Okay.  And approximately how much equity in terms of dollars do you have with Spectro-UV?

A      I'm unsure in terms of dollars.

Q      Okay.  How about Refrigerated Solutions Group, do you still have equity in that?

A      My understanding is that I do not have equity in that.  However -- yes, that is my answer.  Yes, I don't believe that I have equity in that business any longer.

Q      Okay.  Did you sell that or was that an option or something that was removed?

A      There was a process in which I did sell that equity stake, yes.

Q      Okay.  Do you recall how much money you received for that equity stake?

A      That's a good question.  I don't remember the exact number.  But, once again, I can probably give you a range.

Q      That would be great.

A      I believe that that was between 50 and

LORUBBIO0569029

100,000.

Q     Okay.  So I asked you for your AGI for 2021 and 2020.  Do you have an estimated AGI for 2022 yet?

A     I do not.

Q     Okay.  Do you have a sense of whether it will be north of what you received in 2021?

A     It will likely be in a similar range, maybe slightly north.

Q     Okay.  I wanted to just -- looking -- turning your attention back to L-2, your LinkedIn page, it provides that you were chief executive officer of Spectro-UV from 2020 to 2021.

Can you just explain a little bit what Spectro-UV's business model was?

A     Uh-huh.  Spectro-UV's business model was as an electronics manufacturer and they make ultraviolet lamps and a few other tools like radiometers and particularly service the aviation industry, some UV sanitation industries, yeah.

Q     Okay.  Were you recruited to be the CEO of that company?  How did you come to work at Spectro-UV?

A     I was recruited to be the CEO of that

LEXITAS

LORUBBIO0569030

business.

Q        Okay.  And do you know how long that business has been in business for?

A        Yes.  Spectro-UV is a carve-out entity and, therefore, it was in business, is in business, has been in business since July 2021.  Excuse me, 2020, July of 2020.

Q        Okay.  And when you say "a carve-out entity" -- so you were the first CEO of Spectro-UV?

A        Of Spectro-UV as the carve-out entity I was the first CEO.

Q        What corporation or entity was it carved out of?

A        The entity that it was carved out of is called Spectronics Corporation.

Q        Okay.  And what does Spectronics do?

A        Spectronics is in a similar business. However, not just exclusively producing products around ultraviolet, non-destructive testing equipment, they also are in leak detection as well.

Q        Okay.  And how long has Spectronics been around?

A        Joe, you're racking my brain on this, but I believe that Spectronics was founded in the

LORUBBIO0569031

1950s.

Q        Okay.  So it appears that you were CEO of Spectronics for about six months, until January of 2021; is that correct?

A        That is correct.

Q        Why did you leave Spectro-UV after being recruited to go there?

A        I wanted to start another entrepreneurial adventure in Recal Travel.

Q        Did you resign or were you terminated?

A        It was agreed upon that I would leave to begin a new company.

Q        Okay.  Were you asked to leave?

A        I do not recall being asked to leave.

Q        Okay.  Did you feel that your time at Spectro-UV was successful?

A        I think there's a lot of metrics that can be used to define successful.

Q        Okay.

A        Some that come to mind are retention of employees and standing up various functions of a business for a brand new venture, establishing revenue, retaining talent, building culture, producing profit.  There's a lot of metrics

LORUBBIO0569032

Page 28

obviously that we can use to define success and generally speaking, yes, I would consider the company to be successful under my time as CEO.

Q    Okay.  Is it still in business?

A    My understanding that at the moment it is still in business.

Q    Okay.  Did someone replace you as CEO of Spectro-UV?

A    I believe that, from my memory, I believe that sometime after I left to begin my new company, somebody did step into a CEO role.

Q    Okay.  I wanted to just briefly touch on Ten Oaks Group and it says here that you were here from February 2020 to January 2021; is that correct?

A    That is correct.

Q    So getting back to my original question: What is the Ten Oaks Group?

A    Ten Oaks Group is a private equity firm that specializes in corporate carve-outs in particular -- in particular in the -- well, they do have some big businesses, so I was going to try to specify.  They own and for periods of time have holdings much like a traditional private equity firm operates in various industries and companies.

LORUBBIO0569033

Q       What was your role as an operating partner at the Ten Oaks Group?

A       My role was operating partner.  Would you like me to clarify what that --

Q       Absolutely.  Can you describe your daily duties as an operating partner at the Ten Oaks Group?

A       So there were a lot of duties certainly and some that come to mind, and this might not be an exhaustive list, but some that come to mind initially during my time as an operating partner, I reviewed some of the potential deal flow, put together pitch decks, secured financing, worked on building the business, put together strategic initiatives and forecasting and planning and, you know, potential post-acquisition first 90-day strategy and whatnot.

        And then my duties also as acquisitions happened during my time as an operating partner, I then took roles within the acquired entities themselves and typically it took leadership roles related to carve-out transformation and, you know, putting in the foundation of the functions of the business.

Anthony Larubbio

Q        So is that how you ended up leaving to go to Spectro-UV, was that working as -- were you at one point working on a project for Spectronics to create Spectro-UV?

A        I was never working on a project with Spectronics to create Spectro-UV.  My work was related to Ten Oaks Group and I was then recruited to become the CEO of the post-transaction carve-out entity.

Q        Got you.  Okay.  If we could scroll down to Refrigerated Solutions Group.  It lists your LinkedIn page -- on L-2 it lists you as the chief transformation officer at Refrigerated Solutions Group; is that correct?

A        That is correct.

Q        And you held that position from April 2020 to July 2020; is that correct?

A        From my memory and what I'm seeing on this page, yes, that is how I remember.

Q        So you were employed at Refrigerated Solutions Group for about four months.  Why did you leave Refrigerated Solutions Group after four months?

A        I was recruited to be the CEO of

LEXITAS

LORUBBIO0569035

Spectro-UV.

Q      Okay.  So your time with -- you were working both at Ten Oaks and Refrigerated Solutions, your time there overlapped; is that correct?

A      That is correct.

Q      Okay.  I'd like to turn to your time at MMD.  So according to your LinkedIn page here, you cofounded Theobald & Oppenheimer in November of 2011 with Casey Parzych; is that correct?

A      I was cofounder of the business in November of 2011, yes.  It was not just with Casey Parzych.  But, yes, he was the co-founder.

Q      Who was the other co-founders at that time?

A      At the time of our co-founding -- other co-founders that come to mind are Doug Heckmann as well as Jason Paul.  However, the -- and there were a few others in the initial business plan -- excuse me, the entrepreneurship class that this was initiated in a business plan project, but those four would have been the core four that actually really started to work on the business to build it, yes.

Q      And is Theobald & Oppenheimer also known as Midnight Madness Distillery or MMD?

LORUBBIO0569036

Anthony Lorubbio

Page 32

A        It is also known as Midnight Madness Distilling or MMD.

Q        So if I use the word MMD, you'll understand that I'm referring to Theobald & Oppenheimer, correct?

A        Yes, I will understand.  If you say MMD, I know what you're referring to.

Q        I just wanted to confirm because it's a mouthful to say the other names.

A        I totally understand.

Q        So you started -- I was going to ask you how did it come about?  How did you form MMD?  You started to say there were the four core founding partners at Carnegie Mellon.  Could you expand upon that?

A        Sure, yes.  The class was born, so to speak, out of -- or, excuse me, the company was born, so to speak, out of a class project and initially it was us four -- Jason, myself, Doug and Casey -- and then the three that remained to really continue to push the business further were myself, Casey and Doug and -- yeah, are there any other particulars that you would like me to cover out of the initiation of the business?

Anthony Lorubbio

Page 33

Q        Sure.  So did you actually form the corporation with the four of you -- Doug, Jason, yourself and Casey -- as the initial members?

A        From my memory, when we formed the official entity which was named Midnight Madness Distilling, LLC, that was in June of 2012 from my memory and there was really three co-founders at that time between myself, Casey, and Doug.

Q        Okay.  Did Jason state why he didn't want to pursue it with you?

A        I don't recall the exact reasoning.  I think Jason maybe had some other opportunities to pursue, so we were the ones that remained to pursue this business.

Q        Did Doug Heckmann stay involved in the business?

A        For a period of time Doug did stay involved in the business.

Q        And how did he end up leaving the business?

A        I don't recall maybe exactly when or how.  It could have been in 2014 maybe and I know that Doug had another opportunity and I think he saw potential in California, so he pursued that.  Yeah,

LORUBBIO0569038

that's what I remember.

Q    Did you and Casey buy him out or how did that occur?

A    I don't recall Casey and I -- I don't recall there being any buyout with Doug.  Oh, man. How many years ago is this now?

Q    2014, so it's probably nine.

A    So there was -- I do -- from my memory I remember having a conversation with Doug and there being a fairly amicable arrangement of separation between us.  That is what I recall.

Q    Okay.  Did he retain any equity in MMD?

A    He did retain equity in MMD.

Q    Just not any sort of management or -- well, management role?

A    That's correct.

Q    So at the end of the day you owned an equity stake in MMD for approximately 39 percent of the company; is that fair?

A    Certainly when I -- when the company was founded I owned less than that.  I don't quite remember.  We'd have to look back at the initial operating agreement, but I did own I don't want to say significantly less but I owned less than that

Anthony Lorubbio

Page 35

for sure.

Q        Okay.

A        And then over time based on performance and the growth of the business itself, on at least two maybe three even more potentially occasions, I don't remember the exact number, but I continued to earn more equity in the business based on the performance of the company and the direction the business was headed.

Q        Did you meet Casey -- well, did you know Casey prior to taking that class in which MMD was formed?

A        Prior to the class I don't think -- I don't remember knowing Casey before that.  There may be a chance that we had crossed paths at some point on or around Carnegie Mellon campus, but I don't remember specifically knowing him at least significantly until that class.

Q        Okay.  So was it just happenstance that you ended up working with him in that class to form MMD?

A        Yes, more or less that's how I would remember that.  I know that the business projects when they were being formed, I kind of thought that

LORUBBIO0569040

Anthony Larubbio

Page 36

a distillery opportunity at that point in time in 2011 seemed intriguing to build a business plan around and I -- yeah, I wanted to join that group, that class for the class project.

Q        Okay.  Did you meet R.F. Culbertson when you were at Carnegie Mellon?

A        I did meet R.F. Culbertson when I was at Carnegie Mellon.

Q        Was he a professor of yours?

A        He was a professor of mine, yes.

Q        Was he a professor for this particular class in which MMD originated?

A        Yes, R.F. Culbertson was the professor in that class.

Q        Okay.  And then at some point he became involved in MMD; is that correct?

A        I don't recall all the details.  Certainly I think he -- he seemed to have a -- so he was involved at least from a professorial position overseeing the class project.  I don't know that we were calling the business Midnight Madness Distilling at that time.

There was then an additional class that was like a self-guided, professor-led in a way, but

LEXITAS

LORUBBIO0569041

Page 37

self-guided class where we continued to work on the

business plan of the company and he was involved at

least in that capacity.

And then the other thing that comes to

mind, and there may be more involvements as well,

but he seemed to have a -- at least for some periods

of time over the course of Midnight Madness' life,

not all that much time, but he seemed to have a

relationship with Casey Parzych, my co-founder of

the business.

Q        Did he have a relationship with you at

all?

A        I mean, he was my professor at Carnegie

Mellon.

Q        But say after you graduated from

Carnegie Mellon, did you have any sort of

relationship with him other than the business?

A        I did not have a relationship with R.F.

Culbertson other than the business.

Q        Okay.  Did he have any sort of -- go

ahead.

A        No, yeah, excuse me.  No, that is

correct.  My only -- I mean, he's a professor at

Carnegie Mellon and I certainly know other people,

LORUBBIO0569042

friends that went through his class and so at the very least, like, I know of him.

One person that comes to mind is an executive, now the CEO and founder of a company called Hyliion.  I know that R.F. Culbertson for some period of time had a relationship with that business and every now and then I would hear from Thomas Healy, so I knew what was going on in that business and my understanding is that relationship ended in a separation and potential lawsuit I believe between R.F. Culbertson and Hyliion.

So I don't know if we would define that as a relationship that I have with R.F., but at the very least R.F. remained in my purview of connections and relationships in my life.

Q    Okay.  Did R.F. ever have like a formalized advisory role with MMD?

A    Yes, at some points in time and I don't know that I remember the exact date range.  I believe he held a manager role.  I remember exactly, actually, and thank you for sparking my memory here.

Q    Yeah, no, of course.

A    Upon the separation of Doug Heckmann and us, us as in Midnight Madness Distilling, R.F.

LORUBBIO0569043

Culbertson then took a board of managers position, and so then if the date is correct -- and, again, I don't quite recall if the date is correct -- in 2014 then when we separated with Doug, that would have been then when R.F. Culbertson took a board of managers role.

He was not really involved.  There wasn't much going on necessarily directly with him in the business other than him holding that role and then I believe in 2019 he was then taken off the board of managers and then that would have left myself and Casey as the board of managers.

Q    Who removed him from the board of managers?

A    I don't recall.  I don't think it was a who removed somebody.  I don't recall.  I think it was just a part of an agreement that he was then no longer on the board of managers.

Q    Okay.  Did he have a salary as a member of the board of managers or any sort of compensation?

A    Not to my knowledge.  I don't recall any compensation to my knowledge.

Q    Okay.  Did he have any other formalized

LORUBBIO0569044

roles at MMD that you're aware of?

A       I don't recall any other formalized roles.

Q       Okay.

A       Based on -- I mean, of course I don't know what happened exactly after my departure from the business, so there may have been at that point moving forward.

Q       Okay.  So your position at -- directing your attention back to L-2.  Your position at MMD was CEO the entire time you were there?

A       Yes.  I don't recall exactly when we formalized that title during the duration of the business.  But, yes, generally speaking it's safe to say that during my time at the business I was the CEO.

Q       Okay.  And that was -- you were CEO until January of 2020; is that correct?

A       That is correct, yes.  I don't know if there was an official title change in any fashion.  But, yes, I mean, generally speaking January 2020 was through the time in which I was CEO.

Q       Okay.  And then you were terminated in January of 2020, correct?

A   I'm not sure exactly what all is included in the term terminated.

Q   Well, at least in your amended Complaint I believe you alleged that Casey Parzych at least purportedly terminated you on January 30th of 2020; is that fair?

A   There was certainly -- yes, I don't -- I don't know when that was formalized exactly, if it was January or shortly after.  But, yes, at the very least I left the company as of that time.  So, therefore, was no longer the CEO.

Q   Okay.  As you're looking at L-2, you identify your core functions as including P&L oversight.  What did that include?

A   P&L includes profit and loss.

Q   Okay.  So you oversaw the profits and losses of MMD during your time as CEO; is that correct?

A   I was within the management group that certainly was overseeing that.  So as it states, that was one of my roles among myself and in the management team.

Q   Okay.  And then you also saw brand strategy and management, correct?

LORUBBIO0569046

Anthony Larubbio

Page 42

A      We had people that worked on the brand strategy.  We worked with agencies that also created a lot of the brand strategies around our products and I had a role in that as well, yes.

Q      Okay.  And then I also see here product development.  What did that entail?

A      That entailed from my -- generally speaking to kind of build on what product development entailed, it was identification of a potential market for our product.  It then entailed trying to define the formula for a product and ensuring that that fit into the market that we saw as an opportunity and then it also included some of the branding and packaging in particular in the beverage space and then some consumer testing and ensuring that, you know, the product we are developing fits the opportunity that we saw.

I'm sure there's a lot more to product development, but those are the things at least that come to mind.

Q      Did you ever help oversee the development of new technologies?

A      I did have a role in helping develop new technologies.  I was not a contributor in the weeds

LORUBBIO0569047

Page 43

as an engineer per se.  I held meetings and provided guidance and advising and whatnot alongside projects relating to technical developments.

Q       Okay.  So you were more overseeing other people coming up with new technologies.  Is that a fair description of what you did with regard to product development?

A       I oversaw and managed people that were building technologies.

Q       Was one of those people Angus Rittenburg?

A       We did have a few engineers and at least, yes, Angus does come to mind.  We had another engineer named Mihir as well.  That's spelled M-I-H-I-R if I recall from memory just for the record.

Q       Is that his first name or her first name?

A       It is his first name, yes.

Q       Do you know his last name?

A       Joe, come on.

Q       If you don't, that's fine.

A       I don't recall.  It may start with a G, but that may be all that I remember.

LEXITAS

LORUBBIO0569048

Anthony Lorubbio

Page 44

Q        Okay.  Any other engineers you oversaw?

A        I do have a clarify -- I'm not sure that the organizational structure was that I "oversaw." I oversaw some of the projects alongside management and I worked with these people.

Q        Okay.

A        And were there other engineers?  We had people with other technical expertise at the company for sure.  I don't recall.  Those at least are the names that come to mind as we specifically hone in on new product technology and engineering.

Q        Okay.  You mentioned you oversaw certain projects.  What technological projects did you oversee?

A        I think at least in some spectrum there's some technical expertise to any product that we did launch.  So I was involved in and oversaw some components that led to new products.

Some of them include that come to mind favor in general -- there may be some technical components to that, so we could potentially put that in that bucket, but single profit was a bit more intricate of the product, so I guess we could even more so consider that some technical expertise

LORUBBIO0569049

around that.

And I was at least involved in the project in particular with a cap, for example, that's made from coconut wood.  That was of a very specific type of packaging component for us.  And then the most technical project from memory here -- I don't know if it's the most but certainly one that required a lot of technical expertise was our effervescent liquor line of products under the J.W. Tufts brand name or at least what came to be J.W. Tufts as we dug deep into the brand strategy and that was a long-standing project for us but one with a lot of high hopes around that product and I oversaw at least some portions of the project to bring that to life.

Q       Okay.  Was there an invention that was known internally as a siphon associated with the effervescent liquor product J.W. Tufts?

A       So siphon -- yes, that is something that we refer to often, yes, and in particular that refers to a type of packaging where the contents of the liquid are under pressure inside glass and then the siphon basically would dispense that effervescent liquid that's inside the glass.

LORUBBIO0569050

Anthony Lorubbio

Page 46

Q        Okay.  And the siphon, was that technology ever patented by MMD?

A        To my knowledge, yes, it was.

Q        And was Angus Rittenburg the named inventor of that patent or patents associated with the siphon?

A        I don't recall all of the names that were associated with that.

Q        Okay.  The siphon technology, that was strictly related to effervescent alcohol, it wasn't associated at all with cannabis or CBD at all; is that correct?

A        The siphon was involved with dispensing of liquid.

Q        So there was no technology component of injecting say CBD into a liquor or other fluid relating to the siphon; is that fair?

A        I think there was potential for a lot of types of applications for this technology.

Q        Okay.  Are you familiar with another form of technology developed by Angus called a siphon 2 or siphon version 2?

A        Prior to my -- prior to my review -- prior to my review of emails that were provided in

LORUBBIO0569051

defense production, I don't believe that I was aware of a siphon 2, V2. I don't recall exactly what you said. I don't believe that I was aware of that prior to my review of the production.

Q       Were you aware of technology that Angus was working on involving the injection of CBD into a beverage?

A       He may have. I don't really recall all of the specifics around that. Yeah, in terms of injecting CBD, I don't remember exactly him working on that. He may have. I just -- I'm not quite sure.

Q       Okay. Fair enough. Did MMD acquire any loans to finance its operations while you were CEO?

A       We did acquire various types of financing while I was CEO, yes. Some of them were in the form of loan, yes.

Q       Did MMD ever acquire a loan from Quakertown National Bank?

A       Yes, that is correct. We did acquire a loan from Quakertown National Bank.

Q       Okay. Do you recall when that loan was acquired?

A       For some reason summer 2016 sticks out

to me.

Q      Okay.

A      But that's to the best of my memory and knowledge at the moment.

Q      That's fair.  And do you recall any conditions that were placed on the acquisition of that loan relating to your salary as CEO?

A      I recall as part of loan documents there were certain conditions, but I don't recall the specifics of the loan documents there.

Q      Okay.  So you don't recall a specific covenant that limited or capped your salary as CEO to $75,000?

A      I don't recall that specific covenant. There may have been.  I recall there being quite a few covenants I believe, but that one specifically may have been there, but I don't remember that exactly.

Q      Okay.  Do you recall what your salary was as CEO of MMD in 2016?

A      I don't remember exactly in 2016.  It may have been a little bit lower than that, maybe higher than that.  I'm truly not quite sure that I remember what my salary was.

Q    Okay.  Was your salary less than $100,000 at that time?

A    I don't remember in 2016 having a salary higher than 100,000.  I don't remember that, so I think it's probably -- I don't want to speculate or assume, but I don't -- I feel like I would remember that number and I believe it was less than 100,000.

Q    Okay.  As CEO of MMD, did your salary ever go above $75,000 that you recall?

A    There were certainly people that made more than that in salary, but I don't remember.  I don't quite -- I may have made more than that at some points.  But, again, I think I would be assuming or speculating, so I'm not quite sure.

Q    When you may have made more than that, would it have been after 2016?

A    Based on the growth of the business I would assume that it would be after 2016, but let's put it this way, I don't recall making more than that in the earlier stages of the business.

Q    Do you recall what your final salary was as CEO of MMD annualized?

A    No, I'm not quite sure exactly what I was at when I was relieved.  I would have to go back

LORUBBIO0569054

and check bank records and all of that.

Q      Okay.  Do you recall if it was north of 100,000 per year at that time?

A      I do not.

Q      Okay.  At some point did you ever take an extended leave of absence from MMD and stop taking a salary for about seven months?

MR. GREEN:  Objection to form.

A      May I answer still or no?

BY MR. HEFFERN:

Q      Yeah.  Unless your attorney tells you not to answer, you can answer if you understand.

A      I do not recall.  I would remember an extended leave and I certainly don't remember taking an extended leave, no.

Q      Do you recall at some point stop taking a salary during your last year at MMD?

A      There were -- I mean, there were periods of time for me within the business that given I believed in the growth and the future of the business that I would have adjusted my own personal income based on ensuring that the business and the people at the business were succeeding, but I don't recall.  I may have during that time period, but I

LORUBBIO0569055

don't remember exactly. I may have earlier on in the business as well. I mean, for me the business was always first.

Q So just to clarify, you don't recall not taking a salary for about seven months during your final year at MMD?

MR. GREEN: Objection to form.

A I may have. But, I mean, I remember more than anything in the final seven months of my time working extremely hard to launch a product that was the J.W. Tufts effervescent liquor and oversee our sales and marketing side of the business and continue to try to drive those things forward.

BY MR. HEFFERN:

Q During that final year at MMD, so around the 2019 to 2020 time period, did you primarily live in Ohio at that time?

A During the final year -- during the final year I was traveling a lot for the business. I don't recall exactly where I may have spent majority of my time. I was on site at the distillery a lot in Trumbauersville. I was in Philadelphia for a lot of time in particular with the launch of our product. We had other markets

LORUBBIO0569056

that we were expanding into and I was spending a lot of time in those markets, so -- and I had family in Ohio, so I was spending some time there. But, yeah, so I was spending my time in quite a few places from memory during that year.

Q       You had a home in Ohio, the 3014 Franklin Boulevard in Cleveland beginning in November of 2018, that was your primary residence?

A       I did have -- I did own that property at that time.

Q       Okay. Approximately what percentage of days spent of 2019 were spent on site at MMD's facility in Pennsylvania?

A       In 2019?

Q       Yes.

A       From my memory, I can recall probably staying pretty consistent with a schedule that I had been doing for quite a few years at that point which included me staying on site at the distillery at the very least between Tuesday and Thursday which included me -- I mean, for periods of time I would sleep on an air mattress in my office for a couple of years during those days of the week and then as we moved into a new building I got a room.

LORUBBIO0569057

Anthony Lorubbio

Page 53

So in terms of percentage, if Tuesday through Thursday is kind of -- it would be three out of seven I would say.  I'm no math major but what does that land us at, 37 percent, something in that range.

Q     Okay.  Would the Friday through Monday, was that primarily spent in Ohio during 2019?

A     During 2019 it would depend on my travel schedule for the business as we expanded into new markets.  So it certainly included Ohio, but it also included time in market in Pennsylvania with our sales and marketing teams.  It included time in New York and New Jersey.  It would have included time in Florida.  Those are some of our key expansion markets at that point in time.

Q     Okay.  But none of those included Ohio, correct?

A     I did say that I spent time in Ohio certainly in 2019.

Q     I'm sorry, let me clarify.  Ohio wasn't one of those markets into which you were expanding at that point in time; was it?

A     We at that point in time had hired a controlled states sales manager.  His name is Chad

LORUBBIO0569058

Merriweather. And Ohio is a controlled state, so it was certainly a consideration of ours.

Q       Okay. Was there a business reason for you to travel back and forth to Ohio from Pennsylvania?

A       I do recall at times there being business reasons certainly for me to be in Ohio.

Q       What were those business reasons?

A       From memory -- from memory I do recall pitching, for example, the Ohio Liquor Control Board. There were a few -- at least one person that we were working with on the business end that was based in Ohio. We also had a strong contingent of investors, of course, based in Ohio.

But, you know, I also, of course, had family in Ohio, so I would spend time personally as well. So there was a lot of reasons. And Pittsburgh and Western Pennsylvania is one of our biggest markets. So, for example, with me having family in Youngstown, Ohio right on the boarder, I was able to spend time both working on the business as well as being able to easily visit family.

Q       Did MMD sell any product in Ohio in 2019?

LORUBBIO0569059

A        We may have sold some product in 2019 in Ohio, but nothing comes to mind specifically. There's certainly a chance that we had sold some product.  I remember it being a conversation of topic often with Chad and from a controlled state expansion perspective, but I don't quite recall if we sold anything.

Q        You said Chad -- was Chad based in Ohio?

A        From my memory Chad was based near Philadelphia and he oversaw the sales at least for the period of time that he was employed with us.  He was managing the potential growth to all controlled states which there are quite a few of those states, Ohio being one, Pennsylvania also being one, just to name a couple.

Q        What percentage of MMD's sales would you estimate were to Ohio in 2019?

A        I recall a large portion of our percentage of our sales being in Pennsylvania and then smaller percentages for every other market that we were in, Ohio being one of those other potential -- either potential or selling markets for us.

Q        Okay.  Would you estimate that it was

LORUBBIO0569060

Anthony Larubbio

Page 56

less than ten percent?

A        I would estimate that it was less than ten percent because I believe at that time Pennsylvania was a significant percentage of our existing revenue.  We had a strong contingent of customers inside Pennsylvania.  So really since the beginning of our business up through our growth plans that we had for expansion markets, Pennsylvania still really remained probably around 90 percent, but I would be speculating, so I don't quite remember exactly.

So when I think of were they ten percent, I think of, well, I bet 90 percent was probably around what our business was in Pennsylvania.  So that's how I would look at that question.

Q        Would you estimate that your sales in Ohio were less than five percent?

A        I think the same answer holds true there most likely.  I think, yes, it would be less than that.

Q        Would it be less than two percent?

A        Given I don't recall exactly how much it would be -- I mean, between any of our expansion

Anthony Lorubbio

Page 57

markets, I don't know where those percentages would lie. We were starting to get pretty small, so I don't quite remember that level of granularity.

Q    Sure. I appreciate that. So you mentioned you -- did you purchase the house in Ohio in 2018 simply because family was there in Cleveland?

A    Earlier in 2018 I was living in New York City and what I recall is wanting a change of pace. That contributed to my reason for then going from New York City to a different city, different place.

Q    So it was primarily for personal reasons then; is that fair?

A    I mean, I felt like where I live certainly does contribute to my ability to be at my best for the business, so whether it was New York City initially that brought hopefully the best version of myself out for the business or whether it was Cleveland, Ohio that would bring out the best version of myself to be able to effectively run and help manage the growth of the company.

Q    Okay. So is it fair to say that as CEO, you didn't feel like you needed to be physically present at the facility in Pennsylvania at MMD to



LORUBBIO0569062

run it effectively?

A     I think that there's a lot of -- there's quite a few ways in which I approached effectively running the business.  Some that come to mind are being on site at the distillery which did include as we mentioned a three out of five working days of the week and then also being out in the markets in which we were selling.  That was very important as well I thought and had to receive feedback as well and it meant a lot that I was in the market with them, so that's where a lot of my travel would come into play as well.

So that's just a couple of the ways in which I think I led and formulated a schedule that worked to lead the business.

Q     You mentioned prior to -- well, at the beginning of -- well, prior to having your primary residence in Cleveland, Ohio your primary residence you said was in New York City?

A     Prior to my -- well, I do want to clarify.  I'm not quite sure -- for example, on tax documents I'm not quite sure where my primary residence was because of the time that I was spending in Pennsylvania.  From memory at the very

LORUBBIO0569063

least some years, the residency that I said which was in Pennsylvania, yeah.

So, yeah, that would be my answer. I'm not quite sure where my primary residence was. And when you say primary residence, I think of the IRS and taxes and whatnot, so, yeah.

Q     I guess what state issued your driver's license in 2019?

MR. GREEN:  Objection to form.

A     In 2019 I was not issued a driver's license.

BY MR. HEFFERN:

Q     What was the residence -- did you have a driver's license in 2019?

A     I did.

Q     Okay. What was the state in which you were listed as your residence on that driver's license?

A     Oh, man. From memory I believe it was Pennsylvania but, oh, man. I believe so. I think it was Pennsylvania.

Q     Okay. Do you recall what address you had on that driver's license, like the actual residence address?

LORUBBIO0569064

A        My, gosh.  The specific address that --
I would love to be able to remember this because
then I would be happy with my memory.  I believe it
was an address in which I lived in Roxborough in the
neighborhood -- the neighborhood Roxborough in
Philadelphia.  I just for the life of me can't
remember that address.

Q        All right.  So you mentioned in 2018 I
think you said, so primary to I guess obtaining the
house in Ohio, you mentioned that you had been at
least living a significant amount of time in New
York City.

        MR. GREEN:  Joe, is this a good time --
    I'll let him answer the question.  Is this a
    good time for a break?

        MR. HEFFERN:  If I could just have like
    five minutes.

        MR. GREEN:  Yeah.

A        I was spending some time -- I don't know
that I would say a significant, but I was spending
some time in New York City prior to Ohio, yes.
BY MR. HEFFERN:

Q        Did you rent a property there to live in
while you were spending time in New York?

LORUBBIO0569065

Anthony Larubbio

Page 61

A        I was renting an apartment, yes.  I was on a lease and renting an apartment in New York City prior to -- yes, you're correct.

Q        Did MMD pay for that lease?

A        There were -- from my memory there were leases that Midnight Madness Distilling did pay at least some portion.  I don't recall all of the details of places that I had lived or spent time I should really say, but I don't remember if New York City, that apartment was one of them.  I don't recall.

Q        Okay.

A        Yeah.

Q        Where were some of the places that MMD leased residences for you?

A        One that comes to mind is as we were launching a new product in the J.W. Tufts effervescent liquor in particular in Philadelphia, in order for me to be in the launch market and have a place to stay, more or less they -- MMD contributed to an apartment rental there.  So that is one that comes to mind.

Q        What was the time period that J.W. Tufts launched?

LORUBBIO0569066

Anthony Lorubbio

Page 62

A        J.W. Tufts was launched in I want to say -- Joe, it was September of 2019 maybe.  I think that's about right.

Q        Okay.  And do you recall the length of time that MMD leased that apartment for you in Philadelphia in 2019?

A        Yeah.  At the very -- wow.  The period of time that they at least contributed to that lease -- I don't remember the exact financial arrangement there, but at the very least the time that they contributed was when I started staying there through January 2020.

Q        Okay.  So just to clarify, so J.W. Tufts launched in 2019, is that when your lease started -- I'm sorry, September of 2019.  Is that when your lease started at the Philadelphia property?

A        I don't quite remember when, but it would make sense to me that it started right around that same time.  I just don't quite remember when that lease started.

Q        Okay.  And you mentioned that you think it was more like MMD provided a percentage of the rent; is that correct?

A        Yes.  I just don't quite remember how

LORUBBIO0569067

much it was, yes.  Like I don't remember what percentage it was.

Q        Do you know if it was more than 50 percent?

A        I believe it was.  I would say that it was more than 50 and it may have been even 100 percent, but there's -- I don't know why.  In my mind I'm just recalling having to pay -- maybe I only had to pay after January '21, so I don't quite remember to be honest, but I think between 50 and 100 percent is say safe guess, yeah.

MR. HEFFERN:  Why don't we take a break.  Is five, ten minutes good?

MR. GREEN:  Sure.  Do you want to come back at 11:55?

MR. HEFFERN:  Yeah, that's fine.  Mr. Lorubbio, I just want to remind you you're under oath, so you're not to talk substantively about your testimony or potential testimony with your counsel during this time, but I just wanted to put that out there and remind you, okay?

THE WITNESS:  Great.

MR. HEFFERN:  Thank you very much.  I'll

see you at 11:55.

- - -

(Whereupon, there was a recess in the proceedings.)

- - -

BY MR. HEFFERN:

Q        Just to confirm, you didn't have any conversations substantively about your testimony with your counsel; is that correct during the break?

A        Yes, that is correct.

Q        Great.  Before the break we were discussing the rent portion thereof that MMD paid for your apartment in Philadelphia in the 2019 period.

Were there any other properties that you resided at over the course of your tenure at MMD for which the company paid for you to live more than a few nights, like say a hotel room or something like that?  Were there any extended stay properties where you -- where MMD at least paid a portion of your lease to stay at?

A        Yes, there were others.  At least one other, yes.

Q        What was the other one that you recall?

LORUBBIO0569069

Anthony Lorubbio

Page 65

A        The one other that I recall is an apartment in Trumbauersville.

Q        What was the time period when that was leased?

A        That was sometime in 2019 and beginning of 2020 from my memory.

Q        Okay.  Was that the same time that the property in Philadelphia was being leased as well?

A        I do recall there being overlap, yes.

Q        Okay.  And why did you have two properties leased for you at the same time in the Philadelphia region?

A        It might seem a little extra, doesn't it.  There was a -- from my memory the reason that we did it this way was there was a laser-focused approach on launching J.W. Tufts in Philadelphia which required that I spend a lot of time in that market and in particular in the evenings there was a lot of tastings that I was conducting in store, a lot of meetings with bars and restaurants that were picking up the product and selling it, a lot of time spent and just even the drive between Philadelphia and the distillery late at night was just a little bit cumbersome, so that's what I recall the reasons

being.

Q        Okay.  Were there any others that you recall besides the place in Philadelphia and the place in Trumbauersville that MMD leased or paid for partially a lease on your behalf?

A        There may have been some others short term.  I don't remember any substantially long term, but there may have been some other short term but fairly consistent properties that the company did pay for or at least subsidized for me.

Q        Okay.  Do you recall any periods of time that they may have occurred?

A        Oh, man.  I really don't recall exactly.

Q        Okay.  And when you were flying to or traveling I guess to Ohio and Pennsylvania and back, did MMD reimburse you, your travel expenses like airfare, hotel, et cetera?

A        It was common practice for Midnight Madness to accommodate and pay for my travel as it related to a lot of my operations as CEO, yes.

Q        Do you recall having a travel budget at MMD during 2019?

A        During 2019 I don't recall having set a specific travel budget, no.

LORUBBIO0569071

Q       Okay.  Do you recall how much you may have been reimbursed in 2019 for travel expenses by MMD?

A       I don't recall the specifics of how much I was reimbursed for expenses.

Q       Do you have any sort of estimate at all, like a range or anything like that?

A       I really don't actually, no.  Yeah, I mean, less than a million.

Q       Okay.  So kind of anywhere between a million and zero?

A       Yeah.  I'm not trying to be silly with it at all.  I just -- I know it wasn't some, you know, exorbitant amount or anything, but I don't really remember what my budget was at that time.

         MR. HEFFERN:  I'm going to mark this next exhibit as L-3.

                    - - -

         (At this time, Exhibit L-3 was marked for identification.)

                    - - -

BY MR. HEFFERN:

Q       I'll share it with you.  This is honestly just a Google search that I did of your

LORUBBIO0569072

Anthony Larubbio

Page 68

name of places where you've lived and this is what came up. I'm just trying to see if I can refresh your recollection to see of the places that you've lived and the time periods. I don't pretend that this is accurate on its own but just trying to do it to refresh your recollection, see if it jogs any memory, okay?

A    Sure. I'm curious what Google thinks of me.

Q    Yeah, right. Aren't we all. This has your birthday. It says your age is 32, birthday May 1990 which seems reasonably accurate, correct?

A    Correct.

Q    Okay. And this lists your current address as the 3014 Franklin Boulevard in Cleveland, Ohio and it lists the dates as June 2018 to 2023.

Do you see that?

A    I do see that, yes. That's what Google says.

Q    And I think you said that that's not actually the dates that -- and did you -- forgive me if I've asked you this.

Did you own that property in Cleveland, the 3014 Franklin Boulevard?

LEXITAS

LORUBBIO0569073

A        That was a purchase of mine, yes.

Q        Okay.  And then you sold it in the summer of 2021; is that correct?

A        From what I remember I also answered earlier, yes.

Q        All right.

MR. GREEN:  And, Joe, I don't want to interrupt your flow, but I just want to object to using this.  It's not just that it wouldn't be -- obviously it's not admissible at trial, but it's not something that refreshes someone's recollection if you just Googled it.

It's not like this is some verifiable information and you're saying does this refresh your recollection.  You just took a stab at looking at some random website.  That's not the purpose.  It doesn't refresh recollection. It's a document that has no authenticity.

MR. HEFFERN:  Right, absolutely.  I always learned -- I learned in evidence you could refresh a witness' recollection with a bowl of spaghetti, so I'm not -- I have no -- you know, no pretences that this is accurate or admissible at all.  This is just to see do you

LORUBBIO0569074

Anthony Larubbio

Page 70

recall this address.

MR. GREEN:  Well, why does it have to be used as an exhibit?  Why not just ask him the questions?

MR. HEFFERN:  The reason -- and I'm just -- I'm not suggesting it's an admissible at trial exhibit.  I'm using it simply as a deposition exhibit just so we know what I'm referring to.  When I say L-3 we know what he's referring to.  That's all.  I have no intention of trying to admit this at trial.

MR. GREEN:  I mean, I'm not going to tell him to not answer the question.  If you want to keep using it, that's up to you.

MR. HEFFERN:  No, I appreciate that. Thank you.

BY MR. HEFFERN:

Q      So just going down here, this lists one of your former addresses as 3200 Southdale Circle, Number 515, Minneapolis, Minnesota.

Did you ever live at that address?

A      I have lived at that address.

Q      Okay.  And do you recall the dates that you lived at that address?

LORUBBIO0569075

Anthony Larubbio

Page 71

A        I lived at that address sometime in spring of 2021, maybe summer through July of 2022.

Q        Okay.  And you were just leasing that property or renting it?

A        I was renting it.

Q        Okay.  And this next one, it lists 99 West Saint Clair Avenue, Number 910, Cleveland, Ohio, Cuyahoga County.

Did you ever live at that address?

A        I rented that address for a period of time, yes.

Q        Do you recall the dates that you rented that address?

A        From memory I believe that was -- that I rented that or was on the lease agreement there between July of 2018 and toward the end of that year I believe.

Q        Okay.  And was that a lease that MMD reimbursed you for at all?

A        Good question.  I'm not quite sure if I remember being reimbursed for that or not.  Yeah, I'm not sure.

Q        Okay.  And then this next one, 8201 Henry Avenue, Number H14, Philadelphia, PA, did you

LORUBBIO0569076

ever live at that address?

A   Joe, this is my bowl of soup I think. Yes, I did live at this address.

Q   From what time period do you recall living at that address?

A   I recall living at that address roughly between maybe the end of 2015 and beginning of 2016.

Q   Okay.

A   We're painting a pretty like -- clearly I have a lot of addresses that I've moved around to, huh.

Q   Yeah.  Did MMD reimburse you at all for that lease, the 8201 Henry Avenue?

A   They may have.  Again, I don't quite remember.

Q   Okay.  This next one that lists you at 245 West 25th Street, Number 2C, New York, New York.

Do you see that?

A   I do see that.

Q   Is that an address you ever lived at?

A   Yes, I do remember me being on a lease at that address.

Q   And do you recall the time periods that you lived there?

888-893-3767
www.lexitaslegal.com

LEXITAS

LORUBBIO0569077

Anthony Lorubbio

Page 73

A        I believe that was sometime in 2016, summer of 2016 and through sometime the beginning of 2018.

Q        Okay.  Do you know if that's a lease that MMD reimbursed you for at all?

A        Same thing.  At these places that I lived I may have received some form of reimbursement from the company for living, yeah, but I just don't really remember if that was one of them and the details of it.

Q        Okay.  That 245 West 25th Street, is that in the Chelsea neighborhood in Manhattan?

A        It is in the Chelsea neighborhood of Manhattan.

Q        And were you living there for work purposes?

A        The lease that I had signed in that area -- so I just want to clarify.  Again, we've mentioned live.  I clearly travel a lot.  So, I mean, I'm sort of living wherever I am.

Q        Right.

A        But the lease that I signed there, I don't recall the exact intention around it, whether that was -- and I don't think it was just purely one

LORUBBIO0569078

or the other, so I think there were many reasons why I wanted to sign a lease there.

Q        Okay.  Did MMD have accounts in New York City where their product was purchased in that time period you identified?

A        We may have had accounts.  I don't remember exactly when we -- when we officially launched with a distributor there and began to sell. Certainly there's a long period of time that we were attempting to sell into a substantial market like New York City.

Q        Right.  But at this time Pennsylvania was still 90 percent of your business or so?

A        From a revenue standpoint, like I had mentioned, I believe that's accurate.  From a focus and growth standpoint, I wouldn't say that 90 percent of my focus and time was spent on one particular market.

Q        Okay.  I'm going to -- we mentioned -- we briefly touched upon some loans that MMD had taken out.

        Do you recall MMD ever acquiring loans from PNC Bank?

A        Yes, I do.

LORUBBIO0569079

Anthony Larubbio

Page 75

Q        Do you recall how much money MMD borrowed from PNC Bank?

A        I don't quite remember the exact amount. Between two and $3 million I think would be an accurate range, though, for you.

Q        Okay.  And did you authorize those loans as CEO of MMD?

A        There were people that authorized the loans and I was one of them.

Q        Okay.  Did you ever sign a personal guarantee for those PNC loans?

A        There were some personal guarantees and I believe I was one of them, yes.

Q        Okay.  Did anyone else sign any personal guarantees for those loans?

A        From memory, one that does come to mind for sure is Casey Parzych.  I don't recall if there was any others.

Q        Okay.  Do you know when those loans were taken out from PNC?

A        From my -- from memory I believe that they were taken out in April, April, maybe late April 2019.  Yeah, sometime in the spring I guess. I don't know if it was specifically April, but

LORUBBIO0569080

sometime around then.

Q       Okay.  And do you recall a specific purpose of what those loans were earmarked for at MMD?

A       At this particular time what I recall about our engagement with PNC was I actually wasn't too heavily involved in a lot of those conversations.  Casey had sort of taken more of a first point of contact with PNC.

However, from what I remember, what those funds were earmarked for was there was certainly some excitement alongside PNC with the general growth and projection and historical plus projecting out into the future of our liquor business.  I recall showing them the J.W. Tufts effervescent liquor specifically and some excitement around that.

There were some changes to our bottling and production facility to accommodate growth and to accommodate some of these more technical products that we were starting to package.

There may have been other things that were earmarked.  I'd have to obviously double check and go see the sources and uses of the loan

documentation, but those are the things that I recall at this time.

Q      Okay.  Do you recall ever trying to or earmarking at least in part those loans to expand the sales force?

A      I do recall there being some consideration toward personnel and to accommodate for the growth.  Any time you go into a new market, you do need to invest in personnel, so we had our eyes set on growth.  So I think that was a part of it, but I'm not totally sure, Joe, if we explicitly said, you know, personnel -- at the very least I bet it was a part of our conversation.

Q      In that time period of spring of 2019, did you hire a number of additional personnel for the sales force?

A      Specifically in the period of time that you're referring to, I know that there were some hires in -- there was consistent hiring happening for quite a long time and I think that it included spring of 2019.

Q      Okay.  And you were -- were you the one kind of spearheading that growth?

A      Well, I think it was truly a joint

LEXITAS

LORUBBIO0569082

effort.  There was quite a few people working really hard to spearhead our growth.

Q    But I guess you were talking about kind of expanding into new markets.  You were spending a lot of time expanding into new markets.  I don't want to mischaracterize what you're saying, and correct me if I'm wrong, but it sounded like you were kind of the person who was trying to grow new markets and potentially hire new people to fulfill those markets; is that fair?

A    I had a role in recruiting, finding, and trying to hire personnel on the sales of marketing side of our business during all of the growth years of our business, yes.

Q    Okay.  Do you recall approximately how many new hires MMD brought on for the sales team between say summer of 2018 and summer of 2019?

A    I remember some consistent hiring even before the date that you had mentioned to start with with our growth and revenue and subsequent profit, but our growth and revenue in particular afforded the opportunity to hire people.  And I don't recall exactly how many, but certainly consistently over the period of time that I was the CEO of the

LORUBBIO0569083

business with the growth, we hired quite a few.  I mean, at least I would view it as a consistent hiring process to fuel the growth.

Q        Okay.  So there was no particular spurt in hiring from summer of 2018 to summer of 2019?

A        We went in spurts of growth a few different times where I went on a -- I was tasked with attempting to find good talent to continue our growth.  There may have been a few chunks of time and at that point in time with the pending product development and launch of J.W. Tufts, I mean, that was yet another one of our growth opportunities and so I was looking to hire people for that.

Q        Do you have -- and I'm not asking for an exact number, but do you have an estimate of the number of additional salespeople you may have hired during that time period of relating to the expansion of J.W. Tufts?

A        This is what I recall.  Dating from 2015 there was probably only two or three sales personnel and then I recall adding at least two or three that year, three or four probably in 2017, maybe even five or six 2017 to '18.  Some people had dropped off, though, of course, so I had to go back to the

LORUBBIO0569084

drawing board and rehire some people for some critical roles and about the same types of numbers in 2018 and '19.

So, yeah, I mean, we were on a pretty consistent growth plan with hiring.

Q Okay. So in just about an additional five or six during that time period, that summer of 2018 to summer of 2019?

A Yes, I would say maybe a little less than that, but that sounds about right. I know one of the hires in New York that we had hired, we hired him and then he left, so we had to rehire somebody there.

So it felt certainly like I was spending quite a bit of my time getting our personnel right. And, yeah, from what I remember on the sales and marketing side, in general there was probably about 20 people that would report in to me. That's kind of the total that I recall.

Q During that time period, that summer of 2018 to summer of 2019?

A Certainly I think, yeah, from what I remember we probably were around 15 to 20 people in the sales and marketing side during that time, yeah.

Q       Okay.  And was that kind of the maximum that MMD ever reached as far as salespeople that you're aware of?

A       Yeah.  Maybe after I was no longer part of the business operationally day to day, they may have changed that, but I don't know.

Q       Okay.  So during that time period you said 15 to 20 reported to you and I thought you said you increased hiring to kind of deal with the launch of J.W. Tufts.  How did the 15 to 20 amount of salespeople differ from kind of prior to the launch of J.W. Tufts?

A       Prior to the launch of J.W Tufts -- prior to the launch of J.W Tufts we were less than 15 to 20 I assume.  I don't quite remember the exact amount, though.

Q       Okay.  Somewhere between like ten and 15 or lower than that?

A       No, somewhere -- yeah, in between ten and 15.  I think at no point in time I think during the year leading up to that time period were we less than ten for sure, yeah.

Q       Was J.W Tufts a commercial success?

MR. GREEN:  Objection to form.

LORUBBIO0569086

A      I'm not -- could you maybe clarify what commercial success means.

BY MR. HEFFERN:

Q      Sure.  Did the sales of J.W Tufts meet your expectations?  Maybe that's a better word.

MR. GREEN:  Objection.

A      Our J.W Tufts launch was a very isolated launch within the Philadelphia market during the time, of course, that I oversaw it.

BY MR. HEFFERN:

Q      I'm not sure what that means and I apologize.  I'm not trying to be difficult.  You said it's an isolated launch.  What do you mean by that?

A      J.W Tufts launched in from my memory between 15 and 20 stores within the Pennsylvania Fine Wine & Spirit stores and we isolated them to Philadelphia for our -- effectively our test launch, our initial launch I think you could characterize it as, so that's what I mean by isolated.

Q      Okay.  So did it meet your expectations or --

A      From my memory my expectations --

MR. GREEN:  Objection.  Keep going.

Sorry, I want to make an objection when his answer is done.

A        From my memory I don't recall exactly what my expectations were.  We had different expectations during different periods of time in the product development of what we were going to do, what our strategy was.  I don't really recall exactly what the expectations were at that time of launch.

BY MR. HEFFERN:

Q        Okay.  You mentioned that you signed a personal guarantee for those PNC loans.  Do you know if MMD ever paid those loans back to PNC?

A        I was not part of the company at that particular time, so I'm unaware.

Q        Okay.  Are you, for lack of a better word, are you still on the hook for that personal guarantee with PNC?

A        I don't understand all of the intricacies of bankruptcy, so I'm unsure.

Q        So has PNC approached you at any point to repay the loans?

A        There were periods of time that there was communication with PNC, yes.

Anthony Lorubbio

Q   And they asked you to pay back the loans?

A   I don't recall the specifics of their outreach and when it was exactly.  You asked me, of course, if I'm on the line now and I said I'm not sure about that.  And, secondly, I don't really recall the details of their outreach in the past.

Q   Okay.  So do you recall the last time you heard from PNC regarding those loans?

A   From my memory, January 2021 comes to mind.  I believe there was an email exchange with someone from PNC at that time.

Q   Do you recall the substance of that email exchange, what was said?

A   Yeah, some of the specifics I really don't.  That was the first time that I think that I -- from my memory maybe it was December 2020, but that was the first time that I was made even aware that there was an issue with the loan documents and that is the first time that I ever was reached out to, but I don't really recall the very specifics of the conversation.

Q   Okay.  And that was the last time you had any contact with PNC regarding the loans?

LORUBBIO0569089

Anthony Larubbio

A        To my memory, yes.  I may have been included in some correspondence since, but that's really what I remember, yeah.

Q        Okay.  At some point -- and I know this because I had contact with your prior counsel prior to the bankruptcy and whatnot, but at some point did you -- was there an outside buyer that was attempting to purchase MMD and repay the loans so that it would be forgiven for you and Mr. Parzych?

MR. GREEN:  Objection to form.

A        What I remember is fairly limited as it relates to this, but I remember my counsel mentioning --

MR. GREEN:  Objection, objection.  You can't -- I don't want you talking about what your counsel said to you.

BY MR. HEFFERN:

Q        Yeah.  And I'm not looking for your advice of counsel.  I was just trying to understand if anyone -- if you had received any offers from PNC that you're aware of or from a third party to have you released from your guarantee.

A        My counsel handled those conversations and I guess that's all I can say.

Anthony Larubbio

Q       Okay.  I want to kind of turn back to the substantive work at MMD.

At some point did MMD become interested in developing a beverage that contained cannabidiol which is also known as CBD?

A       I don't believe Midnight Madness Distilling -- I mean, generally speaking I don't think Midnight Madness Distilling had an interest necessarily in that, but maybe clarify what you mean by Midnight Madness Distilling, please.

Q       Sure.  So the company that you were CEO of, right, was there an effort or an opportunity that that company which we've been calling MMD to enter the market for beverages containing CBD, do you recall that?

A       Our company and our personnel were very focused on in particular selling spirits beverages.  However, we always looked for new opportunities definitely in new products, new markets.  So we had our eyes on a lot of things, definitely.

Q       Okay.  Do you recall Midnight Madness considering making a beverage called CBD Delight or CB Delight?

A       I do recall that product, yes.

LORUBBIO0569091

Q    And was that something that you were involved in in any way?

A    It was a product certainly that I had some limited fashion, knew of and saw -- yeah, I was more so, of course, focused on our existing product lines and selling and then, of course, always had my eye on new growth opportunities and J.W Tufts was one of my focal points.  Launching in new markets was as well and CB Delight was a product that our company was considering as well.

Q    Did MMD develop CB Delight or did someone else develop it?

A    I don't recall all of the origins around CB Delight.  I believe Midnight Madness had a hand in that.  From a company standpoint some of our personnel may have, but I don't recall all of the development steps in that product.

Q    Okay.  But you were involved in new product development, correct?

A    I had a hand in our new product development across many of those launched and unlaunched products yes.

Q    Okay.  Did MMD own any intellectual property relating to CB Delight?

A        I feel that it's fair to say that there was intellectual property owned by Midnight Madness Distilling for any of the new products that we were developing and that would include CB Delight.

Q        Okay.  Do you recall what type of intellectual property it owned relating to CB Delight?

A        Type of intellectual property, there's quite a few different areas that would fall into that category.  One that comes to mind would be packaging.  Another area of intellectual property could be formula.  It could be any market research that was happening, consumer testing, formulas if I hadn't already mentioned that.

So those are things that I'd say contribute, but I'm sure there's still other categories as well that would contribute to intellectual property.

Q        Do you recall specific patent applications whether they be design or utility patent applications that MMD owned relating to CB Delight?

A        We may have.  I don't recall any -- I don't recall the specifics around all of our patents

LORUBBIO0569093

necessarily and something specific to CB Delight.  I don't -- we certainly may have a patent related to it, but I'm not quite sure.

Q    Okay.  You say "related to."  Do you recall the technology that was patented?

A    I recall Midnight Madness having technologies that were patented, yes.

Q    Relating to CB Delight?

A    Potentially related to CB Delight.  I'm not sure.  I think some of our -- some of the things that we developed could have been applied to different products that we were launching.

Q    Okay.  So do you recall how it was related to CB Delight, the IP that you're discussing here?

A    I don't really recall all of our patents and all of the underlying details around that, so for me to say that this specific side of this patented technology related to that, off the top of my head as we stand right this second I'm not quite sure that I can recall, but certainly I believe that our patents, you know, were valuable at the company and I think could be applied to any and all products that we launched or planned to launch.

Q     Okay.  Is it your understanding that CBD is a nonintoxicating compound found in cannabis?

A     That's generally my understanding.

Q     Okay.  And are you familiar with the term THC?

A     Only in the form of fashion that it's probably the intoxicating substance within cannabis.

Q     So you're familiar then there's a difference between CBD and THC, correct?

A     I'm not really familiar with how those two interplay with each other to be honest, no.  I'm assuming that they are related, but to the extent in which -- the full extent of which they are, I'm not totally sure.

Q     Okay.  So just to summarize, and correct me if I'm wrong, your understanding is CBD is nonintoxicating and THC is intoxicating, correct?

A     My understanding is they both have an impact on somebody's body certainly, so to that extent that is kind of my knowledge on CBD and THC.

Q     Okay.  Are you familiar at all with the regulations of either in states that MMD produced product?

A     Sorry, could you repeat the question.

LORUBBIO0569095

Q    Sure.  Are you familiar with the difference in regulation between CBD and THC in the various states that MMD produced product?

A    I am not particularly knowledgeable on the regulation of the states in which MMD produces products as it relates to anything cannabis-related.

Q    Okay.  But you agree that CBD is a separate compound from THC; is that fair?

A    I'm actually -- of course it has a different title, but I'm not sure how those two really play -- interplay with each other.  I know that they both make an impact on somebody's body, hence I think why people consume them in some ways. They're looking for something and they're both my understanding in the category of cannabis, so, yeah.

Q    Your understanding is that THC is illegal in a number of states where CBD is no longer illegal; are you aware of that?

MR. GREEN:  Objection.

THE WITNESS:  May I answer?

MR. GREEN:  Yeah.

BY MR. HEFFERN:

Q    Yeah.

A    I am aware that there are various

Anthony Larubbio

Page 92

regulations that are out there and they vary between states, but I'm not sure where they land and especially -- I mean, I don't know the details underlying the regulations.

Q        Okay.  Do you recall back in 2018 MMD had regulatory concerns about having a beverage containing CBD?

A        I remember there being concerns about the regulatory environment around any product containing cannabis.

Q        Specifically do you recall MMD being concerned that the Pennsylvania Liquor Control Board might take adverse action against MMD for selling a beverage containing CBD?

A        I do not recall.  Pennsylvania Liquor Control Board certainly may have had an issue, but I don't recall that specific communication happening.

Q        Okay.  Do you recall PNC Bank raising any concerns with MMD about selling a beverage containing CBD?

A        I don't recall any conversation with PNC as it relates to CBD or cannabis in general.  So, no, I don't recall.  Maybe there was after I was gone certainly, but I don't recall that.

Q        Okay.  Did MMD ever sell CB Delight?

A        There certainly was some sales effort around CB Delight happening among a lot of our products, but our sales team certainly attempted to sell all of our products and I think CB Delight was one of them.

Q        Do you recall -- well, did MMD ever make and bottle CB Delight?

A        I wasn't particularly involved heavily in that side of the business of all of what we bottled, but we certainly may have.  I think it's -- yes, I would think that of all the products that we had bottled and canned, that may have been one of them.

Q        Do you recall when MMD launched CB Delight?

A        I don't recall specifically when CB Delight was launched or when it came to life, yeah.

Q        Do you recall if it was under your tenure as CEO?

A        CB Delight I believe was a product during the time period that I was the CEO of Midnight Madness Distilling, yes.

Q        So apart from the specific launch date,


LORUBBIO0569098

do you have a general sense of what year MMD began selling CB Delight?

A        I believe the year that CB Delight was a product was 2019.

Q        Okay.  So that would have been under your tenure then as CEO, correct?

A        I was the CEO of Midnight Madness Distilling in 2019.

Q        Okay.  Did MMD ever partner with a third entity or new company to create or sell CB Delight?

A        I don't recall exactly if -- I wasn't particularly involved in the product CB Delight.  They may have, but I don't quite remember any details coming my way about how that product was being sold as it relates to third party relationships.

Q        Why weren't you involved in the sale of CB Delight?

A        I said I was not heavily involved in that product.  I was very focused on our company's sales as a whole and any new product, of course, is a small portion of it and I oversaw our sales and marketing team as kind of holistically, so I wouldn't say that I was heavily involved with CB

Delight but I was involved across-the-board on what our sales and marketing teams would be doing and working on.

Q        Okay.  Were you heavily involved in the launch of J.W Tufts?

A        I would say that I was heavily -- I was involved in that, yes, more heavily for sure.  That got more of my attention and time and effort definitely than some other products.  A lot of our products got a lot of my time and attention, but that one and its launch definitely demanded a lot.

Q        Why is that?

A        I think there's a lot of reasons why J.W Tufts demanded a lot of attention and time.  The first one is it is a complicated product.  It's more of an intricate sale and sales pitch.  It was a higher-end product, more money and more buyer discretion, so a lot of time to receive sales around that and I think in general it was -- there was a lot of time and investment that went into that product and, therefore, pursuing that market opportunity I think commanded a lot of my time.

Those are some thoughts that come to mind of why I maybe invested time into that product.

LORUBBIO0569100

Q        Okay.  So is it fair to say that in your opinion CB Delight was a more minor product for MMD than J.W Tufts?

A        I mean, in my opinion CB Delight as a product is an entirely different thing, yeah.  As it relates to Midnight Manslaughter Distilling, J.W Tufts is a potential growth focus, so I was pretty heavily focused on that.

Q        Okay.  Are you familiar with a company named Polebridge, LLC?

A        I am familiar with Polebridge, LLC.

Q        When did you first become familiar with Polebridge, LLC?

A        The first time I believe I ever saw the name Polebridge, LLC was well after I was out of the company Midnight Madness Distilling.  I think the first time that I ever saw Polebridge, LLC was sometime in late 2020.

Q        Okay.  So obviously after January 2020. How about Good Design, Inc., are you familiar with that company?

A        I am familiar with the company Good Design, Inc.

Q        And when did you first become familiar

with Good Design, Inc.?

A        The first time that I became familiar with Good Design, Inc. I believe it was sometime in spring of 2019, yeah.

Q        Okay.  How did you become familiar with the company Good Design, Inc.?

A        I think the first time that I knew of the name Good Design, Inc. I think it related to Ashleigh Baldwin in particular.  I don't remember exactly how or where or when I saw or was exposed to the name Good Design, Inc., but I think it was related to her.

Q        Did Good Design, Inc. have any business dealings with MMD while you were CEO?

A        With Midnight Madness Distilling and Good Design, Inc. I do recall there being some form of business dealings, yes, in various forms.

Q        Can you describe those?

A        Well, I actually don't -- I don't quite recall any formal -- any formal business relationship being established between Midnight Madness Distilling and Good Design, Inc., yeah.

Q        Do you recall any efforts to transfer intellectual property from MMD to Good Design, Inc.

LORUBBIO0569102

Anthony Larubbio

Page 98

in 2019 that you were part of while you were CEO?

A    I do recall intellectual property contract of some kind being mulled over or a consideration between the two entities.

Q    Do you recall it being a transfer of IP from MMD to Good Design, Inc.?

A    I do recall there at least being some form of a contract that related to intellectual property being transferred.

Q    From MMD to Good Design?

A    Yes.

Q    Okay.  Do you recall what the intellectual property related to?

A    Again, I don't remember the full extent of the intellectual property, but I assume like we talked about intellectual property being owned by a distillery would include some formulas and packaging and things of that nature, but I don't really quite remember all of them and/or where that contract review went.

Q    Do you recall the intellectual property relating to CBD?

A    What I recall is Good Design, Inc. being involved in and interested in cannabis.

LEXITAS

LORUBBIO0569103

Q      Did you approve that transfer of IP from MMD to Good Design?

A      As it relates to CBD or cannabis in general I was not as focused there as I was on a lot of the other products at Midnight Madness Distilling, so I don't think I had as much time and attention and focused on what was going to happen in that realm of things, so I don't really recall like explicitly approving or not.

Q      Do you recall being informed about the transfer?

A      I recall in some communication with Casey that Good Design, Inc. would be pursuing cannabis-related things.  That's a communication that I recall, but I don't -- there may be more to that.  I just don't quite remember anything else around that.

Q      Okay.  It's 1 o'clock.  Are you good with a half hour lunch or do you need more time than that?

A      I'm good with a half hour.

MR. HEFFERN:  Okay.  Great.  Why don't we reconvene at 12:30 and just remind you, please don't discuss anything substantive --

LEXITAS

LORUBBIO0569104

Anthony Lorubbio

MR. GREEN:  And I'm going to speak to that.  I don't agree with you.  That's not the law.  We're not in the middle of a trial.  I mean, if you want to send me a Court of Common Pleas case from this jurisdiction that says that a client is not allowed to speak to his attorney during deposition breaks, I'm happy to see it.

MR. HEFFERN:  You're not familiar with that?

MR. GREEN:  That's not the rule.  I mean, there are certain judges in federal court who take that position based on an old decision, but that's not in the rules and as far as I know it's not -- it's not the rules of this local court.

MR. HEFFERN:  That you can discuss substantive matters with your --

MR. GREEN:  Yeah.  Show me in the rules. We're in Bucks County.

MR. HEFFERN:  Right.  I don't have that in my fingertips at the moment, but --

MR. GREEN:  What is this, the Hall/Clifton decision.  That's federal court

LEXITAS

LORUBBIO0569105

and that's a decision that's been criticized.

If he was on the stand at trial, then I can see a judge giving an instruction, but that's not the rule for depositions.

But then again if you want to send me a case or send me a local rule that says that it is, I'm happy to see it.  The problem is that it interferes with a client's right to speak to their counsel, but I'm happy to be schooled if I'm wrong.

MR. HEFFERN:  Okay.  I don't have time to research it right now, but if that's the position you want to take, that's fine.  I mean, I don't agree with it.  But, you know, you're good.

MR. GREEN:  Well, it's certainly not in the rules, right.  If it were in the rules you could show me the rules, so it would have to be a court decision.  That's not based on the rules.

MR. HEFFERN:  I'm not arguing that with you, Casey.  I don't doubt that it's not specifically in the rules, but I've always learned it was based on case law, but I'm not


LORUBBIO0569106

Anthony Lorubbio

going to argue with you.

MR. GREEN:  I'm telling you it's not.
We'll be back at 1:35.  How about that?

MR. HEFFERN:  That sounds good.

- - -

(Whereupon, there was a recess
in the proceedings.)

- - -

MR. HEFFERN:  I'm going to show you what
I'm going to mark as L-4.  I take that back.
I'm going to call it L-5.  It's already
premarked L-5.  L-4 doesn't exist.

- - -

(At this time, Exhibit L-5 was
marked for identification.)

- - -

BY MR. HEFFERN:

Q      So I'm showing you what is an email
string and you're not on this topmost email, but the
email string is in May of 2019.  If you'd like,
you're welcome to look through the email string, but
I was going to go down to where you are copied if
that's all right.

A      I would like to see, yeah, the dates and

LEXITAS

LORUBBIO0569107

Anthony Lorubbio

Page 103

I would like to kind of scroll through at least the extent of this document.

Q       Yeah, absolutely.  Let me know -- should I just start scrolling?

MR. GREEN:  Are the emails sequential and chronologically with the oldest one at the bottom?

MR. HEFFERN:  Do you want me to start down there?

MR. GREEN:  Well, not to waste time, if you're only going to ask him questions about an email that predates these other emails that he's not on -- I mean, I don't know.  It's up to you.  Do you want him to look at every email?

MR. HEFFERN:  I was asking him.  I'm fine either way.  I can scroll down and kind of --

MR. GREEN:  It's only five pages.  Why don't you let him look at the whole thing.

MR. HEFFERN:  Sure.

BY MR. HEFFERN:

Q       Just let me know when you're ready to roll down.

888-893-3767
www.lexitaslegal.com

LEXITAS

Anthony Lorubbio

Page 104

MR. GREEN:  I guess my question, though, is if the bottom is the older dates, why don't we start at the bottom.

MR. HEFFERN:  Sure.

BY MR. HEFFERN:

Q        Is that okay with you, Mr. Lorubbio?

A        Yes, that's fine with me.

Q        All right.  So this first one is from Chad Merriweather.  Is this the Chad you were referring to before?

A        From what I can tell, yes, that is the Chad I was referring to before.

Q        And this is a letter from -- I mean an email from Chad to Casey, you, R.F. Culbertson regarding Muller initial order.

A        Okay.

Q        Let me know when you've read this part.

A        Yeah, go ahead and scroll up.

Q        Okay.  And then R.F. responds later that same day, May 17th, 2019.

A        Okay.

Q        And then Chad responds.

A        Okay.

Q        And then R.F. responds to that, same

day, May 17th, 2019.

A    Uh-huh.

Q    And then Casey responds.  Let me know when you're good.

A    Okay.

Q    And this is the email I actually wanted to focus on.  This email is dated Monday, May 20th, 2019 from you to Casey with a copy to R.F. Culbertson.

Do you see that?

A    I see that.

Q    Okay.

A    If you can go ahead and continue to scroll down so I can read the email.

Q    Okay.

A    I'm done with this email.

Q    Okay.  So this email is --

A    Can you go ahead and scroll up so I can continue to read this document?

Q    Absolutely.  You're welcome to.  Although, you weren't copied this part, but you're welcome to.

A    I would assume I wasn't copied on that email.

LORUBBIO0569110

Anthony Lorubbio

Q        I don't believe so.  Let me know when you're ready for me to continue.

A        I'm ready.

MR. GREEN:  I'm sorry, can you go down for one second?  I missed that bottom part.

MR. HEFFERN:  Sure.

MR. GREEN:  Okay.

A        Is that the extent of that email?  If you want to scroll down slightly more.

BY MR. HEFFERN:

Q        Okay.

A        Okay.  So that was from R.F.  Okay.

Q        Let me when you're ready for me to scroll up.

A        I'm ready.

Q        Okay.  Let me know when you're done.

A        I'm done.  And I will -- I also just want to clarify that am I correct in saying that the string of emails toward the top of this document were from a personal email account?

Q        I have no idea.  I didn't receive it.

MR. GREEN:  Well, it says gmail.

BY MR. HEFFERN:

Q        Discern what you'd like.



LORUBBIO0569111

A        And in the beginning of this email chain was with our company emails.

Q        So getting to my question, you wrote: Casey and R.F., I have created a list of candidates to reach out for a national accounts role that has specific experience in a few different areas that might be applicable:  National accounts/channel management, cannabis specifically, craft-beer-sales-that-is-going-downhill-and-might-be -looking-to-jump-ship guys, retail/off premises in general, et cetera.  To be clear, I did not make this list as a result of what transpired with Chad. I was asked to contribute this way on Saturday by Casey, and that's how I interpreted that piece of our convo, Casey.  Finding candidates for this type of role might be a highly-motivated member of our spin-off entity that specifically is in cannabis.

So you're mentioning a spin-off entity that's specifically in cannabis.  Do you recall that spin-off entity being Good Design, Inc. that you identified earlier?

A        I don't recall the specific entity I'm referring to when I say spin-off entity here, no.

Q        Okay.  Do you recall if there was any

other entity that -- do you remember any spin-off entity being created that was from MMD that dealt exclusively with cannabis?

A        I don't recall a spin-off entity from MMD specifically related to cannabis.

Q        Okay.  And then you write in the next paragraph:  Casey, is CB Delight not considered a viable route to market?  Also, some of these candidates are Canada-based.  Is that market a viable option for us?

Do you recall at the time you wrote this email thinking that CB Delight might not be a viable option going forward for MMD?

MR. GREEN:  Objection.

A        I don't recall my exact thoughts on CB Delight at the time of this email.

BY MR. HEFFERN:

Q        Okay.  Going back down with the emails you read already, there's some discussion down here from Chad regarding a coming ruling from the FDA.

Do you recall what that was relating to?

MR. GREEN:  Objection.

A        I do not recall exactly what that ruling from the FDA was related to, no.

LORUBBIO0569113

BY MR. HEFFERN:

Q     Do you recall Muller, the company in the subject line here, as being a customer of MMD?

A     I do recall Muller.

Q     Do you recall if they purchased CB Delight or CB Delight from MMD?

A     I don't remember the specifics of when they purchased or not from us specifically, no, I'm sorry.

MR. HEFFERN:  Okay.  I'm going to show you this next exhibit.  Let me zoom out so you can see more of it.  Let me know when you've had a chance to -- when you want me to move forward.

- - -

(At this time, Exhibit L-6 was marked for identification.)

- - -

MR. GREEN:  Are you going to have him read the whole agreement?

MR. HEFFERN:  He's welcome to.  He doesn't have to if he doesn't want to.

MR. GREEN:  Well, I mean, that's going to take a while.  It's a ten-page legal

document, right?

MR. HEFFERN:  Yeah.  I mean, he's welcome to.  I'm trying to -- I'm going to ask him if he can identify it, if he's seen it before and signed it.

MR. GREEN:  Okay.  I think you could take him to the first page and then scroll through without him reading each page.

BY MR. HEFFERN:

Q      Are you okay with that, Anthony?

A      Yeah, I'm okay with that.

Q      Okay.  Do you recognize this document, the Intellectual Property Asset Assignment Agreement?

A      I do recognize this.

Q      Okay.  And it's an intellectual property agreement dated June 5th, 2019 between Good Design, Inc. and Midnight Madness, correct?

A      I see that's what it says there, yes.

Q      Okay.  And do you remember ever approving this agreement?

A      I do not recall whether or not I approved this agreement.

Q      Okay.  So in this document, you're

LORUBBIO0569115

welcome to read however much you want, there's a number of IP assets that are identified such as 1.1, the CBD trademark means all issued and pending trademarks relating to CBD including, without limitation, trademark application 88389825 and CBD trademark further includes all good will associated with CBD trademark.

Do you see that?

A    I do see what you just read, yes.

Q    And it goes through and defines a number of different pieces of IP that MMD is purporting to transfer to Good Design, Inc.

In fact, it includes in section 1.5: Intellectual property or IP means all confidential information, formulations, manufacturing techniques, marketing/distribution/packaging materials, mechanical files including label layout, bottle design and point of sale materials, designs, color palette, goodwill, patents, trademarks including, without limitation, the CBD trademark, CBD domain names, CBD copyrights, CBD patents and all other protectable intellectual property and intangible assets related to botanical extracts.

Do you see that?

LORUBBIO0569116

A        I do see what you just read, yes.

Q        Okay.  And you'd agree with me that includes basically any IP relating to CBD that MMD owned at this period of time?

MR. GREEN:  Objection to the extent that any of these questions are asking him to make legal conclusions.

MR. HEFFERN:  Sure, of course.

A        Yeah, I'm unsure what the full implications are of this legally, but I see the words that you did read.

BY MR. HEFFERN:

Q        Is there any intellectual property that's been listed in here that relates to CBD that MMD held that you -- that's not included on this list?

A        I'm unsure if there would have been more intellectual property.  There may have been.

Q        You don't know anything specifically at this point?

A        As it stands right this moment, nothing comes to mind, but there may have.

Q        Do you recall if it's a patent application, trademark -- I mean the IP intellectual



LORUBBIO0569117

properties is pretty comprehensive, that definition; wouldn't you agree?

A        It seems lengthy, yes, I would agree with that.

Q        Okay.  So I'm going to go to the end here.  It appears there's a number of people who have signed this including -- so on MMD's side, Casey signed it, R.F. Culbertson signed it, he's a board member, Michael Boyer who's a general counsel of MMD at this point; is that correct?

A        I'm unsure when and if Michael Boyer's title as general counsel -- I'm not quite sure.  I see that this says that his title is general counsel.  I don't remember exactly.

Q        Okay.  Do you recall Michael Boyer being MMD's general counsel?

A        I recall in some capacity at various times of our company's history us working with or receiving some form of counseling from Michael Boyer.

Q        Okay.  You don't recall if he was general counsel in June of 2019, though?

A        No.  I mean, I don't recall specifically, yeah.

Q        Okay.  So the only one from Midnight Madness that hasn't appeared to sign this particular draft was you; would you agree with that?

A        I see that there's no signature next to what appears to be my name there, yes.

Q        Okay.  Did you ultimately sign a copy of this agreement?

A        I don't recall.

Q        Okay.

A        I may have, but I don't recall.

Q        That was you may have?

A        Yeah, I said I may have, but I don't recall specifically.

Q        Okay.  But you do recall this deal, though?

A        I recall having seen this contract at least at some point in my life, yes.

Q        Back at that point in time?

A        I may have seen this contract back at that point in time or some version that looks like this.  I mean, it appears familiar in some capacity.

Q        Okay.  Do you recall approving this deal?

A        I don't recall whether or not I approved

LORUBBIO0569119

this deal.

Q        Okay.  Do you recall disapproving this deal?

A        I don't recall that either to be honest, no.

MR. HEFFERN:  Okay.  I'm going to show you the next document.  I've marked this one L-7.

- - -

(At this time, Exhibit L-7 was marked for identification.)

- - -

BY MR. HEFFERN:

Q        Do you see L-7?

A        I see what I believe is L-7 that you're referring to, yes.

Q        Okay.  And I'll represent to you, and you're welcome to confirm, this is the amended Complaint you filed in this action.

Do you recognize this?

A        Yes, I recognize this.

Q        Okay.  And do you recall verifying your statements in this Complaint to be true and accurate?

888-893-3767
www.lexitaslegal.com

LEXITAS

Anthony Lorubbio

Page 116

A        I recall verification process being a part of the bigger picture around this, yes.

Q        Okay.  This is page 23 of 67 of L-7.  Is that your signature dated July 26, 2021 under the verification?

A        It does appear to be so, yes.

Q        And under this verification, you understand what's made herein are subject to penalties related to unsworn falsification to authorities?  Do you recall making that verification?

A        Yes, I recall that this verification process was a part of it, yes.

Q        I'm going to go up to page two here.  Is it your understanding that Good Design, Inc. is another name for the company Polebridge?

A        Quite frankly I'm a bit confused on exactly the on paper legal relationship between the two, but generally speaking it's my understanding that Good Design, Inc. is a member of Polebridge.

Q        Okay.

A        But I could also be wrong on that, but that is my general understanding.

Q        Okay.  So if that's your

LEXITAS

LORUBBIO0569121

understanding -- I want to point out to paragraph six.  You stated in that allegation:  Polebridge is a Pennsylvania limited liability company which operates from time to time under the fictitious name Good Design, Inc.

Do you see that?

A     I do see that that's what it says there, yes.

Q     And given L-6 which we just looked at, the IP assignment from MMD to Good Design, Inc., do you have an understanding as to whether Polebridge would have a right to use IP assigned from MMD to Good Design, Inc. in its business?

MR. GREEN:  Objection.

A     Yeah, I don't want to speculate on what counsel would say could or could not be done based on the contract.

BY MR. HEFFERN:

Q     Okay.  But it's your understanding Polebridge is at least according to what you allege in this amended Complaint that Polebridge operates as Good Design, Inc., correct?

A     Like I said, I'm genuinely confused and unsure exactly the relationship.  I would want to

seek counsel and all of the documents that show the relationship between the two.  Other than that, I don't think I can speculate exactly.

Q      Okay.  That's fine.  I'm just showing you what you alleged.  I appreciate that.

Are you familiar with a company named WYNK?

A      I generally know of a cannabis product named WYNK.

Q      What is WYNK to your understanding?

A      To my knowledge WYNK is a cannabis beverage.

Q      Okay.  And when you say cannabis, are you -- is it CBD infused or is it THC infused? What's your understanding of the cannabis in it?

A      I'm unsure of their total product lines and all of the SKUs, for example, that they have and they sell, but my understanding is they at least sell or have sold THC and/or CBD-based beverages and generally speaking in the cannabis beverage market.

Q      Have you ever consumed a WYNK beverage?

A      I don't recall ever consuming a WYNK beverage.

Q      Did you ever consume a CB Delight

Anthony Lorubbio

beverage?

A        I don't know that I ever consumed a full CB Delight beverage either.  I'm sure I've tasted samples of it, but, yeah.

Q        Okay.  Do you know when you first became aware of the WYNK beverage line?

A        Unfortunately, Joe, I don't recall when. Normally my memory is very good on this.  But, yeah, I don't recall exactly when I became aware of WYNK.

Q        Okay.  Did you ever -- well, are you aware of who owns WYNK?

A        I'm unsure of their exact ownership structure.

Q        Okay.  Is it your belief that Casey Parzych is a partial owner of the company that manufactures WYNK?

MR. GREEN:  Objection to form.

A        Based on information that I've seen in the past, I have been led to believe that Casey is in some way affiliated with WYNK.  I'm unsure of the ownership of WYNK.

BY MR. HEFFERN:

Q        Okay.  Did you ever communicate with Casey about his formation of the company that sold

Anthony Lorubbio

Page 120

WYNK or sells WYNK?

A       I don't remember.  I don't recall ever having that type of conversation with Casey.

Q       Okay.  I'm going to direct your attention to page seven of the amended Complaint, paragraph 33.

In paragraph 33 you allege:  Without seeking or obtaining authorization from plaintiff or the board of managers, provided company -- which is MMD, it's defined earlier -- provided company resources to Polebridge at no charge.  These resources include use of the company's sales team and its manufacturing capabilities to develop, promote, and manufacture CBD products sold by, including but not limited to, CB Delight originally trademarked by the company farmed hemp and a CBD-dispensing apparatus under the name siphon, originally a concept conceived by the company and its employees.  Upon information and belief, this product is now sold as WYNK.

Do you still agree with everything you alleged in that paragraph?

MR. GREEN:  As of the time that it was written?

LEXITAS

LORUBBIO0569125

MR. HEFFERN:  Yes.

MR. GREEN:  Wait, wait.  Just for clarification, I'm making an objection, but I'm also -- I don't like doing this, but is the question:  Do you still agree with everything that's written here as of the time that you verified this amended Complaint?

MR. HEFFERN:  Yes.

BY MR. HEFFERN:

Q        So today, do you still agree with your allegations in paragraph 33 today with what you wrote back on July 26th, 2021?

MR. GREEN:  Objection.

A        As of July 26th, 2021 I certainly felt that this paragraph statement to be true and accurate according to my general knowledge of the situation.

Q        Today do you believe that it's still accurate?

MR. GREEN:  Objection.

A        I'm unsure.  I feel like I would want more information which I haven't maybe had access to in some ways to continue to speculate on whether or not this is still fully accurate.

LORUBBIO0569126

So, yeah, I can't really comment on exactly how I feel at this moment without some what I would assume is key information.

BY MR. HEFFERN:

Q    You no longer believe -- well, let me ask you this:  What key information do you believe are missing?

A    Well, I mentioned I'm unaware of the ownership structures around WYNK.  I'm unaware of exactly what people are associated with that product.  I mean, the full extent of that and which ones may have been associated with the company as in Midnight Madness Distilling and which ones work for WYNK.

So, yeah, those are just some of the things that I think that I would want to know and discover more about.  I'm sure that's not an exhaustive list, but those are some of the thoughts that come to mind.

Q    So if I'm understanding you correctly, and I just want to make sure I understand, there's nothing -- you haven't learned anything that changes your mind concerning the accuracy of your allegations as you verified back on July 26th, 2021?

Anthony Lorubbio

Page 123

A    I feel I still need more information for me to make a statement about exactly how I felt and verified this back then.

Q    I'm sorry, I don't understand.  What do you mean?

A    I feel like in order for me to answer that question accurately, I would need and want more information so that I can then provide you an opinion on exactly whether or not I still believe that this is exactly true as I verified it back then.

Q    Okay.  So do you believe that Casey Parzych used MMD sales team without --

MR. GREEN:  Wait until he's done the question.

BY MR. HEFFERN:

Q    Do you believe that Casey Parzych used MMD sales team without the authorization of the board of managers to sell CB Delight?

A    I do want to clarify, we're referring to Casey Parzych?

Q    Yeah.

A    I don't recall exactly what permissions were granted or not at that time, so, yeah.

888-893-3767
www.lexitaslegal.com

LEXITAS

LORUBBIO0569128

Q    I'm sorry.  Go ahead.

A    No, that was it.

Q    So Chad Merriweather, that email I showed you, I think it was L-5, Chad Merriweather was a salesperson for MMD, correct?

A    Chad Merriweather was the sales manager of controlled states for Midnight Madness Distilling, yes.

Q    And you were involved in that email conversation where he was being used to promote CB Delight, correct?

A    I did see my involvement in that email chain.

Q    Okay.  So you were aware back on -- let me just switch back to L-5 real quick.  You were aware back on May 2019 that MMD sales force was being used to promote CB Delight; is that fair?

A    I was aware that people affiliated with Midnight Madness Distilling were trying to push CB Delight and some of the people that were doing that were certainly getting other members -- all members, not all, but some people within the sales organization to, quote, unquote, get on board with that.



Q       Okay.  Excuse me, I'm sorry?  You broke up there.

A       I said or attempt to get on board with selling that product.

Q       Okay.  And, in fact, you were involved in trying to recruit people for that process; is that fair to say based on this email?

A       If I were to think back to my thinking at the time of this email, I'm unsure that I could say what exactly my motivation was around this.  Some things that come to mind, and this might not be the full list, but certainly keeping a cordial relationship with my co-founder would be one and clearly also some drama seems to have come up with our sales organization around the various people as it relates to cannabis-related products.

And if I'm thinking back to what I was probably thinking at that time was to keep company morale and personnel motivated to continue to work here at the business given what apparently seems to be some drama just based on what I read and you kind of recollected for me here.

Q       Okay.  So you were aware, though, that the sales force -- that MMD sales force was involved

in selling CB Delight, correct?

A    I was aware that people were certainly pushing for MMD sales team to sell cannabis-related products.

Q    But specifically CB Delight, right? That's one of the things that you specifically reference in your email.

A    Yeah, cannabis-related products.

Q    Going back to paragraph 33, you mention the siphon.  So if you look down at the third line -- and I don't know if you see my pointer there hovering over and --

A    I can, yes.

Q    The second half of that sentence:  And a CBD-dispensing apparatus under the name siphon originally conceived by the company and its employees.

The siphon I thought you testified earlier was a specific apparatus that was used to effervesce alcohol or liquor in the bottle and it became branded as J.W Tufts; is that a fair estimate of your prior testimony?

MR. GREEN:  Objection.

A    When referencing siphon, I often use

that to reference a technical packaging component that dispenses liquid or a beverage.

BY MR. HEFFERN:

Q     Okay. So I thought previously you had testified that the siphon was specifically used to effervesce the liquor for J.W Tufts. Is that what you recall being your prior testimony?

A     I've used siphon certainly to reference a technology that dispenses liquid in a beverage. So, you know, I may use that word to reference multiple things that dispense beverages.

Q     Okay. So the word siphon wasn't a specific product then that you had in mind, it was for relating exclusively to J.W Tufts?

A     I would say that's a fair statement. We never had a product named siphon from what I remember in terms of our brand names and how we specifically referenced a product, yes.

Q     How about internally referenced? Kind of leaving alone the brand name. Were there multiple products that you referenced as siphon internally at MMD?

A     There were. Siphon was thrown around in various forms, fashions, and contexts within our

LORUBBIO0569132

company as we were developing this technology, so, yeah.

Q        Okay.  In paragraph 33 you allege that one of the resources that Mr. Parzych is using without authorization is CB Delight originally trademarked by the company.

Do you see that?

A        I do see what you just read to me, yes.

Q        Okay.  And do you recall CB Delight being part of that IP asset transfer agreement from MMD to Good Design, Inc.?

A        I'm not quite sure that I remember explicitly that, but if you want to go back, we could.

Q        Let's go back.  So some of the assets that were identified were CBD trademark means all issued and pending trademarks relating to CBD including, without limitation, trademark application 88389825.  CBD trademark further includes all good will associated with the CBD trademark.

Now, do you believe that CB Delight is one of those CBD trademarks that was transferred from MMD to Good Design in 2019?

MR. GREEN:  Objection.

Anthony Lorubbio

A        What I recall is I'm not clear on whether or not this contract was approved and executed, so I'm unsure that I can -- and beyond that I don't know exactly what that trademark application number was in this contract that may or may not have been approved and executed.

BY MR. HEFFERN:

Q        Sure, but you would agree with me that that's just one example that's given, right?  The application number there is just one example of all CBD trademarks that MMD owned; is that fair?

A        I see that in this section that they do list an example of an application number.  Again, in a contract that I'm unsure if it was approved and executed.

Q        Okay.  If you're unsure, you mean it could have been executed, you just don't know, right?

A        Yes, that is what I mean by unsure, yeah.

Q        So if MMD had transferred that mark possibly, is it appropriate for you to allege that Mr. Parzych began using the CB Delight improperly that was owned by MMD?

LORUBBIO0569134

Anthony Lorubbio

A       I'm unsure that I'm following the track of that question.

Q       Sure.

A       Could you possibly rephrase or say it a different way.

Q       Yeah.  I'm not trying to be confusing. It's just -- you're right.  It's a complex concept, right.

So in this paragraph you allege that Mr. Parzych used -- and I'm paraphrasing here because I'm trying to make it so we can follow it. Mr. Parzych used or obtained without authorization the trademark CB Delight owned by MMD.

Do you agree with that as that's what you're alleging here?

A       I do see that is what I'm alleging here.

Q       Okay.  And based on the IP asset transfer agreement, if that were executed appropriately, which you're not sure of, it may have been, it may not have been, but if it had been, would your allegation of improper or improperly obtaining the CB Delight mark still hold true?

MR. GREEN:  Objection.

A       It's clear to me that there's not a

LEXITAS

LORUBBIO0569135

particular time box around this statement that I allege.  So I'm not, you know, certainly rescinding this statement by any means.  This very well still to this point rings true for me.  But, again, I would like more information about company dealings with CB Delight that maybe I haven't been shown or privileged to.

Q       You mention here the last part of paragraph 33, you say:  Upon information and belief, this product is now sold as WYNK.

Do you see that?

A       I do see what you just read, yes.

Q       In that sentence, are you alleging that Mr. Parzych took CB Delight and just is now selling it as WYNK inappropriately?

A       At the time of this Complaint it is and was my belief that upon the information that was available to me at that time, that the cannabis product CB Delight is now sold as WYNK.

Q       Okay.  Is that still your opinion?

A       I'm unsure.  I would like more information, yeah.

Q       Okay.  What would give you the information you need to make that decision?  What

information are you missing?

A        I think that there's probably quite a few pieces of information that would help me "reverify" that this is accurate.  Some things that come to mind would be communications between the people that own and operate WYNK, where and how formulas came to be around that product, where discussions went around, you know, naming, any trade secrets that were being passed along around that time.

Those are things that come to mind at least right now that I would appreciate having in order for me to verify this.

Q        CB Delight did not contain THC; is that correct?

A        I'm unsure exactly of all the extent of the cannabis components that CB Delight contained.

Q        So you don't know if it contained THC, CB Delight?

A        I don't recall whether or not it did in any of its forms.

Q        When you say "any of its forms," what do you mean by that?

A        I'm referring to product lines that had

LORUBBIO0569137

multiple SKUs and/or products in development and whatnot, so that's what I mean by multiple forms.

Q       Okay.  Did you recall any CB Delight varieties containing an appreciable amount of THC?

A       I don't recall the specifics around what components of cannabis were involved in CB Delight.

Q       Okay.  But just to clarify, it's your understanding that WYNK does contain an appreciable amount of THC, correct?

A       My understanding of WYNK is that it is a cannabis beverage.  As I mentioned, I don't believe I've ever had it before, so, yeah.

Q       So you don't know if WYNK contains THC then; is that a fair statement of what you said?

A       I believe that it contains cannabis, whether that's THC, CBD, any combination thereof, yeah.

Q       I mean, I think we kind of went through this.  THC is different than CBD, correct?  They're not the same molecule?

A       I'm not totally familiar with the relationship between THC, CBD, cannabis.  I'm familiar that people consume cannabis for what is does to their body, whether that's between THC or

CBD.

Q        Okay.  So you don't know one way or the other then; is that fair?

A        That is fair, yes.

Q        Okay.

A        Is it possible that we can take a very quick bathroom break?

Q        Absolutely.  Five minutes?

A        Yeah, that works for me.

MR. HEFFERN:  Let's take five.

- - -

(Whereupon, there was a recess in the proceedings.)

- - -

BY MR. HEFFERN:

Q        I'm going to share my screen again.  I want to direct your attention to paragraph 68 of your amended Complaint.

In paragraph 68 you allege:  Instead of selling to ETOH, defendants wrongfully put the company into bankruptcy.

What is your understanding of what is ETOH?

A        My understanding is ETOH is an entity

LEXITAS

LORUBBIO0569139

Anthony Lorubbio

Page 135

that -- actually, I probably should not speculate

on -- I was going to say the ownership structure,

but I shouldn't speculate on that.  I'm not quite

sure.

Based on my knowledge today, ETOH was

the stalking horse in the bankruptcy.  Those are the

things that come to mind that -- off the top of my

head that I know about ETOH.

Q       Right.  You reference in here, though,

as before bankruptcy.  Were you familiar with ETOH

prior to the bankruptcy?

A       Clearly I was.  I don't recall all of

the context in which I was exposed to ETOH.

Q       Okay.

A       And the date in which this amended

Complaint was made is July 26th; is that correct?

Q       Yes, 2021 I believe.  Let me check the

date on the side.  Yes, 2021.

A       So this may have -- I mean, this was

written after the bankruptcy.

Q       Right, right.  But you state in here

instead of -- this is written I believe a few

days -- maybe a little bit more, about a month after

the bankruptcy, but you write in here:  Instead of

LORUBBIO0569140

Page 136

selling to ETOH, the defendants wrongfully put the company into bankruptcy.

So is it your recollection that ETOH was the company that was trying to buy out MMD to prevent it from going into bankruptcy?

A      Based on my knowledge and information at that time, I believe that that's accurate to say that's what I believed.  However, there was a lot of limited information being provided to me and my counsel at that time and I'm not going to speculate on what my counsel and I, you know, thought through in writing this statement.

Q      Okay.  So it's your position, though, that the defendants in this lawsuit wrongfully put MMD into bankruptcy; is that fair to say based on what you alleged in paragraph 68?

A      I think there's probably a lot of layers behind wrongfully and I'm not going to speculate on what specifically I maybe meant at that point in time, but what I know is that the company -- that the managers at the time voluntarily petitioned for bankruptcy for the business, yes.

Q      Now, you were represented by counsel in the bankruptcy proceeding; is that correct?

A     I have had counsel at various times since my departure from the business.

Q     In fact, the same counsel that represented you in this case also entered an appearance in the bankruptcy proceeding; is that correct?

A     That is correct, yes.

Q     If it's your belief that the defendants put the -- put MMD wrongfully into bankruptcy.  Did you raise those objections with the bankruptcy court before the bankruptcy was approved by the court?

          MR. GREEN:  Objection.  Did he?

          MR. HEFFERN:  Did he or did he direct his counsel to.

          MR. GREEN:  Objection to directing his counsel or any communications to his counsel.

BY MR. HEFFERN:

Q     Well, then let's put it this way.  Did you raise with the bankruptcy court any objection to finalizing the bankruptcy proceeding?

          MR. GREEN:  Objection.

A     I don't recall exactly the conversations between myself and counsel nor what they said or didn't say as it relates to the bankruptcy.

LORUBBIO0569142

BY MR. HEFFERN:

Q       Did you ever meet the bankruptcy trustee?

A       I've never -- I don't recall ever meeting the bankruptcy -- may I ask to clarify what stage of the bankruptcy we're referring to?

Q       Any part.  Did you ever meet -- I believe you identified her as Bonnie Finkel, the bankruptcy trustee.

A       My understanding is Bonnie Finkel is the chapter 7 bankruptcy trustee and there may have been another one during chapter 11 as well.  I'm not sure of the title and name of that person, but I just wanted to clarify what part of the bankruptcy we're referring to.

Q       Yeah, so any part really.  I mean, did you ever meet with a trustee from MMD's bankruptcy proceeding?

A       I have held -- I have held a meeting with Bonnie Finkel before, yes.

Q       And she interviewed you?

A       I'm not sure I remember the context of the meeting and if it was a "interview."

Q       Did you provide her with facts relating

LEXITAS

LORUBBIO0569143

Anthony Lorubbio

to MMD?

A       She asked me questions about MMD and my involvement for sure and I answered them to the best of my ability.

Q       Do you recall anything she asked you?

A       I remember she said something like I reminded her of her son.

Q       That's not a bad position to be in I suppose.

A       Well, it depends on who the person that says that and what they want out of you.  She asked a lot of questions about the relationship between Casey and Angus and Casey and Ashleigh.  I remember that.  She wanted to know the work history of Kelly Festa-Dolan.  Upon hiring her maiden name Kelly Dolan.  She wanted to understand more clearly what Kelly's roles were within our company.

Yeah, those are some.  She wanted to understand more clearly the -- she asked me, and I'm not speculating on what I said or didn't say in response, but she also wanted to know what the relationship was between Casey, Angus actually and Shawn Sheehan.

She asked a lot of questions and those

LEXITAS

LORUBBIO0569144

are some that come to mind.

Q    Did you ever tell her that you believed that MMD was wrongly put into bankruptcy by the defendants?

A    I don't remember ever saying that explicitly to her.

Q    Did you express any concerns that you had about whether MMD was properly placed into bankruptcy?

A    I have held concerns definitely about whether or not it was appropriately placed into bankruptcy and I don't feel like she asked a question that ever led me to say that to her necessarily.

Q    Okay.

A    I don't recall specifically, though.

Q    You don't recall.  Okay.  I'm going to move forward to paragraph 81 in this paragraph.  So there's a number of counts that you allege in your amended Complaint.  The first one is specifically against Casey Parzych for breach of the operating agreement.  In 81 you discuss the damages you're claiming.

In paragraph 81, you write:  As a result

LORUBBIO0569145

Anthony Lorubbio

of Parzych's conduct, Lorubbio has suffered damages and continue to suffer damages, including but not limited to, lost rights to participate in, manage and/or control the activities and sale of the company, the loss of his compensation as CEO and monetary losses for which he is entitled indemnification.

I want to deal first with your compensation as CEO. How much money are you claiming as damages for your lost compensation as CEO?

MR. GREEN:  Objection.

A     I don't know that that number has been identified at this point.

BY MR. HEFFERN:

Q     Okay. And you at this time don't recall your precise salary as CEO back in 2019; that's correct?

A     Correct, I don't recall. I've held -- I recall having multiple levels of compensation as CEO.

Q     Okay. And you mention monetary losses for which you're entitled to indemnification. What monetary losses specifically are you seeking

LEXITAS

LORUBBIO0569146

Anthony Lorubbio

relating to indemnification?

MR. GREEN:  Objection.

A       I truly don't want to speculate on what my counsel at the time of writing this was referring to there.

BY MR. HEFFERN:

Q       Okay.  So you don't know?

A       I don't know the extent of the monetary losses.

Q       You're specifically speaking indemnification, though, correct?

A       It was in conversations with my counsel at that time that we put this together and I don't want to speculate on what -- what the spirit of this line was intended to be.

Q       Do you recall what your basis is for seeking indemnification?

A       I do not.

Q       Is it based upon the operating agreement?

A       It may be.  I'm not sure that that's the extent of it, but it may be.

Q       Okay.  And to be clear, you're seeking this from Mr. Parzych personally, not MMD, correct?

888-893-3767
www.lexitaslegal.com

LEXITAS

LORUBBIO0569147

A        I mean --

MR. GREEN:  Objection.  Joe, you're entitled to ask these questions of a nonlawyer based on pleadings that speak for themselves, but I find it to be wasteful on a Friday afternoon, but we can sit here if that's how you want to spend your time.

MR. HEFFERN:  I'm just trying to understand what he's basing this on.

MR. GREEN:  But what I guess I'm saying is that MMD is not a defendant, right?

MR. HEFFERN:  Right.

MR. GREEN:  You're asking a nonlawyer about legal terms and about things that the pleadings clearly speak for themselves, so to me the question is argumentative and it has no purpose.

But, again, I mean, I'll use some leeway.  I'm not going to tell him not to answer.

MR. HEFFERN:  That's fine.  I'm just trying to understand what he meant when he alleged this and the reason I ask is because the contract -- if go to page 24 of the

contract which you attached to the amended Complaint doesn't provide for indemnification for Mr. Parzych in his personal capacity but provides for indemnification by MMD.

So I wanted to get a sense -- like you said, Casey, he hasn't sued MMD, so I wanted to get a sense of what he was basing his claim for indemnification upon and it sounds like it's from this contract, but as you can see here it speaks expressly about --

MR. GREEN: Objection. This is argument and you can make that in court, but this isn't the method to get factual information from a witness.

So I don't mind you asking questions, but at a certain point I'm going to say, okay, you used a fair amount of time on information that is not something that you can get from this witness during a deposition.

So, again, you want to read from it, you want to make your arguments, we'll sit here, but at a certain point I'm going to say, okay, I got to go, I got to pick my kids up.

MR. HEFFERN: Okay. That's fine and I

Anthony Lorubbio

Page 145

appreciate that.  I don't have a whole lot more left, but I'm just trying to get a sense of what he was --

BY MR. HEFFERN:

Q       So let me ask it this way, Mr. Lorubbio. Do you know what you were basing your claim for indemnification upon?  Do you know -- was it a specific document?

A       I wish I could answer that specifically, but I think this does go into the -- a lot of the legal nuance of this and I'm truthfully, like, unsure.

Q       Okay.  That's fine.  I just wanted to make sure I understood your position there.

MR. HEFFERN:  I want to show you what I've marked as L-8.

- - -

(At this time, Exhibit L-8 was marked for identification.)

- - -

BY MR. HEFFERN:

Q       I'll represent to you this is motion for leave to amend that you filed back on December 20th, 2022 and to this you attached an affidavit and I

Page 146

just wanted to -- do you recognize this affidavit you signed in support of your motion to amend?

A        Can you scroll down, please.

Q        Absolutely.

A        Thank you.  Yes, this looks familiar.

Q        And is that your signature on the affidavit?

A        It does appear to be my signature on the affidavit.

Q        And do you remember signing this affidavit back in December of 2022?

A        Do I explicitly remember it, I would say yes.  Clearly it is my signature, so I believe I did sign this then.

Q        It's only a little over three months ago, right?

A        Yeah.

Q        Quick question, this is just to clarify what you alleged in this part of the affidavit, you write:  Defendant, Casey Parzych, myself are co-founders of Midnight Madness Distilling, LLC company, a Pennsylvania distillery that experienced significant and rapid success, growing from zero to hundreds of thousands of dollars to almost $10

LEXITAS

LORUBBIO0569151

million from 2014 through 2019, an average growth of over 150 percent year over year.

That growth, are you referring to profit in that paragraph or are you just referring to sales?

A        I am unsure exactly what I was referring to there.  I was clearly referring to growth in general with that.  Certainly I know that the sales did go up significantly over that period of time and I also know that the company was profitable for periods of time while I was the CEO.

Q        Okay.  Was it still profitable at the end of 2019?

A        I don't recall what the profitability was exactly at the end of 2019.

Q        So you don't remember if it was profitable versus not profitable?

A        The financials that would have been compiled and worked on by our accountant would have been done after my departure, so I'm unsure.  And for a long period of time I was locked out of receiving any financial information from the business.  Even though I felt that I was due that information as an active founder, I never received

LORUBBIO0569152

that.

Q   So you never received the financials after -- before bankruptcy?

MR. GREEN:  Objection.

A   Before bankruptcy I may have received some company financials, but I don't recall them exactly.

BY MR. HEFFERN:

Q   Okay.  You don't remember receiving profit loss statements prior to bankruptcy from Mr. -- or MMD's attorneys?

MR. GREEN:  Objection.  And I would just say that you can clarify specifically if you say before bankruptcy by whom and whether it's between counsel or not.

A   I do not recall explicitly, but I believe my counsel did receive some financial information before bankruptcy.  I just don't remember all the details around that.

BY MR. HEFFERN:

Q   Okay.  Do you recall if he shared that information to you, provided the documents to you to review that you were looking for?

A   I don't recall.

888-893-3767
www.lexitaslegal.com

LEXITAS

Anthony Lorubbio

Page 149

Q    I'm going to go to the next paragraph. Paragraph four, you write:  Parzych, however, in breach of his contractual and fiduciary duties to me and the company began funneling company monies and benefits to defendant Polebridge, LLC which is owned by defendants Ashleigh Baldwin and Angus Rittenburg, Parzych's wife and close friend respectively.

What money are you referring to in that paragraph, monies and benefits?

A    I'm referring to monies and benefits relating to the company Midnight Madness Distilling.

Q    And how are -- I guess can you explain what benefits in particular you're alleging in that paragraph?

A    Without having all of the documentation and financial records in front of me, I don't think that I can provide you with like an exhaustive list of that, but some things that come to mind are certainly time spent by employees and resources, bottling line labor, general company know-how, potential trade secrets potentially.

That's not probably the full list of monies and benefits, but those are the things that come to mind there.

LEXITAS

LORUBBIO0569154

Q      What trade secrets are you referring to?

A      Any and all trade secrets that came into our company over the course of our nine to ten years up to this point business.

Q      Are there specific ones you believe that he funneled to Polebridge?

A      Some things do come to mind.  I don't think this is the full extent of all of the potential trade secrets but various internal ways in which we operated business or brought new products to life which we had learned over many years of time working on the business.

Q      And what were those?  You're referring to the way you brought products.  Like what was trade secreted about that?

A      Again, I don't think that this is an exhaustive list, but any of the proprietary information that we held within our company to develop and produce beverages across all of our products as well as also any of the expertise that was held by our company and staff in general could likely fall under that trade secret category.

Q      Did you have all your employees sign noncompetes?



LORUBBIO0569155

A I don't recall and I don't know that I can confirm whether or not all employees signed employment agreements with Midnight Madness Distilling, but I do believe some, maybe most, did and potentially all. I just don't quite remember. We likely need to refer to our HR department and somebody by the name of Babs Carryer maybe to get some more of that information.

Q Okay. If you go down to paragraph five, you write: I objected to these unlawful actions. Parzych wrongfully removed me from the company -- excuse me.

After I objected to these unlawful actions, Parzych wrongfully removed me from the company while concealing critical information including how assets of the company were unlawfully transferred.

So based on what I'm reading here, you're alleging that you objected to Casey prior to being removed from the company; is that fair?

MR. GREEN: Objection. He objected to Casey prior to being removed from the company?

BY MR. HEFFERN:

Q I'm trying to understand what you meant

by after I objected to these unlawful actions.  So

after I objected to these unlawful actions, Parzych

wrongfully removed me from the company.

So based on what you said here, just the

plain English, it sounds like you objected to

unlawful actions of which you were aware that

resulted in you being removed from the company.

Do you agree with that?

A        I recall being concerned about many of

the actions that Parzych was taking in his

leadership role at the business and upon confronting

Parzych about some of my concerns, I then was

wrongfully removed from the company.

Q        Okay.  What were the actions Casey was

taking that you thought were wrongful to which you

objected before being removed from the company?

A        I had concerns about the lack of

communication that Casey held with me and with

people within the company.  That's one thing that

comes to mind, one of my concerns.  I think there

were -- I think there were many concerns and that is

certainly one of them, but lack of transparency and

communication, that comes to mind.

Q        Did you object to Casey funneling money

LORUBBIO0569157

Anthony Lorubbio

Page 153

and benefits from the company to Polebridge prior to being removed as -- prior to being removed from MMD?

A        I don't recall objecting to monies and benefits to Polebridge at that time.  As I mentioned before, I don't believe I knew of the existence of Polebridge for quite a long time.

Q        Okay.  Paragraph six, you write:  On April 2nd, 2021, I initiated the instant matter by filing a Complaint against the defendants.

This is a simple clarification, but that initial Complaint you filed on April 2nd, 2021, that was only against Mr. Parzych, correct, not against Angus or Polebridge or Ashleigh, right?

A        From my recollection of the approach that my counsel advised, that is correct.

Q        Correct that it was only against Parzych in April of 2021, right?

A        From memory, that is what I recall.

Q        Okay.  I'm going to go down to paragraph nine.  In paragraph nine, you write:  A United States trustee for the bankruptcy case, Bonnie Finkel, was appointed by the bankruptcy court and has been collecting discovery that is relevant to the instant litigation and was previously unknown to

LORUBBIO0569158

Anthony Lorubbio

Page 154

me.  This newly uncovered information forms the basis for the motion I seek to add additional defendants to this case.

Do you see that?

A        I see what you read to me there, yes.

Q        What new information specifically did you obtain from the bankruptcy court?

A        I recall that my counsel reviewed the bankruptcy proceedings and then, therefore, suggested to take this approach with an amended Complaint.

Q        Okay.  Was that your current counsel or your prior counsel?

A        That was not my current counsel.

Q        Okay.  When did you change from your prior counsel to your new counsel?

A        I don't recall maybe exactly.  It was toward the end of 2022.  I don't remember when that process happened specifically.

Q        Okay.

A        Yeah, November or December, something in that range.  Maybe slightly earlier than that.  I don't quite recall.

Q        Okay.  Is there specific newly

LORUBBIO0569159

Anthony Lorubbio

Page 155

uncovered -- well, was there specific documents you obtained from the bankruptcy court that led you to new information?

A       I don't recall what my counsel had reviewed and wanted to -- and considered, you know, some of the new uncovered information and then wanted to file this amended Complaint.  I don't quite recall.

Q       Okay.  If we go down to paragraph 13, you allege:  Parzych and Sheehan co-founded WYNK in October 2020, close to a year before the bankruptcy case was filed.

Do you see that?

A       I do see what you just read to me, yes.

Q       Do you recall -- well, Sheehan, is that referring to Shawn Sheehan?

A       Here in this context, I think it's safe -- it's never safe to assume, but I think it's safe here to assume we're referring to Shawn Sheehan.

Q       Okay.  Do you know Shawn Sheehan?

A       I know of and have met Shawn Sheehan before.

Q       Have you ever had any business dealings

LORUBBIO0569160

Anthony Lorubbio

with Shawn Sheehan?

A        Does this count?

Q        No, this doesn't count.

A        He and I -- I don't recall a time that he and I had any specific business dealings.

Q        Did he ever advise MMD while you were CEO there?

A        I'm unsure that I can answer that. There may have been other leadership within Midnight Madness Distilling that received advising.  I'm unsure.

Q        Okay.  In paragraph 13, it this when you first became aware of WYNK, in October of 2020?

MR. GREEN:  Objection.

A        Joe, I recall you asking me this before and, again, I don't really remember exactly when I became aware of WYNK.  So saying as before, I'm unsure.

BY MR. HEFFERN:

Q        I wanted to see if this refreshed your recollection, but it appears it didn't.

If we go down to paragraph 15, you allege:  The company, MMD, previously developed a nearly identical product under the brand name CB

LORUBBIO0569161

Delight and it is believed that WYNK has misappropriated the company's intelligent property to start its business.

What intellectual property are you referring to or specifically alleging in this paragraph was misappropriated from MMD to WYNK?

A       I feel that there's quite a few potential areas of intellectual property that we're referring to here as we've discussed before that might refer to any and all of our business know-how and how to bring a product to market, any of the efforts by our sales teams, packaging, design know-how or market research, consumer testing, formulation of products.

Any and all of these I think could be -- are a part of the intellectual -- can be a part of the intellectual property we're referring to.

Q       Okay.  You're not alleging that WYNK or whoever owns WYNK is infringing MMD's patents; are you?

A       I can't say whether I am or not there.

Q       Are you alleging that whoever owns WYNK is infringing any of MMD's trademarks?

A       I'm unsure.  I don't know all of the

LORUBBIO0569162

Anthony Lorubbio

Page 158

ways in which WYNK operates its business and how there's explicit overlap between that and Midnight Madness Distilling, so at least not the full extent here.  Based on my knowledge of the time of this, of course I believed it to be true.  But, yeah, I think I would need more information.

Q       So what leads you to believe that WYNK has misappropriated MMD's intellectual property?

A       Based on my counsel's advising, there seem to be a clear line between --

MR. GREEN:  Well, I'm going to object and say that anything that relates to conversations with counsel is not something that should be testified about.

MR. HEFFERN:  And I'm just trying to -- he's alleged -- he's put forth a factual affidavit and I'm just trying to understand the facts on which he made this affidavit.  He's alleging --

MR. GREEN:  Yeah, except that I disagree that referring to intellectual property is something that is a lay term and I think that there's a way that you can question him without having him invoke conversations with counsel.

888-893-3767
www.lexitaslegal.com

LEXITAS

LORUBBIO0569163

Anthony Lorubbio

MR. HEFFERN:  No, and I'm just trying to understand.  He said there's a clear line between MMD's -- the misappropriation of MMD's intellectual property and WYNK's use of it and I'm trying to understand that factual line that he's claiming there.

BY MR. HEFFERN:

Q     What leads you to believe -- is it something -- is it something that Mr. Parzych took from MMD?  Is it something that was in his head?  Is it know-how that he just had and if he's the founder of WYNK and he's the founder of MMD, one of the founders of MMD, are you alleging that he inappropriately took something that was in his head from MMD and took it to WYNK after MMD went -- or at some point?  I'm just trying to understand.

MR. GREEN:  Well, again, I'm going to object because I think that you are sort of treading on an area that -- where there's a legal concept and he's already talked about conversations with counsel.

And I also think there's a lot of ways that you can ask about this without just simply referencing that one sentence.  You could ask

888-893-3767
www.lexitaslegal.com

LEXITAS

LORUBBIO0569164

him questions --

BY MR. HEFFERN:

Q      What things -- let's call it things --
what things do you believe were taken from MMD
inappropriately to WYNK?

MR. GREEN:  Objection.  Go ahead, you
can answer.

A      Again, I do have to refer to
conversations with counsel here where they seem to
put together a clear line.  I am not actually
saying -- and I don't want to speak for what my
previous counsel had stated about their belief on
intellectual property and all of that.

BY MR. HEFFERN:

Q      So I'm not asking about your advice of
counsel or anything.  I'm asking about factually,
what things do you think WYNK took from MMD?  What
specific items do you think WYNK misappropriated?
Is it know-how?  What sort of know-how are you
referring to?

It sounded like you were saying
know-how.  It's not trademarks.  It's not patents I
believe, right?  So we're left with trade secrets or
copyrights.  Are there specific copyrights that

you're uncertain about?

MR. GREEN:  Hold on.  Objection.  Your description of what you believe constitutes intellectual property, number one, is wrong.  So I don't appreciate that that's -- that you're providing that to him.

And, number two, that is an improper way to ask a question.  And I understand that you're struggling with the way -- and you're using the word "things," but I object to it.

BY MR. HEFFERN:

Q        So I'm just asking you, Mr. Lorubbio, what was taken by WYNK from MMD?

A        I think that there's potentially multiple things in the category of intellectual property that enabled WYNK to start its business.

Q        Okay.  What are they?

A        Well, as I've mentioned before, my understanding of intellectual property would be anything from formation of products, formulation of products to packaging and design know-how to the expertise of employees to market research and consumer information, things of that nature.

Q        So what leads you to believe that WYNK's

LORUBBIO0569166

packaging was taken from MMD?

A       I don't know that we're limited to just packaging.  I think that there's potentially a lot of things that were misappropriated that landed in WYNK with the product that they ended up with.

Q       What are they?

A       Well, anything that would fall under the category of intellectual property, whether that's formulas or market know-how, relationships with customers, market research, anything of that nature.

Q       Okay.  What leads you to believe that CB Delight's formula was taken and misappropriated by WYNK?

A       I feel like there's a lot of potential ways in which CB Delight is a predecessor to -- excuse me, not predecessor.  I think there's a lot of -- potentially a lot of ways in which WYNK came to be that is in the mold of CB Delight.

I mean, we're looking at very -- we're looking at cannabis beverages here, so I don't think it's limited to just the fact -- it could be anything from the intellectual property from the company CB Delight related that led to WYNK.

Q       Okay.  So are you claiming the idea of

putting cannabis into a beverage as part of the intellectual property that was misappropriated from MMD to WYNK?

A    I think that generally -- I think there's a lot of areas in which the company developed expertise around beverage-making that led to the creation of WYNK and, therefore, the misappropriation of the company's know-how and intellectual property.

Q    What leads you to believe that WYNK is using that to create their beverage?

A    I don't know all of the ways in which the WYNK product is made today and if I could have more of that information, I can -- I think I could give you a real answer there, but I'm unsure.

Q    Do you know how CB Delight was made?

A    Only to the extent that I really knew how all of generally beverages are made and that's not necessarily my area that I focused on a majority of my time, so, yeah.

Q    Paragraph 16, you write:  In fact, many of the employees at WYNK previously worked for the company in nearly identical roles.

     Do you see that?

Anthony Lorubbio

Page 164

A       I do see what you just read to me, yes.

Q       Are there specific employees that you're familiar with who worked for WYNK who previously worked for MMD?

A       I'm unsure of the full list of employees, but the ones that come to mind -- and this is not an exhaustive list -- but I think the ones that come to mind are Angus Rittenburg, Casey Parzych and, of course, I don't know all of the employees at the time of this amended Complaint.

Q       Well, this is what you filed three months ago about.  This isn't the amended Complaint.

A       Oh, my apologies.  Even still I don't know all of the current employment status of WYNK employees even as of three months ago to today, but those are some people that come to mind.  There may be more, though.

Q       So you're talking about two right now, Angus and Casey, correct?  Those are the two that you know of?

A       The ones that I mentioned just now are those, so you're correct.

Q       And are you suggesting that neither of them were allowed to go to work for WYNK after

LEXITAS

LORUBBIO0569169

leaving MMD?

A     That's not what I'm suggesting.  I'm just stating that some employees at WYNK previously worked for Midnight Madness Distilling in nearly identical roles.

Q     Okay.  Is there any significance to that statement?

MR. GREEN:  Objection.  Now you're being argumentative because you asked -- the statement says what it says and then you said, well, are they not allowed to -- it speaks for itself.  He's not an attorney.

MR. HEFFERN:  I'm just trying to understand why he's alleging that fact, what's the significance of it.  I'm trying to understand why he put that fact in there.  If he doesn't know, that's fine.  He could just say that.

MR. GREEN:  That's not what you asked.

A     I'm unsure, Joe.

BY MR. HEFFERN:

Q     Okay.  That's fine.  Let's go down to 20.  You write:  Another entity, Can Man, LLC d/b/a Best Bev, also appears to have been improperly

benefited from the assets of the company.

What facts led you to make that statement?

A       There may be quite a few different facts when I think of the assets.  The company I think of, again, intellectual property and all that falls into that category, so that's probably not an exhaustive list of all of the assets that this statement is referring to, but it's certainly a consideration of it.

Q       What I guess my question -- let me reformulate that question.  What assets do you contend Best Bev -- what MMD assets do you contend Best Bev is using improperly?

A       Like I said, I believe intellectual property is one and there may be more.

Q       Are there specific processes you believe Can Man is using or specific formulas you believe Can Man is using or specific packaging you believe Can Man is improperly using?

I'm just trying to understand like concrete.  I know you're saying intellectual property.  That can be kind of a mushy concept, so I'm trying to ask you about concrete things that you

Anthony Lorubbio

Page 167

believe Can Man is using that was MMD's.

A         I think potentially all those things that you mentioned maybe.

Q         Okay.  And what -- when you say "potentially," what's your basis for that?

MR. GREEN:  Objection.  Go ahead, you can answer.

A         Can you just repeat that question for me once, Joe.

Q         Sure.

MR. HEFFERN:  Aubrey, would you mind please repeating that back.

(Whereupon, at this time, the court reporter read a preceding portion of the testimony as directed:  "Okay.  And what -- when you say "potentially," what's your basis for that?"

A         Based on knowledge and information available at the time of this writing.

BY MR. HEFFERN:

Q         And so I guess my question is -- again, I'm trying to -- is there something about Can Man's packaging that leads you to believe that?  Is there something about Can Man's formulations that lead you

LORUBBIO0569172

to believe that?  Concrete -- you're saying knowledge and information, but what specifically makes you say, you know what, that Can Man, I'm pretty sure they took what MMD had, the secret sauce?  What is the concrete thing?

MR. GREEN:  Objection.  You're putting words in his mouth.  That's not what he said.  You're paraphrasing specific language that's right in front of us and saying -- and then repeating it in your own words that are not what he said.

It's right there.  It is right there in front of him.  If he can answer the question and provide more information as to what that sentence means, then he can, but it's not your place to then come in and attribute something to it.  That's not what he said.

BY MR. HEFFERN:

Q        So can you explain what you meant by what you believe was taken?  I'm just trying to understand concretely what was taken.

MR. GREEN:  Objection.  He doesn't use that language and you keep saying taken.  He doesn't say that.  He doesn't say it once and

LEXITAS

LORUBBIO0569173

Anthony Lorubbio

I'm not trying to do your job but I am trying to expedite this.  I think you can say can you expound what you said in paragraph 20, do you have more information to add, things like that, but when you keep repeating things as if he said them and he clearly didn't say them, I think that that creates a problem for the transcript.

MR. HEFFERN:  Sure.  I appreciate that.

BY MR. HEFFERN:

Q      Do you have anything you can expound upon your answer?

A      No, I think that this statement speaks for itself, that another entity, Can Man, improperly benefited from the assets of the company.

MR. HEFFERN:  Okay.  I'm getting close to being done.  I just wanted to show you what's been marked as L-9.

- - -

(At this time, Exhibit L-9 was marked for identification.)

- - -

BY MR. HEFFERN:

Q      These are requests for production of

888-893-3767
www.lexitaslegal.com

LEXITAS

LORUBBIO0569174

documents that we served on your counsel.

First of all, do you recognize this document?

A    I may have been sent this, but I don't really recognize it.

Q    Okay.  Are you collecting documents responsive to these document requests?

MR. GREEN:  Objection.  He's not going to answer that.

MR. HEFFERN:  Why is that?

MR. GREEN:  Because that deals with an attorney-client manner and it has nothing to do with the fact-finding basis for a deposition.

MR. HEFFERN:  No, it's totally -- it's about document collection.

MR. GREEN:  Objection.  No, he's not going to answer that.

MR. HEFFERN:  Are you --

MR. GREEN:  Yeah, I'm instructing him not to answer the question.

MR. HEFFERN:  That's based on --

MR. GREEN:  You're asking -- you served discovery requests on March 14th, right?  That's what it says.  And you want to know

LORUBBIO0569175

Anthony Lorubbio

right now whether he's working with us to collect documents.  No, that's off limits.

BY MR. HEFFERN:

Q        Okay.  Are you going to follow your counsel's instruction?

A        Yes, that's, yes, what I am going to do.

Q        All right.  So you were terminated on January 30th, 2020, right?

A        I recall that being the day of my departure from Midnight Madness Distilling, yes.

Q        Did you leave the premises immediately?

A        I recall leaving the premises that day for sure, yes.  Can you define what you mean by immediately?

Q        Sure.  Did you remain on the premises for a couple hours?

A        My recollection of that day is that shortly after my meeting with Casey, I in press of leaving the building said hello I think actually and had a few conversations with some of the people down at the bottling line who were there bottling and then shortly after those conversations with those folks, I then left.

Q        Okay.  Did you at any point refuse to

LEXITAS

LORUBBIO0569176

leave the premises?

A    I don't recall ever refusing to leave the premises.

Q    Okay.  Do you recall the premises being evacuated before you left?

A    I do not recall the premises being evacuated.  I specifically remember production happening at that time and even having conversations with a few of our bottling employees.  So, no, I don't recall the building being evacuated.

Q    Did you write a check to yourself after you were terminated on January 30th, 2020?

A    After I was terminated?

Q    By Casey.

A    After January 30th --

Q    No, not after.  Sorry, not after January 30th.  After being terminated before leaving the premises, did you draft a check to yourself from MMD?

A    I did not draft a check to myself after leaving the premises.

Q    Not after leaving the premises, while still on the premises but after being terminated, did you draft a check to yourself?

LORUBBIO0569177

A    From my memory I do not recall even at the premises writing a check to myself.

Q    Okay.  Did you leave in a company car from the premises?

A    I recall leaving in a Honda Accord that was in the company's name.

Q    Okay.  Did you return that car to the company?

A    I worked alongside my counsel and the company to return the car.

Q    Okay.  Do you recall how you returned the car?

A    Yeah.  I remember leaving the car near an auto shop in Philadelphia and I don't know what happened to it after that, but I assume the company got it.

Q    Why did you leave the car in front of an auto shop in Philadelphia?

A    That was what my counsel instructed me to do based on what I assume is correspondence between my counsel and the company.

Q    Okay.  Did you break a window in the car prior to -- well, prior to leaving it?

A    There was a window that had gotten



LORUBBIO0569178

Anthony Lorubbio

Page 174

broken on that car shortly after leaving the building with all of my belongings, personal belongings, things from my office, things from the apartment in Trumbauersville and things that I couldn't actually fit in my car.

My car was full of all of my personal belongings and upon arriving back down to Philadelphia at the aforementioned apartment that we discussed, it was very late in the evening and I parked my car as close as I could to that apartment and brought in as many things as I could.

However, that night there was apparently -- well, the next morning I went out to my car and I saw that the window had been smashed in and clearly some of my things were stolen, some things from the apartment, some things from my office and, yeah, I assessed what was stolen and then shortly after I then unpacked the rest of the things in my car or, excuse me, in the Honda Accord that was in the company's name and due to the damage, I actually took the car to an auto body shop to get it repaired and out of my own pocket I paid for the repair of the window.

Q        Okay.

Anthony Lorubbio

A    And then after that is when I dropped the car off at the auto body shop for the company to receive it.

Q    Okay.  So the window was fixed when you dropped it off?

A    When I dropped it off there was a new window that had just been installed in the car, yes.

Q    Did you ever file a police report for the theft of your items?

A    I don't recall filing a police report. I may have, but I don't recall if I did.

Q    Okay.  Angus testified that one of the reasons he decided to go along with the termination of you was because he believed you were untrustworthy.

Were you ever engaged to be married?

A    I have been engaged, yes.

Q    And you never got married?

A    That's correct, I've never been married.

Q    At what point were you engaged?  Like what year?

A    I was engaged November of 2017.

Q    Okay.  And is that when the engagement ended?

LORUBBIO0569180

Anthony Lorubbio

Page 176

MR. GREEN: What's the relevance for this?

MR. HEFFERN: So the relevance is Angus testified as to why he -- he was asked during his deposition why he went along -- why he thought Mr. Lorubbio should be fired and he testified regarding this incident that I'm about to ask Mr. Lorubbio about.

MR. GREEN: Relating to his engagement?

MR. HEFFERN: Yes.

MR. GREEN: I'll wait for the question. Go for it.

BY MR. HEFFERN:

Q    I'm sorry, so when did your engagement end?

A    My engagement ended in August of 2019.

Q    Okay. So you were engaged for approximately two years?

A    Yes, just shy of two years, yes.

Q    Okay. Did you introduce Angus Rittenburg to a dating app?

A    I think I recall being out to dinner once with Angus and him mentioning having not -- him mentioning having recently moved to the area, that

it was a little tough maybe I guess for him to get a date or just date in general and I may have suggested that he use a dating app.

Q        Okay.  Was this a dating app that you used to find dates while you were engaged, other dates of other women while you were engaged to your fiancé?

A        No, I did not use the dating app to find dates while I was engaged.

MR. HEFFERN:  I have no further questions.

MR. GREEN:  I don't have questions.

- - -

(Deposition concluded at 3:50 p.m.)

- - -

Anthony Lorubbio

C E R T I F I C A T I O N

I, AUBREY MCNALLY, a Certified Court reporter and Notary Public of the State of New Jersey, do hereby certify that I reported the deposition in the above-captioned matter; that the said witness was duly sworn by me; that the reading and signing of the deposition were waived by said witness and by counsel for the respective parties; That the foregoing is a true and correct transcript of the stenographic notes of testimony taken by me in the above-captioned matter.

I further certify that I am not an attorney or counsel for any of the parties, nor a relative or employee of any attorney or counsel connected with this action, nor financially interested in the action.

*Aubrey McNally CCR RPR*

----------------------------------------

AUBREY D. MCNALLY, CCR, RPR #30XI00234300



LORUBBIO0569183