# EXHIBIT 2

**IN THE COURT OF COMMON PLEAS OF BUCKS COUNTY, PENNSYLVANIA**

| | | |
|---|---|---|
| ANTHONY LORUBBIO | : | |
| Plaintiff, | : | CIVIL ACTION - LAW |
| | : | |
| | : | Case No. 2021-01816-0-JUDGE: 34 |
| v. | : | |
| | : | **EXPERTY REPORT OF R.F.** |
| CASEY PARZYCH, POLEBRIDGE LLC, | : | **CULBERTSON** |
| ASHLEIGH BALDWIN, and ANGUS | : | |
| RITTENBURG | : | |
| | : | |
| Defendants. | : | |
| | : | |
| | : | |

## I.      Introduction:

I have been asked by Rogers Counsel, attorneys for Defendants Casey Parzych ("Parzych"), Polebridge LLC ("Polebridge"), Ashleigh Baldwin ("Baldwin"), and Angus Rittenburg (Rittenburg") (collectively, "Defendants"), to provide this expert report ("Report") in response to, Stephen J. Scherf's expert report submitted on behalf of Plaintiff Anthony Lorubbio ("Lorubbio" or "Plaintiff") in the above-captioned action.  This Report reflects my expert opinions as a former Adjunct Professor at the Tepper School of Business at Carnegie-Mellon University and based on the knowledge of the facts and documents in my personal possession as a former advisor to Midnight Madness Distilling, LLC a/k/a Theobald & Oppenheimer ("MMD").  I taught entrepreneurship at Carnegie-Mello for 17 years, from 1998 through 2015.  During that time, I taught over 15,000 students at CMU, and helped launch over 250 businesses.  While there, I also formed a class named "The Apprentice," which was then turned into a TV series of the same name.  I have attached a copy of my *curriculum vitae* as "Exhibit A."

LORUBBIO0567026

## II.    Overview & Summary of Expert Opinions:

- Mr. Scherf's valuation of MMD and Lorubbio's purported 39.3861% share of the company is deeply flawed because it fails to account for the expenses and debt that MMD incurred under Lorubbio's leadership as an absentee CEO on the cusp of COVID-19 global pandemic, which shut down most sources of revenue for MMD throughout 2020 and prior to MMD declaring bankruptcy in 2021.

- Specifically, the Expert Report compiled by Stephen J. Scherf did not refer to any 'percentage exceptions' due to a 'global pandemic', and the only inferable reference to COVID would be that he used a 20% marketability reduction when returning his assessment.

- In my opinion, Mr. Scherf's 'top down' approach of valuing a company during a pandemic is akin to trying to sell your house during a hurricane.  In this particular vertical sector, the government closed ALL of MMD's distribution channels, Lorubbio (MMD's absentee CEO) had 'self-checked-out' for the last half of 2019, and the Bank (who was also scared of COVID) was on the verge of foreclosing over missed 'loan covenants'.  The 'missing loan covenants' would trigger both Parzych and Lorubbio losing their homes.  For all of this Mr. Scherf gave a mere 20% 'marketing reduction'.

- I assume that Mr. Scherf did not have access to the PNC Loan document - showing the loan covenants, but he had a copy of MMD's 2019 financials.  Both Lorubbio and Parzych agreed on a $3.6m re-capitalization loan from PNC - that required Lorubbio and Parzych to put up their homes as collateral based upon various loan covenants (which were broken in 2019 and 2020).

- Lorubbio was with MMD through the beginning of 2020, so he saw and knew what was coming: another year of not making his sales or profit goals.  His ill-timed 2019 vision dramatically increased expenses by over +$1 million annually for both payroll and R&D, scheduled expansion into a new product line, and an expansion into 27 new states.

- The Global Pandemic (which triggered governmental & state shutdowns, a dramatic sales downturn, and even more broken PNC loan covenants), ultimately resulted in MMD's bankruptcy.

## III.    Factual Background & Analysis:

1.    From approximately 2011-2012, Parzych and Lorubbio were students in my CMU Entrepreneurship class and planned the launch of a company that would become MMD during that time.

2.    MMD was always Parzych's vision from brewing 'glow in the dark' beverages in his bathtub to flying to Europe to see how 'real spirits' are made and flavored.

2

LORUBBIO0567027

3.      Parzych dropped out of CMU to pursue the formation of MMD full-time, allowing Lorubbio to get his CMU degree and work at Mellon Bank in Pittsburgh – while 'moon-lighting' with MMD.

4.      Parzych's vision was 'inexpensive well spirits' that taste good.  He wanted to bring good tasting, $5 Vodka to every bar/restaurant in Pennsylvania.

5.      Parzych's expertise was in product sourcing, R&D, production, and co-packing.

6.      Lorubbio's focus was sales, partnerships, admin, finance and accounting.

7.      The business plan was simple: A sales person would walk into an establishment with a price list that would show that MMD's products were (roughly) $2/bottle cheaper than the competition; Have the establishment sample the products to prove superior taste; The establishment would buy the products - right then and there; and MMD would set up delivery directly to their establishment - going directly from distiller to end-user.

8.      Parzych and Lorubbio learned how to work with each other for the first 6 years of operation (2012 to 2018), and sales grew from $0 to $7.2m in revenues respectively.

9.      It was the following couple of years that forced their break-up and eventually MMD's bankruptcy.

10.     The first 6 years were spent attacking (for the most part) one style of 'on premise' customer with a single price list.  It worked predictably and profitably.

11.     Every December/January, Lorubbio would call a General Sales Meeting at the corporate offices in Trumbauersville, and it was there that he would deliver the next year's sales plan / goals / KPI's and accountabilities.  But the pitch changed dramatically in 2019 and 2020, and the financial results show it, as demonstrated by the following:

LORUBBIO0567028



|        | 2018             | 2019              | 2020                    |
|--------|------------------|-------------------|-------------------------|
| Sales  | $7.237m (+28%)   | $7.971m (+10%)    | $4,710,476  (-41%)      |
| Rev – Exp. | $0.701m (+40%) | $0.118m (-85%)  | $(-2,628,296)           |
| Payroll | $1.823m         | $2.572m (+41%)    | $1,933,605  (-25%)      |
| R&D    | $179k            | $459k  (+156%)    | $27,983  (-94%)         |

12.    Lorubbio's 2019 Vision: He hired three top-flight and expensive sales people to handle MMD's 'soon-to-be' three separate regions, and a marketing brand director to support MMD's Single Prop and SIPHON markets:



13.    The following graphic demonstrates Single Prop rum – MMD's entry into the fledgling high-end rum market.

4

LORUBBIO0567029



14.     Casey Parzych was convinced that the rum market was not big enough to warrant our attention on it, but Anthony Lorubbio set out to prove him wrong.  For example, Lorubbio would give out $300 machete's to bars and restaurants that agreed to carry Single Prop – for cutting the coconuts that went with the drink.

15.     The SIPHON was a pressurized device filled with Japonica™ (an effervescent liqueur that was made to add to each and every drink).  It would launch 'the world' into a new category of alcoholic beverages.  SIPHON was very expensive, associated with unproven demand, had $0 in pre-orders, no timeframe for profitability, and a large liability risk due to its pressurization.

5

LORUBBIO0567030



16.    Lorubbio ambitiously planned on expanding to 27 new 'red, blue, and green' states

on the map in 2019 – without existing marquis customers in any of the new states:



17.    Lorubbio had unrealistic and competing goals that sought both unbridled growth

and wealth creation:

6

LORUBBIO0567031



18.     To finance MMD's growth, PNC Bank loaned MMD over $3.5m in exchange for the building, equipment, Parzych's domicile in Trumbauersville, PA and Lorubbio's home in Cleveland, Ohio.

## Loan Agreement                     PNC

THIS LOAN AGREEMENT (the "**Agreement**"), is entered into as of April____, 2019 between **MIDNIGHT MADNESS DISTILLING LLC**, a Pennsylvania limited liability company (the "**Borrower**"), with an address at 118 North Main Street, Trumbauersville, Pennsylvania 18970, and **PNC BANK, NATIONAL ASSOCIATION** (the "**Bank**"), with an address at 2 Walnut Grove, Horsham, Pennsylvania 19044.

The Borrower and the Bank, with the intent to be legally bound, agree as follows:

1.     **Loan.**  The Bank has made or may make one or more loans ("**Loan**") to the Borrower subject to the terms and conditions and in reliance upon the representations and warranties of the Borrower set forth in this Agreement.  Each Loan shall be used for business purposes (and not for personal, family or household use) and is or will be evidenced by a promissory note or notes of the Borrower and all renewals, extensions, amendments and restatements thereof (whether one or more, collectively, the "**Note**") acceptable to the Bank, which shall set forth the interest rate, repayment and other provisions of the respective Loan, the terms of which are incorporated into this Agreement by reference.

The Loans governed by this Agreement shall include the Loans specifically described below, if any, and any additional lines of credit or term loans that the Bank has made or may, in its sole discretion, make to the Borrower in the future.

2.     **Security**.  The security for repayment of the Loan shall include but not be limited to the collateral, guaranties and other documents heretofore, contemporaneously or hereafter executed and delivered to the Bank (the "**Security Documents**"), which shall secure repayment of the Loan and all other loans, advances, debts, liabilities, obligations, covenants and duties owing by the Borrower to the Bank described therein (hereinafter referred to collectively as the "**Obligations**").

LORUBBIO0567032

19. The following real numbers, demonstrate that none of the goals were met for revenues and net income, but all payroll and R&D expense numbers were certainly exceeded. It also exposed MMD's real mis-management of Matt Falvey (NY / NJ) and Eddy Paredes (FLA.) in terms of KPI's = no revenue or net income minimums, no minimum sales calls / day, but large allowances for them giving away 'free money'. It really was an expensive exploratory operation on managing 'work from home' personnel.

|  | 2018 | 2019 | 2020 |
|---|---|---|---|
| Sales | $7.237m (+28%) | $7.971m (+10%) | $4,710,476 (-41%) |
| Rev – Exp. | $0.701m (+40%) | $0.118m (-85%) | $(-2,628,296) |
| Payroll | $1.823m | $2.572m (+41%) | $1,933,605 (-25%) |
| R&D | $179k | $459k (+156%) | $27,983 (-94%) |

Nobody (including Anthony) expected the 'Perfect Storm': COVID, State Shutdown, large financing package, & ambitious hiring & training.

20. In 2019, dramatic changes were made on the sales / marketing side of things. Lorubbio made 4 'big buck' hires: Kyle Harder (Brands); Chad Merriweather (Mgr. Control States); Matt Falvey (Regional Sales - NY, NJ); and Eddy Paredes (Regional Sales - FLA). All reporting to Lorubbio.

21. Lorubbio 's pet projects required a lot more money: Single Prop Rum (a high-end rum) (+$91k) and SIPHON (a new liquor + dispenser) (+$368k). Both were huge 'money sucking' operations with no profitable end in sight.

8

LORUBBIO0567033

22.     Lorubbio had an ill-timed vision and it was this vision that caused MMD to increase sales & R&D spend in 2019 over 126% (+$1m in new recurring expenses) - simply due to 4 new people and 2 pet projects.

23.     In the early spring of 2019, it was anticipated that Lorubbio and his 'newly expanded' sales / marketing team would welcome the ability to sell a CBD seltzer beverage. It was one of MMD partner's beverages, and MMD simply wanted to add it to its product catalogue - because grocery stores and distributors were asking for it. Lorubbio resisted the effort, and told all of the sales / marketing team to 'fake like' they agreed with selling the product, but then intentionally NOT sell the CBD seltzer.

24.     In the late spring of 2019, MMD started to change the sales tactic from selling anything to anyone to only selling where MMD would make money. This effort was also resisted by Lorubbio and the sales force. The pattern quickly became apparent that if Lorubbio did not think of it or if it didn't improve Single Prop Rum or SIPHON - he would instruct his sales and marketing teams not to touch it. This behavior caused not only an increase in payroll expenses, but a dramatic downturn in profitability.

25.     For example, the following were MMD's 2019 Quarterly results:

|  | March 2019 | July 2019 |
|---|---|---|
| Cash | $180k | $328k |
| Payroll (Exp.) | $720,000 | **$1.6m** |
| Net Inc. | $13,000 | **(-$155k)** |

26.     After 2 quarters of not making deadlines and profitability moving in the wrong direction, Parzych tried to enhance profitability at MMD.

9

LORUBBIO0567034

27.    Starting in early summer of 2019, MMD started working with PNC Bank to institute a series of strict sales profitability processes that included: calls per day and performance quotas - that allowed T&O to reduce headcount of those sales people that refused to comply.

28.    Strict profitability guidelines were put in place that effectively 'shelved' any R&D efforts that could not show a profit within a 90-day window, and where contracted demand was not customer driven but more 'hopium' related - which effectively shelved any more formulations for Single Prop and any more work on SIPHON.

29.    These conditions were put into effect due to the financial performance of the company by the end of Q2, 2019:

|  | March 2019 | July 2019 | Goals for March 2020 | |
| --- | --- | --- | --- | --- |
| Cash | $180k | $328k | $620k | +244% YoY |
| Payroll (Exp.) | $720k | $1.6m | $465k | - 35% YoY |
| Net Inc. | $13k | (-$155k) | $273k | +2,000% YoY |

30.    Net Income in July, 2019 was a negative (-$155,000) due to expenditures on R&D, branding and national account personnel.  MMD cutback dramatically in all of the above areas, and finished the year positive by over $100,000.

31.    The act of terminating the 4 new hires, and stopping R&D on Single Prop and SIPHON – alienated Lorubbio and he effectively checked-out and became an absentee CEO of MMD.

32.    All of the new hires were terminated as a cost saving measure along with any further efforts on Single Prop and SIPHON.  Unfortunately, it was a +$1m experiment gone wrong.

33.    MMD returned to solely focusing on selling profitable products and that was on a trajectory to improve MMD's returns over 250% from July 2019.

LORUBBIO0567035

34.   MMD also developed strict numeric calculations showing how it would save 'marquis' customers hundreds of thousands of dollars per year – by switching to its FABER™ products.

## ANNUAL SAVINGS: +$29k

**Est. Volume = 1 pallet / mo.**   **60 (1.75L) cases / pallet**

|  |  | COMPETITOR | SAVINGS |
|---|---|---|---|
| PRICE PER BOTTLE (VODKA) | $8.02 | $12.59 | $4.57 |
| PRICE PER CASE | $48.12 | $75.54 | $27.42 |
| CASES ORDERED PER MONTH | 30 | 30 |  |
| MONTHLY COST | $1,443.60 | $2,266.20 | $822.60 |
|  |  |  |  |
| PRICE PER BOTTLE (SILVER/T) | $9.91 | $18.89 | $8.98 |
| PRICE PER CASE | $59.46 | $113.34 | $53.88 |
| CASES ORDERED PER MONTH | 30 | 30 |  |
| MONTHLY COST | $1,783.80 | $3,400.20 | $1,616.40 |
|  |  |  |  |
| TOTAL MONTHLY | $3,227 | $5,666 | $2,439 |
| TOTAL ANNUAL | $38,729 | $67,997 | $29,268 |

35.   Subsequently, MMD successfully co-packed for its first third-party firm: Narragansett Malt Beverages.

36.   From November 2019 through February 2020, MMD (including Parzych as a salesperson) expanded its national account profitability initiative that broadened its partnership with such groups as: The Starr Restaurant Group, The Schulson Group, and Big Heads.  MMD also signed some 'marquis customers': Wind Creek Casino, Woody's, Mayfield Social Club, River's Casino, Hollywood Casino, Mohegan Sun Arena, Tabu Nightclub, and P.J. Whelihan's Restaurant Group.

37.   These were large, targeted marquis sales - that were specifically shown how they could save hundreds of thousands of dollars by switching to FABER™ products.  Moreover,

LORUBBIO0567036

MMD (pre-COVID) was preparing to close even more marquis accounts such as: Parx Casino, Harrah's, Valley Forge Casino, and The Meadows Casino and Racetrack.

38.    Pre-COVID, MMD's Sales Goals for 2020 were fairly straight-forward – still climbing toward that elusive $10m milestone – but this time without any baggage of 4 national account personnel, Single Prop Rum, and/or SIPHON to hold profits back:

| 2020 Sales Goals | |
| --- | --- |
| Faber Sales- On Premise | $2,415,000 |
| Faber Sales- Off Premise | $2,070,000 |
| Well Sales | $4,800,000 |
| Co-Packaging & Other Brands | $960,000 |
| Other- T&O store | $84,000 |
| Totals Needed | $10,329,000 |

| 2020 Monthly Sales Goals | | | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 2020 | Jan | Feb | March | April | May | June | July | Aug | Sept | Oct | Nov | Dec |
| Faber Sales- On Premise | $160,000 | $165,000 | $170,000 | $180,000 | $180,000 | $200,000 | $210,000 | $220,000 | $230,000 | $250,000 | $200,000 | $250,000 |
| Faber Sales- Off Premise | $100,000 | $90,000 | $155,000 | $165,000 | $160,000 | $180,000 | $200,000 | $200,000 | $190,000 | $250,000 | $200,000 | $180,000 |
| Well Sales | $400,000 | $400,000 | $400,000 | $400,000 | $400,000 | $400,000 | $400,000 | $400,000 | $400,000 | $400,000 | $400,000 | $400,000 |
| Co-Packaging & Other Brands | $80,000 | $80,000 | $80,000 | $80,000 | $80,000 | $80,000 | $80,000 | $80,000 | $80,000 | $80,000 | $80,000 | $80,000 |
| Other- T&O store | $7,000 | $7,000 | $7,000 | $7,000 | $7,000 | $7,000 | $7,000 | $7,000 | $7,000 | $7,000 | $7,000 | $7,000 |
| 2020 Totals needed | $747,000 | $742,000 | $812,000 | $832,000 | $827,000 | $867,000 | $897,000 | $907,000 | $907,000 | $987,000 | $887,000 | $917,000 |
| 2019 Totals | $691,787 | $572,756 | $617,493 | $666,497 | $796,754 | $811,398 | $753,302 | $777,109 | $675,624 | $826,084 | $651,108 | |
| YTD lift needed | 7% | 23% | 24% | 20% | 4% | 6% | 16% | 14% | 26% | 16% | 27% | 100% |

12

LORUBBIO0567037

39.    Unfortunately, during the second-half of 2019 Lorubbio became an absentee CEO—just before the global COVID-19 pandemic hit in early 2020.

40.    As a result of COVID-19, 110,000 hospitality and beverage companies permanently closed or became bankrupt in 2020.  The food and beverage sector was hit harder than any other industry by the pandemic – and had very little to no relief in the two stimulus packages passed through Congress.

41.    What follows is an excerpt from Pennsylvania Governor Wolf's mandated closure of all bars and restaurants within the state of Pennsylvania.

March 18, 2020



**ADVISORY NOTICE NO. 26**
**TEMPORARY CESSATION OF THE SALE OF FOOD AND ALCOHOL FOR ON-PREMISES CONSUMPTION RELATIVE TO COVID-19 PUBLIC HEALTH EMERGENCY**
**March 18, 2020**
**TO: All License Holders**
The PLCB, upon authorization from the Governor, has the authority under the Liquor Code (47 P.S. §4-462) to mandate the closure of licensed establishments in times of emergency. Section 7101 of the Emergency Management Services Code (35 Pa.C.S. § 7101) gives the Governor wide latitude in dealing with disasters such as the public health crisis precipitated by the outbreak of the COVID-19 coronavirus. As part of that authority and in response to the current public health emergency, the Wolf Administration had previously asked all retail establishments to cease selling food and alcohol for on-premises consumption. The PLCB had indicated that, pursuant to the Governor's directive, licensees no longer needed to sell food and alcohol for on-premises consumption as a precondition to sell alcohol for off-premise consumption.
In that the crisis continues, and in consultation with the Wolf Administration and public health officials, the PLCB now directs that **all retail licensees, clubs, permittees and producers must cease the sale of food and alcohol for on premises consumption**, effective **Wednesday, March 18, 2020 at 8 p.m. and until further notice**, in the interest of slowing the spread of the COVID-19 virus and mitigating the unprecedented public health crisis the commonwealth faces.
Any licensee that fails to comply with this mandate risks citation by the Pennsylvania State Police Bureau of Liquor Control Enforcement (BLCE).  Further, BLCE has agreed to notify the PLCB if any citations are issued relative to this issue. The PLCB may suspend a licensee's operating authority under section 462 based on the circumstances.  A licensee who continues to operate after its operating privileges have been suspended risks further enforcement action by the BLCE.

42.    MMD was in the midst of implementing and replicating its 'marquis customer' strategy when COVID struck.  The global pandemic shut down all of the bars, restaurants, casinos, and State Stores across Pennsylvania.

43.    When things began to open back up, approximately only half of MMD's previous clientele came back on-line, and those were only at 50% capacity.

44.    The reality is: approximately 47% of all craft distillers by the end of June 2020 declared bankruptcy.

LORUBBIO0567038

45.    Then, in 2020 a shortage of the proper ethanol available for making MMD'S 'well' and premium brands of products arose.

46.    The servicing of MMD's PNC debt (with dramatically reduced revenues) became a headwind with the loan covenants on everyone's mind.

47.    The SIPHON product (called Japonica™ the effervescent liqueur) was to launch a new category of alcoholic beverages.



48.    Lorubbio risked his career on this product even though it was expensive, associated with unproven demand, and had a large liability risk.  Unfortunately, nobody would ever get a chance to try it due to COVID.

14

LORUBBIO0567039

49.     SIPHON was the straw that broke the camel's back and the one that caused Lorubbio's termination from MMD.  It was explained to Lorubbio why he could not 'sell' the SIPHON product, and he was given a direct order to NOT sell it at all cost, because it had a number flaws such as: a leaking seal around the top and under certain conditions there were concerns that the bottle could explode due to internal pressure - pushing flying glass fragments virtually everywhere.

50.     Lorubbio directly disobeyed the order, and dropped some SIPHON proto-types off at several Philadelphia establishments for trial.  Due to potentially 'exploding glass' this put all of MMD in a 'huge liability' risk.

51.     Parzych learned of this, talked to myself and others, and proceeded to terminate Lorubbio.

52.     When Lorubbio was asked for his company car and laptop, he responded with a profane hand-gesture, and stormed out of the HQ offices.

53.     Lorubbio was notified that the Police would be called for return of the company's car.

54.     He eventually dropped the car off at a service facility near his previous attorney's offices - after intentionally breaking the car's front widow and tossing the laptop on the passenger seat.

55.     Adding insult to injury, Lorubbio then proceeded to send some of MMD's intellectual property to his friends - in direct violation of his employment agreement.

56.     MMD's attorney received the following e-mail from Lorubbio's previous attorney - knowing that the company was looking for the car:

LORUBBIO0567040

**From:** Menkowitz, Michael G. <MMenkowitz@foxrothschild.com>
**Sent:** Tuesday, February 18, 2020 3:24 PM
**To:** Moran, Joseph T. <JMoran@BlankRome.com>
**Subject:**

The car will be at address below by the end of the day and I will have the keys and the ticket.
KX Auto Repair –
2429 Washington Ave
Philadelphia, PA 19146

**Michael Menkowitz**
**Fox Rothschild LLP**
2000 Market Street
20th Floor
Philadelphia, PA 19103-3222
(215) 299-2756 - direct
(215) 299-2150- fax

57.    In December of 2019 and January of 2020, the CDC, WHO, Homeland Security, and the FDA were all compiling data relating to COVID-19. By the end of January, federal agencies started to issue 'emergency use authorizations' and 'quarantine' procedures for the COVID-19 virus.

58.    Pennsylvania recorded its first COVID case on March 6th, and Pennsylvania Governor Tom Wolf mandated closure on March 15 of all bars and sit-in restaurants under Pennsylvania's COVID-19 disaster declaration order.

59.    Thus it became clear to all that MMD's loan covenants were in jeopardy of being breached:

LORUBBIO0567041



**CONTINUATION OF ADDENDU**

Anthony realized the one or both loan covenants were in jeopardy of being broken…

**4.2    Financial Reporting Requ**

2.    **Guarantor's Financia** returns for the Individual Guarantor within one hundred ____ (120) days of each calendar year end, which tax returns shall be true and correct copies of the tax re___ filed by Individual Guarantor with the Internal Revenue Service and (ii) personal financial statements f____e Individual Guarantor within one hundred twenty (120) days of each calendar year end

**4.8    Financial Covenants.**

(1)    The Borrower will maintain at all times a ratio of (i) total liabilities to (ii) Tangible Net Worth of not more than 4.00 to 1.00

(2)    The Borrower will maintain as of the end of each fiscal year, a Fixed Charge Coverage Ratio of at least 1.10 to 1.00

60.    Moreover, the new PNC LOAN Agreement was guaranteed with Lorubbio's

Cleveland, Ohio home and he signed a Confession of Judgment:

# Guaranty and
# Suretyship Agreement



THIS GUARANTY AND SURETYSHIP AGREEMENT (this "**Guaranty**") is made and entered into as of April _____, 2019, by **ANTHONY LORUBBIO** (the "**Guarantor**"), with an address at 3014 Franklin Boulevard, Cleveland, Ohio 44113, in consideration of the extension of credit by **PNC BANK, NATIONAL ASSOCIATION** (the "**Bank**") with an address at __ Walnut Grove, Horsham, Pennsylvania 19044, to **MIDNIGHT MADNESS DISTILLING LLC** (the "**Borrower**" and other good and valuable consideration, the receipt and sufficiency of which are hereby ack___

Anthony and Casey both guaranteed the loan - using their residences as collateral.

1.    **Guaranteed Obligations.**

(a)    The Guarantor hereby _____ _____ surety for (i) the prompt payment and performance of the Obligations and (ii) the prompt payment of all costs and expenses of the Bank (including reasonable attorneys' fees and expenses) incurred in the documentation, negotiation, modification, enforcement, collection and otherwise in connection with the Obligations (collectively, the "**Guaranteed Obligations**"). As used herein "**Obligations**" means all loans advances debts liabilities

LORUBBIO0567042

## Disclosure for Confession of Judgment
### (GUARANTOR)

Undersigned:        **Anthony Lorubbio**
                    **3014 Franklin Boulevard,**
                    **Cleveland, Ohio 4411.**

Lender:             **PNC Bank, National Association**
                    **2 Walnut Grove**
                    **Horsham, Pennsylvania 19044**

Cont'd: Anthony and Casey both guaranteed the loan - using their residences as collateral.

The undersigned has executed, and/or is executing, on or about the date hereof, a Guaranty and Suretyship Agreement, in respect of the obligations owed to Lender by Midnight Madness Distilling LLC, under which the undersigned is obligated to repay monies to Lender.

A.    THE UNDERSIGNED ACKNOWLEDGES AND AGREES THAT THE ABOVE DOCUMENT CONTAINS PROVISIONS UNDER WHICH LENDER MAY ENTER JUDGMENT BY CONFESSION AGAINST THE UNDERSIGNED. BEING FULLY AWARE OF ITS RIGHTS TO PRIOR NOTICE AND A HEARING ON THE VALIDITY OF ANY JUDGMENT

61.    Lorubbio's RISK tolerance was a mis-match for the entrepreneurial environment: People forget that Lorubbio graduated CMU and went to work for Mellon bank while Parzych quit CMU to follow his dream. There's a big difference in risk tolerance between a banker and an entrepreneur.

62.    Lorubbio could no longer ignore the math: Lorubbio was in charge of communicating to the investors all during MMD's life. But when PNC placed MMD's new loan into 'non-performing / foreclosure' category - three-quarters of the way through 2019, Lorubbio knew the numbers (in advance) and knew they were correct. He also could not bear to share the news with the investors (some of which were his personal friends), and therefore, went on a self-imposed, leave-of-absence. Lorubbio knew that PNC was FIRST in line for collecting any big checks being written or received.

63.    Lorubbio tried to purchase MMD with others. Unfortunately, the price that everyone came up with was much lower than the PNC loan value. Thus, with PNC's obligation being satisfied first in the 'food-chain' both Parzych and Lorubbio would be left with $0 in proceeds under these scenarios.

LORUBBIO0567043

64.    Indeed, under previous legal representation Lorubbio submitted the following as buyout methodologies that he supported.  Unfortunately, they all involved the demand PNC Loan getting paid before any investors and/or equity holders.

| Gross Profit 2019 | |
|---|---|
| Revenue | $7,971,486 |
| Less: Cost of Goods Sold | (3,691,346) |
| **Gross Profit** | **4,280,140** |

| Net Ordinary Income | |
|---|---|
| Gross Profit | 4,280,140 |
| Less: Operating Expense | (4,161,693) |
| **Net Ordinary Income** | **118,447** |

| EBITDA ADD BACKS | |
|---|---|
| Net Ordinary Income | 118,447 |
| Plus: Interest Expense | 133,204 |
| Plus: Anthony Comp/FICA | 103,550 |
| Plus: Related Expenses | 189,855 |
| Less: Related Revenue | (258,407) |
| **EBITDA** | **286,648** |

**Anthony Lorubbio's Calculation #1 =6.75 X Earnings**

| FMV Equity | |
|---|---|
| EBITDA | 286,648 |
| EBITDA Multiple | 6.75x |
| **TEV** | **1,934,877** |
| Plus: Cash | 358,327 |
| Less: Debt | (3,479,826) |
| FMV Equity | -1,186,622 |

| Anthony Lorubbio Equity Value | |
|---|---|
| FMV Equity | -1,186,622 |
| Anthony Lorubbio Equity (%) | 39.3861% |
| **Anthony Lorubbio Equity ($)** | **-$467,364** |

3 liquor company specific valuation methodologies for less than $10m in sales
1.  Revenue Model          (0.24 to 0.39 times revenues)
2.  EBITDA Multiples       (3 to 3.5 times)
3.  Seller's Discretionary Ear   (2.5 to 4.5 times)

**The average multiplier for earnings should be 3.25 for earnings and 0.325 for revenues - minus debt

19

LORUBBIO0567044

**Gross Profit 2019**

| | |
|---|---|
| Revenue | $7,971,486 |
| Less: Cost of Goods Sold | (3,691,346) |
| Gross Profit | 4,280,140 |

**Net Ordinary Income**

| | |
|---|---|
| Gross Profit | 4,280,140 |
| Less: Operating Expense | (4,161,693) |
| Net Ordinary Income | 118,447 |

**EBITDA ADD BACKS**

| | |
|---|---|
| Net Ordinary Income | 118,447 |
| Plus: Interest Expense | 133,204 |
| Plus: Anthony Comp/FICA | 103,550 |
| Plus: Related Expenses | 189,855 |
| Less: Related Revenue | (258,407) |
| EBITDA | 286,648 |

3 liquor company specific valuation methodologies for less than $10m in sales
1. Revenue Model          (0.24 to 0.39 times revenues)
2. EBITDA Multiples       (3 to 3.5 times)
3. Seller's Discretionary Eai  (2.5 to 4.5 times)

**The average multiplier for earnings should be 3.25 for earnings and 0.325 for revenues - minus debt

---

**AL's Calculation #2 (Revenue Model - 0.24 multiplier)**

**FMV Equity**

| | |
|---|---|
| Revenue | 7,971,486 |
| Revenue Multiple | 0.24x |
| TEV | 1,913,157 |
| Plus: Cash | 358,327 |
| Less: Debt | (3,479,826) |
| FMV Equity | -1,208,342 |

**Anthony Lorubbio Equity Value**

| | |
|---|---|
| FMV Equity | -1,208,342 |
| Anthony Lorubbio Equity (%) | 39.3861% |
| Anthony Lorubbio Equity ($) | -$475,919 |

**AL's Calculation #2 (Revenue Model - 0.39 multiplier)**

**FMV Equity**

| | |
|---|---|
| Revenue | 7,971,486 |
| Revenue Multiple | 0.39x |
| TEV | 3,108,880 |
| Plus: Cash | 358,327 |
| Less: Debt | (3,479,826) |
| FMV Equity | -12,619 |

**Anthony Lorubbio Equity Value**

| | |
|---|---|
| FMV Equity | -12,619 |
| Anthony Lorubbio Equity (%) | 39.3861% |
| Anthony Lorubbio Equity ($) | -$4,970 |

---

**Gross Profit 2019**

| | |
|---|---|
| Revenue | $7,971,486 |
| Less: Cost of Goods Sold | (3,691,346) |
| Gross Profit | 4,280,140 |

**Net Ordinary Income**

| | |
|---|---|
| Gross Profit | 4,280,140 |
| Less: Operating Expense | (4,161,693) |
| Net Ordinary Income | 118,447 |

**EBITDA ADD BACKS**

| | |
|---|---|
| Net Ordinary Income | 118,447 |
| Plus: Interest Expense | 133,204 |
| Plus: Anthony Comp/FICA | 103,550 |
| Plus: Related Expenses | 189,855 |
| Less: Related Revenue | (258,407) |
| EBITDA | 286,648 |

3 liquor company specific valuation methodologies for less than $10m in sales
1. Revenue Model          (0.24 to 0.39 times revenues)
2. EBITDA Multiples       (3 to 3.5 times)
3. Seller's Discretionary Eai  (2.5 to 4.5 times)

**The average multiplier for earnings should be 3.25 for earnings and 0.325 for revenues - minus debt

---

**AL's Calculation #3 (EBITDA Model = 3 multiplier)**

**FMV Equity**

| | |
|---|---|
| EBITDA | 286,648 |
| EBITDA Multiple | 3.00x |
| TEV | 859,945 |
| Plus: Cash | 358,327 |
| Less: Debt | (3,479,826) |
| FMV Equity | -2,261,554 |

**Anthony Lorubbio Equity Value**

| | |
|---|---|
| FMV Equity | -2,261,554 |
| Anthony Lorubbio Equity (%) | 39.3861% |
| Anthony Lorubbio Equity ($) | -$890,738 |

**AL's Calculation #3 (EBITDA Model = 3.5 multiplier)**

**FMV Equity**

| | |
|---|---|
| EBITDA | 286,648 |
| EBITDA Multiple | 3.00x |
| TEV | 859,945 |
| Plus: Cash | 358,327 |
| Less: Debt | (3,479,826) |
| FMV Equity | -2,261,554 |

**Anthony Lorubbio Equity Value**

| | |
|---|---|
| FMV Equity | -2,261,554 |
| Anthony Lorubbio Equity (%) | 39.3861% |
| Anthony Lorubbio Equity ($) | -$890,738 |

LORUBBIO0567045

| Gross Profit 2019 | |
|---|---|
| Revenue | $7,971,486 |
| Less: Cost of Goods Sold | (3,691,346) |
| **Gross Profit** | **4,280,140** |

| Net Ordinary Income | |
|---|---|
| Gross Profit | 4,280,140 |
| Less: Operating Expense | (4,161,693) |
| **Net Ordinary Income** | **118,447** |

| EBITDA ADD BACKS | |
|---|---|
| Net Ordinary Income | 118,447 |
| Plus: Interest Expense | 133,204 |
| Plus: Anthony Comp/FICA | 103,550 |
| Plus: Related Expenses | 189,855 |
| Less: Related Revenue | (258,407) |
| **EBITDA** | **286,648** |

3 liquor company specific valuation methodologies for less than $10m in sales
1. Revenue Model (0.24 to 0.39 times revenues)
2. EBITDA Multiples (3 to 3.5 times)
3. Seller's Discretionary Ear (2.5 to 4.5 times)

**The average multiplier for earnings should be 3.25 for earnings and 0.325 for revenues - minus debt

| AL's Calculation #4 (Sellers Discretionary Earnings Model = 2.5 multiplier) | |
|---|---|
| **FMV Equity** | |
| EBITDA | 286,648 |
| EBITDA Multiple | 2.50x |
| TEV | 716,621 |
| Plus: Cash | 358,327 |
| Less: Debt | (3,479,826) |
| FMV Equity | -2,404,878 |

| Anthony Lorubbio Equity Value | |
|---|---|
| FMV Equity | -2,404,878 |
| Anthony Lorubbio Equity (%) | 39.3861% |
| **Anthony Lorubbio Equity ($)** | **-$947,188** |

| AL's Calculation #4 (Sellers Discretionary Earnings Model = 4.5 multiplier) | |
|---|---|
| **FMV Equity** | |
| EBITDA | 286,648 |
| EBITDA Multiple | 4.50x |
| TEV | 1,289,918 |
| Plus: Cash | 358,327 |
| Less: Debt | (3,479,826) |
| FMV Equity | -1,831,581 |

| Anthony Lorubbio Equity Value | |
|---|---|
| FMV Equity | -1,831,581 |
| Anthony Lorubbio Equity (%) | 39.3861% |
| **Anthony Lorubbio Equity ($)** | **-$721,388** |

65. Mr. Scherf's suggested buyout fails to account for the following critical facts: COVID-19 started in in 2019 and reached pandemic levels in early 2020 when Lorubbio was terminated; MMD was already in default of its PNC loan obligations; and PNC was monitoring cash-flows from mid-2019 forward. Accordingly, any large checks (non-operations related) would have first been applied to paying down the PNC Loan Balance.

66. The COVID-19 global pandemic that started in 2019 was not declared over until 2023. COVID caused 110,000 hospitality and beverage companies to be permanently closed / bankrupt in 2020. The food and beverage sector was hit harder than any other industry by the pandemic – and had very little to no relief in the two stimulus packages passed through Congress. Mr. Scherf's analysis, however, fails to mention this, and brings his entire analysis into question.

67. Indeed, Mr. Scherf's report appears to recognize that by December of 2019 the economic environment was about to plummet: "Growth for all of 2019 was 2.3%, the lowest in three years. One warning sign: business investment—a prime driver of economic growth— which had declined sharply in Q2 and Q3, plunged by a revised 14.4% in Q4, possibly portending slower growth in 2020." Thus, it is clear that from a business standpoint that COVID-19 started at the

LORUBBIO0567046

end of 2019 and caused a global meltdown in 2020 and beyond. When business investment plunges a NEGATIVE 14.4% it is cause for alarm. This plunge was caused by COVID but this cause is not even mentioned in Mr. Scherf's report.

68.     Furthermore, Mr. Scherf's report appears to cherry pick November 2019 as the benchmark for his valuation—months before Lorubbio's termination and just before business began its abrupt downturn in December of 2019.

69.     Contrary to Mr. Scherf's understanding, MMD did maintain future projections of cash flows and in fact had to do that for PNC in order to explain how they were going to rectify their loan covenant non-compliance situation. Lorubbio certainly knew of these projections – because he presented some of them prior to the General Sales Meeting in January of 2020. It begs the question as to whether this information was purposefully withheld from Mr. Scherf.

70.     Mr. Scherf wrongly assumes that a 'normal' (non-COVID) bank loan repayment schedule was in place. Unfortunately, it was not. Every one of the 110,000 bars, restaurants, breweries and distilleries that went bankrupt in 2020 understood the 'COVID factor'. It also appears that he used 'average' coefficients that: (1) that were not specific to the liquor industry, and (2) that were not pre-corrected for COVID.

71.     I disagree with Mr. Scherf's 'debt-free cash flow' number because it doesn't consider that MMD was in 'non-performing' status by PNC. In 2019, MMD would have been required to take any (and all) excess cash to pay down their existing $1.9m long-term note, and an additional $1.6m in current liabilities – simply due to the nature of those liabilities. Therefore, Mr. Scherf's cash award of $3.3m would have (in reality) never gotten past PNC ($1.9m) and the other short-term liability creditors.

LORUBBIO0567047

72.    Commensurate with Mr. Scherf's previous note, business investment had crashed / "plunged by over 14%", in-bound cash had become a rare commodity as the COVID fear started in December 2019.

73.    If Mr. Scherf chose to pay Mr. Lorubbio out of 2020's proceeds, he would have had to consider a negative net income of almost $3m – along with a PNC group that wanted their +$3.6m loan paid back as quickly as we could get it them the cash.

74.    Small and Medium Sized Businesses ("SMBs") are run on a 'cash-flow' basis. The numbers from week-to-week and month-to-month are constantly reviewed versus year-over-year. To every SMB out there, cash is more important than a balance sheet or income statement – because employees get paid from cash and they are every SMB's #1 asset. Lorubbio's dramatic over-spending in the time period directly leading into COVID, cannot be over-stated. Through the remainder of 2020, MMD was balancing cash between various accounts in order to make sure all of the bills were paid.

75.    The market told us the correct / final buyout price for MMD, and it was bankruptcy. There was no grand scheme to defraud Lorubbio of his riches – there simply were just no riches.

76.    I am surprised Lorubbio did not try to save the company that he helped to build, but he 'checked-out' for the last 6 months of 2019.

77.    Parzych and the remaining leadership tried to sell MMD and included Lorubbio in on a number of the proposals. All of the buyout bids received, however, were less than $1m, and because of the Loan Covenants for PNC would get satisfied first and leave nothing for the investors (including Lorubbio and Parzych).

78.    Combine this with Lorubbio's ongoing threats of litigation, bankruptcy was the only alternative.

23

LORUBBIO0567048

79.    The surest methodology for valuation would be to measure the discounted cash flows of 2020, subtract off the loan amount - and that would be the appropriate conclusion.

80.    Unfortunately, 2020 resulted in a Liquor loss of over $2m in net income - so discounting negative cash flows is a non-starter:

**MIDNIGHT MADNESS DISTILLING, LLC**
**STATEMENT OF ASSESTS, LIABILITIES AND EQUITY**

2020

| | | % OF TOTAL | % GROW / 2019 |
|---|---|---|---|
| ASSETS | | | |
| Current Assets | | | |
| Cash | $ 248,592.82 | 23.0% | 12% |
| Accounts receivable | $ 392,415.03 | 36.2% | -33% |
| Inventory | $ 443,264.07 | 40.8% | -80% |
| Total current assets | $ 1,085,271.92 | 21.1% | -43% |
| | | | |
| Fixed Assets | | | |
| Building and improvements | $ 1,124,262.74 | 39.6% | -2% |
| Production equipment | $ 1,973,539.21 | 69.5% | -9% |
| Vehicles | $ 595,857.49 | 21.0% | 5% |
| Office equipment | $ 55,534.24 | 2.0% | 19% |
| | $ 3,748,293.68 | | -5% |
| Less accumulated depreciation | $ (909,995.00) | -32.0% | 0% |
| Total fixed assets | $ 2,839,398.68 | 55.1% | -6% |
| | | | |
| Non Current Assets | $ 869,780.51 | | |
| Pre-Paid Materials | $ 354,293.00 | 12.5% | 3% |
| Total assets | $ 5,148,644.11 | | -3% |
| | | | |
| LIABILITIES | | | |
| Current Liabilities | | | |
| Notes payable - current portion | $ 990,098.00 | 56.0% | -36% |
| Accounts payable & accrued expenses | $ 327,741.64 | 18.5% | -55% |
| Sales and payroll taxes | $ 450,076.91 | 25.5% | 1186% |
| Total current liabilities | $ 1,767,916.55 | 40.5% | -24% |
| | | | |
| Long- term liabilities | | | |
| Notes payable | $ 2,601,267.64 | | 36% |
| Total long-term liabilities | $ 2,601,267.64 | 59.5% | 36% |
| Total liabilities | $ 4,369,184.19 | 84.9% | 3% |
| | | | |
| EQUITY | | | |
| Partner's capital | $ 779,459.92 | 15.1% | -25% |
| Total liabilities and equity | $ 5,148,644.11 | | |

**MIDNIGHT MADNESS DISTILLING, LLC**
**STATEMENT OF INCOME**

| | | % OF TOTAL | % GROW / 2019 |
|---|---|---|---|
| Revenues | | | |
| Sales Alcohol | $4,710,476 | 100.0% | -41% |
| Total revenues | 4,710,476 | | |
| | | | |
| Expenses | | | |
| Materials | 1,909,390 | 39.7% | -5% |
| Payroll | 2,172,150 | 45.1% | -6% |
| Payroll taxes | 174,982 | 3.6% | 5% |
| Subcontract | 39,317 | 0.8% | -3% |
| Shipping and freight | 502,057 | 10.4% | 40% |
| Supplies | 13,269 | 0.3% | 9% |
| Total direct expenses | 4,811,164 | 62.7% | -2% |
| | | | |
| Excise taxes | 364,334 | 12.7% | -24% |
| Rent | 326,704 | 11.4% | 27% |
| Repairs and maintenance | 384,144 | 13.4% | 103% |
| Depreciation | 338,476 | 11.8% | -1% |
| Interest | 122,910 | 4.3% | -8% |
| Research and developement | 27,983 | 1.0% | -80% |
| Sales and promotion expenses | 291,822 | 10.2% | -51% |
| Travel and entertainment | 118,977 | 4.2% | -2% |
| Licenses | 37,521 | 1.3% | -37% |
| Legal and professional fees | 321,629 | 11.2% | 33% |
| Insurance | 213,536 | 7.5% | -9% |
| Bank and credit card fees | 70,257 | 2.5% | 318% |
| Office expense | 88,164 | 3.1% | 20% |
| Auto and truck | 86,642 | 3.0% | 293% |
| Utilities | 72,985 | 2.5% | 72% |
| Total indirect and administrative expenses | 2,866,083 | | -3% |
| | | | |
| Total expenditures | 7,677,247 | | -2% |
| | | | |
| Revenues in excess of expenditures | -$2,966,772 | | -2605% |

81.    One particular PNC Loan Covenant came in at 5.6 and its upper boundary was 4.0. We continued in the non-performing, foreclosure group as we were in  violation of our PNC Loan Covenants.  Corresponding 2019 financials provide the following:

24

LORUBBIO0567049

**MIDNIGHT MADNESS DISTILLING, LLC**
**STATEMENT OF ASSESTS, LIABILITIES AND EQUITY**

| | 2019 | % OF TOTAL | % GROW / 2018 |
|---|---|---|---|
| **ASSETS** | | | |
| Current Assets | | | |
| Cash | $ 222,377.00 | 11.6% | -16% |
| Accounts receivable | $ 583,958.00 | 30.6% | 6% |
| Inventory | $ 1,104,154.00 | 57.8% | 267% |
| **Total current assets** | **$ 1,910,489.00** | **37.1%** | **71%** |
| | | | |
| **Fixed Assets** | | | |
| Building and improvements | $ 1,148,155.00 | 37.9% | -2% |
| Production equipment | $ 2,175,908.00 | 71.9% | 52% |
| Vehicles | $ 567,037.00 | 18.7% | 15% |
| Office equipment | $ 46,829.00 | 1.5% | 32% |
| | $ 3,937,929.00 | | 28% |
| Less accumulated depreciation | $ (909,995.00) | -30.1% | 60% |
| **Total fixed assets** | **$ 3,027,934.00** | **57.3%** | **20%** |
| | | | |
| Non Current Assets | | | |
| Pre-Paid Materials | $ 344,293.00 | 11.4% | 175% |
| **Total assets** | **$ 5,282,716.00** | | **41%** |
| | | | |
| **LIABILITIES** | | | |
| Current Liabilities | | | |
| Notes payable - current portion | $ 1,559,072.00 | 67.0% | 394% |
| Accounts payable & accrued expenses | $ 732,307.00 | 31.5% | 28% |
| Sales and payroll taxes | $ 34,992.00 | 1.5% | -6% |
| **Total current liabilities** | **$ 2,326,371.00** | **54.8%** | **152%** |
| | | | |
| Long- term liabilities | | | |
| Notes payable | $ 1,915,554.00 | | 15% |
| **Total long-term liabilities** | **$ 1,915,554.00** | **45.2%** | **15%** |
| **Total liabilities** | **$ 4,241,925.00** | **82.4%** | **64%** |
| | | | |
| **EQUITY** | | | |
| Partner's capital | $ 1,040,791.00 | 20.2% | -11% |
| **Total liabilities and equity** | **$ 5,282,716.00** | | |

**MIDNIGHT MADNESS DISTILLING, LLC**
**STATEMENT OF INCOME**

| | | % OF TOTAL | % GROW / 2018 |
|---|---|---|---|
| **Revenues** | | | |
| Sales Alcohol | $7,971,486 | 100.0% | 10% |
| **Total revenues** | **7,971,486** | | |
| | | | |
| **Expenses** | | | |
| Materials | 2,018,054 | 41.2% | 17% |
| Payroll | 2,304,926 | 47.0% | 26% |
| Payroll taxes | 166,215 | 3.4% | 38% |
| Subcontract | 40,715 | 0.8% | -2% |
| Shipping and freight | 358,854 | 7.3% | 8% |
| Supplies | 12,175 | 0.2% | 31% |
| **Total direct expenses** | **4,900,939** | **62.4%** | **21%** |
| | | | |
| Excise taxes | 478,632 | 16.2% | -9% |
| Rent | 257,841 | 8.7% | 62% |
| Repairs and maintenance | 189,133 | 6.4% | 20% |
| Depreciation | 342,996 | 11.6% | 17% |
| Interest | 133,204 | 4.5% | 24% |
| Research and developement | 137,287 | 4.7% | -23% |
| Sales and promotion expenses | 601,032 | 20.4% | 38% |
| Travel and entertainment | 121,551 | 4.1% | 31% |
| Licenses | 59,212 | 2.0% | -26% |
| Legal and professional fees | 241,607 | 8.2% | 57% |
| Insurance | 234,779 | 8.0% | 76% |
| Bank and credit card fees | 16,816 | 0.6% | -27% |
| Office expense | 73,438 | 2.5% | -9% |
| Auto and truck | 22,058 | 0.7% | 17% |
| Utilities | 42,514 | 1.4% | -12% |
| **Total indirect and administrative expenses** | **2,952,100** | **37.6%** | **19%** |
| | | | |
| **Total expenditures** | **7,853,039** | | **20%** |
| | | | |
| Revenues in excess of expenditures | $118,447 | | -83% |

82. One particular PNC Loan Covenant came in at 4.08 and its upper boundary was 4.0. MMD was placed into the non-performing, foreclosure group as we were in violation of our PNC Loan Covenants.

83. The corresponding 2018 financials for MMD provide as follows:

LORUBBIO0567050

**MIDNIGHT MADNESS DISTILLING, LLC**
**STATEMENT OF ASSESTS, LIABILITIES AND EQUITY**

| | 2018 | % OF TOTAL |
|---|---|---|
| **ASSETS** | | |
| Current Assets | | |
| Cash | $264,560 | 23.7% |
| Accounts receivable | $553,143 | 49.5% |
| Inventory | $300,844 | 26.9% |
| **Total current assets** | **$1,118,547** | **21.7%** |
| | | |
| Fixed Assets | | |
| Building and improvements | $1,123,745 | 44.7% |
| Production equipment | $1,427,545 | 56.8% |
| Vehicles | $494,256 | 19.7% |
| Office equipment | $35,516 | 1.4% |
| | $3,081,062 | |
| Less accumulated depreciation | -$566,999 | -22.6% |
| **Total fixed assets** | **$2,514,063** | **66.9%** |
| | | |
| Non Current Assets | | |
| Pre-Paid Materials | $125,012 | 5.0% |
| **Total assets** | **$3,757,622** | |
| | | |
| **LIABILITIES** | | |
| Current Liabilities | | |
| Notes payable - current portion | $315,755 | 17.9% |
| Accounts payable & accrued expenses | $569,909 | 61.7% |
| Sales and payroll taxes | $37,330 | 4.0% |
| **Total current liabilities** | **$922,994** | **35.6%** |
| | | |
| Long- term liabilities | | |
| Notes payable | $1,670,370 | |
| **Total long-term liabilities** | **$1,670,370** | **64.4%** |
| **Total liabilities** | **$2,593,364** | **50.4%** |
| | | |
| **EQUITY** | | |
| Partner's capital | $1,164,258 | 22.6% |
| **Total liabilities and equity** | **$3,757,622** | |

**MIDNIGHT MADNESS DISTILLING, LLC**
**STATEMENT OF INCOME**

| | | % OF TOTAL |
|---|---|---|
| **Revenues** | | |
| Sales Alcohol | $7,237,720 | 100.0% |
| **Total revenues** | **$7,237,720** | |
| | | |
| **Expenses** | | |
| Materials | $1,718,958 | 42.5% |
| Payroll | $1,823,196 | 45.1% |
| Payroll taxes | $120,619 | 3.0% |
| Subcontract | $41,629 | 1.0% |
| Shipping and freight | $332,236 | 8.2% |
| Supplies | $9,282 | 0.2% |
| **Total direct expenses** | **$4,045,920** | **61.9%** |
| | | |
| Excise taxes | $528,797 | 21.2% |
| Rent | $158,986 | 6.4% |
| Repairs and maintenance | $157,680 | 6.3% |
| Depreciation | $293,608 | 11.8% |
| Interest | $107,169 | 4.3% |
| Research and developement | $178,682 | 7.2% |
| Sales and promotion expenses | $435,679 | 17.5% |
| Travel and entertainment | $92,515 | 3.7% |
| Licenses | $80,148 | 3.2% |
| Legal and professional fees | $153,497 | 6.2% |
| Insurance | $133,062 | 5.3% |
| Bank and credit card fees | $23,175 | 0.9% |
| Office expense | $80,874 | 3.2% |
| Auto and truck | $18,835 | 0.8% |
| Utilities | $48,152 | 1.9% |
| Total indirect and administrative expenses | $2,490,859 | 38.1% |
| | | |
| Total expenditures | $6,536,779 | |
| | | |
| Revenues in excess of expenditures | $700,941 | |

84.    In 2018, the PNC Loan Covenant came in at 2.23 and it had to remain below 4.0 – or MMD was in the foreclosure group. Therefore, it was in compliance with the PNC Loan Covenant.

85.    The following provides a financial snapshot of MMD:

**2018 Bank Ratio: (Upcoming Loan Covenant between 1 and 4) == 2.23**

**2019 Sales Goal vs Actual:**          $10m          vs $8m (20% short-fall)

    **Income Goal vs Actual:**          vs $0.1m (barely profitable)

    **Bank Ratio: (Loan Covenant between 1 and 4) == 4.08**

**2020 Sales Goal vs Actual:**          $10.3m          vs $4.7M (54% short-fall)

    **Sales Jan. Goal vs Actual:**     $747,000     vs $391,000

    **Income Goal vs Actual:**          vs $-$2.9m

    **Bank Ratio: (Loan Covenant between 1 and 4) == 5.61**

LORUBBIO0567051

86.     Even with the above financial results, the company continued following Lorubbio's plan up until the time when Lorubbio went on a 'self-imposed leave of absence' (mid-2019 – when the writing was on the wall).

87.     Lorubbio's termination was just good business.  He had failed to meet his own goals for 2 years – and drove MMD into bankruptcy.  Lorubbio took the company away from its core roots of providing 'well liquor' to bars and restaurants in Pennsylvania – and spent over $1m chasing: (1) a high-end Rum product; (2) a new category SIPHON product; and (3) hiring 4 national account focused individuals for: PA, NJ & NY, and Florida.

88.     Lorubbio was given control of the liquor business due to his past success from 2012 to 2018, but his 2019 and 2020 vision drove MMD into the ground.  Moreover, when the writing was on the wall – he went on a 'self-imposed-sabbatical' instead of working to get MMD back on its feet.  Then, he has the audacity to claim that it was the people's fault that fought to rebuild MMD's business.  The facts simply do not support any of Lorubbio's claims.

89.     I have expressed the foregoing expert opinions within a reasonable degree of professional certainty based on facts personally known to me through my association with MMD and the following documents I have considered that were in my personal possession, which are simultaneously being produced with this Report and are hereby incorporated by reference: CULBERTSON_0001-0541.  In addition to Mr. Scherf's Expert Report, I have also considered Plaintiff's Amended Complaint.  I reserve the right to amend or supplement my Expert Report in light of any additional fact or legal arguments that come to light in this matter.

LORUBBIO0567052

Date: June 1, 2023                    Respectfully submitted,


_____
R. F. Culbertson
*Expert Witness for the Defendants*

LORUBBIO0567053

## CERTIFICATE OF SERVICE

I certify that I served the foregoing Expert Report of R. F. Culbertson on the following counsel for the Plaintiff *via* e-mail as indicated below:

Casey Greene, Esq. (cg@SidkoffPincusGreen.com)
Rachel Dennis, Esq. (RDennis@SidkoffPincusGreen.com)
Shawn McBrearty, Esq. (SMcbrearty@sidkoffpincusgreen.com)
SIDKOFF, PINCUS & GREEN, P.C.
1101 Market Street, Suite 2700
Philadelphia, PA 19107
Phone: (215) 574-0600
Fax: (215) 574-0310

*Attorneys for Plaintiff*

Date: June 1, 2023                           Respectfully submitted,

                                             By:___*/s/ Joseph R. Heffern*_____
                                             Joseph R. Heffern
                                             Attorney I.D. No. 87819
                                             ROGERS COUNSEL
                                             25 E. Athens Ave.
                                             Ardmore, PA 19003
                                             610-649-1880 / 877-649-1880 (fax)

                                             *Counsel for Defendants Casey Parzych, Polebridge
                                             LLC, Ashleigh Baldwin, and Angus Rittenburg*

LORUBBIO0567054

# Exhibit A

LORUBBIO0567055

## R.F. CULBERTSON

17 Churchill Road                                                                    412.855.8767
Pittsburgh, PA  15235    https://www.linkedin.com/in/rfculbertson/    rfc@culbertsons.com

**WORK EXPERIENCE (partial):**
**Founder, CEO, Advisor, & Entrepreneurship Prof. at Carnegie Mellon University**
- CEO & Founder: Pittsburgh Transportation Co., … Sold via ESOP
- COO & Co-Founder: Pittsburgh MicroGuide, Inc., … Sold to IBM
- Co-Founder & CTO: LeaseTek, Inc., '88 – '99 … IPO'd (IDS) on London Exchange
- Founder: *"The Apprentice"*, '98 – '15 … M&A NBC
- Co-Founder & CEO: GetABBY, Inc., '00 – '14 … M&A TrueImage
- Financial Advisor: ModCloth, Inc., '02 - '17 … M&A Walmart
- VP Sales:  Hyliion, Inc., '14 – '17 … IPO'd (HYLN) 10/2/2020
- Financial Advisor: GetBamboo, Inc., '18 - present
- Financial Advisor: Datawallet, Inc., '17 – present
- Financial Advisor: HopScotch, Inc., '21 – present

**PRINCIPAL SPEAKING ENGAGEMENTS** (*Denotes Audience > 2,500 attendees)**:**
- Automobile & Truck Dealership Conferences (NADA*, AICPA, CBT, NIADA, IAA*, ATA*, etc.)
- Entrepreneurship Conferences (ACERE, Kaufmann*, CEE, Global E-ship Summit*, etc.)
- Global Capital Markets Conferences (RBC*, SIFMA, BMO, etc.)
- Int'l Entrepreneurship Coalition between CMU and Universidad Externado de Colombia
- Banking Conferences (ABA*, CBA*, BBA, etc.)
- Vehicle & Equipment Leasing Conferences (NVLA*, ELFA*, BVRLA, AFLA, NAELB, etc.)
- The KDKA Entrepreneurship Hour* [Radio Talk Show Host]

**EDUCATION:**
**Carnegie Mellon University:**
- Created: *"The Apprentice"* as a CMU Entrepreneurship Course – then the TV show
- Created: *"This Week in Barrons"* – current weekly circulation > 2.2M
- Adjunct Professor of Engineering, Carnegie Institute of Technology, '99 – '15
- Professor of Entrepreneurship, Don Jones Center for Entrepreneurship, '99 – '14
- Advisory Board for the Don Jones' Center for Entrepreneurship, '99 – '14
- Carnegie Mellon Innovation Network Council
  B.S. Mechanical Engineering, Carnegie Mellon University
  M.S. Industrial Administration, Carnegie Mellon University
  M.S. Computer & Process Engineering, Carnegie Mellon University
    o  Aerobic Waste Water Treatment", [Master's Thesis]
  Ph.D. Environmental Engineering (Thesis Outstanding), CMU
    o  A Total Environmental Quality Index", [Ph.D. Thesis]

**TOPICS INCLUDED:** *"The Apprentice"*, *"Startup Incinerator"*, and *"This Week in Barrons"*.
   Average class size = 250 / 300 students.  Creativity = https://youtu.be/n2QiPSe_dKk,
   Sales = https://youtu.be/blKw0zb6SZk, Startup Incinerator = https://youtu.be/ieR6yzCFldl

**TECHNICAL SKILLS:**    Java, C, Various Prog. Languages, Microsoft Office, ChatGPT

2

LORUBBIO0567056