# EXHIBIT 4

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| In re | : | Chapter 7 |
|  | : |  |
| MIDNIGHT MADNESS DISTILLING LLC, | : | Case No. 21-11750-PMM |
|  | : |  |
| Debtor. | : | Jointly Administered |
|  | : |  |
| BONNIE B. FINKEL, in her capacity as Chapter 7 Trustee for Midnight Madness Distilling LLC, | : | Adv. Proc. No. 23-00047-PMM |
|  | : |  |
| Plaintiff, | : |  |
|  | : |  |
| v. | : |  |
|  | : |  |
| CASEY PARZYCH, *et al.*, | : |  |
|  | : |  |
| Defendants. | : |  |
|  | : |  |

**PLAINTIFF'S OMNIBUS RESPONSES AND OBJECTIONS TO
<u>DEFENDANTS' INTERROGATORIES</u>**

Pursuant to Rule 7033 of the Federal Rules of Bankruptcy Procedure, Plaintiff Bonnie B.

Finkel (the "Trustee"), in her capacity as Chapter 7 Trustee for Midnight Madness Distilling LLC

(the "Debtor"), by and through undersigned counsel, serves the following responses and objections

to the Interrogatories served by Defendants Angus Rittenburg, Ashleigh Baldwin, Best Bev, LLC,

Canvas 340, LLC, Casey Parzych, Good Design, Inc., Kelly Festa, Michael Boyer, Polebridge,

LLC, R.F. Culbertson, Shawn Sheehan, XO Energy Worldwide, LLLP, XO EW LLC, AgTech PA,

1

LLC, Can Man, LLC, and Ryan Uszenski.  Plaintiff's responses and objections are based solely

on information and documents that are presently known and available to Plaintiff.  Discovery in

this case is ongoing.  Consequently, Plaintiff reserves its right to amend, modify or supplement

these Answers and Objections stated herein.  Plaintiff further reserves its right to rely on any facts,

documents or other evidence that may develop or come to Plaintiff's attention at a later date.

## GENERAL OBJECTIONS

1.      Plaintiff objects to the Interrogatories, Definitions, and Instructions to the extent

they seek to impose upon Plaintiff any obligation that is greater than that which is required by the

Federal Rules of Civil Procedure or the Federal Rules of Bankruptcy Procedure.

2.       To the extent that an Interrogatory is vague and ambiguous such that Plaintiff is

required to speculate on the scope of the Interrogatory in the context of this action, Plaintiff may

nonetheless respond to such Interrogatory, giving it what Plaintiff believes to be a reasonable

interpretation and construction.  Plaintiff, however, shall not be deemed bound by any

inconsistent interpretation applied by the Defendants.

## RESPONSES AND OBJECTIONS

## ANGUS RITTENBURG

1.      Identify all facts and Documents supporting Your assertion that "[m]any other full-time
Debtor employees utilized the Polebridge Entities' email addresses, accessed through Debtor
computers, to further the business interests of the Polebridge Entities, including Defendant
Rittenburg (angus@gooddesigninc.com), Debtor customer service representative Casey
Coughlin (ccoughlin@gooddesigninc.com), and Debtor production manager John Pitts
(john@gooddesigninc.com)," as stated in Paragraph 57 of the Amended Complaint.

ANSWER:    *See* objections and response to Rittenburg Interrogatory #10, *infra*, which are incorporated by reference herein.  By way of further response, pursuant to Federal Rule of Civil Procedure 33(d), further documents responsive to this interrogatory may be identified by examining the documents which have been and will be produced in this matter, and the burden of deriving or ascertaining the answer will be substantially the same for all parties.

2.    Identify all facts and Documents supporting Your assertion that "Defendants Casey Parzych, Rittenburg and Sheehan used Debtor resources and personnel to create a cannabis infused beverage known as Wynk seltzer," as stated in Paragraph 86 of the Amended Complaint.

ANSWER:    Plaintiff objects to this contention interrogatory as a premature, improper, and unduly burdensome attempt to force Plaintiff to marshal her case on paper while discovery is ongoing.  Plaintiff further objects to this interrogatory on the grounds that discovery is incomplete and the Defendants have not yet produced a single document in response to Plaintiff's requests for production.

Subject to and without waiving the foregoing objections, publicly available documents filed with the Government of the United States Virgin Islands establish that AGTech VI LLC was formed on September 1, 2020 and is ultimately controlled by Defendant Sheehan.  *See* TRUSTEE19422.  Publicly available documents filed with the Pennsylvania Department of State establish that, shortly thereafter, on November 25, 2020, Defendant Casey Parzych, as organizer, caused Defendant AGTech PA LLC (then known as American Cannabis LLC) to file its certificate of organization.  TRUSTEE18402.  A publicly available document filed with the Pennsylvania Department of State establishes that, on April 26, 2021, American Cannabis LLC

3

filed a document with the Pennsylvania Department of State to change its name to AgTech PA

LLC ("AgTech PA"), thus establishing it as related to AGTech VI LLC. *Id.* The document was

signed by Defendant Casey Parzych as President of AgTech PA and indicates that it should be

returned to Defendant Festa via the email address kellyfesta@drinkwynk.com. *Id.* A July 14,

2021 press release issued by Defendants to advertise the Wynk product states that Wynk was

founded by Defendants Casey Parzych, Rittenburg, and Sheehan "[a] little over a year ago," i.e.,

contemporaneously with the registration of AgTech VI and AgTech PA. *See* FG029410.

A screenshot of undated solicitation emails from Defendant Culbertson establish that

Defendant Culbertson represented that he is "reaching out on behalf of a beverage manufacturer

based outside of Philadelphia[, i.e., the Debtor]. We've been making liquor since 2011, cannabis

beverages since 2015, and are the largest 'well-liquor' producer in the tri-state area. We're

developing infrastructure to create THC beverages at processing facilities nationwide" and "[w]e

have the infrastructure and programming in place in MI, OH, FL and MA to launch a national THC

beverage in 2021." *See* LORUBBIO0570238-39. The website of the Cannabis Beverage

Association features a member page for "WYNK ;)", listing its telephone number as (215) 565-

5845, a phone number which is listed as belonging to the Debtor on vendor invoices. *See*

https://cannabisbeverageassociation.org/members/wynk/; Bankr. E.D. Pa. No. 21-11750-mdc,

Claim 33-1. Moreover, hidden system files on a Debtor hard drive which has been produced to

Defendants in this litigation reveals that multiple individuals used Debtor resources for the benefit

of the Wynk Entities.

On April 19, 2022[1], current Wynk Seltzer Brand Manager Casey Coughlin posted the

following to her LinkedIn page, indicating that, on April 19, 2021 (while still a full-time

employee of the Debtor), she was "[w]rapping up Wynk's 1st mobile production run in Ohio":



The vehicle depicted in Ms. Coughlin's post is the "Wynk Wagon" described in detail in the

aforementioned July 14, 2021 press release.  Debtor credit card records establish that the Debtor—

not the Wynk Entities—paid for Ms. Coughlin's travel to Ohio, including:

---

[1] Historical LinkedIn posts do not publicly display the exact date on which a post was made, instead giving an approximation based off the date the post was viewed (in the case of this post, approximately "1 yr" from the June 6, 2023 date on which the screenshot was taken).  The exact posting date, however, is available within computer code used to display the LinkedIn website and a publicly available internet tool (https://ollie-boyd.github.io/Linkedin-post-timestamp-extractor/) can use the URL of a given LinkedIn post to display the exact date the post was made.  Utilizing this tool, the Trustee's special counsel determined that the LinkedIn post was made on April 19, 2022.

a. On April 18, 2021, a $200.45 charge at the Hampton Inn in Gallipolis, Ohio;

b. On April 18, 2021, an $18.46 charge to the United Dairy Farmers convenience store in Columbus, Ohio;

c. On April 18, 2021, a $15.78 charge to a Bob Evans restaurant in Jackson, Ohio;

d. On April 18, 2021, a $30.52 charge to a Target in Columbus, Ohio;

e. On April 19, 2021, a $2.95 charge to a Starbucks in Columbus, Ohio;

f. On April 20, 2021, a $23.00 charge to Jolly Pirate Donuts in Newark, Ohio;

g. On April 20, 2021, a $96.80 charge to Destination Donuts in Columbus, Ohio;

h. On April 23, 2021, a total of $41.43 in charges to a BP gas station in Columbus, Ohio;

i. On April 23, 2021, a $973.01 charge to Budget Rent-A-Car in Columbus Ohio for a vehicle which was rented from 4/19/21 until 4/23/21;

j. On April 23, 2021, a $719.10 charge to the Canopy by Hilton hotel in Columbus, Ohio;

k. On April 23, 2021, a $26.44 charge to Duck Donuts in Mason, Ohio; and

l. On April 23, 2021, a $313.40 charge to American Airlines for travel from Columbus, Ohio to Philadelphia. *See* CI-013SM6M AMEX 000001 - CI-013SM6M AMEX 001552.

6

Contemporaneous with the Debtor-funded launch of the Wynk Wagon, numerous invoices were billed to the Debtor yet either explicitly stated that they were for purposes related to Wynk Seltzer or called for deliveries to 2512 Quakertown Road, Pennsburg, Pennsylvania ("2512 Quakertown Road"), an address which was never disclosed by the Debtor as part of its operations, and which is listed as Wynk's address on the website of the Cannabis Beverage Association. *See* FG041064 (10/5/21 email from Millstone Attorney Patricia Jefferson to the Debtor's bankruptcy counsel listing invoices that Defendant Festa "sent over for payment approval. . . . As you will see, Kelly is requesting that MMD pay $16,035 for shipments that Either went to 2512 Quakertown Road, Pennsburg PA, or were shipped by Drink Wynk."); JM000200, 204 (5/4/21 Palmer Beverage Solutions LLC invoices for equipment billed and shipped to the Debtor, yet which AgTech VI's counsel represented was paid for by AgTech VI); JM000203, 209 (5/3/21 Palmer Beverage Solutions LLC invoices for equipment billed and shipped to the Debtor, yet which AgTech VI's counsel represented was paid for by AgTech VI); JM000208 (3/30/21 Linker Equipment Corporation Invoice for equipment billed and shipped to the Debtor, yet which AgTech VI's counsel represented was paid for by AgTech VI); JM000216, 225 (3/11/21 CODI Manufacturing invoices for equipment billed and shipped to the Debtor, yet which AgTech VI's counsel represented was paid for by AgTech VI); JM000221 (1/7/21 Scott Laboratories invoice for equipment billed and shipped to the Debtor, yet which AgTech VI's counsel represented was paid for by AgTech VI); JM000222 (5/5/21 Palmer Beverage Solutions invoice for equipment billed and shipped to the Debtor, yet which AgTech VI's counsel represented was paid for by AgTech

7

VI); JM000223 (4/29/21 Palmer Beverage Solutions invoice for equipment billed and shipped to the Debtor, yet which AgTech VI's counsel represented was paid for by AgTech VI); JM000227 (2/12/21 Linker Equipment Corporation Invoice for equipment billed and shipped to the Debtor, yet which AgTech VI's counsel represented was paid for by AgTech VI); JM000229 (4/16/21 CODI Manufacturing invoices for equipment billed and shipped to the Debtor, yet which AgTech VI's counsel represented was paid for by AgTech VI); MILLSTONE000457 (4/21/22 Rockwell Automation invoice for equipment shipped, sold, and billed to "Wynk" at 118 N. Main).

Additionally, on May 11, 2021, the Wynk Entities arranged for the shipment of industrial equipment to 2600 Milford Square Pike, Quakertown PA 18591 ("2600 Milford"), a location which was paid for by the Debtor, *see* NML001465 (Defendant Casey Parzych, acting on behalf of the Debtor, executes a lease agreement for 2600 Milford).  The point is established by a May 11, 2021 invoice from Stover-Sensor Controls, Inc. to Wynk c/o AgTech VI, produced by the Trustee under Bates-number JM000224, listing Part Number 540313-0001 with the description 1/2" F Linear Trim, 316," with a Ship To address of 2600 Milford Square Pike.  Other equipment related to Wynk's operations was sent to the Debtor's headquarters at 118 N. Main.  *See* JM000199 (5/10/21 CODI Manufacturing invoice for equipment "sold to" AgTech VI yet shipped to the Debtor at 118 N. Main); JM000210 (5/17/21 Keyence invoice for equipment billed to ETOH Worldwide and shipped to "American Cannabis LLC" at 118 N. Main); JM000217 (5/24/21 Palmer Beverage Solutions invoice for equipment billed to ETOH Worldwide yet shipped to the Debtor at 118 N. Main); JM000219 (5/18/21 Palmer Beverage Solutions invoice for equipment billed to ETOH

8

Worldwide yet shipped to the Debtor at 118 N. Main); JM000220 (6/4/21 Palmer Beverage Solutions invoice for equipment billed to ETOH Worldwide yet shipped to the Debtor at 118 N. Main); JM000231 (3/4/21 Burt Process Equipment invoice for equipment billed to "American Cannabis" yet shipped to the Debtor at 118 N. Main).

On May 6, 2021, Casey Coughlin – who identified herself on her LinkedIn page as an employee of the Debtor and Wynk – posted the following to her facebook page: "Hiring spree! Beverage production in Quakertown (don't sleep on it) at Faber Distilling. . . . Signing bonus, referral bonus, bonus for breathing.  Name your bonus."  Ms. Coughlin's hiring efforts – while ostensibly made on behalf of the Debtor – were intended to benefit the Wynk Entities and the other Pilfering Entities, as a company on the verge of a bankruptcy filing would likely not make such extraordinary hiring expenditures.

On June 1, 2021, despite knowing that the Debtor's bankruptcy filing was imminent, Defendant Casey Parzych, acting on behalf of the Debtor, executed a Consulting Services Agreement with DPG Management, LLC ("DPG") under which DPG was to provide human resources consulting services more fully described in a proposal dated May 20, 2021.  FG043998. The May 20, 2021 DPG proposal, while addressed to the Debtor, is entitled "Wynk – Proposal," and provides for comprehensive human resources programs and assessments which would be of no use to a company about to file for bankruptcy. *See* TRUSTEE19113.  Accordingly, the services provided by DPG, although contracted and paid for by the Debtor, were used by Defendants to benefit the Pilfering Entities.

9

On July 26, 2021, counsel to the United States Trustee held a Section 341 meeting at which Defendant Casey Parzych testified under penalty of perjury, inter alia, that the Debtor had no relationship with Wynk Seltzer.  This testimony was willfully false -- that same day, a creditor which participated in the meeting emailed counsel for the United States Trustee, forwarding an email from a representative of Classic Staffing Services, Inc. (stating that a Debtor representative told her that "Drink Wynk, Theo and Opp, and Faber were one and the same"), and pointing out that it establishes the "opposite of what [Defendant Casey Parzych] testified [to] on today's call re: DrinkWynk's relationship to Midnight Madness."  *See* JM000280-81.  Mr. Blobe's LinkedIn profile states that he was a full-time employee of the Debtor from May 2020 through September 2021 and a full-time employee of the Wynk Entities from May 2021 through February 2022.  *See* TRUSTEE18987.

In an email dated July 26, 2021 to counsel to the United States Trustee, PNC attorney Jennifer Maleski forwarded a link to the website drinkwynk.com, noting that Defendant Casey Parzych was "listed on the company website (as a founder).  Note the very bottom states that the trademarks are owned by …… AgTech.  None of this has been disclosed despite all connections between MMD/Buyer Affiliates disclosed last week."  JM000311.  Another July 26, 2021 email from Attorney Maleski states that "the failed transaction with XO Energy that the other shareholder blew up pre-petition was for a purchase price of more than $2.5 million.  Creditors are now at risk of ETOH taking the company for $1.5 million ($1,025,000 cash plus assumption of $450,000 in secured debt) and Casey getting the benefit of whatever side deals he's negotiated and this co-

10

venture with Wynk.  If you assume $2.5 million is the floor, fulsome marketing and a fair auction (overseen by a true fiduciary) could get unsecured creditors paid." JM000280.  Attorney Maleski further confirmed that confirmed that numerous Debtor employees were simultaneously working for the Debtor and for the Wynk Entities.  JM000279; FG029387.

On August 6, 2021, in response to questioning from counsel from the United States Trustee, the Debtor represented that:

> The debtor does not now and never has provided services to any companies for the purpose of unlawfully manufacturing, storing, distribution, or using a controlled substance as defined under federal law.
>
> The debtor has no knowledge of a company called DrinkWynk. Wynk seltzer is a product.
>
> Casey Parzych is the sole member of AgTech PA LLC ("AgTech"). Agtech contracts with different cannabis processors to produce Wynk seltzer.  None of the debtor's assets (including but not limited to the collateral of the PNC Loans) are currently used by or in the business operations of AgTech nor have they ever been used by or in the business operations [sic] AgTech.  AgTech lawfully provides services to cannabis companies using assets that are not and never were owned by the debtor.

See FG031212.  This statement, like Defendant Casey Parzych's testimony at the Section 341 meeting, is demonstrably false given the numerous instances described herein and in the Amended Complaint of the Wynk Entities using the Debtor's equipment, facilities, and employees.

Documents filed with the Bankruptcy Court by Millstone for the purpose of objecting to the Sheehan Entities' requests for allowance of expense reimbursement aptly summarize the

11

chilling effect of the Defendants' misconduct on the bidding at the Section 363 auction and the

inextricable intertwinement of the Debtor, the Sheehan Entities, and the Wynk Entities:

> [t]he Stalking Horse bid[, i.e., the Sheehan Entities' collusive initial bid for the Debtor's assets,] did not serve as a catalyst for additional bids. The mere fact that the Stalking Horse bidder was an insider of the Debtor with intimate and preexisting knowledge of the assets to be sold, and that Finland Leasing (the Debtor's landlord for 2300 Trumbauersville Road and Casey Parzych's father) made clear he would only lease to [Sheehan Entity] ETOH, certainly dissuaded true third party purchasers. Millstone was the only bidder at the auction other than ETOH and PNC, and even then, the Debtor attempted to prevent Millstone from bidding by announcing, at the auction with no advance warning, that the Debtor would not consider the bids apples-to-apples unless Millstone agreed to pay ETOH's administrative expense claim. If ETOH's insider status wasn't . . . enough to chill bidding, the Debtor's overwhelming support of the Stalking Horse surely did. . . . ETOH had unfettered access to information regarding the valuation of the Debtor's assets and its business operations for months, if not longer, before the bankruptcy was filed.
>
> * * *
>
> The [Sheehan Entities'] and the Debtor's businesses and management have been inextricably [i]ntertwined since well before this bankruptcy case was filed[.] . . . The [Sheehan Entities] are insiders of the Debtor, . . . [and] the transactions resulting in the [Sheehan Entities'] request for an administrative claim were not arms-length[.] . . . Millstone submits that the invoices for many of the parts associated with [equipment which is the subject of the aforementioned sham lease agreements between the Sheehan Entities and the Debtor] demonstrates the [Sheehan Entities'] insider relationship. For example, several of the invoices that appear to be for pieces of the Leased Equipment were billed to "Kelly Festa, Etoh Worldwide." . . . Ms. Festa was, at all relevant times, the Debtor's

12

> chief operating officer.  Other invoices reflect equipment that was billed and shipped to a company called "American Cannabis" located at the Debtor's business address and "ordered by Kelly Festa." . . . While the Debtor was never in the business of cannabis production, the venture formed by Debtor's members, Casey Parzych and Angus Rittenburg, with the indirect owner of the [Sheehan Entities], Shawn Sheehan, were in that business, through their "Wynk" business.  Yet other invoices [pertaining to equipment used by the Wynk Entities] were billed directly to "Theobald & Oppenheimer," the dba used by the Debtor.

*See* Bankruptcy Docket D.I. No. 214.

Defendant Sheehan (using his Sheehan Entities email address, ssheehan@xo-energy.com, and his Wynk Entities email address, shawn@drinkwynk.com) and Sheehan Entities CFO John Charette (using his Wynk Entities email address, johncharette@drinkwynk.com) were copied on otherwise privileged emails between the Debtor, its bankruptcy counsel, and/or its accountants concerning the Debtor's bankruptcy strategy.  *See, e.g.,* FG009683 (6/9/21 email from Defendant Festa to the Debtor's bankruptcy counsel, copying John Charette at johncharette@drinkwynk.com); FG016871 (6/25/2021 email chain including Defendant Festa, the Debtor's accountants, the Debtor's bankruptcy counsel, and John Charette at johncharette@drinkwynk.com); FG020161 (July 7, 2021 email chain including Defendant Casey Parzych, Debtor's bankruptcy counsel, and Shawn Sheehan at shawn@drinkwynk.com discussing the Debtor's bankruptcy communications strategy).

Numerous individuals employed by the Debtor used Wynk Entities email addresses, including in emails conducting Debtor business and otherwise privileged emails with Debtor

attorneys. *See, e.g.,* FG041119 (10/7/21 invoice from Defendant Culbertson listing an rf@drinkwynk.com email address and requesting reimbursement from the Debtor for liquor deliveries); BR010166 (Defendant Parzych copies Defendant Culbertson at rf@drinkwynk.com on an otherwise privileged 4/6/21 email to Debtor's outside counsel); BR010264 (4/7/21 email from Defendant Culbertson at rf@drinkwynk.com to Debtor's outside counsel concerning Debtor's litigation strategy);  FG004019 (5/13/21 email evidencing Defendant Rittenberg's use of the Debtors copier/scanner to send documents to angus@drinkwynk.com, which he subsequently forwards to Defendants Casey Parzych at casey@drinkwynk.com and Festa at kellyfesta@drinkwynk.com); FG017237 (June 2021 email chain including Defendant Boyer, Defendant Casey Parzych at casey@drinkwynk.com, and Debtor's bankruptcy counsel discussing Debtor's bankruptcy strategy); MBOYER000282 (5/19/21 email chain with Defendant Boyer, Defendant Casey Parzych at casey@drinkwynk.com, and Defendant Culbertson at rf@drinkwynk.com in which they Discuss the Debtor's litigation strategy); MBOYER000558 (5/5/21 email chain with Defendant Boyer, Defendant Casey Parzych at casey@drinkwynk.com, and Defendant Culbertson at rf@drinkwynk.com in which they Discuss Debtor business and the Debtor's bankruptcy strategy); NYE004881 (March and April 2021 email chain with Defendant Boyer, Defendant Casey Parzych at casey@drinkcannabisusa.com and casey@drinkwynk.com), Defendant Culbertson, and Debtor's outside counsel in which they discuss the Debtor's litigation strategy); BR006852 (12/28/2020 email chain in which Defendant Boyer, Defendant Casey Parzych at casey@drinkcannabisusa.com, Defendant Culbertson at rf@drinkcannabisusa.com,

14

and the Debtor's outside counsel discuss litigation strategy).

3. Identify all facts and Documents supporting Your assertion that "Debtor computers were used to access email addresses associated with Wynk Seltzer, including those belonging to Defendant Casey Parzych (casey@drinkwynk.com and casey@drinkcannabisusa.com), Defendant Rittenburg (angus@drinkwynk.com), Defendant Festa (kellyfesta@drinkwynk.com), Defendant Culbertson (rf@drinkwynk.com and rf@drinkcannabisusa.com), Sheehan Entities' employee Kelli Sheehan (kellisheehan@drinkwynk.com), and Debtor customer service representative Casey Coughlin (ccoughlin@drinkwynk.com)," as stated in Paragraph 92 of the Amended Complaint.

ANSWER: *See* objections and response to Rittenburg Interrogatory #2, *supra*, which are

incorporated by reference herein. Subject to and without waiving the foregoing objections, by

way of further response, pursuant to Federal Rule of Civil Procedure 33(d), further documents

responsive to this interrogatory may be identified by examining the documents which have been

and will be produced in this matter, and the burden of deriving or ascertaining the answer will be

substantially the same for all parties.

4. Identify all facts and Documents supporting Your assertion that "numerous individuals used their Wynk Entities email accounts in communications concerning the Debtor and its bankruptcy, many of which would have been otherwise privileged communications with the Debtor's attorneys, including: Defendant Casey Parzych (casey@drinkwynk.com and casey@drinkcannabisusa.com), Defendant Rittenburg (angus@drinkwynk.com), Defendant Festa (kellyfesta@drinkwynk.com), Defendant Culbertson (rf@drinkwynk.com and rf@drinkcannabisusa.com), and Defendant Sheehan (shawn@drinkwynk.com)," as stated in Paragraph 101 of the Amended Complaint.

ANSWER: *See* objections and response to Rittenburg Interrogatory #2, *supra*, which are

incorporated by reference herein. Subject to and without waiving the foregoing objections, by

way of further response, pursuant to Federal Rule of Civil Procedure 33(d), further documents

responsive to this interrogatory may be identified by examining the documents which have been

15

and will be produced in this matter, and the burden of deriving or ascertaining the answer will be

substantially the same for all parties.

5.      Identify all facts and Documents supporting Your assertion that "Defendants Casey Parzych, Rittenburg, Baldwin, Festa, Culbertson, Uszenski, Best Bev, LLC, Can Man, EtOH Worldwide, LLC and AgTech VI have failed to cooperate," as stated in Paragraph 195 of the Amended Complaint.

ANSWER:     Plaintiff objects to this contention interrogatory as a premature, improper, and

unduly burdensome attempt to force Plaintiff to marshal her case on paper while discovery is

ongoing.  Plaintiff further objects to this interrogatory on the grounds that discovery is

incomplete and the Defendants have not yet produced a single document in response to the

Plaintiff's requests for production.  Subject to and without waiving the foregoing  objections,

undersigned counsel sent requests for documents and testimony pursuant to E.D.Pa. Local Rule

2004-1 as follows:

| Date | Defendant | Mode of Delivery |
|---|---|---|
| 4/14/2023 | Casey Parzych | Email and US Mail |
| 4/14/2023 | Angus Rittenburg | FedEx and Email |
| 4/14/2023 | Ashleigh Baldwin | FedEx and US Mail |
| 5/9/2023 | Ryan Uszenski | Email |
| 5/9/2023 | Best Bev, LLC | Email |
| 5/29/2023 | Can Man, LLC | Email |
| 4/5/2023 | EtOH Worldwide, LLC | Email |
| 4/5/2023 | AgTech VI, LLC | Email |

Incredibly, Defendants Casey Parzych, Rittenburg, Baldwin, Uszenski, Best Bev, LLC, and Can

Man, LLC failed to respond in any manner to the request.  EtOH Worldwide, LLC and AgTech

VI, LLC initially responded through counsel that the request and a subsequent substantially

16

narrowed request was overbroad, but failed to respond in any manner to undersigned counsel's

inquiry into how the substantially narrowed request – which could be easily honored via a simple

email search – was overbroad.

6.      Identify all facts and Documents supporting Your assertion that "[t]he Insider Defendants breached their fiduciary duties to the Debtor" by "[u]sing or allowing to be used the Debtor's funds for the use of the Pilfering Entities or the personal use of Defendants Casey Parzych and Rittenburg," as stated in Paragraph 204 of the Amended Complaint.

ANSWER:     Plaintiff objects to this contention interrogatory as a premature, improper, and

unduly burdensome attempt to force Plaintiff to marshal her case on paper while discovery is

ongoing.  Plaintiff further objects to this interrogatory on the grounds that discovery is

incomplete and the Defendants have not yet produced a single document in response to the

Plaintiff's requests for production.  Plaintiff further objects to this interrogatory as calling for a

legal conclusion.  By way of further response, *see* objections and responses to Rittenburg

Interrogatory #2, *supra*, Rittenburg Interrogatory #10, *infra*, Best Bev Interrogatory #1, *infra*,

and Rittenburg Interrogatory #7, *infra*, which are incorporated by reference herein.

 7.      Identify all facts and Documents supporting Your assertion that "the Defendants was enriched and received economic and other benefits from the Debtor without justification," when "Defendant Casey Parzych's and Rittenburg's receipt of the Parzych/Rittenburg Purchases," as stated in Paragraph 240 of the Amended Complaint.

ANSWER:     Plaintiff objects to this contention interrogatory as a premature, improper, and

unduly burdensome attempt to force Plaintiff to marshal her case on paper while discovery is

ongoing.  Plaintiff further objects to this interrogatory on the grounds that discovery is

incomplete and the Defendants have not yet produced a single document in response to the

17

Plaintiff's requests for production.  Subject to and without waiving these objections, the quoted

language is one of many listed examples cited in Paragraph 240 of the Amended Complaint of

Defendants receiving economic and other benefits from the Debtor without justification, with the

Parzych/Rittenburg Purchases described in detail in Paragraph 178 of the Amended Complaint,

which purchases are evidenced by the Debtor's American Express credit card statements (CI-

013SM6M AMEX 000001 - CI-013SM6M AMEX 001552) and the facially obvious non-Debtor

nature of the purchases.

8.      Identify all facts and Documents supporting Your assertion that "Defendants Casey
Parzych and Rittenburg generated Work Product . . . 1) related to the Debtor's Business (i.e.,
selling, making, marketing, distributing or otherwise engaging in the liqueur, spirits, carbonated
beverage, seltzer, general beverage, or alcoholic beverage business); 2) was conceived, created,
reduced to practice, developed, or made entirely or in any part during the time Parzych and
Rittenburg were performing services for the Debtor; and 3) was conceived, created, reduced to
practice, developed, or made entirely or in any part using the equipment, supplies, facilities,
assets, materials, information and resources of the Debtor," as stated in Paragraph 250 of the
Amended Complaint.

ANSWER:     Plaintiff objects to this contention interrogatory as a premature, improper, and

unduly burdensome attempt to force Plaintiff to marshal her case on paper while discovery is

ongoing.  Plaintiff further objects to this interrogatory on the grounds that discovery is

incomplete and the Defendants have not yet produced a single document in response to the

Plaintiff's requests for production.  By way of further response, *see* objections and responses to

Rittenburg Interrogatory #2, *supra*, Rittenburg Interrogatory #10, *infra*, and Best Bev

Interrogatory #1, *infra*, which are incorporated by reference herein.

18

9.      Identify all facts and Documents supporting Your assertion that "Debtor experienced rapid growth—from almost nothing to $10 million in annual sales—developing, manufacturing, marketing and selling thirty+ distilled spirit products, with its most prominent products bearing the Faber brand," as stated in Paragraph 40 of the Amended Complaint.

ANSWER:      Plaintiff objects to this contention interrogatory as a premature, improper, and unduly burdensome attempt to force Plaintiff to marshal her case on paper while discovery is ongoing.  Plaintiff further objects to this interrogatory on the grounds that discovery is incomplete and the Defendants have not yet produced a single document in response to the Plaintiff's requests for production.  Subject to and without waiving these objections, the Debtor's 2020 tax return reports over $9.9 million in sales.  TRUSTEE012495.

10.      Identify all facts and Documents supporting Your assertion that "Insider Defendants caused the Debtor to manufacture, bottle, and sell hand sanitizer under the Faber brand," as stated in Paragraph 62 of the Amended Complaint.

ANSWER:  Plaintiff objects to this contention interrogatory as a premature, improper, and unduly burdensome attempt to force Plaintiff to marshal her case on paper while discovery is ongoing.  Plaintiff further objects to this interrogatory on the grounds that discovery is incomplete and the Defendants have not yet produced a single document in response to the Plaintiff's requests for production.  Subject to and without waiving these objections, on April 19, 2019, the Debtor entered into a Loan Agreement and a Security Agreement with PNC pursuant to which it ultimately borrowed approximately $2.5 million.  *See* NYE008037 and attachments thereto.  To secure the loan, PNC received a first lien on all personal property of the Debtor and a second mortgage on the Debtor's headquarters at 118 North Main St., Trumbauersville in Bucks

19

County ("118 North Main").  *See id.*  Publicly available documents establish that, effective April 19, 2019 – the same date that the Debtor executed the PNC Loan Agreement – Defendant Baldwin formed Defendant Polebridge as a Pennsylvania limited liability company, listing its registered office as the Debtor's headquarters at 118 North Main.  TRUSTEE17978.  Using Debtor computers, Defendant Festa provided administrative support for the filing of Polebridge's registration documents -- Defendant Festa was Polebridge's Treasurer and Secretary and a Debtor hard drive provided to the Trustee by Millstone contains Defendant Festa's "Users" folder, which contains numerous documents demonstrating her systematic provision of administrative services to Polebridge using a Debtor computer.

On May 23, 2019, Defendants Baldwin and Rittenburg formed Defendant Good Design as a British Columbia corporation, listing the Debtor's headquarters as the incorporators' address. Using Debtor computers, Defendant Festa provided administrative support for the filing of Good Design's registration documents -- a Debtor hard drive provided to the Trustee by Millstone contains Defendant Festa's "Users" folder, which contains numerous documents demonstrating her systematic provision of administrative services to Good Design using a Debtor computer, including copies of Good Design's registration documents and other documents relevant thereto. Publicly available document establish that, on February 4, 2020, Defendant Baldwin caused Polebridge to register "Good Design" as a fictitious name with the Pennsylvania Department of State, listing "canning," a key line of business of the Debtor, as the "nature of the business or other activity to be carried on under or through the fictitious name."  TRUSTEE19272.

The Polebridge Entities' first project was CBDelight seltzer, a carbonated beverage containing cannabis derivatives.  While sometimes described to the public as a Good Design product, publicly available documents establish that "C B Delight" was in fact a trademark filed by the Debtor on April 17, 2019.  On August 1, 2019, Defendants issued a press release stating that "Cbdelight (a division of Good Design Inc.) announced that it has partnered with Pennsylvania-based distributor Nittany Beverage to expand the brand's footprint in Pennsylvania. . . . Ashleigh Baldwin, CEO of Good Design Inc., remarked: 'With Chad Merriweather and Kelli Scozzaro working with Nittany's seasoned team, we're going to hit it out of the park.'"  *See* https://www.bevnet.com/news/2019/cbdelight-partners-with-nittany-beverage-to-expand-pennsylvania-footprint/.  At the time of the press release, Kelli Scozzaro and Chad Merriweather were full time employees of the Debtor.

Defendant Culbertson's LinkedIn page states that he has been employed in sales and marketing for Good Design since January 2019 and further states that "[o]ur cbDelight product is one of the top selling products in the tri-state area. . . . Our new Siphon device allows anyone to carbonate any drink with CBD – anywhere – at a far reduced price point."  TRUSTEE17675.  The "Siphon device" referenced by Defendant Culbertson constituted or utilized the Debtor's intellectual property, as established by a May 19, 2019 email from Defendant Culbertson to "All T&O" employees, stating that Culbertson has "attached a document (and corresponding video. . . ) on our newest offering: a patented CBD delivery device called: *Siphon*."  *See* LORUBBIO0000253.  The siphon device is further described in the following documents:

JM000123 (Complaint filed on 4/22/21 by former Debtor principal Anthony Lorubbio against Defendant Parzych, in which Lorubbio swore under penalty of perjury that Debtor resources were provided to Defendant Good Design, Inc. "at no charge.  These resources included use of the [Debtor's] sales team and its manufacturing capabilities to develop, promote, and manufacture CBD products . . . and a CBD-dispensing apparatus under the name 'siphon,' originally a concept conceived by the Debtor and its employees").  The Debtor utilized Defendant Culbertson's Polebridge Entities' email address (rf@gooddesigninc.com) on its application for a Paycheck Protection Program loan.  *See* TRUSTEE000283.

While employed full-time as the Debtor's CFO, Defendant Festa utilized a Polebridge Entities email address (kellyfesta@gooddesigninc.com), which she accessed using the Debtor's computer equipment.  *See, e.g.,* RFRANK000391.  On numerous occasions, Defendant Casey Parzych conducted Debtor business, including communications with Debtor's outside counsel, using his Polebridge Entities email address (casey@gooddesigninc.com).  *See, e.g.,* BR001896.  Many other full-time Debtor employees utilized the Polebridge Entities' email addresses, accessed through Debtor computers, to further the business interests of the Polebridge Entities, including Defendant Rittenburg (angus@gooddesigninc.com), Debtor customer service representative Casey Coughlin (ccoughlin@gooddesigninc.com), and Debtor production manager John Pitts (john@gooddesigninc.com).  *See, e.g.,* MBOYER002540; MBOYER002562.

CBDelight's Facebook page lists its telephone number as (215) 268-6071, a telephone number owned, paid for, and utilized by the Debtor, and staffed by Debtor employees.

22

TRUSTEE17794.   The LinkedIn page of John Aguilar—a Debtor account manager from November 2019 through November 2020—emphasizes that, while employed full-time by the Debtor, he "[d]eveloped, maintained and grew a target account list within Philadelphia market that drove volume & brand recognition for . . . CBDelight," and which resulted in a 40% increase in brand growth for CBDelight.  TRUSTEE18824.

An April 19, 2019 presentation approved by Defendant Parzych to train Debtor sales representatives announced new Debtor product CBDelight as Debtor's top "mission critical" priority:



*See* TRUSTEE17015.

A Debtor marketing presentation entitled "Theobald & Oppenheimer Leadership Brands

23

Presentation" features numerous CBDelight slides emphasizing that the Debtor makes, cans, and

delivers the CBDelight product:



*See* TRUSTEE013118.

In March 2020, after the WHO declared COVID-19 a global pandemic and bars throughout

the United States shut down due to government orders, the Insider Defendants caused the Debtor

to manufacture, bottle, and sell hand sanitizer under the Faber brand ("Faber Hand Sanitizer"),

24

which had been trademarked by the Debtor in 2016. As they did with CBDelight, Defendants diverted the proceeds and profits from the massively lucrative Faber Hand Sanitizer out of the hands of the Debtor where they rightfully belonged and into the pockets of Defendants—funneled through the Polebridge Entities.

Good Design's LinkedIn profile describes its business as "[m]anufacturing," specifically "[m]aking beverages and FDA-approved hand sanitizer for hospitals, grocery stores, employees and everyday Americans." TRUSTEE17667. Defendant Baldwin's LinkedIn profile lists her former employment as CEO of Good Design, which she states "makes consumer goods including spirits, sodas and hand sanitizer. We are registered with the FDA and are currently supplying hand sanitizer to several of the largest healthcare systems in the U.S." Defendant Baldwin's profile further states that Good Design "is a good kind of consumer goods company. We invent and make delightful spirits, sodas and other consumer products in our own factory in rural Pennsylvania." TRUSTEE18430. These descriptions are false—the Polebridge Entities had no manufacturing capability, facilities, or personnel whatsoever, except for that pilfered from the Debtor. *See, e.g.*, LORUBBIO0004713 (Defendant Baldwin testifies that Polebridge did not lease or own any equipment).

Good Design's LinkedIn profile depicts bottles of Faber Distilling Co. hand sanitizer in its background:

25



On March 24, 2020, Defendant Culbertson emailed the Debtor's outside counsel, copying Defendants Boyer and Casey Parzych, stating that "we're pushing hand sanitizer out the door at a rate we've never seen!!! . . . we (MMD) produced 50 TONS of hand sanitizer on last night's shift! WOW[.]" Culbertson attaches several photos depicting finished hand sanitizer bottles containing a label stating: "FABER DISTILLING CO. HAND SANITIZER BROUGHT TO YOU by: FABER LIQUORS," with a notation that "Faber" is trademarked. The label further states "produced by: FABER DISTILLING CO. Trumbauersville, PA 18970" and contains the URL of the Debtor's website: "FABEREASYDRINKING.com" *See* BR002147. The same day, Defendant Culbertson further informed the Debtor's counsel that: that "we are sooo inundated with

26

liquor orders online … we have not yet put the hand sanitizer out there" and "we in W. PA. are going to get our first shipment of hand sanitizer – arriving later today – so to say we're working on distribution out here is an understatement.  We haven't even given it to our 10 distributors as of yet – that's how large demand has been just out of HQ."  *See* BR002175.

Beginning on March 26, 2020, the Debtor's Faber Liquors Instagram page was dominated by posts advertising Faber Hand Sanitizer.  A Philadelphia Inquirer article dated April 6, 2020 highlights the Debtor, with no mention of Polebridge or Good Design:

> Bucks County's Theobald & Oppenheimer[, i.e., the Debtor,] is on the opposite end of the spectrum [from a smaller distillery]: The second-largest distillery in the state, it made $2 million worth of alcohol last year between its two brands, Faber Liquors and Singe Prop Rum.  Like its smaller peers, Theobald has pivoted to hand sanitizer – also using its own bottles – but it can churn it out by the pallet.
>
> "We bought ethanol at 200 [proof] and we get a tanker in a day," said T&O chief financial officer Kelly Festa.  "We mix it with hydrogen peroxide and glycerin, and then we run it through the bottling lines."
>
> The Trumbauersville company has increased the number of production shifts and employees.  "We're running three shifts a day, seven days a week, trying to get as much out the door as possible," Festa said.  "We're getting orders left and right, from hospitals, the U.S. Postal Service, huge supermarket chains, you name it."
>
> By the end of March, T&O had filled 167,300 one-liter glass bottles with hand sanitizer branded with the Faber Liquors label. . . . At the moment, hand sanitizer is all T&O is making.

*See*      https://www.inquirer.com/news/free-hand-sanitizer-distilleries-philadelphia-new-jersey-

pittsburgh-20200406.html.

The Facebook page of the Faber Foundation – a purported "charity" organized by Defendants to promote Faber Hand Sanitizer – confirms that Faber Hand Sanitizer was a Debtor product: "The Faber Foundation was established to help vulnerable communities access Personal Protective Equipment (PPE) during the Covid-19 pandemic.  When the pandemic escalated in the United States, our founders rose to the challenge and converted a distillery into a hand sanitizer production facility."  TRUSTEE22205.

On April 3, 2020, Defendant Casey Parzych emailed the Debtor's outside counsel and copied cdrangula@agtechvi.com, informing counsel that "Carey and her team are looking to help us on the sanitizer and ethanol projects," thus establishing the Sheehan Defendants' role in the scheme.  *See* BR000264.  Further confirmation of the Sheehan Defendants' participation is provided via by Kelly Sheehan's "Users" folder on a Debtor hard drive provided to the Trustee by Millstone, which contains hidden files with internet history revealing the Sheehan Defendants' systemic involvement with the Debtor's business, including via use of the email address kelli@fabersanitizer.com.

Confirming the theft of payments due to the Debtors from sales of Faber Hand Sanitizer, by email dated April 9, 2020, Defendant Baldwin instructed the Debtor's sales team to divert payments from Debtor's Square point of sale system to Polebridge's Square account:

28



*See* LORUBBIO007499.

As the Debtor's April 17, 2020 press release made clear:

> [The Debtor] has shifted production of its high-quality vodkas, gin, and rum to the manufacture of hand sanitizer (Faber Hand Sanitizer). While many distillers have made similar adjustments, Faber has scaled the production of its hand sanitizer to supply consumers as well as medical professionals and first responders. . .

29

> So many people are having trouble securing sanitizer right now. We knew we could help by producing an abundant supply, despite disruptions in the supply chain," said Ashleigh Baldwin, Faber's spokesperson. "When people get their sanitizer from us, they are protecting themselves and supporting efforts to help those heroes on the frontlines of the COVID-19 pandemic. . . .
>
> Faber Hand Sanitizer is available in the same one-liter bottles that the company has traditionally used to store the spirits that it has produced for more than 8 years. The hand sanitizer has less viscosity, allowing it to be utilized in spray bottles or with towels to help disinfect surfaces.

https://www.prnewswire.com/news-releases/faber-distilling-donates-portion-of-hand-sanitizer-sales-to-first-responders-301043010.html.

Similarly, Faber Hand Sanitizer's Facebook page stated: "we – the team at FABER Liquors – have shifted our usual operations to produce much-needed hand sanitizer" and lists the telephone number of Faber Hand Sanitizer as (215) 268-6071, a telephone number owned by, paid for, utilized, and staffed by the Debtor.  TRUSTEE19946.

On April 17, 2020, Defendant Sheehan made a post to his LinkedIn page advertising Faber Hand Sanitizer.  Upon information and belief, Defendant Sheehan and the Sheehan Entities had an agreement with the Insider Defendants to share in the ill-gotten profits from the sale of CBDelight and Faber Hand Sanitizer.

An April 21, 2020 email from Defendant Festa's Polebridge Entities email account (kellyfesta@gooddesigninc.com) to the Debtor's sales managers—via their Debtor email accounts (@theoandopp.com)—instructed the Debtor's sales managers to ensure that the

30

Debtor's customers made payments by electronic transfer, i.e., ACH or wire, into Polebridge's

bank account, and not the account of the Debtor, for sales of Faber Hand Sanitizer:

> From: **Kelly Festa**
> <kellyfesta@gooddesigninc.com>
> Date: Tue, Apr 21, 2020 at 3:55 PM
> Subject: New bank account wiring
> instructions
> To: Ian Kobos <ian@theoandopp.com>,
> Kelli Scozzaro
> <kscozzaro@theoandopp.com>
>
>
> Hello,
>
> Can you please send this along to your
> sales team? We have a new bank account
> for wires and ACH's to go into. ACH info
> below and wire instructions attached.
>
> Thank you!
>
>
> Account name: Polebridge LLC
>
> Account type: Checking
>
> Bank name: Raymond James- UMB Bank
>
> Account: ▮▮▮▮▮▮▮▮
> Routing: ▮▮▮▮▮▮

*See* LORUBBIO0004644.  The Debtor's sales representatives also accepted tens of thousands, if

not hundreds of thousands, of dollars in cash payments for Faber Hand Sanitizer, which were

diverted from the Debtor for the benefit of the Polebridge Entities.  *See* TRUSTEE013194-95

(November 24, 2021 email from former Debtor employee Ian Kobos including a picture of a

large number of $20, $50, and $100 bills, constituting "[p]roof that there were many cash

31

transactions from hand sani for 10's of thousands of dollars coming from my reps.").

An April 24, 2020 press release issued by the Debtor reports that the Debtor:

> is increasing its production of hand sanitizer (Faber Hand Sanitizer)
> to meet growing demand . . . .
>
> The Faber team has been supplying hospitals, truck drivers, and first
> responders since it first made the switch from producing its high-
> quality vodkas, gin, and rum. The company has also made its 80
> percent alcohol antiseptic hand sanitizer available directly to
> consumers too.
>
> "It is no secret that essential businesses and services need hand
> sanitizer to maintain operations. However, as more businesses make
> plans to re-open, many are experiencing difficulties and frustrations
> sourcing much-needed hand sanitizer," said Faber spokesperson
> Ashleigh Baldwin. "We are producing abundant supplies of high-
> quality sanitizer to relieve the anxieties of businesses preparing to
> safely conduct business again."

https://www.prnewswire.com/news-releases/faber-distilling-expands-sanitizer-production-

301046681.html.

A May 12, 2020 email from the Debtor's outside counsel to a representative of the United

States Alcohol & Tobacco Tax & Trade Bureau confirms that the Debtor "has converted to hand

sanitizer production and [is] supplying large hospital centers." *See* NML003251.

A June 11, 2020 presentation approved by Defendant Parzych to train the Debtor's sales

representatives lists four "Mission Critical" products for emphasis to the Debtor's customers.

Faber Hand Sanitizer shared the top spot with Faber liquor (with CBDelight demoted to third

place):



*See* TRUSTEE013194.

Another Debtor marketing presentation—entitled "Theobald & Oppenheimer Leadership Brands Presentation"—featured numerous slides touting Faber Hand Sanitizer and the massive success of this Debtor product:









*See* TRUSTEE013112-114.

Numerous individuals utilized email addresses associated with Faber Hand Sanitizer, which they accessed using Debtor computer equipment, to further the business interests of the Polebridge Entities, including: Defendant Baldwin (ashleigh@fabersanitizer.com), Defendant Culbertson (rf@fabersanitizer.com), and Debtor customer service representative Casey Coughlin (ccoughlin@fabersanitizer.com). *See, e.g.,* FG014497; BR006023.

Faber Hand Sanitizer exploited the Debtor's marketing staff and resources, and utilized advertising mirroring that for Debtor's liquor products:



## AGTECH PA LLC

1.    Identify all facts and Documents supporting Your assertion that "Defendant Sheehan caused Defendant AgTech VI to file Articles of Organization as a United States Virgin Islands ("USVI") limited liability company for the purposes of diverting the profits from the sale of Wynk Seltzer away from the Debtor," as stated in Paragraph 87 of the Amended Complaint.

ANSWER:   *See* objections and response to Rittenburg Interrogatory #2, *supra*, which are incorporated by reference herein.

2.   Identify all facts and Documents supporting Your assertion that "Defendants instructed former debtor employees to sign non-disclosure agreements," as stated in Paragraph 196 of the Amended Complaint.

ANSWER: Plaintiff objects to this contention interrogatory as a premature, improper, and unduly burdensome attempt to force Plaintiff to marshal her case on paper while discovery is ongoing. Plaintiff further objects to this interrogatory on the grounds that discovery is incomplete and the Defendants have not yet produced a single document in response to Plaintiff's requests for production.  Subject to and without waiving these objections, in an October 19, 2021 email from attorney Jennifer Maleski to the Trustee, attorney Maleski relayed the following information from Millstone attorney Patricia Jefferson: "A former MMD employee/now Millstone employee told us that the day we had scheduled to meet with the employees pre-closing, when they arrived they were met with clipboards to sign new letters to work at CanMan and told to go home for the week, under the guise this was their actual meeting with Millstone."  *See* JM000005-6.  Former Debtor employee Ian Kobos reports that the documents presented at the meeting included an NDA.

3.   Identify all "non-disclosure agreements" referenced in Paragraph 196 of the Amended Complaint and provide a list of all employees that were allegedly instructed to sign those agreements.

ANSWER: *See* objections and response to AGTech PA LLC Interrogatory #2, *supra*, which are incorporated by reference herein.

36

 4.      Identify the "Debtor employee" to whom "a chocolate phallus was sent" as stated in Paragraph 197 of the Amended Complaint and the address to which it was sent.

ANSWER:  Ian Kobos; address to which phallus was sent unknown at this time.

5.      Identify all facts and Documents supporting Your assertion that "Trustee has undertaken an investigation," as stated in Paragraph 191 of the Amended Complaint.

ANSWER:     Plaintiff objects to this contention interrogatory as a premature, improper, and unduly burdensome attempt to force Plaintiff to marshal her case on paper while discovery is ongoing.  Plaintiff further objects to this interrogatory as overbroad, unduly burdensome, and beyond the scope of permissible discovery as it is not relevant to any party's claim or defense. Plaintiff further objects to this interrogatory to the extent that it seeks information protected by the attorney-client privilege, work product doctrine, or any applicable privilege or immunity. Subject to and without waiver of the foregoing objections, the Trustee has produced to Defendants the over 700,000 pages of documents gathered during the course of her investigation.

6.      Describe the results of the Trustee's investigation.

ANSWER:     Plaintiff objects to this interrogatory as overbroad, unduly burdensome, and beyond the scope of permissible discovery as it is not relevant to any party's claim or defense. Plaintiff further objects to this interrogatory to the extent that it seeks information protected by the attorney-client privilege, work product doctrine, or any applicable privilege or immunity. Subject to and without waiver of the foregoing objections, as a result of the Trustee's investigation, the Trustee initiated the above-captioned lawsuit.

7.      Identify all facts and Documents supporting Your assertion that "Defendants have actively obstructed the Trustee's investigation," as stated in Paragraph 192 of the Amended Complaint.

ANSWER:  *See* objections and response to Rittenburg Interrogatory #5, *supra*, AgTech PA

Interrogatory #2, *supra*, and Canvas 340 Interrogatory #7, *infra*, which are incorporated by

reference herein.

8.      Identify "the most basic principles of corporate governance and internal controls," to which you refer in Paragraph 172 of the Amended Complaint.

ANSWER:  Plaintiff objects to this interrogatory to the extent that it calls for a legal conclusion

and requests an interpretation of a document which is in writing and speaks for itself.  Subject to

and without waiving these objections, Paragraph 172 of the Amended Complaint is the first

paragraph in a section entitled "The Insider Defendants' Utter Failure To Maintain Internal

Controls."  The remaining paragraphs in that section identify the failures in detail, i.e.:

accounting failures which allowed Defendants to freely pilfer the Debtor for the benefit of the

Defendants and the Pilfering Entities; the Debtor's outside accounting firm's letter to the

Debtor's Board of Directors and Members noting a lack of internal controls over financial

reporting which is "cause for substantial concern because management cannot rely entirely on

the accuracy of internally prepared financial statements"; the gross mismanagement of the

Debtor's Chapter 11 case; the use of Defendant Boyer as general counsel while he was

simultaneously acting as counsel to the Polebridge Entities and the Wynk Entities to the

38

considerable prejudice and detriment of the Debtor; and Defendant Parzych and Rittenburg's use

of the Debtor as their personal piggy bank.

9.      Identify the "substantial unnecessary and avoidable fees, costs, and expenses," the Debtor
incurred as stated in Paragraph 175 of the Amended Complaint.

ANSWER:      *See* objections and responses to Rittenburg Interrogatories #2 and #10, *supra*,

Best Bev Interrogatory #1, *infra*, and Culbertson Interrogatory #5, *infra*,  which are incorporated

by reference herein.

 10.     Identify and describe all "inaccurate testimony and declarations," and "inaccurate
documents" that were "produced and/or filed," as stated in Paragraph 175 of the Amended
Complaint.

ANSWER:      *See* objections and responses to Rittenburg Interrogatory #2, *supra*, and

Culbertson Interrogatory #5, *infra*,  which are incorporated by reference herein.


### ASHLEIGH BALDWIN

1.      Identify all facts and Documents supporting Your assertion that "[n]umerous individuals
utilized email addresses associated with Faber Hand Sanitizer, which they accessed using Debtor
computer equipment, to further the business interests of the Polebridge Entities, including:
Defendant     Baldwin     (ashleigh@fabersanitizer.com),     Defendant     Culbertson
(rf@fabersanitizer.com),     and     Debtor customer     service representative  Casey
Coughlin (ccoughlin@fabersanitizer.com)," as stated in Paragraph 81 of the Amended
Complaint.

ANSWER:      *See* objections and response to Rittenburg Interrogatory #10, *supra*, which are

incorporated by reference herein.  Subject to and without waiving the foregoing  objections, by

way of further response, pursuant to Federal Rule of Civil Procedure 33(d), further documents

responsive to this interrogatory may be identified by examining the documents which have been

39

and will be produced in this matter, and the burden of deriving or ascertaining the answer will be

substantially the same for all parties.

2.      Identify all facts and Documents supporting Your assertion that "a minimum of $8.8 million of profits attributable to the sale of Faber Hand Sanitizer and CBDelight were stolen from the Debtor and diverted to Defendants," as stated in Paragraph 85 of the Amended Complaint.

ANSWER:      *See* objections and responses to Rittenburg Interrogatory #10, *supra*, and XO

Energy Interrogatory #5, *infra*, which are incorporated herein by reference.


3.      Identify all facts and Documents supporting Your assertion that the "actual amount diverted is likely much higher, as there was no proper accounting for cash transactions," as stated in Paragraph 85 of the Amended Complaint

ANSWER:      *See* objections and response to Rittenburg Interrogatory #10, *supra*, which are

incorporated by reference herein.

4.      Identify all facts and Documents supporting Your assertion that "[t]he Wynk Seltzer business was facilitated using Debtor resources, including labor, material, office and warehouse space for operations, the purchase of additional canning/bottling equipment utilized for the purposes of Wynk Seltzer, sales services and incentives, marketing services, graphic design services, digital marketing and advertising services, legal services, intellectual property, and canning services," as stated in Paragraph 90 of the Amended Complaint.

ANSWER: *See* objections and response to Rittenburg Interrogatory #2, *supra*, which are

incorporated by reference herein.

5.      Identify all facts and Documents supporting Your assertion that a "forensic analysis of system files on a Debtor hard drive reveals that, as with CBDelight and Faber Hand Sanitizer, substantial Debtor resources were diverted for the ultimate benefit of the Wynk Entities," as stated in Paragraph 91 of the Amended Complaint.

ANSWER:    *See* objections and response to Rittenburg Interrogatory #2, *supra*, which are

incorporated by reference herein.

6.    Identify all facts and Documents supporting Your assertion that "Wynk Entities regularly used a copier and scanner belonging to the Debtor," as stated in Paragraph 93 of the Amended Complaint.

ANSWER:    *See* objections and response to Rittenburg Interrogatory #2, *supra*, which are

incorporated by reference herein.

7.    Identify all purchases and supporting Documents for the purchases that the "Debtor paid for . . . the sole benefit of the Wynk Entities and the Wynk Seltzer product," as stated in Paragraph 96 of the Amended Complaint.

ANSWER:    *See* objections and response to Rittenburg Interrogatory #2, *supra*, which are

incorporated by reference herein.

8.    Identify all documents "invoices, tax forms, and other documents . . . were phony and a sham" as stated in Paragraph 104 of the Amended Complaint.

ANSWER:    *See* objections and responses to Rittenburg Interrogatories ## 2 and 10, *supra*, and

Best Bev Interrogatory #1 and Culbertson Interrogatory #5, *infra*, which are incorporated by

reference herein.

9.    Identify all facts and Documents supporting Your assertion that "[Defendants] were extracting millions of dollars of value out of the Debtor, to place it beyond the reach of Debtor's creditors," as stated in Paragraph 105 of the Amended Complaint.

ANSWER:    *See* objections and responses to Rittenburg Interrogatory ## 2 and 10, *supra*, and

Best Bev Interrogatory #1, Culbertson Interrogatory #5, and XO Energy Interrogatory #5, *infra*,

which are incorporated herein by reference.

41

10.     Describe how You determined that the "Hamrick Recaser machine" had an "estimated value of $145,000," as alleged in Paragraph 119 of the Amended Complaint.

ANSWER:     On March 7, 2022, Millstone Spirits Group, LLC, filed a Proof of Claim (POC No. 36-1) for "at least" $1,414,000.00, including an "estimated claim amount" of $145,000 attributable to a "Hamrick Recaser Model CHALL.  Debtor's CFO informed Millstone that this piece of equipment was scrapped in May 2021, but that no documentation evidencing the disposal was available."

## BEST BEV, LLC

1.     Identify all facts and Documents supporting Your assertion that "Best Bev LLC is either the successor in interest to Can Man or was created by Defendants to avoid liability for misconduct on the part of Can Man, which at all times relevant hereto operated using the name 'Best Bev,'" as stated in Paragraph 125 of the Amended Complaint.

ANSWER:     Plaintiff objects to this contention interrogatory as a premature, improper, and unduly burdensome attempt to force Plaintiff to marshal her case on paper while discovery is ongoing.  Plaintiff further objects to this interrogatory on the grounds that discovery is incomplete and the Defendants have not yet produced a single document in response to the Plaintiff's requests for production.

Subject to and without waiving the foregoing  objections, Due to Defendants' diversion of Debtor resources and profits to the Polebridge Entities, the Wynk Entities, and their principals and affiliates, the Debtor was unable to pay its debts and, on February 28, 2021, defaulted on the PNC loan.  Under scrutiny but not wanting to abandon their profitable scheme, Defendants conspired to

have Defendant Sheehan utilize his complex network of wholly-owned USVI entities to further defraud the Debtor and its creditors.  Defendants first attempted to have certain of the Sheehan Entities either purchase PNC's debt or purchase the Debtor's business assets outside of bankruptcy. *See* objections and response to Culbertson Interrogatory #5, *infra*, which are incorporated by reference herein.  That plan failed and Defendants pivoted to a bankruptcy alternative, which included an effort to sell the business cheap to the Sheehan Entities through a Section 363 sale or, if that failed – via a web of entities doing business as "Best Bev" and/or "Can Man" and referred to in the Amended Complaint as the "Best Bev Entities" – through outright theft of the Debtor's property and resources.

The Debtor filed for chapter 11 on June 21, 2021.  In the run up to that filing Defendants established the Best Bev Entities to further their plan to steal the Debtor's property and resources to establish a competing enterprise in the exact same line of business as the Debtor.  As part of that plan, publicly available documents filed with the Pennsylvania Department of State establish that, on May 3, 2021, Can Man, LLC ("Can Man") was formed as a Pennsylvania limited liability company with Debtor's outside counsel acting as organizer.  TRUSTEE19370.  Can Man's registered office was originally listed as 2600 Milford, a location paid for by the Debtor, but changed on September 30, 2021 to 2512 Quakertown Road, the same address used by the Wynk Entities.  *Id.*; TRUSTEE18000.

Immediately prior to the bankruptcy filing and while operating the Debtor in Possession (the "DIP"), Defendants caused the DIP to make numerous transfers and incur debts from which

43

the Debtor derived no benefit and which went to the sole benefit of the Best Bev Entities and the other Pilfering Entities, including the following:

a.      Personnel expenses, as established by a publicly available May 6, 2021 Facebook post by Casey Coughlin – who identifies herself on her LinkedIn page as an employee of the Debtor and Wynk – posted the following to her facebook page: "Hiring spree! Beverage production in Quakertown (don't sleep on it) at Faber Distilling. . . . Signing bonus, referral bonus, bonus for breathing.  Name your bonus."  Ms. Coughlin's hiring efforts – while ostensibly made on behalf of the Debtor – were intended to benefit the Best Bev Entities and the other Pilfering Entities, as a company on the verge of a bankruptcy filing would have no need to make such extraordinary hiring expenditures.  Invoices from Express Employment Professionals which were billed to the Debtor yet mailed to Best Bev's address at 2512 Quakertown Road further establish the point.  *See* TRUSTEE016455-56; TRUSTEE016453.

b.      On or about July 6, 2021, Defendants caused an industrial shrink wrapper machine (PMI Shrink Wrapper with Heat Tunnel, SI-TW30, Serial No. 02498) belonging to the Debtor to be delivered to 2512 Quakertown Road for use by Best Bev.  Defendant Festa later falsely informed Millstone that the machine was broken and scrapped before closing, *see* Millstone POC No. 36-1 ("Debtor's CFO informed Millstone that the Shrink Wrapper was broken and was scrapped prior to closing.  Debtor's CFO later disclosed that the shrink wrapper was sold on July 6, 2021.  At the time of its sale, the shrink wrapper was located at a non-debtor location: 2512 Quakertown Road");

44

c.       On or about July 14, 2021, Defendants used the Debtor's account to order $700.40 worth of carbon dioxide from Roberts Oxygen Company, Inc., with the carbon dioxide delivered to Best Bev at 2512 Quakertown Road, TRUSTEE016517;

d.       On or about July 14, 2021, Defendants used the Debtor's account to order 25,872 750 ML glass bottles and 2,688 1.75 L glass bottles from O-I Packaging Solutions LLC at a cost of $22,198.03, which were delivered to Best Bev at 2512 Quakertown Road, and which were paid for by check drawn on the Debtor's DIP account and signed by Defendant Festa, TRUSTEE016435;

e.       On or about July 19, 2021, Defendants used the Debtor's account to order 25,872 750 ML glass bottles, 1,344 1.75L glass bottles, and 3,072 750 ML tequila bottles from O-I Packaging Solutions LLC at a cost of $22,919.06, which were delivered to Best Bev at 2512 Quakertown Road, and which were paid for by check drawn on the Debtor's DIP account and signed by Defendant Festa, TRUSTEE016484;

f.       On or about July 20, 2021, Defendants used the Debtor's account to pay for transportation of 3.24 tons of goods/equipment at 2512 Quakertown Road, TRUSTEE000409;

g.       On or about August 5, 2021, a $400.00 check to Milford Township (in which 2512 Quakertown Road sits) for a "Fire Inspection" was drawn on the Debtor's DIP bank account and signed by Defendant Festa, TRUSTEE014849;

45

h.　　　On or about August 10, 2021, Defendants used the Debtor's account to arrange for SunTeck Transport Co., LLC to deliver a 2,000 LB shipment from Eastgate Graphics in Lebanon, OH to Best Bev at 2512 Quakertown Road at a cost of $2,795.00, TRUSTEE016528;

i.　　　On or about August 11, 2021, Defendants used the Debtor's account to order $1,244.30 worth of packaging material from Century Packing, Inc., for shipment to Best Bev at 2512 Quakertown Road, TRUSTEE000414;

j.　　　On or about August 12, 2021, Defendants used the Debtor's account to order 24,024 1L glass bottles from O-I Packaging Solutions LLC at a cost of $17,125.14, which were delivered to Best Bev at 2512 Quakertown Road, TRUSTEE016494;

k.　　　On or about August 18 and 19, 2021, Defendants used the Debtor's account to order a total of $1,236.64 worth of carbon dioxide from Roberts Oxygen Company, Inc., which was delivered to Best Bev at 2512 Quakertown Road, TRUSTEE016436-37;

l.　　　On or about August 31, 2021, Defendants used the Debtor's account to order and ship 181,984 aluminum cans from Zuckerman Honickman at a total cost of $41,037.12, which were delivered to Best Bev at 2512 Quakertown Road, JM000182-84;

m.　　　On or about September 13, 2021, Defendants used the Debtor's account to order 722,000 aluminum can ends from Zuckerman Honickman at a cost of $23,465.00, which were delivered to Best Bev at 2512 Quakertown Road, JM000185-87; and

n.　　　A September 29, 2021 email from Millstone's counsel to Debtor's bankruptcy counsel reported that Defendants removed the following items from Debtor's facility (upon

46

information and belief, for the benefit of the Best Bev Entities): a case shrink sealer, a nitrogen doser, and a bulk carbon dioxide system, FG039504.

Defendants have intentionally sabotaged the Trustee's efforts to determine the full extent of goods and services paid for by the Debtor but used for the sole benefit of Best Bev or the other Pilfering Entities. In addition to the wholesale destruction of Debtor records described in the objections and response to Canvas 340 Interrogatory #7, *infra*, which is incorporated herein by reference, Defendant Festa instructed vendors to falsely state that Debtor orders were being delivered to the Debtor's facilities when they were actually being delivered to Best Bev at 2512 Quakertown Road. *See* FG041062.

Definitive proof of the scheme is established by the fact that, on June 14, 2021, Defendants Festa and Uszenski utilized the Debtor's computer equipment and email system to create and edit a Word document, which has been produced to Defendants in the above-captioned litigation, titled "Can Man Shadow Structure," which depicted a corporate structure under which Can Man would own Faber and all the Debtor's other brands and operate out of a headquarters located 2512 Quakertown Road:



Additionally, the Debtor's bankruptcy counsel became aware of the Defendants' plan to steal Debtor assets and divert business to the Best Bev Entities, as established by an August 31, 2021 email from counsel to Defendant Casey Parzych:

> Casey, as a follow up to our conversation, I want to reiterate that our strong advice is for you and MMD to at all times act in good faith to take all actions to preserve and protect the assets, business, customers, contracts, relationships, etc of MMD and to deliver to the winning bidder at the auction--- Millstone--- the assets that they contracted to purchase so that their expectations for the transaction that they bargained for will be consummated at the closing. Doing anything less, would contradict our advice could subject you (and maybe others) to significant legal issues and concerns. One particular issue of note is that you could be found personally liable for failure to uphold your fiduciary duty to MMD and its creditors and such personal liability could be deemed non-dischargeable (even if you filed a Chapter 7) see, for example Section 523(a)(4) of the Bankruptcy Code.

48

FG035744.

As summarized by Patricia Jefferson, counsel to Millstone, "[o]nce [Defendant] Casey [Parzych] realized that Millstone was going to be the successful buyer of the assets, he and his team started diverting customers.  They shut down MMD's bottling line (which was leased from ETOH), and started telling customers that MMD couldn't service them anymore, but the new company could."  TRUSTEE012988.

On September 27, 2021, Millstone's counsel reported to the Debtor's counsel that "I am working on the list of open items for you, but more pressing--- why were employees told not to come in this week? That is what has been relayed to us by the employees and not a single employee is in the building today.  I also need some clarity on Casey's explanation as to why he hasn't been filling orders.  Faber products are out of stock in basically every store, and he confirmed in response to our DD questions that he was filling orders.  Yet, there is no backlog of inventory or glass bottles at the warehouse. I need to know what's going on with employees and orders asap. It seems that the business has simply shut down." *See* FG39076.

Defendants lied about the true nature of their supposedly new enterprise, informing customers that Best Bev was simply a continuation of the Debtor.  For example an October 7, 2021 text message from Defendant Culbertson to a former customer of the Debtor stated that the Defendants had "re-formed" the Debtor "and quickly started [manufacturing] & co-packing 500,000 cans/bottles per day." *See* FG041067.  Culbertson's text message further offered to "save you at least 14% OFF your current prices," with the "current prices" being a reference to the

49

Debtor's prices, and with the discount made possible only because Defendants had been stealing

the Debtor's personnel, equipment, and inventory for use by Best Bev.

An October 11, 2021 email from counsel to Millstone to Debtor's bankruptcy attorneys

reports:

> [b]ased on . . . conversations our sales guys are having with [former Debtor] customers, [Defendant] Casey [Parzych] and [Defendant] RF [Culbertson] are holding themselves out to customers as "Faber" and saying the[y] "re-formed" the business.
>
> I am also getting invoices from other [Debtor] vendors who say they haven't been paid in months, and that [Defendant] Kelly [Festa] recently asked them to make edits to invoices before they sent them to us to make it look like the goods were shipping to [the Debtor] at 118 N. main Street (when the original invoice says they were shipping to CanMan at 2512 Quakertown Road).

FG041062.

Defendants subsequently began manufacturing, marketing, and selling the Well Rebellion

product using stolen Debtor equipment as well as the Debtor's supposedly deleted internal data.

On October 12, 2021, Defendants made their first post to the wellrebellion Instagram account.

Well Rebellion was the new name for the liquor product Defendants manufactured and bottled

using Debtor resources and employees. The post encourages viewers to "Call BEST BEV," listing

the phone number (215) 987-5616, Best Bev's telephone number, the email orders@bestbev.co, a

Best Bev email address, and includes a link to the Instagram page @best.bevco

(https://www.instagram.com/best.bevco/?hl=en), Best Bev LLC's Instagram page.  The website

for Well Rebellion liquors, www.wellrebellionliquor.com, lists its address as 2512 Quakertown

50

Road, its phone number as (215) 987-5616, and its email address as orders@bestbev.co.  A January 11, 2022 post on the Instagram page for Well Rebellion liquor depicts a bottle of Well Rebellion orange flavored vodka bearing a label stating that it is "produced and bottled by Best Bev Pennsburg, PA."

Certain of the Defendants, including Defendants Festa and Culbertson, utilized custom Well Rebellion flyers – which bear an uncanny similarity to the marketing material used by the Debtor – that included their cell phone numbers to market the product for the benefit of Best Bev. *See* TRUSTEE013259 and TRUSTEE013249.

Prior to and after the closing of the sale of the Debtor's assets to Millstone, the Defendants utilized the Debtor's phone.com account for the benefit of Best Bev, returning calls to Debtor customers who placed orders for Faber products, and instead selling them the corresponding Best Bev products.  The point is established by an October 19, 2021 email from attorney Jennifer Maleski to the Trustee, in which attorney Maleski relayed the following information from Millstone attorney Patricia Jefferson: "We . . . know from customers that up until this week, Casey and his team had the ability to log into the MMD phone.com account, and they knew we couldn't get into it. Customers were calling to leave orders for Faber products; CanMan/Casey employees were checking the messages and then calling them back to get them to order different product." *See* JM000005.  Moreover, on October 19, 2021, a PLCB Enforcement Officer called (215) 268-6071, a telephone number belonging to the Debtor, and spoke with Jamie Fahie, who informed the officer that he reached "Faber."  MILLSTONE001086-87.  Fahie asked the officer "what other

51

information he wants to know about Midnight Madness Distilling LLC, [and] stated that the new

location is at 2512 Quakertown Road and they sell products called 'Well Rebellion.'" *Id.*

On October 18, 2021, Drifter Spirits emailed Millstone concerning a meeting that Drifter

Spirits had that day with "Midnight Madness," the Debtor; in reality, the Defendants had set up a

meeting between Drifter Spirits and Best Bev under the guise that Best Bev was a mere

continuation of the Debtor. *See* JM000005.

In an October 19, 2021 email from attorney Jennifer Maleski to the Trustee, attorney

Maleski relayed the following information from Millstone attorney Patricia Jefferson:

> A former MMD employee/now Millstone employee told us that the
> day we had scheduled to meet with the employees pre-closing, when
> they arrived they were met with clipboards to sign new letters to
> work at CanMan and told to go home for the week, under the guise
> this was their actual meeting with Millstone.  That same week,
> several pieces of large equipment were removed from MMD. . . .
> When PNC obtained its appraisal of MMD's various assets,
> including the RP located at 118 N. Main St, there were numerous
> pictures taken.  During the walk through that was made available
> to prospective bidders (against the debtors' wishes), Millstone was
> told they couldn't see the apartment located in 118 N. Main street
> but that we should refer to the photos attached to the PNC appraisal
> in the data room for the sale.  When we were finally permitted, a few
> days before closing, to access that space, we found that every single
> appliance and fixture had been ripped out, down to the toilet and
> lights. The entire kitchen was missing. When I presented this issue
> to MMD's counsel, their only response was "ok, so what do you
> want to do about it now? Cancel the sale over a kitchen?" . . .
>
> Post closing we determined that several pieces of equipment that had
> been included in the Debtor's inventory were missing. The excuse
> we got from MMD was via some of the most ridiculous affidavits I

> have ever seen, stating that the equipment was broken so they scrapped it. But rather than have a company pick it up, or take it somewhere that kept records, one of their drivers just drove it to a junk yard and they don't know which one because the driver passed away this past June. They were fairly valuable and large pieces of equipment and we suspect they may actually be located at 2512 Quakertown Road, Pennsburg PA. . . .

> Hoover mixing tanks.  These were critical to the MMD operations. About a week before closing Millstone inquired as to why they weren't on site any longer and we were told by MMD's CFO that they were "just leased and so we sent them back to Texas." About a week ago, one of our drivers went to the 2512 Quakertown Road, Pennsburg PA, saw a number of identical Hoover tanks and took pictures. We called Hoover and they told us that "CanMan assumed the MMD lease."  I am working on getting more information from Hoover on that. . . .

> Basically, from what I have seen, they thought they could force a quick sale approval through the Court and acquire all of the business assets free and clear in a Newco that Casey formed with the owners of ETOH. When that didn't happen, they absolutely gutted the business for their own enrichment and sold us the shell, leaving the estate with significantly more administrative claims than it ought to have had, and misrepresented the operations to the court throughout.

*See* JM000005-6; *see also* FG039086 (Millstone attorney reports to Debtor's bankruptcy counsel on 9/27/21 that "Adam, the plant manager, told us today that the tankers, leased from Hoover, were sent back to Texas.").

In an October 20, 2021 report, a Millstone sales manager complained that Defendants were using the Faber brand name in communications with the Debtor's former customers and were causing the customers to think that Best Bev was simply a continuation of the Debtor:

> All of our customers are still very confused and getting daily constant texts/calls/emails from BestBev claiming to be us and asking for their 'Faber well order'. . . . They hired a team of reps + call center with 5 people non stop calling our customers working phones + email off our old customer lists.  Many of our customer are telling me they call them, text them, and email them multiple times a day after they told them to please please stop.

*See* TRUSTEE009948.

Millstone's counsel Patricia Jefferson reported in October 2021 that "many of the invoices we are receiving are for deliveries that were made to 2512 Quakertown Road, Pennsburg PA.  That is the address of DrinkWynk (the company that Casey Parzych formed with the owner of ETOH and lied to the court about).  It is also the address of CanMan, LLC, a competing company that Casey formed immediately pre-petition and got up and running in the last 1-2 months.  I have numerous invoices addressed to Midnight Madness, or Theo and Opp, at that address.  When I asked MMD and their counsel about it, I was told the vendor made a mistake.  When I spoke with the vendors, they told me that up until a month ago, 'all of the businesses were on one account.'  It is my belief that much of the money that went through the DIP account during he case was used to pay bills for and employees of Casey's other entities."  TRUSTEE012988.  She further reported that "[a] former MMD employee/now Millstone employee told us that the day we had scheduled to meet with the employees pre-closing, when they arrived they were met with clipboards to sign new letters to work at Can Man and told to go home for the week, under the guise that this was their actual meeting with Millstone.  That same week, several pieces of large equipment were removed from MMD."  TRUSTEE 012988-99.  She further reported that "Hoover mixing tanks

54

[were] critical to the MMD operations. About a week before closing Millstone inquired as to why they weren't on site any longer and were told by MMD's CFO that they were 'just leased and so we sent them back to Texas.' About a week ago, one of our drivers went to the 2512 Quakertown Road, Pennsburg PA, saw a number of identical Hoover tanks and took pictures. We called Hoover and they told us that 'CanMan assumed the MMD lease.'" TRUSTEE012989. Counsel summarized Defendants' activity as follows: "Basically, from what I have seen, they thought they could force a quick sale approval through the Court and acquire all of the business assets free and clear in a Newco that Casey formed with the owners of ETOH. When that didn't happen, they absolutely gutted the business for their own enrichment and sold us the shell, leaving the estate with significantly more administrative claims than it ought to have had, and misrepresented the operations to the court throughout." TRUSTEE012989.

On November 1, 2021, a Millstone sales manager reported that the Best Bev Entities "are continuing to spam all of our customers direct cell phones with texts and calls" and that the customers were confused as to whether the Debtor and Best Bev were separate entities. *See* TRUSTEE010857.

Publicly available documents establish that, on December 16, 2021, Can Man, LLC "DBA" Best Bev filed a trademark application for Well Rebellion liquors, listing its address as 2512 Quakertown Road, its phone number as 215-987-5616, and its email addresses as compliance@bestbev.co and cdrangula@bestbev.co. The application was signed by John Pitts as "Processing & Compliance Manager."

55

On June 13, 2022, Best Bev, LLC was formed as a United States Virgin Islands limited liability company. TRUSTEE18527. Best Bev LLC is either the successor in interest to Can Man or was created by Defendants to avoid liability for misconduct on the part of Can Man, which at all times relevant hereto operated using the name "Best Bev." The conclusion is supported by the fact that: Best Bev LLC and Can Man LLC use the same address (2512 Quakertown Road), email domain (@bestbev.co), website (https://bestbev.co), and telephone number (215.987.5616); at all times relevant hereto, Defendant Uszenski has been the Manager of both Best Bev LLC and Can Man LLC and thus responsible for its misconduct; Best Bev LLC and Can Man LLC have a large number of personnel in common; and Can Man LLC commonly used "Best Bev" as a DBA. Moreover, on June 24, 2022, Maho, LLC, an entity which appears in the aforementioned "Can Man Shadow Structure" document, filed papers with the Pennsylvania Department of State to utilize "Best Bev" as a fictitious name. The document was signed by John Pitts, the Best Bev Entities' Processing & Compliance Manager (and the Debtor's former production manager) and indicates that it should be returned to Defendant Festa at 2512 Quakertown Road.

On July 17, 2022, a Millstone sales manager reported that "Best Bev is continuing to use the 'Faber' name in communication when reaching out to our customers. And they are using our customer contact lists from a 'drive' they said was deleted." *See* TRUSTEE013250. On September 13, 2022, a Millstone representative reported that "[a] purchase was made under [an] old Midnight Madness Amex card by Can Man." TRUSTEE013240. In the fall of 2022, Defendants caused Best Bev to join the Upper Perkiomen Valley Chamber of Commerce, stating that, "[a]fter years

56

of dreaming up, canning and distributing our own beverages, we have expanded our universe . . .

[and] have the space to do it all at our new 100,000+ sf facility centrally located just outside

Philadelphia," i.e., 2512 Quakertown Road.  The reference to "years of dreaming up, canning and

distributing our own beverages" is an obvious reference to the Debtor, and yet another indication

that Defendants treated the Debtor and Best Bev as one and the same.

2.      Identify all facts and Documents supporting Your assertion that "[w]hile operating the
Debtor in Possession (the "DIP"), Defendants caused the DIP to make numerous transfers and
incur debts from which the Debtor derived no benefit and which went to the sole benefit of the
Best Bev Entities and the other Pilfering Entities," as stated in Paragraph 148 of the Amended
Complaint.

ANSWER:     *See* objections and response to Best Bev LLC Interrogatory #1, *supra*, which are

incorporated by reference herein.

3.      Identify the orders that were "being delivered to the Debtor's facilities when they were
actually being delivered to Best Bev at 2512 Quakertown Road," as stated in Paragraph 152 of
the Amended Complaint.

ANSWER:  *See* objections and response to Best Bev LLC Interrogatory #1, *supra*, which are

incorporated by reference herein.

4.      Identify the Best Bev agents present at the meeting referenced in Paragraph 153 of the
Amended Complaint.

ANSWER:     *See* objections and response to Best Bev LLC Interrogatory #1, *supra*, which are

incorporated by reference herein.  By way of further response, the identity of the Best Bev agents

is unknown at this time and will be revealed through further discovery.

5.      Identify all the "pieces of large equipment [removed] from the Debtor for the benefit of
the Best Bev entities," as stated in Paragraph 153 of the Amended Complaint.

57

ANSWER:    *See* objections and response to Best Bev LLC Interrogatory #1, *supra*, which are

incorporated by reference herein.

6.    Identify all facts and Documents supporting Your assertion that "millions of dollars' worth of DIP property was improperly diverted to the Best Bev Entities," as stated in Paragraph 157 of the Amended Complaint.

ANSWER:    *See* objections and response to Best Bev LLC Interrogatory #1, *supra*, which are

incorporated by reference herein.

7.    Identify all facts and Documents supporting Your assertion that "Defendants utilized the Debtor's phone.com account for the benefit of Best Bev, returning calls to Debtor customers who placed orders for Faber products, and instead selling them the corresponding Best Bev products," as stated in Paragraph 166 of the Amended Complaint.

ANSWER:  *See* objections and response to Best Bev LLC Interrogatory #1, *supra*, which are

incorporated by reference herein.

8.    Identify all facts and Documents supporting Your assertion that "all activity taking place at 2600 Milford, 2512 Quakertown Road, and 300 Commerce Drive, Quakertown, PA was for the benefit of Can Man, the other Best Bev Entities, and the other Pilfering Entities," as stated in Paragraph 118 of the Amended Complaint.

ANSWER:  Plaintiff objects to this contention interrogatory as a premature, improper, and

unduly burdensome attempt to force Plaintiff to marshal her case on paper while discovery is

ongoing.  Plaintiff further objects to this interrogatory on the grounds that discovery is

incomplete and the Defendants have not yet produced a single document in response to the

Plaintiff's requests for production.  By way of further response, Paragraph 118 of the Amended

Complaint states that, "[u]pon information and belief, all activity taking place at 2600 Milford,

2512 Quakertown Road, and 300 Commerce Drive, Quakertown, PA ('300 Commerce') was for

the benefit of Can Man, the other Best Bev Entities, and the other Pilfering Entities."  The

allegation is supported by the facts set forth in response to Rittenburg Interrogatory #2, *supra*,

Rittenburg Interrogatory #10, *supra*, and Best Bev Interrogatory #1, *supra*, which are

incorporated by reference herein.

9.      Identify all facts and Documents supporting Your assertion that "Defendants caused the
Best Bev Entities to, inter alia, utilize resources, property, and personnel of the Debtor to
generate beverage sales and beverage packaging sales for which the profits flowed not to the
Debtor, but instead to the Best Bev Entities," as stated in Paragraph 33 of the Amended
Complaint.

ANSWER:     *See* objections and response to Best Bev LLC Interrogatory #1, *supra*, which are

incorporated by reference herein.

10.     Identify all facts and Documents supporting Your assertion that "Defendants lied about
the true nature of their supposedly new enterprise, informing customers that Best Bev was
simply a continuation of the Debtor," as stated in Paragraph 158 of the Amended Complaint.

ANSWER:     *See* objections and response to Best Bev LLC Interrogatory #1, *supra*, which are

incorporated by reference herein.

## CANVAS 340, LLC

1.      Identify all of "Debtor's employees, vendors, and customers" that You reference in
Paragraph 232 of the Amended Complaint.

ANSWER:     *See* objections and responses to Rittenburg Interrogatory #2, *supra*, and Best Bev

Interrogatory #1, *supra*, which are incorporated herein by reference.

59

2.      Identify all facts and Documents supporting Your assertion that "[t]he Pilfering Entities were . . . utilized for the sole purpose of siphoning funds and resources from the Debtor," as stated in Paragraph 233 of the Amended Complaint.

ANSWER:     Plaintiff objects to this contention interrogatory as a premature, improper, and unduly burdensome attempt to force Plaintiff to marshal her case on paper while discovery is ongoing.  Plaintiff further objects to this interrogatory on the grounds that discovery is incomplete and the Defendants have not yet produced a single document in response to the Plaintiff's requests for production.  By way of further response, *see* objections and responses to Rittenburg Interrogatory #2, *supra*, Rittenburg Interrogatory #10, *supra*, and Best Bev Interrogatory #1, *supra*, which are incorporated by reference herein.

3.      Identify all facts and Documents supporting Your assertion that "Debtor and the Pilfering Entities have common ownership and a common administrative nexus, which was used to perpetrate a wrong on the Debtor and its creditors by siloing assets, profits, personnel, resources, and opportunities with the Pilfering Entities," as stated in Paragraph 237 of the Amended Complaint.

ANSWER:     Plaintiff objects to this contention interrogatory as a premature, improper, and unduly burdensome attempt to force Plaintiff to marshal her case on paper while discovery is ongoing.  Plaintiff further objects to this interrogatory on the grounds that discovery is incomplete and the Defendants have not yet produced a single document in response to the Plaintiff's requests for production.  By way of further response, *see* objections and responses to Rittenburg Interrogatory #2, *supra*, Rittenburg Interrogatory #10, *supra*, and Best Bev Interrogatory #1, *supra*, which are incorporated by reference herein.

4.      Identify all facts and Documents supporting Your assertion that "the Defendants was enriched and received economic and other benefits from the Debtor without justification," when "[t]he Pilfering Entities use of the Debtor's facilities, equipment, personnel, inventory, and intellectual property without payment of fair compensation therefor," as stated in Paragraph 240 of the Amended Complaint.

ANSWER:      Plaintiff objects to this contention interrogatory as a premature, improper, and

unduly burdensome attempt to force Plaintiff to marshal her case on paper while discovery is

ongoing.  Plaintiff further objects to this interrogatory on the grounds that discovery is

incomplete and the Defendants have not yet produced a single document in response to the

Plaintiff's requests for production.  By way of further response, *see* objections and responses to

Rittenburg Interrogatory #2, *supra*, Rittenburg Interrogatory #10, *supra*, and Best Bev

Interrogatory #1, *supra*, which are incorporated by reference herein.

5.      Identify all facts and Documents supporting Your assertion that "the Defendants was enriched and received economic and other benefits from the Debtor without justification," when "[t]he Pilfering Entities receipt of revenue from the sale of CBDelight, Faber Hand Sanitizer, Wynk Seltzer, and other products manufactured by the Debtor or with the use of the Debtor resources," as stated in Paragraph 240 of the Amended Complaint.
ANSWER:      Plaintiff objects to this contention interrogatory as a premature, improper, and

unduly burdensome attempt to force Plaintiff to marshal her case on paper while discovery is

ongoing.  Plaintiff further objects to this interrogatory on the grounds that discovery is

incomplete and the Defendants have not yet produced a single document in response to the

Plaintiff's requests for production.  By way of further response, *see* objections and responses to

Rittenburg Interrogatory #2, *supra*, Rittenburg Interrogatory #10, *supra*, and Best Bev

Interrogatory #1, *supra*, which are incorporated by reference herein.

61

6.      Identify all "injur[ies] to Debtor's creditors," that You reference in Paragraph 260 of the Amended Complaint.

ANSWER:     As a result of Defendants' misconduct as described in detail herein and in the Amended Complaint, the Debtor's creditors were left unpaid, resulting in significant claims outstanding against the Debtor's estate.

7.      Identify all "items in the possession of the Defendants," that You reference in Paragraph 263 of the Amended Complaint and explain why you believe these items are in possession of the Defendants.

ANSWER:     Plaintiff objects to this contention interrogatory as a premature, improper, and unduly burdensome attempt to force Plaintiff to marshal her case on paper while discovery is ongoing.  Plaintiff further objects to this interrogatory on the grounds that discovery is incomplete and the Defendants have not yet produced a single document in response to the Plaintiff's requests for production.  Subject to and without waiving the foregoing  objections, the identity of the items is in the exclusive possession of Defendants, and includes, at a minimum, the Debtor's electronic records, including emails.  In an October 19, 2021 email from attorney Jennifer Maleski to the Trustee, Attorney Maleski relayed the following information from Millstone attorney Patricia Jefferson: "On September 21, MMD claims they transferred their email and file backup to a new host and in the transition, "lost everything."  Every single email pre- 9/21 is gone.  Based on some research our outside IT guys did, it looks like they intentionally wiped everything, and the night before closing, they were transferring files off of the server." *See* JM000006.  In a November 22, 2021 email, former Debtor and then-Millstone

62

employee Ian Kobos reported that "Kelli Festa still had access to information that was wiped after the 'wipe.'  The wipe happened around 5pm on Friday, September 24th. . . . She had to 'ask for permission' to send me these [sales] reports . . . that were previously wiped after the wipe. Where did they come from and who gave her permission?"  *See* TRUSTEE013180.  The items also include those which were pilfered from the Debtor's safe by Defendant Casey Parzych, as described in an October 1, 2021 email from counsel to Millstone to counsel for the Debtor-in-possession, which reports that "this morning Millstone discovered that the safe at the Main Street Property, which had been filled with documents yesterday afternoon, was entirely empty. We confirmed that someone entered the Main Street Property yesterday evening, and their cell phone, identified as 'Casey's Phone' connected to the Main Street wifi at 6:43 p.m. and 11:18 p.m."  *See* FG40459.

8.      Identify all facts and Documents supporting Your assertion that "Pilfering Entities utilized the same employees, telephone number and address as the Debtor," as stated in Paragraph 229 of the Amended Complaint.

ANSWER:     Plaintiff objects to this contention interrogatory as a premature, improper, and unduly burdensome attempt to force Plaintiff to marshal her case on paper while discovery is ongoing.  Plaintiff further objects to this interrogatory on the grounds that discovery is incomplete and the Defendants have not yet produced a single document in response to the Plaintiff's requests for production.  By way of further response, *see* objections and responses to Rittenburg Interrogatory #2, *supra*, Rittenburg Interrogatory #10, *supra*, and Best Bev Interrogatory #1, *supra*, which are incorporated by reference herein.

63

9.    Identify all facts and Documents supporting Your assertion that "Defendants intentionally failed to keep adequate books and records rendering it impossible to disentangle the affairs of the Debtor from those of the Pilfering Entities," as stated in Paragraph 231 of the Amended Complaint.

ANSWER:    See objections and response to Boyer Interrogatory #6, *infra*, which are

incorporated by reference herein.

10.    Identify every effort You made to understand the books and records describing the affairs of the Debtor.

ANSWER:    The Trustee objects to this interrogatory as overbroad, unduly burdensome, and

beyond the scope of permissible discovery as it is not relevant to any party's claim or defense.

### **CASEY PARZYCH**

1.    Identify all facts and Documents supporting Your assertion that "Casey Parzych conducted Debtor business, including communications with Debtor's outside counsel, using his Polebridge Entities email address (casey@gooddesigninc.com)," as stated in Paragraph 56 of the Amended Complaint.

ANSWER: *See* objections and response to Rittenburg Interrogatory #10, *supra*, which are

incorporated by reference herein.  Subject to and without waiving the foregoing  objections, by

way of further response, pursuant to Federal Rule of Civil Procedure 33(d), further documents

responsive to this interrogatory may be identified by examining the documents which have been

and will be produced in this matter, and the burden of deriving or ascertaining the answer will be

substantially the same for all parties.

2.    Identify all facts and Documents supporting Your assertion that "Defendant Casey Parzych, as organizer, registered American Cannabis LLC as a Pennsylvania limited liability company for the purposes of diverting the profits from Wynk Seltzer away from the Debtor," as stated in Paragraph 88 of the Amended Complaint.

64

ANSWER:     *See* objections and response to Rittenburg Interrogatory #2, *supra*, which are

incorporated by reference herein.

3.     Identify all facts and Documents supporting Your assertion that the contemplated transactions "were closely coordinated among the Defendants, with Defendants Casey Parzych and Sheehan leading the scheme," as stated in Paragraph 110 of the Amended Complaint.

ANSWER:     Plaintiff objects to this contention interrogatory as a premature, improper, and

unduly burdensome attempt to force Plaintiff to marshal her case on paper while discovery is

ongoing.  Plaintiff further objects to this interrogatory on the grounds that discovery is

incomplete and the Defendants have not yet produced a single document in response to the

Plaintiff's requests for production.  By way of further response, *see* objections and responses to

Rittenburg Interrogatory #2, *supra*, Rittenburg Interrogatory #10, *supra*, and Best Bev

Interrogatory #1, *supra*, which are incorporated by reference herein.

4.     Identify all facts and Documents supporting Your assertion that "Defendants Sheehan and Casey Parzych jointly retained Washington D.C.-based public relations firm kglobal to direct marketing strategies in light of Debtor's bankruptcy and Sheehan's anticipated takeover of Debtor's assets," as stated in Paragraph 116 of the Amended Complaint.

ANSWER:  The Trustee objects to this interrogatory as unduly burdensome and intended to

harass the Trustee given that Defendants Parzych and Sheehan admitted this allegation in their

Answer.  *See* D.I. 69 at ¶ 116.

5.     Identify all facts and Documents supporting Your assertion that "Defendant Parzych told Debtor employees not to come to work," as stated in Paragraph 156 of the Amended Complaint.

65

ANSWER: *See* objections and response to Best Bev LLC Interrogatory #1, *supra*, which are incorporated by reference herein.

6.      Identify all facts and Documents supporting Your assertion that "[a] forensic analysis of the Debtor's Wi-Fi system disclosed that a device named 'Casey's Phone' logged into the Debtor's network at a time contemporaneous with the removal," as stated in Paragraph 194 of the Amended Complaint.

ANSWER: Plaintiff objects to this contention interrogatory as a premature, improper, and unduly burdensome attempt to force Plaintiff to marshal her case on paper while discovery is ongoing. Plaintiff further objects to this interrogatory on the grounds that discovery is incomplete and the Defendants have not yet produced a single document in response to the Plaintiff's requests for production. Subject to and without waiving the foregoing objections, an October 1, 2021 email from counsel to Millstone to counsel for the Debtor-in-possession, reports that "this morning Millstone discovered that the safe at the Main Street Property, which had been filled with documents yesterday afternoon, was entirely empty. We confirmed that someone entered the Main Street Property yesterday evening, and their cell phone, identified as 'Casey's Phone' connected to the Main Street wifi at 6:43 p.m. and 11:18 p.m." *See* FG40459.

7.      Identify all Persons who You believe may have discoverable material, knowledge, or information Relating in any way to this Action or the Subject Matter of this Action, and for each, Identify the subject matter of the discoverable material Identified or information these Persons may possess.

ANSWER:     Pursuant to Federal Rule of Civil Procedure 33(d), information responsive to this request may be identified by examining the Trustee's Initial Disclosures, the instant interrogatory

66

responses, and the documents which have been and will be produced in this matter, and the

burden of deriving or ascertaining the answer will be substantially the same for all parties.

8.      Identify all Persons who provided any facts and information that You included in the Amended Complaint.

ANSWER:      Pursuant to Federal Rule of Civil Procedure 33(d), information responsive to this

request may be identified by examining the Trustee's Initial Disclosures, the instant interrogatory

responses, and the documents which have been and will be produced in this matter, and the

burden of deriving or ascertaining the answer will be substantially the same for all parties.

9.      Identify all locations where any Documents or Communications disclosed in response to these Requests are or were stored.

ANSWER:      The documents and communications disclosed in response to these interrogatories

are either publicly available or cited by Bates number herein and already produced to Defendants

by the Trustee.

10.     Identify all actions you took to preserve the Debtor's electronic data and cloud computing drives and accounts.

ANSWER:      Due to the Defendants' misconduct as set forth further at length herein, the bulk of

the Debtor's electronic data and cloud computing drives were destroyed and stolen, and the

Trustee was thus unable to "preserve" data which she never gained access to.  A limited amount

of Debtor electronic data was gathered by the Trustee, and has been produced to Defendants in

this litigation.

11.     Identify all Documents and Communications made by and between You and Anthony Lorubbio, or by and between You and any other Person Related to Anthony Lorubbio regarding the Debtor and any defendant in this Action.

ANSWER:     Plaintiff objects to this interrogatory as unduly burdensome.  Plaintiff further objects to this interrogatory on the grounds that usage of the defined term "Related to" renders it nonsensical.  Subject to and without waiving the foregoing objections, by way of further response, pursuant to Federal Rule of Civil Procedure 33(d), documents responsive to this interrogatory may be identified by examining the documents which have been and will be produced in this matter, and the burden of deriving or ascertaining the answer will be substantially the same for all parties.

12.     Identify any witnesses whom You expect to call at trial and the subject matter upon which each witness is expected to testify.

ANSWER:     Plaintiff objects to this interrogatory as premature.  Plaintiff further objects to this interrogatory to the extent that it seeks information protected by the attorney-client privilege, work product doctrine, or any applicable privilege or immunity.  Subject to and without waiver of the foregoing objections, Plaintiff avers that discovery in this matter is ongoing and she has not yet made a decision as to the fact witnesses she intends to call at trial in this matter.  Plaintiff will produce information regarding testifying fact witnesses in the time and manner required by the Scheduling Order and the applicable Federal Rules of Civil Procedure, Federal Rules of Bankruptcy Procedure, and local rules.

13.     Identify all exhibits that You intend to use at the trial in this Action.

ANSWER:     Plaintiff objects to this interrogatory as premature.  Plaintiff further objects to this interrogatory to the extent that it seeks information protected by the attorney-client privilege, work product doctrine, or any applicable privilege or immunity.  Subject to and without waiver of the foregoing objections, Plaintiff avers that discovery in this matter is ongoing and she has not yet made a decision as to the exhibits she intends to use at trial in this matter.  Plaintiff will produce information regarding trial exhibits in the time and manner required by the Scheduling Order and the applicable Federal Rules of Civil Procedure, Federal Rules of Bankruptcy Procedure, and local rules.

### GOOD DESIGN, INC.

1.      Identify all facts and Documents supporting Your assertion that "CBDelight was manufactured, packaged, and marketed using Debtor resources, labor, and material, including but not limited to: office and warehouse space for operations, the purchase of additional canning/bottling equipment utilized for the purposes of Good Design/Polebridge, sales services and incentives, marketing services, graphic design services, digital marketing and advertising services, legal services, intellectual property, and bottling services," as stated in Paragraph 50 of the Amended Complaint.

ANSWER:     *See* objections and response to Rittenburg Interrogatory #10, *supra*, which are incorporated by reference herein.

2.      Identify all facts and Documents supporting Your assertion that "flyers were created using the Debtor's marketing files, but with the Faber brand name replaced with the Well Rebellion name," as stated in Paragraph 165 of the Amended Complaint.

ANSWER:     *See* objections and response to Best Bev LLC Interrogatory #1, *supra*, which are incorporated by reference herein.  By way of further response, Paragraph 165 of the Amended Complaint states that "Certain of the Defendants, including Defendants Festa and Culbertson,

69

utilized custom Well Rebellion flyers which included their cell phone numbers to market the product for the benefit of Best Bev. Upon information and belief, the flyers were created using the Debtor's marketing files, but with the Faber brand name replaced with the Well Rebellion name." The contentions in paragraph 165 are supported by the following Bates-numbered documents produced by the Trustee: TRUSTEE013259, depicting a Well Rebellion flyer which bears an uncanny similarity to the marketing material used by the Debtor and which encourages potential customers to "Call / Text RF" at (412) 855.8767, a telephone number belonging to Defendant Culbertson; and TRUSTEE013249, depicting the same flyer with a handwritten note "Kelly Dolan – 973-573-1441." Kelly Dolan is an alias of Defendant Festa, and (973) 573-1441 is Defendant Festa's telephone number.

3.    Identify all facts and Documents supporting Your assertion that "Well Rebellion was the new name for the liquor product Defendants manufactured and bottled using Debtor resources and employees," as stated in Paragraph 163 of the Amended Complaint.

ANSWER:    *See* objections and response to Best Bev LLC Interrogatory #1, *supra*, which are incorporated by reference herein.

4.    Identify the allegedly "stolen Debtor equipment as well as the Debtor's supposedly deleted internal data," as referenced in Paragraph 164 of the Amended Complaint.

ANSWER:    *See* objections and responses to Best Bev LLC Interrogatory #1, *supra*, and Canvas 340 Interrogatory #7, *infra*, which are incorporated by reference herein.

5.    Identify all facts and Documents supporting Your assertion that "Debtor had not been fulfilling customer orders," as stated in Paragraph 156 of the Amended Complaint.

ANSWER: *See* objections and response to Best Bev LLC Interrogatory #1, *supra*, which are incorporated by reference herein. By way of further response, the Trustee further objects to this interrogatory as mischaracterizing the allegations of Paragraph 156, which states in relevant part that, "[o]n September 27, 2021, Millstone's counsel reported to the Debtor's counsel that . . . the Debtor had not been fulfilling customer orders[.]" The paragraph is referring to a September 27, 2021 email from Millstone attorney Patricia Jefferson to the Debtor's bankruptcy counsel in which Ms. Jefferson reported that "I am working on the list of open items for you, but more pressing--- why were employees told not to come in this week? That is what has been relayed to us by the employees and not a single employee is in the building today. I also need some clarity on Casey's explanation as to why he hasn't been filling orders. Faber products are out of stock in basically every store, and he confirmed in response to our DD questions that he was filling orders. Yet, there is no backlog of inventory or glass bottles at the warehouse. I need to know what's going on with employees and orders asap. It seems that the business has simply shut down." *See* FG39076.

6.      Identify all facts and Documents supporting Your assertion that "there was no backlog of inventory or glass bottles at the Debtor's premises," as stated in Paragraph 156 of the Amended Complaint.

ANSWER:      *See* objections and response to Best Bev LLC Interrogatory #1, *supra*, which are incorporated by reference herein. By way of further response, the Trustee further objects to this interrogatory as mischaracterizing the allegations of Paragraph 156, which states in relevant part that, "[o]n September 27, 2021, Millstone's counsel reported to the Debtor's counsel that . . .

71

there was no backlog of inventory or glass bottles at the Debtor's premises." The paragraph is referring to a September 27, 2021 email from Millstone attorney Patricia Jefferson to the Debtor's bankruptcy counsel in which Ms. Jefferson reported that "I am working on the list of open items for you, but more pressing--- why were employees told not to come in this week? That is what has been relayed to us by the employees and not a single employee is in the building today. I also need some clarity on Casey's explanation as to why he hasn't been filling orders. Faber products are out of stock in basically every store, and he confirmed in response to our DD questions that he was filling orders. Yet, there is no backlog of inventory or glass bottles at the warehouse. I need to know what's going on with employees and orders asap. It seems that the business has simply shut down." *See* FG39076.

7.      Identify all facts and Documents supporting Your assertion that "[o]n or about July 6, 2021, Defendants caused an industrial shrink wrapper machine (PMI Shrink Wrapper with Heat Tunnel, SI-TW30, Serial No. 02498) belonging to the Debtor to be delivered to 2512 Quakertown Road for use by Best Bev," as stated in Paragraph 150 of the Amended Complaint.

ANSWER:      *See* objections and response to Best Bev LLC Interrogatory #1, *supra*, which are incorporated by reference herein.

 8.      Identify all facts and Documents supporting Your assertion that "other bidders informed PNC's counsel that they were dropping out," as stated in Paragraph 136 of the Amended Complaint.

ANSWER: Plaintiff objects to this contention interrogatory as a premature, improper, and unduly burdensome attempt to force Plaintiff to marshal her case on paper while discovery is ongoing. Plaintiff further objects to this interrogatory on the grounds that discovery is

incomplete and the Defendants have not yet produced a single document in response to the

Plaintiff's requests for production.  Subject to and without waiving the foregoing objections, in

an October 19, 2021, email from attorney Jennifer Maleski to the Trustee, attorney Maleski

reported, inter alia, that:

> Casey's father owns the building at 2300 Trumbauerville Road that was used by MMD and housed the EtOH/AgTech canning equipment and some of PNC's collateral.  In a letter to PNC prior to the bankruptcy (which we can provide) ETOH admitted that Casey's father would only lease to them going forward because of their relationship with Casey (as business partners) and would not negotiate with anyone else.  This was not disclosed in the stalking horse APA or in the sale motion so PNC did not think of it as anything more than posturing.  The lease was listed in the stalking horse APA for assumption and a copy was uploaded to the data room.  Suddenly one day (not coincidentally during the week that interested buyers were touring the business) a document was added to the data room that stated that this lease was expired and any buyer would be required to remove the equipment immediately upon closing.   This disclosure no doubt spooked certain bidders (including Bruce Toll whose counsel advised me and Patti that Toll dropped out because it was obvious the sale was designed for ETOH to win and was not a level playing field).  I immediately raised the issue to Flaster which seemed unconcerned and disclaimed any collusion by Casey or his father.  The issue was resolved by a revised document uploaded to the data room that said the landlord would negotiate and provided his number.  When Millstone contacted Casey's father they were told he won't rent to anyone other than ETOH because Shawn Sheehan (owner) is his business partner. . . .
>
> [T]he only connection between ETOH and MMD disclosed in the sale motion is the above referenced equipment leases. That's it.  We were aware, however, of other connections - including that ETOH or an affiliate loaned money to Polebridge and that Casey and his wife were personally obligated on that debt.  The sale motion also

73

contained vague representations that EtOH might hire employees of MMD (though no specific disclosure about Casey). PNC objected to these disclosures as being inadequate. Flaster tried to argue that this was an issue for the sale hearing, but begrudgingly agreed to disclose the connections on the record and in a supplemental affidavit (which was filed). There was no mention of DrinkWynk during these disclosures (though we learned about it later). Casey only disclosed the connections that we mentioned in our objection. To this day we do not know the extent of the connections between EtOH/AgTech and their affiliates and MMD/Casey and their affiliates. We also repeatedly asked questions about a convertible note showing on MMD's balance sheet and who held the note. Flaster would not respond to this inquiry - I suspect the note is held by the stalking horse or an affiliate. . . .

The warning signs were all over this case from day 1 and PNC raised many concerns with MMD and its counsel - most of which were ignored, fought about, or disclosures reluctantly made. The entire sale process was rushed through in an effort to quell bidding, including a ridiculous original timeline, slow due diligence responses by MMD and the broker, etc. Bruce Toll was interested in the company but was quickly scared off by the obvious advantage being given to the stalking horse. We were able to argue for more time for due diligence and the bid deadline, but MMD had little concern for maximizing value.

Casey clearly favored EtOH because he was going to be part of the Newco (though that was never actually disclosed). They were so confident that ETOH would be the only bidder that they started consolidating the business lines and employees BEFORE the bankruptcy was filed. Then when Millstone won Casey pretty overtly sabotaged the business, wiped e-mails and stole documents from a safe. He was aided in these efforts by Kelly Festa who MMD retained to continue meeting estate obligations. She is to be paid $2000 per week but has pretty much been unavailable (she initially demanded a flat upfront fee of $15,000 which PNC rejected, but Flaster was willing to agree to). She told Flaster and Millstone that

74

she was going to pursue a career in psychology.  The truth is she was
hired by CanMan (and is apparently an owner of that entity).

*See* JM000003-5.

9.      Identify all of the "other bidders" referenced in Paragraph 136 of the Amended
Complaint.

ANSWER:     *See* objections and response to Good Design, Inc. Interrogatory #8, *supra*, which

are incorporated by reference herein.

10.     Identify all of the "numerous instances described in this Complaint of the Wynk Entities
using the Debtor's equipment, facilities, and employees," and identify all facts and documents
supporting the same, as stated in Paragraph 142 of the Amended Complaint.

ANSWER:     See objections and response to Rittenburg Interrogatory #2, *supra*, which are

incorporated by reference herein.

## **KELLY FESTA**

1.      Identify all facts and Documents supporting Your assertion that "[u]sing Debtor
computers, Defendant Festa provided administrative support for the filing of Polebridge's
registration documents," as stated in Paragraph 46 of the Amended Complaint.

ANSWER:     *See* objections and response to Rittenburg Interrogatory #10, *supra*, which are

incorporated by reference herein.

2.      Identify all facts and Documents supporting Your assertion that "[u]sing Debtor
computers, Defendant Festa provided administrative support for the filing of Good Design's
registration documents," as stated in Paragraph 47 of the Amended Complaint.

ANSWER:     *See* objections and response to Rittenburg Interrogatory #10, *supra*, which are

incorporated by reference herein.

3.      Identify all facts and Documents supporting Your assertion that "[w]hile employed full-time as the Debtor's CFO, Defendant Festa utilized a Polebridge Entities email address (kellyfesta@gooddesigninc.com)," as stated in Paragraph 55 of the Amended Complaint.

ANSWER:  *See* objections and response to Rittenburg Interrogatory #10, *supra*, which are incorporated by reference herein.  By way of further response, pursuant to Federal Rule of Civil Procedure 33(d), further documents responsive to this interrogatory may be identified by examining the documents which have been and will be produced in this matter, and the burden of deriving or ascertaining the answer will be substantially the same for all parties.

 4.      Identify all facts and Documents supporting Your assertion that "Defendant Festa later falsely informed Millstone that the machine was broken and scrapped before closing," as stated in Paragraph 150 of the Amended Complaint.

ANSWER:     *See* objections and response to Best Bev LLC Interrogatory #1, *supra*, which are incorporated by reference herein.

5.      Identify all facts and Documents supporting Your assertion that Defendant Festa's testimony "is contradicted by numerous facts, including: a) due to standardized safeguards and warnings issued by the Debtor's cloud provider prior to mass deletion of data, and a thirty day hold period during which deleted data can be recovered, it is highly improbable that all of the Debtor's email and electronic data could be inadvertently destroyed; b) in addition to data stored on cloud services, the Debtor's computers were wiped of meaningful data prior to their transfer to Millstone; c) a forensic analysis conducted by Millstone indicated that the data was not destroyed, but instead transferred; and d) in discussions which occurred after the supposed deletion of data, Defendant Festa was able to retrieve specifically requested electronic documents belonging to the Debtor, but only after reporting that she had to ask for permission to do so," as stated in Paragraph 155 of the Amended Complaint.

ANSWER:  Plaintiff objects to this contention interrogatory as a premature, improper, and unduly burdensome attempt to force Plaintiff to marshal her case on paper while discovery is ongoing.

76

Plaintiff further objects to this interrogatory on the grounds that discovery is incomplete and the Defendants have not yet produced a single document in response to the Plaintiff's requests for production. Subject to and without waiving the foregoing objections, in an October 19, 2021 email from attorney Jennifer Maleski to the Trustee, Attorney Maleski relayed the following information from Millstone attorney Patricia Jefferson: "On September 21, MMD claims they transferred their email and file backup to a new host and in the transition, 'lost everything.' Every single email pre- 9/21 is gone. Based on some research our outside IT guys did, it looks like they intentionally wiped everything, and the night before closing, they were transferring files off of the server." *See* JM000006. In a November 22, 2021 email, former Debtor and then-Millstone employee Ian Kobos reported that "Kelli Festa still had access to information that was wiped after the 'wipe.' The wipe happened around 5pm on Friday, September 24th. . . . She had to 'ask for permission' to send me these [sales] reports . . . that were previously wiped after the wipe. Where did they come from and who gave her permission?" *See* TRUSTEE013180.

6.      Identify all facts and Documents supporting Your assertion that "the Polebridge Entities, with the substantial assistance of the Insider Defendants, misappropriated Debtor resources, property, and personnel to generate sales and profits from CBDelight and Faber Hand Sanitizer products," as stated in Paragraph 20 of the Amended Complaint.

ANSWER:     *See* objections and response to Rittenburg Interrogatory #10, *supra*, which are incorporated by reference herein.

7.      Identify all facts and Documents supporting Your assertion that "prior to the Millstone deal closing, the Insider Defendants intentionally deleted, wiped, or stole all the Debtor's electronic data and cloud computing drives," as stated in Paragraph 154 of the Amended Complaint.

77

ANSWER:  Plaintiff objects to this contention interrogatory as a premature, improper, and unduly burdensome attempt to force Plaintiff to marshal her case on paper while discovery is ongoing.  Plaintiff further objects to this interrogatory on the grounds that discovery is incomplete and the Defendants have not yet produced a single document in response to the Plaintiff's requests for production.  Subject to and without waiving the foregoing objections, in an October 19, 2021 email from attorney Jennifer Maleski to the Trustee, Attorney Maleski relayed the following information from Millstone attorney Patricia Jefferson: "On September 21, MMD claims they transferred their email and file backup to a new host and in the transition, 'lost everything.'  Every single email pre- 9/21 is gone.  Based on some research our outside IT guys did, it looks like they intentionally wiped everything, and the night before closing, they were transferring files off of the server."  *See* JM000006.  In a November 22, 2021 email, former Debtor and then-Millstone employee Ian Kobos reported that "Kelli Festa still had access to information that was wiped after the 'wipe.'  The wipe happened around 5pm on Friday, September 24th. . . . She had to 'ask for permission' to send me these [sales] reports . . . that were previously wiped after the wipe.  Where did they come from and who gave her permission?"  *See* TRUSTEE013180.

8.      Identify all facts and Documents supporting Your assertion that "Insider Defendants caused the Debtor to fail to comply with the most basic principles of corporate governance and internal controls," as stated in Paragraph 172 of the Amended Complaint.

ANSWER:     Plaintiff objects to this contention interrogatory as a premature, improper, and unduly burdensome attempt to force Plaintiff to marshal her case on paper while discovery is

78

ongoing. Plaintiff further objects to this interrogatory on the grounds that discovery is incomplete and the Defendants have not yet produced a single document in response to the Plaintiff's requests for production. Plaintiff further objects to this interrogatory as calling for a legal conclusion. By way of further response, *see* objections and responses to Rittenburg Interrogatory #2, *supra*, Rittenburg Interrogatory #10, *supra*, Best Bev Interrogatory #1, *supra*, and Rittenburg Interrogatory #7, *supra*, which are incorporated by reference herein.

9.      Identify all facts and Documents supporting Your assertions as stated in Paragraph 204 of the Amended Complaint, including all subparts, that "[t]he Insider Defendants breached their fiduciary duties to the Debtor."

ANSWER:     Plaintiff objects to this contention interrogatory as a premature, improper, and unduly burdensome attempt to force Plaintiff to marshal her case on paper while discovery is ongoing. Plaintiff further objects to this interrogatory on the grounds that discovery is incomplete and the Defendants have not yet produced a single document in response to the Plaintiff's requests for production. Plaintiff further objects to this interrogatory as calling for a legal conclusion. By way of further response, *see* objections and responses to Rittenburg Interrogatory #2, *supra*, Rittenburg Interrogatory #10, *supra*, Best Bev Interrogatory #1, *supra*, and Rittenburg Interrogatory #7, *supra*, which are incorporated by reference herein.

10.     Identify all facts and Documents supporting Your assertion that "[t]he Insider Defendants breached their fiduciary duties to the Debtor" by "[m]aking, or allowing to be made, significant unauthorized or improper transfers," as stated in Paragraph 204 of the Amended Complaint.

ANSWER:     Plaintiff objects to this contention interrogatory as a premature, improper, and unduly burdensome attempt to force Plaintiff to marshal her case on paper while discovery is

ongoing.  Plaintiff further objects to this interrogatory on the grounds that discovery is incomplete and the Defendants have not yet produced a single document in response to the Plaintiff's requests for production.  Plaintiff further objects to this interrogatory as calling for a legal conclusion.  By way of further response, *see* objections and responses to Rittenburg Interrogatory #2, *supra*, Rittenburg Interrogatory #10, *supra*, Best Bev Interrogatory #1, *supra*, and Rittenburg Interrogatory #7, *supra*, which are incorporated by reference herein.

## MICHAEL BOYER

1.      Identify how "Defendant Boyer was breaching fiduciary duties," as stated in Paragraph 176 of the Amended Complaint.

ANSWER:     Plaintiff objects to this interrogatory as calling for a legal conclusion.  Subject to and without waiving this objection, Defendant Boyer served as the Debtor's general counsel while simultaneously acting as counsel to the Polebridge Entities and the Wynk Entities to the considerable prejudice and detriment of the Debtor and its creditors.  Defendant Boyer breached his fiduciary duties to the Debtor by simultaneously representing the Debtor, the Polebridge Entities, and the Wynk Entities, which, as set forth herein, existed for the purpose of defrauding the Debtor and its creditors.  Moreover, Defendant Boyer as general counsel to the Debtor knew or should have known of management's wrongdoing and failure to follow proper standards of corporate governance as set forth herein, had a duty to take corrective measures, and actively assisted Defendants' scheme instead of fulfilling his duty to correct the wrongdoing.

2.      Identify all facts and Documents supporting Your assertion that "[t]he Insider Defendants breached their fiduciary duties to the Debtor" by "[c]ausing the Debtor to enter into transactions

80

with affiliates and family members of its managers and members without proper authorization," as stated in Paragraph 204 of the Amended Complaint.

ANSWER:     Plaintiff objects to this contention interrogatory as a premature, improper, and unduly burdensome attempt to force Plaintiff to marshal her case on paper while discovery is ongoing.  Plaintiff further objects to this interrogatory on the grounds that discovery is incomplete and the Defendants have not yet produced a single document in response to the Plaintiff's requests for production.  Plaintiff further objects to this interrogatory as calling for a legal conclusion.  By way of further response, *see* objections and responses to Rittenburg Interrogatory #2, *supra*, Rittenburg Interrogatory #10, *supra*, Best Bev Interrogatory #1, *supra*, and Rittenburg Interrogatory #7, *supra*, which are incorporated by reference herein.

3.     Identify all facts and Documents supporting Your assertion that "[t]he Insider Defendants breached their fiduciary duties to the Debtor" by "[e]ngaging in numerous acts of self- dealing and theft for the benefit of the Pilfering Entities," as stated in Paragraph 204 of the Amended Complaint.

ANSWER:     Plaintiff objects to this contention interrogatory as a premature, improper, and unduly burdensome attempt to force Plaintiff to marshal her case on paper while discovery is ongoing.  Plaintiff further objects to this interrogatory on the grounds that discovery is incomplete and the Defendants have not yet produced a single document in response to the Plaintiff's requests for production.  Plaintiff further objects to this interrogatory as calling for a legal conclusion.  By way of further response, *see* objections and responses to Rittenburg Interrogatory #2, *supra*, Rittenburg Interrogatory #10, *supra*, Best Bev Interrogatory #1, *supra*, and Rittenburg Interrogatory #7, *supra*, which are incorporated by reference herein.

4.      Identify all facts and Documents supporting Your assertion that "[t]he Insider Defendants breached their fiduciary duties to the Debtor" by "[c]ausing or allowing the Debtor's funds to be commingled with the funds of other persons or entities," as stated in Paragraph 204 of the Amended Complaint.

ANSWER:      Plaintiff objects to this contention interrogatory as a premature, improper, and unduly burdensome attempt to force Plaintiff to marshal her case on paper while discovery is ongoing.  Plaintiff further objects to this interrogatory on the grounds that discovery is incomplete and the Defendants have not yet produced a single document in response to the Plaintiff's requests for production.  Plaintiff further objects to this interrogatory as calling for a legal conclusion.  By way of further response, *see* objections and responses to Rittenburg Interrogatory #2, *supra*, Rittenburg Interrogatory #10, *supra*, Best Bev Interrogatory #1, *supra*, and Rittenburg Interrogatory #7, *supra*, which are incorporated by reference herein.

5.      Identify all facts and Documents supporting Your assertion that "[t]he Insider Defendants breached their fiduciary duties to the Debtor" by "[f]ailing to maintain and preserve the Debtor's assets and records, including, among other things, intentionally destroying or stealing Debtor emails and electronic records," as stated in Paragraph 204 of the Amended Complaint.

ANSWER:  Plaintiff objects to this contention interrogatory as a premature, improper, and unduly burdensome attempt to force Plaintiff to marshal her case on paper while discovery is ongoing.  Plaintiff further objects to this interrogatory on the grounds that discovery is incomplete and the Defendants have not yet produced a single document in response to the Plaintiff's requests for production.  Subject to and without waiving the foregoing objections, in an October 19, 2021 email from attorney Jennifer Maleski to the Trustee, Attorney Maleski relayed the following information from Millstone attorney Patricia Jefferson: "On September 21,

82

MMD claims they transferred their email and file backup to a new host and in the transition, 'lost everything.' Every single email pre- 9/21 is gone. Based on some research our outside IT guys did, it looks like they intentionally wiped everything, and the night before closing, they were transferring files off of the server." *See* JM000006. In a November 22, 2021 email, former Debtor and then-Millstone employee Ian Kobos reported that "Kelli Festa still had access to information that was wiped after the 'wipe.' The wipe happened around 5pm on Friday, September 24th. . . . She had to 'ask for permission' to send me these [sales] reports . . . that were previously wiped after the wipe. Where did they come from and who gave her permission?" *See* TRUSTEE013180. The pilfered items also include those which were pilfered from the Debtor's safe by Defendant Casey Parzych, as described in an October 1, 2021 email from counsel to Millstone to counsel for the Debtor-in-possession, which reports that "this morning Millstone discovered that the safe at the Main Street Property, which had been filled with documents yesterday afternoon, was entirely empty. We confirmed that someone entered the Main Street Property yesterday evening, and their cell phone, identified as 'Casey's Phone' connected to the Main Street wifi at 6:43 p.m. and 11:18 p.m." *See* FG40459.

6.      Identify all facts and Documents supporting Your assertion that "[t]he Insider Defendants breached their fiduciary duties to the Debtor" by "[f]ailing to ensure that adequate internal controls and reporting systems were in place and property utilized to mitigate against the misappropriation of Debtor funds and resources," as stated in Paragraph 204 of the Amended Complaint.

ANSWER:     Plaintiff objects to this contention interrogatory as a premature, improper, and unduly burdensome attempt to force Plaintiff to marshal her case on paper while discovery is

83

ongoing. Plaintiff further objects to this interrogatory on the grounds that discovery is

incomplete and the Defendants have not yet produced a single document in response to the

Plaintiff's requests for production. Plaintiff further objects to this interrogatory as calling for a

legal conclusion. By way of further response, *see* objections and responses to Rittenburg

Interrogatory #2, *supra*, Rittenburg Interrogatory #10, *supra*, Best Bev Interrogatory #1, *supra*,

Rittenburg Interrogatory #7, *supra*, and Canvas 340 Interrogatory #7, *supra*, which are

incorporated by reference herein. By way of further response, a May 10, 2021 letter from the

Debtor's outside accounting firm addressed to the Debtor's Board of Directors and Members of

the Debtor and its related entities reported the complete failure of the Debtor's accounting

function:

> In planning and performing our review of the consolidated financial statements of [the Debtor] and related entities . . . as of and for the year ended December 2020 in accordance with Statements on Standards for Accounting and Review Services promulgated by the Accounting and Review Services Committee of the American Institute of Certified Public Accountants (AICPA) we considered the Company's internal control over financial reporting together with certain administrative and procedural aspects which the Company employs.
>
> During the course of the review engagement we encountered numerous issues that we believe need to be addressed. These matters lead to a prior period adjustment, numerous adjusting journal entries, and a significant amount of additional time to complete the review because of the need to perform additional review procedures. . . .
>
> Moreover, the issues noted cause for substantial concern

84

> because management cannot rely entirely on the accuracy of
> internally prepared financial statements.

WG000001-4 (detailing numerous deficiencies concerning Debtor's internal controls, including the failure to document owner/manager meetings).

7.      Identify all facts and Documents supporting Your assertion that "[t]he Insider Defendants breached their fiduciary duties to the Debtor" by "[f]ailing to maintain an adequate accounting system," as stated in Paragraph 204 of the Amended Complaint.

ANSWER:      *See* objections and response to Boyer Interrogatory #6, *supra*, which are

incorporated by reference herein.

 8.      Identify all facts and Documents supporting Your assertion that "[t]he Insider Defendants breached their fiduciary duties to the Debtor" by "[f]ailing to hold regular meetings of the Board of Managers," as stated in Paragraph 204 of the Amended Complaint.

ANSWER:      *See* objections and response to Boyer Interrogatory #6, *supra*, which are

incorporated by reference herein.

9.      Identify all facts and Documents supporting Your assertion that "[t]he Insider Defendants breached their fiduciary duties to the Debtor" by "[f]ailing to conduct or maintain written records of meetings, votes, resolutions, or written consents," as stated in Paragraph 204 of the Amended Complaint.

ANSWER:      *See* objections and response to Boyer Interrogatory #6, *supra*, which are

incorporated by reference herein.

10.      Identify all facts and Documents supporting Your assertion that "[t]he Insider Defendants breached their fiduciary duties to the Debtor" by "[f]ailing to keep, or cause to be kept, accurate, complete, and proper books, records, and accounts pertaining to Debtor's affairs," as stated in Paragraph 204 of the Amended Complaint.

85

ANSWER:     See objections and response to Boyer Interrogatory #6, *supra*, which are incorporated by reference herein.

## POLEBRIDGE, LLC

1.      Identify all facts and Documents supporting Your assertion that "Debtor emails, internal documents, sales records, customer lists, invoices, and marketing strategies (but for a few which remained in system files and metadata uncovered by the Trustee) were purposefully destroyed or transferred to the Pilfering Entities," as stated in Paragraph 3 of the Amended Complaint.

ANSWER:     Plaintiff objects to this contention interrogatory as a premature, improper, and unduly burdensome attempt to force Plaintiff to marshal her case on paper while discovery is ongoing.  Plaintiff further objects to this interrogatory on the grounds that discovery is incomplete and the Defendants have not yet produced a single document in response to the Plaintiff's requests for production.  Subject to and without waiving the foregoing objections, in an October 19, 2021 email from attorney Jennifer Maleski to the Trustee, Attorney Maleski relayed the following information from Millstone attorney Patricia Jefferson: "On September 21, MMD claims they transferred their email and file backup to a new host and in the transition, 'lost everything.'  Every single email pre- 9/21 is gone.  Based on some research our outside IT guys did, it looks like they intentionally wiped everything, and the night before closing, they were transferring files off of the server."  *See* JM000006.  In a November 22, 2021 email, former Debtor and then-Millstone employee Ian Kobos reported that "Kelli Festa still had access to information that was wiped after the 'wipe.'  The wipe happened around 5pm on Friday, September 24th. . . . She had to 'ask for permission' to send me these [sales] reports . . . that were

86

previously wiped after the wipe.  Where did they come from and who gave her permission?”  *See*

TRUSTEE013180.

2.      Identify all facts and Documents supporting Your assertion that “Defendants diverted the proceeds and profits from the massively lucrative Faber Hand Sanitizer out of the hands of the Debtor where they rightfully belonged and into the pockets of Defendants,” as stated in Paragraph 63 of the Amended Complaint.

ANSWER:     *See* objections and response to Rittenburg Interrogatory #10, *supra*, which are

incorporated by reference herein.

3.      Identify all facts and Documents supporting Your assertion that “Faber Hand Sanitizer was manufactured, packaged, and marketed with Debtor resources, including labor, material, office and warehouse space for operations, the purchase of additional canning/bottling equipment, sales services and incentives, marketing services, graphic design services, digital marketing and advertising services, legal services, intellectual property, and bottling services,” as stated in Paragraph 64 of the Amended Complaint.

ANSWER:     *See* objections and response to Rittenburg Interrogatory #10, *supra*, which are

incorporated by reference herein.

4.      Identify everything “pilfered from the Debtor,” as stated in Paragraph 67 of the Amended Complaint.

ANSWER:     Plaintiff objects to this contention interrogatory as a premature, improper, and

unduly burdensome attempt to force Plaintiff to marshal her case on paper while discovery is

ongoing.  Plaintiff further objects to this interrogatory on the grounds that discovery is

incomplete and the Defendants have not yet produced a single document in response to the

Plaintiff’s requests for production.  By way of further response, *see* objections and responses to

87

Rittenburg Interrogatory #2, *supra*, Rittenburg Interrogatory #10, *supra*, Best Bev Interrogatory

#1, *supra*, and Rittenburg Interrogatory #7, *supra*, which are incorporated by reference herein.

5.      Identify all facts and Documents supporting Your assertion that "the Polebridge Entities had no manufacturing capability, facilities, or personnel whatsoever," as stated in Paragraph 67 of the Amended Complaint.

ANSWER:  *See* objections and response to Rittenburg Interrogatory #10, *supra*, which are

incorporated by reference herein.

6.      Identify all facts and Documents supporting Your assertion that "The Debtor's sales representatives also accepted tens of thousands, if not hundreds of thousands, of dollars in cash payments for Faber Hand Sanitizer, which were diverted from the Debtor for the benefit of the Polebridge Entities," as stated in Paragraph 78 of the Amended Complaint.

ANSWER:      *See* objections and response to Rittenburg Interrogatory #10, *supra*, which are

incorporated by reference herein.

7.      Identify all facts and Documents supporting Your assertion that "profits from Faber Hand Sanitizer were diverted to the Polebridge Entities, and ultimately to the Defendants," as stated in Paragraph 84 of the Amended Complaint.

ANSWER:      *See* objections and response to Rittenburg Interrogatory #10, *supra*, which are

incorporated by reference herein.

8.      Identify all facts and Documents supporting Your assertion that "Defendants intentionally deleted, wiped, and stole the Debtor's electronic data and cloud computing drives," as stated in Paragraph 3 of the Amended Complaint.

ANSWER:      Plaintiff objects to this contention interrogatory as a premature, improper, and

unduly burdensome attempt to force Plaintiff to marshal her case on paper while discovery is

ongoing.  Plaintiff further objects to this interrogatory on the grounds that discovery is

88

incomplete and the Defendants have not yet produced a single document in response to the Plaintiff's requests for production. Subject to and without waiving the foregoing objections, in an October 19, 2021 email from attorney Jennifer Maleski to the Trustee, Attorney Maleski relayed the following information from Millstone attorney Patricia Jefferson: "On September 21, MMD claims they transferred their email and file backup to a new host and in the transition, 'lost everything.' Every single email pre- 9/21 is gone. Based on some research our outside IT guys did, it looks like they intentionally wiped everything, and the night before closing, they were transferring files off of the server." *See* JM000006. In a November 22, 2021 email, former Debtor and then-Millstone employee Ian Kobos reported that "Kelli Festa still had access to information that was wiped after the 'wipe.' The wipe happened around 5pm on Friday, September 24th. . . . She had to 'ask for permission' to send me these [sales] reports . . . that were previously wiped after the wipe. Where did they come from and who gave her permission?" *See* TRUSTEE013180.

9.      Identify all facts and Documents supporting Your assertion that "Faber Hand Sanitizer exploited the Debtor's marketing staff and resources, and utilized advertising mirroring that for Debtor's liquor products," as stated in Paragraph 82 of the Amended Complaint.

ANSWER:     *See* objections and response to Rittenburg Interrogatory #10, *supra*, which are incorporated by reference herein.

10.     Identify which "documents were phony and a sham—as they failed to fully and accurately describe and account for Debtor resources being devoted to the sole benefit of the Polebridge Entities, the Wynk Entities, and, ultimately, the individual Defendants," as stated in Paragraph 104 of the Amended Complaint.

89

ANSWER:    *See* objections and response to Baldwin Interrogatory #8, *supra*, which are

incorporated by reference herein.

### R.F. CULBERTSON

1.       Identify "[t]he 'Siphon device' referenced by Defendant Culbertson," and Identify the ways in which it "constituted or utilized the Debtor's intellectual property," as referenced in Paragraph 53 of the Amended Complaint.

ANSWER:    *See* objections and response to Rittenburg Interrogatory #10, *supra*, which are

incorporated by reference herein.

2.       Identify all facts and Documents supporting Your assertion that "Debtor utilized Defendant Culbertson's Polebridge Entities' email address (rf@gooddesigninc.com) on its application for a Paycheck Protection Program loan," as stated in Paragraph 54 of the Amended Complaint.

ANSWER:  The Trustee objects to this interrogatory as unduly burdensome and intended to

harass the Trustee given that Defendants admitted this allegation in their Answer.  *See* D.I. 69 at

¶ 54.  Plaintiff further objects to this contention interrogatory as a premature, improper, and

unduly burdensome attempt to force Plaintiff to marshal her case on paper while discovery is

ongoing.  Plaintiff further objects to this interrogatory on the grounds that discovery is

incomplete and the Defendants have not yet produced a single document in response to the

Plaintiff's requests for production.  Subject to and without waiving the foregoing  objections, a

copy of the pertinent application can be found at TRUSTEE000283.

3.       Identify every "customer[] who placed orders for Faber products," as stated in Paragraph 166 of the Amended Complaint.

ANSWER:    *See* objections and response to Best Bev Interrogatory #1, *supra*, which are incorporated by reference herein.  By way of further response, the identity of all customers who placed such orders is in the exclusive possession of Defendants, who have not yet responded to the Trustee's requests for production.

4.    Identify all facts and Documents supporting Your assertion that "documents stored in a safe located at 118 North Main were removed," as stated in Paragraph 194 of the Amended Complaint.

ANSWER:  Plaintiff objects to this contention interrogatory as a premature, improper, and unduly burdensome attempt to force Plaintiff to marshal her case on paper while discovery is ongoing.  Plaintiff further objects to this interrogatory on the grounds that discovery is incomplete and the Defendants have not yet produced a single document in response to the Plaintiff's requests for production.  Subject to and without waiving the foregoing objections, an October 1, 2021 email from counsel to Millstone to counsel for the Debtor-in-possession, reports that "this morning Millstone discovered that the safe at the Main Street Property, which had been filled with documents yesterday afternoon, was entirely empty. We confirmed that someone entered the Main Street Property yesterday evening, and their cell phone, identified as 'Casey's Phone' connected to the Main Street wifi at 6:43 p.m. and 11:18 p.m."  *See* FG40459.

5.    Identify all facts and Documents supporting Your assertion that "[t]he Insider Defendants breached their fiduciary duties to the Debtor" by "[c]onspiring to attempt to sell Debtor or its assets to the Sheehan Entities at a fraction of its true value, and in so doing sabotaging offers from other interested purchasers," as stated in Paragraph 204 of the Amended Complaint.

91

ANSWER:     Plaintiff objects to this contention interrogatory as a premature, improper, and unduly burdensome attempt to force Plaintiff to marshal her case on paper while discovery is ongoing.  Plaintiff further objects to this interrogatory on the grounds that discovery is incomplete and the Defendants have not yet produced a single document in response to the Plaintiff's requests for production.

Subject to and without waiving the foregoing objections, due to Defendants' diversion of Debtor resources and profits to the Polebridge Entities, the Wynk Entities, and their principals and affiliates as described at length herein and in the Amended Complaint, the Debtor was unable to pay its debts and, on February 28, 2021, defaulted on the PNC loan.  Under scrutiny but wanting to suck every last dollar out of the Debtor, Defendants conspired to have Defendant Sheehan utilize his complex network of wholly-owned USVI entities to further defraud the Debtor and its creditors.

Defendants first attempted to have certain of the Sheehan Entities either purchase PNC's debt or purchase the Debtor's business assets outside of bankruptcy.   The contemplated transactions were not arm's length and were closely coordinated among the Defendants, with Defendants Casey Parzych and Sheehan leading the scheme.  The coordination between the Debtor and the Sheehan Entities was so egregious that the Debtor's outside counsel admonished Defendants Casey Parzych, Culbertson, Boyer, and Festa in a January 18, 2021 email:

> [I]t's very unusual and inadvisable to be including [Sheehan Entities' attorney] Carey Drangula and [the Sheehan Entities referred to as] X/O on all of these emails [concerning the Sheehan Entities acquiring the Debtor or its assets].  There is no privilege.

92

> She and X/O are an adverse party in these negotiations, particularly now that another party . . . is in the mix.  You again must treat this as an arm's length transaction for the ultimate maximum benefit of the Company between two equal suitors or you are going to get yourselves in trouble.   I would not advise continuing to seek her legal counsel or X/O's approval on anything. I would also keep confidential communications within this team unless or until a deal is made.  Any indication that you have favored X/O or have been providing them access or information that you have not provided to [the other potential purchaser] or other suitors has the potential to become fodder for litigation.   X/O and [the other potential purchaser] are competitors and we must treat them as such.

NYE000551.  Despite counsel's warning, Kelli Sheehan and Sheehan Entities CFO John Charette, full-time employees of the Sheehan Entities, maintained accounts on the Debtor's computer system and had full access to the books, records, and online accounts belonging to the Debtor.  *See* Adv. D.I. 69 at ¶ 108.

On January 21, 2021, Defendant Casey Parzych reported to the Debtor's counsel that "Shawn [Sheehan] (potential buyer) is yelling at me that this is taking so long.  I do not want to lose his interest."  NYE000893.  Shortly thereafter, Attorney Drangula sent Defendants Casey Parzych and Rittenburg a "letter of intent from Unattended 2.0 LLC for the acquisition of Midnight Madness Distilling, LLC," attaching a letter of intent signed by Defendant Uszenski on behalf of Unattended 2.0 LLC.  NYE001085.  As established by the aforecited email, Defendant Sheehan was the individual ultimately in control of Unattended 2.0 LLC.  On April 21, 2021, Attorney Drangula reported that her "principal[, i.e., Defendant Sheehan,] believes that there is a deal to be had here, one that involves his taking control of MMD."  NYE007450.

93

The plan to have Defendant Sheehan acquire control over the Debtor outside of bankruptcy failed due to Debtor co-founder Anthony Lorubbio's refusal to accept a lowball valuation of the Debtor, and Defendants pivoted to a bankruptcy alternative, which included an effort to sell the business cheap to the Sheehan Entities through a Section 363 sale or, if that failed – via a web of entities doing business as "Best Bev" and/or "Can Man" and referred to herein as the "Best Bev Entities" – through outright theft of the Debtor's property and resources, which Defendants actually effectuated as described at length herein.  *See* Objections and Response to Best Bev Interrogatory #1, which are incorporated by reference herein.  As summarized by counsel for PNC,

> In January 2021 an affiliate of ETOH/AgTech was negotiating with MMD to acquire the company.  A deal was reached (PNC is aware because it consented) for ETOH to buy the company for north of $2 million with $2 million coming to PNC and Casey and Anthony being paid $100k each. Anthony ended up blowing up that deal.  In anticipation of that deal closing, we believe that ETOH/AgTech purchased and installed equipment at MMD in January/February 2021.  After the deal fell through - and in anticipation of the June bankruptcy filing and stalking horse sale - MMD (through Flaster) suddenly signed lease agreements for the equipment.  We believe the leases were sham agreements designed to create false administrative claims that would accrue during the chapter 11 but not be paid.  Based on the lease payments that were accruing, MMD over a two year term would pay well more than double the original cost of the equipment (PNC has the cost information from ETOH).  If ETOH was the winning bidder, it would have "assume" the leases and forgiven the debt.  While the bid procedures required the buyer to pay cure amounts, it did not require anything for rejected contracts (or payment of accruing but unpaid admins). Unexpectedly, the morning of the action, MMD (through counsel) announced for the first time that in order for ETOH and Millstone's bids to be "apples to apples" Millstone must agree to pay the accrued admin expenses for ETOH and AgTech ($500k).  This was clearly designed to entice Millstone to drop out of bidding.  Thankfully they stayed in. Millstone later discovered that the accrued admin (at 12 cents per can) was

94

being booked at a rate significantly higher than the product that MMD was actually producing.

*See* JM000002.

Attorney time entries filed with this Court in support of certain of the Sheehan Entities' attorneys' application for allowance of a purported "expense reimbursement" establish the essential role of the Sheehan Entities in the scheme, indicating that, as of at least April 8, 2021, the Sheehan Entities were conspiring with the Debtor Defendants to formulate the Debtor's bankruptcy strategy, specifically "pursuing asset purchase as strategy and . . . doing so through bankruptcy filing." *See* Bankruptcy Docket Entry #187-5.  Indeed, Defendant Sheehan (using his Sheehan Entities email address, ssheehan@xo-energy.com, and his Wynk Entities email address, shawn@drinkwynk.com) and Sheehan Entities CFO John Charette (using his Wynk Entities email address, johncharette@drinkwynk.com) were copied on otherwise privileged emails between the Debtor, its bankruptcy counsel, and/or its accountants concerning the Debtor's bankruptcy strategy.  *See, e.g.,* FG009673, FG017237, FG020161. Defendants Sheehan and Casey Parzych jointly retained Washington D.C.-based public relations firm kglobal to direct marketing strategies in light of Debtor's bankruptcy and Sheehan's anticipated takeover of Debtor's assets.  *See* Adv. D.I. 69 at ¶ 116.

In a letter dated June 10, 2021, Defendant Sheehan, writing as President of Defendant EtOH Worldwide, LLC, sent a letter (the "Sheehan Letter") to coerce PNC into cooperating with a Section 363 sale of the Debtor's assets to the Best Bev Entities at a low-ball price.  *See* FG010051.  While signed only by Defendant Sheehan, the letter was drafted by Sheehan, counsel

for Sheehan and the Best Bev Entities, and the Debtor's bankruptcy counsel. *See, e.g.,* FG009739.

The Sheehan Letter states in pertinent part:

> EtOH has evaluated MMD, [i.e., the Debtor,] including the collateral pledged to PNC, and concluded that the remaining value of its business, however slight, is as an ongoing concern. As soon as MMD is reduced to its assets, the value of the business will plummet. The equipment that was pledged to PNC has significantly diminished in value and is almost inextricably integrated into the building in which it has housed. . . . EtOH's acquisition of MMD's assets will be the only viable path forward, and this path will require PNC to reset its expectations for several reasons.

* * *

> Without EtOH as a counterparty, MMD will shutter its operations in Trumbauersville, leaving 80 employees jobless in a small rural town in Pennsylvania. PNC will be left with virtually unsaleable equipment, and, in the face of Casey Parzych's personal bankruptcy, a meaningless guaranty. EtOH is aware of certain additional complicating factors that will only frustrate PNC's attempts to recoup value from MMD's assets . . . .

* * *

> The landlord of the leased premises[, i.e., 2300 Trumbauersville Road, which was leased by Defendant Finland Leasing to the Debtor,] is the father of MMD's majority Unit Holder; it is solely because of this relationship that the landlord has not pursued a default claim for nonpayment of rent under the lease. . . . [T]he landlord is unwilling to relet the premises to an unknown third party (including PNC or its eventual assignee) and nothing could compel him to do so. Without a lease at these premises, the distilled spirits production permits . . . will be immediately revoked.

*See* FG010052.

96

After the attempt to threaten PNC failed, on June 14, 2021, Defendants Festa and Uszenski utilized the Debtor's computer equipment and email system to create and edit a Word document titled "Can Man Shadow Structure," which depicted a corporate structure under which Can Man would own Faber and all the Debtor's other brands and operate out of a headquarters located 2512 Quakertown Road. *See* Objections and Response to Best Bev Interrogatory #1, which are incorporated by reference herein. On the Petition Date, the Debtor filed a motion seeking approval of a sale under Section 363 of the Bankruptcy Code (the "Sale Motion"). The Sale Motion proposed to sell the Debtor's assets to Sheehan Entity EtOH Worldwide, LLC, and failed to disclose the extent of the relationship between the Sheehan Entities and Debtor insiders.

In the run up to the Section 363 sale, Defendant Gary Parzych effectuated the threat set forth in the Sheehan letter, advising potential buyers that he would not allow anyone other than the Sheehan Entities to lease the 2300 Trumbauersville Road property, nor would he even permit a transition period for a buyer to find a new location for the operations in that building. Gary Parzych further stated that he was only willing to allow the Sheehan Entities to occupy the building because his son, Defendant Casey Parzych, was part of their organization. *See* Emails quoted *infra*.

On July 22, 2021, the Debtor caused a document to be posted to the Section 363 sale data room which stated that the 2300 Trumbauersville Road "lease is expired. All batching and bottling equipment that is currently stored in this building needs to be immediately removed from the premises upon completion of the sale. New distilled spirits plant license [sic] will then have to be obtained as all current licenses are tied to 2300 Trumbauersville Road." *See* JM000316. The

chilling impact of this sudden revelation was well-summarized in a July 22, 2021 email from

PNC's counsel to the Debtor's bankruptcy counsel:

> This document about the lease at 2300 Trumbauersville Road being
> expired was suddenly uploaded today - by MMD - and provides
> alarming information to potential bidders about the alleged need to
> immediately remove all equipment from the building upon closing
> (no mention about negotiating a new lease with the landlord or
> making short-term arrangements while the equipment is being
> moved - or even the fact that what happens post-closing will be
> decided by the landlord, not MMD).   This lease is identified in the
> Stalking Horse APA for assumption and assignment, so the sudden
> revelation that it is not available to other bidders is problematic.  The
> landlord – Finland Leasing – is owned by Casey's father.
>
> If the Stalking Horse is getting favored (undisclosed) treatment for
> this lease by virtue of this property being owned by Casey's father
> – and other potential bidders will not be afforded similar treatment
> or even told they can negotiate with Finland – this is highly
> inappropriate.  None of this has been disclosed but for a random
> paragraph uploaded for the first time today (that seems well
> designed to scare off potential bidders).  This document should be
> removed from the data room immediately since it is highly
> prejudicial.
>
> It's looking more and more like MMD is designing this sale to
> overwhelmingly favor ETOH (in a sale that no doubt will benefit
> Casey personally) – a clear violation of MMD's fiduciary
> obligations.

*See* JM000315.

The next day, counsel for PNC expressed further concerns to counsel for the United

States Trustee, and highlighted how Defendants were depressing the value of the Debtor's assets

at the anticipated Section 363 sale:

> I am very concerned about the due diligence materials being presented to potential bidders and management's favoritism to ETOH (that an affiliate holds Casey and his wife's personal guaranty over their heads is a major red flag – I don't care what was proffered yesterday). PNC got access to the data room yesterday and discovered that only 2020/2021 financials were uploaded (only COVID operations, nothing historic). PNC requested that historical financials for the past 3 years be updated (and was told by [the Debtor's auctioneer] that they would be). It just seems like management is doing everything it can to make this business look unattractive to third parties. BET Investments has already dropped out – Kurtzman told me today.

JM000329. Other bidders informed PNC's counsel that they were dropping out because it was obvious that the Insider Defendants were attempting to rig the sale in favor of the Sheehan Entities. *See* JM000003.

A July 23, 2021 email from PNC's counsel further describes the impact of the Debtor's failure to provide full disclosure as to the relationship between the Debtor, its principals, Finland Leasing, and the Sheehan Entities:

> What information was provided to PNC pre-petition has little bearing on the information being provided to third party bidders by MMD/Comly – nor is posturing by ETOH in connection with pre-petition sale negotiations pertinent to whether or not MMD is meeting its fiduciary obligations now that it is in bankruptcy. At best the information provided to third party bidders regarding this lease has been misleading and contradictory (with this lease reported as unexpired in the Schedules and disclosure schedules to the APA when allegedly it is not). At worst, the bidders are being given late information that is both inaccurate and designed to discourage participation. It's fair to alert bidders that the lease is expired and cannot be assumed or assigned under Section 365 (if that is the case). But it's another thing entirely for MMD to pre-emptively tell bidders

99

that they will have no access to that building post-closing under any circumstances (which is the message sent by the document uploaded yesterday).

Casey's father and his company, Finland Leasing, are statutory insiders of the Debtor. *See* Section 101(31)(B)(vi) and (E). If there is a side-agreement or any sort of understanding (even informal) between Finland Leasing and ETOH, it should have been disclosed at Wednesday's hearing (where it was reported that there are no agreements/understandings at all between ETOH and its affiliates/insiders and MMD and its affiliates/insiders other than the vague reference in the APA to possible retention of employees). The fact that the APA provides for assumption and assignment of this expired lease strongly suggests there is such a side-agreement. This should be disclosed in the notice you are preparing to interested parties.

Most importantly, however, Casey and his father (both insiders of MMD) cannot collude with each other and ETOH to favor ETOH over other bidders. That is what this is if Finland would only agree to enter into a new lease with ETOH and no other potential buyers. It's deliberately and purposefully putting the other bidders at a disadvantage to throw the auction to ETOH. That ETOH was aware of this advantage and previewed it for PNC is all the more troubling and suggestive of the collusion. But ETOH's posturing does not excuse MMD and Casey from meeting their fiduciary obligations to conduct a fair sale process designed to maximize the value of the assets. A fix in favor of ETOH hardly does that.

This can be corrected by MMD/Comly advising potential bidders that they too are free to reach out to Finland Leasing to negotiate terms of a new lease (or a short-term accommodation if they don't want to use that building). But any attempt by Finland Leasing (a debtor insider) to pre-emptively foreclose those discussions is a significant problem and clear violation of MMD's fiduciary obligations. All bidders need to be on equal footing with respect to potential negotiations with Finland (except for normal market issues

100

such as ability to perform, etc.) – and that should be communicated clearly to the interested bidders.

*See* FG027049.

In an email string dated August 16 & 17, 2021, counsel for PNC complained to the Debtor's

bankruptcy counsel that:

> Counsel for New Liberty[, a division of Millstone,] reached out to advise that she spoke with Casey's father (principal of the landlord for 2300 Trumbauersville Road) and was told in no uncertain terms that he will not accommodate anyone other than ETOH with respect to either a new lease or even transition time for a new buyer to find a new location for the operations in that building. He told her that he is only willing to allow ETOH occupy the building because his son is going to be involved with them going forward. All he will offer a new buyer is 30 days, which New Liberty's counsel tells me is not enough time to transition; they need at least 90 days. At the same time, he is offering ETOH (as the stalking horse) much more than that – because he knows that Casey will be involved with that enterprise.
>
> Needless to say, this is concerning and contrary to representations made by Casey and ETOH (including representations made by Casey under oath). Casey's recent declaration said that his father was willing to discuss arrangements with other bidders and that there is no formal or informal agreement between ETOH and Finland regarding the premises. Casey has also sworn (and your firm has represented) that there is no agreement – informal or otherwise – between Casey and ETOH regarding his ongoing involvement with the business. It's very obvious to anyone paying attention that that simply isn't true. Casey's father pretty much confirmed it today with New Liberty's counsel.
>
> This also reeks of continuing collusion among Casey, ETOH and his father. As estate fiduciaries, both Casey and your firm should welcome the participation of New Liberty. We therefore implore

101

you and Harry to address this immediately with Casey and his father. Casey's father – as a debtor insider – cannot favor ETOH over other potential bidders because of his son's business relationship with ETOH (current or future).  That is the very reason why relatives of debtor insiders are themselves considered debtor insiders.

* * *

The problem is that ETOH apparently intends to deal with this zoning issue by Casey's ongoing involvement in the business, but that hasn't been disclosed in the bankruptcy and should have been disclosed at the outset. The fact that there is this zoning issue (which was apparently disclosed for the first time this morning - 3 business days prior to the bid deadline) confirms that there is some sort of agreement/arrangement between Casey and ETOH (otherwise, as you point out ETOH will not be able to operate at the location yet proposes somehow to assume the lease through its APA). Casey's father confirmed this with New Liberty's counsel - stating that Casey is ETOH/Shaun Sheehan's business partner and intimating that's he's giving ETOH a lease because of that relationship.  Insisting that's not the case in the face of evidence to the contrary doesn't absolve anyone of their fiduciary duties or obligations to fully disclose these arrangements with the court and interested parties.

* * *

Casey has been less than forthcoming with everyone (including your firm) about the extent of his and his family's relationships with the stalking horse – disclosing things only when they're called out by others.  Given these prior issues, questions need to be asked and information verified – and it is not my practice to blindside opposing counsel by simply raising issues at a hearing.

All PNC wants is a fair auction process that puts bidders on somewhat equal footing and does not give ETOH an inside advantage because of Shaun Sheehan's other business relationships with Casey.

102

*See* FG033253.

On or about August 25, 2021, Millstone placed a winning bid at the Section 363 auction

for an approximate price of $1.4 million and agreements to assume certain contracts, and pay

certain administrative expenses.  Due to the Defendants' misconduct as alleged herein, the price

paid by Millstone for the Debtor's assets was less than it would have been had the Section 363 sale

been conducted on a level playing field.  *See, e.g.,* Bankruptcy Docket D.I. 195 and 214 (Millstone

filings describing how Defendants' conduct chilled bidding); FG033253.

On September 17, 2021, this Court approved the sale of substantially all of the Debtor's

assets to Millstone.  *See* Bankruptcy Docket D.I. 178.  Documents filed with this Court by

Millstone for the purposes of objecting to the Sheehan Entities' requests for allowance of

expense reimbursement aptly summarize the chilling effect of the Defendants' misconduct on the

bidding at the Section 363 auction and the inextricable intertwinement of the Debtor, the

Sheehan Entities, and the Wynk Entities:

> [t]he Stalking Horse bid[, i.e., the Sheehan Entities' collusive initial
> bid for the Debtor's assets,] did not serve as a catalyst for additional
> bids.  The mere fact that the Stalking Horse bidder was an insider of
> the Debtor with intimate and preexisting knowledge of the assets to
> be sold, and that Finland Leasing (the Debtor's landlord for 2300
> Trumbauersville Road and Casey Parzych's father) made clear he
> would only lease to [Sheehan Entity] ETOH, certainly dissuaded
> true third party purchasers.  Millstone was the only bidder at the
> auction other than ETOH and PNC, and even then, the Debtor
> attempted to prevent Millstone from bidding by announcing, *at the
> auction with no advance warning*, that the Debtor would not
> consider the bids apples-to-apples unless Millstone agreed to pay

ETOH's administrative expense claim. If ETOH's insider status wasn't . . . enough to chill bidding, the Debtor's overwhelming support of the Stalking Horse surely did. . . . ETOH had unfettered access to information regarding the valuation of the Debtor's assets and its business operations for months, if not longer, before the bankruptcy was filed.

* * *

The [Sheehan Entities'] and the Debtor's businesses and management have been inextricably [i]ntertwined since well before this bankruptcy case was filed[.] . . . The [Sheehan Entities] are insiders of the Debtor, . . . [and] the transactions resulting in the [Sheehan Entities'] request for an administrative claim were not arms-length[.] . . . Millstone submits that the invoices for many of the parts associated with [equipment which is the subject of the aforementioned sham lease agreements between the Sheehan Entities and the Debtor] demonstrates the [Sheehan Entities'] insider relationship. For example, several of the invoices that appear to be for pieces of the Leased Equipment were billed to "Kelly Festa, Etoh Worldwide." . . . Ms. Festa was, at all relevant times, the Debtor's chief operating officer. Other invoices reflect equipment that was billed and shipped to a company called "American Cannabis" located at the Debtor's business address and "ordered by Kelly Festa." . . . While the Debtor was never in the business of cannabis production, the venture formed by Debtor's members, Casey Parzych and Angus Rittenburg, with the indirect owner of the [Sheehan Entities], Shawn Sheehan, were in that business, through their "Wynk" business. Yet other invoices [pertaining to equipment used by the Wynk Entities] were billed directly to "Theobald & Oppenheimer," the dba used by the Debtor.

*See* Bankruptcy Docket D.I. 195 and 214. PNC's counsel elaborated on Defendants' misconduct

as follows:

104

False Representations made to Unsecured Creditors to Deter them from forming a committee - prior to the bankruptcy being filed - and throughout the case - unsecured creditors were told not to worry because the buyer would pay all outstanding pre-petition claims.  While ETOH's stalking horse offer did provide for the assumption of a significant number of pre-petition claims (even claims not tied to executory contracts), it never provided for the assumption of ALL unsecured claims.  PNC also advised ETOH an MMD prior to the bankruptcy that it would object to the proposed stalking horse offer to the extent it provided for unsecureds to be assumed and paid ahead of PNC's secured claim.  Nevertheless the debtor and ETOH proceeded with the stalking horse offer assuming that PNC would fold on the issue.  It did not and objected to the sale structure after which they immediately revised the stalking horse APA To remove the assumption of unsecured debt.  At the insistence of the US Trustee, a notice was sent to creditors advising of this change, but the damage was already done and Kevin could not form a committee.  We believe that, notwithstanding the change to the stalking horse offer, that creditors continued to be told that they would be paid in full.  This was false information and no question deterred the creditors from forming a committee.

Collusion during sale process - Casey's father owns the building at 2300 Trumbauerville Road that was used by MMD and housed the EtOH/AgTech canning equipment and some of PNC's collateral.  In a letter to PNC prior to the bankruptcy (which we can provide) ETOH admitted that Casey's father would only lease to them going forward because of their relationship with Casey (as business partners) and would not negotiate with anyone else.  This was not disclosed in the stalking horse APA or in the sale motion so PNC did not think of it as anything more than posturing.  The lease was listed in the stalking horse APA for assumption and a copy was uploaded to the data room.  Suddenly one day (not coincidentally during the week that interested buyers were touring the business) a document was added to the data room that stated that this lease was expired and any buyer would be required to remove the equipment immediately upon closing.  This disclosure no doubt spooked certain bidders (including Bruce Toll whose counsel advised me and Patti that Toll dropped out because it was obvious the sale was designed for ETOH to win and was not a level playing field).  I immediately raised the issue to Flaster which seemed unconcerned and disclaimed any collusion by Casey or his father.  The issue was resolved by a revised document uploaded to the data room that said the landlord would negotiate and provided his number. When Millstone contacted Casey's father they were told he won't rent to anyone other than ETOH

105

because Shawn Sheehan (owner) is his business partner.

Undisclosed connections with Stalking Horse/Affiliates - the only connection between ETOH and MMD disclosed in the sale motion is the above referenced equipment leases. That's it.  We were aware, however, of other connections - including that ETOH or an affiliate loaned money to Polebridge and that Casey and his wife were personally obligated on that debt.  The sale motion also contained vague representations that EtOH might hire employees of MMD (though no specific disclosure about Casey).  PNC objected to these disclosures as being inadequate.  Flaster tried to argue that this was an issue for the sale hearing, but begrudgingly agreed to disclose the connections on the record and in a supplemental affidavit (which was filed).  There was no mention of DrinkWynk during these disclosures (though we learned about it later).  Casey only disclosed the connections that we mentioned in our objection.  To this day we do not know the extent of the connections between EtOH/AgTech and their affiliates and MMD/Casey and their affiliates.  We also repeatedly asked questions about a convertible note showing on MMD's balance sheet and who held the note.  Flaster would not respond to this inquiry - I suspect the note is held by the stalking horse or an affiliate.

Bank accounts - MMD (and its subsidiaries) had bank accounts at PNC and Penn Community bank.  The Penn Community bank accounts were never closed.  The pre-bankruptcy account at PNC was never closed and customers continued to deposit funds into it (though PNC maintained a hold on the account so funds could only be transferred into the DIP account).  PNC also monitored the subsidiary accounts to be sure revenues of the consolidated entity (as MMD was paying all expenses through the DIP account) were transferred to the DIP account.  I raised the impropriety of this arrangement multiple times with Flaster.  Nothing was ever done.   The activity from all bank accounts needs to be reviewed to be sure funds were not misappropriated.

Strange payments during 90 days  pre-petition - during the 341, Kevin asked questions that led to disclosures that MMD funds were used to flip an expensive antique car and that MMD paid a disproportionate amount of fuel for a charter flight.  There are also many payments to Casey's father's company's (landlord for 2300 Trumbauersville and his construction company) that need to be scrutinized.  After the 341, they agreed that Casey/Angus would reimburse the estate for the

106

fuel costs (about $20,000) but I doubt they ever did.  I have the e-mail from Flaster about this.

The warning signs were all over this case from day 1 and PNC raised many concerns with MMD and its counsel - most of which were ignored, fought about, or disclosures reluctantly made.  The entire sale process was rushed through in an effort to quell bidding, including a ridiculous original timeline, slow due diligence responses by MMD and the broker, etc.  Bruce Toll was interested in the company but was quickly scared off by the obvious advantage being given to the stalking horse.  We were able to argue for more time for due diligence and the bid deadline, but MMD had little concern for maximizing value.  Casey clearly favored EtOH because he was going to be part of the Newco (though that was never actually disclosed).  They were so confident that ETOH would be the only bidder that they started consolidating the business lines and employees BEFORE the bankruptcy was filed.  Then when Millstone won Casey pretty overtly sabotaged the business, wiped e-mails and stole documents from a safe.  He was aided in these efforts by Kelly Festa who MMD retained to continue meeting estate obligations.  She is to be paid $2000 per week but has pretty much been unavailable (she initially demanded a flat upfront fee of $15,000 which PNC rejected, but Flaster was willing to agree to).  She told Flaster and Millstone that she was going to pursue a career in psychology.  The truth is she was hired by CanMan (and is apparently an owner of that entity).

JM000004 (formatting altered).

6.      Identify all facts and Documents supporting Your assertion and calculation that "Insider Defendants deprived the Debtor of millions of dollars," as stated in Paragraph 221 of the Amended Complaint.

ANSWER:     *See* objections and responses to Rittenburg Interrogatory ## 2 and 10, Best Bev

Interrogatory #1, and Culbertson Interrogatory #5, *supra*, and, and XO Energy Interrogatory #5,

*infra*, which are incorporated herein by reference.

7.      Explain and specify Your assertion that "Insider Defendants' waste of the Debtor's assets was commercially unreasonable and served no rational business purpose," as stated in Paragraph 222 of the Amended Complaint.

107

ANSWER :   Plaintiff objects to this interrogatory as calling for a legal conclusion.  Subject to

and without waiving the foregoing objection, as set forth in detail herein and in the Amended

Complaint, Insider Defendants allowed the Pilfering Entities to use the assets, personnel, and

other resources belonging to the Debtor not for the benefit of the Debtor, but instead for the

benefit of the Pilfering Entities.  It is self-evident that the use of an entity's resources in a way

that provides no benefit to that entity is commercially unreasonable and serves no rational

business purpose.

8.      Identify the electronic data and cloud computing drives that You allege were deleted,
wiped, or stolen.

ANSWER:     All of the Debtor's electronic data and cloud computing drives, with the exception

of that limited information which has been provided to the Trustee and produced to Defendants.

9.      Identify all facts and Documents supporting Your assertion that "[d]ue to the Defendants'
misconduct as alleged herein, the price paid by Millstone for the Debtor's assets was less than it
would have been had the Section 363 sale been conducted on a level playing field," as stated in
Paragraph 145 of the Amended Complaint.

ANSWER:     *See* objections and responses to Culbertson Interrogatory #5, *supra*, which are

incorporated by reference herein.

10.     Describe how you determined the original cost of the equipment referenced in Paragraph
129 of the Amended Complaint.

ANSWER:     In an October 19, 2021 email from attorney Jennifer Maleski to the Trustee,
attorney Maleski stated as follows:

> ETOH/AgTech Leases - In January 2021 an affiliate of ETOH/AgTech was
> negotiating with MMD to acquire the company.  A deal was reached (PNC is aware

108

because it consented) for ETOH to buy the company for north of $2 million with $2 million coming to PNC and Casey and Anthony being paid $100k each. Anthony ended up blowing up that deal. In anticipation of that deal closing, we believe that ETOH/AgTech purchased and installed equipment at MMD in January/February 2021. After the deal fell through - and in anticipation of the June bankruptcy filing and stalking horse sale - MMD (through Flaster) suddenly signed lease agreements for the equipment. We believe the leases were sham agreements designed to create false administrative claims that would accrue during the chapter 11 but not be paid. Based on the lease payments that were accruing, MMD over a two year term would pay well more than double the original cost of the equipment (PNC has the cost information from ETOH). If ETOH was the winning bidder, it would have "assume" the leases and forgiven the debt. While the bid procedures required the buyer to pay cure amounts, it did not require anything for rejected contracts (or payment of accruing but unpaid admins). Unexpectedly, the morning of the action, MMD (through counsel) announced for the first time that in order for ETOH and Millstone's bids to be "apples to apples" Millstone must agree to pay the accrued admin expenses for ETOH and AgTech ($500k). This was clearly designed to entice Millstone to drop out of bidding. Thankfully they stayed in. Millstone later discovered that the accrued admin (at 12 cents per can) was being booked at a rate significantly higher than the product that MMD was actually producing.

*See* JM000003.

## SHAWN SHEEHAN

1.      Identify the "complex web of entities which are ultimately owned and controlled by Defendant Sheehan," as referenced in Paragraph 24 of the Amended Complaint, and the ownership structure of those entities.

RESPONSE:   The entities are clearly identified in paragraph 44 of the Amended Complaint as

the "Sheehan Entities." To the extent their ownership is not set forth in the Amended Complaint,

it is the subject of outstanding discovery requests made by the Trustee to Defendants.

2.      Identify all facts and Documents supporting Your assertion that "Defendant Sheehan and the Sheehan Entities had an agreement with the Insider Defendants to share in the ill- gotten

109

profits from the sale of CBDelight and Faber Hand Sanitizer," as stated in Paragraph 74 of the Amended Complaint.

ANSWER:     *See* objections and response to Rittenburg Interrogatory #10, *supra*, which are

incorporated by reference herein.

3.     Identify all facts and Documents supporting Your assertion that "Kelli Sheehan (who, upon information and belief, has a familial relationship with Defendant Sheehan), while a full-time employee and agent of the Sheehan Entities, utilized the Debtor's computers to conduct business relating to the Faber Hand Sanitizer product (kelli@fabersanitizer.com)," as stated in Paragraph 83 of the Amended Complaint.

ANSWER:     *See* objections and response to Rittenburg Interrogatory #10, *supra*, which are

incorporated by reference herein.

4.     Identify what resources and profits the Defendants diverted from the Debtor to "to the Polebridge Entities, the Wynk Entities, and their principals and affiliates" as stated in Paragraph 106 of the Amended Complaint.

ANSWER:     Plaintiff objects to this contention interrogatory as a premature, improper, and

unduly burdensome attempt to force Plaintiff to marshal her case on paper while discovery is

ongoing.  Plaintiff further objects to this interrogatory on the grounds that discovery is

incomplete and the Defendants have not yet produced a single document in response to the

Plaintiff's requests for production.  By way of further response, see objections and responses to

Rittenburg Interrogatory #2, *supra*, and Rittenburg Interrogatory #10, *supra*, which are

incorporated by reference herein.

5.     Identify all facts and Documents supporting Your assertion that "Defendants conspired to have Defendant Sheehan utilize his complex network of wholly-owned USVI entities to further defraud the Debtor and its creditors," as stated in Paragraph 107 of the Amended Complaint.

110

ANSWER:   See objections and responses to Rittenburg Interrogatory #2, *supra*, Rittenburg Interrogatory #10, *supra*, Best Bev Interrogatory #1, *supra*, and Culbertson Interrogatory #5, *supra*, which are incorporated by reference herein.

6.      Identify all facts and Documents supporting Your assertion that "Kelli Sheehan and Sheehan Entities CFO John Charette . . . maintained accounts on the Debtor's computer system and had full access to the books, records, and online accounts belonging to the Debtor," as stated in Paragraph 108 of the Amended Complaint.

ANSWER:  Plaintiff objects to this contention interrogatory as a premature, improper, and unduly burdensome attempt to force Plaintiff to marshal her case on paper while discovery is ongoing.  Plaintiff further objects to this interrogatory on the grounds that discovery is incomplete and the Defendants have not yet produced a single document in response to the Plaintiff's requests for production.  The Trustee further objects to this interrogatory as unduly burdensome and intended to harass the Trustee given that Defendants admitted this allegation in their Answer.  *See* D.I. 69 at ¶ 108.

7.      Identify the equipment referenced in Paragraph 129 of the Amended Complaint.

ANSWER:  The equipment referenced in Paragraph 129 of the Amended Complaint is the equipment which is the subject of the Equipment Lease Agreements referenced in Paragraph 217 of the Amended Complaint.

8.      Identify all facts and Documents supporting Your assertion that "[t]he Insider Defendants breached their fiduciary duties to the Debtor" by "[g]rossly mismanaging Debtor's Chapter 11 Case, including allowing representatives of the Sheehan Entities to manage the bankruptcy process to the detriment of the Debtor and its estate," as stated in Paragraph 204 of the Amended Complaint.

111

ANSWER:    *See* objections and response to Culbertson Interrogatory #5, *supra,* which are

incorporated by reference herein.

9.      Identify all facts and Documents supporting Your assertion that "[t]he Insider Defendants breached their fiduciary duties to the Debtor" by "[d]estroying Debtor's attorney-client privilege by including the Wynk Entities and Sheehan Entities in numerous communications," as stated in Paragraph 204 of the Amended Complaint.


ANSWER:    *See* objections and responses to Rittenburg Interrogatory #2, *supra*, and

Culbertson Interrogatory #5, *supra*, which are incorporated by reference herein.  By way of

further response, pursuant to Federal Rule of Civil Procedure 33(d), further documents

responsive to this interrogatory may be identified by examining the documents which have been

and will be produced in this matter, and the burden of deriving or ascertaining the answer will be

substantially the same for all parties.

10.     Identify all facts and Documents supporting Your assertion that "[t]he Insider Defendants breached their fiduciary duties to the Debtor" by "[c]onspiring with the Sheehan Entities, Finland Leasing, and Gary Parzych to chill bidding at the Debtor's Section 363 sale," as stated in Paragraph 204 of the Amended Complaint.

ANSWER:    *See* objections and response to Culbertson Interrogatory #5, *supra,* which are

incorporated by reference herein.

## XO ENERGY WORLDWIDE, LLLP

1.      Identify all facts and Documents supporting Your assertion that "Debtor's employees, vendors, and customers understood Debtor and the Pilfering Entities to be one and the same," as stated in Paragraph 232 of the Amended Complaint.

112

ANSWER:      *See* objections and responses to Rittenburg Interrogatory #2, *supra*, and Best Bev

Interrogatory #1, *supra*, which are incorporated herein by reference.

2.      Identify the "acts of fraud, gross negligence, or other material breaches of their fiduciary duties," as stated in Paragraph 204 of the Amended Complaint.

ANSWER:      Plaintiff objects to this contention interrogatory as a premature, improper, and

unduly burdensome attempt to force Plaintiff to marshal her case on paper while discovery is

ongoing.  Plaintiff further objects to this interrogatory on the grounds that discovery is

incomplete and the Defendants have not yet produced a single document in response to the

Plaintiff's requests for production.  Plaintiff further objects to this interrogatory as calling for a

legal conclusion.  By way of further response, *see* objections and responses to Rittenburg

Interrogatory #2, *supra*, Rittenburg Interrogatory #10, *supra*, Best Bev Interrogatory #1, *supra*,

and Rittenburg Interrogatory #7, *supra*, which are incorporated by reference herein.

3.      Identify all facts and Documents supporting Your assertion that "Insider Defendants engaged in self-dealing," as stated in Paragraph 205 of the Amended Complaint.

ANSWER:      Plaintiff objects to this contention interrogatory as a premature, improper, and

unduly burdensome attempt to force Plaintiff to marshal her case on paper while discovery is

ongoing.  Plaintiff further objects to this interrogatory on the grounds that discovery is

incomplete and the Defendants have not yet produced a single document in response to the

Plaintiff's requests for production.  Plaintiff further objects to this interrogatory as calling for a

legal conclusion.  By way of further response, *see* objections and responses to Rittenburg

113

Interrogatory #2, *supra*, Rittenburg Interrogatory #10, *supra*, Best Bev Interrogatory #1, *supra*,

and Rittenburg Interrogatory #7, *supra*, which are incorporated by reference herein.

4.      Identify all facts and Documents supporting Your assertion that "Insider Defendants and their affiliates received millions of dollars for their roles in facilitating and implementing the breaches of fiduciary duty," as stated in Paragraph 206 of the Amended Complaint.

ANSWER:      *See* objections and responses to Rittenburg Interrogatories ## 2 and 10, Best Bev

Interrogatory #1, Culbertson Interrogatory #5, *supra*, and, and XO Energy Interrogatory #5,

*infra*, which are incorporated herein by reference.

5.      Identify all facts and Documents supporting Your assertion and calculation that "Debtor has suffered damages in an amount to be determined at trial, but which exceeds the sum of $10 million," as stated in Paragraph 208 of the Amended Complaint.

ANSWER:  Plaintiff objects to this contention interrogatory as a premature, improper,

and unduly burdensome attempt to force Plaintiff to marshal her case on paper while discovery is

ongoing.  Plaintiff further objects to this interrogatory on the grounds that discovery is

incomplete, damages have yet to be fully calculated, the Defendants have not yet produced a

single document in response to the Plaintiff's requests for production.  Subject to and without

waiving the foregoing objections, the damages sought by the Trustee include the following:

- a minimum of $8.8 million of profits attributable to the sale of Faber Hand

Sanitizer, which were stolen from the Debtor and diverted to Defendants.  A spreadsheet

maintained by the Insider Defendants (TRUSTEE013084) indicates that, between 3/25/2020 and

5/12/2020, the Debtor collected $12,959,206.13 in hand sanitizer revenue, against which the

Polebridge Entities purportedly paid the Debtor $4,136,004.72; the difference between these two

114

figures is $8,823,201.41, which is the minimum in damages attributable to the sale of Faber

Hand Sanitizer alone.  The total damages are greater due to the lack of accounting for cash

transactions (*see* objections and response to Rittenburg Interrogatory #10, *supra*) and the fact

that there were sanitizer sales conducted outside of the date range for which the Trustee currently

has data;

- a minimum of $2,949,946.49 in Debtor revenue not reflected in Debtor records

which was diverted to the Defendants.  Prior to appointment of the Trustee, the Insider

Defendants caused the Debtor to file three monthly operating reports corresponding to June

2021, July 2021, and August 2021, reporting gross sales of $357,808, $383,990, and $104,860,

respectively.  These reports were materially false, as reflected by an internal document kept

secret by the Insider Defendants (LORUBBIO0569362) which reported the Debtor's gross sales

as $1,301,440.53 for June 2021, $1,211,516.06 for July 2021, and $1,283,647.90 for August

2021.  The difference for just these three months between Debtor gross sales tracked internally

by the Insider Defendants versus that reported to the Court totals $2,949,946.49;

- a minimum of $842,985.66 in CBD-related expenses as detailed on

LORUBBIO0454074;

- a minimum of $46,713.98 due to the Parzych/Rittenburg Purchases detailed in

paragraph 178 of the Amended Complaint, *see* objections and response to Rittenburg

Interrogatory #10, *supra*;

115

- the $224,339.62 in Finland Lease Overpayments detailed in paragraph 183 of the Amended Complaint;

- the $355,778.05 in unjustified and extracontractual ETP Payments detailed in paragraph 188 of the Amended Complaint;

- the $75,000.00 payment to Defendant Boyer detailed in paragraph 277 of the Amended Complaint;

- a minimum of $280,582.03 attributable to Debtor funds and resources diverted to the Pilfering Entities detailed in paragraphs 95, 119, and 150 of the Amended Complaint, *see* Rittenburg Interrogatory #2 and Best Bev Interrogatory #1, *supra*;

- the return of Debtor property and damages arising out of Defendant Parzych and Rittenburg's breach of the Debtor's Amended and Restated Operating Agreement;

- damages attributable to the Post Petition Best Bev Transfers; and

- punitive damages in an amount to be determined at trial.

6. Identify by party each of the specific breaches of fiduciary duties alleged in Paragraph 211 of the Amended Complaint that "Defendants aided and abetted."

ANSWER: Plaintiff objects to this contention interrogatory as a premature, improper, and unduly burdensome attempt to force Plaintiff to marshal her case on paper while discovery is ongoing. Plaintiff further objects to this interrogatory on the grounds that discovery is incomplete and the Defendants have not yet produced a single document in response to the Plaintiff's requests for production. Plaintiff further objects to this interrogatory as calling for a

116

legal conclusion.  By way of further response, *see* objections and responses to Rittenburg

Interrogatory #2, *supra*, Rittenburg Interrogatory #10, *supra*, and Best Bev Interrogatory #1,

*supra*, and Rittenburg Interrogatory #7, *supra*, which are incorporated by reference herein.

7.      Identify all facts and Documents supporting Your assertion that "Defendants substantially assisted and/or encouraged the Insider Defendants to breach their fiduciary duties owed to the Debtor," as stated in Paragraph 213 of the Amended Complaint.

ANSWER:     Plaintiff objects to this contention interrogatory as a premature, improper, and

unduly burdensome attempt to force Plaintiff to marshal her case on paper while discovery is

ongoing.  Plaintiff further objects to this interrogatory on the grounds that discovery is

incomplete and the Defendants have not yet produced a single document in response to the

Plaintiff's requests for production.  Plaintiff further objects to this interrogatory as calling for a

legal conclusion.  By way of further response, *see* objections and responses to Rittenburg

Interrogatory #2, *supra*, Rittenburg Interrogatory #10, *supra*, Best Bev Interrogatory #1, *supra*,

and Rittenburg Interrogatory #7, *supra*, which are incorporated by reference herein.

8.      Identify the "improper benefits [Defendants] received," as stated in Paragraph 215 of the Amended Complaint.

ANSWER:     *See* objections and responses to Rittenburg Interrogatories ## 2 and 10, Best Bev

Interrogatory #1, Culbertson Interrogatory #5, and XO Energy Interrogatory #5, *supra*, which are

incorporated herein by reference.

9.      Identify all facts and Documents supporting Your assertion and calculation that "Defendants received millions of dollars for their roles in aiding and abetting the breaches of fiduciary duty," as stated in Paragraph 216 of the Amended Complaint.

117

RESPONSE:   *See* objections and responses to Rittenburg Interrogatories ## 2 and 10, Best Bev

Interrogatory #1, Culbertson Interrogatory #5, and XO Energy Interrogatory #5, *supra*, which are

incorporated herein by reference.

10.     Identify all facts and Documents supporting Your assertion that "[t]he Insider Defendants
breached their fiduciary duties to the Debtor" by "[c]ausing the Debtor to operate in an illegal
fashion in violation of tax laws and other regulatory obligations," as stated in Paragraph 204 of
the Amended Complaint.

ANSWER:     Plaintiff objects to this contention interrogatory as a premature, improper, and

unduly burdensome attempt to force Plaintiff to marshal her case on paper while discovery is

ongoing.  Plaintiff further objects to this interrogatory on the grounds that discovery is

incomplete and the Defendants have not yet produced a single document in response to the

Plaintiff's requests for production.  Plaintiff further objects to this contention interrogatory on the

grounds that it calls for a legal conclusion.  Subject to and without waiving the foregoing

objections, the Debtor's operations were intentionally structured to illegally avoid taxes.  *See*

NML000182 (Debtor's outside attorney states that he "get[s] the sense [the Debtor is] under

investigation [by the TTB] because they have multiple APs all with the same or similar

ownership, and they are paying the reduced rate under the Aps when they should all be

calculated together"); BR000126 (Defendant Culbertson informs Debtor's outside counsel that

"[f]or excise tax purposes . . . there's a 100k limit on the # of gallons a PA state distiller can sell

with incurring state excise tax – giving MMD a price competitive advantage in the market

price[.]  MMD then formed 5 other separate entities in order to sell up to 600,000 total gallons of

spirits in PA without incurring tax."); FG027553-54 (email to the Debtor's bankruptcy counsel

118

concerning multiple potential breaches of federal law engaged in by the Debtor, including the conduct of other business on the premises of a distilled spirits plant without proper authorization, the location of a distilled spirits plant in an enclosure connected to a residence, and a failure to list major plant equipment); BR001662 (2/28/20 Notice of Violations from TTB); BR003519 (4/15/20 email in which Defendant Culbertson states that MMD should file bankruptcy because "TTB / PLCB are going to come after [Defendant Casey Parzych] for excise tax evasion"). Moreover, as acknowledged by the Insider Defendants in their motion to dismiss briefing, it was illegal for the Debtor to be involved with products containing CBD or THC, yet, as discussed at length herein in the response to Rittenburg Interrogatories ##2 and 10, the Insider Defendants caused the Debtor to be extensively involved with products containing CBD and THC.  By way of further response, pursuant to Federal Rule of Civil Procedure 33(d), further documents responsive to this interrogatory may be identified by examining the documents which have been and will be produced in this matter, and the burden of deriving or ascertaining the answer will be substantially the same for all parties.

## XO EW, LLC

1. Identify all shadow entities and their location referred to in Paragraph 2 of the Amended Complaint.

ANSWER:  The shadow entities referred to in paragraph 2 of the Amended Complaint are the entities defined in the Amended Complaint as the Pilfering Entities, and their locations are clearly identified in Section III.B of the Amended Complaint.

2.      Identify all "industrial equipment [shipped] to 2600 Milford Square Pike, Quakertown PA 18591, a location which as paid for by the Debtor but which, upon information and belief, was used solely by the Pilfering Entities," as stated in Paragraph 97 of the Amended Complaint.

ANSWER:  *See* objections and response to Rittenburg Interrogatory #2, *supra*, which are incorporated by reference herein.  By way of further response, Paragraph 97 of the Amended Complaint states that, "On May 11, 2021, the Wynk Entities arranged for the shipment of industrial equipment to 2600 Milford Square Pike, Quakertown PA 18591 ("2600 Milford"), a location which was paid for by the Debtor but which, upon information and belief, was used solely by the Pilfering Entities."  The point is established by a May 11, 2021 invoice from Stover-Sensor Controls, Inc. to Wynk c/o AgTech VI, produced by the Trustee under Bates-number JM000224, listing Part Number 540313-0001 with the description 1/2" F Linear Trim, 316," with a Ship To address of 2600 Milford Square Pike.

3.      Identify the "numerous other invoices [that You allege] were billed to the Debtor yet either explicitly stated that they were for purposes related to Wynk Seltzer or called for deliveries to 2512 Quakertown Road, Pennsburg, Pennsylvania," including all Documents and Communications Relating thereto, as referenced in Paragraph 98 of the Amended Complaint.

ANSWER:      *See* objections and response to Rittenburg Interrogatory #2, *supra*, which are incorporated by reference herein.

 4.      Identify all facts and Documents supporting Your assertion that "Wynk Entities regularly ordered supplies for Wynk Seltzer using the Debtor's computers, telephone lines, and vendor accounts," as stated in Paragraph 100 of the Amended Complaint.

ANSWER:      *See* objections and response to Rittenburg Interrogatory #2, *supra*, which are incorporated by reference herein.

120

5.     Identify all facts and Documents supporting Your assertion that "in May 2021, Defendants caused the Debtor to transfer a Hamrick Recaser machine with an estimated value of $145,000 to 2512 Quakertown Road for use by the Pilfering Entities," as stated in Paragraph 119 of the Amended Complaint.

ANSWER:    Plaintiff objects to this contention interrogatory as a premature, improper, and unduly burdensome attempt to force Plaintiff to marshal her case on paper while discovery is ongoing.  Plaintiff further objects to this interrogatory on the grounds that discovery is incomplete and the Defendants have not yet produced a single document in response to the Plaintiff's requests for production.  Subject to and without waiving the foregoing  objections, on March 7, 2022, Millstone Spirits Group, LLC, filed a Proof of Claim (POC No. 36-1) for "at least" $1,414,000.00, including an "estimated claim amount" of $145,000 attributable to a "Hamrick Recaser Model CHALL.  Debtor's CFO informed Millstone that this piece of equipment was scrapped in May 2021, but that no documentation evidencing the disposal was available."  The facts set forth herein and in the Amended Complaint concerning the Defendants' systemic usurpation of Debtor resources to the Pilfering Entities' facility at 2512 Quakertown Road support the conclusion that this piece of equipment, which was purportedly scrapped but which Defendants could provide no documentation establishing as such, was diverted to 2512 Quakertown Road for use by the Pilfering Entities.

6.     Identify all the "goods and services which were paid for by the Debtor, but which were used for the sole benefit of Best Bev or the other Pilfering Entities," as stated in Paragraph 151 of the Amended Complaint and identify the Documents supporting the assertion.

121

ANSWER:     *See* objections and response to Best Bev LLC Interrogatory #1, *supra*, which are

incorporated by reference herein.

7.     Identify all facts and Documents supporting Your assertion that "Defendants have
intentionally sabotaged the Trustee's efforts to determine the full extent of goods and services
paid for by the Debtor but used for the sole benefit of Best Bev or the other Pilfering Entities," as
stated in Paragraph 152 of the Amended Complaint.

ANSWER:     *See* objections and responses to Canvas 340 Interrogatory # 7, *supra*, and Boyer

Interrogatory #6, *supra*, which are incorporated by reference herein.

8.     Identify all facts and Documents supporting Your assertion that Defendants "encouraged
the Debtor's former employees to work for the Best Bev Entities instead of Millstone," as stated
in Paragraph 156 of the Amended Complaint.

ANSWER: *See* objections and response to Best Bev LLC Interrogatory #1, *supra*, which are

incorporated by reference herein.  By way of further response, In a September 27, 2021 email

from Millstone attorney Patricia Jefferson to the Debtor's bankruptcy counsel, Ms. Jefferson

reported that "I am working on the list of open items for you, but more pressing--- why were

employees told not to come in this week? That is what has been relayed to us by the employees

and not a single employee is in the building today." *See* FG39076.  In an October 19, 2021 email

from attorney Jennifer Maleski to the Trustee, attorney Maleski relayed the following

information from Millstone attorney Patricia Jefferson: "A former MMD employee/now

Millstone employee told us that the day we had scheduled to meet with the employees pre-

closing, when they arrived they were met with clipboards to sign new letters to work at CanMan

and told to go home for the week, under the guise this was their actual meeting with Millstone."

*See* JM000005-6.

9. Identify all facts and Documents supporting Your assertion that Defendants "were fulfilling the Debtor's customer orders for the benefit of the Best Bev Entities instead of the Debtor," as stated in Paragraph 156 of the Amended Complaint.

ANSWER: *See* objections and response to Best Bev LLC Interrogatory #1, *supra*, which are

incorporated by reference herein.

10. Identify all facts and Documents supporting Your assertion that Defendants "were using the Debtor's inventory and equipment to produce large amounts of product for use by Best Bev," as stated in Paragraph 156 of the Amended Complaint.

ANSWER: *See* objections and response to Best Bev LLC Interrogatory #1, *supra*, which are

incorporated by reference herein.

## CAN MAN, LLC

1. Please identify all person(s) answering these Interrogatories on behalf of Plaintiff by

providing the following: the person's full name and address.

**RESPONSE:** The responses to the instant interrogatories have been prepared by undersigned

counsel with the input of the Trustee.

2. Please identify each person(s) who has/have supplied information used in answering

these Interrogatories and specify the Interrogatories for which each person(s) is/are responsible.

For each additional person, please provide their full name and address.

**RESPONSE:** The responses to the instant interrogatories have been prepared by undersigned

counsel with the input of the Trustee.

3.      Identify by name and address each person with knowledge and/or information that relates to any of the matters described in the Amended Complaint that relate to Can Man, and briefly state the substance of their knowledge and/or information.

**RESPONSE:** Pursuant to Federal Rule of Civil Procedure 33(d), information responsive to this request may be identified by examining the Trustee's Initial Disclosures, the instant interrogatory responses, and the documents which have been and will be produced in this matter, and the burden of deriving or ascertaining the answer will be substantially the same for all parties.

4.      Identify, with specificity, all damages, losses, or expenses incurred, to date, which you attribute to the specific alleged misconduct of Can Man, and all documents and witnesses supporting Your assertions.

**RESPONSE:** *See* objections and responses to Best Bev Interrogatory #1 and XO Energy Interrogatory #5, *supra*, which are incorporated by reference herein.

5.      Identify the process by which Plaintiff determined Defendants "intentionally deleted, wiped, and stole the Debtor's electronic data after Debtor filed for bankruptcy," as described in Paragraph 3 of the Amended Complaint.  In particular, state with specificity Can Man's purported involvement and identify and all documents and witnesses supporting Your assertions.

**RESPONSE:** *See* objections and response to Canvas 340 Interrogatory #7, *supra*, which are incorporated by reference herein.  By way of further response, the stolen data was used for the benefit of Can Man's effort to usurp the Debtor's business as described in detailed herein in response to Best Bev Interrogatory #1, which is incorporated by reference herein.

124

6.      Describe, with particularity Can Man's specific involvement in the Debtor's transfer of a Hamrick Recaser machine to 2512 Quakertown Road, as identified in Paragraph 119 of the Amended Complaint.

**RESPONSE:** Plaintiff objects to this contention interrogatory as a premature, improper, and unduly burdensome attempt to force Plaintiff to marshal her case on paper while discovery is ongoing.  Plaintiff further objects to this interrogatory on the grounds that discovery is incomplete and the Defendants have not yet produced a single document in response to the Plaintiff's requests for production.  Subject to and without waiving the foregoing  objections, on March 7, 2022, Millstone Spirits Group, LLC, filed a Proof of Claim (POC No. 36-1) for "at least" $1,414,000.00, including an "estimated claim amount" of $145,000 attributable to a "Hamrick Recaser Model CHALL.  Debtor's CFO informed Millstone that this piece of equipment was scrapped in May 2021, but that no documentation evidencing the disposal was available."  The facts set forth herein and in the Amended Complaint concerning the Defendants' systemic usurpation of Debtor resources to the Pilfering Entities' facility at 2512 Quakertown Road support the conclusion that this piece of equipment, which was purportedly scrapped but which Defendants could provide no documentation establishing as such, was diverted to 2512 Quakertown Road for use by the Pilfering Entities, which include Can Man.

7.      Identify all facts, witnesses, and Documents supporting Your assertion that "[w]hile operating the Debtor in Possession (the "DIP"), Defendants caused the DIP to make numerous transfers and incur debts from which the Debtor derived no benefit and which went to the sole

125

benefit of the Best Bev Entities and the other Pilfering Entities," as stated in Paragraph 148 of the Amended Complaint. In particular, state with specificity Can Man's purported involvement.

**RESPONSE:** *See* objections and response to Best Bev LLC Interrogatory #1, *supra*, which are incorporated by reference herein.  By way of further response, Can Man is located at 2512 Quakertown Road and benefitted from the orders pilfered from the Debtors.

8.      Identify the orders that were "being delivered to the Debtor's facilities when they were actually being delivered to Best Bev at 2512 Quakertown Road," as stated in Paragraph 152 of the Amended Complaint. In particular, state with specificity Can Man's purported involvement.

**RESPONSE:** *See* objections and response to Best Bev LLC Interrogatory #1, *supra*, which are incorporated by reference herein.  By way of further response, Can Man is located at 2512 Quakertown Road and benefitted from the orders pilfered from the Debtors.

9.      Identify the Can Man agents present at the meeting referenced in Paragraph 153 of the Amended Complaint and identify and all documents and witnesses supporting Your assertions.

**RESPONSE:** *See* objections and response to Best Bev LLC Interrogatory #1, *supra*, which are incorporated by reference herein.  By way of further response, the identity of the Can Man agents is unknown at this time and will be revealed through further discovery.

10.     Identify all the "pieces of large equipment [removed] from the Debtor for the benefit of the Best Bev entities," as stated in Paragraph 153 of the Amended Complaint. In particular, state with specificity Can Man's purported involvement and identify and all documents and witnesses supporting Your assertions.

126

**RESPONSE:** *See* objections and response to Best Bev LLC Interrogatory #1, *supra*, which are incorporated by reference herein.  By way of further response, Can Man is located at 2512 Quakertown Road and benefitted from the orders pilfered from the Debtors.

11.     Identify all facts, witnesses, and Documents supporting Your assertion that "all activity taking place at 2600 Milford, 2512 Quakertown Road, and 300 Commerce Drive, Quakertown, PA was for the benefit of Can Man, the other Best Bev Entities, and the other Pilfering Entities," as stated in Paragraph 118 of the Amended Complaint.

**RESPONSE:** Plaintiff objects to this contention interrogatory as a premature, improper, and unduly burdensome attempt to force Plaintiff to marshal her case on paper while discovery is ongoing.  Plaintiff further objects to this interrogatory on the grounds that discovery is incomplete and the Defendants have not yet produced a single document in response to the Plaintiff's requests for production.  By way of further response, Paragraph 118 of the Amended Complaint states that, "[u]pon information and belief, all activity taking place at 2600 Milford, 2512 Quakertown Road, and 300 Commerce Drive, Quakertown, PA ('300 Commerce') was for the benefit of Can Man, the other Best Bev Entities, and the other Pilfering Entities."  The allegation is supported by the facts set forth in response to Rittenburg Interrogatory #2, *supra*, Rittenburg Interrogatory #10, *supra*, and Best Bev Interrogatory #1, *supra*, which are incorporated by reference herein.

12.     Identify all facts, witnesses, and Documents supporting Your assertion that "Defendants caused the Best Bev Entities to, inter alia, utilize resources, property, and personnel of the Debtor

127

to generate beverage sales and beverage packaging sales for which the profits flowed not to the Debtor, but instead to the Best Bev Entities," as stated in Paragraph 33 of the Amended Complaint. In particular, state with specificity Can Man's purported involvement.

**RESPONSE:** *See* objections and response to Best Bev LLC Interrogatory #1, *supra*, which are incorporated by reference herein. By way of further response, Can Man was the vehicle through which Defendants operated their scheme until they formed Best Bev LLC in an effort to insulate themselves from liability.

13.     Identity and describe, with specificity, the market value of Debtor's assets on or about June 10, 2021.

**RESPONSE:** Plaintiff objects to this interrogatory as unduly burdensome. Plaintiff further objects to this interrogatory on the grounds that discovery is incomplete and the Defendants have not yet produced a single document in response to the Plaintiff's requests for production.

14.     Identify and describe, with specificity,

a.      The transfers and debts Defendants caused the Debtor in Possession to make; and

b.      The benefit incurred by Defendants as a result of the aforementioned transfers and debts, as identified in Paragraph 148 of the Amended Complaint.

c.      In particular, state with specificity Can Man's purported involvement and identify and all documents and witnesses supporting Your assertions.

**RESPONSE:** *See* objections and response to Best Bev LLC Interrogatory #1, *supra*, which are incorporated by reference herein.

128

15.     Identify how Can Man, LLC, operated as a unified entity with co-defendants Best Bev, LLC, EtoH Worldwide, LLC, Xo Energy Worldwide, LLLP, and XO EW, LLC as alleged in Paragraph 32 of the Amended Complaint.

**RESPONSE:** *See* objections and response to Best Bev LLC Interrogatory #1, *supra*, and Culbertson Interrogatory #5, *supra*, which are incorporated by reference herein.  See also paragraphs 28-31 of the Amended Complaint, which sets forth Can Man and Best Bev's ownership structure in detail.

16.     Identify and describe with particularity Can Man's specific involvement in the "Post-Petition Best Bev Transfers," as identified in Paragraph 150 of the Amended Complaint and identify and all documents and witnesses supporting Your assertions.

**RESPONSE:** *See* objections and response to Best Bev LLC Interrogatory #1, *supra*, which are incorporated by reference herein.  By way of further response, Can Man was the vehicle through which Defendants operated their scheme until they formed Best Bev LLC in an effort to insulate themselves from liability.

17.     Identify and describe with particularity Can Man's purported failure to cooperate with requests for information pursuant to bankr. E.D.Pa. Local Rule 2004-1 and identify and all documents and witnesses supporting Your assertions.

**RESPONSE:** *See* objections and response to Rittenburg Interrogatory #5, *supra*, which are incorporated by reference herein.

18.     Identify and describe, with specificity, the actions Can Man took to conspire with co-Defendants to this action, in order to disadvantage Debtor and identify and all documents and witnesses supporting Your assertions.

**RESPONSE:** *See* objections and response to Best Bev LLC Interrogatory #1, *supra*, which are incorporated by reference herein.  By way of further response, Can Man was the vehicle through which Defendants operated their scheme until they formed Best Bev LLC in an effort to insulate themselves from liability.

19.     Describe the specific investigation you conducted related to your allegations against Can Man in this matter and identify and all documents and witnesses used during Your investigation.

**RESPONSE:** Plaintiff objects to this contention interrogatory as a premature, improper, and unduly burdensome attempt to force Plaintiff to marshal her case on paper while discovery is ongoing.  Plaintiff further objects to this interrogatory as overbroad, unduly burdensome, and beyond the scope of permissible discovery as it is not relevant to any party's claim or defense.  Plaintiff further objects to this interrogatory to the extent that it seeks information protected by the attorney-client privilege, work product doctrine, or any applicable privilege or immunity.  Subject to and without waiver of the foregoing objections, the Trustee has produced to Defendants the over 700,000 pages of documents gathered during the course of her investigation.

### RYAN USZENSKI

1.     Please identify all person(s) answering these Interrogatories on behalf of Plaintiff by providing the following: the person's full name and address.

130

RESPONSE:   The responses to the instant interrogatories have been prepared by undersigned counsel with the input of the Trustee.

2.       Please identify each person(s) who has/have supplied information used in answering these Interrogatories and specify the Interrogatories for which each person(s) is/are responsible. For each additional person, please provide their full name and address.

RESPONSE:   The responses to the instant interrogatories have been prepared by undersigned counsel with the input of the Trustee.

 3.       Identify by name and address each person with knowledge and/or information that relates to any of the matters described in the Amended Complaint that relate to Uszenski, and briefly state the substance of their knowledge and/or information.

RESPONSE:   Pursuant to Federal Rule of Civil Procedure 33(d), information responsive to this request may be identified by examining the Trustee's Initial Disclosures, the instant interrogatory responses, and the documents which have been and will be produced in this matter, and the burden of deriving or ascertaining the answer will be substantially the same for all parties.

4.       Identify, with specificity, all damages, losses, or expenses incurred, to date, which you attribute to the specific alleged misconduct of Uszenski, if any, and all documents and witnesses supporting Your assertions.

RESPONSE:   *See* objections and responses to Best Bev Interrogatory #1 and XO Energy Interrogatory #5, *supra*, which are incorporated by reference herein.

131

5.      Please identify all expert witnesses you intend to have testify at any hearing or

proceeding in this matter. For each expert identified, describe in detail each of the following: (1)

all expert opinions that they will provide; (2) all bases, methods, and analyses utilized in

developing those opinions; (3) all Documents, Communications, and information considered in

developing those opinions; (4) all remuneration provided to the witness to serve as an expert; and

(5) the proposed witness's current curriculum vitae and all proceedings (including all case or

arbitration captions and forum information) with the last five (5) years in which the witness has

provided an expert opinion.

RESPONSE:   Plaintiff objects to this interrogatory as premature.  Plaintiff further objects to this

interrogatory to the extent that it seeks information protected by the attorney-client privilege,

work product doctrine, or any applicable privilege or immunity.  Subject to and without waiver

of the foregoing general and specific objections, Plaintiff avers that discovery in this matter is

ongoing and she has not yet made a decision as to the use of expert witnesses in this matter.

Plaintiff will produce information regarding expert witnesses in the time and manner required by

the Scheduling Order and the applicable Federal Rules of Civil Procedure, Federal Rules of

Bankruptcy Procedure, and local rules.

6.      Identify all non-expert witnesses who Plaintiff intends to call in any deposition, hearing,

or other proceeding in the Action or that may be used for impeachment purposes.

RESPONSE:   Plaintiff objects to this interrogatory as premature.  Plaintiff further objects to this

interrogatory to the extent that it seeks information protected by the attorney-client privilege,

work product doctrine, or any applicable privilege or immunity.  Subject to and without waiver

of the foregoing general and specific objections, Plaintiff avers that discovery in this matter is

ongoing and she has not yet made a decision as to the fact witnesses she intends to call at trial or

in depositions in this matter.  Plaintiff will produce information regarding testifying fact

witnesses in the time and manner required by the Scheduling Order and the applicable Federal

Rules of Civil Procedure, Federal Rules of Bankruptcy Procedure, and local rules.

 7.     Identify all facts, witnesses, and Documents relating to your decision to name Uszenski

as an individual Defendant in his personal capacity (as opposed to simply being an employee-

agent of Defendants Can Man LLC and Best Bev, LLC) in this Action.  In particular, state with

specificity Uszenski's purported actions that he allegedly took on behalf of himself or to benefit

himself.

RESPONSE:  Plaintiff further objects to this interrogatory as overbroad, unduly burdensome,

and beyond the scope of permissible discovery as it is not relevant to any party's claim or

defense.  Plaintiff further objects to this interrogatory to the extent that it seeks information

protected by the attorney-client privilege, work product doctrine, or any applicable privilege or

immunity.  Subject to and without waiving the foregoing objections, *see* objections and response

to Best Bev LLC Interrogatory #1, *supra*, and Culbertson Interrogatory #5, *supra*, which are

incorporated by reference herein.  By way of further response, as the manager and an equity

holder of Can Man and Best Bev, Defendant Uszenski was responsible for its actions and

misconduct.

133

8.      Describe, with particularity Uszenski's specific involvement, if any, in the Debtor's transfer of a Hamrick Recaser machine to 2512 Quakertown Road, as identified in Paragraph 119 of the Amended Complaint.

RESPONSE:   Plaintiff objects to this contention interrogatory as a premature, improper, and unduly burdensome attempt to force Plaintiff to marshal her case on paper while discovery is ongoing.  Plaintiff further objects to this interrogatory on the grounds that discovery is incomplete and the Defendants have not yet produced a single document in response to the Plaintiff's requests for production.  Subject to and without waiving the foregoing  objections, on March 7, 2022, Millstone Spirits Group, LLC, filed a Proof of Claim (POC No. 36-1) for "at least" $1,414,000.00, including an "estimated claim amount" of $145,000 attributable to a "Hamrick Recaser Model CHALL.  Debtor's CFO informed Millstone that this piece of equipment was scrapped in May 2021, but that no documentation evidencing the disposal was available."  The facts set forth herein and in the Amended Complaint concerning the Defendants' systemic usurpation of Debtor resources to the Pilfering Entities' facility at 2512 Quakertown Road support the conclusion that this piece of equipment, which was purportedly scrapped but which Defendants could provide no documentation establishing as such, was diverted to 2512 Quakertown Road for use by the Pilfering Entities, which include Can Man and Best Bev, of which Defendant Uszenski is Manager.

9.      Identify all facts, witnesses, and Documents supporting Your assertion that "[o]n June 14, 2021, Defendants Festa and Uszenski utilized the Debtor's computer equipment and email system to create and edit a Word document titled "Can Man Shadow Structure," which depicted a corporate structure under which Can Man would own Faber and all the Debtor's other brands

134

and operate out of a headquarters located 2512 Quakertown Road," as stated in Paragraph 124 of the Amended Complaint. In particular, state the specific actions Uszenski's purportedly took in his personal capacity and explain how they affected the Debtor.

RESPONSE:   Plaintiff objects to this contention interrogatory as a premature, improper, and unduly burdensome attempt to force Plaintiff to marshal her case on paper while discovery is ongoing.  Plaintiff further objects to this interrogatory on the grounds that discovery is incomplete and the Defendants have not yet produced a single document in response to the Plaintiff's requests for production.  Subject to and without waiving the foregoing  objections, on June 14, 2021, Defendants Festa and Uszenski utilized the Debtor's computer equipment and email system to create and edit a Word document, which has been produced to Defendants in the above-captioned litigation, titled "Can Man Shadow Structure," which depicted a corporate structure under which Can Man and Uszenski would own Faber and all the Debtor's other brands and operate out of a headquarters located 2512 Quakertown Road:

135



The document appears in Defendant Festa's "Users" folder on a Debtor hard drive, and Microsoft Word indicates that the document was last modified by Defendant Uszenski.

10.     Identify the orders that were "being delivered to the Debtor's facilities when they were actually being delivered to Best Bev at 2512 Quakertown Road," as stated in Paragraph 152 of the Amended Complaint. In particular, state with specificity Uszenski's purported involvement, if any.

RESPONSE:   *See* objections and response to Best Bev LLC Interrogatory #1, *supra*, which are incorporated by reference herein.  As the manager and an equity holder of Can Man and Best Bev, Defendant Uszenski was responsible for its actions and misconduct.

136

11.     Identify all the "pieces of large equipment [removed] from the Debtor for the benefit of the Best Bev entities," as stated in Paragraph 153 of the Amended Complaint. In particular, state with specificity Uszenski's purported involvement, if any, and identify all documents and witnesses supporting Your assertions.

RESPONSE:   *See* objections and response to Best Bev LLC Interrogatory #1, *supra*, which are incorporated by reference herein.  As the manager and an equity holder of Can Man and Best Bev, Defendant Uszenski was responsible for its actions and misconduct.

12.     Identify all facts, witnesses, and Documents supporting Your assertion that "all activity taking place at 2600 Milford, 2512 Quakertown Road, and 300 Commerce Drive, Quakertown, PA was for the benefit of Can Man, the other Best Bev Entities, and the other Pilfering Entities," as stated in Paragraph 118 of the Amended Complaint.

RESPONSE:   Plaintiff objects to this contention interrogatory as a premature, improper, and unduly burdensome attempt to force Plaintiff to marshal her case on paper while discovery is ongoing.  Plaintiff further objects to this interrogatory on the grounds that discovery is incomplete and the Defendants have not yet produced a single document in response to the Plaintiff's requests for production.  By way of further response, Paragraph 118 of the Amended Complaint states that, "[u]pon information and belief, all activity taking place at 2600 Milford, 2512 Quakertown Road, and 300 Commerce Drive, Quakertown, PA ('300 Commerce') was for the benefit of Can Man, the other Best Bev Entities, and the other Pilfering Entities."  The allegation is supported by the facts set forth in response to Rittenburg Interrogatory #2, *supra*,

137

Rittenburg Interrogatory #10, *supra*, and Best Bev Interrogatory #1, *supra*, which are

incorporated by reference herein.

13.     Identify all facts, witnesses, and Documents supporting Your assertion that "Defendants caused the Best Bev Entities to, inter alia, utilize resources, property, and personnel of the Debtor to generate beverage sales and beverage packaging sales for which the profits flowed not to the Debtor, but instead to the Best Bev Entities," as stated in Paragraph 33 of the Amended Complaint.  In particular, state with specificity Uszenski's purported involvement in his personal capacity.

RESPONSE:   *See* objections and response to Best Bev LLC Interrogatory #1, *supra*, which are

incorporated by reference herein.  As the manager and an equity holder of Can Man and Best

Bev, Defendant Uszenski was responsible for its actions and misconduct.

14.     Identify and describe, with specificity, a. The transfers and debts Defendants caused the Debtor in Possession to make; and b. The benefit incurred by Defendants as a result of the aforementioned transfers and debts, as identified in Paragraph 148 of the Amended Complaint. c. In particular, state with specificity Uszenski's involvement the purported benefits that he received in his personal capacity. Identify and all documents and witnesses supporting Your assertions.

RESPONSE:   *See* objections and response to Best Bev LLC Interrogatory #1, *supra*, which are

incorporated by reference herein.  As the manager and an equity holder of Can Man and Best

Bev, Defendant Uszenski was responsible for its actions and misconduct.

15.     Identify how Can Man, LLC, operated as a unified entity with co-defendants Best Bev, LLC, EtoH Worldwide, LLC, Xo Energy Worldwide, LLLP, and XO EW, LLC as alleged in Paragraph 32 of the Amended Complaint.

RESPONSE:   *See* objections and response to Best Bev LLC Interrogatory #1, *supra*, and

Culbertson Interrogatory #5, *supra*, which are incorporated by reference herein.

138

16.     Identify and describe with particularity Can Man's specific involvement in the "Post-Petition Best Bev Transfers," as identified in Paragraph 150 of the Amended Complaint and identify and all documents and witnesses supporting Your assertions.

RESPONSE:   *See* objections and response to Best Bev LLC Interrogatory #1, *supra*, which are incorporated by reference herein.  By way of further response, Can Man was the vehicle through which Defendants operated their scheme until they formed Best Bev LLC in an effort to insulate themselves from liability.

 17.     Identify and describe with particularity Can Man's purported failure to cooperate with requests for information pursuant to bankr. E.D.Pa. Local Rule 2004-1 and identify and all documents and witnesses supporting Your assertions.

RESPONSE:   *See* objections and response to Rittenburg Interrogatory #5, *supra*, which are incorporated by reference herein.

18.     Identify and describe, with specificity, the actions Can Man took to conspire with co-Defendants to this action, in order to disadvantage Debtor and identify and all documents and witnesses supporting Your assertions.

RESPONSE:   *See* objections and response to Best Bev LLC Interrogatory #1, *supra*, which are incorporated by reference herein.  By way of further response, Can Man was the vehicle through which Defendants operated their scheme until they formed Best Bev LLC in an effort to insulate themselves from liability.

19.     Describe the specific investigation you conducted related to your allegations against Can Man in this matter and identify and all documents and witnesses used during Your investigation.

RESPONSE:  Plaintiff objects to this contention interrogatory as a premature, improper, and unduly burdensome attempt to force Plaintiff to marshal her case on paper while discovery is ongoing.  Plaintiff further objects to this interrogatory as overbroad, unduly burdensome, and

139

beyond the scope of permissible discovery as it is not relevant to any party's claim or defense.

Plaintiff further objects to this interrogatory to the extent that it seeks information protected by

the attorney-client privilege, work product doctrine, or any applicable privilege or immunity.

Subject to and without waiver of the foregoing objections, the Trustee has produced to

Defendants the over 700,000 pages of documents gathered during the course of her investigation.

                                  */s/ Andrew Belli*
                                  Steven M. Coren, Esq.
                                  Andrew J. Belli, Esq.
                                  **COREN & RESS, P.C.**
                                  Two Commerce Square
                                  2001 Market Street, Suite 3900
                                  Philadelphia, PA 19103
                                  T: (215) 735-8700/F: (215) 735-5170
                                  scoren@kcr-law.com
                                  abelli@kcr-law.com

                                  *Attorneys for Plaintiff*

Dated:  June 27, 2025

140

## <u>VERIFICATION</u>

I, Bonnie B. Finkel, am the Chapter 7 Trustee for the bankruptcy estate of Midnight Madness Distilling LLC and the Plaintiff in the above-captioned action. I have read the foregoing Omnibus Responses to Defendants' Interrogatories – which have been assembled and prepared by my counsel – and verify the same to be true to the best of my current knowledge, information, and belief. I declare under penalty of perjury that the foregoing is true and correct to the best of my current knowledge, information, and belief.

_____
BONNIE B. FINKEL